## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CBV, INC.,

      *Plaintiff*

      *v.*                            C.A. No. _____

CHANBOND, LLC,

      *Defendant.*

## COMPLAINT

Plaintiff CBV, Inc. ("CBV" or "Plaintiff") hereby brings this civil action against Defendant ChanBond, LLC for breach of contract, specific performance, injunctive relief and declaratory relief, and in support thereof represents upon knowledge, information, and belief, as follows.

## INTRODUCTION

1.      This is an action for breach of contract, declaratory judgment, injunctive relief, and seeking specific and prompt performance of payments due and owing to CBV pursuant to the April 9, 2015 Patent Purchase Agreement ("PPA" by and between CBV and ChanBond LLC, which has been stymied by the actions of both the former and current owners of ChanBond.

2.      Under the PPA, CBV transferred its Patents to ChanBond in exchange for an entitlement to a $1,000,000 threshold payment and fifty percent (50%) of the Net Recoveries derived from any monetization of the Patents. These payments are to be made to CBV "within thirty (30) calendar days after each applicable calendar quarter, commencing with the first calendar quarter following the Closing Date until the expiration of the Patent."

3.      In furtherance of monetizing the Patents, ChanBond brought numerous patent suits in this District (collectively, the "Patent Suits").

4.      In June of 2021, ChanBond settled the Patent Suits for the amount of $125,000,000.

1

5.     Accordingly, under Section 3.3.2 of the PPA, CBV is entitled to payment of *at least* $30,506,583.  ChanBond is required by the PPA to make this payment by October 31, 2021. ChanBond has indicated that no payment will be made by this required date.

6.     However, ChanBond has breached the PPA by refusing to pay CBV its share of the Net Recoveries as required under the PPA.  CBV is entitled to specific performance of the PPA because ChanBond's refusal to pay CBV the amounts it is owed under that agreement will cause CBV to suffer significant, negative tax implications if payment is not made by the end of calendar year 2021.

7.     Apart from breaching the PPA by failing to pay CBV significant amounts to which it is entitled, ChanBond and its former and current owners, Dierdre Leane and William "Billy" Carter, breached the PPA by entering into various ancillary agreements which they were without authority to make under the express terms of the PPA.  Unified also tortuously interfered with CBV's rights under the PPA by entering into certain of these ancillary agreements and by adjusting, without the notice or consent of CBV and without authority under the PPA, adjusting various non-parties "takes" of the recoveries from monetization of the patents.

8.     Ms. Leane has improperly asserted that, at the time of entry into the PPA, CBV agreed to an Advisory Services Agreement.  This is plainly false.  First, Ms. Leane's predecessor, Mr. Spangenberg, specifically structured the PPA as a sale of the Patents, rather than a consultancy arrangement, because he found that working with multiple owners made settlement negotiations in patent litigation very difficult, if not impossible.  Second, the PPA expressly disclaims and supersedes any prior and contemporaneous agreements, including the purported ASA.  Rather, Ms. Leane, recognizing the value in the Patents, is trying the squeeze as much value out of them as she can by resorting to breaches of the agreement and fraudulent conduct.  In fact, she unilaterally signed the ASA between ChanBond and IPNav *for both parties* in late July of 2015, 3-months

2

after the PPA, and *backdated* the document to give the appearance that it was signed contemporaneously.  Not only this, but the ASA would clearly qualify as an Affiliate transaction under Section 2.8 of the APA requiring CBV's consent.  No such consent was given here.  In fact, CBV was not informed of this conduct and had no knowledge of this fraudulent and invalid ASA until *2020*.

9.      Further, ChanBond and Ms. Leane entered into an October 27, 2015 Interest Sale Agreement by which all of ChanBond's membership interests were sold to UnifiedOnline and Billy Carter.  ChanBond and Ms. Leane provided no prior notice of the ISA to CBV as required by Section 8.3 of the PPA.

10.     Through various lawsuits and arbitrations between Ms. Leane and Mr. Carter, among others, CBV has become aware that Mr. Carter is also asserting the existence of other agreements which would dilute CBV's share of the Net Recoveries under the PPA and which are invalid as without authority under the PPA, because CBV's consent was neither sought, nor given, as required by the PPA.  Specifically, Mr. Carter has asserted another agreement between Unified and Mr. Carter under which Mr. Carter receives another 20% of the gross revenue from recovery from the Patent Suits as well as agreements by which he purportedly increased King & Wood Mallesons LLP[1] take of the Patent Suit Net Recoveries from 15 to 28%, and also doubled the return for Betham.[2]

11.     Each of these purported agreements are without authority, because they were entered into without the consent of CBV as required by Section 2.8 of the PPA, and are, therefore, invalid.

---

[1] The Patent Suit attorneys.
[2] The litigation financier.

12.     Further, Mr. Carter has billed Unified $5,000 per month for consulting services. These amounts are also improper because they are being billed without the consent of CBV are required under Section 2.8 of the PPA.

13.     Upon information and belief, the result of entering into these purported agreements without CBV's authority is to improperly siphon from CBV's settlement take to pay King & Wood Mallesons LLP, Bentham, and Mr. Carter amounts that they are not owed.

14.     As a result of the above actions, as explained in greater detail below, CBV respectfully requests judgment in its favor that ChanBond breached the PPA and requiring ChanBond to specifically perform the PPA by making prompt payment of the amounts due and owing the CBV.  In the alternative, CBV requests compensatory damages in an amount to be determined at trial.  CBV also respectfully requests that this Court issue declaratory relief in the form of a declaration that the ASA and ISA are invalid as without authority under the PPA.

## JURISDICTION

15.     This Court has personal jurisdiction over Defendant ChanBond LLC because it is a limited liability company organized under the laws of the state of Delaware.

