IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CBV, INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 1:21-cv-01456-MN |
| ) | |
| CHANBOND, LLC, DEIRDRE LEANE, ) | |
| and IPNAV, LLC, ) | ▉ |
| ) | |
| ) | PUBLIC VERSION FILED |
| Defendants. ) | ON APRIL 8, 2022 |

### DECLARATION OF DEIRDRE LEANE

1. I am the principal of IPNAV, LLC and submit this declaration in support of the Leane Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction. I have personal knowledge of the facts submitted herein, and could and would testify competently to them if called to do so.

2. Like Mr. Hennenhoefer, I have also kept an eye on the online investor message boards discussing UnfiedOnline, Inc. ("Unified"). The primary topic of discussion on these boards was the ChanBond patent litigation and the potential recovery for Unified represented by a settlement in that litigation, through its ownership of Chanbond. Nobody who read any online message board relating to Unified could have failed to understand that Unified owned ChanBond.

3. I am the founder and sole member of IPNAV, LLC, and have no predecessor. IPNAV, LLC has never had any members or employees other than me.

4. I performed hundreds of hours of IP monetization consulting work for the ChanBond litigations under the ASA.

5. Attached to this declaration as Exhibit 1 is a true and correct copy of emails and attachments I sent and received in the course of my work on the ChanBond litigations after selling ChanBond to Unified. These documents represent a small fraction of the total work I performed. CBV's ignorance of the level of work involved is unfortunate but irrelevant.

6. At no point did CBV or anybody acting on its behalf ever reach out to me and ask for a copy of either the ASA or the ISA. Had they done so I would have provided them with a copy without hesitation. (Indeed, I publicly filed those documents in connection with my claims against ChanBond, which I understand is how they claim to have obtained a copy. Obviously, I had no interest in or intent to keep those agreements secret.)

7. Indeed, from 2014 until CBV suddenly raised contrary claims in the course of these litigations, I understood that CBV was fully aware that ChanBond had hired IPNAV for a percentage of the gross proceeds of the litigation. Not only was IPNAV's status as ChanBond's patent monetization agent expressly referenced in the Common Interest Agreement that Earl signed for CBV in April 2015, and not only did I repeatedly inform CBV that ChanBond had "hired" IPNAV as a "vendor," but in my earliest correspondence with Earl about potentially monetizing the patents, in 2013, I explained to him that such work was done in exchange for a percentage of the gross proceeds of a successful monetization. A true and correct copy of that November 11, 2013 email is attached hereto as Exhibit 2.

8. Despite that, at no point did Earl, or anyone at CBV, ever ask me about the amount of the advisory services fee, which I believed had been disclosed to them in 2014 during their earlier negotiations for a sale to a different company that would have been advised by IP Navigation Group, LLC.

9. To the extent that CBV subjectively expected IPNAV to work for free because I owned ChanBond until October 2015, and to continue working for free thereafter, I had no knowledge of that expectation and no reason to know of it. CBV's expectation was unreasonable, and had they ever communicated about it with me, or even implied it, I would have told them so.

10. Instead, the first I learned of CBV's supposed belief that I should have been working for free was in the context of my dispute with ChanBond over its refusal to pay me the advisory services fee, in 2020.

11. Finally, to the extent that it is even necessary to say this given how clear the plain language of the Patent Purchase Agreement ("PPA") is, I agree with Earl Hennenhoefer that Section 2.8 of the PPA imposed no limitation on who ChanBond could hire or the validity of any agreement between ChanBond and IPNAV, but merely provided a rule of allocation by which the parties would determine whether such expenses would be deducted from Gross Revenues in calculating the Net Revenues from which CBV would be paid. That was my understanding when I signed the PPA on behalf of ChanBond, and it remains my understanding today.

12. Because it was my understanding in 2015 that CBV fully understood and had agreed to both IPNAV's retention and the 22% advisory services fee (and also because I did not carefully read the definition of "Affiliates" in the PPA and therefore did not understand that it included entities under common control), the question of whether CBV would have to "approve" a payment to IPNAV when it was eventually made never crossed my mind: not at the time I signed the PPA for ChanBond, not during my discussions about the sale of ChanBond to Unified, and not when I actually sold ChanBond to Unified. Whether or not my understanding is legally relevant is a question for the Court, but regardless, and because my integrity has been questioned, I want to be crystal clear about this: At all times, both before and after the execution

of the PPA and both before and after the sale to Unified, my understanding was that IPNAV would be providing advisory services to ChanBond and that ChanBond's payment to IPNAV would be treated as a "shared expense" whether or not ChanBond and IPNAV were affiliates at the time of payment.

_____
Deirdre Leane

March 29, 2022