# EXHIBIT 1

# EXHIBIT A

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

### District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| *Plaintiff* | ) | |
| | ) | Civil Action No.   C.A. Nos.15-842; 15-843; 15-844; |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) ) ) ) ) ) | 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| *Defendant* | | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                              Robert D. Stine
c/o John Petrsoric, Mischon De Reya New York LLP, 2 Park Avenue, 20th Floor, New York, NY 10016

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Fairfield Inn & Suites Carlisle<br>1528 Commerce Ave.<br>Carlisle, PA 17015 | Date and Time:<br>February 20-21, 2017 at 9:30 am |
|---|---|---|

The deposition will be recorded by this method: ___audio-visual and stenographic means___

❐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   ___01/24/2017___

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | |
| | | /s/ Anup K. Misra |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
all defendants                                                                  , who issues or requests this subpoena, are:

Anup K. Misra, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (212) 294-6697, amisra@winston.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   C.A. Nos.15-842; 15-843;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT B

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Delaware

| | |
|---|---|
| Chanbond, LLC | ) |
| *Plaintiff* | ) |
| | )    Civil Action No.    C.A. Nos.15-842; 15-843; 15-844; |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | )    15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:            Robert D. Stine
c/o John Petrsoric, Mishcon De Reya New York LLP, 2 Park Avenue, 20th Floor, New York, NY 10016

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

       See Attachment A

| Place: Fairfield Inn & Suites Carlisle 1528 Commerce Ave. Carlisle, PA 17015 | Date and Time: 02/10/2017 9:30 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

       The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     01/24/2017

CLERK OF COURT

                                    OR

_____     /s/ Anup K. Misra
*Signature of Clerk or Deputy Clerk*           *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
all defendants _____ , who issues or requests this subpoena, are:

Anup K. Misra, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (212) 294-6697, amisra@winston.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.    C.A. Nos.15-842; 15-843; 15-844;

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

### *ChanBond, LLC v. Atlantic Broadband Group, LLC et al.*
### Civil Action No. 1:15-cv-00842 - 854 (D. Del.)

## DEFINITIONS

The following definitions are applicable to terms employed in responding to this Subpoena *Duces Tecum* ("Subpoena") for the production of documents:

1.      "You" or "Your" means Robert Stine.

2.      The term "ChanBond" means ChanBond, LLC, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, including at least CBV and Z-Band, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in ChanBond, LLC, the Asserted Patents, or the Related Patents, including at least UnifiedOnline, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

3.      The term "UnifiedOnline" means UnifiedOnline, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in UnifiedOnline, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

4.      The term "CBV" means CBV, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an

interest in CBV, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

5.      The term "Z-Band" means Z-Band, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in Z-Band, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

6.      The term "Whitaker Corp." means The Whitaker Corporation, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in The Whitaker Corporation, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

7.      The term "ChanBond Patents" means U.S. Patent Nos. 7,346,918, 7,941,822, 8,341,679, 8,984,565, and 9,015,774, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

8.      The term "Related Patents" means any and all patents that relate back to a common application as any ChanBond Patent or Whitaker Patent, including any provisional or non-provisional applications, continuations, continuations-in-part, divisions, interferences, reexaminations, reissues, parents, foreign counterpart applications, as well as any other applications disclosing, describing or claiming any invention disclosed, described or claimed in any ChanBond Patent or Whitaker Patent, or claiming the benefit of the filing date of any

application whose benefit is claimed in any ChanBond Patent or Whitaker Patent, whether or not abandoned and whether or not issued.

9.      The term "Other ChanBond Inventors" means the other named inventors besides You listed on the face of the ChanBond Patents.  This includes Earl Hennenhoefer and Richard Snyder.

10.     The term "Whitaker Patents" means U.S. Patent No. 5,901,340 and U.S. Patent No. 5,875,386, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

11.     The term "Whitaker Inventors" means the named inventors on the Whitaker Patents.  These include Steven Lee Flickinger, James Ray Fetterolf, Sr., Joseph P. Preschutti, Terry P. Bowen, Jeffrey Legg, and David Koller.

12.     The term "GigaTwist" means the GigaTwist product.  For avoidance of doubt, this term includes the GigaTwist Technology referenced in Ex. 1 (ZBAND_0004466) to this subpoena.

13.     The term "GigaBUD" means the GigaBUD product.  For avoidance of doubt, this term includes the GigaBUD product referenced in Ex. 2 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

14.     The term "GigaBOB" means the GigaBOB product.  For avoidance of doubt, this term includes the GigaBOB product referenced in Ex. 2 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

15.     The term "Defendants" means the defendants in the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To

resolve any doubt, these include the Defendants in case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

16.     The term "Instant Litigations" means the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To resolve any doubt, these include case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

17.     The term "Channel Bonding" shall have the same meaning as used by ChanBond in ChanBond's complaints in this matter, and in ChanBond's infringement contentions in this matter. *See, e.g.,* 1:15-cv-00842, D.I. 1 (Complaint) at ¶ 13.

18.     The "DOCSIS Standard" shall mean the Data Over Cable Service Interface Specification published by CableLabs.  To resolve any doubt, this term encompasses all versions of the DOCSIS Standard, including DOCSIS 1.0, DOCSIS 1.1, DOCSIS 2.0, DOCSIS 3.0, and DOCSIS 3.1.

19.     The "DOCSIS 3.0 Standard" shall mean the Data Over Cable Service Interface Specification published by CableLabs

20.     The term "Standard Setting Organization" means any organization responsible for developing technical standards or technical documentation for use in industry.  For avoidance of doubt, CableLabs, the Institute for Electrical and Electronics Engineers ("IEEE"), Telecommunications Industry Association ("TIA"), and Electronic Industries Alliance ("EIA") are all Standard Setting Organizations.

21.     The term "Prior Art" refers to art under 35 U.S.C. §§ 102 and 103 and includes, by way of example and without limitation, printed publications, patents, disclosures, prior inventions, admissions, prior public uses, prior offers for sale, or sales of actual products.

22.    The terms "concerning," "relate," "relating," or "related" mean in any way, directly or indirectly, in whole or part, relating to, concerning, alluding to, referring to, discussing, mentioning, regarding, pertaining to, describing, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, modifying, amending, confirming, endorsing, representing, supporting, qualifying, terminating, revoking, refuting, undermining, canceling, contradicting, or negating.

23.    The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, the original (or a copy when the original is not available) and each non-identical copy (including those which are non-identical by reason of translations, notations, or markings) or any and all other written, printed, typed, punched, taped, filmed, or graphic matter or recorded or tangible thing, or whatever description, however produced or reproduced (including computer-stored or generated data, together with instructions or programs necessary to search and retrieve such data and hard copies where available and retrievable), and shall include all attachments to and enclosures with any requested item to which they are attached or with which they are enclosed, and each draft thereof.  The term "document" shall specifically include all recorded or retrievable electronic data or communications such as electronic mail (e-mail) and the like and all translations thereof.

24.    "Communication" shall mean any oral, written, electronic, or other exchange of words, thoughts, information, or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by Telex, or by other process, electric, electronic, or otherwise.  All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, tape or video

5

recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

25.     The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the request.  The word "including" shall not be used to limit any general category or description that precedes it.  The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the request.

26.     Reference to the singular in any of these requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

## INSTRUCTIONS

1.     Unless otherwise stated in a request, the time period covered by the command of this Subpoena is October 25, 1994 to Present.

2.     All requests for "documents," include a request for any "communications," such as letters or e-mails.

3.     It is Your duty in answering these requests to conduct a reasonable investigation so that You disclose and produce all available responsive and non-privileged documents.

4.     If any request herein requires the production of documents that are no longer in Your actual or constructive possession, custody, or control or which have been destroyed or lost, then in lieu of production, You shall state or identify the title of the document, the author of the document, each person to whom or by whom a copy of the original of the document was delivered, forwarded, or has been received, the date of the document, and the general subject

matter of the document. In the event You claim that information contained other than in documentary form is no longer in Your actual or constructive possession, custody, or control or has been destroyed or lost, You shall state or identify the nature of the information, the creator of the information, the person to whom the information was or was to be forwarded, delivered or for whom it was prepared, the date of the creation of the information, and the manner in which the information has been memorialized, if at all.

5.     In any instance where documents, data, or information requested herein is stored on a computer, a computer hard drive, a computer mainframe, computer back-up tape, or in any other electronic format, Defendants request that You produce the data, information, or documents on CD ROM, computer disk, or in hard copy paper form.  Further, Defendants request that You produce all documentation or programs that would allow Defendants to run, read, view, print, or otherwise access any such disks, CD ROM, or other computer information.

6.     You are under a continuing obligation to respond to the requests set forth herein. Accordingly, if You subsequently gain actual or constructive possession, custody, or control of any document called for in the requests set forth herein that has not been produced to Defendants, You must produce such document to Defendants as soon as possible or provide a written explanation to Defendants as to why You will not produce the document.

7.     The documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the requests.

## DOCUMENT REQUESTS

1.      All documents regarding the ChanBond Patents, the Whitaker Patents, and/or any Related Patents.

2.      All documents regarding Your, ChanBond's, CBV's, Z-Band's, or Other ChanBond Inventors' efforts to obtain patent protection on any invention related to the subject matter shown, described, or claimed in the ChanBond Patents and/or any Related patents, including but not limited to:

        a.      all invention disclosures;

        b.      all documents attached to, referring to or regarding any invention disclosure;

        c.      drafts of patent applications;

        d.      the prosecution history of all of the ChanBond Patents and/or Related Patents;

        e.      the prosecution history of each application on which You and/or the Other ChanBond Inventors is a named inventor, including all issued, pending or abandoned applications;

        f.      all U.S. and foreign patents and patent applications, and corresponding prosecuting histories, including those of unpublished, pending and/or abandoned applications, that are in whole or in part owned, licensed, or expected to be owned or licensed, by Z-Band that are directed to the subject matter disclosed in the ChanBond Patents and/or Related Patents;

        g.      all correspondence regarding the patent applications referred to in subparts (c) through (f) above;

h.      all documents consulted or reviewed by the applicants, patentees, or prosecuting attorneys during the preparation and prosecution of any application referred to in subparts (c) through (f) above, including but not limited to Prior Art references or potential Prior Art references; and

i.      all documents concerning Your participation in any examiner interview during prosecution of the ChanBond Patents, including, but not limited to, any assertions to the examiner made by You stating that "one type of addressable device would be a cable modem terminating system."

3.      All documents regarding (a) Your knowledge of Prior Art related to the ChanBond Patents and/or Related Patents, and (b) the date and circumstances pursuant to which You first learned of each piece of Prior Art.

4.      All documents regarding the inventorship, conception, reduction to practice, research, design, development, or testing of the subject matter shown, described, and claimed in the ChanBond Patents and/or Related Patents, including but not limited to laboratory notebooks, inventor notebooks, source code, and computer data, as well as the first written description or disclosure (including drawings) and the first prototype of such subject matter.

5.      All documents concerning any product, prototype, development version, test version, commercial embodiment, or commercialization of any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

6.      All documents related to the making, using, testing, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any product embodying any technical matter

disclosed in, or any invention claimed in, any ChanBond Patent, Whitaker Patent, and/or Related Patent.

7.    All documents related to the GigaTwist, GigaBUD, or GigaBob products, including all documents related to testing, selling, offering for sale, licensing, or disclosure anywhere in the world, of the GigaTwist product.

8.    All documents concerning any agreement between You and ChanBond, Z-Band, or CBV, including any agreement to cooperate in litigation or provide documents or testimony in litigation concerning any patents or applications in the ChanBond Patents and/or Related Patents or concerning Prior Art relating to the subject matter disclosed or claimed in any of the patents or applications in the ChanBond Patents and/or Related Patents.

9.    All documents concerning ownership of the ChanBond Patents and/or Related Patents, including but not limited to any proposed, requested, or executed assignment, license, conveyance, and/or grant of any right, title or interest in or to any of the ChanBond Patents and/or Related Patents regarding an such assignment, license, conveyance, and/or grant.

10.    All documents, including licenses or agreements, concerning any license, agreement, or contract, including consulting agreements between You, ChanBond, CBV, or Z-Band, and any assignees, licensees, or intermediaries concerning the ChanBond Patents.

11.    All documents that reflect, refer to or relate to the manners or techniques by which the ChanBond Patents allegedly improved upon the Prior Art, added functionality that did not exist in the Prior Art, or provided a variation on or upgrade of the Prior Art and whether each such alleged improvement, added functionality, or variation or upgrade, was nonobvious or unpredictable.

12.     All documents that support, refute or concern the existence of secondary considerations or objective indicia of non-obviousness of the alleged invention(s) described and/or claimed in the ChanBond Patents, including, but not limited to, commercial success, long-felt need, attempts by others, failures by others, commercial acquiescence, or copying.

13.     All documents concerning any service offerings, beta tests, or trials of the subject matter of each of the ChanBond Patents or related technologies prior to the filing date of each of the ChanBond Patents.

14.     All documents concerning any manufacture, use, sale or offer for sale, by or on behalf of ChanBond, CBV, or Z-Band, of any product, prototype, development version, commercial embodiment, or commercialization of any invention disclosed, described or claimed in the ChanBond Patents or related to the subject matter of the ChanBond Patents.

15.     All documents concerning the features, functions, and operation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents.

16.     All documents concerning any marketing, publicity, offers for sale, display, trade show presentation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents.

17.     All documents concerning business plans, marketing plans, projections, research and development capital, funding, and sales and/or distribution for any commercial embodiment of the ChanBond Patents.

18.     All documents related to the value to consumers of any features, functionalities, or any other technological components of any ChanBond, CBV, or Z-Band products or services relating to or embodying the ChanBond Patents.

19.     All communications between or among You, ChanBond, CBV, Z-Band, any of the Other Inventors, and/or any of the attorneys that prosecuted any of the applications or patents in the ChanBond Patents and/or Related Patents concerning any of the patents or applications in the ChanBond Patents and/or Related Patents.

20.     All documents that reflect, refer to or relate to the meaning of any claim term of any of the claims of the ChanBond Patents.

21.     All documents that reflect, refer to or relate to any participation by You, ChanBond, CBV, Z-Band, any of the Other Inventors in any industry organization or Standard Setting Organization.

22.     All documents concerning any communications between You and any person concerning the subject matter of the Instant Litigations.

23.     All documents concerning any document retention policy by You, ChanBond, CBV, or Z-Band, including all documents concerning any practice, policy, procedure, or effort to identify and preserve documents.

24.     All documents or communications related to the agreement between ChanBond and UnifiedOnline, as discussed in the agreement attached as Ex. 3 to this Subpoena.

25.     All notes and minutes from any Z-Band meeting in which You participated where the agreement between ChanBond and UnifiedOnline (attached as Ex. 3 to this Subpoena) was discussed.

26.     All documents or communications related to any negotiations between UnifiedOnline and ChanBond.

27.     All documents or communications related to any valuation of ChanBond.

28.     All communications related to the ChanBond Patents, Whitaker Patents, Related Patents, and/or the Instant Litigations, between You and any of the following parties:

    a.     any Other ChanBond Inventor;

    b.     Z-Band

    c.     CBV

    d.     Whitaker Corp.;

    e.     any Whitaker Inventor;

    f.     C.W. Smith;

    g.     Sprint Corp.

    h.     any business associate of the ChanBond Inventors that communicated with any Defendant (*see, e.g.,* Ex. 4 at ¶ 28);

    i.     any Defendant; or

    j.     Bentham IMF.

29.     All documents related to any negotiations or agreements, related to the ChanBond Patents, Whitaker Patents, Related Patents, and/or the Instant Litigations, between Z-Band and any of the following parties:

    a.     Unified Online;

    b.     any Other ChanBond Inventor;

    c.     Whitaker Corp.;

    d.     any Whitaker Inventor;

    e.     C.W. Smith.;

    f.     Sprint Corp.;

       g.       any business associate of You or the Other ChanBond Inventors that communicated with any Defendant (*see, e.g.,* Ex. 4 at ¶ 28);

       h.       any Defendant; or

       i.       Bentham IMF.

30.    All documents concerning the acquisition, ownership, or assignment of the Whitaker Patents and/or Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Ex. 6 - ZBAND_0005331, Ex. 7 - ZBAND_0005311, Ex. 8 – ZBAND_0005322, Ex. 9 – ZBAND_0005334).

31.    All documents related to any valuation of any ChanBond Patent, Whitaker Patent, and/or any Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

32.    All documents concerning any agreement related to the Whitaker Patents and/or any Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

33.    All documents concerning any negotiations for any assignment, license, contract, covenant, authorization, agreement, stipulation, settlement or any other event relating to any legal right related to the ChanBond Patents, Whitaker Patents, and/or Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

34.    All notes and minutes from Z-Band's meetings in which You participated where any of the Defendant's products, services, apparatuses, devices, systems, method or processes related to Channel Bonding, the DOCSIS Standard, or DOCSIS 3.0 were mentioned or discussed.

35.     All documents and communications regarding the corporate or business relationship between Z-Band and ChanBond.

36.     All documents, concerning whether Z-Band or any licensee to any ChanBond Patent has marked any product with the patent number of any ChanBond Patent, or otherwise attempted to comply with the marking or notice provisions of 35 U.S.C. § 287(a), including but not limited to one copy or sample of each and every product and/or package or other material on which the patent numbers of any of the ChanBond Patent has been marked.

37.     All documents related to Your, Z-Band's, or CBV's first knowledge, or the first knowledge of any Other ChanBond Inventor, of the following:

      a.     Channel Bonding;

      b.     the DOCSIS Standard;

      c.     the DOCSIS 3.0 Standard.

38.     All documents detailing any work performed by You, Z-Band, or the Other ChanBond Inventors related to Channel Bonding.

39.     All documents related to any work to give any Z-Band product the ability to support  DOCSIS 3.0, handle a DOCSIS 3.0 signal, or comply with the DOCSIS 3.0 standard.

40.     All documents concerning any notice from Z-Band to any party regarding an allegation of infringement of any claim of a ChanBond Patent.

41.     All communications between You and Z-Band, including but not limited to, communications with Z-Band during any periods of time for which You were not an employee of Z-Band.

42.     All documents related to any product of Whitaker Corp. that was tested, analyzed, used, modified, or resold by Z-Band.

43.     All documents related to the decision to form CBV.

44.     All documents related to any interest held by You, Z-Band, or any Other ChanBond Inventor, in either (a) the Instant Litigations, (b) the ChanBond Patents, (c) ChanBond, or (d) Whitaker.

45.     Any documents related to any permissions received by Z-Band for use of any cable companies' logo on its website, including the logos shown in Ex. 5 to this Subpoena.

46.     All documents and communications regarding Z-Band's sale, assignment, transfer, lease or license of any of their rights, assets, facilities, operations or services to ChanBond, CBV, or anyone else.

47.     All documents related to the "wideband distribution system" as disclosed in the '822 Patent at column 1:41-57.

48.     All documents related to the "wideband signal distribution network" described in the Whitaker Patents, including as described in the below passage:

> The foregoing and additional objects are attained in accordance with the principles of this invention by providing a wideband cabling system which functions as "passive" infrastructure to distribute wideband signals modulated onto RF carriers within a specified frequency band among a plurality of outlets. ('340 patent at col. 2:18-23)

49.     All documents related to the need for distribution of signals in a "relatively local area," as discussed in the below passage, including how this need was addressed by any product embodying any invention claimed in the ChanBond Patents or the Whitaker Patents:

> There are numerous instances where it is desired to distribute over twisted pair coaxial cable, or fiber optic cable wire, within a relatively local area, such as a single building, wideband signals modulated onto RF carriers. A particular application is the distribution of video signals. For example, a school may have a number of classrooms and administrative offices, each having a television monitor, and it may be desired at a given time to provide

a program to all of the classrooms and offices, originating either from a source within one of the classrooms or offices, such as a VCR, or from an outside source, such as a local cable system. Similarly, a corporation may have a building, or several closely spaced buildings, with numerous conference rooms equipped with television monitors and analogous program presentations may be desired. It is therefore a primary object of the present invention to provide cabling infrastructure for distributing wideband signals within a relatively local area. ('340 patent at col. 1:39-55)

50.    All documents reflecting any financial information, including but not limited to revenue or profits, derived from the sale or license of any product embodying any technical matter disclosed in, or any invention claimed in, any ChanBond Patent, Whitaker Patent, and/or Related Patent.

51.    All documents related to Z-Band's making, using, testing, investigating, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any alternative technologies to Channel Bonding to increase throughput of data transmissions.

# Exhibit 1

REDACTED
IN ITS
ENTIRETY

Exhibit 2



877-801-6475    GET A QUOTE ›

Home    About Z-Band    Products    Technical    Markets    Support    Contact Us

# Products/Services

Home | Markets | Healthcare | Products/Services

## Products/Services

### "GigaBUD" from Z-Band (Video Distribution Hub)

Z-Band's GigaBUD, Active Video Distribution Hub, is ideal for a variety of around-the-clock video applications in healthcare facilities, including live video monitoring in patient rooms and ICU wards and for use in distance learning for medical residents. GigaBUD can also serve as a valuable tool in patient entertainment and education.



### Cascading Capability for Multiple Hub Connectivity

- The GigaBUD is rack mounted to meet the applicable MDF/IDF port count combination for the various video drops
- Desired video is connected to the "CATV IN" port of the initial GigaBUD, which becomes the "Master" hub
- Additional GigaBUDs are connected to the Master through a cascading process and are dubbed "Slaves".
- "Outbound" Master ports are connected to "Cascade In" ports capable of providing up to eight second-level "Slaves" to achieve unidirectional cascading.
- Each second-level "Slave" can be cascaded to third and fourth levels, resulting in the capability for combining up to 585 GigaBUDs.
- End result is a video signal at the "CATV IN" port of the "Master" that can be distributed to as many as 14,040 TVs throughout a healthcare facility or system of facilities.

### "GigaBOB"

The GigaBOB is equipped with numerous attributes that provide HD TV over CAT 5e or CAT 6 cable such as:

- Remotely operated "GigaBOB" with unique distance sensing circuit and internal amplifier
- Simultaneous transmission over thousands of televisions
- 100-meter distribution range for the full bandwidth of RF channels
- DOCSIS or FSK return capability for VOD and/or data applications
- 120 or 240 VAC at 50 or 60 Hz operating frequency capacity
- Hub and balun system complies with UL, CSA and FCC Part 15, Subpart B guidelines




## Z-Band Video Distribution System Benefits

The Z-Band Video Distribution System is a highly effective way to merge voice, data and video over one cabling plant to meet the video distribution needs of any healthcare environment.

In addition, our remotely powered GigaBOB balun simplifies design and installation, as well as the process of making adds, moves, and changes while maintaining the highest level of picture quality. Z-Band can provide a seamless integration of RF and IP Video in your healthcare facility.

**Markets**

Healthcare

Featured Projects

Clients

Products/Services

Resources

Want to see how our products work?

Schedule A Demo

Questions?

Contact Us Today



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
**PHONE:** 877-801-6475 | **FAX:** 717-249-3253

Products assembled in the USA

Stay Connected:

Rep Login

Home   About Z-Band   Products   Technical   Markets   Support   Contact Us   Sitemap
                                                                                 Privacy Policy
Site Credits   Copyright 2017. All Rights Reserved

# Exhibit 3

## Agreement - ChanBond

This Agreement (this "**Agreement**"), is made as of October 27, 2015 (the "**Effective Date**"), by and among **Deirdre Leane**, an individual with an address of 2525 Carlisle St., Suite 439, Dallas, Texas 75201 ("**Seller**"), **ChanBond, LLC**, a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 ("**ChanBond**") and **UnifiedOnline, Inc.**, a Delaware corporation, of 4126 Leonard Drive, Fairfax, Virginia 22030 ("**Purchaser**"). The parties to this Agreement shall be referred to collectively herein as the "Parties" and separately as a "Party".

## W i t n e s s e t h:

WHEREAS, Seller owns 100% of the limited liability company membership interests (the "**Interests**") of **ChanBond**;

WHEREAS, Purchaser wishes to acquire Seller's entire interest in ChanBond, following which Purchaser will become the sole interest holder of ChanBond, all according to the provisions set forth herein below;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the Parties hereto hereby agree as follows:

1.   **Definitions**

    1.1   "**Affiliate**" means, with respect to a Party, any Person in any country that directly or indirectly Controls, is Controlled by or is under common Control with such Party. For the purposes of this Agreement, the term "Control" of a Person means ownership, of record or beneficially, directly or through other Persons, of fifty percent (50%) or more of the voting equity of such Person or, in the case of a non-corporate Person, equivalent interests.

    1.2   "**Collateral Agreements**" means all such concurrent or subsequent agreements, documents and instruments, as amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof, including without limitation, the License Agreement, the Pay Proceeds Agreement, the Common Interest Agreement and the Promissory Note.

    1.3   "**Contract Rights and Obligations**" means the rights and obligation assigned to ChanBond under the contracts ("**Contracts**") listed on **Schedule 1.3.**

    1.4   "**Entity**" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Body (as defined below) or any other legal entity.

    1.5   "**Governmental Body**" means any (i) U.S. federal, state, county, municipal, city, town village, district, or other jurisdiction or government of any nature; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or other entity and any court or other tribunal); or (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

1.6   "**Intellectual Property**" means all domestic or foreign rights in, to and concerning ChanBond's: (i) patents, patent applications, trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, trade dress, logos, symbols, trade names, assumed names, fictitious names, corporate names and other indications or indicia of origin, including translations, adaptations, derivations, modifications, combinations and renewals thereof; (ii) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of data or information), copyrights therein and thereto, moral rights, and rights equivalent thereto, including but not limited to, the rights of attribution, assignation and integrity; (iii) trade secrets, confidential and/or proprietary information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, schematics, designs, discoveries, drawings, prototypes, specifications, hardware configurations, customer and supplier lists, financial information, pricing and cost information, financial projections, and business and marketing methods plans and proposals), collectively "**Trade Secrets**"; (iv) computer software, including programs, applications, source and object code, data bases, data, models, algorithms, flowcharts, tables and documentation related to the foregoing; (v) other similar tangible or intangible intellectual property or proprietary rights, information and technology and copies and tangible embodiments thereof (in whatever form or medium); (vi) all applications to register, registrations, restorations, reversions and renewals or extensions of the foregoing; (vii) internet domain names; and (viii) all the goodwill associated with each of the foregoing and symbolized thereby; and (ix) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including rights to recover for past, present and future violations thereof.

1.7   "**Lien**" means any mortgage, pledge, security interest, encumbrance, lien, charge or debt of any kind, any trust, any filing or agreement to grant, deposit or file a pledge or financing statement as debtor under applicable law, any subordination arrangement in favor of any Person, or any other Third Party right.

1.8   "**Person**" means any individual or Entity.

1.9   "**Proceeding**" means any claim, suit, litigation, arbitration, mediation, hearing, audit, charge, inquiry, investigation, governmental investigation, regulatory proceeding or other proceeding or action of any nature (whether civil, criminal, legislative, administrative, regulatory, prosecutorial, investigative, or informal) commenced, brought, conducted, or known to be threatened, or heard by or before, or otherwise involving, any Governmental Body, arbitrator or mediator or similar person or body.

1.10   "**Third Party**" means any Person other than a Party or its Affiliates.

## 2.   Sale and Purchase of Interests

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser ChanBond and Purchaser shall purchase and accept the assignment, transfer conveyance and delivery of ChanBond from the Seller.

Closing of Sale and Purchase of Interests; Covenants of Purchaser

2.1   Closing.   The sale, assignment, transfer and delivery of ChanBond by the Seller and the purchase thereof by the Purchaser, shall take place at a closing, to be held remotely via the exchange of documents and signatures within one business day following the execution of this Agreement (the "**Closing**" and the "**Closing Date**," respectively).

2.2   Transactions at Closing.   At the Closing, the following transactions shall occur, which transactions shall be deemed to take place simultaneously and no transaction shall be deemed to have been completed or any document delivered until all such transactions have been completed and all required documents delivered:

2.2.1   The Seller shall duly execute an interest assignment deed in the form attached hereto as **Schedule 2.2.1** (the "**Transfer Deed**") and shall deliver their respective Transfer Deed to Purchaser;

2.2.2   At Closing, ChanBond shall appoint William R. Carter, Jr. as sole manager ("**Manager**") and thereafter Manager shall have sole and exclusive authority over the business of ChanBond.

2.2.3   Purchaser shall deliver to the Seller copies of resolutions of its Board of Directors in the form attached hereto as **Schedule 2.2.3**, approving, *inter alia*, the transactions contemplated hereunder and the issuance of the Shares (as defined below) by Purchaser to Seller.

2.2.4   The Collateral Agreements shall have been executed and delivered by the respective parties thereto.

2.2.5   Purchaser shall deliver to the Seller a validly executed share certificate for the Shares (as defined below) issuable in the name of the Seller in such amounts as shall be directed by Seller not less than 72 hours after the Closing.

2.2.6   Purchaser shall deliver to Seller evidence that each Required Approval (as defined below) has been obtained.

2.2.7   Seller, ChanBond and Purchaser shall have entered into the Common Interest Agreement, in the form attached hereto as **Schedule 2.2.7**.

2.2.8   Purchaser shall deliver to Seller the Promissory Note (as defined below), in the form attached hereto as **Schedule 2.2.8**.

2.3   Conditions to Closing.   The obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions, any of which may be waived in writing by the Party entitled to the benefit thereof, in whole or in part, to the extent permitted by the applicable law:

2.3.1   No temporary restraining order, preliminary or permanent injunction or other order (whether temporary, preliminary or permanent) issued by any court of competent jurisdiction, or other legal restraint or prohibition shall be in effect which prevents the consummation of the transactions contemplated herein, nor shall any proceeding brought by any Governmental Body seeking any of the foregoing be pending, and there shall not be any action

3

taken, or any law, regulation or order enacted, entered, enforced or deemed applicable to the transactions contemplated herein illegal.

2.3.2   The representations and warranties of the Seller and Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those (i) representations and warranties that are qualified by materiality, which representations and warranties shall be true and correct in all respects and (ii) representations and warranties which address matters only as of a particular date, which representations and warranties shall be true and correct on and as of such particular date.

2.3.3   Each Party shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the Collateral Agreements ancillary hereto (collectively, the **"Transaction Documents"**) to be performed or complied with by it on or prior to the Closing Date.

2.3.4   Each Party shall have received evidence, in form and substance reasonably satisfactory to it, that any and all approvals of Governmental Bodies and other Third Parties required to have been obtained by a Party to consummate the transactions under the Transaction Documents, if any, have been obtained (each a **"Required Approval"**).

2.4   Covenant of Purchaser.   Promptly following the Closing, Purchaser shall (a) reimburse Seller for all of their costs and expenses (including reasonable attorneys' fees) incurred by Seller in connection with the consummation of the transactions contemplated by this Agreement and (b) file with the relevant Governmental Bodies all legally required reports in respect of the transactions contemplated under the Transaction Documents, including, but not limited to, the SEC Form 8-K and any Forms 3, Forms 4 or Schedule 13D's.

## 3.   Consideration

In consideration for the sale, assignment, transfer and delivery of ChanBond, Purchaser shall pay to the Seller (as directed by Seller) the consideration, as follows:

3.1   Cash Payment.   Five million U.S. Dollars ($5,000,000) payable on or before October 27, 2020 (the **"Cash Payment"**). The obligation to make the Cash Payment shall be evidenced by Purchaser's promissory note (the **"Promissory Note"**) in the form of Schedule 2.2.8 attached hereto; and

3.2   Shares Payment.   Forty-four million, seven hundred thousand (44,700,000) shares of Purchaser's Common Stock (the **"Shares"**) par value of $0.001 each.

3.3   Release.   Purchaser for itself, its respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the **"Releasing Parties"**) knowingly, voluntarily, and irrevocably releases, forever discharges and covenants not to sue the Seller, and their respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively the **"Released Parties"**) from and against any and all rights, claims, losses, lawsuits or causes of action (at law or in equity), liabilities, duties, actions, demands, expenses, breaches of duty, damages,

4

obligations, proceedings, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, agreements, promises, judgments, and executions of whatever nature, type, kind, description or character (each a "**Claim**"), whether known or unknown, suspected or unsuspected, vested or contingent, past or present, that a Releasing Party ever had, now has or hereafter can, shall or may have against or with respect to the Released Parties or any of them for, upon or by reason of any matter, cause or thing related to or arising from any agreement to which ChanBond is a party or by which it is bound prior to the Closing Date, which are listed on **Schedule 3.3** (the "**Company Agreements**"), except in the case that such Claim arises out of an act of fraud, intentional misconduct or gross negligence on the part of one or more of the Released Parties, as finally determined by a court of competent jurisdiction. For the avoidance of doubt, the Company shall continue to be bound by the Company Agreements and neither the Seller nor any of the Released Parties has or shall have any further obligation or liability under the Company Agreement (other than confidentiality, common interest and other similar provisions). The Releasing Parties hereby waive the benefits of any provisions of the law of any state or territory of the United States, or principle of common law, which provides that a general release does not extend to claims which the Releasing Parties do not know or suspect to exist in its favor at the time of executing the release, which if known to it, may have materially affected the release. It is the intention, understanding and agreement of the Releasing Parties to forever discharge and release all known and unknown, present and future claims within the scope of the releases set forth in this Agreement, provided, however, this Release shall not affect or limit any Claims arising under this Agreement, for enforcement, gross negligence or willful misconduct, fraud, misrepresentation, or similar matters.