16.     This Court has diversity jurisdiction over this civil matter under 28 U.S.C. § 1332(a)(1) because there is, upon information and belief, complete diversity among the parties and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

17.     Venue is proper in this Court pursuant to the governing law and forum-selection clause in Section 8.5 of the PPA (defined below) under which they agreed to the exclusive jurisdiction of the state and federal courts situated in Wilmington, State of Delaware, USA.

## THE PARTIES

18.     Plaintiff CBV, Inc. is a Pennsylvania corporation with its principal place of business at 848B North Hanover Street, Carlisle, Pennsylvania 17013.

19.     Defendant ChanBond, LLC ("ChanBond") is a Delaware limited liability company with its principal place of business at 2633 McKinney Ave., Dallas, Texas 75204.  ChanBond was formed by Deirdre Leane on about August 15, 2014.  Its registered agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808.  Its Manager is William "Billy" Carter, an individual resident of North Carolina.

## RELEVANT NON-PARTIES

20.     IP Navigation Group, LLC ("IP Navigation") was a Texas limited liability company with a principal place of business located in Dallas, Texas.  Upon information and belief IP Navigation was founded by Erich Spangenberg in 2003.  IP Navigation was in the business of providing patent monetization consulting services to patent owner clients in exchange for an interest on the recovery generated by the client's patents, a process that often involves patent litigation.  Upon information and believe, IP Navigation Group, LLC was voluntarily dissolved after Dierdre Leane took over the business through the newly incorporated entity, IPNav, LLC.

21.     IPNav, LLC ("IPNav") is a Texas limited liability company with a principal place of business located at 6422 Bryan Parkway, Dallas, TX 75214. Dierdre Leane incorporated IPNav, in order to take over IP Navigation's business upon the retirement of Erich Spangenberg. Upon information and belief, Ms. Leane is the sole member of IPNav.

22.     Upon information and belief, Dierdre Leane is an adult individual, foreign national, and lawful permanent resident of Texas, residing at 6422 Bryan Parkway, Dallas, TX 75214. Ms. Leane formed Defendant ChanBond, a Delaware limited liability company, on about August 15, 2014 while she was employed at IP Navigation Group, LLC, which was in the business of providing patent monetization consulting services to patent owner clients in exchange for an interest on the recovery generated by the client's patents. Ms. Leane also incorporated IPNav, LLC as a new entity through which to engage in this consulting business.

23.     UnifiedOnline, Inc. ("Unified") is a Delaware corporation with a principal place of business located at 4126 Leonard Drive, Fairfax, Virginia 22030. Upon information and belief, William "Billy" Carter, ChanBond's Manager, is Unified's Chief Executive Officer.  On October 27, 2015, Ms. Leane and Unified entered into an Interest Sale Agreement, by which Leane sold her membership interest in ChanBond to Unified.

24.     William "Billy" Carter is an adult individual resident of North Carolina.  Upon information and belief, William "Billy" Carter, ChanBond's Manager as well as UnifiedOnline, Inc.'s Chief Executive Officer.

**FACTUAL BACKGROUND**

**I.      The Parties and the Patents**

25.     CBV is a Pennsylvania corporation with its principal place of business at 848B North Hanover Street, Carlisle, Pennsylvania 17013. Before April of 2015, CBV was the owner of the following U.S. Patents and U.S. Patent Applications (the "Patents") which its owners had

invented and which covered DOCSIS technology for delivering high-speed data over cable systems:

| | |
|---|---|
| US Patent No. 7346918 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 7941822 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8341679 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8984565 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 13/402,813 August 23, 2012* | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 13/799,749 October 10, 2013* | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 14/167,289 Filed January 29, 2014 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application - 10/346,571 (Abandoned – CIP of 09/824,531) | |
| US Application - 09/824,531 (Abandoned – CIP of 7346918) | |
| PCT/US2001/049629 (Expired – no national phase) | |
| PCT/US2002/009863 (Expired – no national phase) | |

*Publication Date

26.    Defendant ChanBond is a Delaware limited liability company formed by Deirdre Leane on about August 15, 2014, while she was employed at IP Navigation, which was in the business of providing patent monetization consulting services to patent owner clients in exchange for an interest on the recovery generated by the client's patents, a process that often involves patent litigation.

27.     On or about October 31, 2014, IP Navigation's principal, Erich Spangenberg, decided to retire and turn over his business to Ms. Leane.  Ms. Leane incorporated IPNav as a new entity through which to engage in this consulting business.

## II.     The Patent Purchase Agreement

28.     In 2013, CBV contacted IP Navigation about potentially monetizing the Patents. After the initial contact, CBV negotiated a relationship regarding monetization of the Patents with IP Navigation's founder, Erich Spangenberg.

29.     IP Navigation's literature on its website noted that some cases would be taken on a consultancy basis, if not on an ownership basis.  In negotiations, CBV and IP Navigation discussed various relationship structures, however Mr. Spangenberg made it clear that he was only interested in a deal with CBV in which he owned the Patents because he found that working with multiple owners made settlement negotiations in patent litigation very difficult, if not impossible.

30.     Because of the above concern, Mr. Spangenberg proposed an agreement in which (i) CBV provides the Patents, (ii) IP Navigation, or a shell company, provides the financing, (iii) legal costs are divided between the parties, (iv) both parties share the remaining revenue, and (v) any up-front money is paid back double to IP Navigation or the shell company. This outline formed the basis for the agreement that was actually agreed upon.

31.     Ultimately CBV and IP Navigation agreed that CBV would sell its Patents to IP Navigation in exchange for a 50% interest of the net recoveries of any monetization.

32.     However, upon information and belief, Billy Carter of IP Navigation had problems coming up with the financial backing necessary to effectuate the agreement.  Because of this, ChanBond was substituted in as Purchaser.

33.     In the fall of 2014, Spangenberg informed CBV that he was retiring and turning his patent monetization business over to Deirdre Leane.  Ms. Leane, through her entity ChanBond,

would be party to the agreement with CBV. The agreement was essentially the same, but did not include any upfront money from ChanBond because of the passing of the new American Invention Act.