4.      **Representations and Warranties of the Seller**

The Seller hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

4.1      The Seller is the sole lawful owners, beneficially and of record, of ChanBond and ChanBond constitute all of the membership interests in ChanBond, and upon the consummation of the transactions at the Closing, Purchaser will acquire from the Seller, good and marketable title to ChanBond sold by it. There are no preemptive, anti-dilution or other participatory rights of any other parties with respect to the transactions contemplated hereunder.

4.2      The Seller has full and unrestricted legal right, power and authority to enter into and perform their obligations under the Transaction Documents and to sell and transfer ChanBond to Purchaser as provided herein. The Transaction Documents, when executed and delivered by the Seller, shall constitute the valid and legally binding obligation of the Seller, legally enforceable against the Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.3      The Seller is acquiring the Shares for investment purposes only, for their own account, and not for the benefit of others, nor with any view to, or in connection with any distribution or public offering thereof within the meaning of the U.S. Securities Act of 1933 (the "**Securities Act**").

4.4     The Seller understands that the Shares have been registered under the Securities Act. The Seller also acknowledges that the Shares will be restricted for sale for six (6) months after the issuance. The Seller acknowledges that any certificates evidencing the Shares will contain a legend to the foregoing effect.

4.5     Seller has sufficient knowledge and expertise in business and financial matters so as to enable it to analyze and evaluate the merits and risks of acquiring the Shares pursuant to the terms of this Agreement and is able to bear the economic risk of such acquisition, including a complete loss of its investment in the Shares.

4.6     Seller acknowledges that it has made detailed inquiries concerning Purchaser and its business, and that the officers of Purchaser have made available to the Seller any and all written information which it has requested and have answered to the Seller's satisfaction all inquiries made by the Seller.

4.7     The transactions provided for in this Agreement with respect to the Shares are not part of any pre-existing plan or arrangement for, and there is no agreement or other understanding with respect to, the distribution by the Seller of any of the Shares.

## 5.     Representations and Warranties of ChanBond

5.1     ChanBond hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

(a)     ChanBond is duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.

(b)     As of the Closing Date, ChanBond is a party to the pending litigation identified in **Schedule 5.1(b)**.

(c)     As of the Closing Date the Contracts are in full force and effect and none of the respective parties to the Contracts are in breach of any material obligation under the Contracts.

(d)     To ChanBond's knowledge, ChanBond is not a party nor bound by any contracts, agreements, promises or commitments except the assignments related to the Contracts.

(e)     Other than the assignments related to the Contracts, ChanBond has no material assets. None of ChanBond's employees will continue with ChanBond after the Closing. ChanBond's bank accounts and the contents thereof will be transferred to Purchaser. Any amounts paid or payable to ChanBond (or any of its Affiliates) under licenses or other agreements or judgments entered into by or awarded to any Affiliates of ChanBond prior to the Closing Date, shall be retained as the exclusive property of such

Affiliates and after the Closing Date, ChanBond or any of its Affiliates will disclaim any interest therein.

## 6.    Representations and Warranties of Purchaser

Purchaser, represents and warrants to the Seller and acknowledges that the Seller are entering into this Agreement in reliance thereon as follows:

6.1    Purchaser is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.  The corporate governance documents of Purchaser (including but not limited to its Certificate of Incorporation, Bylaws and any Voting Rights Agreements, Stockholders' Agreements, Investors' Rights Agreements and the like) as in effect on the date hereof have been provided or made available to the Seller (the "**Purchaser Governance Documents**").

6.2    The Transaction Documents, when executed and delivered by Purchaser, shall constitute the valid and legally binding obligation of Purchaser, respectively, legally enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.3    The authorized capital stock of Purchaser consists of 6,000,000,000 shares of Common Stock and 10,000,000 shares of Convertible Preferred Stock, each having a par value of USD $0.001, of which 912,897,537 shares are issued and outstanding (exclusive of shares issued hereunder).  Purchaser's fully-diluted capital structure before and after Closing is set forth in the capitalization table attached hereto as **Schedule 6.3**.  All capital stock, preemptive rights, rights of first refusal, rights of co-sale, convertible, exercisable or exchangeable securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Purchaser or any of its subsidiaries or Affiliates any capital stock of the Purchaser and/or any of its subsidiaries are set forth in detail on **Schedule 6.3**.  Except for the transactions contemplated by this Agreement and the current Purchaser Governance Documents, there are no Liens, options to purchase, proxies, preemptive rights, convertible, exercisable or exchangeable securities, outstanding warrants, options, voting trust and other voting agreements, calls, promises or commitments of any kind and, Purchaser has no knowledge that any of the said stockholders owns any other stock, options or any other rights to subscribe for, purchase or acquire any capital stock of Purchaser from Purchaser or from each other.

6.4    All issued and outstanding capital stock of Purchaser has been duly authorized, and is validly issued and outstanding and fully-paid and non-assessable.  The Shares, when issued and allotted in accordance with this Agreement:  (a) will be duly authorized, validly issued, fully paid, non-assessable, and free of any preemptive rights, (b) will have the rights, preferences, privileges, and restrictions set forth in Purchaser's Certificate of Incorporation, Certificate of Designation and By-laws, and (c) will be issued free and clear of any Liens of any kind.

6.5     Purchaser is currently in material compliance with all applicable laws, including securities laws. Purchaser has timely filed all forms and reports required to be filed with the Securities Exchange Commission (the "SEC") including, without limitation, all exhibits required to be filed therewith, and has made available to the Seller true, complete and correct copies of all of the same so filed (including any forms, reports and documents incorporated by reference therein or filed after the date hereof, the "**Purchaser SEC Reports**"). For purposes hereof, such Purchaser SEC Reports shall be deemed delivered to Seller via the SEC's EDGAR database. The Purchaser SEC Reports: (i) at the time filed complied (or will comply when filed, as the case may be) in all material respects with the applicable requirements of the Securities Act and/or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and the rules and regulations promulgated thereunder, and with the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder, in each case applicable to such Purchaser SEC Reports at the time they were filed; and (ii) did not at the time they were filed (or, if later filed, amended or superseded, then on the date of such later filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

6.6     Purchaser has timely filed (or has been deemed to have timely filed pursuant to Rule 12b-25 under the Exchange Act) and made publicly available on the SEC's EDGAR system, and the Seller may rely upon, all certifications and statements required by (i) Rule 13a-14 or Rule 15d-14 under the Exchange Act and (ii) Section 906 of the Sarbanes Oxley Act of 2002 with respect to any documents filed with the SEC. Since the most recent filing of such certifications and statements, there have been no significant changes in Purchaser's internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act), or in other factors that could significantly affect its disclosure controls and procedures.

6.7     The financial statements (including footnotes thereto) included in or incorporated by reference into the Purchaser SEC Reports (the "**Purchaser Financial Statements**") were complete and correct in all material respects as of their respective filing dates, complied as to form in all material respects with the Exchange Act and the applicable accounting requirements, rules and regulations of the SEC promulgated thereunder as of their respective dates and have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved (except as otherwise noted therein). The Purchaser Financial Statements fairly present the financial condition of Purchaser as of the dates thereof and results of operations, cash flows and stockholders' equity for the periods referred to therein (subject, in the case of unaudited Purchaser Financial Statements, to normal recurring year-end adjustments which were not and will not be material in amount). Without limiting the generality of the foregoing, (i) no independent public accountant of Purchaser has resigned or been dismissed as independent public accountant of Purchaser as a result of or in connection with any disagreement with Purchaser on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, (ii) no executive officer of Purchaser has failed in any respect to make, without qualification, the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act with respect to any form, report or schedule filed by Purchaser with the SEC since the enactment of the Sarbanes-Oxley Act and (iii) no enforcement action has been initiated or, to the knowledge of Purchaser, threatened against Purchaser by the SEC relating to disclosures contained in any

Purchaser SEC Report.  There has been no change in Purchaser's accounting policies except as described in the notes to the Purchaser Financial Statements.

6.8    Purchaser is not in default and neither the execution and delivery of the Transaction Documents nor compliance by Purchaser with the terms and provisions hereof and thereof, will conflict with, or result in a breach or violation of, any of the terms, conditions and provisions of:  (i) the Purchaser Corporate Governance Documents, or (ii) any note, indenture, mortgage, lease, agreement, contract, purchase order or other instrument, document or agreement to which Purchaser is a party or by which it or any of its property is bound, or (iii) any law, statute, ordinance, regulation, order, writ, injunction, decree, or judgment of any court or any governmental department, commission, board, bureau, agency or instrumentality in any country in which Purchaser conducts business, with the exception of those judgments listed **Schedule 6.8**. Such execution, delivery and compliance with the Transaction Documents will not (a) give to others any rights, including rights of termination, cancellation or acceleration, in or with respect to any agreement, contract or commitment referred to in this paragraph, or to any of the properties of Purchaser, or (b) except for compliance with any applicable requirements under the Securities Act, the Exchange Act and any requirements of the Over-the-Counter Bulletin Board ("OTCBB"), no consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Body or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of the Transaction Documents or the consummation of the transactions contemplated hereby and thereby, which consent or approval has not heretofore been obtained or will be obtained by Closing.  To the knowledge of Purchaser, no third party is in default under any agreement, contract or other instrument or document to which Purchaser is a party.  To the knowledge of Purchaser, Purchaser is not a party to or bound by any order, judgment, decree or award of any Governmental Body.

6.9    No action, proceeding or governmental inquiry or investigation is pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its officers, directors or employees (in their capacity as such or as shareholders, if applicable), or against any of Purchaser's properties, including, without limitation, assets, licenses and rights transferred to Purchaser under any written agreement or other binding undertaking, or with regard to Purchaser's business, before any court, arbitration board or tribunal or administrative or other governmental agency, nor does Purchaser believe that there is any basis for the foregoing.

7.    **Survival; Indemnification; Limitation of Liability; No Consequential Damages**

7.1    The representations and warranties of each Party hereunder shall survive the Closing and remain in effect for a period of one (1) year thereafter.

7.2    Indemnification.  The Seller, on the one side, and Purchaser on the other side (as applicable, the "**Indemnifying Party**") agree to indemnify and hold harmless the Parties of the other side and their respective Affiliates (as applicable, the "**Indemnified Parties**"), against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon (a) any breach of any of such Party's representations or warranties herein, misrepresentation or warranty or breach or failure by the Indemnifying Party to comply with any covenants or

agreement made by it herein, in the other Transaction Documents or in any other document furnished by it to any of the foregoing in connection with this transaction and (b) any action for securities law violations instituted by an Indemnifying Party which is finally resolved by judgment against such Indemnifying Party.

7.3     Mechanics of Indemnification.   Whenever any claim arises for indemnification under this Agreement or an event which may result in a claim for such indemnification has occurred, the Indemnified Party(ies) will promptly notify the Indemnifying Party of the claim and, when known, the facts constituting the basis for such claim.  The Indemnifying Party shall have the obligation to dispute and defend all such Third Party claims and thereafter so defend and pay any adverse final judgment or award or settlement amount in regard thereto.  Such defense shall be controlled by the Indemnifying Party, and the cost of such defense shall be borne by the Indemnifying Party, provided that the Indemnified Parties shall have the right to participate in such defense at their own expense, unless the Indemnified Parties require their own attorney due to a conflict of interest, in which case, the expense of a single law firm acceptable to such Indemnified Party will be borne by the Indemnifying Party.  The Indemnified Parties shall cooperate in all reasonable respects in the investigation, trial and defense of any such claim at the cost of the Indemnifying Party. If the Indemnifying Party fails to take action within thirty (30) days of notice, then the Indemnified Parties shall have the right to pay, compromise or defend any third party claim, such costs to be borne by the Indemnifying Party.  The Indemnified Parties shall also have the right and upon delivery of ten (10) days advance written notice to such effect to the Indemnifying Party, exercisable in good faith, to take such action as may be reasonably necessary to avoid a default prior to the assumption of the defense of the Third Party claim by the Indemnifying Party, and any reasonable expenses incurred by the Indemnified Parties so acting shall be paid by the Indemnifying Party.  The Indemnifying Party will not settle or compromise any Third Party claim without the prior written consent of the Indemnified Parties, not to be unreasonably withheld.

7.4     Purchaser Indemnification.  Purchaser and ChanBond shall indemnify and hold the Seller harmless with respect to any loss, expense, cost, damage and settlement (collectively, "**Indemnified Expenses**") caused to Seller as a result of Purchaser's or ChanBond's or its Affiliates' actions or omissions with respect to the Patents following the Closing Date, provided Seller is not determined to responsible for such actions as a result of their fraud or intentional misconduct.  In particular, in the event that the enforcement or other activities with the Patents results in litigation or other dispute resolution processes with one or more Third Parties, with Seller being required to be involved or liable for the expenses arising through actions of ChanBond (*e.g.*, being added as a party to the process, even if such joinder is improper, or being subject to Third Party discovery requests or otherwise having any exposure for any claims arising through activities of ChanBond), Purchaser and ChanBond shall, at Seller's request, indemnify Seller all of Seller's Indemnified Expenses arising from that involvement.

7.5     Limitation of Liability.   SELLER'S TOTAL LIABILITY UNDER THE TRANSACTION   DOCUMENTS   WILL   NOT   EXCEED   THE   CASH   CLOSING CONSIDERATION ACTUALLY RECEIVED BY SELLER HEREUNDER. THE PARTIES ACKNOWLEDGE THAT THIS LIMITATION ON POTENTIAL LIABILITIES WAS AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THE TRANSACTION DOCUMENTS.

7.6   Limitation on Consequential Damages.  NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS EMPLOYEES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 8.   Miscellaneous

8.1   Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of the Transaction Documents and the intentions of the Parties as reflected thereby.

8.2   Governing Law; Arbitration; Prevailing Party.  This Agreement and all claims or causes of action that may be based upon, arise out of or relate to this Agreement or the Collateral Agreements will be construed in accordance with and governed by the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State without regard to conflicts of laws principles thereof.  Any dispute arising under or in connection with any matter of any nature (whether sounding in contract or tort) relating to or arising out of this Agreement, shall be resolved exclusively by arbitration.  The arbitration shall be in conformity with and subject to the applicable rules and procedures of the American Arbitration Association. The arbitration shall be conducted before a panel of three (3) arbitrators, with one arbitrator to be selected by each of Seller and Buyer and the third arbitrator to be selected by the arbitrators selected by the Parties.  The Parties agree to be (a) subject to the exclusive jurisdiction and venue of the arbitration in the Eastern District of Texas (b) bound by the decision of the arbitrator as the final decision with respect to the dispute, and (c) subject to the jurisdiction of both of the federal courts of the United States of America or the courts sitting in the Eastern District in the State of Texas for the purpose of confirmation and enforcement of any award.  The prevailing party in any arbitration shall be entitled to recover its costs and expenses (including attorney's fees and expenses) from the non-prevailing party.

8.3   Limitations on Assignment.  Except as expressly permitted in this Section, none of Purchaser or ChanBond may grant or assign any rights or delegate any duties under this Agreement to any Third Party (including by way of a "change in control") or may sell, transfer, or spin-off any of the interests in ChanBond or any of its material assets without the prior written consent of Seller.  Notwithstanding the foregoing, Purchaser shall be permitted to transfer or assign) its rights, interests and obligations under this Agreement, as applicable, without Seller's prior written consent as part of a sale of all or substantially all of its business, equity to, or a change in control transaction with a Third Party acquirer (an "**M&A Transaction**", and an "**Acquirer**," respectively); provided that (a) such transfer or assignment is subject to all of the terms and conditions of this Agreement; and (ii) such Acquirer executes a written undertaking towards Seller agreeing to be bound by all of the terms and conditions of this Agreement with respect to the rights being transferred or assigned.  Except as otherwise expressly limited herein,

the provisions hereof shall inure to the benefit of, and be binding upon, the successors, permitted assigns, heirs, executors, and administrators of the Parties hereto.

8.4    This Agreement and the Schedules hereto constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.  Any term of this Agreement may be amended only with the written consent of all Parties thereto.  The observance of any term hereof may be waived (either prospectively or retroactively and either generally or in a particular instance) only with the written consent of the party against which such waiver is sought.

8.5    All notices and other communications required or permitted hereunder to be given to a Party to this Agreement shall be in writing and shall be faxed, emailed or mailed by registered or certified mail, postage prepaid, or prepaid air courier, or otherwise delivered by hand or by messenger, addressed to such Party's address as set forth above; or at such other address as the Party shall have furnished to each other Party in writing in accordance with this provision.  Any notice sent in accordance with this Section shall be effective (i) if mailed, seven (7) business days after mailing, (ii) if by air courier two (2) business days after delivery to the courier service, (iii) if sent by messenger, upon delivery, and (iv) if sent via facsimile or email, upon transmission and electronic confirmation of receipt or (if transmitted and received on a non-business day) on the first business day following transmission and electronic confirmation of receipt (provided, however, that any notice of change of address shall only be valid upon receipt).

8.6    No delay or omission to exercise any right, power, or remedy accruing to any Party upon any breach or default under this Agreement, shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any of the Parties, shall be cumulative and not alternative.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                          **DEIRDRE LEANE**

                                 By: *[signature]*
                                 Name: DEIRDRE LEANE
                                 Date: 27 October 2015


PURCHASER:                       **UNIFIEDONLINE, INC.**

                                 By: *[signature]*
                                 Name: Rob Howe
                                 Title: CEO
                                 Date: 27 October, 2015


CHANBOND:                        **CHANBOND, LLC**

                                 By: *[signature]*
                                 Name: DEIRDRE LEANE
                                 Title: MANAGER
                                 Date: 27 October 2015

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                        **DEIRDRE LEANE**

                               By: _Deirdre Leane_
                               Name: _DEIRDRE LEANE_
                               Date: _27 October 2015_


PURCHASER:                     **UNIFIEDONLINE, INC.**

                               By: _____
                               Name: _Rob Howe_
                               Title: _CEO_
                               Date: _27 October, 2015_

CHANBOND:                      **CHANBOND, LLC**

                               By: _Deirdre Leane_
                               Name: _DEIRDRE LEANE_
                               Title: _MANAGER_
                               Date: _27 October 2015_

13

## SCHEDULE 1.3

### Contracts

1. ChanBond, LLC – CBV, Inc. Patent Purchase Agreement dated April 9, 2015
2. ChanBond, LLC – Bentham IMF Litigation Funding Agreement dated September 9, 2015
3. ChanBond, LLC - IPNAV, LLC Advisory Services Agreement dated April 9, 2015
4. ChanBond, LLC - Mishcon de Reya Retention Agreement dated April 20, 2015
5. ChanBond, LLC - Bayard Law Engagement Agreement dated June 8, 2015
6. ChanBond, LLC - Ascenda Law Group Engagement Agreement dated July 14, 2015

## SCHEDULE 2.2.1

### Interest Transfer Deed

**FOR VALUE RECEIVED**, the undersigned, Deirdre Leane ("**Transferor**") hereby assigns, transfers and conveys all of its membership interests in ChanBond, LLC, a Delaware limited liability company (the "**Interests**") to UnifiedOnline, Inc., a Delaware corporation ("**Transferee**") and Transferee hereby accepts the above mentioned Interests.

In witness whereof, we affix our signatures hereto this 27th day of October, 2015.

Transferor:

**Deirdre Leane**

27. October 2015
Date

Transferee:

UnifiedOnline, Inc.

10-27-2015
Date

Witness:

Name: Joseph Ghally

10/27/2015
Date

Witness:

Name: B.I. Rodriguez

10-27-2015
Date

## SCHEDULE 2.2.3

**UnifiedOnline, Inc.'s Board of Directors Resolutions**

STATEMENT OF UNANIMOUS
CONSENT TO ACTION TAKEN IN
LIEU OF A
SPECIAL MEETING OF THE BOARD OF
DIRECTORS OF
UNIFIEDONLINE, INC.

In lieu of a special meeting of the board of directors (the "Board") of UnifiedOnline, Inc., a Delaware corporation (the "Corporation"), and in accordance with the Bylaws of the Corporation and §141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the members of the Board, do hereby consent to the adoption of, and do hereby adopt, the following resolutions and declare them to be in full force and effect as if they had been duly adopted at a meeting of the Board, duly called, noticed and held:

WHEREAS, the Board deems it to be in the best interests of the Corporation to enter into a Purchase Agreement dated October 26, 2015 (the "Agreement"), in connection with the acquisition of ChanBond, LLC ("ChanBond"), a Delaware limited liability company, the owner of that certain portfolio of Intellectual Property, known as the "ChanBond" patent portfolio, more particularly described as follows:

> The Corporation and CHANBOND agree to an acquisition by the Corporation of 100% of the membership interests of CHANBOND for consideration generally defined as: 44,700,000 shares of the common stock of the Corporation, plus a $5MM 5-Year No-Interest Promissory Note, with a Maturity Date of October 27, 2020..

NOW, THEREFORE BE IT RESOLVED, that the Corporation is hereby authorized to enter into the Agreement and the Note.

FURTHER RESOLVED, that any executive officer of the Corporation be, and hereby is authorized, empowered and directed, from time to time, to take such additional action and to execute, certify and deliver to the transfer agent of the Corporation, as any appropriate or proper to implement the provisions of the foregoing resolutions, and be it

FURTHER RESOLVED, that this Consent may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument, and that counterpart signature pages transmitted by facsimile transmission, by electronic mail in portable document format (.pdf) or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, shall have the same effect as physical delivery of the paper document bearing an original signature.

IN WITNESS WHEREOF, the undersigned members of the Board have executed this Consent as of October 26, 2015.

Robert M. Howe, III

## SCHEDULE 2.2.7

### Common Interest Agreement

THIS COMMON INTEREST AGREEMENT ("**Agreement**") is entered into as of April 9, 2015, by and among **ChanBond, LLC** (the "**Company**") having its principal offices at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204; **UnifiedOnline, Inc.** ("**UnifiedOnline**"), having its principal offices at 4126 Leonard Drive, Fairfax, Virginia 22030; and **Deirdre Leane ("Leane")**, located at 2525 Carlisle Street, Suite 439, Dallas, Texas 75201.

1. <u>Background.</u>

1.1 Company, Unified and Leane are sometimes referred to herein as a "**party**" or the "**parties**" and are presently negotiating the closing of an agreement under which UnifiedOnline will purchase Company from Leane and continue to enforce and license patents and related rights owned by the Company "**IP Rights**" and the "**Patent Matters**" respectively).

1.2 The parties have a common legal interest in upholding the validity and enforceability of the IP Rights, for purposes of enforcement. The parties anticipate they will enforce inherent rights of the IP Rights against third parties through litigation. The parties have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest doctrine. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of privileged information and attorney work product developed by the parties and their respective counsel.

2. <u>Common Interest.</u>

2.1 The parties have a common, joint and mutual legal interest in the monetization of valid and enforceable patents. In furtherance of that common interest, the parties will cooperate with each other, to the extent permitted by law, to share information protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or immunity with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of this Agreement.

2.2 In order to further their common interest, the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, evidence of use materials, claims charts, prosecution history files and other information (hereinafter "**Common Interest Materials**"). The sole purpose of the exchange of the Common Interest Materials is to support the parties' common interest with respect to the enforcement for the Patent Matters. Any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection. Nothing in this Agreement requires a party to share information with the other party.

3. <u>Nondisclosure.</u>

3.1 The parties and their counsel shall use the Common Interest Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Common Interest Material. No party nor

their respective counsel shall produce privileged documents or information unless or until directed to do so by a final order of a court of competent jurisdiction, or upon the prior written consent of the other party.  No privilege or objection shall be waived by a party hereunder without the prior written consent of the other party.

3.2    Except as herein provided, in the event that either party or its counsel is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar process) to disclose any Common Interest Materials, the party or its counsel shall assert all applicable privileges, including, without limitation, the common interest doctrine, and shall immediately inform the other party and the other party's counsel of the request or requirement to disclose.

4.    Relationship; Additions; Termination.

4.1.    This Agreement does not create any agency or similar relationship among the parties.  Through the term of the agreement between the parties, or any other agreement requiring confidentiality, (whichever term is longer), no party nor their respective counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2    Nothing in this Agreement affects the separate and independent representation of each party by its respective counsel or creates an attorney-client relationship between the counsel for a party and the other party to this Agreement.

4.3    This Agreement shall continue until terminated upon the written request of either party.  Upon termination, each party and their respective counsel shall return any Common Interest Material furnished by the other party. Notwithstanding termination, this Agreement shall continue to protect all Common Interest Materials disclosed prior to termination. Sections 3 and 5 shall survive termination of this Agreement.

5.    General Terms.

5.1.    This Agreement is governed by the laws of the State of Delaware, without regard to its choice of law principles to the contrary.  In the event any provision of the Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect.  Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2.    The parties agree that a breach of this Agreement would result in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party shall be entitled to equitable relief, including injunctive relief, as a non-exclusive remedy for any

such breach.

5.3    Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service as set forth below, and shall be deemed to have been given on the day received:

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, TX 75204

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

Deirdre Leane
2525 Carlisle Street
Suite 439
Dallas, TX 75201

5.4    This Agreement is effective and binding upon each party as of the date it is signed by or on behalf of a party and may be amended only by a writing signed by or on behalf of each party. This Agreement may be executed in counterparts. Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

***The remainder of this page has been intentionally left blank.**

IN WITNESS WHEREOF, CHANBOND, LLC, UNIFIEDONLINE, INC. and DEIRDRE LEANE have executed this Common Interest Agreement by their duly authorized representatives.

CHANBOND, LLC

By: _____
      (Signature)

Name: DEIRDRE LEANE

Title: MANAGER


UNIFIEDONLINE, INC.

By: _____
      (Signature)

Name: Rob Howe

Title: CEO


DEIRDRE LEANE

By: _____
      (Signature)

Name: DEIRDRE LEANE

Title: DR.

## SCHEDULE 2.2.8

### Promissory Note

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.

## UNIFIEDONLINE, INC.

## PROMISSORY NOTE

Principal Amount: $5,000,000                    Original Issuance Date: October 27, 2015

FOR VALUE RECEIVED UnifiedOnline, Inc., a Delaware corporation (the "Company"), promises to pay to Deirdre Leane, an individual, of 2525 Carlisle St., Suite 439, Dallas, TX 75201 (the "Holder") an aggregate principal amount of Five Million Dollars ($5,000,000.00) (representing the Cash Payment as provided for and defined in the Interest Sale Agreement dated as of the date hereof (the "Interest Sale Agreement"), to which the Company and the Holder are parties) payable on or prior to October 27, 2020 (the "Maturity Date"), provided, however, that if this Note is not paid in full by the Maturity Date, the aggregate principal amount of this Note shall be increased by Twenty Five Thousand Dollars ($25,000.00) for each month such payment is delayed (or *pro rata* portion thereof) until paid in full (the "New Principal Balance").

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    Event of Default.

     (a)    For purposes of this Note, an "Event of Default" means:

         (i)    the Company shall default in the payment of principal on this Note on or prior to the applicable Maturity Date; or

         (ii)    the Company shall be in breach of any obligation, covenant or representation made in this Note or the Interest Sale Agreement; or

         (iii)    the Company shall (a) become insolvent; (b) dissolve or terminate its existence; (c) admit in writing its inability to pay its debts generally as they mature; (d) make an assignment for the benefit of creditors or commence proceedings for its

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CHANBOND, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) C.A. No. _____ |
|  | ) |
| COMCAST CORPORATION and | ) **TRIAL BY JURY DEMANDED** |
| COMCAST CABLE | ) |
| COMMUNICATIONS, LLC, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ChanBond, LLC ("ChanBond"), as for its complaint of patent infringement in this matter, hereby alleges through its attorneys as follows:

### Nature of the Action

This is an action for patent infringement of United States Patent Nos. 7,941,822 (the "'822 Patent"), 8,341,679 (the "'679 Patent") and 8,984,565 (the "'565 Patent") (collectively, the Patents) under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, seeking damages and injunctive and other relief under 35 U.S.C. § 281, *et seq.*

### The Parties

1.     Plaintiff ChanBond is a Delaware limited liability company with its principal place of business at 2633 McKinney Ave., Dallas, Texas 75204.

2.     Defendant Comcast Corporation ("Comcast Corp.") is a Pennsylvania corporation with its principal place of business at 1701 John F Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Corp. may be served with process pursuant to the Delaware long arm statute, 10 *Del. C.* § 3104.

3. Defendant Comcast Cable Communications, LLC ("Comcast Cable") is a Delaware limited liability company with its principal place of business at 1701 John F Kennedy Boulevard, Philadelphia, Pennsylvania 19103. On information and belief, Comcast Cable is a wholly owned, direct or indirect subsidiary of Comcast Corp. Comcast Cable may be served with process via its registered agent, Comcast Capital Corporation, 1201 North Market Street, Suite 1000, Wilmington, Delaware 19801.

4. Comcast Corp. and Comcast Cable are referred to herein, collectively, as "Comcast" or "defendants."

## Jurisdiction and Venue

5. This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action concerns the infringement of United States patents.

7. This court has personal jurisdiction over defendants. Upon information and belief, each defendant transacts substantial business in the State of Delaware, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein, and (ii) regularly does or solicits business in Delaware, engages in other persistent courses of conduct, maintains continuous and systematic contacts in Delaware, purposefully avails itself of the privileges of doing business in Delaware, and/or derives substantial revenue from goods and services provided to individuals in Delaware. In addition, Comcast Cable is a limited liability corporation organized and existing under the laws of the State of Delaware.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other reasons, defendants have transacted business in the State of Delaware and defendants have committed and continue to commit acts of patent infringement in Delaware.

**The Patents-In-Suit**

9.      On May 10, 2011, the United States Patent and Trademark Office duly and legally issued the '822 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer, Richard Snyder and Robert Stine.  The inventors assigned all rights in the '822 Patent to CBV, Inc. ("CBV"), which was founded by the inventors, and CBV assigned the '822 Patent to ChanBond, including all rights to enforce the '822 Patent and to recover for infringement.  ChanBond has all right, title and interest to the '822 Patent.  The '822 Patent is valid and in force.  A true and correct copy of the '822 Patent is attached hereto as Exhibit A.

10.     On December 25, 2012, the United States Patent and Trademark Office duly and legally issued the '679 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer, Richard Snyder and Robert Stine.  The inventors assigned all rights in the '679 Patent to CBV, which was founded by the inventors, and CBV assigned the '679 Patent to ChanBond, including all rights to enforce the '679 Patent and to recover for infringement.  ChanBond has all right, title and interest to the '679 Patent.  The '679 Patent is valid and in force.  A true and correct copy of the '679 Patent is attached hereto as Exhibit B.

11.     On March 17, 2015, the United States Patent and Trademark Office duly and legally issued the '565 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer,

Richard Snyder and Robert Stine. The inventors assigned all rights in the '565 Patent to CBV, which was founded by the inventors, and CBV assigned the '565 Patent to ChanBond, including all rights to enforce the '565 Patent and to recover for infringement. ChanBond has all right, title and interest to the '565 Patent. The '565 Patent is valid and in force. A true and correct copy of the '565 Patent is attached hereto as Exhibit C.

12.     Generally, the patents-in-suit are directed in improving the data transmission of wideband distribution systems. Historically, data service flows (e.g. data, web traffic, voice and video transmitted via the Internet Protocol) have been transmitted over a single channel at a fixed bandwidth. But with the demand for transmission of more and more content at ever increasing speeds, the capabilities of a single channel transmission methodology became exhausted.

13.     The patents-in-suit address and overcome, among other things, the throughput problems regarding this single channel methodology. The inventors of the patents-in-suit invented intelligent devices that allow a single data service flow (e.g. large data transmissions) to be split and modulated onto multiple channels for transmission. This transmission is then demodulated and recombined back into a single service flow for distribution to addressable devices. Using the inventions, service providers are now capable of efficiently transmitting more content at higher speeds and better quality of service.