34.    Because of the problems with Mr. Carter in obtaining financing, CBV informed Ms. Leane that it was not interested and started in working with Tom McWilliams and an ex-partner of Kirkland & Ellis.

35.    Ultimately, CBV was informed that Ms. Leane could make the deal happen and that the resulting patent lawsuits would be filed within a month.

36.    With extreme pressure from the other two partners, CBV signed an agreement with ChanBond on April 9, 2015. By the Patent Purchase Agreement dated April 9, 2015 (the "PPA"), CBV, as Seller, and ChanBond, as Purchaser, agreed that ChanBond would purchase the Patents from CBV in order to monetize those Patents through patent litigation. In exchange, CBV retained a right to 50% of the net recovery in litigation involving the Patents. A true and correct copy of the PPA is attached hereto as Exhibit A.

37.    Upon information and belief, in or about August of 2015, ChanBond retained Bentham as its litigation financier. Despite requests for information regarding the financing agreement between ChanBond and Bentham, CBV has been provided no information on this topic.

38.    In August of 2015, ChanBond, through its then Manager Ms. Leane induced CBV and Chanbond to execute an Amendment to the PPA (the "PPA Amendment") which revoked CBV's ability to have the Patents returned to them, as the original PPA provided. A true and correct copy of the fraudulent PPA Amendment is attached hereto as Exhibit B.

**III.    The Patent Suits**

39.    After signing the PPA, various patent infringement suits were filed on September 21, 2015 in the United States District Court for the District of Delaware.

9

40.     The defendants to the patent infringement suits filed a total of 14 *inter partes review* ("IPR") petitions to challenge the validity of the 3 asserted ChanBond patents. ChanBond completely defeated 13 of these IPR requests, and the remaining IPR resulted in the invalidation of only some claims (the broadest claims) of one of the 3 asserted Patents.

41.     ChanBond's claims have also survived two motions for summary judgment.

42.     Currently, there are 13 patent infringement suits by ChanBond pending in the District of Delaware against 13 separate defendants (the "Patent Suits"):

- *ChanBond, LLC v. WideOpen West Finance, LLC*, No. 1:15-cv-00854 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. WaveDivision Holdings, LLC*, No. 1:15-cv-00853 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Time Warner Cable Inc. et al*, No. 1:15-cv-00852 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. RCN Telecom Services, LLC*, No. 1:15-cv-00851 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Mediacom Communications Corporation*, No. 1:15-cv-00850 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Cox Communications, Inc. et al.*, No. 1:15-cv-00849 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Comcast Corporation et al.*, No. 1:15-cv-00848 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Charter Communications, Inc.*, No. 1:15-cv-00847 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Cequel Communications, LLC et al.*, No. 1:15-cv-00846 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Cablevision Systems Corporation et al.*, No. 1:15-cv-00845 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Cable One Inc.*, No. 1:15-cv-00844 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v Bright House Networks, LLC*, No. 1:15-cv-00843 (D. Del. Sep 21, 2015)

- *ChanBond, LLC v. Atlantic Broadband Group, LLC, et al.*, No. 1:15-cv-00842 (D. Del. Sep 21, 2015)

43.    By Stipulation and Order dated March 6, 2017, the above Patent Suits were consolidated.

44.    On May 25, 2021, a jury trial was held before Judge Richard G. Andrews on the above Patent Suits.

45.    On July 12, 2021, Judge Andrews entered a Joint Stipulation and Order for dismissal of the Patent Suits with prejudice as a result of the parties agreement to "settle, adjust and compromise all claims" in the Patent Suits.

## IV.    The Invalid Advisory Services Agreement

46.    As noted above in Section II, *supra*, in the preliminary negotiations regarding monetization of the Patents, various structures were discussed, but, ultimately, Mr. Spangenberg required ownership of the Patents. CBV and IP Navigation never agreed on any consultancy-type relationship with IP Navigation.

47.    Nevertheless, upon information and belief, in July 2015, Ms. Leane asked IP Navigation's in-house counsel to review a draft advisory services agreement (the "ASA"), backdated to reflect that it had been in effect since April of 2015 contemporaneous with the PPA (despite that it was *not*).  Upon information and belief, on or about July 31, 2015, Ms. Leane improperly executed the ASA on behalf of both ChanBond and IPNav, and dated it as of April 9, 2015. Pursuant to the invalid, unilaterally entered ASA, IPNav was entitled to 22% of any Gross Recovery obtained by ChanBond on the Patents, despite that the parties to the PPA *never* agreed to such an arrangement. A true and correct copy of the purported ASA is attached hereto as Exhibit C.

48.     CBV was never informed of the ASA.  Rather, CBV learned of the invalid, unilateral ASA through an arbitration filed by Ms. Leane against Unified and ChanBond in 2020, AAA Case No. 01-20-0015-0793.

49.     Upon information and belief, upon engaging Bentham, Ms. Leane learned that the true value of the Patents was much higher than she had thought.  In order to get more money for herself out of the Patents, she unilaterally, fraudulently, and in breach of the PPA, fashioned the ASA in order to get more than her contracted-for share out of the monetization of the Patents.

## V.     Leane, on behalf of ChanBond, Breaches the PPA by Selling a Membership Interest in ChanBond to UnifiedOnline, Inc.

50.     On October 27, 2015, Leane, ChanBond, and Unified entered into an Interest Sale Agreement ("ISA"), by which Leane sold her membership interest in ChanBond to Unified. A true and correct copy of the ISA is attached hereto as Exhibit D.

51.     The ISA called for Unified to pay Ms. Leane for the ChanBond membership interests by: (1) issuing her 44,700,000 shares in Unified, representing a roughly 4.5% interest in Unified; and (2) $5,000,000.00 on or before October 27, 2020, pursuant to the terms of a promissory note executed together with the ISA.  The ISA also identifies and adopts the improper ASA.