## COUNT I
## (INFRINGEMENT OF THE '822 PATENT)

14.     Plaintiff incorporates paragraphs 1 through 13 herein by reference as if set forth here in full.

15.     Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '822 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing

into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '822 Patent.  The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the Data Over Cable System Interface Specification ("DOCSIS") standard, version 3.0 or higher.[1]  More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality").  Comcast's cable systems and components that perform or are capable of performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '822 Patent under 35 U.S.C. § 271.

16.     As a result of Comcast's unlawful infringement of the '822 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff is entitled to recover from Comcast the damages adequate to compensate for such infringement, which have yet to be determined.

17.     Comcast will continue to infringe the '822 Patent unless and until it is enjoined by this Court.

---

[1] *See, e.g.,* http://customer.xfinity.com/help-and-support/internet/docsis3/?ts=2 ("With DOCSIS 3.0, you'll experience significantly faster speeds, so you can make the most of your online experience. DOCSIS 3.0 also opens the door to new Internet technologies.")

## COUNT II
### (INFRINGEMENT OF THE '679 PATENT)

18.     Plaintiff incorporates paragraphs 1 through 17 herein by reference as if set forth here in full.

19.     Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '679 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '679 Patent.  The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the DOCSIS standard, version 3.0 or higher.  More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality").  Comcast's cable systems and components that perform or are capable of performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '679 Patent under 35 U.S.C. § 271.

20.     As a result of Comcast's unlawful infringement of the '679 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff is

entitled to recover from Comcast the damages adequate to compensate for such infringement, which have yet to be determined.

21.     Comcast will continue to infringe the '679 Patent unless and until it is enjoined by this Court.

**COUNT III**
**(INFRINGEMENT OF THE '565 PATENT)**

22.     Plaintiff incorporates paragraphs 1 through 21 herein by reference as if set forth here in full.

23.     Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '565 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '565 Patent.  The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the DOCSIS standard, version 3.0 or higher.  More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality").  Comcast's cable systems and components that perform or are capable of

performing the Accused Functionality, and/or the use of such cable systems and components,

infringe one or more claims of the '565 Patent under 35 U.S.C. § 271.

24.     As a result of Comcast's unlawful infringement of the '565 Patent, Plaintiff has

suffered and will continue to suffer damages in an amount to be proven at trial. Plaintiff is

entitled to recover from Comcast the damages adequate to compensate for such infringement,

which have yet to be determined.

25.     Comcast will continue to infringe the '565 Patent unless and until it is enjoined by

this Court.

**WILLFUL INFRINGEMENT OF THE '822, '679, and '565 PATENTS**

26.     Plaintiff incorporates paragraphs 1 through 25 herein by reference as if set forth

here in full.

27.     In January 2012, Comcast announced that it had completed its rollout of DOCSIS

3.0.

28.     In February 2012, a business associate of the inventors communicated with Mr.

Joseph DiTrolio, Comcast Vice President and Corporate Comptroller, regarding the patent

portfolio. On February 23, 2012, the business associate had a face-to-face meeting with Mr.

DiTrolio, wherein he provided a write-up that identified the '822 Patent and the application that

would issue as the '679 Patent, and that indicated other continuations were pending. The write-

up described the patents and applications and their applicability to DOCSIS 3.0 and the cable

industry's channel bonding technology. The business associate and Mr. DiTrolio discussed the

patents, patent applications, relevant technology, and the patents' and patent applications'

applicability to the cable industry's channel bonding technology. By February 23, 2012, Mr.

DiTrolio, and thus Comcast, knew of the at least the '822 Patent and the application that would

issue as the '679 Patent, and knew of their relevance to the DOCSIS 3.0 channel bonding technology used by Comcast.

29.     By February 27, 2012, Mr. DiTrolio had communicated the patent portfolio and the write-up to Mr. James Finnegan, Comcast Senior Vice President, Intellectual Property Strategy.  On information and belief, by February 27, 2012, Mr. Finnegan knew of the '822 Patent and the applications that would issue as the '679 and '565 Patents, and knew of their relevance to the DOCSIS 3.0 channel bonding technology used by Comcast.

30.     On March 28, 2012, Mr. Hennenhoefer (one of the co-inventors) had a teleconference with Mr. Finnegan during which the patents, applications and CBV were discussed.  Mr. Finnegan informed Mr. Hennenhoefer that Comcast was obtaining a legal opinion regarding the patents.  Shortly thereafter, Mr. Hennenhoefer had a follow-up call with Mr. Finnegan.

31.     On February 12, 2013, the '822 and '679 Patents and the application that would issue as the '565 Patent were also brought to the attention of Mr. Tony Werner of Comcast.  On February 13, 2013, Mr. Werner communicated the patents and applications, for at least a second time, to Mr. Finnegan.  Shortly thereafter, Messrs. Hennenhoefer and Stine (another of the co-inventors) had a teleconference with Mr. Mark Dellinger, Comcast Vice President, Intellectual Property Strategy in which the patents and applications were discussed, along with their applicability to DOCSIS 3.0.

32.     Despite Comcast's knowledge of the Patents and the channel bonding technology that they covered, Comcast nevertheless continued making, using and selling products that complied with and used DOCSIS 3.0 (and higher) channel bonding, despite an objectively high likelihood that such actions constituted infringement of the Patents.  This infringement was

known to Comcast or was so obvious that Comcast should have known about this infringement.

Despite knowing that its actions constituted infringement of the Patents and/or despite knowing

that that there was a high likelihood that its actions constituted infringement of the Patents,

Comcast nevertheless continued its infringing actions, and continued to make, use and sell

infringing DOCSIS 3.0 (and higher) products.

33.     Comcast's infringement of the '822, '679 and '565 Patents has thus been

deliberate and willful, at least since February 23, 2012.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ChanBond, LLC respectfully requests that this Court enter

judgment in its favor as follows:

A.      Declaring that defendants have infringed, literally and/or under the doctrine of

equivalents, at least one claim of each of the '822, '679 and '565 Patents, and that this

infringement is willful;

B.      Awarding to Plaintiff the damages to which it is entitled under 35 U.S.C. § 284

for defendants' past infringement and any continuing or future infringement, including

compensatory damages, and the trebling of such damages due to the willful nature of the

infringement;

C.      Awarding Plaintiff costs (including all disbursements) and expenses incurred in

this action;

D.      Awarding Plaintiff pre- and post-judgment interest on its damages;

E.      Declaring that this case is exceptional pursuant to 35 U.S.C. §285 and awarding

Plaintiff its attorneys' fees and costs; and

      F.      Awarding Plaintiff such other and further relief in law or in equity as this Court deems just and proper.

**JURY DEMAND**

      Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any and all issues so triable by right.

Dated:  September 21, 2015

OF COUNSEL:

Mark Raskin
Robert Whitman
John F. Petrsoric
MISHCON DE REYA NEW YORK LLP
750 Seventh Ave., 26th Floor
New York, NY 10019

BAYARD, P.A.

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)
Vanessa R. Tiradentes (No. 5398)
Sara E. Bussiere (No. 5725)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
sbrauerman@bayardlaw.com
vtiradentes@bayardlaw.com
sbussiere@bayardlaw.com

*Attorneys for Plaintiff ChanBond, LLC*

# Exhibit 5



# Video Distribution Product



## CATV/Satellite Distribution

## IPTV/IP Video

Learn More

## Markets We Serve



| Healthcare |
|---|

| Hospitals | Assisted Living |



| Government & Military |
|---|

| Federal | Civilian |



| Hospitality |
|---|

| Casinos | Resorts |



| Education |
|---|

| K-12 | Universities |



| Commercial Businesses |
|---|

| Financial | Corp. Headquarters |



| International |
|---|

| International | International |

### Z-Band: The Leader in Enterprise Video Distribution Systems

Z-Band is a veteran-owned commercial video system provider based in Carlisle, PA. We design, manufacture, and implement cutting-edge high-definition video distribution systems for the government, healthcare, commercial, education, hospitality, and international markets. We feature an active, self-adjusting video distribution system that is capable of distributing CATV/HDTV, satellite, internally-generated video, and other video-on-demand (VOD) services over unshielded twisted pair (UTP) Category cable.

» Read More

| Upcoming Webinar |
|---|
| Read Our Blogs |
| Schedule a Demo |

---



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
**PHONE:** 877-801-6475 | **FAX:** 877-801-6475

Fully patented technology made in the USA - ISO 9001:2008

Stay Connected:

Rep Login

Home | About Z-Band | Products | Technical | Markets | Support | Contact Us
Sitemap | Privacy Policy | Site Credits | Copyright 2014. All Rights Reserved

# Exhibit 6

REDACTED
IN ITS
ENTIRETY

# Exhibit 7

REDACTED

IN ITS

ENTIRETY

Exhibit 8

REDACTED
IN ITS
ENTIRETY

Exhibit 9

REDACTED

IN ITS

ENTIRETY

# EXHIBIT C

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| *Plaintiff* | ) | |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC *Defendant* | ) ) ) ) ) ) ) | Civil Action No.  C.A. Nos.15-842; 15-843; 15-844; 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                     Richard Snyder
c/o John Petrsoric, Mischon De Reya New York LLP, 2 Park Avenue, 20th Floor, New York, NY 10016
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Fairfield Inn & Suites Carlisle 1528 Commerce Ave. Carlisle, PA 17015 | Date and Time: February 16-17, 2017 at 9:30 am |
|---|---|

The deposition will be recorded by this method:  audio-visual and stenographic means

❏ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/24/2017

| CLERK OF COURT | |
|---|---|
| | OR |
| _____ | /s/ Anup K. Misra |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
all defendants
, who issues or requests this subpoena, are:

Anup K. Misra, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (212) 294-6697, amisra@winston.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   C.A. Nos.15-842; 15-843;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT D

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| _Plaintiff_ | ) | Civil Action No. |
| | ) | C.A. Nos.15-842; 15-843; 15-844; |
| Atlantic Broadband Group, LLC, Bright House Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) ) ) ) ) ) | 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| _Defendant_ | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      Richard Snyder
c/o John Petrsoric, Mishcon De Reya New York LLP, 2 Park Avenue, 20th Floor, New York, NY 10016
_(Name of person to whom this subpoena is directed)_

✔ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

   See Attachment A

| Place: Fairfield Inn & Suites Carlisle | Date and Time: |
|---|---|
| 1528 Commerce Ave. Carlisle, PA 17015 | 02/10/2017 9:30 am |

❒ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

   The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     01/24/2017

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Anup K. Misra |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
all defendants _____ , who issues or requests this subpoena, are:

Anup K. Misra, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (212) 294-6697, amisra@winston.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   C.A. Nos.15-842; 15-843; 15-844;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

***ChanBond, LLC v. Atlantic Broadband Group, LLC et al.***
**Civil Action No. 1:15-cv-00842 - 854 (D. Del.)**

**DEFINITIONS**

The following definitions are applicable to terms employed in responding to this Subpoena *Duces Tecum* ("Subpoena") for the production of documents:

1.      "You" or "Your" means Richard Snyder.

2.      The term "ChanBond" means ChanBond, LLC, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, including at least CBV and Z-Band, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in ChanBond, LLC, the Asserted Patents, or the Related Patents, including at least UnifiedOnline, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

3.      The term "UnifiedOnline" means UnifiedOnline, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in UnifiedOnline, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

4.      The term "CBV" means CBV, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an

1

interest in CBV, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

5.      The term "Z-Band" means Z-Band, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in Z-Band, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

6.      The term "Whitaker Corp." means The Whitaker Corporation, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in The Whitaker Corporation, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

7.      The term "ChanBond Patents" means U.S. Patent Nos. 7,346,918, 7,941,822, 8,341,679, 8,984,565, and 9,015,774, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

8.      The term "Related Patents" means any and all patents that relate back to a common application as any ChanBond Patent or Whitaker Patent, including any provisional or non-provisional applications, continuations, continuations-in-part, divisions, interferences, reexaminations, reissues, parents, foreign counterpart applications, as well as any other applications disclosing, describing or claiming any invention disclosed, described or claimed in any ChanBond Patent or Whitaker Patent, or claiming the benefit of the filing date of any

application whose benefit is claimed in any ChanBond Patent or Whitaker Patent, whether or not abandoned and whether or not issued.

9.      The term "Other ChanBond Inventors" means the other named inventors besides You listed on the face of the ChanBond Patents.  This includes Earl Hennenhoefer and Robert Stine.

10.     The term "Whitaker Patents" means U.S. Patent No. 5,901,340 and U.S. Patent No. 5,875,386, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

11.     The term "Whitaker Inventors" means the named inventors on the Whitaker Patents.  These include Steven Lee Flickinger, James Ray Fetterolf, Sr., Joseph P. Preschutti, Terry P. Bowen, Jeffrey Legg, and David Koller.

12.     The term "GigaTwist" means the GigaTwist product.  For avoidance of doubt, this term includes the GigaTwist Technology referenced in Ex. 1 (ZBAND_0004466) to this subpoena.

13.     The term "GigaBUD" means the GigaBUD product.  For avoidance of doubt, this term includes the GigaBUD product referenced in Ex. 2 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

14.     The term "GigaBOB" means the GigaBOB product.  For avoidance of doubt, this term includes the GigaBOB product referenced in Ex. 2 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

15.     The term "Defendants" means the defendants in the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To

resolve any doubt, these include the Defendants in case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

16.     The term "Instant Litigations" means the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To resolve any doubt, these include case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

17.     The term "Channel Bonding" shall have the same meaning as used by ChanBond in ChanBond's complaints in this matter, and in ChanBond's infringement contentions in this matter.  *See, e.g.,* 1:15-cv-00842, D.I. 1 (Complaint) at ¶ 13.

18.     The "DOCSIS Standard" shall mean the Data Over Cable Service Interface Specification published by CableLabs.  To resolve any doubt, this term encompasses all versions of the DOCSIS Standard, including DOCSIS 1.0, DOCSIS 1.1, DOCSIS 2.0, DOCSIS 3.0, and DOCSIS 3.1.

19.     The "DOCSIS 3.0 Standard" shall mean the Data Over Cable Service Interface Specification published by CableLabs

20.     The term "Standard Setting Organization" means any organization responsible for developing technical standards or technical documentation for use in industry.  For avoidance of doubt, CableLabs, the Institute for Electrical and Electronics Engineers ("IEEE"), Telecommunications Industry Association ("TIA"), and Electronic Industries Alliance ("EIA") are all Standard Setting Organizations.

21.     The term "Prior Art" refers to art under 35 U.S.C. §§ 102 and 103 and includes, by way of example and without limitation, printed publications, patents, disclosures, prior inventions, admissions, prior public uses, prior offers for sale, or sales of actual products.

22.     The terms "concerning," "relate," "relating," or "related" mean in any way, directly or indirectly, in whole or part, relating to, concerning, alluding to, referring to, discussing, mentioning, regarding, pertaining to, describing, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, modifying, amending, confirming, endorsing, representing, supporting, qualifying, terminating, revoking, refuting, undermining, canceling, contradicting, or negating.

23.     The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, the original (or a copy when the original is not available) and each non-identical copy (including those which are non-identical by reason of translations, notations, or markings) or any and all other written, printed, typed, punched, taped, filmed, or graphic matter or recorded or tangible thing, or whatever description, however produced or reproduced (including computer-stored or generated data, together with instructions or programs necessary to search and retrieve such data and hard copies where available and retrievable), and shall include all attachments to and enclosures with any requested item to which they are attached or with which they are enclosed, and each draft thereof.  The term "document" shall specifically include all recorded or retrievable electronic data or communications such as electronic mail (e-mail) and the like and all translations thereof.

24.     "Communication" shall mean any oral, written, electronic, or other exchange of words, thoughts, information, or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by Telex, or by other process, electric, electronic, or otherwise.  All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, tape or video

recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

25.     The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the request.  The word "including" shall not be used to limit any general category or description that precedes it.  The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the request.

26.     Reference to the singular in any of these requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

## INSTRUCTIONS

1.     Unless otherwise stated in a request, the time period covered by the command of this Subpoena is October 25, 1994 to Present.

2.     All requests for "documents," include a request for any "communications," such as letters or e-mails.

3.     It is Your duty in answering these requests to conduct a reasonable investigation so that You disclose and produce all available responsive and non-privileged documents.

4.     If any request herein requires the production of documents that are no longer in Your actual or constructive possession, custody, or control or which have been destroyed or lost, then in lieu of production, You shall state or identify the title of the document, the author of the document, each person to whom or by whom a copy of the original of the document was delivered, forwarded, or has been received, the date of the document, and the general subject

matter of the document. In the event You claim that information contained other than in documentary form is no longer in Your actual or constructive possession, custody, or control or has been destroyed or lost, You shall state or identify the nature of the information, the creator of the information, the person to whom the information was or was to be forwarded, delivered or for whom it was prepared, the date of the creation of the information, and the manner in which the information has been memorialized, if at all.

5.      In any instance where documents, data, or information requested herein is stored on a computer, a computer hard drive, a computer mainframe, computer back-up tape, or in any other electronic format, Defendants request that You produce the data, information, or documents on CD ROM, computer disk, or in hard copy paper form.  Further, Defendants request that You produce all documentation or programs that would allow Defendants to run, read, view, print, or otherwise access any such disks, CD ROM, or other computer information.

6.      You are under a continuing obligation to respond to the requests set forth herein. Accordingly, if You subsequently gain actual or constructive possession, custody, or control of any document called for in the requests set forth herein that has not been produced to Defendants, You must produce such document to Defendants as soon as possible or provide a written explanation to Defendants as to why You will not produce the document.

7.      The documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the requests.

## DOCUMENT REQUESTS

1.      All documents regarding the ChanBond Patents, the Whitaker Patents, and/or any Related Patents.

2.      All documents regarding Your, ChanBond's, CBV's, Z-Band's, or Other ChanBond Inventors' efforts to obtain patent protection on any invention related to the subject matter shown, described, or claimed in the ChanBond Patents and/or any Related patents, including but not limited to:

      a.      all invention disclosures;

      b.      all documents attached to, referring to or regarding any invention disclosure;

      c.      drafts of patent applications;

      d.      the prosecution history of all of the ChanBond Patents and/or Related Patents;

      e.      the prosecution history of each application on which You and/or the Other ChanBond Inventors is a named inventor, including all issued, pending or abandoned applications;

      f.      all U.S. and foreign patents and patent applications, and corresponding prosecuting histories, including those of unpublished, pending and/or abandoned applications, that are in whole or in part owned, licensed, or expected to be owned or licensed, by Z-Band that are directed to the subject matter disclosed in the ChanBond Patents and/or Related Patents;

      g.      all correspondence regarding the patent applications referred to in subparts (c) through (f) above;

h.      all documents consulted or reviewed by the applicants, patentees, or prosecuting attorneys during the preparation and prosecution of any application referred to in subparts (c) through (f) above, including but not limited to Prior Art references or potential Prior Art references; and

i.      all documents concerning Your participation in any examiner interview during prosecution of the ChanBond Patents, including, but not limited to, any assertions to the examiner made by You stating that "one type of addressable device would be a cable modem terminating system."

3.      All documents regarding (a) Your knowledge of Prior Art related to the ChanBond Patents and/or Related Patents, and (b) the date and circumstances pursuant to which You first learned of each piece of Prior Art.

4.      All documents regarding the inventorship, conception, reduction to practice, research, design, development, or testing of the subject matter shown, described, and claimed in the ChanBond Patents and/or Related Patents, including but not limited to laboratory notebooks, inventor notebooks, source code, and computer data, as well as the first written description or disclosure (including drawings) and the first prototype of such subject matter.

5.      All documents concerning any product, prototype, development version, test version, commercial embodiment, or commercialization of any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

6.      All documents related to the making, using, testing, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any product embodying any technical matter

disclosed in, or any invention claimed in, any ChanBond Patent, Whitaker Patent, and/or Related Patent.

7.      All documents related to the GigaTwist, GigaBUD, or GigaBob products, including all documents related to testing, selling, offering for sale, licensing, or disclosure anywhere in the world, of the GigaTwist product.

8.      All documents concerning any agreement between You and ChanBond, Z-Band, or CBV, including any agreement to cooperate in litigation or provide documents or testimony in litigation concerning any patents or applications in the ChanBond Patents and/or Related Patents or concerning Prior Art relating to the subject matter disclosed or claimed in any of the patents or applications in the ChanBond Patents and/or Related Patents.

9.      All documents concerning ownership of the ChanBond Patents and/or Related Patents, including but not limited to any proposed, requested, or executed assignment, license, conveyance, and/or grant of any right, title or interest in or to any of the ChanBond Patents and/or Related Patents regarding an such assignment, license, conveyance, and/or grant.

10.     All documents, including licenses or agreements, concerning any license, agreement, or contract, including consulting agreements between You, ChanBond, CBV, or Z-Band, and any assignees, licensees, or intermediaries concerning the ChanBond Patents.

11.     All documents that reflect, refer to or relate to the manners or techniques by which the ChanBond Patents allegedly improved upon the Prior Art, added functionality that did not exist in the Prior Art, or provided a variation on or upgrade of the Prior Art and whether each such alleged improvement, added functionality, or variation or upgrade, was nonobvious or unpredictable.

12.     All documents that support, refute or concern the existence of secondary considerations or objective indicia of non-obviousness of the alleged invention(s) described and/or claimed in the ChanBond Patents, including, but not limited to, commercial success, long-felt need, attempts by others, failures by others, commercial acquiescence, or copying.

13.     All documents concerning any service offerings, beta tests, or trials of the subject matter of each of the ChanBond Patents or related technologies prior to the filing date of each of the ChanBond Patents.

14.     All documents concerning any manufacture, use, sale or offer for sale, by or on behalf of ChanBond, CBV, or Z-Band, of any product, prototype, development version, commercial embodiment, or commercialization of any invention disclosed, described or claimed in the ChanBond Patents or related to the subject matter of the ChanBond Patents.

15.     All documents concerning the features, functions, and operation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents.

16.     All documents concerning any marketing, publicity, offers for sale, display, trade show presentation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents.

17.     All documents concerning business plans, marketing plans, projections, research and development capital, funding, and sales and/or distribution for any commercial embodiment of the ChanBond Patents.

18.     All documents related to the value to consumers of any features, functionalities, or any other technological components of any ChanBond, CBV, or Z-Band products or services relating to or embodying the ChanBond Patents.

19.     All communications between or among You, ChanBond, CBV, Z-Band, any of the Other Inventors, and/or any of the attorneys that prosecuted any of the applications or patents in the ChanBond Patents and/or Related Patents concerning any of the patents or applications in the ChanBond Patents and/or Related Patents.

20.     All documents that reflect, refer to or relate to the meaning of any claim term of any of the claims of the ChanBond Patents.

21.     All documents that reflect, refer to or relate to any participation by You, ChanBond, CBV, Z-Band, any of the Other Inventors in any industry organization or Standard Setting Organization.

22.     All documents concerning any communications between You and any person concerning the subject matter of the Instant Litigations.

23.     All documents concerning any document retention policy by You, ChanBond, CBV, or Z-Band, including all documents concerning any practice, policy, procedure, or effort to identify and preserve documents.

24.     All documents or communications related to the agreement between ChanBond and UnifiedOnline, as discussed in the agreement attached as Ex. 3 to this Subpoena.

25.     All notes and minutes from any Z-Band meeting in which You participated where the agreement between ChanBond and UnifiedOnline (attached as Ex. 3 to this Subpoena) was discussed.

26.     All documents or communications related to any negotiations between UnifiedOnline and ChanBond.

27.     All documents or communications related to any valuation of ChanBond.

28.     All communications related to the ChanBond Patents, Whitaker Patents, Related Patents, and/or the Instant Litigations, between You and any of the following parties:

      a.     any Other ChanBond Inventor;

      b.     Z-Band

      c.     CBV

      d.     Whitaker Corp.;

      e.     any Whitaker Inventor;

      f.     C.W. Smith;

      g.     Sprint Corp.

      h.     any business associate of the ChanBond Inventors that communicated with any Defendant (*see, e.g.,* Ex. 4 at ¶ 28);

      i.     any Defendant; or

      j.     Bentham IMF.

29.     All documents related to any negotiations or agreements, related to the ChanBond Patents, Whitaker Patents, Related Patents, and/or the Instant Litigations, between Z-Band and any of the following parties:

      a.     Unified Online;

      b.     any Other ChanBond Inventor;

      c.     Whitaker Corp.;

      d.     any Whitaker Inventor;

      e.     C.W. Smith.;

      f.     Sprint Corp.;

       g.     any business associate of You or the Other ChanBond Inventors that communicated with any Defendant (*see, e.g.,* Ex. 4 at ¶ 28);

       h.     any Defendant; or

       i.     Bentham IMF.

30.    All documents concerning the acquisition, ownership, or assignment of the Whitaker Patents and/or Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Ex. 6, ZBAND_0005331 and Ex. 7, ZBAND_0005311, Ex. 8 – ZBAND_0005322, Ex. 9 – ZBAND_0005334).

31.    All documents related to any valuation of any ChanBond Patent, Whitaker Patent, and/or any Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

32.    All documents concerning any agreement related to the Whitaker Patents and/or any Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

33.    All documents concerning any negotiations for any assignment, license, contract, covenant, authorization, agreement, stipulation, settlement or any other event relating to any legal right related to the ChanBond Patents, Whitaker Patents, and/or Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

34.    All notes and minutes from Z-Band's meetings in which You participated where any of the Defendant's products, services, apparatuses, devices, systems, method or processes related to Channel Bonding, the DOCSIS Standard, or DOCSIS 3.0 were mentioned or discussed.

35.     All documents and communications regarding the corporate or business relationship between Z-Band and ChanBond.

36.     All documents, concerning whether Z-Band or any licensee to any ChanBond Patent has marked any product with the patent number of any ChanBond Patent, or otherwise attempted to comply with the marking or notice provisions of 35 U.S.C. § 287(a), including but not limited to one copy or sample of each and every product and/or package or other material on which the patent numbers of any of the ChanBond Patent has been marked.

37.     All documents related to Your, Z-Band's, or CBV's first knowledge, or the first knowledge of any Other ChanBond Inventor, of the following:

      a.     Channel Bonding;

      b.     the DOCSIS Standard;

      c.     the DOCSIS 3.0 Standard.

38.     All documents detailing any work performed by You, Z-Band, or the Other ChanBond Inventors related to Channel Bonding.

39.     All documents related to any work to give any Z-Band product the ability to support  DOCSIS 3.0, handle a DOCSIS 3.0 signal, or comply with the DOCSIS 3.0 standard.

40.     All documents concerning any notice from Z-Band to any party regarding an allegation of infringement of any claim of a ChanBond Patent.

41.     All communications between You and Z-Band, including but not limited to, communications with Z-Band during any periods of time for which You were not an employee of Z-Band.

42.     All documents related to any product of Whitaker Corp. that was tested, analyzed, used, modified, or resold by Z-Band.

43.     All documents related to the decision to form CBV.

44.     All documents related to any interest held by You, Z-Band, or any Other ChanBond Inventor, in either (a) the Instant Litigations, (b) the ChanBond Patents, (c) ChanBond, or (d) Whitaker.

45.     Any documents related to any permissions received by Z-Band for use of any cable companies' logo on its website, including the logos shown in Ex. 5 to this Subpoena.

46.     All documents and communications regarding Z-Band's sale, assignment, transfer, lease or license of any of their rights, assets, facilities, operations or services to ChanBond, CBV, or anyone else.

47.     All documents related to the "wideband distribution system" as disclosed in the '822 Patent at column 1:41-57.

48.     All documents related to the "wideband signal distribution network" described in the Whitaker Patents, including as described in the below passage:

> The foregoing and additional objects are attained in accordance with the principles of this invention by providing a wideband cabling system which functions as "passive" infrastructure to distribute wideband signals modulated onto RF carriers within a specified frequency band among a plurality of outlets. ('340 at col. 2:18-23)

49.     All documents related to the need for distribution of signals in a "relatively local area," as discussed in the below passage, including how this need was addressed by any product embodying any invention claimed in the ChanBond Patents or the Whitaker Patents:

> There are numerous instances where it is desired to distribute over twisted pair coaxial cable, or fiber optic cable wire, within a relatively local area, such as a single building, wideband signals modulated onto RF carriers.   A particular application is the distribution of video signals. For example, a school may have a number of classrooms and administrative offices, each having a television monitor, and it may be desired at a given time to provide

a program to all of the classrooms and offices, originating either from a source within one of the classrooms or offices, such as a VCR, or from an outside source, such as a local cable system. Similarly, a corporation may have a building, or several closely spaced buildings, with numerous conference rooms equipped with television monitors and analogous program presentations may be desired. It is therefore a primary object of the present invention to provide cabling infrastructure for distributing wideband signals within a relatively local area. ('340 patent at col. 1:39-55)

50.    All documents reflecting any financial information, including but not limited to revenue or profits, derived from the sale or license of any product embodying any technical matter disclosed in, or any invention claimed in, any ChanBond Patent, Whitaker Patent, and/or Related Patent.

51.    All documents related to Z-Band's making, using, testing, investigating, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any alternative technologies to Channel Bonding to increase throughput of data transmissions.

# Exhibit 1

REDACTED
IN ITS
ENTIRETY

Exhibit 2



877-801-6475     GET A QUOTE ❯

Home    About Z-Band    Products    Technical    Markets    Support    Contact Us

# Products/Services

Home  |  Markets  |  Healthcare  |  Products/Services

## Products/Services

### "GigaBUD" from Z-Band (Video Distribution Hub)

Z-Band's GigaBUD, Active Video Distribution Hub, is ideal for a variety of around-the-clock video applications in healthcare facilities, including live video monitoring in patient rooms and ICU wards and for use in distance learning for medical residents. GigaBUD can also serve as a valuable tool in patient entertainment and education.



### Cascading Capability for Multiple Hub Connectivity

- The GigaBUD is rack mounted to meet the applicable MDF/IDF port count combination for the various video drops
- Desired video is connected to the "CATV IN" port of the initial GigaBUD, which becomes the "Master" hub
- Additional GigaBUDs are connected to the Master through a cascading process and are dubbed "Slaves".
- "Outbound" Master ports are connected to "Cascade In" ports capable of providing up to eight second-level "Slaves" to achieve unidirectional cascading.
- Each second-level "Slave" can be cascaded to third and fourth levels, resulting in the capability for combining up to 585 GigaBUDs.
- End result is a video signal at the "CATV IN" port of the "Master" that can be distributed to as many as 14,040 TVs throughout a healthcare facility or system of facilities.

### "GigaBOB"

The GigaBOB is equipped with numerous attributes that provide HD TV over CAT 5e or CAT 6 cable such as:

Case 1:15-cv-00456-GBW    Document 93-1    Filed 04/24/17    Page 110 of 282 PageID #: 7335

- Remotely operated "GigaBOB" with unique distance sensing circuit and internal amplifier
- Simultaneous transmission over thousands of televisions
- 100meter distribution range for the full bandwidth of RF channels
- DOCSIS or FSK return capability for VOD and/or data applications
- 120 or 240 VAC at 50 or 60 Hz operating frequency capacity
- Hub and balun system complies with UL, CSA and FCC Part 15, Subpart B guidelines




## Markets

### Healthcare

#### Featured Projects

#### Clients

#### Products/Services

#### Resources

## Z-Band Video Distribution System Benefits

The ZBand Video Distribution System is a highly effective way to merge voice, data and video over one cabling plant to meet the video distribution needs of any healthcare environment.

In addition, our remotely powered GigaBOB balun simplifies design and installation, as well as the process of making adds, moves, and changes while maintaining the highest level of picture quality. ZBand can provide a seamless integration of RF and IP Video in your healthcare facility.

Want to see how our products work?

Schedule A Demo

Questions?

Contact Us Today



ZBand, Inc.

848B North Hanover St. Carlisle, PA 17013.

**PHONE:** 8778016475 | **FAX:** 7172493253

Products assembled in the USA

Stay Connected:

Home    About ZBand    Products    Technical    Markets    Support    Contact Us    Sitemap

Site Credits    Copyright 2017. All Rights Reserved          Privacy Policy

Rep Login

# Exhibit 3

## Agreement - ChanBond

This Agreement (this "**Agreement**"), is made as of October 27, 2015 (the "**Effective Date**"), by and among **Deirdre Leane**, an individual with an address of 2525 Carlisle St., Suite 439, Dallas, Texas 75201 ("**Seller**"), **ChanBond, LLC**, a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 ("**ChanBond**") and **UnifiedOnline, Inc.**, a Delaware corporation, of 4126 Leonard Drive, Fairfax, Virginia 22030 ("**Purchaser**"). The parties to this Agreement shall be referred to collectively herein as the "Parties" and separately as a "Party".