52.     Upon information and belief, upon sale of ChanBond's membership interest to Unified, Ms. Leane made Mr. Carter ChanBond's sole manager.  Mr. Carter also has a controlling interest in, and is CEO of, Unified.

53.     Section 8.3 of the PPA provides, in full:

Assignment.  *This Agreement may not be assigned by Seller without the prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder upon the provision of written notice to Seller. A* "change of control" transaction of Seller shall be deemed an assignment and therefore subject to Purchaser's consent as aforesaid. Under no circumstances will any assignment be permitted to an entity acquiring Seller through insolvency, bankruptcy, assignment

for the benefit of one or more creditors (through foreclosure or any other means) or any similar proceeding, any or all of which shall require the consent of Purchaser.

Ex. A at Sec. 8.3 (emphasis added).

54.    Under Section 8.3 of the PPA, CBV must be informed in writing of any assignment of Chanbond's rights and obligations under the PPA.

55.    Upon information and belief, pursuant to the ISA, ChanBond sold to Unified all of its membership interests.  Such a sale necessarily implicated ChanBond's rights and obligations under the PPA.

56.    However, CBV was never informed of the ISA at all, let alone in writing.  CBV has requested documentation regarding the ISA, but has been refused and stonewalled by ChanBond. Rather, CBV learned of the ISA through Ms. Leane's 2020 arbitration demand against Unified and ChanBond.  As such, the ISA and resulting assignment of ChanBond to Unified is a breach of the PPA and is invalid.

57.    In addition, in negotiation of the ISA, Mr. Carter was represented by Mark Raskin of the law firm King & Wood Mallesons LLP and ChanBond was represented by Robert Whitman of King & Wood Mallesons LLP.  This is a clear conflict of interest.

58.    After learning of the ISA, CBV had legitimate concerns regarding its validity As such, CBV requested a copy of the ISA to review. However, ChanBond and Ms. Leane's attorneys refused CBV's request, asserting that CBV had no right to review the contract.

## VI.    The Lawsuits Settle and CBV Is Entitled to *at Least* $30,506,583, But ChanBond Refuses to Pay

59.    Settlement discussions in the Patent Suits were sporadic over the course of the litigations, and the parties were an order of magnitude apart.

60.    For the first time, by her attorney's demand letter dated August 29, 2020, Ms. Leane asserted that the anti-assignment provision in the ISA gave her a right to approve (or hold hostage)

ChanBond's settlements. However, ChanBond has never suggested that it would assign the Patents to settle these cases, with or without Ms. Leane's approval.

61.    Despite this, as noted in Section III, *supra*, on July 12, 2021, Judge Andrews entered a Joint Stipulation and Order for dismissal of the Patent Suits with prejudice as a result of the parties agreement to "settle, adjust and compromise all claims" in the Patent Suits.

62.    Upon information and belief, the settlement of the various Patent Suits was pursuant to a settlement agreement entered into in late June or early July of 2021 (the "Settlement Agreement").

63.    Upon information and belief, pursuant to the Settlement Agreement, the Patent Suits settled for $125,000,000. However, CBV has been stonewalled by ChanBond as to specific information regarding the Settlement Agreement. Despite requests from CBV, ChanBond has refused to provide a copy of the Settlement Agreement, an accounting of the settlement funds, or any other specific information allowing CBV to determine the proper amount it should receive. This is contrary to, and in breach of, contractual language in the PPA *requiring* ChanBond to provide CBV with such information. Specifically, Section 3.5 of the PPA reads, in full:

> Reports. Simultaneous with any wire transfer pursuant to Section 3.4, Purchaser will include a report detailing the payment amount and will provide such supporting documentation as may reasonably be requested by Seller (subject to appropriate and customary confidentiality obligations as may be required in order to disclose such documentation to Seller).

Ex. A. at Sec. 3.5. Despite that ChanBond has made payment of $10 million to CBV, only a fraction of the amounts due pursuant to the PPA, ChanBond has refused to provide CBV with a copy of the Settlement Agreement, an accounting of disbursements, or any other information permitting CBV to determine the exact amount it is due and owed under the PPA.

64. Under Section 3.3.2 of the PPA, CBV is entitled to a portion of any recoveries from the Patent Suits. Section 3.3.2 of the PPA reads, in full:

> Possible Future Cash Payment. Following the Closing Date, Purchaser shall pay to Seller one hundred percent (100%) of the Net Recoveries received, up to a cumulative amount of One Million US Dollars ($1,000,000) (the *"Recoveries Threshold"* and the payments making up the Recoveries Threshold, the *"Threshold Payments")*. Thereafter, Purchaser will pay to Seller a portion (each a *"Recoveries Payment"* and together with the Threshold Payments, the *"Payments")* of the Net Recoveries received by Purchaser in consideration for the licensing, enforcement and/or sale by Purchaser of the Patents, calculated as follows: fifty percent (50%) of all Net Recoveries actually received and collected by Purchaser. For the avoidance of doubt, it is hereby clarified that, if a licensee paid in a consideration in a form other than Cash, there would be no payment made under this Section 3.3.2 for the non-Cash portion at the time of the non-Cash payment. However, when such non-Cash payments are converted to Cash by way of licensing, enforcement and or sale, Purchaser will pay a Recoveries Payment (as defined above) to Seller in consideration for the licensing, enforcement and/or sale by Purchaser of the non-Cash portion. By way of example, if a licensee took a license to the Patents and no other patents or patent applications owned by Purchaser with payment being made in Cash, there would be a payment made under this Section 3.3.2 as follows:
>
> R x fifty percent (50%), where R = Net Recoveries
>
> Payments payable under this Section 3.3.2 shall be paid within thirty (30) calendar days after each applicable calendar quarter, commencing with the first calendar quarter following the Closing Date until the expiration of the Patent.
>
> Seller acknowledges that (i) the obligations of Purchaser under this Agreement are contractual only and do not create any fiduciary or other relationship between them; (ii) any Gross Recoveries may be subject to and may be dependent on the provision of licenses, releases and covenants not to sue with respect to the Patents, and enforcement action, all as solely determined by Purchaser; (iii) in the event of a sale of a Patent by Purchaser to a third party (a *"Sale Transaction"* and an *"Acquirer,"* respectively), no further Payments with respect to such Patent would be due or owing to Seller from either Purchaser or such Acquirer, provided that Seller receives the Payment to which it is entitled in connection with such Sale Transaction; and (iv) Purchaser has not represented that it will be successful in its efforts to monetize the Patents and, accordingly, makes no representation as to the value, if any, of the possible Gross Recoveries or Net Recoveries under this Section 3.3.2.