### Witnesseth:

WHEREAS, Seller owns 100% of the limited liability company membership interests (the "**Interests**") of **ChanBond**;

WHEREAS, Purchaser wishes to acquire Seller's entire interest in ChanBond, following which Purchaser will become the sole interest holder of ChanBond, all according to the provisions set forth herein below;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the Parties hereto hereby agree as follows:

1. **Definitions**

    1.1     "**Affiliate**" means, with respect to a Party, any Person in any country that directly or indirectly Controls, is Controlled by or is under common Control with such Party. For the purposes of this Agreement, the term "Control" of a Person means ownership, of record or beneficially, directly or through other Persons, of fifty percent (50%) or more of the voting equity of such Person or, in the case of a non-corporate Person, equivalent interests.

    1.2     "**Collateral Agreements**" means all such concurrent or subsequent agreements, documents and instruments, as amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof, including without limitation, the License Agreement, the Pay Proceeds Agreement, the Common Interest Agreement and the Promissory Note.

    1.3     "**Contract Rights and Obligations**" means the rights and obligation assigned to ChanBond under the contracts ("**Contracts**") listed on **Schedule 1.3.**

    1.4     "**Entity**" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Body (as defined below) or any other legal entity.

    1.5     "**Governmental Body**" means any (i) U.S. federal, state, county, municipal, city, town village, district, or other jurisdiction or government of any nature; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or other entity and any court or other tribunal); or (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

1.6     "**Intellectual Property**" means all domestic or foreign rights in, to and concerning ChanBond's: (i) patents, patent applications, trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, trade dress, logos, symbols, trade names, assumed names, fictitious names, corporate names and other indications or indicia of origin, including translations, adaptations, derivations, modifications, combinations and renewals thereof; (ii) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of data or information), copyrights therein and thereto, moral rights, and rights equivalent thereto, including but not limited to, the rights of attribution, assignation and integrity; (iii) trade secrets, confidential and/or proprietary information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, schematics, designs, discoveries, drawings, prototypes, specifications, hardware configurations, customer and supplier lists, financial information, pricing and cost information, financial projections, and business and marketing methods plans and proposals), collectively "**Trade Secrets**"; (iv) computer software, including programs, applications, source and object code, data bases, data, models, algorithms, flowcharts, tables and documentation related to the foregoing; (v) other similar tangible or intangible intellectual property or proprietary rights, information and technology and copies and tangible embodiments thereof (in whatever form or medium); (vi) all applications to register, registrations, restorations, reversions and renewals or extensions of the foregoing; (vii) internet domain names; and (viii) all the goodwill associated with each of the foregoing and symbolized thereby; and (ix) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including rights to recover for past, present and future violations thereof.

1.7     "**Lien**" means any mortgage, pledge, security interest, encumbrance, lien, charge or debt of any kind, any trust, any filing or agreement to grant, deposit or file a pledge or financing statement as debtor under applicable law, any subordination arrangement in favor of any Person, or any other Third Party right.

1.8     "**Person**" means any individual or Entity.

1.9     "**Proceeding**" means any claim, suit, litigation, arbitration, mediation, hearing, audit, charge, inquiry, investigation, governmental investigation, regulatory proceeding or other proceeding or action of any nature (whether civil, criminal, legislative, administrative, regulatory, prosecutorial, investigative, or informal) commenced, brought, conducted, or known to be threatened, or heard by or before, or otherwise involving, any Governmental Body, arbitrator or mediator or similar person or body.

1.10    "**Third Party**" means any Person other than a Party or its Affiliates.

## 2.     Sale and Purchase of Interests

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser ChanBond and Purchaser shall purchase and accept the assignment, transfer conveyance and delivery of ChanBond from the Seller.

Closing of Sale and Purchase of Interests; Covenants of Purchaser

2.1     Closing.  The sale, assignment, transfer and delivery of ChanBond by the Seller and the purchase thereof by the Purchaser, shall take place at a closing, to be held remotely via the exchange of documents and signatures within one business day following the execution of this Agreement (the "**Closing**" and the "**Closing Date**," respectively).

2.2     Transactions at Closing.  At the Closing, the following transactions shall occur, which transactions shall be deemed to take place simultaneously and no transaction shall be deemed to have been completed or any document delivered until all such transactions have been completed and all required documents delivered:

2.2.1     The Seller shall duly execute an interest assignment deed in the form attached hereto as **Schedule 2.2.1** (the "**Transfer Deed**") and shall deliver their respective Transfer Deed to Purchaser;

2.2.2     At Closing, ChanBond shall appoint William R. Carter, Jr. as sole manager ("**Manager**") and thereafter Manager shall have sole and exclusive authority over the business of ChanBond.

2.2.3     Purchaser shall deliver to the Seller copies of resolutions of its Board of Directors in the form attached hereto as **Schedule 2.2.3**, approving, *inter alia*, the transactions contemplated hereunder and the issuance of the Shares (as defined below) by Purchaser to Seller.

2.2.4     The Collateral Agreements shall have been executed and delivered by the respective parties thereto.

2.2.5     Purchaser shall deliver to the Seller a validly executed share certificate for the Shares (as defined below) issuable in the name of the Seller in such amounts as shall be directed by Seller not less than 72 hours after the Closing.

2.2.6     Purchaser shall deliver to Seller evidence that each Required Approval (as defined below) has been obtained.

2.2.7     Seller, ChanBond and Purchaser shall have entered into the Common Interest Agreement, in the form attached hereto as **Schedule 2.2.7**.

2.2.8     Purchaser shall deliver to Seller the Promissory Note (as defined below), in the form attached hereto as **Schedule 2.2.8**.

2.3     Conditions to Closing.  The obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions, any of which may be waived in writing by the Party entitled to the benefit thereof, in whole or in part, to the extent permitted by the applicable law:

2.3.1     No temporary restraining order, preliminary or permanent injunction or other order (whether temporary, preliminary or permanent) issued by any court of competent jurisdiction, or other legal restraint or prohibition shall be in effect which prevents the consummation of the transactions contemplated herein, nor shall any proceeding brought by any Governmental Body seeking any of the foregoing be pending, and there shall not be any action

taken, or any law, regulation or order enacted, entered, enforced or deemed applicable to the transactions contemplated herein illegal.

2.3.2   The representations and warranties of the Seller and Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those (i) representations and warranties that are qualified by materiality, which representations and warranties shall be true and correct in all respects and (ii) representations and warranties which address matters only as of a particular date, which representations and warranties shall be true and correct on and as of such particular date.

2.3.3   Each Party shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the Collateral Agreements ancillary hereto (collectively, the "**Transaction Documents**") to be performed or complied with by it on or prior to the Closing Date.

2.3.4   Each Party shall have received evidence, in form and substance reasonably satisfactory to it, that any and all approvals of Governmental Bodies and other Third Parties required to have been obtained by a Party to consummate the transactions under the Transaction Documents, if any, have been obtained (each a "**Required Approval**").

2.4   Covenant of Purchaser.   Promptly following the Closing, Purchaser shall (a) reimburse Seller for all of their costs and expenses (including reasonable attorneys' fees) incurred by Seller in connection with the consummation of the transactions contemplated by this Agreement and (b) file with the relevant Governmental Bodies all legally required reports in respect of the transactions contemplated under the Transaction Documents, including, but not limited to, the SEC Form 8-K and any Forms 3, Forms 4 or Schedule 13D's.

## 3.   Consideration

In consideration for the sale, assignment, transfer and delivery of ChanBond, Purchaser shall pay to the Seller (as directed by Seller) the consideration, as follows:

3.1   Cash Payment.   Five million U.S. Dollars ($5,000,000) payable on or before October 27, 2020 (the "**Cash Payment**"). The obligation to make the Cash Payment shall be evidenced by Purchaser's promissory note (the "**Promissory Note**") in the form of Schedule 2.2.8 attached hereto; and

3.2   Shares Payment.   Forty-four million, seven hundred thousand (44,700,000) shares of Purchaser's Common Stock (the "**Shares**") par value of $0.001 each.

3.3   Release.   Purchaser for itself, its respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the "**Releasing Parties**") knowingly, voluntarily, and irrevocably releases, forever discharges and covenants not to sue the Seller, and their respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the "**Released Parties**") from and against any and all rights, claims, losses, lawsuits or causes of action (at law or in equity), liabilities, duties, actions, demands, expenses, breaches of duty, damages,

4

obligations, proceedings, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, agreements, promises, judgments, and executions of whatever nature, type, kind, description or character (each a "**Claim**"), whether known or unknown, suspected or unsuspected, vested or contingent, past or present, that a Releasing Party ever had, now has or hereafter can, shall or may have against or with respect to the Released Parties or any of them for, upon or by reason of any matter, cause or thing related to or arising from any agreement to which ChanBond is a party or by which it is bound prior to the Closing Date, which are listed on **Schedule 3.3** (the "**Company Agreements**"), except in the case that such Claim arises out of an act of fraud, intentional misconduct or gross negligence on the part of one or more of the Released Parties, as finally determined by a court of competent jurisdiction. For the avoidance of doubt, the Company shall continue to be bound by the Company Agreements and neither the Seller nor any of the Released Parties has or shall have any further obligation or liability under the Company Agreement (other than confidentiality, common interest and other similar provisions). The Releasing Parties hereby waive the benefits of any provisions of the law of any state or territory of the United States, or principle of common law, which provides that a general release does not extend to claims which the Releasing Parties do not know or suspect to exist in its favor at the time of executing the release, which if known to it, may have materially affected the release. It is the intention, understanding and agreement of the Releasing Parties to forever discharge and release all known and unknown, present and future claims within the scope of the releases set forth in this Agreement, provided, however, this Release shall not affect or limit any Claims arising under this Agreement, for enforcement, gross negligence or willful misconduct, fraud, misrepresentation, or similar matters.

4.    **Representations and Warranties of the Seller**

The Seller hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

4.1    The Seller is the sole lawful owners, beneficially and of record, of ChanBond and ChanBond constitute all of the membership interests in ChanBond, and upon the consummation of the transactions at the Closing, Purchaser will acquire from the Seller, good and marketable title to ChanBond sold by it. There are no preemptive, anti-dilution or other participatory rights of any other parties with respect to the transactions contemplated hereunder.

4.2    The Seller has full and unrestricted legal right, power and authority to enter into and perform their obligations under the Transaction Documents and to sell and transfer ChanBond to Purchaser as provided herein. The Transaction Documents, when executed and delivered by the Seller, shall constitute the valid and legally binding obligation of the Seller, legally enforceable against the Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.3    The Seller is acquiring the Shares for investment purposes only, for their own account, and not for the benefit of others, nor with any view to, or in connection with any distribution or public offering thereof within the meaning of the U.S. Securities Act of 1933 (the "**Securities Act**").

4.4    The Seller understands that the Shares have been registered under the Securities Act.  The Seller also acknowledges that the Shares will be restricted for sale for six (6) months after the issuance.  The Seller acknowledges that any certificates evidencing the Shares will contain a legend to the foregoing effect.

4.5    Seller has sufficient knowledge and expertise in business and financial matters so as to enable it to analyze and evaluate the merits and risks of acquiring the Shares pursuant to the terms of this Agreement and is able to bear the economic risk of such acquisition, including a complete loss of its investment in the Shares.

4.6    Seller acknowledges that it has made detailed inquiries concerning Purchaser and its business, and that the officers of Purchaser have made available to the Seller any and all written information which it has requested and have answered to the Seller's satisfaction all inquiries made by the Seller.

4.7    The transactions provided for in this Agreement with respect to the Shares are not part of any pre-existing plan or arrangement for, and there is no agreement or other understanding with respect to, the distribution by the Seller of any of the Shares.

## 5.    Representations and Warranties of ChanBond

5.1    ChanBond hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

(a)    ChanBond is duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.

(b)    As of the Closing Date, ChanBond is a party to the pending litigation identified in **Schedule 5.1(b)**.

(c)    As of the Closing Date the Contracts are in full force and effect and none of the respective parties to the Contracts are in breach of any material obligation under the Contracts.

(d)    To ChanBond's knowledge, ChanBond is not a party nor bound by any contracts, agreements, promises or commitments except the assignments related to the Contracts.

(e)    Other than the assignments related to the Contracts, ChanBond has no material assets.  None of ChanBond's employees will continue with ChanBond after the Closing.    ChanBond's bank accounts and the contents thereof will be transferred to Purchaser.  Any amounts paid or payable to ChanBond (or any of its Affiliates) under licenses or other agreements or judgments entered into by or awarded to any Affiliates of ChanBond prior to the Closing Date, shall be retained as the exclusive property of such

6

Affiliates and after the Closing Date, ChanBond or any of its Affiliates will disclaim any interest therein.

## 6.   Representations and Warranties of Purchaser

Purchaser, represents and warrants to the Seller and acknowledges that the Seller are entering into this Agreement in reliance thereon as follows:

6.1     Purchaser is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted. The corporate governance documents of Purchaser (including but not limited to its Certificate of Incorporation, Bylaws and any Voting Rights Agreements, Stockholders' Agreements, Investors' Rights Agreements and the like) as in effect on the date hereof have been provided or made available to the Seller (the "**Purchaser Governance Documents**").

6.2     The Transaction Documents, when executed and delivered by Purchaser, shall constitute the valid and legally binding obligation of Purchaser, respectively, legally enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.3     The authorized capital stock of Purchaser consists of 6,000,000,000 shares of Common Stock and 10,000,000 shares of Convertible Preferred Stock, each having a par value of USD $0.001, of which 912,897,537 shares are issued and outstanding (exclusive of shares issued hereunder). Purchaser's fully-diluted capital structure before and after Closing is set forth in the capitalization table attached hereto as **Schedule 6.3**. All capital stock, preemptive rights, rights of first refusal, rights of co-sale, convertible, exercisable or exchangeable securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Purchaser or any of its subsidiaries or Affiliates any capital stock of the Purchaser and/or any of its subsidiaries are set forth in detail on **Schedule 6.3**. Except for the transactions contemplated by this Agreement and the current Purchaser Governance Documents, there are no Liens, options to purchase, proxies, preemptive rights, convertible, exercisable or exchangeable securities, outstanding warrants, options, voting trust and other voting agreements, calls, promises or commitments of any kind and, Purchaser has no knowledge that any of the said stockholders owns any other stock, options or any other rights to subscribe for, purchase or acquire any capital stock of Purchaser from Purchaser or from each other.

6.4     All issued and outstanding capital stock of Purchaser has been duly authorized, and is validly issued and outstanding and fully-paid and non-assessable. The Shares, when issued and allotted in accordance with this Agreement: (a) will be duly authorized, validly issued, fully paid, non-assessable, and free of any preemptive rights, (b) will have the rights, preferences, privileges, and restrictions set forth in Purchaser's Certificate of Incorporation, Certificate of Designation and By-laws, and (c) will be issued free and clear of any Liens of any kind.

7

6.5     Purchaser is currently in material compliance with all applicable laws, including securities laws. Purchaser has timely filed all forms and reports required to be filed with the Securities Exchange Commission (the "**SEC**") including, without limitation, all exhibits required to be filed therewith, and has made available to the Seller true, complete and correct copies of all of the same so filed (including any forms, reports and documents incorporated by reference therein or filed after the date hereof, the "**Purchaser SEC Reports**"). For purposes hereof, such Purchaser SEC Reports shall be deemed delivered to Seller via the SEC's EDGAR database. The Purchaser SEC Reports: (i) at the time filed complied (or will comply when filed, as the case may be) in all material respects with the applicable requirements of the Securities Act and/or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and the rules and regulations promulgated thereunder, and with the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder, in each case applicable to such Purchaser SEC Reports at the time they were filed; and (ii) did not at the time they were filed (or, if later filed, amended or superseded, then on the date of such later filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

6.6     Purchaser has timely filed (or has been deemed to have timely filed pursuant to Rule 12b-25 under the Exchange Act) and made publicly available on the SEC's EDGAR system, and the Seller may rely upon, all certifications and statements required by (i) Rule 13a-14 or Rule 15d-14 under the Exchange Act and (ii) Section 906 of the Sarbanes Oxley Act of 2002 with respect to any documents filed with the SEC. Since the most recent filing of such certifications and statements, there have been no significant changes in Purchaser's internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act), or in other factors that could significantly affect its disclosure controls and procedures.

6.7     The financial statements (including footnotes thereto) included in or incorporated by reference into the Purchaser SEC Reports (the "**Purchaser Financial Statements**") were complete and correct in all material respects as of their respective filing dates, complied as to form in all material respects with the Exchange Act and the applicable accounting requirements, rules and regulations of the SEC promulgated thereunder as of their respective dates and have been prepared in accordance with United States generally accepted accounting principles ("**GAAP**") applied on a consistent basis during the periods involved (except as otherwise noted therein). The Purchaser Financial Statements fairly present the financial condition of Purchaser as of the dates thereof and results of operations, cash flows and stockholders' equity for the periods referred to therein (subject, in the case of unaudited Purchaser Financial Statements, to normal recurring year-end adjustments which were not and will not be material in amount). Without limiting the generality of the foregoing, (i) no independent public accountant of Purchaser has resigned or been dismissed as independent public accountant of Purchaser as a result of or in connection with any disagreement with Purchaser on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, (ii) no executive officer of Purchaser has failed in any respect to make, without qualification, the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act with respect to any form, report or schedule filed by Purchaser with the SEC since the enactment of the Sarbanes-Oxley Act and (iii) no enforcement action has been initiated or, to the knowledge of Purchaser, threatened against Purchaser by the SEC relating to disclosures contained in any

Purchaser SEC Report. There has been no change in Purchaser's accounting policies except as described in the notes to the Purchaser Financial Statements.

6.8     Purchaser is not in default and neither the execution and delivery of the Transaction Documents nor compliance by Purchaser with the terms and provisions hereof and thereof, will conflict with, or result in a breach or violation of, any of the terms, conditions and provisions of: (i) the Purchaser Corporate Governance Documents, or (ii) any note, indenture, mortgage, lease, agreement, contract, purchase order or other instrument, document or agreement to which Purchaser is a party or by which it or any of its property is bound, or (iii) any law, statute, ordinance, regulation, order, writ, injunction, decree, or judgment of any court or any governmental department, commission, board, bureau, agency or instrumentality in any country in which Purchaser conducts business, with the exception of those judgments listed **Schedule 6.8**. Such execution, delivery and compliance with the Transaction Documents will not (a) give to others any rights, including rights of termination, cancellation or acceleration, in or with respect to any agreement, contract or commitment referred to in this paragraph, or to any of the properties of Purchaser, or (b) except for compliance with any applicable requirements under the Securities Act, the Exchange Act and any requirements of the Over-the-Counter Bulletin Board ("OTCBB"), no consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Body or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of the Transaction Documents or the consummation of the transactions contemplated hereby and thereby, which consent or approval has not heretofore been obtained or will be obtained by Closing. To the knowledge of Purchaser, no third party is in default under any agreement, contract or other instrument or document to which Purchaser is a party. To the knowledge of Purchaser, Purchaser is not a party to or bound by any order, judgment, decree or award of any Governmental Body.

6.9     No action, proceeding or governmental inquiry or investigation is pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its officers, directors or employees (in their capacity as such or as shareholders, if applicable), or against any of Purchaser's properties, including, without limitation, assets, licenses and rights transferred to Purchaser under any written agreement or other binding undertaking, or with regard to Purchaser's business, before any court, arbitration board or tribunal or administrative or other governmental agency, nor does Purchaser believe that there is any basis for the foregoing.

7.     **Survival; Indemnification; Limitation of Liability; No Consequential Damages**

7.1     The representations and warranties of each Party hereunder shall survive the Closing and remain in effect for a period of one (1) year thereafter.

7.2     Indemnification. The Seller, on the one side, and Purchaser on the other side (as applicable, the "**Indemnifying Party**") agree to indemnify and hold harmless the Parties of the other side and their respective Affiliates (as applicable, the "**Indemnified Parties**"), against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon (a) any breach of any of such Party's representations or warranties herein, misrepresentation or warranty or breach or failure by the Indemnifying Party to comply with any covenants or

agreement made by it herein, in the other Transaction Documents or in any other document furnished by it to any of the foregoing in connection with this transaction and (b) any action for securities law violations instituted by an Indemnifying Party which is finally resolved by judgment against such Indemnifying Party.

7.3     Mechanics of Indemnification.   Whenever any claim arises for indemnification under this Agreement or an event which may result in a claim for such indemnification has occurred, the Indemnified Party(ies) will promptly notify the Indemnifying Party of the claim and, when known, the facts constituting the basis for such claim. The Indemnifying Party shall have the obligation to dispute and defend all such Third Party claims and thereafter so defend and pay any adverse final judgment or award or settlement amount in regard thereto. Such defense shall be controlled by the Indemnifying Party, and the cost of such defense shall be borne by the Indemnifying Party, provided that the Indemnified Parties shall have the right to participate in such defense at their own expense, unless the Indemnified Parties require their own attorney due to a conflict of interest, in which case, the expense of a single law firm acceptable to such Indemnified Party will be borne by the Indemnifying Party. The Indemnified Parties shall cooperate in all reasonable respects in the investigation, trial and defense of any such claim at the cost of the Indemnifying Party. If the Indemnifying Party fails to take action within thirty (30) days of notice, then the Indemnified Parties shall have the right to pay, compromise or defend any third party claim, such costs to be borne by the Indemnifying Party. The Indemnified Parties shall also have the right and upon delivery of ten (10) days advance written notice to such effect to the Indemnifying Party, exercisable in good faith, to take such action as may be reasonably necessary to avoid a default prior to the assumption of the defense of the Third Party claim by the Indemnifying Party, and any reasonable expenses incurred by the Indemnified Parties so acting shall be paid by the Indemnifying Party. The Indemnifying Party will not settle or compromise any Third Party claim without the prior written consent of the Indemnified Parties, not to be unreasonably withheld.

7.4     Purchaser Indemnification.   Purchaser and ChanBond shall indemnify and hold the Seller harmless with respect to any loss, expense, cost, damage and settlement (collectively, "**Indemnified Expenses**") caused to Seller as a result of Purchaser's or ChanBond's or its Affiliates' actions or omissions with respect to the Patents following the Closing Date, provided Seller is not determined to responsible for such actions as a result of their fraud or intentional misconduct. In particular, in the event that the enforcement or other activities with the Patents results in litigation or other dispute resolution processes with one or more Third Parties, with Seller being required to be involved or liable for the expenses arising through actions of ChanBond (*e.g.*, being added as a party to the process, even if such joinder is improper, or being subject to Third Party discovery requests or otherwise having any exposure for any claims arising through activities of ChanBond), Purchaser and ChanBond shall, at Seller's request, indemnify Seller all of Seller's Indemnified Expenses arising from that involvement.

7.5     Limitation of Liability.   SELLER'S TOTAL LIABILITY UNDER THE TRANSACTION DOCUMENTS WILL NOT EXCEED THE CASH CLOSING CONSIDERATION ACTUALLY RECEIVED BY SELLER HEREUNDER. THE PARTIES ACKNOWLEDGE THAT THIS LIMITATION ON POTENTIAL LIABILITIES WAS AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THE TRANSACTION DOCUMENTS.

7.6     Limitation on Consequential Damages.  NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS EMPLOYEES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 8.    Miscellaneous

8.1     Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of the Transaction Documents and the intentions of the Parties as reflected thereby.

8.2     Governing Law; Arbitration; Prevailing Party.  This Agreement and all claims or causes of action that may be based upon, arise out of or relate to this Agreement or the Collateral Agreements will be construed in accordance with and governed by the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State without regard to conflicts of laws principles thereof.  Any dispute arising under or in connection with any matter of any nature (whether sounding in contract or tort) relating to or arising out of this Agreement, shall be resolved exclusively by arbitration.  The arbitration shall be in conformity with and subject to the applicable rules and procedures of the American Arbitration Association.  The arbitration shall be conducted before a panel of three (3) arbitrators, with one arbitrator to be selected by each of Seller and Buyer and the third arbitrator to be selected by the arbitrators selected by the Parties.  The Parties agree to be (a) subject to the exclusive jurisdiction and venue of the arbitration in the Eastern District of Texas (b) bound by the decision of the arbitrator as the final decision with respect to the dispute, and (c) subject to the jurisdiction of both of the federal courts of the United States of America or the courts sitting in the Eastern District in the State of Texas for the purpose of confirmation and enforcement of any award.  The prevailing party in any arbitration shall be entitled to recover its costs and expenses (including attorney's fees and expenses) from the non-prevailing party.

8.3     Limitations on Assignment.  Except as expressly permitted in this Section, none of Purchaser or ChanBond may grant or assign any rights or delegate any duties under this Agreement to any Third Party (including by way of a "change in control") or may sell, transfer, or spin-off any of the interests in ChanBond or any of its material assets without the prior written consent of Seller.  Notwithstanding the foregoing, Purchaser shall be permitted to transfer or assign) its rights, interests and obligations under this Agreement, as applicable, without Seller's prior written consent as part of a sale of all or substantially all of its business, equity to, or a change in control transaction with a Third Party acquirer (an "**M&A Transaction**", and an "**Acquirer**," respectively); provided that (a) such transfer or assignment is subject to all of the terms and conditions of this Agreement; and (ii) such Acquirer executes a written undertaking towards Seller agreeing to be bound by all of the terms and conditions of this Agreement with respect to the rights being transferred or assigned.  Except as otherwise expressly limited herein,

the provisions hereof shall inure to the benefit of, and be binding upon, the successors, permitted assigns, heirs, executors, and administrators of the Parties hereto.

8.4     This Agreement and the Schedules hereto constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.  Any term of this Agreement may be amended only with the written consent of all Parties thereto.  The observance of any term hereof may be waived (either prospectively or retroactively and either generally or in a particular instance) only with the written consent of the party against which such waiver is sought.

8.5     All notices and other communications required or permitted hereunder to be given to a Party to this Agreement shall be in writing and shall be faxed, emailed or mailed by registered or certified mail, postage prepaid, or prepaid air courier, or otherwise delivered by hand or by messenger, addressed to such Party's address as set forth above; or at such other address as the Party shall have furnished to each other Party in writing in accordance with this provision.  Any notice sent in accordance with this Section shall be effective (i) if mailed, seven (7) business days after mailing, (ii) if by air courier two (2) business days after delivery to the courier service, (iii) if sent by messenger, upon delivery, and (iv) if sent via facsimile or email, upon transmission and electronic confirmation of receipt or (if transmitted and received on a non-business day) on the first business day following transmission and electronic confirmation of receipt (provided, however, that any notice of change of address shall only be valid upon receipt).

8.6     No delay or omission to exercise any right, power, or remedy accruing to any Party upon any breach or default under this Agreement, shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any of the Parties, shall be cumulative and not alternative.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                          **DEIRDRE LEANE**

                                 By: _Deirdre Leane_
                                 Name: _DEIRDRE LEANE_
                                 Date: _27 October 2015_

PURCHASER:                       **UNIFIEDONLINE, INC.**

                                 By: _[signature]_
                                 Name: _Rob Howe_
                                 Title: _CEO_
                                 Date: _27 October, 2015_

CHANBOND:                        **CHANBOND, LLC**

                                 By: _Deirdre Leane_
                                 Name: _DEIRDRE LEANE_
                                 Title: _MANAGER_
                                 Date: _23 October 2015_

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                                **DEIRDRE LEANE**

                                       By: _Deirdre Leane_
                                       Name: _DEIRDRE LEANE_
                                       Date: _27 October 2015_

PURCHASER:                             **UNIFIEDONLINE, INC.**

                                       By: _[signature]_
                                       Name: _Rob Howe_
                                       Title: _CEO_
                                       Date: _27 October, 2015_

CHANBOND:                              **CHANBOND, LLC**

                                       By: _Deirdre Leane_
                                       Name: _DEIRDRE LEANE_
                                       Title: _MANAGER_
                                       Date: _27 October 2015_

## SCHEDULE 1.3

### Contracts

1. ChanBond, LLC – CBV, Inc. Patent Purchase Agreement dated April 9, 2015
2. ChanBond, LLC – Bentham IMF Litigation Funding Agreement dated September 9, 2015
3. ChanBond, LLC - IPNAV, LLC Advisory Services Agreement dated April 9, 2015
4. ChanBond, LLC - Mishcon de Reya Retention Agreement dated April 20, 2015
5. ChanBond, LLC - Bayard Law Engagement Agreement dated June 8, 2015
6. ChanBond, LLC - Ascenda Law Group Engagement Agreement dated July 14, 2015

## SCHEDULE 2.2.1

### Interest Transfer Deed

**FOR VALUE RECEIVED**, the undersigned, Deirdre Leane ("**Transferor**") hereby assigns, transfers and conveys all of its membership interests in ChanBond, LLC, a Delaware limited liability company (the "**Interests**") to UnifiedOnline, Inc., a Delaware corporation ("**Transferee**") and Transferee hereby accepts the above mentioned Interests.

In witness whereof, we affix our signatures hereto this 27th day of October, 2015.

Transferor:

**Deirdre Leane**

27. October 2015
Date

Transferee:

UnifiedOnline, Inc.

10-27-2015
Date

Witness:

Name: Joseph Ghally

10/27/2015
Date

Witness:

Name: B.J. Rodriguez

10-27-2015
Date

## SCHEDULE 2.2.3

### UnifiedOnline, Inc.'s Board of Directors Resolutions

STATEMENT OF UNANIMOUS
CONSENT TO ACTION TAKEN IN
LIEU OF A
SPECIAL MEETING OF THE BOARD OF
DIRECTORS OF
UNIFIEDONLINE, INC.

In lieu of a special meeting of the board of directors (the "Board") of UnifiedOnline, Inc., a Delaware corporation (the "Corporation"), and in accordance with the Bylaws of the Corporation and §141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the members of the Board, do hereby consent to the adoption of, and do hereby adopt, the following resolutions and declare them to be in full force and effect as if they had been duly adopted at a meeting of the Board, duly called, noticed and held:

WHEREAS, the Board deems it to be in the best interests of the Corporation to enter into a Purchase Agreement dated October 26, 2015 (the "Agreement"), in connection with the acquisition of ChanBond, LLC ("ChanBond"), a Delaware limited liability company, the owner of that certain portfolio of Intellectual Property, known as the "ChanBond" patent portfolio, more particularly described as follows:

> The Corporation and CHANBOND agree to an acquisition by the Corporation of 100% of the membership interests of CHANBOND for consideration generally defined as: 44,700,000 shares of the common stock of the Corporation, plus a $5MM 5-Year No-Interest Promissory Note, with a Maturity Date of October 27, 2020..

NOW, THEREFORE BE IT RESOLVED, that the Corporation is hereby authorized to enter into the Agreement and the Note.

FURTHER RESOLVED, that any executive officer of the Corporation be, and hereby is authorized, empowered and directed, from time to time, to take such additional action and to execute, certify and deliver to the transfer agent of the Corporation, as any appropriate or proper to implement the provisions of the foregoing resolutions, and be it

FURTHER RESOLVED, that this Consent may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument, and that counterpart signature pages transmitted by facsimile transmission, by electronic mail in portable document format (.pdf) or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, shall have the same effect as physical delivery of the paper document bearing an original signature.

IN WITNESS WHEREOF, the undersigned members of the Board have executed this Consent as of October 26, 2015.

Robert M. Howe, III

## SCHEDULE 2.2.7

### Common Interest Agreement

THIS COMMON INTEREST AGREEMENT ("**Agreement**") is entered into as of April 9, 2015, by and among **ChanBond, LLC** (the "**Company**") having its principal offices at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204; **UnifiedOnline, Inc.** ("**UnifiedOnline**"), having its principal offices at 4126 Leonard Drive, Fairfax, Virginia 22030; and **Deirdre Leane ("Leane")**, located at 2525 Carlisle Street, Suite 439, Dallas, Texas 75201.

1.    Background.

1.1    Company, Unified and Leane are sometimes referred to herein as a "**party**" or the "**parties**" and are presently negotiating the closing of an agreement under which UnifiedOnline will purchase Company from Leane and continue to enforce and license patents and related rights owned by the Company "**IP Rights**" and the "**Patent Matters**" respectively).

1.2    The parties have a common legal interest in upholding the validity and enforceability of the IP Rights, for purposes of enforcement. The parties anticipate they will enforce inherent rights of the IP Rights against third parties through litigation. The parties have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest doctrine. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of privileged information and attorney work product developed by the parties and their respective counsel.