Ex. A at Sec. 3.3.2.

65.     Under Section 3.3.2 of the PPA, CBV is entitled to 100% of Net Recoveries (as defined in the PPA) from the Patent Suits up to one million dollars ($1,000,000).  After the one million dollar threshold, CBV is entitled to fifty percent (50%) of all Net Recoveries actually received and collected by Purchaser. Payment of these amounts are to be made to CBV "within thirty (30) calendar days after each applicable calendar quarter, commencing with the first calendar quarter following the Closing Date until the expiration of the Patent." Ex. A at Sec. 3.3.2.

66.     Section 4.1 of the PPA Amendment requires an allocation report enumerating the planned distribution to the Parties prior to distribution of the settlement amounts. No such allocation report has been provided. That Section provides, in relevant part:

> Law Firm will provide an allocation report enumerating the planned distribution to the Parties ("Allocation Report"). If Law Firm receives no objection from a Party to Law Firm's report within 72 hours of providing the Allocation Report, Law Firm will distribute Gross Recoveries to the Parties as described in the Allocation Report. Any Party's objection to the Allocation Report must explain the basis for the objection as well as identifying the specific amount the objecting Party believes has been improperly allocated (the "Amount in Dispute"). Law Firm will distribute any amount not in dispute and continue to hold the Amount in Dispute on account until the dispute has been resolved in accordance with the dispute resolution provisions contained in the relevant agreement (i.e., the Engagement Agreement or the PPA).

Ex. B at Sec. 4.1.

67.     No such Allocation Report has been provided to CBV.

68.     Upon information and belief, under the framework for payment laid out in Section 3.3.2 of the PPA, because the Patent Suits were settled for $125,000,000, taking into account payments to the various parties (the litigation financier, law firm, etc.), CBV is entitled to payment in the amount of at least $30,506,583 inclusive of the $1,000,000 threshold amount. CBV was notified of this amount by King & Wood Malleson LLP in a July 14, 2021 email from Mark Raskin, a true and correct copy of which is attached hereto as Exhibit E. *See* Ex. E. However, upon information and belief, CBV is entitled to a much greater amount. For example, King & Wood

Malleson LLP is only entitled to between 15% and 23% of gross recoveries, rather than between 15% and 28%, and Bentham is only entitled to 22.5% of the gross recoveries, rather than 25% minus principal (or five (5) times the amount paid out) as claimed by ChanBond.

69.     As of the date of filing, CBV has only received $10 million, inclusive of the $1 million threshold amount— a small portion of the amounts it is due under the PPA.  Therefore, ChanBond is still required to pay CBV at least $20,506,583.

70.     As a result of Defendant's refusal to pay Plaintiff the funds it is owed under the PPA, Plaintiff will suffered certain negative tax implications. Specifically, Congress has passed (at least one house) an increase in the capital gains tax effective Sept 13, 2021. The new capital gains tax percentage will be 25% versus the old number of 20%.

**VII.    Deirdre initiates false and misleading legal actions.**

71.     In or about 2020, Ms. Leane filed numerous lawsuits and arbitrations against Unified, ChanBond, Mr. Carter and the partners of King & Wood Malleson LLP, among others.[3]

72.     Among other things, Ms. Leane has alleged in her suits that CBV and ChanBond signed an agreement for consulting services at a price of 22% of the gross revenue.  Further, Ms. Leane alleges that she informed KWM and Billy Carter that CBV signed the ASA at the time of execution of the original PPA.  She has claimed to have a copy of the ASA signed by CBV on April 9, 2015, but has failed to provide documentation of this upon requests and CBV has serious doubts of the authenticity of any such document.

---

[3] *Dierdre Leane and IPNav, LLC v. UnifiedOnline, Inc. and ChanBond, LLC*, AAA Case No. 01-20-0015-0793; *Dierdre Leane and IPNav, LLC v. Mishcon De Reya LLP, Mishcon De Reya New York LLP, King & Wood Mallesons LLP, Robert Whitman, and Mark Raskin*, C.A. No 1:20-cv-08127-PGG (N.Y. Sup. Ct. September 29, 2020)

73.     None of these assertions are true.  As explained above in Section II, *supra*, CBV never agreed to any consultancy fee at the time of entry into the PPA.  Rather, Ms. Leane, unilaterally executed the ASA for both parties to that transaction without any knowledge, input, or agreement by CBV.  In fact, Ms. Leane was not involved in the initial negotiations between CBV and IP Navigation, outside of the very first meeting between the parties.

74.     At no time was any consulting agreement discussed nor included or attached to the PPA nor the PPA Amendment. Further, the PPA includes an integration clause in Section 8.10 which reads, in full:

> <u>Miscellaneous</u>. *This Agreement, including its exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions including, for the avoidance of doubt, the Previous PPAs.* Neither of the Parties will be bound by any conditions, definitions, warranties, obligations (including obligations to prosecute any of the Patents), understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. *No oral explanation or oral information by either Party hereto will alter the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in writing and signed by authorized representatives of both Parties.* The Exhibits referenced herein and attached hereto are incorporated into this Agreement as though fully set forth herein.

Ex. A at Sec. 8.10 (emphasis added).