2.    Common Interest.

2.1    The parties have a common, joint and mutual legal interest in the monetization of valid and enforceable patents. In furtherance of that common interest, the parties will cooperate with each other, to the extent permitted by law, to share information protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or immunity with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of this Agreement.

2.2    In order to further their common interest, the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, evidence of use materials, claims charts, prosecution history files and other information (hereinafter "**Common Interest Materials**"). The sole purpose of the exchange of the Common Interest Materials is to support the parties' common interest with respect to the enforcement for the Patent Matters. Any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection. Nothing in this Agreement requires a party to share information with the other party.

3.    Nondisclosure.

3.1    The parties and their counsel shall use the Common Interest Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Common Interest Material. No party nor

their respective counsel shall produce privileged documents or information unless or until directed to do so by a final order of a court of competent jurisdiction, or upon the prior written consent of the other party. No privilege or objection shall be waived by a party hereunder without the prior written consent of the other party.

3.2     Except as herein provided, in the event that either party or its counsel is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings    (by    oral    questions, interrogatories, requests for information or    documents,    subpoenas,    civil investigative demands or similar process) to    disclose    any    Common    Interest Materials, the party or its counsel shall assert all applicable privileges, including, without limitation, the common interest doctrine, and shall immediately inform the other party and the other party's counsel of the request or requirement to disclose.

4.     Relationship; Additions; Termination.

4.1     This Agreement does not create any agency or similar relationship among the parties.    Through the term of the agreement between the parties, or any other agreement requiring confidentiality, (whichever term is longer), no party nor their respective counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2     Nothing in this Agreement affects the    separate    and    independent representation of each party by its respective counsel or creates an attorney-client relationship between the counsel for a party and the other party to this Agreement.

4.3     This Agreement shall continue until terminated upon the written request of either party.    Upon termination, each party and their respective counsel shall return any Common Interest Material furnished    by    the    other    party. Notwithstanding termination, this Agreement shall continue to protect all Common Interest Materials disclosed prior to termination. Sections 3 and 5 shall survive termination of this Agreement.

5.     General Terms.

5.1     This Agreement is governed by the laws of the State of Delaware, without regard to its choice of law principles to the contrary.    In the event any provision of the Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect.    Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2     The parties agree that a breach of this    Agreement    would    result    in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party shall be entitled to equitable relief, including injunctive relief, as a non-exclusive remedy for any

such breach.

5.3    Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service as set forth below, and shall be deemed to have been given on the day received:

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, TX 75204

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

Deirdre Leane
2525 Carlisle Street
Suite 439
Dallas, TX 75201

5.4    This Agreement is effective and binding upon each party as of the date it is signed by or on behalf of a party and may be amended only by a writing signed by or on behalf of each party. This Agreement may be executed in counterparts. Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

***The remainder of this page has been intentionally left blank.**

IN WITNESS WHEREOF, CHANBOND, LLC, UNIFIEDONLINE, INC. and DEIRDRE
LEANE have executed this Common Interest Agreement by their duly authorized
representatives.

CHANBOND, LLC
By: _____
　　　　(Signature)

Name: DEIRDRE LEANE

Title: MANAGER

UNIFIEDONLINE, INC.
By: _____
　　　　(Signature)

Name: Rob Howe

Title: CEO

DEIRDRE LEANE

By: _____
　　　　(Signature)

Name: DEIRDRE LEANE

Title: DR.

SCHEDULE 2.2.8

Promissory Note

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.

## UNIFIEDONLINE, INC.

## PROMISSORY NOTE

Principal Amount: $5,000,000                    Original Issuance Date: October 27, 2015

FOR VALUE RECEIVED UnifiedOnline, Inc., a Delaware corporation (the "Company"), promises to pay to Deirdre Leane, an individual, of 2525 Carlisle St., Suite 439, Dallas, TX 75201 (the "Holder") an aggregate principal amount of Five Million Dollars ($5,000,000.00) (representing the Cash Payment as provided for and defined in the Interest Sale Agreement dated as of the date hereof (the "Interest Sale Agreement"), to which the Company and the Holder are parties) payable on or prior to October 27, 2020 (the "Maturity Date"), provided, however, that if this Note is not paid in full by the Maturity Date, the aggregate principal amount of this Note shall be increased by Twenty Five Thousand Dollars ($25,000.00) for each month such payment is delayed (or *pro rata* portion thereof) until paid in full (the "New Principal Balance").

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    Event of Default.

       (a)    For purposes of this Note, an "Event of Default" means:

              (i)    the Company shall default in the payment of principal on this Note on or prior to the applicable Maturity Date; or

              (ii)    the Company shall be in breach of any obligation, covenant or representation made in this Note or the Interest Sale Agreement; or

              (iii)    the Company shall (a) become insolvent; (b) dissolve or terminate its existence; (c) admit in writing its inability to pay its debts generally as they mature; (d) make an assignment for the benefit of creditors or commence proceedings for its

Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHANBOND, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. _____ |
| | ) |
| COMCAST CORPORATION and | )  **TRIAL BY JURY DEMANDED** |
| COMCAST CABLE | ) |
| COMMUNICATIONS, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ChanBond, LLC ("ChanBond"), as for its complaint of patent infringement in this matter, hereby alleges through its attorneys as follows:

### Nature of the Action

This is an action for patent infringement of United States Patent Nos. 7,941,822 (the "'822 Patent"), 8,341,679 (the "'679 Patent") and 8,984,565 (the "'565 Patent") (collectively, the Patents) under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*., seeking damages and injunctive and other relief under 35 U.S.C. § 281, *et seq*.

### The Parties

1.      Plaintiff ChanBond is a Delaware limited liability company with its principal place of business at 2633 McKinney Ave., Dallas, Texas 75204.

2.      Defendant Comcast Corporation ("Comcast Corp.") is a Pennsylvania corporation with its principal place of business at 1701 John F Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Corp. may be served with process pursuant to the Delaware long arm statute, 10 *Del. C.* § 3104.

3.      Defendant Comcast Cable Communications, LLC ("Comcast Cable") is a
Delaware limited liability company with its principal place of business at 1701 John F Kennedy
Boulevard, Philadelphia, Pennsylvania 19103.  On information and belief, Comcast Cable is a
wholly owned, direct or indirect subsidiary of Comcast Corp.  Comcast Cable may be served
with process via its registered agent, Comcast Capital Corporation, 1201 North Market Street,
Suite 1000, Wilmington, Delaware 19801.

4.      Comcast Corp. and Comcast Cable are referred to herein, collectively, as
"Comcast" or "defendants."

## Jurisdiction and Venue

5.      This is an action for patent infringement arising under the Patent Laws of the
United States, Title 35 of the United States Code.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
§§ 1331 and 1338(a) because the action concerns the infringement of United States patents.

7.      This court has personal jurisdiction over defendants.  Upon information and
belief, each defendant transacts substantial business in the State of Delaware, directly or through
intermediaries, including: (i) at least a portion of the infringements alleged herein, and (ii)
regularly does or solicits business in Delaware, engages in other persistent courses of conduct,
maintains continuous and systematic contacts in Delaware, purposefully avails itself of the
privileges of doing business in Delaware, and/or derives substantial revenue from goods and
services provided to individuals in Delaware.  In addition, Comcast Cable is a limited liability
corporation organized and existing under the laws of the State of Delaware.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other reasons, defendants have transacted business in the State of Delaware and defendants have committed and continue to commit acts of patent infringement in Delaware.

### The Patents-In-Suit

9.      On May 10, 2011, the United States Patent and Trademark Office duly and legally issued the '822 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer, Richard Snyder and Robert Stine.  The inventors assigned all rights in the '822 Patent to CBV, Inc. ("CBV"), which was founded by the inventors, and CBV assigned the '822 Patent to ChanBond, including all rights to enforce the '822 Patent and to recover for infringement.  ChanBond has all right, title and interest to the '822 Patent.  The '822 Patent is valid and in force.  A true and correct copy of the '822 Patent is attached hereto as Exhibit A.

10.     On December 25, 2012, the United States Patent and Trademark Office duly and legally issued the '679 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer, Richard Snyder and Robert Stine.  The inventors assigned all rights in the '679 Patent to CBV, which was founded by the inventors, and CBV assigned the '679 Patent to ChanBond, including all rights to enforce the '679 Patent and to recover for infringement.  ChanBond has all right, title and interest to the '679 Patent.  The '679 Patent is valid and in force.  A true and correct copy of the '679 Patent is attached hereto as Exhibit B.

11.     On March 17, 2015, the United States Patent and Trademark Office duly and legally issued the '565 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer,

Richard Snyder and Robert Stine. The inventors assigned all rights in the '565 Patent to CBV, which was founded by the inventors, and CBV assigned the '565 Patent to ChanBond, including all rights to enforce the '565 Patent and to recover for infringement. ChanBond has all right, title and interest to the '565 Patent. The '565 Patent is valid and in force. A true and correct copy of the '565 Patent is attached hereto as Exhibit C.

12.    Generally, the patents-in-suit are directed in improving the data transmission of wideband distribution systems. Historically, data service flows (e.g. data, web traffic, voice and video transmitted via the Internet Protocol) have been transmitted over a single channel at a fixed bandwidth. But with the demand for transmission of more and more content at ever increasing speeds, the capabilities of a single channel transmission methodology became exhausted.

13.    The patents-in-suit address and overcome, among other things, the throughput problems regarding this single channel methodology. The inventors of the patents-in-suit invented intelligent devices that allow a single data service flow (e.g. large data transmissions) to be split and modulated onto multiple channels for transmission. This transmission is then demodulated and recombined back into a single service flow for distribution to addressable devices. Using the inventions, service providers are now capable of efficiently transmitting more content at higher speeds and better quality of service.

## COUNT I
## (INFRINGEMENT OF THE '822 PATENT)

14.    Plaintiff incorporates paragraphs 1 through 13 herein by reference as if set forth here in full.

15.    Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '822 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing

into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '822 Patent. The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the Data Over Cable System Interface Specification ("DOCSIS") standard, version 3.0 or higher.[1] More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality"). Comcast's cable systems and components that perform or are capable of performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '822 Patent under 35 U.S.C. § 271.

16. As a result of Comcast's unlawful infringement of the '822 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial. Plaintiff is entitled to recover from Comcast the damages adequate to compensate for such infringement, which have yet to be determined.

17. Comcast will continue to infringe the '822 Patent unless and until it is enjoined by this Court.

---

[1] *See, e.g.,* http://customer.xfinity.com/help-and-support/internet/docsis3/?ts=2 ("With DOCSIS 3.0, you'll experience significantly faster speeds, so you can make the most of your online experience. DOCSIS 3.0 also opens the door to new Internet technologies.")

## COUNT II
## (INFRINGEMENT OF THE '679 PATENT)

18.     Plaintiff incorporates paragraphs 1 through 17 herein by reference as if set forth here in full.

19.     Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '679 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '679 Patent.  The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the DOCSIS standard, version 3.0 or higher.  More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality").  Comcast's cable systems and components that perform or are capable of performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '679 Patent under 35 U.S.C. § 271.

20.     As a result of Comcast's unlawful infringement of the '679 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff is

entitled to recover from Comcast the damages adequate to compensate for such infringement,

which have yet to be determined.

21.     Comcast will continue to infringe the '679 Patent unless and until it is enjoined by

this Court.

**COUNT III**
**(INFRINGEMENT OF THE '565 PATENT)**

22.     Plaintiff incorporates paragraphs 1 through 21 herein by reference as if set forth

here in full.

23.     Upon information and belief, Comcast has been and is currently directly

infringing, literally or under the doctrine of equivalents, one or more claims of the '565 Patent by

making, using, testing, offering to sell, and/or selling within the United States, and/or importing

into the United States, without authority, cable systems and cable services that are covered by at

least one claim of the '565 Patent.  The accused cable systems include cable system components

such as cable modem termination systems, RF transmission hardware, network monitoring

equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia

terminal adapters, and set-top boxes), including but not limited to components that are compliant

with the DOCSIS standard, version 3.0 or higher.  More particularly, Comcast, without authority

from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable

systems and/or cable services that perform, are capable of performing or are provided having

channel bonding functionality, including but not limited to cable systems and components that

have the capability to distribute a service flow over multiple, bonded channels and/or the

capability to receive a service flow over multiple, bonded channels (the "Accused

Functionality").  Comcast's cable systems and components that perform or are capable of

7

performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '565 Patent under 35 U.S.C. § 271.

24.    As a result of Comcast's unlawful infringement of the '565 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial. Plaintiff is entitled to recover from Comcast the damages adequate to compensate for such infringement, which have yet to be determined.

25.    Comcast will continue to infringe the '565 Patent unless and until it is enjoined by this Court.

**WILLFUL INFRINGEMENT OF THE '822, '679, and '565 PATENTS**

26.    Plaintiff incorporates paragraphs 1 through 25 herein by reference as if set forth here in full.

27.    In January 2012, Comcast announced that it had completed its rollout of DOCSIS 3.0.

28.    In February 2012, a business associate of the inventors communicated with Mr. Joseph DiTrolio, Comcast Vice President and Corporate Comptroller, regarding the patent portfolio. On February 23, 2012, the business associate had a face-to-face meeting with Mr. DiTrolio, wherein he provided a write-up that identified the '822 Patent and the application that would issue as the '679 Patent, and that indicated other continuations were pending. The write-up described the patents and applications and their applicability to DOCSIS 3.0 and the cable industry's channel bonding technology. The business associate and Mr. DiTrolio discussed the patents, patent applications, relevant technology, and the patents' and patent applications' applicability to the cable industry's channel bonding technology. By February 23, 2012, Mr. DiTrolio, and thus Comcast, knew of the at least the '822 Patent and the application that would

issue as the '679 Patent, and knew of their relevance to the DOCSIS 3.0 channel bonding technology used by Comcast.

29.     By February 27, 2012, Mr. DiTrolio had communicated the patent portfolio and the write-up to Mr. James Finnegan, Comcast Senior Vice President, Intellectual Property Strategy.  On information and belief, by February 27, 2012, Mr. Finnegan knew of the '822 Patent and the applications that would issue as the '679 and '565 Patents, and knew of their relevance to the DOCSIS 3.0 channel bonding technology used by Comcast.

30.     On March 28, 2012, Mr. Hennenhoefer (one of the co-inventors) had a teleconference with Mr. Finnegan during which the patents, applications and CBV were discussed.  Mr. Finnegan informed Mr. Hennenhoefer that Comcast was obtaining a legal opinion regarding the patents.  Shortly thereafter, Mr. Hennenhoefer had a follow-up call with Mr. Finnegan.

31.     On February 12, 2013, the '822 and '679 Patents and the application that would issue as the '565 Patent were also brought to the attention of Mr. Tony Werner of Comcast.  On February 13, 2013, Mr. Werner communicated the patents and applications, for at least a second time, to Mr. Finnegan.  Shortly thereafter, Messrs. Hennenhoefer and Stine (another of the co-inventors) had a teleconference with Mr. Mark Dellinger, Comcast Vice President, Intellectual Property Strategy in which the patents and applications were discussed, along with their applicability to DOCSIS 3.0.

32.     Despite Comcast's knowledge of the Patents and the channel bonding technology that they covered, Comcast nevertheless continued making, using and selling products that complied with and used DOCSIS 3.0 (and higher) channel bonding, despite an objectively high likelihood that such actions constituted infringement of the Patents.  This infringement was

known to Comcast or was so obvious that Comcast should have known about this infringement.

Despite knowing that its actions constituted infringement of the Patents and/or despite knowing

that that there was a high likelihood that its actions constituted infringement of the Patents,

Comcast nevertheless continued its infringing actions, and continued to make, use and sell

infringing DOCSIS 3.0 (and higher) products.

33.     Comcast's infringement of the '822, '679 and '565 Patents has thus been

deliberate and willful, at least since February 23, 2012.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ChanBond, LLC respectfully requests that this Court enter

judgment in its favor as follows:

A.     Declaring that defendants have infringed, literally and/or under the doctrine of

equivalents, at least one claim of each of the '822, '679 and '565 Patents, and that this

infringement is willful;

B.     Awarding to Plaintiff the damages to which it is entitled under 35 U.S.C. § 284

for defendants' past infringement and any continuing or future infringement, including

compensatory damages, and the trebling of such damages due to the willful nature of the

infringement;

C.     Awarding Plaintiff costs (including all disbursements) and expenses incurred in

this action;

D.     Awarding Plaintiff pre- and post-judgment interest on its damages;

E.     Declaring that this case is exceptional pursuant to 35 U.S.C. §285 and awarding

Plaintiff its attorneys' fees and costs; and

F.    Awarding Plaintiff such other and further relief in law or in equity as this Court

deems just and proper.

**JURY DEMAND**

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of

any and all issues so triable by right.

Dated:  September 21, 2015                           BAYARD, P.A.

OF COUNSEL:                                          */s/ Stephen B. Brauerman*
                                                    Stephen B. Brauerman (No. 4952)
Mark Raskin                                         Vanessa R. Tiradentes (No. 5398)
Robert Whitman                                      Sara E. Bussiere (No. 5725)
John F. Petrsoric                                   222 Delaware Avenue, Suite 900
MISHCON DE REYA NEW YORK LLP                        P.O. Box 25130
750 Seventh Ave., 26ᵗʰ Floor                        Wilmington, Delaware 19899
New York, NY 10019                                  (302) 655-5000
                                                    sbrauerman@bayardlaw.com
                                                    vtiradentes@bayardlaw.com
                                                    sbussiere@bayardlaw.com

                                                    *Attorneys for Plaintiff ChanBond, LLC*

# Exhibit 5

INTERNET ARCHIVE
WayBackMachine

http://www.z-band.com/    Go

186 captures
7 Jun 00 - 10 Aug 15

FEB JUN AUG    Close
◄ 26 ►
2013 2014 2015    Help

GET A QUOTE



## Video Distribution Product



### CATV/Satellite Distribution

Learn More

### IPTV/IP Video

Learn More

# Markets We Serve



### Healthcare

| Hospitals | Assisted Living |



### Government & Military

| Federal | Civilian |



### Hospitality

| Casinos | Resorts |



### Education

| K-12 | Universities |



### Commercial Businesses

| Financial | Corp. Headquarters |



### International

| International | International |

## Z-Band: The Leader in Enterprise Video Distribution Systems

Z-Band is a veteran-owned commercial video system provider based in Carlisle, PA. We design, manufacture, and implement cutting-edge high-definition video distribution systems for the government, healthcare, commercial, education, hospitality, and international markets. We feature an active, self-adjusting video distribution system that is capable of distributing CATV/HDTV, satellite, internally-generated video, and other video-on-demand (VOD) services over unshielded twisted pair (UTP) Category cable.

» Read More

Upcoming Webinar

Read Our Blogs

Schedule a Demo



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
**PHONE:** 877-801-6475 | **FAX:** 877-801-6475

Fully patented technology made in the USA - ISO 9001:2008

Stay Connected:

Rep Login

Home | About Z-Band | Products | Technical | Markets | Support | Contact Us
Sitemap | Privacy Policy | Site Credits | Copyright 2014. All Rights Reserved

# Exhibit 6

REDACTED

IN ITS

ENTIRETY

# Exhibit 7

REDACTED

IN ITS

ENTIRETY

# Exhibit 8

# REDACTED

# IN ITS

# ENTIRETY

# Exhibit 9

# REDACTED
# IN ITS
# ENTIRETY

EXHIBIT E

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| Chanbond, LLC | ) |
| _Plaintiff_ | ) |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) ) ) ) ) ) ) |

Civil Action No.   C.A. Nos.15-842; 15-843; 15-844; 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA)

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                          Earl Hennenhoefer

c/o John Petrsoric, Mischon De Reya New York LLP, 2 Park Avenue, 20th Floor, New York, NY 10016

_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Fairfield Inn & Suites Carlisle<br>1528 Commerce Ave.<br>Carlisle, PA 17015 | Date and Time:<br>February 14-15, 2017 at 9:30 AM |
|---|---|

The deposition will be recorded by this method:  audio-visual and stenographic means

❏ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/24/2017

| CLERK OF COURT | |
|---|---|
| | OR |
| _Signature of Clerk or Deputy Clerk_ | /s/ Anup K. Misra<br>_Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
all defendants                                                    , who issues or requests this subpoena, are:

Anup K. Misra, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (212) 294-6697, amisra@winston.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.    C.A. Nos.15-842; 15-843;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____  on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT F

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| *Plaintiff* | ) | |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) ) ) ) ) ) | Civil Action No.  C.A. Nos.15-842; 15-843; 15-844; 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                          Earl Hennenhoefer
c/o John Petrsoric, Mishcon De Reya New York LLP, 2 Park Avenue, 20th Floor, New York, NY 10016

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment A

| Place: Fairfield Inn & Suites Carlisle 1528 Commerce Ave. Carlisle, PA 17015 | Date and Time: 02/10/2017 0:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/24/2017

| CLERK OF COURT | OR | |
|---|---|---|
| | | /s/ Anup K. Misra |
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
all defendants_____ , who issues or requests this subpoena, are:

Anup K. Misra, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (212) 294-6697, amisra@winston.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   C.A. Nos.15-842; 15-843; 15-844;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____     on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

*ChanBond, LLC v. Atlantic Broadband Group, LLC et al.*
**Civil Action No. 1:15-cv-00842 - 854 (D. Del.)**

**DEFINITIONS**

The following definitions are applicable to terms employed in responding to this Subpoena *Duces Tecum* ("Subpoena") for the production of documents:

1.      "You" or "Your" means Earl Hennenhoefer.

2.      The term "ChanBond" means ChanBond, LLC, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, including at least CBV and Z-Band, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in ChanBond, LLC, the Asserted Patents, or the Related Patents, including at least UnifiedOnline, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

3.      The term "UnifiedOnline" means UnifiedOnline, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in UnifiedOnline, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

4.      The term "CBV" means CBV, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an

1

interest in CBV, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

5.      The term "Z-Band" means Z-Band, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in Z-Band, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

6.      The term "Whitaker Corp." means The Whitaker Corporation, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in The Whitaker Corporation, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

7.      The term "ChanBond Patents" means U.S. Patent Nos. 7,346,918, 7,941,822, 8,341,679, 8,984,565, and 9,015,774, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

8.      The term "Related Patents" means any and all patents that relate back to a common application as any ChanBond Patent or Whitaker Patent, including any provisional or non-provisional applications, continuations, continuations-in-part, divisions, interferences, reexaminations, reissues, parents, foreign counterpart applications, as well as any other applications disclosing, describing or claiming any invention disclosed, described or claimed in any ChanBond Patent or Whitaker Patent, or claiming the benefit of the filing date of any

application whose benefit is claimed in any ChanBond Patent or Whitaker Patent, whether or not abandoned and whether or not issued.

9.     The term "Other ChanBond Inventors" means the other named inventors besides You listed on the face of the ChanBond Patents.  This includes Richard Snyder and Robert Stine.

10.     The term "Whitaker Patents" means U.S. Patent No. 5,901,340 and U.S. Patent No. 5,875,386, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

11.     The term "Whitaker Inventors" means the named inventors on the Whitaker Patents.  These include Steven Lee Flickinger, James Ray Fetterolf, Sr., Joseph P. Preschutti, Terry P. Bowen, Jeffrey Legg, and David Koller.

12.     The term "GigaTwist" means the GigaTwist product.  For avoidance of doubt, this term includes the GigaTwist Technology referenced in Ex. 1 (ZBAND_0004466) to this subpoena.

13.     The term "GigaBUD" means the GigaBUD product.  For avoidance of doubt, this term includes the GigaBUD product referenced in Ex. 2 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

14.     The term "GigaBOB" means the GigaBOB product.  For avoidance of doubt, this term includes the GigaBOB product referenced in Ex. 2 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

15.     The term "Defendants" means the defendants in the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To

resolve any doubt, these include the Defendants in case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

16.     The term "Instant Litigations" means the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To resolve any doubt, these include case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

17.     The term "Channel Bonding" shall have the same meaning as used by ChanBond in ChanBond's complaints in this matter, and in ChanBond's infringement contentions in this matter.  *See, e.g.,* 1:15-cv-00842, D.I. 1 (Complaint) at ¶ 13.

18.     The "DOCSIS Standard" shall mean the Data Over Cable Service Interface Specification published by CableLabs.  To resolve any doubt, this term encompasses all versions of the DOCSIS Standard, including DOCSIS 1.0, DOCSIS 1.1, DOCSIS 2.0, DOCSIS 3.0, and DOCSIS 3.1.

19.     The "DOCSIS 3.0 Standard" shall mean the Data Over Cable Service Interface Specification published by CableLabs

20.     The term "Standard Setting Organization" means any organization responsible for developing technical standards or technical documentation for use in industry.  For avoidance of doubt, CableLabs, the Institute for Electrical and Electronics Engineers ("IEEE"), Telecommunications Industry Association ("TIA"), and Electronic Industries Alliance ("EIA") are all Standard Setting Organizations.

21.     The term "Prior Art" refers to art under 35 U.S.C. §§ 102 and 103 and includes, by way of example and without limitation, printed publications, patents, disclosures, prior inventions, admissions, prior public uses, prior offers for sale, or sales of actual products.

22.     The terms "concerning," "relate," "relating," or "related" mean in any way, directly or indirectly, in whole or part, relating to, concerning, alluding to, referring to, discussing, mentioning, regarding, pertaining to, describing, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, modifying, amending, confirming, endorsing, representing, supporting, qualifying, terminating, revoking, refuting, undermining, canceling, contradicting, or negating.

23.     The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, the original (or a copy when the original is not available) and each non-identical copy (including those which are non-identical by reason of translations, notations, or markings) or any and all other written, printed, typed, punched, taped, filmed, or graphic matter or recorded or tangible thing, or whatever description, however produced or reproduced (including computer-stored or generated data, together with instructions or programs necessary to search and retrieve such data and hard copies where available and retrievable), and shall include all attachments to and enclosures with any requested item to which they are attached or with which they are enclosed, and each draft thereof.  The term "document" shall specifically include all recorded or retrievable electronic data or communications such as electronic mail (e-mail) and the like and all translations thereof.

24.     "Communication" shall mean any oral, written, electronic, or other exchange of words, thoughts, information, or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by Telex, or by other process, electric, electronic, or otherwise.  All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, tape or video

recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

25.     The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the request.  The word "including" shall not be used to limit any general category or description that precedes it.  The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the request.

26.     Reference to the singular in any of these requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

## INSTRUCTIONS

1.     Unless otherwise stated in a request, the time period covered by the command of this Subpoena is October 25, 1994 to Present.

2.     All requests for "documents," include a request for any "communications," such as letters or e-mails.

3.     It is Your duty in answering these requests to conduct a reasonable investigation so that You disclose and produce all available responsive and non-privileged documents.

4.     If any request herein requires the production of documents that are no longer in Your actual or constructive possession, custody, or control or which have been destroyed or lost, then in lieu of production, You shall state or identify the title of the document, the author of the document, each person to whom or by whom a copy of the original of the document was delivered, forwarded, or has been received, the date of the document, and the general subject

matter of the document. In the event You claim that information contained other than in documentary form is no longer in Your actual or constructive possession, custody, or control or has been destroyed or lost, You shall state or identify the nature of the information, the creator of the information, the person to whom the information was or was to be forwarded, delivered or for whom it was prepared, the date of the creation of the information, and the manner in which the information has been memorialized, if at all.

5.      In any instance where documents, data, or information requested herein is stored on a computer, a computer hard drive, a computer mainframe, computer back-up tape, or in any other electronic format, Defendants request that You produce the data, information, or documents on CD ROM, computer disk, or in hard copy paper form.  Further, Defendants request that You produce all documentation or programs that would allow Defendants to run, read, view, print, or otherwise access any such disks, CD ROM, or other computer information.

6.      You are under a continuing obligation to respond to the requests set forth herein. Accordingly, if You subsequently gain actual or constructive possession, custody, or control of any document called for in the requests set forth herein that has not been produced to Defendants, You must produce such document to Defendants as soon as possible or provide a written explanation to Defendants as to why You will not produce the document.

7.      The documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the requests.

## DOCUMENT REQUESTS

1.      All documents regarding the ChanBond Patents, the Whitaker Patents, and/or any Related Patents.

2.      All documents regarding Your, ChanBond's, CBV's, Z-Band's, or Other ChanBond Inventors' efforts to obtain patent protection on any invention related to the subject matter shown, described, or claimed in the ChanBond Patents and/or any Related patents, including but not limited to:

    a.      all invention disclosures;

    b.      all documents attached to, referring to or regarding any invention disclosure;

    c.      drafts of patent applications;

    d.      the prosecution history of all of the ChanBond Patents and/or Related Patents;

    e.      the prosecution history of each application on which You and/or the Other ChanBond Inventors is a named inventor, including all issued, pending or abandoned applications;

    f.      all U.S. and foreign patents and patent applications, and corresponding prosecuting histories, including those of unpublished, pending and/or abandoned applications, that are in whole or in part owned, licensed, or expected to be owned or licensed, by Z-Band that are directed to the subject matter disclosed in the ChanBond Patents and/or Related Patents;

    g.      all correspondence regarding the patent applications referred to in subparts (c) through (f) above;

h.      all documents consulted or reviewed by the applicants, patentees, or prosecuting attorneys during the preparation and prosecution of any application referred to in subparts (c) through (f) above, including but not limited to Prior Art references or potential Prior Art references; and

i.      all documents concerning Your participation in any examiner interview during prosecution of the ChanBond Patents, including, but not limited to, any assertions to the examiner made by You stating that "one type of addressable device would be a cable modem terminating system."

3.      All documents regarding (a) Your knowledge of Prior Art related to the ChanBond Patents and/or Related Patents, and (b) the date and circumstances pursuant to which You first learned of each piece of Prior Art.

4.      All documents regarding the inventorship, conception, reduction to practice, research, design, development, or testing of the subject matter shown, described, and claimed in the ChanBond Patents and/or Related Patents, including but not limited to laboratory notebooks, inventor notebooks, source code, and computer data, as well as the first written description or disclosure (including drawings) and the first prototype of such subject matter.

5.      All documents concerning any product, prototype, development version, test version, commercial embodiment, or commercialization of any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

6.      All documents related to the making, using, testing, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any product embodying any technical matter

disclosed in, or any invention claimed in, any ChanBond Patent, Whitaker Patent, and/or Related Patent.

7.      All documents related to the GigaTwist, GigaBUD, or GigaBob products, including all documents related to testing, selling, offering for sale, licensing, or disclosure anywhere in the world, of the GigaTwist product.

8.      All documents concerning any agreement between You and ChanBond, Z-Band, or CBV, including any agreement to cooperate in litigation or provide documents or testimony in litigation concerning any patents or applications in the ChanBond Patents and/or Related Patents or concerning Prior Art relating to the subject matter disclosed or claimed in any of the patents or applications in the ChanBond Patents and/or Related Patents.

9.      All documents concerning ownership of the ChanBond Patents and/or Related Patents, including but not limited to any proposed, requested, or executed assignment, license, conveyance, and/or grant of any right, title or interest in or to any of the ChanBond Patents and/or Related Patents regarding an such assignment, license, conveyance, and/or grant.

10.     All documents, including licenses or agreements, concerning any license, agreement, or contract, including consulting agreements between You, ChanBond, CBV, or Z-Band, and any assignees, licensees, or intermediaries concerning the ChanBond Patents.

11.     All documents that reflect, refer to or relate to the manners or techniques by which the ChanBond Patents allegedly improved upon the Prior Art, added functionality that did not exist in the Prior Art, or provided a variation on or upgrade of the Prior Art and whether each such alleged improvement, added functionality, or variation or upgrade, was nonobvious or unpredictable.

12.     All documents that support, refute or concern the existence of secondary considerations or objective indicia of non-obviousness of the alleged invention(s) described and/or claimed in the ChanBond Patents, including, but not limited to, commercial success, long-felt need, attempts by others, failures by others, commercial acquiescence, or copying.

13.     All documents concerning any service offerings, beta tests, or trials of the subject matter of each of the ChanBond Patents or related technologies prior to the filing date of each of the ChanBond Patents.

14.     All documents concerning any manufacture, use, sale or offer for sale, by or on behalf of ChanBond, CBV, or Z-Band, of any product, prototype, development version, commercial embodiment, or commercialization of any invention disclosed, described or claimed in the ChanBond Patents or related to the subject matter of the ChanBond Patents.

15.     All documents concerning the features, functions, and operation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents.

16.     All documents concerning any marketing, publicity, offers for sale, display, trade show presentation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents.

17.     All documents concerning business plans, marketing plans, projections, research and development capital, funding, and sales and/or distribution for any commercial embodiment of the ChanBond Patents.