75.     Section 8.10 of the PPA itself belies Ms. Leane's claim that the ASA was contemplated as part of the PPA transaction.  It was not.  The PPA expressly disclaims and supersedes any prior and contemporaneous agreements. And, therefore, the ASA is void.

76.     Further, Section 2.8 of the PPA requires that ChanBond receive "the prior approval of [CBV]" for any cost or expense which is paid to an Affiliate of [ChanBond]." That Section reads, in full:

"Net Recoveries" shall mean the total aggregate Gross Recoveries less the total aggregate amount of costs and expenses incurred by or on behalf of Purchaser in connection with the monetization, enforcement and/or sale of the Assigned Patent Rights which are exclusively limited to: (a) the reasonable fees and expenses of litigation counsel; (b) the reasonable fees and expenses of licensing counsel (c) the reasonable fees and expenses of any re-examination or other patent prosecution counsel; (d) reasonable expert fees, court costs, deposition costs and other reasonable costs and expenses related to the maintenance, prosecution, enforcement, and licensing of the Patents; and (e) the reasonable fees and expenses of any other advisors or agents Notwithstanding the above, *any cost or expense which is paid to an Affiliate of Purchaser or to a stakeholder of Purchaser shall require the prior approval of Seller, such approval to not be unreasonably withheld.*

Ex. A at Sec. 2.8 (emphasis added).

77.     The PPA further defines "Affiliate" to mean, "with respect to any Person, any Entity in any country that controls, is controlled by or is under common control with such Person. The term "control" means possession directly or indirectly of the power to direct or cause the direction of the management and policies of an Entity, whether through the ownership of voting securities, by trust, management agreement, contract or otherwise; provided, however, that beneficial ownership of more than fifty percent (50%) of the voting equity interests of an Entity shall be deemed to be control."

78.     Because Ms. Leane stood on both sides of the ASA transaction and executed the ASA between ChanBond and Unified for both parties, the ASA was clearly an affiliate transaction requiring the prior approval of CBV. No such approval was ever given. Ms. Leane fraudulently drafted, backdated, and executed the ASA without ever discussing the contract with CBV. Rather, CBV only learned of the ASA's existence through Ms. Leane's various lawsuits. As such, the ASA is improper and is void as without authority.

## COUNT I
(Specific Performance)

79.    Plaintiff incorporates the averments contained in the preceding paragraphs, with the same force and effect as if fully set forth herein.

80.    On or about April 9, 2015, CBV and ChanBond entered into the PPA, as amended on August 27, 2015, which is a valid and binding agreement between the parties.

81.    Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

82.    In or about late June or early July of 2021, the Patent Suits were settled pursuant to the Settlement Agreement.

83.    Upon information and belief, the Patent Suits settled for $125,000,000.

84.    Section 3.3.2 of the PPA entitles Plaintiff to a one million dollar threshold payment plus 50% of Net Recoveries from the Patent Suits, paid within thirty (30) calendar days after each applicable calendar quarter, commencing with the first calendar quarter following the Closing Date until the expiration of the Patent.

85.    Therefore, under Section 3.3.2 of the PPA, taking into account payments to the various parties (i.e. the litigation financier and law firm), Plaintiff is entitled to *at least* $30,506,583. CBV reasonably believes that it is entitled to greater than this amount. However, it has been stonewalled by ChanBond at every turn regarding any information about the settlement, funds disbursements, etc. ChanBond has refused to provide CBV with a copy of the Settlement Agreement, an accounting of funds disbursements, or any other information regarding the

settlement funds, despite requests from CBV and despite a contractual obligation to provide this information under Section 3.5 of the PPA.

86.    Despite Plaintiff's entitlement to these funds, Defendant refuses to pay Plaintiff its full share of the net recovery from the Patent Suits as required by Section 3.3.2 of the PPA, only releasing $10 million to CBV.

87.    Further as a result of Defendant's refusal to pay Plaintiff the funds it is owed under the PPA, Plaintiff will suffer certain negative tax implications. Specifically, if payment is not made by the end of calendar year 2021, CBV will potentially be subject to an increased capital gains tax (i.e. 25% rather than 20%).

88.    CBV is entitled to an order specifically enforcing the provisions of PPA and requiring Defendant ChanBond to immediately distribute to CBV its portion of the net recoveries from the Patent Suits.

89.    Plaintiff lacks an adequate remedy at law.  Money damages would be insufficient to cure Defendant's breaches of the PPA. Specifically, money damages are insufficient because ChanBond refuses to provide CBV with documentation of the Settlement Agreement, disbursement amounts, or any other information allowing CBV to confirm the exact amount that it is due and owed under the PPA..

90.    The equities weigh in favor of ordering specific performance, including performance of Defendant's obligations to distribute 50% of the net recoveries from the Patent Suits pursuant to Section 3.3.2 of the PPA.

### COUNT II
(Breach of Contract – Section 3.3.2 – *in the alternative*)

91.    Plaintiff incorporates the averments contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

92.     On or about April 9, 2015, CBV and ChanBond entered into the PPA, which is a valid and binding agreement between the parties.

93.     Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

94.     Section 3.3.2 of the PPA entitles Plaintiff to a one million dollar threshold payment plus 50% of Net Recoveries from the Patent Suits.

95.     In or about late June or early July of 2021, the Patent Suits were settled pursuant to the Settlement Agreement.

96.     Upon information and belief, the Patent Suits settled for $125,000,000.

97.     Upon information and belief, under Section 3.3.2 of the PPA, taking into account payments to the various parties (i.e. the litigation financier and law firm), Plaintiff is entitled to *at least* $30,506,583.   CBV believes it is entitled to a greater amount, but its requests for the Settlement Agreement and related information has been repeatedly refused by ChanBond.

98.     Despite Plaintiff's entitlement to these funds, Defendant refuses to pay Plaintiff its full share of the net recovery from the Patent Suits as required by Section 3.3.2 of the PPA, having released only $10 million without any accounting or other documentation.