18.     All documents related to the value to consumers of any features, functionalities, or any other technological components of any ChanBond, CBV, or Z-Band products or services relating to or embodying the ChanBond Patents.

19.     All communications between or among You, ChanBond, CBV, Z-Band, any of the Other Inventors, and/or any of the attorneys that prosecuted any of the applications or patents in the ChanBond Patents and/or Related Patents concerning any of the patents or applications in the ChanBond Patents and/or Related Patents.

20.     All documents that reflect, refer to or relate to the meaning of any claim term of any of the claims of the ChanBond Patents.

21.     All documents that reflect, refer to or relate to any participation by You, ChanBond, CBV, Z-Band, any of the Other Inventors in any industry organization or Standard Setting Organization.

22.     All documents concerning any communications between You and any person concerning the subject matter of the Instant Litigations.

23.     All documents concerning any document retention policy by You, ChanBond, CBV, or Z-Band, including all documents concerning any practice, policy, procedure, or effort to identify and preserve documents.

24.     All documents or communications related to the agreement between ChanBond and UnifiedOnline, as discussed in the agreement attached as Ex. 3 to this Subpoena.

25.     All notes and minutes from any Z-Band meeting in which You participated where the agreement between ChanBond and UnifiedOnline (attached as Ex. 3 to this Subpoena) was discussed.

26.     All documents or communications related to any negotiations between UnifiedOnline and ChanBond.

27.     All documents or communications related to any valuation of ChanBond.

28.     All communications related to the ChanBond Patents, Whitaker Patents, Related Patents, and/or the Instant Litigations, between You and any of the following parties:

  a.     any Other ChanBond Inventor;

  b.     Z-Band

  c.     CBV

  d.     Whitaker Corp.;

  e.     any Whitaker Inventor;

  f.     C.W. Smith;

  g.     Sprint Corp.

  h.     any business associate of the ChanBond Inventors that communicated with any Defendant (*see, e.g.,* Ex. 4 at ¶ 28);

  i.     any Defendant; or

  j.     Bentham IMF.

29.     All documents related to any negotiations or agreements, related to the ChanBond Patents, Whitaker Patents, Related Patents, and/or the Instant Litigations, between Z-Band and any of the following parties:

  a.     Unified Online;

  b.     any Other ChanBond Inventor;

  c.     Whitaker Corp.;

  d.     any Whitaker Inventor;

  e.     C.W. Smith.;

  f.     Sprint Corp.;

g.      any business associate of You or the Other ChanBond Inventors that communicated with any Defendant (*see, e.g.,* Ex. 4 at ¶ 28);

h.      any Defendant; or

i.      Bentham IMF.

30.      All documents concerning the acquisition, ownership, or assignment of the Whitaker Patents and/or Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Ex. 6 - ZBAND_0005331, Ex. 7 - ZBAND_0005311, Ex. 8 – ZBAND_0005322, Ex. 9 – ZBAND_0005334).

31.      All documents related to any valuation of any ChanBond Patent, Whitaker Patent, and/or any Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

32.      All documents concerning any agreement related to the Whitaker Patents and/or any Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

33.      All documents concerning any negotiations for any assignment, license, contract, covenant, authorization, agreement, stipulation, settlement or any other event relating to any legal right related to the ChanBond Patents, Whitaker Patents, and/or Related Patents, including, but not limited to, documents related to any agreements between Z-Band and Whitaker (*see e.g* Exs. 6-9).

34.      All notes and minutes from Z-Band's meetings in which You participated where any of the Defendant's products, services, apparatuses, devices, systems, method or processes related to Channel Bonding, the DOCSIS Standard, or DOCSIS 3.0 were mentioned or discussed.

14

35.     All documents and communications regarding the corporate or business relationship between Z-Band and ChanBond.

36.     All documents, concerning whether Z-Band or any licensee to any ChanBond Patent has marked any product with the patent number of any ChanBond Patent, or otherwise attempted to comply with the marking or notice provisions of 35 U.S.C. § 287(a), including but not limited to one copy or sample of each and every product and/or package or other material on which the patent numbers of any of the ChanBond Patent has been marked.

37.     All documents related to Your, Z-Band's, or CBV's first knowledge, or the first knowledge of any Other ChanBond Inventor, of the following:

    a.     Channel Bonding;

    b.     the DOCSIS Standard;

    c.     the DOCSIS 3.0 Standard.

38.     All documents detailing any work performed by You, Z-Band, or the Other ChanBond Inventors related to Channel Bonding.

39.     All documents related to any work to give any Z-Band product the ability to support  DOCSIS 3.0, handle a DOCSIS 3.0 signal, or comply with the DOCSIS 3.0 standard.

40.     All documents concerning any notice from Z-Band to any party regarding an allegation of infringement of any claim of a ChanBond Patent.

41.     All communications between You and Z-Band, including but not limited to, communications with Z-Band during any periods of time for which You were not an employee of Z-Band.

42.     All documents related to any product of Whitaker Corp. that was tested, analyzed, used, modified, or resold by Z-Band.

43.     All documents related to the decision to form CBV.

44.     All documents related to any interest held by You, Z-Band, or any Other ChanBond Inventor, in either (a) the Instant Litigations, (b) the ChanBond Patents, (c) ChanBond, or (d) Whitaker.

45.     Any documents related to any permissions received by Z-Band for use of any cable companies' logo on its website, including the logos shown in Ex. 5 to this Subpoena.

46.     All documents and communications regarding Z-Band's sale, assignment, transfer, lease or license of any of their rights, assets, facilities, operations or services to ChanBond, CBV, or anyone else.

47.     All documents related to the "wideband distribution system" as disclosed in the '822 Patent at column 1:41-57.

48.     All documents related to the "wideband signal distribution network" described in the Whitaker Patents, including as described in the below passage:

> The foregoing and additional objects are attained in accordance with the principles of this invention by providing a wideband cabling system which functions as "passive" infrastructure to distribute wideband signals modulated onto RF carriers within a specified frequency band among a plurality of outlets. ('340 at col. 2:18-23)

49.     All documents related to the need for distribution of signals in a "relatively local area," as discussed in the below passage, including how this need was addressed by any product embodying any invention claimed in the ChanBond Patents or the Whitaker Patents:

> There are numerous instances where it is desired to distribute over twisted pair coaxial cable, or fiber optic cable wire, within a relatively local area, such as a single building, wideband signals modulated onto RF carriers.   A particular application is the distribution of video signals. For example, a school may have a number of classrooms and administrative offices, each having a television monitor, and it may be desired at a given time to provide

16

a program to all of the classrooms and offices, originating either from a source within one of the classrooms or offices, such as a VCR, or from an outside source, such as a local cable system. Similarly, a corporation may have a building, or several closely spaced buildings, with numerous conference rooms equipped with television monitors and analogous program presentations may be desired. It is therefore a primary object of the present invention to provide cabling infrastructure for distributing wideband signals within a relatively local area. ('340 patent at col. 1:39-55)

50.     All documents reflecting any financial information, including but not limited to revenue or profits, derived from the sale or license of any product embodying any technical matter disclosed in, or any invention claimed in, any ChanBond Patent, Whitaker Patent, and/or Related Patent.

51.     All documents related to Z-Band's making, using, testing, investigating, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any alternative technologies to Channel Bonding to increase throughput of data transmissions.

# Exhibit 1

REDACTED

IN ITS

ENTIRETY

# Exhibit 2



877-801-6475    GET A QUOTE ❯

Home    About Z-Band    Products    Technical    Markets    Support    Contact Us

# Products/Services

Home | Markets | Healthcare | Products/Services

## Products/Services

### "GigaBUD" from Z-Band (Video Distribution Hub)

Z-Band's GigaBUD, Active Video Distribution Hub, is ideal for a variety of around-the-clock video applications in healthcare facilities, including live video monitoring in patient rooms and ICU wards and for use in distance learning for medical residents. GigaBUD can also serve as a valuable tool in patient entertainment and education.



### Cascading Capability for Multiple Hub Connectivity

- The GigaBUD is rack mounted to meet the applicable MDF/IDF port count combination for the various video drops
- Desired video is connected to the "CATV IN" port of the initial GigaBUD, which becomes the "Master" hub
- Additional GigaBUDs are connected to the Master through a cascading process and are dubbed "Slaves".
- "Outbound" Master ports are connected to "Cascade In" ports capable of providing up to eight second-level "Slaves" to achieve unidirectional cascading.
- Each second-level "Slave" can be cascaded to third and fourth levels, resulting in the capability for combining up to 585 GigaBUDs.
- End result is a video signal at the "CATV IN" port of the "Master" that can be distributed to as many as 14,040 TVs throughout a healthcare facility or system of facilities.

### "GigaBOB"

The GigaBOB is equipped with numerous attributes that provide HD TV over CAT 5e or CAT 6 cable such as:

- Remotely operated "GigaBOB" with unique distance sensing circuit and internal amplifier
- Simultaneous transmission over thousands of televisions
- 100-meter distribution range for the full bandwidth of RF channels
- DOCSIS or FSK return capability for VOD and/or data applications
- 120 or 240 VAC at 50 or 60 Hz operating frequency capacity
- Hub and balun system complies with UL, CSA and FCC Part 15, Subpart B guidelines





## Z-Band Video Distribution System Benefits

The Z-Band Video Distribution System is a highly effective way to merge voice, data and video over one cabling plant to meet the video distribution needs of any healthcare environment.

In addition, our remotely powered GigaBOB balun simplifies design and installation, as well as the process of making adds, moves, and changes while maintaining the highest level of picture quality. Z-Band can provide a seamless integration of RF and IP Video in your healthcare facility.

**Markets**

Healthcare

Featured Projects

Clients

Products/Services

Resources

Want to see how our products work?

Schedule A Demo

Questions?
**Contact Us Today**

---



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
**PHONE:** 877-801-6475 | **FAX:** 717-249-3253

Products assembled in the USA

Stay Connected:

Rep Login

Home  About Z-Band  Products  Technical  Markets  Support  Contact Us  Sitemap
Site Credits  Copyright 2017. All Rights Reserved                              Privacy Policy

Exhibit 3

## Agreement - ChanBond

This Agreement (this "**Agreement**"), is made as of October 27, 2015 (the "**Effective Date**"), by and among **Deirdre Leane**, an individual with an address of 2525 Carlisle St., Suite 439, Dallas, Texas 75201 ("**Seller**"), **ChanBond, LLC,** a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 ("**ChanBond**") and **UnifiedOnline, Inc.,** a Delaware corporation, of 4126 Leonard Drive, Fairfax, Virginia 22030 ("**Purchaser**"). The parties to this Agreement shall be referred to collectively herein as the "Parties" and separately as a "Party".

### Witnesseth:

WHEREAS, Seller owns 100% of the limited liability company membership interests (the "**Interests**") of **ChanBond**;

WHEREAS, Purchaser wishes to acquire Seller's entire interest in ChanBond, following which Purchaser will become the sole interest holder of ChanBond, all according to the provisions set forth herein below;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the Parties hereto hereby agree as follows:

1. **Definitions**

    1.1     "**Affiliate**" means, with respect to a Party, any Person in any country that directly or indirectly Controls, is Controlled by or is under common Control with such Party. For the purposes of this Agreement, the term "Control" of a Person means ownership, of record or beneficially, directly or through other Persons, of fifty percent (50%) or more of the voting equity of such Person or, in the case of a non-corporate Person, equivalent interests.

    1.2     "**Collateral Agreements**" means all such concurrent or subsequent agreements, documents and instruments, as amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof, including without limitation, the License Agreement, the Pay Proceeds Agreement, the Common Interest Agreement and the Promissory Note.

    1.3     "**Contract Rights and Obligations**" means the rights and obligation assigned to ChanBond under the contracts ("**Contracts**") listed on **Schedule 1.3.**

    1.4     "**Entity**" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Body (as defined below) or any other legal entity.

    1.5     "**Governmental Body**" means any (i) U.S. federal, state, county, municipal, city, town village, district, or other jurisdiction or government of any nature; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or other entity and any court or other tribunal); or (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

1.6   **"Intellectual Property"** means all domestic or foreign rights in, to and concerning ChanBond's: (i) patents, patent applications, trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, trade dress, logos, symbols, trade names, assumed names, fictitious names, corporate names and other indications or indicia of origin, including translations, adaptations, derivations, modifications, combinations and renewals thereof; (ii) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of data or information), copyrights therein and thereto, moral rights, and rights equivalent thereto, including but not limited to, the rights of attribution, assignation and integrity; (iii) trade secrets, confidential and/or proprietary information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, schematics, designs, discoveries, drawings, prototypes, specifications, hardware configurations, customer and supplier lists, financial information, pricing and cost information, financial projections, and business and marketing methods plans and proposals), collectively **"Trade Secrets"**; (iv) computer software, including programs, applications, source and object code, data bases, data, models, algorithms, flowcharts, tables and documentation related to the foregoing; (v) other similar tangible or intangible intellectual property or proprietary rights, information and technology and copies and tangible embodiments thereof (in whatever form or medium); (vi) all applications to register, registrations, restorations, reversions and renewals or extensions of the foregoing; (vii) internet domain names; and (viii) all the goodwill associated with each of the foregoing and symbolized thereby; and (ix) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including rights to recover for past, present and future violations thereof.

1.7   **"Lien"** means any mortgage, pledge, security interest, encumbrance, lien, charge or debt of any kind, any trust, any filing or agreement to grant, deposit or file a pledge or financing statement as debtor under applicable law, any subordination arrangement in favor of any Person, or any other Third Party right.

1.8   **"Person"** means any individual or Entity.

1.9   **"Proceeding"** means any claim, suit, litigation, arbitration, mediation, hearing, audit, charge, inquiry, investigation, governmental investigation, regulatory proceeding or other proceeding or action of any nature (whether civil, criminal, legislative, administrative, regulatory, prosecutorial, investigative, or informal) commenced, brought, conducted, or known to be threatened, or heard by or before, or otherwise involving, any Governmental Body, arbitrator or mediator or similar person or body.

1.10   **"Third Party"** means any Person other than a Party or its Affiliates.

## 2.   Sale and Purchase of Interests

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser ChanBond and Purchaser shall purchase and accept the assignment, transfer conveyance and delivery of ChanBond from the Seller.

Closing of Sale and Purchase of Interests; Covenants of Purchaser

2.1     Closing.  The sale, assignment, transfer and delivery of ChanBond by the Seller and the purchase thereof by the Purchaser, shall take place at a closing, to be held remotely via the exchange of documents and signatures within one business day following the execution of this Agreement (the "**Closing**" and the "**Closing Date**," respectively).

2.2     Transactions at Closing.  At the Closing, the following transactions shall occur, which transactions shall be deemed to take place simultaneously and no transaction shall be deemed to have been completed or any document delivered until all such transactions have been completed and all required documents delivered:

2.2.1   The Seller shall duly execute an interest assignment deed in the form attached hereto as **Schedule 2.2.1** (the "**Transfer Deed**") and shall deliver their respective Transfer Deed to Purchaser;

2.2.2   At Closing, ChanBond shall appoint William R. Carter, Jr. as sole manager ("**Manager**") and thereafter Manager shall have sole and exclusive authority over the business of ChanBond.

2.2.3   Purchaser shall deliver to the Seller copies of resolutions of its Board of Directors in the form attached hereto as **Schedule 2.2.3**, approving, *inter alia*, the transactions contemplated hereunder and the issuance of the Shares (as defined below) by Purchaser to Seller.

2.2.4   The Collateral Agreements shall have been executed and delivered by the respective parties thereto.

2.2.5   Purchaser shall deliver to the Seller a validly executed share certificate for the Shares (as defined below) issuable in the name of the Seller in such amounts as shall be directed by Seller not less than 72 hours after the Closing.

2.2.6   Purchaser shall deliver to Seller evidence that each Required Approval (as defined below) has been obtained.

2.2.7   Seller, ChanBond and Purchaser shall have entered into the Common Interest Agreement, in the form attached hereto as **Schedule 2.2.7**.

2.2.8   Purchaser shall deliver to Seller the Promissory Note (as defined below), in the form attached hereto as **Schedule 2.2.8**.

2.3     Conditions to Closing.  The obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions, any of which may be waived in writing by the Party entitled to the benefit thereof, in whole or in part, to the extent permitted by the applicable law:

2.3.1   No temporary restraining order, preliminary or permanent injunction or other order (whether temporary, preliminary or permanent) issued by any court of competent jurisdiction, or other legal restraint or prohibition shall be in effect which prevents the consummation of the transactions contemplated herein, nor shall any proceeding brought by any Governmental Body seeking any of the foregoing be pending, and there shall not be any action

3

taken, or any law, regulation or order enacted, entered, enforced or deemed applicable to the transactions contemplated herein illegal.

2.3.2   The representations and warranties of the Seller and Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those (i) representations and warranties that are qualified by materiality, which representations and warranties shall be true and correct in all respects and (ii) representations and warranties which address matters only as of a particular date, which representations and warranties shall be true and correct on and as of such particular date.

2.3.3   Each Party shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the Collateral Agreements ancillary hereto (collectively, the **"Transaction Documents"**) to be performed or complied with by it on or prior to the Closing Date.

2.3.4   Each Party shall have received evidence, in form and substance reasonably satisfactory to it, that any and all approvals of Governmental Bodies and other Third Parties required to have been obtained by a Party to consummate the transactions under the Transaction Documents, if any, have been obtained (each a **"Required Approval"**).

2.4   Covenant of Purchaser.   Promptly following the Closing, Purchaser shall (a) reimburse Seller for all of their costs and expenses (including reasonable attorneys' fees) incurred by Seller in connection with the consummation of the transactions contemplated by this Agreement and (b) file with the relevant Governmental Bodies all legally required reports in respect of the transactions contemplated under the Transaction Documents, including, but not limited to, the SEC Form 8-K and any Forms 3, Forms 4 or Schedule 13D's.

## 3.   Consideration

In consideration for the sale, assignment, transfer and delivery of ChanBond, Purchaser shall pay to the Seller (as directed by Seller) the consideration, as follows:

3.1   Cash Payment.   Five million U.S. Dollars ($5,000,000) payable on or before October 27, 2020 (the **"Cash Payment"**). The obligation to make the Cash Payment shall be evidenced by Purchaser's promissory note (the **"Promissory Note"**) in the form of Schedule 2.2.8 attached hereto; and

3.2   Shares Payment.   Forty-four million, seven hundred thousand (44,700,000) shares of Purchaser's Common Stock (the **"Shares"**) par value of $0.001 each.

3.3   Release.   Purchaser for itself, its respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the **"Releasing Parties"**) knowingly, voluntarily, and irrevocably releases, forever discharges and covenants not to sue the Seller, and their respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the **"Released Parties"**) from and against any and all rights, claims, losses, lawsuits or causes of action (at law or in equity), liabilities, duties, actions, demands, expenses, breaches of duty, damages,

obligations, proceedings, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, agreements, promises, judgments, and executions of whatever nature, type, kind, description or character (each a "**Claim**"), whether known or unknown, suspected or unsuspected, vested or contingent, past or present, that a Releasing Party ever had, now has or hereafter can, shall or may have against or with respect to the Released Parties or any of them for, upon or by reason of any matter, cause or thing related to or arising from any agreement to which ChanBond is a party or by which it is bound prior to the Closing Date, which are listed on **Schedule 3.3** (the "**Company Agreements**"), except in the case that such Claim arises out of an act of fraud, intentional misconduct or gross negligence on the part of one or more of the Released Parties, as finally determined by a court of competent jurisdiction. For the avoidance of doubt, the Company shall continue to be bound by the Company Agreements and neither the Seller nor any of the Released Parties has or shall have any further obligation or liability under the Company Agreement (other than confidentiality, common interest and other similar provisions). The Releasing Parties hereby waive the benefits of any provisions of the law of any state or territory of the United States, or principle of common law, which provides that a general release does not extend to claims which the Releasing Parties do not know or suspect to exist in its favor at the time of executing the release, which if known to it, may have materially affected the release. It is the intention, understanding and agreement of the Releasing Parties to forever discharge and release all known and unknown, present and future claims within the scope of the releases set forth in this Agreement, provided, however, this Release shall not affect or limit any Claims arising under this Agreement, for enforcement, gross negligence or willful misconduct, fraud, misrepresentation, or similar matters.

**4.    Representations and Warranties of the Seller**

The Seller hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

4.1    The Seller is the sole lawful owners, beneficially and of record, of ChanBond and ChanBond constitute all of the membership interests in ChanBond, and upon the consummation of the transactions at the Closing, Purchaser will acquire from the Seller, good and marketable title to ChanBond sold by it. There are no preemptive, anti-dilution or other participatory rights of any other parties with respect to the transactions contemplated hereunder.

4.2    The Seller has full and unrestricted legal right, power and authority to enter into and perform their obligations under the Transaction Documents and to sell and transfer ChanBond to Purchaser as provided herein. The Transaction Documents, when executed and delivered by the Seller, shall constitute the valid and legally binding obligation of the Seller, legally enforceable against the Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.3    The Seller is acquiring the Shares for investment purposes only, for their own account, and not for the benefit of others, nor with any view to, or in connection with any distribution or public offering thereof within the meaning of the U.S. Securities Act of 1933 (the "**Securities Act**").

5

4.4     The Seller understands that the Shares have been registered under the Securities Act. The Seller also acknowledges that the Shares will be restricted for sale for six (6) months after the issuance. The Seller acknowledges that any certificates evidencing the Shares will contain a legend to the foregoing effect.

4.5     Seller has sufficient knowledge and expertise in business and financial matters so as to enable it to analyze and evaluate the merits and risks of acquiring the Shares pursuant to the terms of this Agreement and is able to bear the economic risk of such acquisition, including a complete loss of its investment in the Shares.

4.6     Seller acknowledges that it has made detailed inquiries concerning Purchaser and its business, and that the officers of Purchaser have made available to the Seller any and all written information which it has requested and have answered to the Seller's satisfaction all inquiries made by the Seller.

4.7     The transactions provided for in this Agreement with respect to the Shares are not part of any pre-existing plan or arrangement for, and there is no agreement or other understanding with respect to, the distribution by the Seller of any of the Shares.

5.     **Representations and Warranties of ChanBond**

5.1     ChanBond hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

(a)     ChanBond is duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.

(b)     As of the Closing Date, ChanBond is a party to the pending litigation identified in **Schedule 5.1(b)**.

(c)     As of the Closing Date the Contracts are in full force and effect and none of the respective parties to the Contracts are in breach of any material obligation under the Contracts.

(d)     To ChanBond's knowledge, ChanBond is not a party nor bound by any contracts, agreements, promises or commitments except the assignments related to the Contracts.

(e)     Other than the assignments related to the Contracts, ChanBond has no material assets. None of ChanBond's employees will continue with ChanBond after the Closing.     ChanBond's bank accounts and the contents thereof will be transferred to Purchaser. Any amounts paid or payable to ChanBond (or any of its Affiliates) under licenses or other agreements or judgments entered into by or awarded to any Affiliates of ChanBond prior to the Closing Date, shall be retained as the exclusive property of such

Affiliates and after the Closing Date, ChanBond or any of its Affiliates will disclaim any interest therein.

## 6.    Representations and Warranties of Purchaser

Purchaser, represents and warrants to the Seller and acknowledges that the Seller are entering into this Agreement in reliance thereon as follows:

6.1    Purchaser is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted. The corporate governance documents of Purchaser (including but not limited to its Certificate of Incorporation, Bylaws and any Voting Rights Agreements, Stockholders' Agreements, Investors' Rights Agreements and the like) as in effect on the date hereof have been provided or made available to the Seller (the "**Purchaser Governance Documents**").

6.2    The Transaction Documents, when executed and delivered by Purchaser, shall constitute the valid and legally binding obligation of Purchaser, respectively, legally enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.3    The authorized capital stock of Purchaser consists of 6,000,000,000 shares of Common Stock and 10,000,000 shares of Convertible Preferred Stock, each having a par value of USD $0.001, of which 912,897,537 shares are issued and outstanding (exclusive of shares issued hereunder). Purchaser's fully-diluted capital structure before and after Closing is set forth in the capitalization table attached hereto as **Schedule 6.3**. All capital stock, preemptive rights, rights of first refusal, rights of co-sale, convertible, exercisable or exchangeable securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Purchaser or any of its subsidiaries or Affiliates any capital stock of the Purchaser and/or any of its subsidiaries are set forth in detail on **Schedule 6.3**. Except for the transactions contemplated by this Agreement and the current Purchaser Governance Documents, there are no Liens, options to purchase, proxies, preemptive rights, convertible, exercisable or exchangeable securities, outstanding warrants, options, voting trust and other voting agreements, calls, promises or commitments of any kind and, Purchaser has no knowledge that any of the said stockholders owns any other stock, options or any other rights to subscribe for, purchase or acquire any capital stock of Purchaser from Purchaser or from each other.

6.4    All issued and outstanding capital stock of Purchaser has been duly authorized, and is validly issued and outstanding and fully-paid and non-assessable. The Shares, when issued and allotted in accordance with this Agreement:  (a) will be duly authorized, validly issued, fully paid, non-assessable, and free of any preemptive rights, (b) will have the rights, preferences, privileges, and restrictions set forth in Purchaser's Certificate of Incorporation, Certificate of Designation and By-laws, and (c) will be issued free and clear of any Liens of any kind.

7

6.5     Purchaser is currently in material compliance with all applicable laws, including securities laws. Purchaser has timely filed all forms and reports required to be filed with the Securities Exchange Commission (the "**SEC**") including, without limitation, all exhibits required to be filed therewith, and has made available to the Seller true, complete and correct copies of all of the same so filed (including any forms, reports and documents incorporated by reference therein or filed after the date hereof, the "**Purchaser SEC Reports**"). For purposes hereof, such Purchaser SEC Reports shall be deemed delivered to Seller via the SEC's EDGAR database. The Purchaser SEC Reports: (i) at the time filed complied (or will comply when filed, as the case may be) in all material respects with the applicable requirements of the Securities Act and/or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and the rules and regulations promulgated thereunder, and with the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder, in each case applicable to such Purchaser SEC Reports at the time they were filed; and (ii) did not at the time they were filed (or, if later filed, amended or superseded, then on the date of such later filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

6.6     Purchaser has timely filed (or has been deemed to have timely filed pursuant to Rule 12b-25 under the Exchange Act) and made publicly available on the SEC's EDGAR system, and the Seller may rely upon, all certifications and statements required by (i) Rule 13a-14 or Rule 15d-14 under the Exchange Act and (ii) Section 906 of the Sarbanes Oxley Act of 2002 with respect to any documents filed with the SEC. Since the most recent filing of such certifications and statements, there have been no significant changes in Purchaser's internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act), or in other factors that could significantly affect its disclosure controls and procedures.

6.7     The financial statements (including footnotes thereto) included in or incorporated by reference into the Purchaser SEC Reports (the "**Purchaser Financial Statements**") were complete and correct in all material respects as of their respective filing dates, complied as to form in all material respects with the Exchange Act and the applicable accounting requirements, rules and regulations of the SEC promulgated thereunder as of their respective dates and have been prepared in accordance with United States generally accepted accounting principles ("**GAAP**") applied on a consistent basis during the periods involved (except as otherwise noted therein). The Purchaser Financial Statements fairly present the financial condition of Purchaser as of the dates thereof and results of operations, cash flows and stockholders' equity for the periods referred to therein (subject, in the case of unaudited Purchaser Financial Statements, to normal recurring year-end adjustments which were not and will not be material in amount). Without limiting the generality of the foregoing, (i) no independent public accountant of Purchaser has resigned or been dismissed as independent public accountant of Purchaser as a result of or in connection with any disagreement with Purchaser on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, (ii) no executive officer of Purchaser has failed in any respect to make, without qualification, the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act with respect to any form, report or schedule filed by Purchaser with the SEC since the enactment of the Sarbanes-Oxley Act and (iii) no enforcement action has been initiated or, to the knowledge of Purchaser, threatened against Purchaser by the SEC relating to disclosures contained in any

Purchaser SEC Report. There has been no change in Purchaser's accounting policies except as described in the notes to the Purchaser Financial Statements.

6.8     Purchaser is not in default and neither the execution and delivery of the Transaction Documents nor compliance by Purchaser with the terms and provisions hereof and thereof, will conflict with, or result in a breach or violation of, any of the terms, conditions and provisions of: (i) the Purchaser Corporate Governance Documents, or (ii) any note, indenture, mortgage, lease, agreement, contract, purchase order or other instrument, document or agreement to which Purchaser is a party or by which it or any of its property is bound, or (iii) any law, statute, ordinance, regulation, order, writ, injunction, decree, or judgment of any court or any governmental department, commission, board, bureau, agency or instrumentality in any country in which Purchaser conducts business, with the exception of those judgments listed **Schedule 6.8**. Such execution, delivery and compliance with the Transaction Documents will not (a) give to others any rights, including rights of termination, cancellation or acceleration, in or with respect to any agreement, contract or commitment referred to in this paragraph, or to any of the properties of Purchaser, or (b) except for compliance with any applicable requirements under the Securities Act, the Exchange Act and any requirements of the Over-the-Counter Bulletin Board ("OTCBB"), no consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Body or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of the Transaction Documents or the consummation of the transactions contemplated hereby and thereby, which consent or approval has not heretofore been obtained or will be obtained by Closing. To the knowledge of Purchaser, no third party is in default under any agreement, contract or other instrument or document to which Purchaser is a party. To the knowledge of Purchaser, Purchaser is not a party to or bound by any order, judgment, decree or award of any Governmental Body.

6.9     No action, proceeding or governmental inquiry or investigation is pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its officers, directors or employees (in their capacity as such or as shareholders, if applicable), or against any of Purchaser's properties, including, without limitation, assets, licenses and rights transferred to Purchaser under any written agreement or other binding undertaking, or with regard to Purchaser's business, before any court, arbitration board or tribunal or administrative or other governmental agency, nor does Purchaser believe that there is any basis for the foregoing.

7.     **Survival; Indemnification; Limitation of Liability; No Consequential Damages**

7.1     The representations and warranties of each Party hereunder shall survive the Closing and remain in effect for a period of one (1) year thereafter.

7.2     Indemnification. The Seller, on the one side, and Purchaser on the other side (as applicable, the "**Indemnifying Party**") agree to indemnify and hold harmless the Parties of the other side and their respective Affiliates (as applicable, the "**Indemnified Parties**"), against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon (a) any breach of any of such Party's representations or warranties herein, misrepresentation or warranty or breach or failure by the Indemnifying Party to comply with any covenants or

agreement made by it herein, in the other Transaction Documents or in any other document furnished by it to any of the foregoing in connection with this transaction and (b) any action for securities law violations instituted by an Indemnifying Party which is finally resolved by judgment against such Indemnifying Party.

7.3    Mechanics of Indemnification.    Whenever any claim arises for indemnification under this Agreement or an event which may result in a claim for such indemnification has occurred, the Indemnified Party(ies) will promptly notify the Indemnifying Party of the claim and, when known, the facts constituting the basis for such claim. The Indemnifying Party shall have the obligation to dispute and defend all such Third Party claims and thereafter so defend and pay any adverse final judgment or award or settlement amount in regard thereto. Such defense shall be controlled by the Indemnifying Party, and the cost of such defense shall be borne by the Indemnifying Party, provided that the Indemnified Parties shall have the right to participate in such defense at their own expense, unless the Indemnified Parties require their own attorney due to a conflict of interest, in which case, the expense of a single law firm acceptable to such Indemnified Party will be borne by the Indemnifying Party. The Indemnified Parties shall cooperate in all reasonable respects in the investigation, trial and defense of any such claim at the cost of the Indemnifying Party. If the Indemnifying Party fails to take action within thirty (30) days of notice, then the Indemnified Parties shall have the right to pay, compromise or defend any third party claim, such costs to be borne by the Indemnifying Party. The Indemnified Parties shall also have the right and upon delivery of ten (10) days advance written notice to such effect to the Indemnifying Party, exercisable in good faith, to take such action as may be reasonably necessary to avoid a default prior to the assumption of the defense of the Third Party claim by the Indemnifying Party, and any reasonable expenses incurred by the Indemnified Parties so acting shall be paid by the Indemnifying Party. The Indemnifying Party will not settle or compromise any Third Party claim without the prior written consent of the Indemnified Parties, not to be unreasonably withheld.