99.     Defendant has breached the PPA by refusing to pay Plaintiff its share of the net recovery from the Patent Suits as required by Section 3.3.2 of the PPA.

100.    Defendant's breaches of the PPA has harmed Plaintiff in an amount to be determined at trial, but believed to be at least $20,506,583, plus interest.

101.    Further Defendant's breach of the PPA by refusing to pay Plaintiff the funds it is owed under the PPA will cause Plaintiff to suffer certain negative tax implications. Specifically, if payment is not made by the end of calendar year 2021, CBV will be subject to an increased capital gains tax (i.e. 25% rather than 20%).

## COUNT III
### (Breach of Contract – Section 8.3)

102.    Plaintiff incorporates the averments contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

103.    On or about April 9, 2015, CBV and ChanBond entered into the PPA, as amended on August 27, 2015, which is a valid and binding agreement between the parties.

104.    Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

105.    Section 8.3 of the PPA provides, in full:

Assignment.  *This Agreement may not be assigned by Seller without the prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder upon the provision of written notice to Seller.* A "change of control" transaction of Seller shall be deemed an assignment and therefore subject to Purchaser's consent as aforesaid. Under no circumstances will any assignment be permitted to an entity acquiring Seller through insolvency, bankruptcy, assignment for the benefit of one or more creditors (through foreclosure or any other means) or any similar proceeding, any or all of which shall require the consent of Purchaser.

Ex. A at Sec. 8.3 (emphasis added).

106.     Under Section 8.3 of the PPA, CBV must be informed in writing of any assignment of ChanBond's rights and/or obligations under the PPA.

107.    The ISA's sale of all of ChanBond's membership interests to Unified necessarily implicated ChanBond's rights and obligations under the PPA.

108.    However, CBV was never informed of the ISA at all, let alone in writing.  Rather, CBV learned of the ISA through Ms. Leane's 2020 arbitration filing.

109.    Therefore, Defendant ChanBond, through Ms. Leane, has breached Section 8.3 of the PPA by selling its membership interests and assigning its rights and obligations under the PPA to Unified without first providing written notice to CBV.

110.   Defendant's breaches of the PPA has harmed Plaintiff in an amount to be determined at trial.

## COUNT IV
(Declaratory Judgment - ISA)

111.   Plaintiff incorporates the averments contained in the preceding paragraphs, with the same force and effect as if fully set forth herein.

112.   On or about April 9, 2015, CBV and ChanBond entered into the PPA, as amended on August 27, 2015, which is a valid and binding agreement between the parties.

113.   Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

114.   Section 8.3 of the PPA provides, in full:

Assignment.  *This Agreement may not be assigned by Seller without the prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder upon the provision of written notice to Seller.* A "change of control" transaction of Seller shall be deemed an assignment and therefore subject to Purchaser's consent as aforesaid. Under no circumstances will any assignment be permitted to an entity acquiring Seller through insolvency, bankruptcy, assignment for the benefit of one or more creditors (through foreclosure or any other means) or any similar proceeding, any or all of which shall require the consent of Purchaser.

Ex. A at Sec. 8.3 (emphasis added).

115.   On or about October 27, 2015, Ms. Leane and ChanBond sold all membership interest in ChanBond to Unified.  Such a sale necessarily implicated ChanBond's rights and obligations under the PPA.

116.   Defendants failed to provide any written notice to Plaintiff regarding the transfer to Unified.

117.   Defendant's failure to provide written notice of the transfer to Unified violated Section 8.3 of the PPA.

118.    An actual controversy exists between the parties as to the validity of the ISA, effectuating the transfer to Unified, under Section 8.3 of the PPA.

119.    Plaintiff therefore respectfully requests that the Court issue an Order declaring that:

a.      Defendant breached the PPA by assigning its membership interests to Unified without receiving written consent of CBV;

b.      As a result of Defendant's breach of the PPA and lack of authority to enter into the ISA, the ISA is invalid.

**COUNT V**
(Declaratory Judgment - ASA)

120.    Plaintiff incorporates the averments contained in the preceding paragraphs, with the same force and effect as if fully set forth herein.

121.    Ms. Leane has asserted that ChanBond and IPNav signed an agreement for consulting services at a price of 22% of the gross revenue.  Further, Ms. Leane asserts that she informed King & Wood Malleson LLP and Billy Carter that CBV signed the ASA at the time of execution of the original PPA.

122.    On or about April 9, 2015, CBV and ChanBond entered into the PPA, as amended on August 27, 2015, which is a valid and binding agreement between the parties.

123.    Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

124.    Section 8.10 of the PPA contains an integration clause expressly disclaiming and superseding "all prior and contemporaneous agreements, understandings, negotiations and discussions" regarding the PPA.

25

125.    Further Section 2.8 of the PP, which defines "Net Recoveries" requires that ChanBond receive "the prior approval of [CBV]" for any cost or expense which is paid to an Affiliate of ChanBond or to a stakeholder of Chanbond.

126.    At the time of the PPA and APA, both IPNav and ChanBond were controlled by Ms. Leane.  As a result, IPNav is an "Affiliate" of ChanBond under the PPA, and the APA would require the prior approval of CBV.

127.    No such approval was requested of, nor given by, CBV.

128.    Upon information and belief, Ms. Leane executed the ASA for *both* ChanBond and IPNav in July of 2015 and backdated the document to appear as if it was executed contemporaneously with the PPA in April of 2015.

129.    Therefore, Defendant ChanBond, through Ms. Leane, has breached Section 2.8 of the PPA by purporting to enter into the improper ASA without the consent of ChanBond.

130.    Defendant's breaches of the PPA has harmed Plaintiff in an amount to be determined at trial.

## COUNT VI
Against ChanBond
(Declaratory Judgment - ASA)

131.    Plaintiff incorporates the averments contained in the preceding paragraphs, with the same force and effect as if fully set forth herein.