7.4    Purchaser Indemnification.    Purchaser and ChanBond shall indemnify and hold the Seller harmless with respect to any loss, expense, cost, damage and settlement (collectively, "**Indemnified Expenses**") caused to Seller as a result of Purchaser's or ChanBond's or its Affiliates' actions or omissions with respect to the Patents following the Closing Date, provided Seller is not determined to responsible for such actions as a result of their fraud or intentional misconduct. In particular, in the event that the enforcement or other activities with the Patents results in litigation or other dispute resolution processes with one or more Third Parties, with Seller being required to be involved or liable for the expenses arising through actions of ChanBond (e.g., being added as a party to the process, even if such joinder is improper, or being subject to Third Party discovery requests or otherwise having any exposure for any claims arising through activities of ChanBond), Purchaser and ChanBond shall, at Seller's request, indemnify Seller all of Seller's Indemnified Expenses arising from that involvement.

7.5    Limitation of Liability.    SELLER'S TOTAL LIABILITY UNDER THE TRANSACTION DOCUMENTS WILL NOT EXCEED THE CASH CLOSING CONSIDERATION ACTUALLY RECEIVED BY SELLER HEREUNDER. THE PARTIES ACKNOWLEDGE THAT THIS LIMITATION ON POTENTIAL LIABILITIES WAS AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THE TRANSACTION DOCUMENTS.

7.6     Limitation on Consequential Damages.  NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS EMPLOYEES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 8.     Miscellaneous

8.1     Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of the Transaction Documents and the intentions of the Parties as reflected thereby.

8.2     Governing Law; Arbitration; Prevailing Party.  This Agreement and all claims or causes of action that may be based upon, arise out of or relate to this Agreement or the Collateral Agreements will be construed in accordance with and governed by the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State without regard to conflicts of laws principles thereof.  Any dispute arising under or in connection with any matter of any nature (whether sounding in contract or tort) relating to or arising out of this Agreement, shall be resolved exclusively by arbitration.  The arbitration shall be in conformity with and subject to the applicable rules and procedures of the American Arbitration Association.  The arbitration shall be conducted before a panel of three (3) arbitrators, with one arbitrator to be selected by each of Seller and Buyer and the third arbitrator to be selected by the arbitrators selected by the Parties.  The Parties agree to be (a) subject to the exclusive jurisdiction and venue of the arbitration in the Eastern District of Texas (b) bound by the decision of the arbitrator as the final decision with respect to the dispute, and (c) subject to the jurisdiction of both of the federal courts of the United States of America or the courts sitting in the Eastern District in the State of Texas for the purpose of confirmation and enforcement of any award.  The prevailing party in any arbitration shall be entitled to recover its costs and expenses (including attorney's fees and expenses) from the non-prevailing party.

8.3     Limitations on Assignment.  Except as expressly permitted in this Section, none of Purchaser or ChanBond may grant or assign any rights or delegate any duties under this Agreement to any Third Party (including by way of a "change in control") or may sell, transfer, or spin-off any of the interests in ChanBond or any of its material assets without the prior written consent of Seller.  Notwithstanding the foregoing, Purchaser shall be permitted to transfer or assign) its rights, interests and obligations under this Agreement, as applicable, without Seller's prior written consent as part of a sale of all or substantially all of its business, equity to, or a change in control transaction with a Third Party acquirer (an "**M&A Transaction**", and an "**Acquirer**," respectively); provided that (a) such transfer or assignment is subject to all of the terms and conditions of this Agreement; and (ii) such Acquirer executes a written undertaking towards Seller agreeing to be bound by all of the terms and conditions of this Agreement with respect to the rights being transferred or assigned.  Except as otherwise expressly limited herein,

the provisions hereof shall inure to the benefit of, and be binding upon, the successors, permitted assigns, heirs, executors, and administrators of the Parties hereto.

8.4    This Agreement and the Schedules hereto constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.  Any term of this Agreement may be amended only with the written consent of all Parties thereto.  The observance of any term hereof may be waived (either prospectively or retroactively and either generally or in a particular instance) only with the written consent of the party against which such waiver is sought.

8.5    All notices and other communications required or permitted hereunder to be given to a Party to this Agreement shall be in writing and shall be faxed, emailed or mailed by registered or certified mail, postage prepaid, or prepaid air courier, or otherwise delivered by hand or by messenger, addressed to such Party's address as set forth above; or at such other address as the Party shall have furnished to each other Party in writing in accordance with this provision.  Any notice sent in accordance with this Section shall be effective (i) if mailed, seven (7) business days after mailing, (ii) if by air courier two (2) business days after delivery to the courier service, (iii) if sent by messenger, upon delivery, and (iv) if sent via facsimile or email, upon transmission and electronic confirmation of receipt or (if transmitted and received on a non-business day) on the first business day following transmission and electronic confirmation of receipt (provided, however, that any notice of change of address shall only be valid upon receipt).

8.6    No delay or omission to exercise any right, power, or remedy accruing to any Party upon any breach or default under this Agreement, shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any of the Parties, shall be cumulative and not alternative.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                        **DEIRDRE LEANE**

By: _Deidre Leane_
Name: DEIRDRE LEANE
Date: 27 October 2015

PURCHASER:                     **UNIFIEDONLINE, INC.**

By: _Rob Howe_
Name: Rob Howe
Title: CEO
Date: 27 October, 2015

CHANBOND:                      **CHANBOND, LLC**

By: _Deidre Leane_
Name: DEIRDRE LEANE
Title: MANAGER
Date: 27 October 2015

13

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                              **DEIRDRE LEANE**

                                     By: _Deirdre Leane_
                                     Name: _DEIRDRE LEANE_
                                     Date: _27 October 2015_

PURCHASER:                           **UNIFIEDONLINE, INC.**

                                     By: _____
                                     Name: _Rob Howe_
                                     Title: _CEO_
                                     Date: _27 October, 2015_

CHANBOND:                            **CHANBOND, LLC**

                                     By: _Deirdre Leane_
                                     Name: _DEIRDRE LEANE_
                                     Title: _MANAGER_
                                     Date: _23 October 2015_

## SCHEDULE 1.3

### Contracts

1. ChanBond, LLC – CBV, Inc. Patent Purchase Agreement dated April 9, 2015
2. ChanBond, LLC – Bentham IMF Litigation Funding Agreement dated September 9, 2015
3. ChanBond, LLC - IPNAV, LLC Advisory Services Agreement dated April 9, 2015
4. ChanBond, LLC - Mishcon de Reya Retention Agreement dated April 20, 2015
5. ChanBond, LLC - Bayard Law Engagement Agreement dated June 8, 2015
6. ChanBond, LLC - Ascenda Law Group Engagement Agreement dated July 14, 2015

## SCHEDULE 2.2.1

### Interest Transfer Deed

**FOR VALUE RECEIVED**, the undersigned, Deirdre Leane ("**Transferor**") hereby assigns, transfers and conveys all of its membership interests in ChanBond, LLC, a Delaware limited liability company (the "**Interests**") to UnifiedOnline, Inc., a Delaware corporation ("**Transferee**") and Transferee hereby accepts the above mentioned Interests.

In witness whereof, we affix our signatures hereto this 27th day of October, 2015.

Transferor:

**Deirdre Leane**

27. October 2015
Date

Transferee:

UnifiedOnline, Inc.

10-27-2015
Date

Witness:

Name: Joseph Ghally

10/27/2015
Date

Witness:

Name: B. J. Rodriguez

10-27-2015
Date

## SCHEDULE 2.2.3

### UnifiedOnline, Inc.'s Board of Directors Resolutions

STATEMENT OF UNANIMOUS
CONSENT TO ACTION TAKEN IN
LIEU OF A
SPECIAL MEETING OF THE BOARD OF
DIRECTORS OF
UNIFIEDONLINE, INC.

In lieu of a special meeting of the board of directors (the "Board") of UnifiedOnline, Inc., a Delaware corporation (the "Corporation"), and in accordance with the Bylaws of the Corporation and §141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the members of the Board, do hereby consent to the adoption of, and do hereby adopt, the following resolutions and declare them to be in full force and effect as if they had been duly adopted at a meeting of the Board, duly called, noticed and held:

WHEREAS, the Board deems it to be in the best interests of the Corporation to enter into a Purchase Agreement dated October 26, 2015 (the "Agreement"), in connection with the acquisition of ChanBond, LLC ("ChanBond"), a Delaware limited liability company, the owner of that certain portfolio of Intellectual Property, known as the "ChanBond" patent portfolio, more particularly described as follows:

> The Corporation and CHANBOND agree to an acquisition by the Corporation of 100% of the membership interests of CHANBOND for consideration generally defined as: 44,700,000 shares of the common stock of the Corporation , plus a $5MM 5-Year No-Interest Promissory Note, with a Maturity Date of October 27, 2020..

NOW, THEREFORE BE IT RESOLVED, that the Corporation is hereby authorized to enter into the Agreement and the Note.

FURTHER RESOLVED, that any executive officer of the Corporation be, and hereby is authorized, empowered and directed, from time to time, to take such additional action and to execute, certify and deliver to the transfer agent of the Corporation, as any appropriate or proper to implement the provisions of the foregoing resolutions, and be it

FURTHER RESOLVED, that this Consent may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument, and that counterpart signature pages transmitted by facsimile transmission, by electronic mail  in portable document format (.pdf) or by any other electronic means intended to preserve the original  graphic and pictorial appearance of a document, shall have the same effect as physical delivery of the  paper document bearing an original signature.

IN WITNESS WHEREOF, the undersigned members of the Board have executed this Consent as of October 26, 2015.

Robert M. Howe, III

## SCHEDULE 2.2.7

### Common Interest Agreement

THIS COMMON INTEREST AGREEMENT ("**Agreement**") is entered into as of April 9, 2015, by and among **ChanBond, LLC** (the "**Company**") having its principal offices at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204; **UnifiedOnline, Inc.** ("**UnifiedOnline**"), having its principal offices at 4126 Leonard Drive, Fairfax, Virginia 22030; and **Deirdre Leane ("Leane")**, located at 2525 Carlisle Street, Suite 439, Dallas, Texas 75201.

1.    Background.

1.1    Company, Unified and Leane are sometimes referred to herein as a "**party**" or the "**parties**" and are presently negotiating the closing of an agreement under which UnifiedOnline will purchase Company from Leane and continue to enforce and license patents and related rights owned by the Company "**IP Rights**" and the "**Patent Matters**" respectively).

1.2    The parties have a common legal interest in upholding the validity and enforceability of the IP Rights, for purposes of enforcement. The parties anticipate they will enforce inherent rights of the IP Rights against third parties through litigation. The parties have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest doctrine. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of privileged information and attorney work product developed by the parties and their respective counsel.

2.    Common Interest.

2.1    The parties have a common, joint and mutual legal interest in the monetization of valid and enforceable patents. In furtherance of that common interest, the parties will cooperate with each other, to the extent permitted by law, to share information protected by the

attorney-client privilege, the work product doctrine, or other applicable privilege or immunity with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of this Agreement.

2.2    In order to further their common interest, the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, evidence of use materials, claims charts, prosecution history files and other information (hereinafter "**Common Interest Materials**"). The sole purpose of the exchange of the Common Interest Materials is to support the parties' common interest with respect to the enforcement for the Patent Matters. Any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection. Nothing in this Agreement requires a party to share information with the other party.

3.    Nondisclosure.

3.1    The parties and their counsel shall use the Common Interest Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Common Interest Material. No party nor

their respective counsel shall produce privileged documents or information unless or until directed to do so by a final order of a court of competent jurisdiction, or upon the prior written consent of the other party. No privilege or objection shall be waived by a party hereunder without the prior written consent of the other party.

3.2    Except as herein provided, in the event that either party or its counsel is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar process) to disclose any Common Interest Materials, the party or its counsel shall assert all applicable privileges, including, without limitation, the common interest doctrine, and shall immediately inform the other party and the other party's counsel of the request or requirement to disclose.

4.    Relationship; Additions; Termination.

4.1    This Agreement does not create any agency or similar relationship among the parties. Through the term of the agreement between the parties, or any other agreement requiring confidentiality, (whichever term is longer), no party nor their respective counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2    Nothing in this Agreement affects the separate and independent representation of each party by its respective counsel or creates an attorney-client relationship between the counsel for a party and the other party to this Agreement.

4.3    This Agreement shall continue until terminated upon the written request of either party. Upon termination, each party and their respective counsel shall return any Common Interest Material furnished by the other party. Notwithstanding termination, this Agreement shall continue to protect all Common Interest Materials disclosed prior to termination. Sections 3 and 5 shall survive termination of this Agreement.

5.    General Terms.

5.1    This Agreement is governed by the laws of the State of Delaware, without regard to its choice of law principles to the contrary. In the event any provision of the Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect. Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2    The parties agree that a breach of this Agreement would result in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party shall be entitled to equitable relief, including injunctive relief, as a non-exclusive remedy for any

such breach.

5.3    Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service as set forth below, and shall be deemed to have been given on the day received:

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, TX 75204

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

Deirdre Leane
2525 Carlisle Street
Suite 439
Dallas, TX 75201

5.4    This Agreement is effective and binding upon each party as of the date it is signed by or on behalf of a party and may be amended only by a writing signed by or on behalf of each party. This Agreement may be executed in counterparts. Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

***The remainder of this page has been intentionally left blank.**

IN WITNESS WHEREOF, CHANBOND, LLC, UNIFIEDONLINE, INC. and DEIRDRE
LEANE have executed this Common Interest Agreement by their duly authorized
representatives.

CHANBOND, LLC

By: _____
       (Signature)

Name: DEIRDRE LEANE

Title: MANAGER


UNIFIEDONLINE, INC.

By: _____
       (Signature)

Name: Rob Howe

Title: CEO


DEIRDRE LEANE

By: _____
       (Signature)

Name: DEIRDRE LEANE

Title: DR.

<u>**SCHEDULE 2.2.8**</u>

**Promissory Note**

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.

### UNIFIEDONLINE, INC.

### PROMISSORY NOTE

Principal Amount: $5,000,000        Original Issuance Date: October 27, 2015

FOR VALUE RECEIVED UnifiedOnline, Inc., a Delaware corporation (the "Company"), promises to pay to Deirdre Leane, an individual, of 2525 Carlisle St., Suite 439, Dallas, TX 75201 (the "Holder") an aggregate principal amount of Five Million Dollars ($5,000,000.00) (representing the Cash Payment as provided for and defined in the Interest Sale Agreement dated as of the date hereof (the "Interest Sale Agreement"), to which the Company and the Holder are parties) payable on or prior to October 27, 2020 (the "Maturity Date"), provided, however, that if this Note is not paid in full by the Maturity Date, the aggregate principal amount of this Note shall be increased by Twenty Five Thousand Dollars ($25,000.00) for each month such payment is delayed (or *pro rata* portion thereof) until paid in full (the "New Principal Balance").

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.      Event of Default.

       (a)     For purposes of this Note, an "Event of Default" means:

          (i)     the Company shall default in the payment of principal on this Note on or prior to the applicable Maturity Date; or

          (ii)     the Company shall be in breach of any obligation, covenant or representation made in this Note or the Interest Sale Agreement; or

          (iii)     the Company shall (a) become insolvent; (b) dissolve or terminate its existence; (c) admit in writing its inability to pay its debts generally as they mature; (d) make an assignment for the benefit of creditors or commence proceedings for its

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CHANBOND, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| COMCAST CORPORATION and | ) | **TRIAL BY JURY DEMANDED** |
| COMCAST CABLE | ) | |
| COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ChanBond, LLC ("ChanBond"), as for its complaint of patent infringement in this matter, hereby alleges through its attorneys as follows:

### Nature of the Action

This is an action for patent infringement of United States Patent Nos. 7,941,822 (the "'822 Patent"), 8,341,679 (the "'679 Patent") and 8,984,565 (the "'565 Patent") (collectively, the Patents) under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*., seeking damages and injunctive and other relief under 35 U.S.C. § 281, *et seq*.

### The Parties

1.     Plaintiff ChanBond is a Delaware limited liability company with its principal place of business at 2633 McKinney Ave., Dallas, Texas 75204.

2.     Defendant Comcast Corporation ("Comcast Corp.") is a Pennsylvania corporation with its principal place of business at 1701 John F Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Corp. may be served with process pursuant to the Delaware long arm statute, 10 *Del. C.* § 3104.

3.      Defendant Comcast Cable Communications, LLC ("Comcast Cable") is a
Delaware limited liability company with its principal place of business at 1701 John F Kennedy
Boulevard, Philadelphia, Pennsylvania 19103.  On information and belief, Comcast Cable is a
wholly owned, direct or indirect subsidiary of Comcast Corp.  Comcast Cable may be served
with process via its registered agent, Comcast Capital Corporation, 1201 North Market Street,
Suite 1000, Wilmington, Delaware 19801.

4.      Comcast Corp. and Comcast Cable are referred to herein, collectively, as
"Comcast" or "defendants."

## Jurisdiction and Venue

5.      This is an action for patent infringement arising under the Patent Laws of the
United States, Title 35 of the United States Code.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
§§ 1331 and 1338(a) because the action concerns the infringement of United States patents.

7.      This court has personal jurisdiction over defendants.  Upon information and
belief, each defendant transacts substantial business in the State of Delaware, directly or through
intermediaries, including: (i) at least a portion of the infringements alleged herein, and (ii)
regularly does or solicits business in Delaware, engages in other persistent courses of conduct,
maintains continuous and systematic contacts in Delaware, purposefully avails itself of the
privileges of doing business in Delaware, and/or derives substantial revenue from goods and
services provided to individuals in Delaware.  In addition, Comcast Cable is a limited liability
corporation organized and existing under the laws of the State of Delaware.

2

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other reasons, defendants have transacted business in the State of Delaware and defendants have committed and continue to commit acts of patent infringement in Delaware.

**The Patents-In-Suit**

9.      On May 10, 2011, the United States Patent and Trademark Office duly and legally issued the '822 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer, Richard Snyder and Robert Stine.  The inventors assigned all rights in the '822 Patent to CBV, Inc. ("CBV"), which was founded by the inventors, and CBV assigned the '822 Patent to ChanBond, including all rights to enforce the '822 Patent and to recover for infringement.  ChanBond has all right, title and interest to the '822 Patent.  The '822 Patent is valid and in force.  A true and correct copy of the '822 Patent is attached hereto as Exhibit A.

10.      On December 25, 2012, the United States Patent and Trademark Office duly and legally issued the '679 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer, Richard Snyder and Robert Stine.  The inventors assigned all rights in the '679 Patent to CBV, which was founded by the inventors, and CBV assigned the '679 Patent to ChanBond, including all rights to enforce the '679 Patent and to recover for infringement.  ChanBond has all right, title and interest to the '679 Patent.  The '679 Patent is valid and in force.  A true and correct copy of the '679 Patent is attached hereto as Exhibit B.

11.      On March 17, 2015, the United States Patent and Trademark Office duly and legally issued the '565 Patent, entitled "Intelligent Device System and Method for Distribution of Digital Signals on a Wideband Signal Distribution System," to its inventors, Earl Hennenhoefer,

Richard Snyder and Robert Stine. The inventors assigned all rights in the '565 Patent to CBV, which was founded by the inventors, and CBV assigned the '565 Patent to ChanBond, including all rights to enforce the '565 Patent and to recover for infringement. ChanBond has all right, title and interest to the '565 Patent. The '565 Patent is valid and in force. A true and correct copy of the '565 Patent is attached hereto as Exhibit C.

12.      Generally, the patents-in-suit are directed in improving the data transmission of wideband distribution systems. Historically, data service flows (e.g. data, web traffic, voice and video transmitted via the Internet Protocol) have been transmitted over a single channel at a fixed bandwidth. But with the demand for transmission of more and more content at ever increasing speeds, the capabilities of a single channel transmission methodology became exhausted.

13.      The patents-in-suit address and overcome, among other things, the throughput problems regarding this single channel methodology. The inventors of the patents-in-suit invented intelligent devices that allow a single data service flow (e.g. large data transmissions) to be split and modulated onto multiple channels for transmission. This transmission is then demodulated and recombined back into a single service flow for distribution to addressable devices. Using the inventions, service providers are now capable of efficiently transmitting more content at higher speeds and better quality of service.

## COUNT I
## (INFRINGEMENT OF THE '822 PATENT)

14.      Plaintiff incorporates paragraphs 1 through 13 herein by reference as if set forth here in full.

15.      Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '822 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing

into the United States, without authority, cable systems and cable services that are covered by at
least one claim of the '822 Patent. The accused cable systems include cable system components
such as cable modem termination systems, RF transmission hardware, network monitoring
equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia
terminal adapters, and set-top boxes), including but not limited to components that are compliant
with the Data Over Cable System Interface Specification ("DOCSIS") standard, version 3.0 or
higher.[1] More particularly, Comcast, without authority from Plaintiff, provides, operates,
implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that
perform, are capable of performing or are provided having channel bonding functionality,
including but not limited to cable systems and components that have the capability to distribute a
service flow over multiple, bonded channels and/or the capability to receive a service flow over
multiple, bonded channels (the "Accused Functionality"). Comcast's cable systems and
components that perform or are capable of performing the Accused Functionality, and/or the use
of such cable systems and components, infringe one or more claims of the '822 Patent under 35
U.S.C. § 271.

16. As a result of Comcast's unlawful infringement of the '822 Patent, Plaintiff has
suffered and will continue to suffer damages in an amount to be proven at trial. Plaintiff is
entitled to recover from Comcast the damages adequate to compensate for such infringement,
which have yet to be determined.

17. Comcast will continue to infringe the '822 Patent unless and until it is enjoined by
this Court.

---

[1] *See, e.g.,* http://customer.xfinity.com/help-and-support/internet/docsis3/?ts=2 ("With DOCSIS
3.0, you'll experience significantly faster speeds, so you can make the most of your online
experience. DOCSIS 3.0 also opens the door to new Internet technologies.")

# COUNT II
## (INFRINGEMENT OF THE '679 PATENT)

18.　　Plaintiff incorporates paragraphs 1 through 17 herein by reference as if set forth here in full.

19.　　Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '679 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '679 Patent.  The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the DOCSIS standard, version 3.0 or higher.  More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality").  Comcast's cable systems and components that perform or are capable of performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '679 Patent under 35 U.S.C. § 271.

20.　　As a result of Comcast's unlawful infringement of the '679 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff is

entitled to recover from Comcast the damages adequate to compensate for such infringement, which have yet to be determined.

21.     Comcast will continue to infringe the '679 Patent unless and until it is enjoined by this Court.

## COUNT III
### (INFRINGEMENT OF THE '565 PATENT)

22.     Plaintiff incorporates paragraphs 1 through 21 herein by reference as if set forth here in full.

23.     Upon information and belief, Comcast has been and is currently directly infringing, literally or under the doctrine of equivalents, one or more claims of the '565 Patent by making, using, testing, offering to sell, and/or selling within the United States, and/or importing into the United States, without authority, cable systems and cable services that are covered by at least one claim of the '565 Patent.  The accused cable systems include cable system components such as cable modem termination systems, RF transmission hardware, network monitoring equipment and customer premises equipment (*e.g.,* cable modems, embedded multimedia terminal adapters, and set-top boxes), including but not limited to components that are compliant with the DOCSIS standard, version 3.0 or higher.  More particularly, Comcast, without authority from Plaintiff, provides, operates, implements, sells, markets, imports and/or offers for sale cable systems and/or cable services that perform, are capable of performing or are provided having channel bonding functionality, including but not limited to cable systems and components that have the capability to distribute a service flow over multiple, bonded channels and/or the capability to receive a service flow over multiple, bonded channels (the "Accused Functionality").  Comcast's cable systems and components that perform or are capable of

7

performing the Accused Functionality, and/or the use of such cable systems and components, infringe one or more claims of the '565 Patent under 35 U.S.C. § 271.

24.     As a result of Comcast's unlawful infringement of the '565 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff is entitled to recover from Comcast the damages adequate to compensate for such infringement, which have yet to be determined.

25.     Comcast will continue to infringe the '565 Patent unless and until it is enjoined by this Court.

**WILLFUL INFRINGEMENT OF THE '822, '679, and '565 PATENTS**

26.     Plaintiff incorporates paragraphs 1 through 25 herein by reference as if set forth here in full.

27.     In January 2012, Comcast announced that it had completed its rollout of DOCSIS 3.0.

28.     In February 2012, a business associate of the inventors communicated with Mr. Joseph DiTrolio, Comcast Vice President and Corporate Comptroller, regarding the patent portfolio.  On February 23, 2012, the business associate had a face-to-face meeting with Mr. DiTrolio, wherein he provided a write-up that identified the '822 Patent and the application that would issue as the '679 Patent, and that indicated other continuations were pending.  The write-up described the patents and applications and their applicability to DOCSIS 3.0 and the cable industry's channel bonding technology.  The business associate and Mr. DiTrolio discussed the patents, patent applications, relevant technology, and the patents' and patent applications' applicability to the cable industry's channel bonding technology.  By February 23, 2012, Mr. DiTrolio, and thus Comcast, knew of the at least the '822 Patent and the application that would

issue as the '679 Patent, and knew of their relevance to the DOCSIS 3.0 channel bonding technology used by Comcast.

29. By February 27, 2012, Mr. DiTrolio had communicated the patent portfolio and the write-up to Mr. James Finnegan, Comcast Senior Vice President, Intellectual Property Strategy. On information and belief, by February 27, 2012, Mr. Finnegan knew of the '822 Patent and the applications that would issue as the '679 and '565 Patents, and knew of their relevance to the DOCSIS 3.0 channel bonding technology used by Comcast.

30. On March 28, 2012, Mr. Hennenhoefer (one of the co-inventors) had a teleconference with Mr. Finnegan during which the patents, applications and CBV were discussed. Mr. Finnegan informed Mr. Hennenhoefer that Comcast was obtaining a legal opinion regarding the patents. Shortly thereafter, Mr. Hennenhoefer had a follow-up call with Mr. Finnegan.

31. On February 12, 2013, the '822 and '679 Patents and the application that would issue as the '565 Patent were also brought to the attention of Mr. Tony Werner of Comcast. On February 13, 2013, Mr. Werner communicated the patents and applications, for at least a second time, to Mr. Finnegan. Shortly thereafter, Messrs. Hennenhoefer and Stine (another of the co-inventors) had a teleconference with Mr. Mark Dellinger, Comcast Vice President, Intellectual Property Strategy in which the patents and applications were discussed, along with their applicability to DOCSIS 3.0.

32. Despite Comcast's knowledge of the Patents and the channel bonding technology that they covered, Comcast nevertheless continued making, using and selling products that complied with and used DOCSIS 3.0 (and higher) channel bonding, despite an objectively high likelihood that such actions constituted infringement of the Patents. This infringement was

known to Comcast or was so obvious that Comcast should have known about this infringement.

Despite knowing that its actions constituted infringement of the Patents and/or despite knowing

that that there was a high likelihood that its actions constituted infringement of the Patents,

Comcast nevertheless continued its infringing actions, and continued to make, use and sell

infringing DOCSIS 3.0 (and higher) products.

33.     Comcast's infringement of the '822, '679 and '565 Patents has thus been

deliberate and willful, at least since February 23, 2012.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ChanBond, LLC respectfully requests that this Court enter

judgment in its favor as follows:

A.      Declaring that defendants have infringed, literally and/or under the doctrine of

equivalents, at least one claim of each of the '822, '679 and '565 Patents, and that this

infringement is willful;

B.      Awarding to Plaintiff the damages to which it is entitled under 35 U.S.C. § 284

for defendants' past infringement and any continuing or future infringement, including

compensatory damages, and the trebling of such damages due to the willful nature of the

infringement;

C.      Awarding Plaintiff costs (including all disbursements) and expenses incurred in

this action;

D.      Awarding Plaintiff pre- and post-judgment interest on its damages;

E.      Declaring that this case is exceptional pursuant to 35 U.S.C. §285 and awarding

Plaintiff its attorneys' fees and costs; and

10

F.      Awarding Plaintiff such other and further relief in law or in equity as this Court

deems just and proper.

## JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of

any and all issues so triable by right.

Dated:  September 21, 2015                    BAYARD, P.A.

OF COUNSEL:                                   */s/ Stephen B. Brauerman*
                                              Stephen B. Brauerman (No. 4952)
Mark Raskin                                   Vanessa R. Tiradentes (No. 5398)
Robert Whitman                                Sara E. Bussiere (No. 5725)
John F. Petrsoric                             222 Delaware Avenue, Suite 900
MISHCON DE REYA NEW YORK LLP                  P.O. Box 25130
750 Seventh Ave., 26th Floor                  Wilmington, Delaware 19899
New York, NY 10019                            (302) 655-5000
                                              sbrauerman@bayardlaw.com
                                              vtiradentes@bayardlaw.com
                                              sbussiere@bayardlaw.com

                                              *Attorneys for Plaintiff ChanBond, LLC*

# Exhibit 5

INTERNET ARCHIVE
WayBackMachine

http://www.z-band.com/    Go

186 captures
7 Jun 00 - 10 Aug 15

FEB  JUN  AUG    Close
◄ 26 ►
2013  2014  2015    Help

877 867 6475



GET A QUOTE

Home    About Z-Band    Products    Technical    Markets    Support    Contact Us

# Video Distribution Product



## CATV/Satellite Distribution

Learn More

## IPTV/IP Video

Learn More

Case 1:15-cv-00842-GBW    Document 93-1    Filed 01/28/22    Page 232 of 283 PageID #: 7830

# Markets We Serve



| Healthcare |
|---|

| Hospitals | Assisted Living |



| Government & Military |
|---|

| Federal | Civilian |



| Hospitality |
|---|

| Casinos | Resorts |



| Education |
|---|

| K-12 | Universities |



| Commercial Businesses |
|---|

| Financial | Corp. Headquarters |



| International |
|---|

| International | International |

## Z-Band: The Leader in Enterprise Video Distribution Systems

Z-Band is a veteran-owned commercial video system provider based in Carlisle, PA. We design, manufacture, and implement cutting-edge high-definition video distribution systems for the government, healthcare, commercial, education, hospitality, and international markets. We feature an active, self-adjusting video distribution system that is capable of distributing CATV/HDTV, satellite, internally-generated video, and other video-on-demand (VOD) services over unshielded twisted pair (UTP) Category cable.

» Read More

| Upcoming Webinar |
|---|

| Read Our Blogs |

| Schedule a Demo |



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
**PHONE:** 877-801-6475 | **FAX:** 877-801-6475

Fully patented technology made in the USA - ISO 9001:2008

Stay Connected:

Rep Login

Home | About Z-Band | Products | Technical | Markets | Support | Contact Us

Sitemap | Privacy Policy | Site Credits | Copyright 2014. All Rights Reserved

# Exhibit 6

REDACTED

IN ITS

ENTIRETY

Exhibit 7

REDACTED
IN ITS
ENTIRETY

# Exhibit 8

REDACTED
IN ITS
ENTIRETY

# Exhibit 9

REDACTED

IN ITS

ENTIRETY

# EXHIBIT G

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| *Plaintiff* | ) | |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) ) ) ) ) ) | Civil Action No.   C.A. Nos.15-842; 15-843; 15-844; 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| *Defendant* | | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: 
        Jonathan R. Bowser, Buchanan Ingersoll & Rooney PC
        1737 King Street, Suite 500 Alexandria, VA 22314
        *(Name of person to whom this subpoena is directed)*

✓ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Winston & Strawn LLP<br>1700 K Street, N.W.<br>Washington D.C. 200006 | Date and Time:<br>02/23/2017 9:30 am |
|---|---|

The deposition will be recorded by this method:   audio-visual and stenographic means

❒ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   01/24/2017

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ James C. Lin |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* all defendants                                                              , who issues or requests this subpoena, are:

James C. Lin, Winston & Strawn , 275 Middlefield Road, Suite 205, Menlo Park, CA; (650) 858-6434, jalin@winston.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.    C.A. Nos.15-842; 15-843; 15-844;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                                                *Server's signature*

                                                           _____
                                                                              *Printed name and title*


                                                           _____
                                                                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
   **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
   **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
   **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
   **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT H

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| *Plaintiff* | ) | |
| | ) | Civil Action No.   C.A. Nos.15-842; 15-843; 15-844; |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) ) ) ) ) ) ) | 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| *Defendant* | | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Jonathan R. Bowser, Buchanan Ingersoll & Rooney PC
                1737 King Street, Suite 500 Alexandria, VA 22314

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

          See Attachment A

| Place: Winston & Strawn LLP 1700 K Street, N.W. Washington D.C. 200006 | Date and Time: 02/13/2017 9:30 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

          The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/24/2017

| CLERK OF COURT | OR | |
|---|---|---|
| | | /s/ James C. Lin |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
all defendants _____ , who issues or requests this subpoena, are:

James C. Lin, Winston & Strawn , 275 Middlefield Road, Suite 205, Menlo Park, CA; (650) 858-6434, jalin@winston.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   C.A. Nos.15-842; 15-843; 15-844;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

*ChanBond, LLC v. Atlantic Broadband Group, LLC et al.*
**Civil Action No. 1:15-cv-00842 - 854 (D. Del.)**

**DEFINITIONS**

The following definitions are applicable to terms employed in responding to this Subpoena *Duces Tecum* ("Subpoena") for the production of documents:

1.    "You" or "Your" means Jonathan R. Bowser.