132.    Ms. Leane has asserted that ChanBond and IPNav signed an agreement for consulting services at a price of 22% of the gross revenue.  Further, Ms. Leane asserts that she informed King & Wood Malleson LLP and Billy Carter that CBV signed the ASA at the time of execution of the original PPA.

133.    On or about April 9, 2015, CBV and ChanBond entered into the PPA, as amended on August 27, 2015, which is a valid and binding agreement between the parties.

26

134.    Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

135.    Section 8.10 of the PPA contains an integration clause expressly disclaiming and superseding "all prior and contemporaneous agreements, understandings, negotiations and discussions" regarding the PPA.

136.    Further Section 2.8 of the PP, which defines "Net Recoveries" requires that ChanBond receive "the prior approval of [CBV]" for any cost or expense which is paid to an Affiliate of ChanBond or to a stakeholder of Chanbond.

137.    At the time of the PPA and APA, both IPNav and ChanBond were controlled by Ms. Leane.  As a result, IPNav is an "Affiliate" of ChanBond under the PPA, and the APA would require the prior approval of CBV.

138.    No such approval was requested of, nor given by, CBV.

139.    Upon information and belief, Ms. Leane executed the ASA for *both* ChanBond and IPNav in July of 2015 and backdated the document to appear as if it was executed contemporaneously with the PPA in April of 2015.

140.    An actual controversy exists between the parties as to the validity of the ASA, effectuating the transfer to Unified, under Section 8.3 of the PPA.

141.    Plaintiff therefore respectfully requests that the Court issue an Order declaring that:

a.    Defendant breached the PPA by entering into the ASA without the prior approval of CBV;

b.    As a result of Defendant's breach of the PPA and lack of authority to enter into the ASA, the ASA is invalid.

## COUNT VI
(Injunctive Relief)

142.    Plaintiff incorporates the averments contained in the preceding paragraphs, with the same force and effect as if fully set forth herein.

143.    In April 9, 2015, CBV, as Seller, and ChanBond, as Purchaser, agreed that ChanBond would purchase the Patents from CBV in order to monetize those Patents through patent litigation. In exchange, CBV retained a right to 50% of the net recovery in litigation involving the Patents.

144.    The PPA is a valid and binding agreement between the parties.

145.    Plaintiff has fully, and in good faith performed all conditions and obligations under the PPA.

146.    Since entry into the PPA, ChanBond and Unified, through their former and current Managers, Ms. Leane and Mr. Carter, entered into various agreements and altered the proportions of the Net Recoveries to which various parties are entitled. These agreements and alterations were entered into without authority under the PPA.

147.    Upon information and belief, the Patent Suits settled in late June or early July of 2021 for $125,000,000.

148.    CBV has been informed that it is entitled to *at least* $30,506,583 from the settlement amounts.  However, only $10 million has been disbursed by ChanBond to CBV.

149.    Upon information and belief, CBV is entitled to a much greater amount from the settlement, but has been stonewalled by ChanBond in its requests for the Settlement Agreement or any related information.

150.    Section 4.1 of the PPA requires an allocation report enumerating the planned distribution to the Parties prior to distribution of the settlement amounts. No such allocation report has been provided.

151.    Further, Section 3.5 of the PPA requires that ChanBond provide "a report detailing the payment amount" and to "provide such supporting documentation as may reasonably be requested by Seller."  Such requests from CBV to ChanBond have been unreasonably refused to date. A failure to receive such an accounting will result in diversion of funds due to CBV to accounts outside the US, with Ms. Leane being a citizen of the United Kingdom, and will cause irreparable harm to CBV.

152.    Plaintiff therefore respectfully requests that the Court issue an Injunction barring disbursement of any payments from the settlement amount to any parties before an accounting has taken place and allocation report distributed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, CBV, Inc., respectfully requests that judgment be granted in its favor awarding the following relief:

a.    Specific performance of the PPA, including specific performance of PPA Section 3.3.2 requiring that Defendant pay Plaintiff its share of the net recoveries from the Patent Suits in an amount not less than $20,506,583 and provision by ChanBond to CBV of the Settlement Agreement, an accounting of disbursements, and any other information reasonably necessary for CBV to determine the exact, proper amount that it is due and owed under the PPA;

b.    In the alternative, compensatory damages for the amount of the late payment due to CBV under the PPA, the losses incurred due to delayed payment, including the

significant tax consequences, and damages resulting from ChanBond's entry into the improper ASA and ISA without authority under the PPA.

c.    A declaration regarding the ISA that:

    i.    Defendant breached the PPA by assigning its membership interests to Unified without receiving written consent of CBV;

    ii.    As a result of Defendant's breach of the PPA and lack of authority to enter into the ISA, the ISA is invalid.

d.    A declaration regarding the ASA that:

    i.    Defendant breached the PPA by entering into the ASA without the prior approval of CBV;

    ii.    As a result of Defendant's breach of the PPA and lack of authority to enter into the ASA, the ASA is invalid.

e.    An Injunction barring disbursement of any payments from the settlement amount to any parties before an accounting has taken place and allocation report distributed.

f.    Attorneys' fees, costs, and expenses to the extent permitted by law; and

g.    Such other and further relief as this Court deems just and appropriate under these circumstances.

**BUCHANAN, INGERSOLL & ROONEY PC**

Dated:  October 15, 2021        */s/ Geoffrey Grivner*
        Geoffrey G. Grivner (#4711)
        Kody M. Sparks (#6464)
        500 Delaware Avenue, Suite 720
        Wilmington, DE 19801-3036
        (302) 552-4200
        geoffrey.grivner@bipc.com
        kody.sparks@bipc.com

\*        \*        \*

Patrick C. Keane, Esq.
BUCHANAN, INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, VA 22314-2727
(703) 836-6620
patrick.keane@bipc.com

*Attorneys for Plaintiff*