2.    "Buchanan" means Buchanan Ingersoll & Rooney PC, and any predecessor or successor entity and any past or present parent, division, subsidiary, affiliate, associated organization, officer, agent, employee, consultant, staff member, associate, partner, or other representative.

3.    The term "ChanBond" means ChanBond, LLC, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, including at least CBV and Z-Band, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in ChanBond, LLC, the ChanBond Patents, or Related Patents, including at least UnifiedOnline, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

4.    The term "UnifiedOnline" means UnifiedOnline, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in UnifiedOnline, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

1

5.     The term "CBV" means CBV, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in CBV, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

6.     The term "Z-Band" means Z-Band, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in Z-Band, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

7.     The term "ChanBond Patents" means U.S. Patent Nos. 7,346,918, 7,941,822, 8,341,679, and 8,984,565, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

8.     The term "Related Patents" means any and all patents that relate back to a common application as any ChanBond Patent, including any provisional or non-provisional applications, continuations, continuations-in-part, divisions, interferences, reexaminations, reissues, parents, foreign counterpart applications, as well as any other applications disclosing, describing or claiming any invention disclosed, described or claimed in any ChanBond Patent, or claiming the benefit of the filing date of any application whose benefit is claimed in any ChanBond Patent, whether or not abandoned and whether or not issued.

9.      The term "ChanBond Inventors" means Earl Hennenhoefer, Richard V. Snyder, and Robert D. Stine.

10.     The term "Prior Art" refers to art under 35 U.S.C. §§ 102 and 103 and includes, by way of example and without limitation, printed publications, patents, disclosures, prior inventions, admissions, prior public uses, prior offers for sale, or sales of actual products.

11.     The term "GigaTwist" means the GigaTwist product.

12.     The term "GigaBUD" means the GigaBUD product.  For avoidance of doubt, this term includes the GigaBUD product referenced in Ex. 1 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

13.     The term "GigaBOB" means the GigaBOB product.  For avoidance of doubt, this term includes the GigaBOB product referenced in Ex. 1 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

14.     The term "Whitaker Corp." means The Whitaker Corporation, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in The Whitaker Corporation, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

15.     The term "Whitaker Patents" means U.S. Patent No. 5,901,340 and U.S. Patent No. 5,875,386, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

16.     The term "Whitaker Inventors" means Steven Lee Flickinger, James Ray Fetterolf, Sr., Joseph P. Preschutti, Terry P. Bowen, Jeffrey Legg, and David Koller.

17.     The term "Defendants" means the defendants in the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.   To resolve any doubt, these include the Defendants in case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

18.     The term "Instant Litigations" means the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.   To resolve any doubt, these include case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

19.     The term "U.S.P.T.O." means the United States Patent and Trademark Office.

20.     The terms "concerning," "relate," "relating," or "related" mean in any way, directly or indirectly, in whole or part, relating to, concerning, alluding to, referring to, discussing, mentioning, regarding, pertaining to, describing, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, modifying, amending, confirming, endorsing, representing, supporting, qualifying, terminating, revoking, refuting, undermining, canceling, contradicting, or negating.

21.     The term "DOCSIS" shall mean the Data Over Cable Service Interface Specification, and shall include all versions, including, but not limited to, DOCSIS 3.0, DOCSIS 2.0, DOCSIS 1.1, and DOSCSIS 1.0.

22.     The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, the original (or a copy when the original is not available) and each non-identical copy (including those which are non-identical by reason of translations, notations, or markings) or any and all other written, printed, typed, punched, taped, filmed, or graphic matter or recorded or tangible thing, or whatever description, however produced or reproduced (including computer-stored or generated data,

together with instructions or programs necessary to search and retrieve such data and hard copies where available and retrievable), and shall include all attachments to and enclosures with any requested item to which they are attached or with which they are enclosed, and each draft thereof.  The term "document" shall specifically include all recorded or retrievable electronic data or communications such as electronic mail (e-mail) and the like and all translations thereof.

23.     "Communication" shall mean any oral, written, electronic, or other exchange of words, thoughts, information, or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by Telex, or by other process, electric, electronic, or otherwise.  All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, tape or video recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

24.     The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the request.  The word "including" shall not be used to limit any general category or description that precedes it.  The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the request.

25.     Reference to the singular in any of these requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

## **INSTRUCTIONS**

1.      Unless otherwise stated in a request, the time period covered by the command of this Subpoena is June 27, 1999 to Present.

2.      All requests for "documents" include a request for any "communications," such as letters or e-mails.

3.      It is Your duty in answering these requests to conduct a reasonable investigation so that You disclose and produce all available responsive and non-privileged documents.

4.      If production of any responsive documents are being withheld on the ground of the attorney-client privilege, attorney work product, or any other privilege, immunity, or protection, please provide a privilege log with the following information for each such document: (a) the name of the document; (b) the name of the person(s) who prepared the document; (c) the name of the person(s) to whom the document was directed or circulated; (d) the date(s) on which the document was prepared or transmitted; (e) the name of the person(s) now in possession of the document; (f) a description of the subject matter of the document; and (g) the specific nature of the privilege or protection claimed with respect to the document.

5.      If any request herein requires the production of documents that are no longer in Your actual or constructive possession, custody, or control or which have been destroyed or lost, then in lieu of production, You shall state or identify the title of the document, the author of the document, each person to whom or by whom a copy of the original of the document was delivered, forwarded, or has been received, the date of the document, and the general subject matter of the document. In the event You claim that information contained other than in documentary form is no longer in Your actual or constructive possession, custody, or control or has been destroyed or lost, You shall state or identify the nature of the information, the creator of

the information, the person to whom the information was or was to be forwarded, delivered or for whom it was prepared, the date of the creation of the information, and the manner in which the information has been memorialized, if at all.

6.      In any instance where documents, data, or information requested herein is stored on a computer, a computer hard drive, a computer mainframe, computer back-up tape, or in any other electronic format, Defendants request that You produce the data, information, or documents on CD ROM, computer disk, or in hard copy paper form.  Further, Defendants request that You produce all documentation or programs that would allow Defendants to run, read, view, print, or otherwise access any such disks, CD ROM, or other computer information.

7.      You are under a continuing obligation to respond to the requests set forth herein. Accordingly, if You subsequently gain actual or constructive possession, custody, or control of any document called for in the requests set forth herein that has not been produced to Defendants, You must produce such document to Defendants as soon as possible or provide a written explanation to Defendants as to why You will not produce the document.

8.      The documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the requests.

## DOCUMENT REQUESTS

1. All documents regarding the ChanBond Patents and/or any Related Patents.

2. All documents regarding Your, ChanBond's, CBV's, Z-Band's, or the ChanBond Inventors' efforts to obtain patent protection on any invention related to the subject matter shown, described, or claimed in the ChanBond Patents and/or any Related patents, including but not limited to:

      a.      all invention disclosures and draft patent applications;

      b.      all documents attached to, referring to or regarding any invention disclosure;

      c.      the prosecution file of each ChanBond Patent;

      d.      the prosecution history of all of the ChanBond Patents and/or Related Patents;

      e.      the prosecution history of each application on which any of the ChanBond Inventors is a named inventor, including all issued, pending or abandoned applications;

      f.      all notes related to any office action, examiner interview, or other proceeding before the U.S.P.T.O. related to the ChanBond Patents and/or Related Patents

      g.      all U.S. and foreign patents and patent applications, and corresponding prosecuting histories, including those of unpublished, pending and/or abandoned applications, that are or have been prepared in whole or in part owned by You that are directed to the subject matter disclosed in the ChanBond Patents and/or Related Patents;

      h.      all correspondence regarding the patent applications referred to in subparts (c) through (g) above;

i.      all documents consulted or reviewed by the applicants, patentees, or You during the preparation and prosecution of any application referred to in subparts (c) through (g) above, including but not limited to Prior Art references or potential Prior Art references;

j.      all documents related to any Prior Art search contemplated or run in preparation and prosecution of any application referred to in subparts (c) through (g) above; and

k.      all documents concerning Your participation in any examiner interview during prosecution of the ChanBond Patents and/or Related Patents, including, but not limited to, any assertions to the examiner made by You.

3.      All documents regarding (a) Your knowledge of any Prior Art to the ChanBond Patents and/or Related Patents, and (b) the date and circumstances pursuant to which You first learned of each piece of Prior Art.

4.      All documents regarding the ChanBond Patents or Related Patents and (1) cable systems, (2) high-speed data services, or (3) the DOCSIS protocol, including any investigation of the foregoing.

5.      All documents related to the ChanBond Patents or Related Patents and any named Defendants.

6.      All documents regarding the conception, reduction to practice, research, design, development, or testing of the subject matter shown, described, and claimed in the ChanBond Patents and/or Related Patents, including but not limited to laboratory notebooks, inventor notebooks, source code, and computer data, as well as the first written description or disclosure (including drawings) and the first prototype of such subject matter.

7.      All documents concerning any analysis of the validity or invalidity of any of the claims of the ChanBond Patents and/or Related Patents.

8.      All documents concerning any analysis of the infringement of any of the claims of the ChanBond Patents and/or Related Patents.

9.      All documents prepared in relation to the licensing, offer to license, or offer for sale of the ChanBond Patents and/or Related Patents.

10.     All documents related to any pre-filing investigation, infringement analysis, or competitive analysis with respect to any ChanBond Patent or Related Patent.

11.     All documents that reflect, refer to or relate to the meaning of any claim term of any of the claims of the ChanBond Patents and/or Related Patents.

12.     All documents concerning any product, prototype, development version, test version, commercial embodiment, or commercialization of any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

13.     All documents that reflect, refer to or relate to any testing, analysis, comparison, or experimentation relating to the any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

14.     All documents related to the making, using, testing, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any product embodying any technical matter disclosed in, or any invention claimed in, any ChanBond Patent and/or Related Patent.

15.     All documents related to the GigaTwist, GigaBUD, or GigaBOB product,s including all documents related to testing, selling, offering for sale, licensing, or disclosure anywhere in the world, of the GigaTwist product.

10

16.     All documents concerning the inventorship of any invention described, disclosed or claimed in the patents and applications in the ChanBond Patents and/or Related Patents, including documents regarding any person considered for inclusion as an inventor, and the contribution of each person involved in the conception, development, and reduction to practice of the subject matter claimed as an invention in any of the patents or applications in the ChanBond Patents and/or Related Patents.

17.     All documents concerning ownership of the ChanBond Patents and/or Related Patents, including but not limited to any proposed, requested, or executed assignment, license, conveyance, and/or grant of any right, title or interest in or to any of the ChanBond Patents and/or Related Patents regarding any such assignment, license, conveyance, and/or grant.

18.     All documents concerning any service offerings, beta tests, or trials of the subject matter of each of the ChanBond Patents and/or Related Patents or related technologies prior to the filing date of each of the ChanBond Patents and/or Related Patents.

19.     All documents concerning the features, functions, and operation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents and/or Related Patents.

20.     All documents that reflect, refer to or relate to the manners or techniques by which the Chanbond Patents and/or Related Patents allegedly improved upon the Prior Art, added functionality that did not exist in the Prior Art, or provided a variation on or upgrade of the Prior Art and whether each such alleged improvement, added functionality, or variation or upgrade, was nonobvious or unpredictable.

11

21.     All communications between or among You, ChanBond, CBV, Z-Band, and/or any of the ChanBond Inventors concerning any of the ChanBond Patents and/or Related Patents or relating to the Instant Litigations.

22.     All documents concerning any communications between You and any person concerning the subject matter of the Instant Litigations.

23.     All documents concerning any document retention policy by You, ChanBond, CBV, or Z-Band, including all documents concerning any practice, policy, procedure, or effort to identify and preserve documents.

24.     All documents concerning the reasons for creation of CBV, or the decision to assign patents to CBV.

25.     All documents concerning any valuation of any ChanBond Patents and/or any Related Patents.

26.     All documents regarding the Whitaker Patents.

27.     All communications between you, ChanBond, CBV, Z-Band, and/or any of the ChanBond Inventors concerning any of the Whitaker Patents.

28.     All communications between you and Whitaker Corp., or any of the Whitaker Inventors, regarding either the ChanBond patents or the Whitaker Patents.

# Exhibit 1



877-801-6475    GET A QUOTE ❯

Home    About Z-Band    Products    Technical    Markets    Support    Contact Us

# Products/Services

Home | Markets | Healthcare | Products/Services

## Products/Services

### "GigaBUD" from Z-Band (Video Distribution Hub)

Z-Band's GigaBUD, Active Video Distribution Hub, is ideal for a variety of around-the-clock video applications in healthcare facilities, including live video monitoring in patient rooms and ICU wards and for use in distance learning for medical residents. GigaBUD can also serve as a valuable tool in patient entertainment and education.



### Cascading Capability for Multiple Hub Connectivity

- The GigaBUD is rack mounted to meet the applicable MDF/IDF port count combination for the various video drops
- Desired video is connected to the "CATV IN" port of the initial GigaBUD, which becomes the "Master" hub
- Additional GigaBUDs are connected to the Master through a cascading process and are dubbed "Slaves".
- "Outbound" Master ports are connected to "Cascade In" ports capable of providing up to eight second-level "Slaves" to achieve unidirectional cascading.
- Each second-level "Slave" can be cascaded to third and fourth levels, resulting in the capability for combining up to 585 GigaBUDs.
- End result is a video signal at the "CATV IN" port of the "Master" that can be distributed to as many as 14,040 TVs throughout a healthcare facility or system of facilities.

### "GigaBOB"

The GigaBOB is equipped with numerous attributes that provide HD TV over CAT 5e or CAT 6 cable such as:

Markets

- Remotely operated "GigaBOB" with unique distance sensing circuit and internal amplifier
- Simultaneous transmission over thousands of televisions
- 100-meter distribution range for the full bandwidth of RF channels
- DOCSIS or FSK return capability for VOD and/or data applications
- 120 or 240 VAC at 50 or 60 Hz operating frequency capacity
- Hub and balun system complies with UL, CSA and FCC Part 15, Subpart B guidelines

Healthcare

Featured Projects

Clients

Products/Services

Resources




## Z-Band Video Distribution System Benefits

The Z-Band Video Distribution System is a highly effective way to merge voice, data and video over one cabling plant to meet the video distribution needs of any healthcare environment.

In addition, our remotely powered GigaBOB balun simplifies design and installation, as well as the process of making adds, moves, and changes while maintaining the highest level of picture quality. Z-Band can provide a seamless integration of RF and IP Video in your healthcare facility.

Want to see how our products work?

Schedule A Demo

Questions?
Contact Us Today



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
PHONE: 877-801-6475 | FAX: 717-249-3253

Products assembled in the USA

Stay Connected:

Rep Login

Home  About Z-Band  Products  Technical  Markets  Support  Contact Us  Sitemap

Site Credits   Copyright 2017. All Rights Reserved

Privacy Policy

EXHIBIT I

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### District of Delaware

| | | |
|---|---|---|
| Chanbond, LLC | ) | |
| *Plaintiff* | ) | Civil Action No.  C.A. Nos.15-842; 15-843; 15-844; 15-845; 15-846; 15-847; 15-848; 15-849; 15-850; 15-851; 15-852; 15-853; 15-854 (RGA) |
| Atlantic Broadband Group, LLC, BrightHouse Networks, LLC, Cable One Inc., Cablevision Systems Corp., CSC Holdings, LLC, Cequel Communications, LLC, Cequel Communications Holdings I, LLC d/b/a Suddenlink Communications, Charter Communications, Inc., Comcast Corp., Comcast Cable Communications, LLC, Cox Communications, Inc., Mediacom Communications Corp., RCN Telecom Services, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, WaveDivision Holdings, LLC, and WideOpen West Finance, LLC | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Buchanan Ingersoll & Rooney PC c/o Managing Partner or General Counsel
1737 King Street, Suite 500 Alexandria, VA 22314

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment A

| Place: Winston & Strawn LLP<br>1700 K Street, N.W.<br>Washington D.C. 200006 | Date and Time:<br>02/13/2017 9:30 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  01/24/2017

CLERK OF COURT

OR

_____          /s/ James C. Lin
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
all defendants _____ , who issues or requests this subpoena, are:

James C. Lin, Winston & Strawn , 275 Middlefield Road, Suite 205, Menlo Park, CA; (650) 858-6434, jalin@winston.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   C.A. Nos.15-842; 15-843; 15-844;

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                          *Server's signature*

                                          _____
                                                          *Printed name and title*

                                          _____
                                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

***ChanBond, LLC v. Atlantic Broadband Group, LLC et al.***
**Civil Action No. 1:15-cv-00842 - 854 (D. Del.)**

**DEFINITIONS**

The following definitions are applicable to terms employed in responding to this Subpoena *Duces Tecum* ("Subpoena") for the production of documents:

1.      "You" or "Your" means Buchanan Ingersoll & Rooney PC, and any predecessor or successor entity and any past or present parent, division, subsidiary, affiliate, associated organization, officer, agent, employee, consultant, staff member, associate, partner, or other representative.

2.      The term "ChanBond" means ChanBond, LLC, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, including at least CBV and Z-Band, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in ChanBond, LLC, the ChanBond Patents, or Related Patents, including at least UnifiedOnline, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

3.      The term "UnifiedOnline" means UnifiedOnline, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in UnifiedOnline, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

4.      The term "CBV" means CBV, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in CBV, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

5.      The term "Z-Band" means Z-Band, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in Z-Band, Inc., and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

6.      The term "ChanBond Patents" means U.S. Patent Nos. 7,346,918, 7,941,822, 8,341,679, and 8,984,565, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

7.      The term "Related Patents" means any and all patents that relate back to a common application as any ChanBond Patent, including any provisional or non-provisional applications, continuations, continuations-in-part, divisions, interferences, reexaminations, reissues, parents, foreign counterpart applications, as well as any other applications disclosing, describing or claiming any invention disclosed, described or claimed in any ChanBond Patent, or claiming the benefit of the filing date of any application whose benefit is claimed in any ChanBond Patent, whether or not abandoned and whether or not issued.

8.      The term "ChanBond Inventors" means Earl Hennenhoefer, Richard V. Snyder, and Robert D. Stine.

9.      The term "Prior Art" refers to art under 35 U.S.C. §§ 102 and 103 and includes, by way of example and without limitation, printed publications, patents, disclosures, prior inventions, admissions, prior public uses, prior offers for sale, or sales of actual products.

10.     The term "GigaTwist" means the GigaTwist product.

11.     The term "GigaBUD" means the GigaBUD product.  For avoidance of doubt, this term includes the GigaBUD product referenced in Ex. 1 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

12.     The term "GigaBOB" means the GigaBOB product.  For avoidance of doubt, this term includes the GigaBOB product referenced in Ex. 1 (http://www.z-band.com/markets/healthcare/products-services/) to this subpoena.

13.     The term "Whitaker Corp." means The Whitaker Corporation, and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present members, shareholders, officers, directors, employees, agents, attorneys, representatives, any past or current investors or persons with an interest in The Whitaker Corporation, and all other persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

14.     The term "Whitaker Patents" means U.S. Patent No. 5,901,340 and U.S. Patent No. 5,875,386, including any application that led to issuance of any of the aforementioned patents, or any reexaminations thereof.

15.     The term "Whitaker Inventors" means Steven Lee Flickinger, James Ray Fetterolf, Sr., Joseph P. Preschutti, Terry P. Bowen, Jeffrey Legg, and David Koller.

16.     The term "Defendants" means the defendants in the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To resolve any doubt, these include the Defendants in case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

17.     The term "Instant Litigations" means the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To resolve any doubt, these include case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

18.     The term "Defendants" means the defendants in the litigations initiated by ChanBond currently pending in the District of Delaware against each of the Defendants.  To resolve any doubt, these include the Defendants in case numbers 1:15-cv-00842-RGA through 1:15-cv-00854-RGA.

19.     The term "U.S.P.T.O." means the United States Patent and Trademark Office.

20.     The terms "concerning," "relate," "relating," or "related" mean in any way, directly or indirectly, in whole or part, relating to, concerning, alluding to, referring to, discussing, mentioning, regarding, pertaining to, describing, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, modifying, amending, confirming, endorsing, representing, supporting, qualifying, terminating, revoking, refuting, undermining, canceling, contradicting, or negating.

21.     The term "DOCSIS" shall mean the Data Over Cable Service Interface Specification, and shall include all versions, including, but not limited to, DOCSIS 3.0, DOCSIS 2.0, DOCSIS 1.1, and DOSCSIS 1.0.

22.     The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, the original (or a copy when

the original is not available) and each non-identical copy (including those which are non-identical by reason of translations, notations, or markings) or any and all other written, printed, typed, punched, taped, filmed, or graphic matter or recorded or tangible thing, or whatever description, however produced or reproduced (including computer-stored or generated data, together with instructions or programs necessary to search and retrieve such data and hard copies where available and retrievable), and shall include all attachments to and enclosures with any requested item to which they are attached or with which they are enclosed, and each draft thereof. The term "document" shall specifically include all recorded or retrievable electronic data or communications such as electronic mail (e-mail) and the like and all translations thereof.

23.     "Communication" shall mean any oral, written, electronic, or other exchange of words, thoughts, information, or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by Telex, or by other process, electric, electronic, or otherwise. All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, tape or video recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

24.     The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the request. The word "including" shall not be used to limit any general category or description that precedes it. The words "all," "every," "any," "each,"

and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the request.

25.    Reference to the singular in any of these requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

## INSTRUCTIONS

1.    Unless otherwise stated in a request, the time period covered by the command of this Subpoena is June 27, 1999 to Present.

2.    All requests for "documents" include a request for any "communications," such as letters or e-mails.

3.    It is Your duty in answering these requests to conduct a reasonable investigation so that You disclose and produce all available responsive and non-privileged documents.

4.    If production of any responsive documents are being withheld on the ground of the attorney-client privilege, attorney work product, or any other privilege, immunity, or protection, please provide a privilege log with the following information for each such document: (a) the name of the document; (b) the name of the person(s) who prepared the document; (c) the name of the person(s) to whom the document was directed or circulated; (d) the date(s) on which the document was prepared or transmitted; (e) the name of the person(s) now in possession of the document; (f) a description of the subject matter of the document; and (g) the specific nature of the privilege or protection claimed with respect to the document.

5.    If any request herein requires the production of documents that are no longer in Your actual or constructive possession, custody, or control or which have been destroyed or lost, then in lieu of production, You shall state or identify the title of the document, the author of the document, each person to whom or by whom a copy of the original of the document was

delivered, forwarded, or has been received, the date of the document, and the general subject matter of the document. In the event You claim that information contained other than in documentary form is no longer in Your actual or constructive possession, custody, or control or has been destroyed or lost, You shall state or identify the nature of the information, the creator of the information, the person to whom the information was or was to be forwarded, delivered or for whom it was prepared, the date of the creation of the information, and the manner in which the information has been memorialized, if at all.

6.      In any instance where documents, data, or information requested herein is stored on a computer, a computer hard drive, a computer mainframe, computer back-up tape, or in any other electronic format, Defendants request that You produce the data, information, or documents on CD ROM, computer disk, or in hard copy paper form.  Further, Defendants request that You produce all documentation or programs that would allow Defendants to run, read, view, print, or otherwise access any such disks, CD ROM, or other computer information.

7.      You are under a continuing obligation to respond to the requests set forth herein. Accordingly, if You subsequently gain actual or constructive possession, custody, or control of any document called for in the requests set forth herein that has not been produced to Defendants, You must produce such document to Defendants as soon as possible or provide a written explanation to Defendants as to why You will not produce the document.

8.      The documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the requests.

## DOCUMENT REQUESTS

1.      All documents regarding the ChanBond Patents and/or any Related Patents.

2.      All documents regarding Your, ChanBond's, CBV's, Z-Band's, or the ChanBond Inventors' efforts to obtain patent protection on any invention related to the subject matter shown, described, or claimed in the ChanBond Patents and/or any Related patents, including but not limited to:

        a.      all invention disclosures and draft patent applications;

        b.      all documents attached to, referring to or regarding any invention disclosure;

        c.      the prosecution file of each ChanBond Patent;

        d.      the prosecution history of all of the ChanBond Patents and/or Related Patents;

        e.      the prosecution history of each application on which any of the ChanBond Inventors is a named inventor, including all issued, pending or abandoned applications;

        f.      all notes related to any office action, examiner interview, or other proceeding before the U.S.P.T.O. related to the ChanBond Patents and/or Related Patents

        g.      all U.S. and foreign patents and patent applications, and corresponding prosecuting histories, including those of unpublished, pending and/or abandoned applications, that are or have been prepared in whole or in part owned by You that are directed to the subject matter disclosed in the ChanBond Patents and/or Related Patents;

        h.      all correspondence regarding the patent applications referred to in subparts (c) through (g) above;

              i.      all documents consulted or reviewed by the applicants, patentees, or You during the preparation and prosecution of any application referred to in subparts (c) through (g) above, including but not limited to Prior Art references or potential Prior Art references;

              j.      all documents related to any Prior Art search contemplated or run in preparation and prosecution of any application referred to in subparts (c) through (g) above; and

              k.      all documents concerning Your participation in any examiner interview during prosecution of the ChanBond Patents and/or Related Patents, including, but not limited to, any assertions to the examiner made by You.

3.      All documents regarding (a) Your knowledge of any Prior Art to the ChanBond Patents and/or Related Patents, and (b) the date and circumstances pursuant to which You first learned of each piece of Prior Art.

4.      All documents regarding the ChanBond Patents or Related Patents and (1) cable systems, (2) high-speed data services, or (3) the DOCSIS protocol, including any investigation of the foregoing.

5.      All documents related to the ChanBond Patents or Related Patents and any named Defendants.

6.      All documents regarding the conception, reduction to practice, research, design, development, or testing of the subject matter shown, described, and claimed in the ChanBond Patents and/or Related Patents, including but not limited to laboratory notebooks, inventor notebooks, source code, and computer data, as well as the first written description or disclosure (including drawings) and the first prototype of such subject matter.

7.      All documents concerning any analysis of the validity or invalidity of any of the claims of the ChanBond Patents and/or Related Patents.

8.      All documents concerning any analysis of the infringement of any of the claims of the ChanBond Patents and/or Related Patents.

9.      All documents prepared in relation to the licensing, offer to license, or offer for sale of the ChanBond Patents and/or Related Patents.

10.      All documents related to any pre-filing investigation, infringement analysis, or competitive analysis with respect to any ChanBond Patent or Related Patent.

11.      All documents that reflect, refer to or relate to the meaning of any claim term of any of the claims of the ChanBond Patents and/or Related Patents.

12.      All documents concerning any product, prototype, development version, test version, commercial embodiment, or commercialization of any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

13.      All documents that reflect, refer to or relate to any testing, analysis, comparison, or experimentation relating to the any invention claimed in the ChanBond Patents and/or Related Patents, or related to the subject matter of the ChanBond Patents and/or Related Patents.

14.      All documents related to the making, using, testing, selling, offering for sale, licensing, or disclosure, anywhere in the world, of any product embodying any technical matter disclosed in, or any invention claimed in, any ChanBond Patent and/or Related Patent.

15.      All documents related to the GigaTwist, GigaBUD, or GigaBOB product,s including all documents related to testing, selling, offering for sale, licensing, or disclosure anywhere in the world, of the GigaTwist product.

16.     All documents concerning the inventorship of any invention described, disclosed or claimed in the patents and applications in the ChanBond Patents and/or Related Patents, including documents regarding any person considered for inclusion as an inventor, and the contribution of each person involved in the conception, development, and reduction to practice of the subject matter claimed as an invention in any of the patents or applications in the ChanBond Patents and/or Related Patents.

17.     All documents concerning ownership of the ChanBond Patents and/or Related Patents, including but not limited to any proposed, requested, or executed assignment, license, conveyance, and/or grant of any right, title or interest in or to any of the ChanBond Patents and/or Related Patents regarding any such assignment, license, conveyance, and/or grant.

18.     All documents concerning any service offerings, beta tests, or trials of the subject matter of each of the ChanBond Patents and/or Related Patents or related technologies prior to the filing date of each of the ChanBond Patents and/or Related Patents.

19.     All documents concerning the features, functions, and operation of any ChanBond, CBV, or Z-Band product embodying the claims of the ChanBond Patents and/or Related Patents.

20.     All documents that reflect, refer to or relate to the manners or techniques by which the Chanbond Patents and/or Related Patents allegedly improved upon the Prior Art, added functionality that did not exist in the Prior Art, or provided a variation on or upgrade of the Prior Art and whether each such alleged improvement, added functionality, or variation or upgrade, was nonobvious or unpredictable.

21.     All communications between or among You, ChanBond, CBV, Z-Band, and/or any of the ChanBond Inventors concerning any of the ChanBond Patents and/or Related Patents or relating to the Instant Litigations.

22.     All documents concerning any communications between You and any person concerning the subject matter of the Instant Litigations.

23.     All documents concerning any document retention policy by You, ChanBond, CBV, or Z-Band, including all documents concerning any practice, policy, procedure, or effort to identify and preserve documents.

24.     All documents concerning the reasons for creation of CBV, or the decision to assign patents to CBV.

25.     All documents concerning any valuation of any ChanBond Patents and/or any Related Patents.

26.     All documents regarding the Whitaker Patents.

27.     All communications between you, ChanBond, CBV, Z-Band, and/or any of the ChanBond Inventors concerning any of the Whitaker Patents.

28.     All communications between you and Whitaker Corp., or any of the Whitaker Inventors, regarding either the ChanBond patents or the Whitaker Patents.

# Exhibit 1



877-801-6475   GET A QUOTE ›

Home    About Z-Band    Products    Technical    Markets    Support    Contact Us

# Products/Services

Home | Markets | Healthcare | Products/Services

## Products/Services

### "GigaBUD" from Z-Band (Video Distribution Hub)

Z-Band's GigaBUD, Active Video Distribution Hub, is ideal for a variety of around-the-clock video applications in healthcare facilities, including live video monitoring in patient rooms and ICU wards and for use in distance learning for medical residents. GigaBUD can also serve as a valuable tool in patient entertainment and education.



### Cascading Capability for Multiple Hub Connectivity

- The GigaBUD is rack mounted to meet the applicable MDF/IDF port count combination for the various video drops
- Desired video is connected to the "CATV IN" port of the initial GigaBUD, which becomes the "Master" hub
- Additional GigaBUDs are connected to the Master through a cascading process and are dubbed "Slaves".
- "Outbound" Master ports are connected to "Cascade In" ports capable of providing up to eight second-level "Slaves" to achieve unidirectional cascading.
- Each second-level "Slave" can be cascaded to third and fourth levels, resulting in the capability for combining up to 585 GigaBUDs.
- End result is a video signal at the "CATV IN" port of the "Master" that can be distributed to as many as 14,040 TVs throughout a healthcare facility or system of facilities.

### "GigaBOB"

The GigaBOB is equipped with numerous attributes that provide HD TV over CAT 5e or CAT 6 cable such as:

- Remotely operated "GigaBOB" with unique distance sensing circuit and internal amplifier
- Simultaneous transmission over thousands of televisions
- 100-meter distribution range for the full bandwidth of RF channels
- DOCSIS or FSK return capability for VOD and/or data applications
- 120 or 240 VAC at 50 or 60 Hz operating frequency capacity
- Hub and balun system complies with UL, CSA and FCC Part 15, Subpart B guidelines



## Z-Band Video Distribution System Benefits

The Z-Band Video Distribution System is a highly effective way to merge voice, data and video over one cabling plant to meet the video distribution needs of any healthcare environment.

In addition, our remotely powered GigaBOB balun simplifies design and installation, as well as the process of making adds, moves, and changes while maintaining the highest level of picture quality. Z-Band can provide a seamless integration of RF and IP Video in your healthcare facility.

Markets

Healthcare

Featured Projects

Clients

Products/Services

Resources



Want to see how our products work?

Schedule A Demo

Questions?
Contact Us Today

---



Z-Band, Inc.
848B North Hanover St. Carlisle, PA 17013.
**PHONE:** 877-801-6475 | **FAX:** 717-249-3253

Products assembled in the USA

Stay Connected:

Home   About Z-Band   Products   Technical   Markets   Support   Contact Us   Sitemap
Privacy Policy
Site Credits   Copyright 2017. All Rights Reserved

Rep Login