# EXHIBIT A

*Execution Version*

# PATENT PURCHASE AGREEMENT

This PATENT PURCHASE AGREEMENT (the *"Agreement"*) is entered into on April $\mathcal{9}$, 2015 (the *"Effective Date"*) by and between CBV, Inc., a Pennsylvania corporation, of 848B North Hanover Street, Carlisle, Pennsylvania 17013 (the *"Seller"*) and ChanBond, LLC, a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 (the *"Purchaser"*) (each a *"Party"* and collectively the *"Parties"*). The Parties hereby agree as follows:

1. **BACKGROUND**

1.1    Seller is the sole and exclusive owner of certain Patents (defined below).

1.2    Seller wishes to sell to Purchaser its right, title and interest in the Patents and any and its rights associated therewith, including, for the avoidance of doubt and without limitation (i) the right to practice the Patents, including without limitation, the right to make, use and sell products and services under the Patents; and (ii) exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current and future infringement of the Patents.

1.3    Purchaser wishes to purchase from Seller its right, title and interest in the Patents and any and its rights associated therewith, including, for the avoidance of doubt and without limitation (i) the right to practice the Patents, including without limitation, the right to make, use and sell products and services under the Patents; and (ii) exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current and future infringement of the Patents.

1.4    The Parties hereby agree and acknowledge that this Agreement supersedes that certain Patent Purchase Agreements by and between the Parties dated as of May 6, 2014 and October 26, 2014 (the *"Previous PPAs"*) which Previous PPAs are now terminated and of no force or effect.

2. **DEFINITIONS**

2.1    *"Affiliate"* means, with respect to any Person, any Entity in any country that controls, is controlled by or is under common control with such Person. The term "control" means possession directly or indirectly of the power to direct or cause the direction of the management and policies of an Entity, whether through the ownership of voting securities, by trust, management agreement, contract or otherwise; provided, however, that beneficial ownership of more than fifty percent (50%) of the voting equity interests of an Entity shall be deemed to be control.

2.2    *"Assigned Patent Rights"* means its right, title and interest in the Patents and (a) all causes of action (whether currently pending, filed, or otherwise) and exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current and future infringement; (b) all rights to recover and collect settlement arrangements, license payments (including lump sum payments), royalties and other payments due now or hereafter due or payable with respect thereto, under or on account of any of the Patents or any of the foregoing; (c) the right to practice the Patents, including without limitation, the right to make, use and sell products and services under the Patents; and (d) any and all privileges, including the benefit of all attorney-client privilege and attorney work product privilege, to the extent transferrable.

2.3    "*Cash*" shall mean cash and Cash Equivalents.

2.4    "*Cash Equivalents*" shall mean debt and/or equity securities (including, but not limited to stocks, warrants, options or ADRs) and/or any real or personal property, received by Purchaser, that is reducible to cash (net of taxes required to be paid by Purchaser on Seller's portion in order to take possession of the same) but only at such time as such debt securities, equity securities, real or personal property have been converted to cash. Purchaser shall convert Cash Equivalents to cash as soon as commercially practical and legally permissible.

2.5    "*Entity*" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, governmental entity (or any department, agency, or political subdivision thereof) or any other legal entity.

2.6    "*Executed Assignment*" means an executed original of the Patent Assignment Agreement in *Exhibit 2.6*.

2.7    "*Gross Recoveries*" shall mean the Cash compensation received by Purchaser solely from payments made by a third party in consideration for the licensing, enforcement and/or sale of the Patents.

2.8    "*Net Recoveries*" shall mean the total aggregate Gross Recoveries less the total aggregate amount of costs and expenses incurred by or on behalf of Purchaser in connection with the monetization, enforcement and/or sale of the Assigned Patent Rights which are exclusively limited to: (a) the reasonable fees and expenses of litigation counsel; (b) the reasonable fees and expenses of licensing counsel (c) the reasonable fees and expenses of any re-examination or other patent prosecution counsel; (d) reasonable expert fees, court costs, deposition costs and other reasonable costs and expenses related to the maintenance, prosecution, enforcement, and licensing of the Patents; and (e) the reasonable fees and expenses of any other advisors or agents Notwithstanding the above, any cost or expense which is paid to an Affiliate of Purchaser or to a stakeholder of Purchaser shall require the prior approval of Seller, such approval to not be unreasonably withheld.

2.9    "*Patents*" means each and all of the patents and patent applications listed on *Exhibit A* hereto, all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, provisionals and divisions of such patents, and any patents or patent applications which correspond to or claim priority to any of the foregoing, and all foreign counterparts of the foregoing, whether or not listed on *Exhibit A*.

2.10   "*Person*" means any individual or Entity.

3.     DOCUMENT DELIVERY; LICENSE-BACK; CONSIDERATION AND REPORTS

3.1    Document Delivery. As of the Effective Date, the Mutual Non Disclosure Agreement attached hereto as *Exhibit B* and the Common Interest Agreement attached hereto as *Exhibit C* have been executed by the parties and the parties have agreed that such agreements apply to the materials provided previously by Seller to Purchaser or Purchaser's affiliates, such materials consisting of the originals and/or certified copies of the patent prosecution files and all other documents, communications and files (electronic or otherwise) relating to the Assigned Patent Rights in possession or control of Seller and its agents, counsel and related parties that pertain to the ownership, prosecution, maintenance and enforcement of the Patents, including, but not limited to those documents listed on the Document Request Form attached hereto as *Exhibit 3.1*

(collectively, the *"Documents"*).  The Seller has signed the declaration attached to the Document Request Form as *Attachment 1*.

3.2     [Intentionally omitted.]

3.3     Additional Consideration for the Patents.  In consideration for the Patents, Seller shall be entitled, in addition to the other consideration to which Seller is entitled herein, to the following:

    3.3.1     Intentionally omitted.

    3.3.2     Possible Future Cash Payment.  Following the Closing Date, Purchaser shall pay to Seller one hundred percent (100%) of the Net Recoveries received, up to a cumulative amount of One Million US Dollars ($1,000,000) (the *"Recoveries Threshold"* and the payments making up the Recoveries Threshold, the *"Threshold Payments"*).  Thereafter, Purchaser will pay to Seller a portion (each a *"Recoveries Payment"* and together with the Threshold Payments, the *"Payments"*) of the Net Recoveries received by Purchaser in consideration for the licensing, enforcement and/or sale by Purchaser of the Patents, calculated as follows: fifty percent (50%) of all Net Recoveries actually received and collected by Purchaser. For the avoidance of doubt, it is hereby clarified that, if a licensee paid in a consideration in a form other than Cash, there would be no payment made under this Section 3.3.2 for the non-Cash portion at the time of the non-Cash payment. However, when such non-Cash payments are converted to Cash by way of licensing, enforcement and or sale, Purchaser will pay a Recoveries Payment (as defined above) to Seller in consideration for the licensing, enforcement and/or sale by Purchaser of the non-Cash portion. By way of example, if a licensee took a license to the Patents and no other patents or patent applications owned by Purchaser with payment being made in Cash, there would be a payment made under this Section 3.3.2 as follows:

    R x fifty percent (50%) , where R = Net Recoveries

Payments payable under this Section 3.3.2 shall be paid within thirty (30) calendar days after each applicable calendar quarter, commencing with the first calendar quarter following the Closing Date until the expiration of the Patent.

Seller acknowledges that (i) the obligations of Purchaser under this Agreement are contractual only and do not create any fiduciary or other relationship between them; (ii) any Gross Recoveries may be subject to and may be dependent on the provision of licenses, releases and covenants not to sue with respect to the Patents, and enforcement action, all as solely determined by Purchaser; (iii) in the event of a sale of a Patent by Purchaser to a third party (a *"Sale Transaction"* and an *"Acquirer,"* respectively), no further Payments with respect to such Patent would be due or owing to Seller from either Purchaser or such Acquirer, provided that Seller receives the Payment to which it is entitled in connection with such Sale Transaction; and (iv) Purchaser has not represented that it will be successful in its efforts to monetize the Patents and, accordingly, makes no representation as to the value, if any, of the possible Gross Recoveries or Net Recoveries under this Section 3.3.2.

3.4     Payment Procedures.  All payments made by Purchaser pursuant to this Agreement shall be made by wire transfer to an account specified by Seller at such times and in accordance with the provisions of Sections 3.4 (and until another account is designated in writing to Purchaser by Seller, to the account identified in *Exhibit 3.4*).

3.5    Reports. Simultaneous with any wire transfer pursuant to Section 3.4, Purchaser will include a report detailing the payment amount and will provide such supporting documentation as may reasonably be requested by Seller (subject to appropriate and customary confidentiality obligations as may be required in order to disclose such documentation to Seller).

3.6    Milestone Amounts; True Up Amount Payments. In the event the aggregate amount of all payments (including all Threshold Payments and all Recoveries Payments) paid to Seller from the Closing Date and until the fourth (4th) anniversary following the Closing Date (the "*Milestone Date*") does not equal five million USD ($5,000,000) (the "*Milestone Amount*"), Purchaser shall pay Seller an amount (the "*True Up Amount*") equal to the Milestone Amount less the aggregate amount of all payments (including the Threshold Payments and all Recoveries Payments) paid to Seller hereunder from the Closing Date and until the Milestone Date. The True Up Amount, if any, will be payable to Seller not later than thirty (30) days following the Milestone Date. It is hereby clarified and agreed that the True Up Amount paid to Seller shall be deemed an advance payment of Gross Recoveries for the purposes of calculating Gross Recoveries payable to Assignor pursuant to Section 3.3.2 above. In the event that one or more of the Patents becomes involved in an inter-partes review or other re-examination or similar action before the USPTO or any litigation relating to the Patents is stayed by a court (an "*IPR*") at any time prior to the Milestone Date, Milestone Date set forth in this Section 3.6 shall be tolled for the duration of the IPR and shall resume only upon the receipt of a final non-appealable judgment on the matter, in favor of the Purchaser, with Milestone Date and the Last Date (as defined below) extended accordingly.

3.7    Reversion Assignment Right. In the event that Purchaser fails to timely pay the True Up Amount and does not cure such failure within thirty (30) calendar days of receipt of notice from Seller with a request to cure (the "*Last Date*"), then, provided that Seller is not in material breach of this Agreement at such time, Seller shall have the right, exercisable by it by written notice to Purchaser within thirty (30) days of the Last Date, to re-acquire from Purchaser for no additional consideration all right, title and interest in and to the Assigned Patent Rights (the "*Reversion Assignment Right*"), subject to all then-in-effect licenses, encumbrances, covenants not to sue and other restrictions applicable thereto. If Seller exercises the Reversion Assignment Right within such thirty (30) calendar day period, Purchaser and Seller shall execute a patent assignment and any other required documents in order to transfer the Assigned Patent Rights back to Seller, who shall acquire the Assigned Patent Rights, subject to all then-in-effect licenses, encumbrances, covenants not to sue and other restrictions applicable thereto. Purchaser shall execute all documents reasonably required to transfer the Assigned Patent Rights back to Seller within five (5) business days of receipt of the same from Seller.

3.8    Seller's rights set forth in Sections 3.6 and 3.7 shall be the sole and exclusive right and remedy available to Seller in the event the True Up Amount is not paid and Seller shall have no other rights or remedies against such failure, monetary or otherwise with respect to the Assigned Patent Rights or otherwise against Purchaser, under or in connection with Sections 3.6 and 3.7.

4.    **TRANSFER OF PATENTS AND ADDITIONAL RIGHTS**

4.1    Assignment of Patents. At Closing, Seller shall sell, assign, transfer and convey to Purchaser its right, title and interest in and to the Assigned Patent Rights and at Closing will provide Purchaser with the Executed Assignment for the Assigned Patent Rights.

4.2    Additional Patents. Seller hereby represents and warrants to Purchaser that the only patents, reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, provisionals and divisions of the Patents and patents and patent applications that

claim priority to any of the foregoing are listed on *Exhibit A*, including any foreign counterparts thereof. In the event that Purchaser discovers, at any time, any patents, reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, provisionals and/or divisions of the Patents or patents and patent applications that claim priority or otherwise relate to any of the foregoing, or any foreign counterparts thereof that are owned by Seller (the *"Additional Patents"*), then the Additional Patents shall be sold, including by transferring, assigning and setting over, to Purchaser, its right, title and interest thereto, for no additional consideration, and the Additional Patents shall be deemed "Patents", as applicable, under this Agreement, for all intents and purposes. In such event, the Parties shall sign an amended *Exhibit A* to add the Additional Patents thereto and in the event that Purchaser's notification to Seller is subsequent to the Closing, then the Parties shall conduct a subsequent closing and the provisions of Section 5.1 shall apply to the sale, assignment transfer and setting over to Purchaser of the Additional Patents, *mutatis mutandis*.

4.3    Non-Assumption of Liabilities. It is expressly understood and agreed that Purchaser shall not be liable for and hereby disclaims any assumption of any of the obligations, claims or liabilities of Seller and/or its Affiliates and/or of any third party of any kind or nature whatsoever arising from or in connection with any circumstances, causes of action, breach, violation, default or failure to perform with respect to the Assigned Patent Rights prior to the assignment and sale thereof to Purchaser.

4.4    License to Seller. Subject to the Closing, Purchaser shall grant to Seller and its Affiliate, Z-Band, Inc., effective as of the Closing Date, a license-back to the Patents, pursuant to the terms of the License Agreement, in the form attached hereto as *Exhibit 4.4* (the *"License Agreement"*).

5.    **CLOSING AND ADDITIONAL OBLIGATIONS**

5.1    The closing of the purchase and sale of the Assigned Patent Rights (the *"Closing"*) shall take place on the Effective Date. The conditions to Closing set forth in Section 5.1.2, 5.2 and 5.3 below have been previously met and/or simultaneously with the Closing will be met.

    5.1.1    At the Closing, Seller shall execute and deliver to Purchaser the Executed Assignment and a copy of any and all corporate approvals required by it in order to execute, deliver and perform this Agreement and the transactions contemplated hereunder.

    5.1.2    The parties acknowledge and agree that the following conditions have each been previously met and/or simultaneously with the Closing will be met:

        (a)    Seller has performed all of its obligations hereunder required to be performed by it at or prior to the Closing;

        (b)    the representations and warranties of Seller contained in this Agreement are true at and as of the Closing;

        (c)    the Purchaser has completed all of its financial, commercial, intellectual property and legal due diligence examination of the Assigned Patent Rights; and

        (d)    all corporate and other proceedings in connection with the transactions contemplated by this Agreement have been performed by Seller, all documents and instruments incident to such transactions and reasonably requested by Purchaser are reasonably satisfactory in substance and form to Purchaser and its counsel, have been executed and Purchaser and its counsel have received

> counterpart originals or certified or other copies of such documents and instruments as Purchaser or its counsel have reasonably requested.

5.2     Inventor Agreements. Seller has obtained and delivered to Purchaser the Inventor Consulting Agreements, in the form attached hereto as **_Exhibit 5.2_**, signed by each of the inventors under the Patents. For the avoidance of doubt, such inventors shall be reasonably compensated for their assistance, in accordance with the terms of **_Exhibit 5.2_**.

5.3     Inventor Oath and Declaration. Seller shall obtain and deliver to Purchaser fully executed declarations from each inventor under those of the Patents which are, as of the Effective Date, pending before the United States Patent and Trademark Office (a "**_Pending Patent_**"), in the form attached hereto as **_Exhibit 5.3_** or in another form compliant with 37 CFR 1.63 as in force on the filing date of the Pending Patent and on the Effective Date, in connection with any Pending Patent. The foregoing shall not apply to any Pending Patent(s) which are reissue applications. All Pending Patents that are reissue applications will be particularly designated as such by the Seller.

5.4     Further Cooperation. At the reasonable request of Purchaser, Seller will execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers for fully perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby.

5.5     Payment of Fees. Purchaser shall have the sole responsibility to pay any maintenance fees, annuities, and the like due or payable on the Patents for the period commencing on the Closing Date.

6.     **REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser as follows that, as of the Effective Date:

6.1     Authority. Seller has the full power and authority, and has obtained all third party consents, approvals or other authorizations required, to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the Assigned Patent Rights to Purchaser. The execution and delivery of this Agreement and the related transaction documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate actions on the part of Seller. This Agreement and the other transaction documents have been duly executed and delivered by Seller, and constitute legal, valid and binding obligations of Seller, enforceable in accordance with their terms.

6.2     Non-Contravention. To the best of Seller's knowledge, Seller's execution, delivery, and performance of its obligations under this Agreement will not conflict with or violate the corporate documents of Seller or any laws to which Seller is subject, or any agreement or other obligation of Seller or binding upon Seller's assets or result in the creation or imposition of any mortgage, lien, charge, pledge, security interest, other encumbrance or third party right upon any of the Assigned Patent Rights.

6.3     Title and Contest. Seller owns the right, title, and interest to the Assigned Patent Rights, including the right, title, and interest to sue for infringement of the Patents. To the best of Seller's knowledge, the identity of all inventors of the inventions underlying the Patents has been fully disclosed to the U.S. Patent Office as required by U.S. law. To the best of Seller's knowledge, the Assigned Patent Rights are free and clear of all liens, claims, mortgages and security interests.

There are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the Assigned Patent Rights. Seller is not obligated or under any liability whatsoever to make any payments by way of royalties, fees or otherwise to any owner or licensee of, or other claimant with respect to the use of any of the Assigned Patent Rights or subject matter disclosed and claimed in the Patents or in connection with the licensing or sale of any of the Assigned Patent Rights to third parties.

6.4     No Joint Development Activity. No Patent (i) is the product or subject of any joint development activity or agreement with any third party; (ii) is the subject of any consortia agreement; or (iii) has been financed in whole or in part by any third party.

6.5     No Preexisting Licenses. Except as otherwise listed on *Exhibit 6.5* (the "*Pre-Existing Licenses*"), no exclusive or non-exclusive licenses under the Patents or interest or rights in any of the Assigned Patent Rights have ever been granted. For the avoidance of doubt, from and after the Closing Date, Seller shall not be entitled to any payment or other consideration with respect to any Pre-Existing Licenses.

6.6     Terminal Disclaimers. Except as otherwise listed on *Exhibit 6.6*, there are no terminal disclaimers of any kind related to or affecting any of the Assigned Patent Rights. *Exhibit 6.6* includes a list of all terminal disclaimers that exist with respect to or that affect the Assigned Patent Rights and provides a description of each such terminal disclaimer, including the subject earlier issued patent(s) and the respective expiration dates thereof.

6.7     Pending United States Applications. Except as otherwise listed on *Exhibit 6.7*, there are no pending US patent applications of any kind constituting an Assigned Patent Right. *Exhibit 6.7* includes a list of all pending US patent applications and the respective confirmation numbers issued by the USPTO therefor.

6.8     Enforcement. Seller has not put a third party on notice of actual or potential infringement of any of the Patents. Seller has not invited any third party to enter into a license under any of the Patents. Seller has not initiated any enforcement action with respect to any of the Patents.

6.9     Patent Office Proceedings. To Seller's best knowledge, none of the Patents has been or is currently involved in any reexamination, reissue, interference proceeding, or any similar proceeding, or that any such proceedings are pending or threatened.

6.10    Prosecution Obligations; Fees. No actions must be taken by Seller before any governmental entity (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) within ninety (90) days of the Closing Date with respect to any of the Assigned Patent Rights. All maintenance fees, annuities, and the like due or payable on the Patents until the lapse of ninety (90) days following the Closing Date have been timely paid. For the avoidance of doubt, such timely payment includes payment of registration, maintenance, and renewal fees for which the fee payment window has opened even if the surcharge date is in the future.

6.11    Validity and Enforceability. To Seller's knowledge, the Patents have never been found invalid or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and there are no proceedings or actions before any governmental entity (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) in which claims are or were raised relating to the validity, enforceability, scope, ownership or infringement of any of the Patents. Seller does not know of and has not received any notice or information of any kind from any source suggesting that the Patents may be invalid or unenforceable.

6.12    Compliance with Applicable Law. To the best of Seller's knowledge, the Patents are currently in compliance with all legal requirements (including payment of filing, examination and maintenance fees and the filing of any necessary oaths, proofs of use or other documents) for maintaining, registering, filing, certifying or otherwise perfecting or recording such Patents.

## 7.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows that, as of the Effective Date:

7.1     Purchaser is a Delaware limited liability company.

7.2     Purchaser has the full power and authority, and has obtained all third party consents, approvals or other authorizations required, to enter into this Agreement and to carry out its obligations hereunder.

7.3     Purchaser's execution, delivery, and performance of its obligations under this Agreement will not conflict with or violate any laws to which Purchaser is subject, or any agreement or other obligation directly or indirectly applicable to Purchaser or binding upon Purchaser's assets.

## 8.    MISCELLANEOUS

8.1     Indemnification. Purchaser shall provide counsel to Seller to defend any Third Party Claim (as defined below) and shall indemnify and hold Seller, its Subsidiaries and each of their respective employees, agents, officers, directors and managers (collectively, the "**Seller Indemnified Parties**") harmless from and against all of its reasonable fees and expenses that are suffered or otherwise incurred by the Seller Indemnified Parties or to which the Seller Indemnified Parties may otherwise become subject and that arise from or directly relate to any Third Party claim relating to any Patent (including, without limitation, by way of counterclaim should a Seller Indemnified Party be included in a litigation as an indispensable or necessary plaintiff party) (a "**Third Party Claim**"), all except to the extent that the Seller Indemnified Parties' expenses or costs are due to acts or omissions of any of the Seller Indemnified Parties and/or obligations, claims or liabilities of any of the Seller Indemnified Parties of any kind or nature whatsoever arising from or in connection with any circumstances, causes of action, breach, violation, default or failure to perform with respect to the Patents prior to the assignment and sale thereof to Purchaser. The foregoing indemnification obligation shall not apply to the Seller Indemnified Parties' legal fees, unless and only to the extent that due to a conflict of interests, the Seller Indemnified Parties reasonably requires their own counsel.

8.2     Compliance With Laws. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties will be subject to all laws, present and future, of any government having jurisdiction over the Parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.3     Assignment. This Agreement may not be assigned by Seller without the prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder upon the provision of written notice to Seller. A "change of control" transaction of Seller shall be deemed an assignment and therefore subject to Purchaser's consent as aforesaid. Under no circumstances will any assignment be permitted to an entity acquiring Seller through insolvency, bankruptcy, assignment for the benefit of one or more creditors (through foreclosure or any other means) or any similar proceeding, any or all of which shall require the consent of Purchaser.

8.4     Confidentiality of Terms.  The Parties hereto will keep the terms and existence of this Agreement and the identities of the Parties and their Affiliates confidential and will not now or hereafter divulge any of this information to any third party except as follows: (a) with the prior written consent of the other Party; (b) subject to obligations of confidentiality and/or privilege at least as stringent as those contained herein, to a Party's legal and financial counsel and other professional advisors, in their capacity of advising a Party in such matters; (c) subject to obligations of confidentiality and/or privilege at least as stringent as those contained herein, to a counterparty engaged in due diligence in connection with a proposed merger, acquisition, reorganization, or financing of all or substantially of a Party's assets or equity or in connection with a proposed sale or exclusive license of the Assigned Patent Rights, as applicable; (d) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignment in any governmental patent office); (e) to enforce Purchaser's right, title and interest in and to the Assigned Patent Rights; (f) to any governmental body having jurisdiction and specifically requiring such disclosure; or (g) as required during the course of litigation and subject to a protective order with a confidentiality designation of "Outside Attorneys' Eyes Only" or higher; provided that, in (f) and (g) above, (i) the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing Party will provide the other Party with at least ten (10) days' prior written notice of such disclosure.

8.5     Governing Law; Forum.  This Agreement, its performance and interpretation shall be governed by the substantive law of the State of Delaware, USA, exclusive of its choice of law rules.  The competent courts and tribunals situated in Wilmington, State of Delaware, USA shall have sole and exclusive jurisdiction in any dispute or controversy arising out of or relating to this Agreement.

8.6     Notices.  All notices given hereunder will be given in writing, will refer to this Agreement and will be: (i) personally delivered, (ii) delivered prepaid by an internationally recognized express courier service, or (iii) sent postage prepaid registered or certified U.S. mail (return receipt requested) to the address set forth below:

| If to Seller | If to Purchaser |
|---|---|
| CBV, Inc. | ChanBond, LLC |
| Tel: 717-249-2606 | 2633 McKinney Avenue |
| Fax: 717-249-3253 | Suite 130-501 |
| Email: earlh@z-band.com | Dallas, TX 75204 |
| Attn: Mr. Earl Hennenhoefer, President | Tel: (214) 930-6408 |
| and CEO | Email: deirdre@ipnav.com |
|  | Attn: Ms. Deirdre Leane, Manager |

Notices are deemed received on (a) the date of receipt if delivered personally or by express courier (or if delivery refused, the date of refusal), or (b) the fifth (5th) calendar day after the date of posting if sent by US mail. Notice given in any other manner will be deemed to have been received only if and when received at the address of the Person to be notified.  Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Section.

8.7     Relationship of Parties.  The Parties are independent contractors and not partners, joint venturers, or agents of the other.  Neither Party assumes any liability of or has any authority to bind, or control the activities of, the other.

8.8    Severability. If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate its original objective.

8.9    Waiver. Failure by either Party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the Parties.

8.10   Miscellaneous. This Agreement, including its exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions including, for the avoidance of doubt, the Previous PPAs. Neither of the Parties will be bound by any conditions, definitions, warranties, obligations (including obligations to prosecute any of the Patents), understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No oral explanation or oral information by either Party hereto will alter the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in writing and signed by authorized representatives of both Parties. The Exhibits referenced herein and attached hereto are incorporated into this Agreement as though fully set forth herein.

8.11   Counterparts; Electronic Signature. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument. Each Party will execute and deliver to the other Party a copy of this Agreement bearing its original signature. Prior to such execution and delivery, in order to expedite the process of entering into this Agreement, the Parties acknowledge that Transmitted Copies of this Agreement will be deemed original documents. *"Transmitted Copies"* means copies that are reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission.

*\*\*\*The remainder of this page has been intentionally left blank.  Signature page follows.\*\*\**

        In witness whereof, the Parties have caused this Patent Purchase Agreement to be executed as of
the Effective Date by their respective duly authorized representatives.

**CBV, Inc.**                                             **ChanBond, LLC**

By: _Earl Hennenhofer_                                    By: _Deirdre Leane_

Name: Mr. Earl Hennenhoefer                               Name: Ms. Deirdre Leane

Title: President and CEO                                   Title: Manager

# EXHIBIT B

April 9, 2015

ChanBond, LLC
2633 McKinney Avenue
Suite 130 501
Dallas, Texas 75204

Re: Advisory Services

Dear Deirdre:

This letter agreement ("Agreement") confirms the agreement of ChanBond LLC, a limited liability corporation organized under the laws of Delaware, with a principal place of business at 2633 McKinney Avenue, Suite 130 501, Dallas, Texas 75204 (including any and all of its current and future affiliates, associates, subsidiaries, successors and assigns, or any combination of the foregoing, the "Company") to engage IPNAV, LLC, a limited liability company organized under the laws of Texas, of 2525 Carlisle Street, Suite 439, Dallas, TX 75201 ("IPNAV") to provide specified services to the Company on the following terms and conditions:

RESPONSIBILITIES

1. IPNAV:
    a. IPNAV has and will continue to act as the Company's worldwide intellectual property licensing agent, and will provide strategic advisory services relating to the acquisition: sale, licensing, commercialization, enforcement, prosecution, and settlement with respect to the intellectual property owned or controlled by the Company, including without limitation, the patents identified in Exhibit A, as the same may be amended from time to time upon mutual agreement of the parties hereto (the "Services" and the "IP Rights," respectively).
    b. IPNAV will introduce the Company to individuals and entities that may, among other things, act as counsel, consultants, vendors and experts relating to the Services.
    c. The Services will be provided' by IPNAV from such locations, and at such times, as IPNAV shall reasonably determine.   IPNAV agrees to provide the Services to the best of its reasonable abilities, but guarantees no particular outcome.
    d. IPNAV will provide additional services as may be reasonably requested by the Company and approved by IPNAV.
    e. IPNAV will act as an independent contractor, and is not a fiduciary for the Company.

2. The Company:
    a. IPNAV will advise and make recommendations within the framework of the Services, but decision making rests solely with the Company. The Company confirms that IPNAV is not affiliated with the Company and does not directly or indirectly control the Company.
    b. IPNAV is not a law or accounting firm, or a tax advisor, and the Company will not rely on IPNAV to provide any such advice or services. The Company will seek separate legal, accounting, tax and other similar advice and services at its discretion.
    c. The Company identifies Deirdre Leane (the "Company Designee") as the point of contact for IPNAV.  IPNAV will exclusively report to and coordinate with the Company Designee and may rely on him/her as the official spokesperson and authorized officer of the Company, with full authority to bind the Company.
    d. The Company will cooperate with IPNAV so that the Services may be performed in an efficient and prompt manner.
    e. The Company will promptly inform IPNAV of any materially relevant information relating to the IP Rights.
    f. The Company will retain full, clear, and exclusive title to the IP Rights, free and clear of any liens, pledges, encumbrances or any other third party rights, except as set forth on Exhibit B and  as discussed and recommended  by IPNAV in writing in connection with the monetization activities conducted in connection with the Services.

**Exhibit 2 ("Advisory Agreement")**

April 9, 2015

ChanBond, LLC
2633 McKinney Avenue
Suite 130 501
Dallas, Texas 75204

Re: Advisory Services

Dear Deirdre:

This letter agreement ("Agreement") confirms the agreement of ChanBond LLC, a limited liability corporation organized under the laws of Delaware, with a principal place of business at 2633 McKinney Avenue, Suite 130 501, Dallas, Texas 75204 (including any and all of its current and future affiliates, associates, subsidiaries, successors and assigns, or any combination of the foregoing, the "Company") to engage IPNAV, LLC, a limited liability company organized under the laws of Texas, of 2525 Carlisle Street, Suite 439, Dallas, TX 75201 ("IPNAV") to provide specified services to the Company on the following terms and conditions:

## RESPONSIBILITIES

1.  IPNAV:
    a.  IPNAV has and will continue to act as the Company's worldwide intellectual property licensing agent, and will provide strategic advisory services relating to the acquisition: sale, licensing, commercialization, enforcement, prosecution, and settlement with respect to the intellectual property owned or controlled by the Company, including without limitation, the patents identified in Exhibit A, as the same may be amended from time to time upon mutual agreement of the parties hereto (the "Services" and the "IP Rights," respectively).
    b.  IPNAV will introduce the Company to individuals and entities that may, among other things, act as counsel, consultants, vendors and experts relating to the Services.
    c.  The Services will be provided' by IPNAV from such locations, and at such times, as IPNAV shall reasonably determine.   IPNAV agrees to provide the Services to the best of its reasonable abilities, but guarantees no particular outcome.
    d.  IPNAV will provide additional services as may be reasonably requested by the Company and approved by IPNAV.
    e.  IPNAV will act as an independent contractor, and is not a fiduciary for the Company.

2.  The Company:
    a.  IPNAV will advise and make recommendations within the framework of the Services, but decision making rests solely with the Company. The Company confirms that IPNAV is not affiliated with the Company and does not directly or indirectly control the Company.
    b.  IPNAV is not a law or accounting firm, or a tax advisor, and the Company will not rely on IPNAV to provide any such advice or services. The Company will seek separate legal, accounting, tax and other similar advice and services at its discretion.
    c.  The Company identifies Deirdre Leane (the "Company Designee") as the point of contact for IPNAV.  IPNAV will exclusively report to and coordinate with the Company Designee and may rely on him/her as the official spokesperson and authorized officer of the Company, with full authority to bind the Company.
    d.  The Company will cooperate with IPNAV so that the Services may be performed in an efficient and prompt manner.
    e.  The Company will promptly inform IPNAV of any materially relevant information relating to the IP Rights.
    f.  The Company will retain full, clear, and exclusive title to the IP Rights, free and clear of any liens, pledges, encumbrances or any other third party rights, except as set forth on Exhibit B and  as discussed and recommended by IPNAV in writing in connection with the monetization activities conducted in connection with the Services.

**Exhibit 2 ("Advisory Agreement")**

g. In the event of a transfer, sale, exchange, acquisition, or other event impacting title to the IP Rights (including a change of control or sale of the Company) (a "Transfer"), which Transfer was not recommended by IPNAV in writing, the Company will ensure that the obligations hereunder will be assumed (in a contract acceptable in form to IPNAV) by the third party involved in such Transfer (the "Transferee"), such that the compensation, payment, and other obligations of the Company hereunder after the Transfer shall be the same upon the Transferee. Prior to any such Transfer, the Company shall offer an entity designated by IPNAV an opportunity to complete the Transfer on substantially similar terms, and shall hold such offer open for a period of twenty (20) business days.

h. The Company has secured (and will secure) the agreement of any holders of indebtedness of the Company that they will not foreclose or exercise rights that would adversely impact the Company, IPNAV or the IP Rights.

3. Both IPNAV and the Company:

a. IPNAV and the Company will act in a reasonable manner so as to preserve the other's goodwill and reputation.

b. Neither IPNAV nor the Company will undertake actions intended to circumvent this Agreement.

c. Both IPNAV and the Company will take reasonable actions to preserve the confidential nature of any information exchanged during the course of this Agreement. To the extent the parties have not already done so, together with the execution of this Agreement, the parties shall execute a Mutual Nondisclosure Agreement in the form attached hereto as Exhibit C.

d. Both IPNAV and the Company will maintain records (including financial records) sufficient to determine their respective rights and obligations under this Agreement, and will make such records available promptly upon written request.

## COSTS AND EXPENSES

4. IPNAV and the Company will each pay their own travel, lodging, copying, fax, telephone and other ordinary business expenses incurred by it in connection with this Agreement. The Company will be responsible for and will pay any costs and expenses payable to third parties in connection with this Agreement (e.g., all litigation, patent prosecution and any other third party costs).

## DISTRIBUTION OF CONSIDERATION FROM THE IP RIGHTS; THE IPNAV FEE

5. IPNAV Fee: As consideration for IPNAV to enter into this Agreement and to provide the Services, the Company shall pay IPNAV twenty two percent (22%) of the Gross Consideration with respect to any Monetization Event (the "IPNAV Fee").

For the purposes hereof:

"Gross Consideration" means the gross amount (prior to any deductions or reductions) of any licensing fee, litigation settlement fee, payment of damages or other remedies, sale or transaction payment, and any other consideration, assets and/or proceeds collected by or made available to the Company in respect of the IP Rights.

"Monetization Event" means any event in which Gross Consideration is realized, including without limitation, by way of a licensing, monetization, enforcement or settlement transaction; the acquisition or disposition of the IP Rights; or an equity sale or merger of the Company which is concluded pursuant to or in connection with the Services.

6. Certain Actions: If the Company takes or fails to take any action the result of which could adversely impact IPNAV's current or future ability to collect payment that is due or may become due under the terms of this Agreement, the Company will enter into an amendment to the

## Exhibit 2 ("Advisory Agreement")

Agreement with IPNAV (in a form reasonably acceptable to IPNAV) to eliminate the adverse impact of such action or failure to take action.

7.  Timing: The Company shall wire the IPNAV Fee within five (5) business days of the Gross Consideration being received by the Company. If the Company receives non-cash consideration (e.g., stock), the Company and IPNAV will cooperate to divide the non-cash consideration in a manner consistent with the terms of this Agreement.  Any amounts that are not paid in a timely manner will bear interest at the lower of (i) 22% per annum and (ii) the maximum rate permitted by law.  IPNAV's wire information is:

> IPNAV, LLC
>
> Bank: Wells Fargo Private Banking
>
> Dallas, TX 75201
>
> Routing No.: 111900659
>
> Swift International: WFBIUS6S
>
> Account Name: IPNAV, LLC
>
> Account Number: 7921420746

## TERMINATION

8.  Generally: Survival: This Agreement will terminate one (1) year after the last to expire of the patents included within the definition of IP Rights unless earlier terminated by mutual written consent of the parties or as set forth in Sections 9 and 10.  Sections 9-13 and 15-16 of this Agreement shall survive any termination of this Agreement and survive until the expiration of the applicable statute of limitations.

9.  Termination by IPNAV:
    a.  IPNAV may terminate this Agreement in the event of a material breach by the Company that is not cured, if capable of being cured, within ten (10) days of notice to the Company of the breach.  In the event of such a termination the Company will remain responsible for and shall pay the IPNAV Fee under and in accordance with this Agreement.
    b.  IPNAV may terminate this Agreement at its discretion upon five (5) days written notice to the Company. In the event of such a termination, the Company will remain responsible for and shall pay the IPNAV Fee with respect to Gross Consideration received prior to termination, but the Company shall otherwise have no further payment obligation to IPNAV under this Agreement.

10. Termination by the Company: The Company may terminate this Agreement in the event of a material breach by IPNAV that is not cured, if capable of being cured, within ten (10) days of notice to IPNAV of the breach. In the event of such a termination, the Company will remain responsible for and shall pay the IPNAV Fee with respect to Gross Consideration received prior to breach, but the Company shall otherwise have no further payment obligation to IPNAV under this Agreement.

## REPRESENTATIONS AND WARRANTIES

11. By the Company: The Company represents and warrants that:
    a.  It exclusively owns and has full, clear and exclusive title to the IP Rights, free and clear of any liens, pledges, encumbrances or any other third party rights, except as otherwise set forth on Exhibit B.
    b.  All prior licenses, covenants, and other third party rights granted under the IP Rights

**Exhibit 2 ("Advisory Agreement")**

are set forth on Exhibit B.

   c.  It has disclosed to IPNAV and listed on Exhibit B, all prior attempts to enforce or monetize the IP Rights, whether through correspondence, litigation or otherwise.

   d.  The IP Rights have never been held invalid or unenforceable.

   e.  It has disclosed to IPNAV all prior art it is aware of in connection with the IP Rights.

   f.  Other than as provided on Exhibit D, there are no terminal disclaimers of any kind related to or arising from the IP Rights. Exhibit D includes a list of all terminal disclaimers that exist with respect to the IP Rights and a detailed description of each such terminal disclaimer. Further, other than as provided on Exhibit D, there are no US patent applications of any kind constituting an Assigned Patent Right. Exhibit D includes a list of all pending US patent applications and the respective confirmation numbers issued by the USPTO therefor.

## MISCELLANEOUS

12. Common Interest: From time to time, the parties may share information with each other that is covered by the attorney client privilege, work product immunity, or other privileges and immunities. This Agreement memorializes the parties' understanding that any such communications are covered by a community of interest that exists between them with respect to the Services. The parties intend that all applicable privileges and immunities have been, are, and will be preserved. Simultaneous with the execution of this Agreement, the parties shall execute a Common Interest Agreement, in the form attached hereto as Exhibit E.

13. Conflicts of Interest: IPNAV is now, and may in the future be, engaged by other entities that may hold intellectual property in a field of technology similar to the IP Rights. The Company has assessed the risks of any potential conflicts and has determined that the benefit of engaging an advisor with relevant experience outweighs the risks of any potential conflicts. Notwithstanding the foregoing, pursuant to that certain Mutual Non Disclosure Agreement by and between the parties, IPNAV shall protect the Confidential Information (as defined therein) of the Company and shall take those steps necessary to ensure that no Confidential Information shall be used by IPNAV in any manner or for any purpose other than in connection with the Services.

14. Choice of Law: This Agreement shall be governed by and construed under the laws of the State of Texas. Any disputes relating to or arising from this Agreement by or among the parties shall be resolved exclusively by arbitration to be conducted exclusively in Dallas, Texas, in accordance with the Commercial Rules of the American Arbitration Association. Any court of competent jurisdiction shall be authorized to enforce the provisions of the previous sentence and enforce the remedies imposed by such arbitration. The losing party in any action to adjudicate rights relating to this Agreement shall bear the costs of such action.

15. Indemnification: The Company shall indemnify, hold harmless and reimburse IPNAV, its affiliates, directors, officers, controlling persons, employees, attorneys and agents ("Indemnified Persons") to the fullest extent lawful against any and all claims, losses, damages, liabilities, expenses; costs, actions, joint or several, of any nature or type whatsoever ("Indemnified Expenses"), relating to or arising from this Agreement, the Services provided hereunder or any other matter whatsoever relating to or involving the IP Rights, except to the extent (and only to the extent) that a court of competent jurisdiction determines that such Indemnified Expenses arose exclusively from such Indemnified Person's reckless or willful misconduct.

16. Other:

   a.  There are no third-party beneficiaries under this Agreement.

   b.  This Agreement shall be binding on and inure to the benefit of the Company and IPNAV, and their respective successors, assigns, heirs and representatives. This Agreement may only be modified or amended by a written agreement signed by both parties.

   c.  This Agreement constitutes the entire agreement between the parties and supersedes any prior written or oral agreements or understandings between the parties hereto. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

# Exhibit 2 ("Advisory Agreement")

    d.   In the event that a party executes this Agreement by an electronic or scanned signature, such electronic or scanned signature shall create a valid and binding obligation of the party executing the same with the same force and effect as if such electronic or scanned signature were an original signed signature.

******

If the foregoing correctly sets forth our understanding, please sign below and return an executed copy of this Agreement to IPNAV. We look forward to working with you.

Regards,
IPNAV, LLC

By: _____
Duly Authorized

Accepted and Agreed to:

ChanBond, LLC

By: _____
Duly Authorized

# Exhibit 2 ("Advisory Agreement")

<u>EXHIBIT A</u>

IP Rights

| | |
|---|---|
| US Patent No. 7346918 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 7941822 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8341679 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8984565 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 9015774 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 13/799,749<br><br>October 10, 2013* | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 14/167,289<br><br>Filed January 29, 2014 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application   10/346,571<br>(Abandoned – CIP of 09/824,531) | |
| US Application - 09/824,531<br>(Abandoned – CIP of 7346918) | |
| PCT/US2001/049629 (Expired – no national phase) | |
| PCT/US2002/009863 (Expired – no national phase) | |

# Exhibit 2 ("Advisory Agreement")

EXHIBIT B

Prior Rights and Monetization Efforts

1.  Nonexclusive license from ChanBond, LLC to Z-Band, Inc. dated April 9, 2015

Exhibit 2 ("Advisory Agreement")

EXHIBIT C

Possible Vendor Arrangements

IPNAV has negotiated arrangements with various vendors at what are believed to be favorable rates. As vendors recommended by IPNav, their fees would be covered under Section 4b of the Agreement as Advanced Costs. Examples of such vendor arrangements are presented below.

     A. Litigation counsel to handle all legal aspects of any litigation filed by the Company

     B. Vendors to (i) collect, electronically format, review for privilege and produce responsive documents in the Company's control and to (i) analyze, review and compile documents received from third parties, including documents produced in the course of any litigation.

     C. Counsel and vendors to (i) prepare Rule 11 analysis, (ii) prepare infringement contentions and (iii) review and analyze invalidity contentions.

     D. Various technical, damages and patent experts required to support Licensing Transactions ("Consulting and Testifying Experts").

     E. Graphics presentation experts and vendors to prepare (i) graphics for Markman, (ii) graphics for key motions and (iii) graphics for trial and appellate matters.

     F. If requested by the Company to be coordinated by counsel that IPNav has preferred rate arrangements with, fees and expenses of prosecution counsel to handle regular portfolio services and possible reexamination counsel.

     G. Foreign litigation counsel to handle all legal aspects of any litigation filed by the Company in any jurisdiction outside of the United States.

     H. ITC counsel to handle all legal aspects of any action filed by the Company in the United States International Trade Commission.

     I. Licensing counsel to handle licensing matters.

IPNAV has longstanding relationship with many of these counsel and vendors and regularly recommends new counsel and vendors. IPNAV and its affiliates regularly refer business to these counsel or vendors. IPNAV or its affiliates may invest in or have other significant relationships with these counsel or vendors. IPNAV is not impartial in recommending counsel or vendors that IPNAV believes provide superior service. The Company, should it choose to work with such counsel and/or vendors, hereby waives, and agrees to sign any required waiver of, any conflicts of interest in connection with any services provided by any such counsel and/or vendors.

**Exhibit 2 ("Advisory Agreement")**

<u>EXHIBIT D</u>

Terminal Disclaimers

None.

Exhibit 2 ("Advisory Agreement")

EXHIBIT E

COMMON INTEREST AGREEMENT

THIS COMMON INTEREST AGREEMENT ("**Agreement**") is entered into as of April 9, 2015, by and between **ChanBond, LLC** and its affiliates, as such affiliates may exist from time to time (the "Company") having its principal offices at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204, and **IPNAV, LLC** ("IPNAV"), having its principal offices at 2525 Carlisle Street, Suite 439, Dallas, Texas 75201.

1.      **Background.**

1.1.    Companies and IPNAV are sometimes referred to herein as a "**party**" or the "**parties**" and are presently negotiating the closing of an agreement under which IPNAV will act as the worldwide intellectual property enforcement and licensing agent of the Companies and will provide services related to the existing and future enforcement and monetization opportunities of the patents and related rights owned by the Companies (the "**IP Rights**" and the "**Patent Matters**" respectively).

1.2.    The parties have a common legal interest in upholding the validity and enforceability of the IP Rights, for purposes of enforcement. The parties anticipate they will enforce inherent rights of the IP Rights against third parties through litigation. The parties have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest doctrine. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of privileged information and attorney work product developed by the parties and their respective counsel.

2.      **Common Interest.**

2.1.    The parties have a common, joint and mutual legal interest in the monetization of valid and enforceable patents. In furtherance of that common interest, the parties will cooperate with each other, to the extent permitted by law, to share information protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or immunity with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of this Agreement.

2.2.    In order to further their common interest, the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, evidence of use materials, claims charts, prosecution history files and other information (hereinafter "**Common Interest Materials**"). The sole purpose of the exchange of the Common Interest Materials is to support the parties' common interest with respect to the enforcement for the Patent Matters. Any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection. Nothing in this Agreement requires a party to share information with the other party.

3.      **Nondisclosure.**

3.1.    The parties and their counsel shall use the Common Interest Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Common Interest Material. No party nor their respective counsel shall produce privileged documents or information unless or until directed to do so by a final order of a court of competent jurisdiction, or upon the prior written consent of the other party. No privilege or objection shall be waived by a

**Exhibit 2 ("Advisory Agreement")**

party hereunder without the prior written consent of the other party.

3.2.    Except as herein provided, in the event that either party or its counsel is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar process) to disclose any Common Interest Materials, the party or its counsel shall assert all applicable privileges, including, without limitation, the common interest doctrine, and shall immediately inform the other party and the other party's counsel of the request or requirement to disclose.

4.    **Relationship; Additions; Termination.**

4.1.    This Agreement does not create any agency or similar relationship among the parties. Through the term of the agreement between the parties, or any other agreement requiring confidentiality, (whichever term is longer), no party nor their respective counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2.    Nothing in this Agreement affects the separate and independent representation of each party by its respective counsel or creates an attorney-client relationship between the counsel for a party and the other party to this Agreement.

4.3.    This Agreement shall continue until terminated upon the written request of either party. Upon termination, each party and their respective counsel shall return any Common Interest Material furnished by the other party. Notwithstanding termination, this Agreement shall continue to protect all Common Interest Materials disclosed prior to termination. Sections 3 and 5 shall survive termination of this Agreement.

5.    **General Terms.**

5.1.    This Agreement is governed by the laws of the State of Delaware, without regard to its choice of law principles to the contrary.  In the event any provision of the Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect. Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2.    The parties agree that a breach of this Agreement would result in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party shall be entitled to equitable relief, including injunctive relief, as a non exclusive remedy for any such breach.

5.3.    Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service as set forth below, and shall be deemed to have been given on the day received:

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, Texas 75204

IPNAV, LLC
2525 Carlisle Street
Suite 439
Dallas, Texas 75201

5.4.    This Agreement is effective and binding upon each party as of the date it is signed by or on behalf of a party and may be amended only by a writing signed by or on behalf of each party.  This Agreement may be executed in counterparts.  Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

**Exhibit 2 ("Advisory Agreement")**

***The remainder of this page has been
intentionally left blank.**

11

**Exhibit 2 ("Advisory Agreement")**

IN WITNESS WHEREOF, CHANBOND, LLC and IPNAV, LLC have executed this Common Interest Agreement by their duly authorized representatives.

**IPNAV, LLC**

By: _____
    (Signature)

Name: DEIRDRE LEANE

Title: 9ᵗʰ April 2015

**CHANBOND, LLC** (on behalf of and including its affiliates)

By: _____
    (Signature)

Name: DEIRDRE LEANE

Title: 9ᵗʰ April 2015

# Exhibit 2 ("Advisory Agreement")

CAUSE NO. _____
DC-20-14152

| | | |
|---|---|---|
| DEIRDRE LEANE AND IPNAV, LLC , | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| UNIFIEDONLINE, INC and CHANBOND, | § | |
| LLC, | § | |
| | § | _____ JUDICIAL DISTRICT |
| Defendants. | | |

## TEMPORARY RESTRAINING ORDER

On this day, the Court considered Plaintiffs' Original Verified Petition and Ex-Parte Application for Temporary Restraining Order and Injunctive Relief in Aid of Arbitration ("Petition") filed by Plaintiffs Deirdre Leane ("Leane") and IPNAV, LLC ("IPNav") (collectively, "Plaintiffs"). After reviewing the Petition and arguments of Plaintiffs' counsel the Court makes the following findings and orders:

In accordance with Rule 680 of the Texas Rules of Civil Procedure and Chapters 61 and 172 of the Texas Civil Practices & Remedies Code, by its application, Plaintiffs seek a Temporary Restraining Order enjoining Defendants UnifiedOnline, Inc. ("Unified") and ChanBond, LLC ("ChanBond") (collectively, "Defendants") from entering into any settlement of the "ChanBond Litigations"[1] without obtaining the consent of Leane in accordance with § 8.3 of the Interest Sale Agreement entered into by and between Leane, Unified, and ChanBond on or about Oct. 27, 2015 (the "ISA").

---

[1] The ChanBond Litigations are defined as the following cases currently pending in the U.S. District Court for the District of Delaware, Cases Nos. 1:15-cv-00842-RGA, 1:15-cv-00843-RGA, 1:15-cv-00844-RGA, 1:15-cv-00845-RGA, 1:15-cv-00846-RGA, 1:15-cv-00847-RGA, 1:15-cv-00848-RGA,_ 1:15-cv-00849-RGA, 1:15-cv-00850-RGA, 1:15-cv-00851-RGA, 1:15-cv-00852-RGA,_ 1:15-cv-00853-RGA, and 1:15-cv-00854-RGA.

# EXHIBIT C

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.:  21 CVS 5405

| | |
|---|---|
| Dr. DEIRDRE LEANE, derivatively on behalf of UNIFIEDONLINE, INC., a Delaware corporation, )<br>Plaintiff, )<br><br>v. )<br><br>WILLIAM RALPH "BILLY" CARTER, JR., )<br>Defendant. ) | **AMENDED**<br>**VERIFIED COMPLAINT**<br><br>*[COMP]*<br><br>(Jury Trial Demanded) |

**NOW COMES** the Plaintiff Dr. Deirdre Leane, by and through undersigned counsel Akiva M. Cohen and T. Greg Doucette, and derivatively on behalf of UnifiedOnline Inc. complains of the above-captioned Defendant as follows:

## I.  PARTIES

1.   UnifiedOnline Inc. ("Unified") is a closely held foreign corporation, incorporated in the state of Delaware (DE Secretary of State Identifier No. 703828).  Upon information and belief, Unified has its principal place of business at 4309 Hoke Lane in Greensboro, North Carolina.

2.   Plaintiff Deirdre Leane ("Plaintiff") is a resident of Texas residing at 6422 Bryan Parkway in Dallas.

3.   Upon information and belief, the Defendant William Ralph "Billy" Carter Jr. ("Defendant") is a resident of North Carolina residing at 4309 Hoke Lane in Greensboro.

## II.  JURISDICTION, VENUE, AND GOVERNING LAW

4.   This Court has personal jurisdiction over Defendant under N.C. Gen. Stat. § 1-75.4.

5.  This Court has subject matter jurisdiction under, *inter alia*, N.C. Gen. Stat. §§ 7A-240, 7A-243, and 55-7-40.

6.  Venue in this Court is proper under N.C. Gen. Stat. § 1-82.

7.  This proceeding is mandatory complex business litigation under N.C. Gen. Stat. § 7A-54.4(a)(1).

8.  As a derivative proceeding in the right of a foreign corporation, Delaware law governs this action under N.C. Gen. Stat. § 55-7-47.

## III.  CONDITIONS PRECEDENT TO SUIT

9.  Plaintiff was a shareholder of the corporation at the time of the act or omission complained of, and fairly and adequately represents the interests of the corporation in enforcing the rights of the corporation, both as required by N.C. Gen. Stat. § 55-7-41.

10. The allegations contained herein are verified by oath as required by Rule 23(b) of the North Carolina Rules of Civil Procedure.

11. No demand has been made upon Unified's board of directors because, as further detailed below, there is no lawfully elected board upon which such a demand can be made.

12. Even if the Court were to conclude such a lawfully elected board exists, demand upon it would be futile under Delaware law because the sole putative member of the board is the Defendant, whose conduct is complained of herein.

13. The futility of any demand is confirmed by the fact that the only action taken in response to this litigation by Unified's sole purported board member was to move to dismiss it.

14. In the alternative, should the Court hold that both a lawfully elected board of directors exists and demand upon it would not be futile, an arbitration proceeding currently pending in Texas before the American Arbitration Association (styled "Deirdre Leane and IPNav, LLC v.

-2-

UnifiedOnline, Inc. and ChanBond, LLC" (Case No. 01-20-0015-0793)) (the "Texas arbitration") should be deemed a sufficient demand on the board as the conduct complained of therein encompasses the Defendant's conduct here.[1]

15. Plaintiff has not waited 90 days from the date of demand to initiate this proceeding, because irreparable injury to the corporation would result by doing so.

## IV.  FACTS

### A.  Origins of Plaintiff's Interest in Unified

16. From its formation to 27 October 2015, Plaintiff was the sole member-owner of ChanBond, LLC ("ChanBond").

17. ChanBond owns several core patents (the "ChanBond Patents") related to the technology of "channel bonding," a method to dramatically increase the throughput of internet-connected devices by splitting outbound data, spreading that data across multiple simultaneous data channels during transmission, then recombining the data on the receiving device.[2]

18. The technology encompassed by the ChanBond Patents is used by nearly every cable provider in the country to improve the transmission speed and quality of service provided to subscribers, and is similarly used by the makers of cable modems and related devices.

19. On 21 September 2015, ChanBond filed 13 patent infringement lawsuits against various defendants in the United States District Court for the District of Delaware.  These Delaware lawsuits (collectively, the "Delaware litigation") have settled, with a significant payment made to ChanBond.

---

[1] Plaintiff sought to have this matter included as part of the Texas arbitration, but Unified's attorneys in the arbitration indicated that Mr. Carter – with whom Plaintiff did not have an arbitration agreement – would not consent to jurisdiction. The Texas arbitration has been completed, and so far as the parties are aware all responsive post-hearing briefs have been filed; an award is now expected on or before 10 March 2022.

[2] A more-precise explanation of the ChanBond Patents can be found under U.S. Patent Nos. 7346918, 7941822, 8341679, 8984565, and 9015774.

20. The ChanBond Patents were and are the only assets owned by ChanBond, and monetizing those patents through licensing or litigation was ChanBond's only business.

21. Seeking to monetize her interest in the ChanBond Patents, Plaintiff sold her entire interest in ChanBond to Unified on or about 27 October 2015.  The sale was memorialized in an Interest Sales Agreement ("ISA") entered between Plaintiff and Unified's then-CEO Robert "Rob" Howe, wherein Unified acquired all of Plaintiff's interest in ChanBond and Plaintiff received a small ownership interest in Unified plus $5,000,000.00 USD payable on or before 27 October 2020 secured by a promissory note.  A complete and accurate copy of the ISA is attached hereto as Plaintiff's Exhibit A.

22. As part of that transaction, Unified appointed Defendant as its agent to be the Manager of ChanBond.

23. In addition to the promissory note, a UCC-1 Financing Statement was filed with the Delaware Department of State on or about 10 November 2015 designated Plaintiff as the secured party with a security interest in the ChanBond Patents.  A complete and accurate copy of the referenced UCC-1 Financing Statement is attached hereto as Plaintiff's Exhibit B.

24. Pursuant to the ISA, Plaintiff became a minority shareholder in Unified on or about 27 October 2015, and remains a minority shareholder in Unified as of the date of this Complaint.

25. Upon information and belief, there also remain an unknown number of other minority shareholders in Unified stemming from the corporation's time as a publicly traded entity under stock symbol "UOIP."

26. The investors suspected to exist include those from before Unified's acquisition of ChanBond, when Mr. Howe issued a press release announcing in part "We're also branching into the area of Intellectual Property Monetization around patent portfolios we're negotiating in our

lines of business; there'll be more on that later. … Come along with us! Be a part of

UNIFIEDONLINE!, INC (UOIP: OTC BB).  It's a new day and a bright future!"[3]

27. The investors suspected to exist include those from after Unified's acquisition of

ChanBond, when new investors bought shares following announcements about the Delaware

litigation.[4]

**B. Unified's Corporate Governance**

28. Based on Unified's filings with the federal Securities and Exchange Commission

through its delisting in July 2019, Unified's then-CEO Rob Howe was the sole member of

Unified's Board of Directors from 9 June 2015 until Mr. Howe's death on or about 24 May

2018.  Mr. Howe was also the sole corporate officer of Unified from 26 April 2016 until his

death.

29. Since becoming a Unified shareholder in 2015, Plaintiff has never received a notice

of a shareholders' meeting or a notice that anyone had been elected to Unified's board of

directors.  Plaintiff has similarly never received a notice that any director had appointed anyone

as a director or principal officer of Unified.

30. Upon information and belief, in light of that lack of notice, Unified has not had any

directors since Mr. Howe's death, nor has it had any officers since Mr. Howe's death.

---

[3] https://www.einpresswire.com/article/242649598/iceweb-name-change-and-reverse-split-is-complete

[4] See, e.g., messages shared online at:  https://investorshub.advfn.com/UnifiedOnline-Inc-(fka-UOIP)-5196/ (forum
messages listed at bottom of page) that include messages of purported Unified investors both before and after the
Delaware litigation was announced –

  * https://investorshub.advfn.com/boards/read_msg.aspx?message_id=109559732 (2 January 2015, "Sadly I
    was holding IWEB [Unified's previous stock symbol] on its 2014 downward slide.  Not worth
    selling it now!");

  * https://investorshub.advfn.com/boards/read_msg.aspx?message_id=118460024 (12 November 2015,
    "UOIP is up Big time for a Pink Penny Stock Today … Up 42%");

  * https://investorshub.advfn.com/boards/read_msg.aspx?message_id=158642533 ("Once I saw the players
    involved and how our side brought the case I bought a sh.. load [sic] of shares").

31. Upon information and belief, Defendant forged any document purporting to appoint Defendant as a board member of Unified.

32. Defendant has nonetheless purported to act as Unified's new CEO. Upon information and belief, the Defendant is now the controlling shareholder of Unified, owning roughly 90% of Unified's issued and outstanding shares of stock.

33. In addition to representing himself as Unified's CEO, upon information and belief Defendant has also created a constellation of Unified-esque entities including UnifiedOnline! LLC (DE Secretary of State Identifier No. 5504684), Unified Online.net Inc. (DE Secretary of State Identifier No. 3306062), UO! IP of NC LLC (NC Secretary of State Identifier No. 1102741), and UO! Foundation Inc. (NC Secretary of State Identifier No. 1102598), through which Defendant conducts unknown activities with, between, or on behalf of Unified.

34. Upon information and belief, Defendant holds his shares of Unified stock through one or more of these "Unified-esque" entities.

35. Defendant also "manages" ChanBond – a wholly owned subsidiary of Unified after the ISA – pursuant to both his appointment in the ISA and a separate purported "Advisory Services and Management Agreement" ("ASMA") between Unified and Defendant's UO! IP of NC LLC entity.

36. Though Defendant now claims that the ASMA was entered into upon Unified's purchase of ChanBond, and the ASMA is dated as of October 2015, Defendant admitted to Plaintiff that he actually entered into the ASMA in 2018. Upon information and belief, the relevant metadata will confirm that admission.[5]

---

[5] The dispute over the ASMA's provenance is encompassed in the pending Texas arbitration.

37. Though the ASMA is purportedly dated October 2015, and purports to grant Defendant's entity a 20% interest in the recovery on the patents, it was not disclosed in Unified's 2015 SEC filings.

38. Upon information and belief, Defendant forged the ASMA.

## C.  Financing the Delaware Litigation

39. Upon information and belief, Unified's sole asset is its 100% ownership of ChanBond.

40. Each shareholders' interest in Unified is therefore wholly dependent on Unified profiting from the ChanBond Patents, via either licensing or success in the Delaware litigation.

41. As is common in litigation of high value patents, the Delaware litigation expenses were separately financed by a litigation funder in exchange for the repayment of all amounts expended plus an additional sliding percentage of any recovery that varied based on the amount expended.  Plaintiff entered into an initial Litigation Funding Agreement ("LFA") with Bentham Capital LLC ("Bentham" or the "Litigation Funder") on or about 9 September 2015, prior to her sale of ChanBond to Unified.  The agreement provided Bentham a share of any settlement in percentages that varied based on the amounts disbursed.[6]

42. ChanBond also had a pre-existing Advisory Services Agreement with IPNav LLC ("IPNav") to which ChanBond would pay 22% of any recovery on the ChanBond Patents, as well as a separate agreement with the inventors of the ChanBond Patents (the "Inventors" or "CBV" (the Inventors' entity for managing their patents)) to pay CBV the first $1,000,000.00 USD after expenses and 50% of any remainder, with the other 50% net remainder paid to Unified.

---

[6] Plaintiff intends to seek leave to file the LFA and other materials under seal.

43. By way of illustration, at the time Plaintiff and Unified entered into the ISA, Unified's potential interest in any recovery on the ChanBond Patents ranged from 24% of any recovery (if Patent Counsel and the Litigation Funder each received their respective minimum percentages) to as little as 14.75% (if Counsel and Funder received maximum percentages). Details of each entity's potential proceeds can be provided under seal.

44. These percentages are applied to proceeds remaining after the Litigation Funder recovers all amounts it advanced for litigation expenses.

### D. Defendant's Systematic Pillaging of ChanBond for His Own Benefit

45. Defendant has exploited his purported role as CEO of Unified, as well as owner-manager of the previously identified "Unified-esque" entities, to systematically pillage ChanBond and squander Unified's interest in the ChanBond Patents.

46. Defendant unilaterally negotiated multiple amendments to ChanBond's Litigation Funding Agreement with Bentham, including but not limited to amendments executed on or about 23 October 2018 and on or about 20 May 2019, increasing the share of any recovery Bentham would receive for financing litigation expenses.

47. Upon information and belief, Defendant has used these Bentham disbursements to finance his personal expenses and other non-Unified business activities.

48. The "Advisory Services and Management Agreement" identified in Paragraph 35, *supra*, provides that Defendant's UO! IP of NC LLC entity is entitled to 20% of any net proceeds otherwise payable to Unified (characterized as "Gross Consideration … the gross amount [of any settlement] … after payments made for litigation financing, attorneys fees and other litigation related expenses"), in addition to ongoing pre-recovery payment of "all travel, lodging, copying, fax, telephone, utilities and other expenses incurred[.]"

49. Yet separate from the ASMA, upon information and belief Defendant has also charged Unified and/or ChanBond $5,000.00 USD per month for consulting services.

50. As with the ASMA, no agreement providing for such a monthly fee was disclosed in Unified's SEC filings.

51. Upon information and belief, Defendant forged any agreement purporting to provide him such a fee.

52. Upon information and belief, Defendant has purported to dole out other interests in the ChanBond Patents and the recovery thereon.

53. By way of illustration, at the present time – and excluding those interests that are currently unknown to Plaintiff – Unified's potential interest in any recovery on the ChanBond Patents has now been depleted to a range of 12.2% of any recovery to as little as 9.8%.  Details of each entity's potential proceeds can be provided under seal.

54. As before, these percentage returns are applied to proceeds remaining after the Litigation Funder recovers the principal amounts it advanced for litigation expenses.  The actual amount remaining for the Inventors and Unified could be even less than the percentages indicated.

55. Defendant has privileged his own shares in Unified over those of the minority shareholders by extracting wealth from Unified-ChanBond through the ASMA, any purported agreement for a consulting fee, amended LFAs and other agreements he negotiated as the purported CEO of Unified and Unified's manager of ChanBond.

56. Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by Unified as a result of the Defendant's breaches of his fiduciary duties as the purported sole

officer and director of the corporation, Defendant's waste of corporate assets, and Defendant's unjust enrichment at the expense of the corporation.

## V.  FIRST CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTIES OF LOYALTY AND CARE

57. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58. Defendant owns a majority interest in Unified.

59. Defendant also exercises control over the business affairs of the corporation, in his capacity as Unified's purported CEO and manager of ChanBond.

60. In Defendant's role as majority owner and controller of Unified, he owes dual fiduciary duties of care and loyalty to the corporation under Delaware law.

61. Defendant breached these duties by pillaging Unified's sole asset for his own benefit, and on terms that cannot be justified by anyone exercising ordinary sound business judgment.

## VI.  SECOND CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTY OF ENTIRE FAIRNESS

62. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63. Under Delaware law, majority shareholders in both close and ordinary corporations owe fiduciary duties to the minority interests where the shareholder owns a majority interest in or exercises control over the business affairs of the corporation.

64. This duty includes an obligation that the majority shareholder's transactions with the corporation are entirely fair with respect to the minority shareholders.

65. Defendant is a corporate insider, sitting on both sides of several transactions as the purported CEO of Unified, the manager of ChanBond, and the owner-manager of the assorted "Unified-esque" entities.

66. Defendant's various transactions in these roles, including his repeated renegotiation of the Litigation Funding Agreement to secure disbursements of "working capital" in exchange for squandering Unified's interest in the ChanBond Patents, were not entirely fair and harmed both Unified and its minority shareholders.

## VII.  THIRD CAUSE OF ACTION:
### CORPORATE WASTE

67. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68. As detailed above, Defendant has mortgaged nearly all of Unified's interest in ChanBond and the ChanBond Patents to secure funding for his own expenses and pet projects.

69. No person of ordinary sound business judgment could view the benefits received by Unified as a fair exchange for the consideration paid by the corporation.

70. Unified has been harmed by the Defendant's corporate waste.

## VIII.  FOURTH CAUSE OF ACTION:
### UNJUST ENRICHMENT

71. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72. Defendant has been enriched by his conduct as the purported CEO of Unified, including through the disbursement of funds from the Litigation Funder.

73. Unified, by contrast, has been impoverished through its near-obliterated interest in its wholly-owned subsidiary ChanBond.

74. The enrichment of Defendant and impoverishment of Unified are directly related, and indeed are simply two sides of the same transactions.

75. Defendant has no justification for his conduct, and Unified has no adequate remedy provided by law.

76. Should the Court conclude that the other causes of action against Defendant cannot be sustained because there are no contractual obligations upon Defendant as Unified's purported CEO, Plaintiff asserts in the alternative that Defendant has been unjustly enriched and his profits should be disgorged and returned to Unified.

## IX.  FIFTH CAUSE OF ACTION:
### FRAUD

77. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78. Upon information and belief, Defendant forged various documents purporting to give him authority to act on behalf of Unified and an enhanced financial interest in Unified's recovery in the Delaware litigation.

79. Upon information and belief, Defendant's fraud has financially harmed Unified.

## X.  PRAYER FOR RELIEF

**WHEREFORE**, based upon the foregoing, the Plaintiff respectfully prays that:

1.   The Court rule that Plaintiff is an adequate representative of Unified and has standing to maintain this action on behalf of the corporation;

2.   A trial by jury be granted on all issues so triable;

3.   Defendant be compelled to provide an equitable accounting to Plaintiff, and all other minority shareholders, of all amounts received and expended for Unified and for its wholly-owned subsidiary ChanBond;

4.   Unified have and recover of the Defendant restitution in an amount in excess of $25,000.00 to be determined at trial;

5.   Unified have and recover of the Defendant treble damages to the extent permitted by statute;

6.   Unified have and recover of the Defendant punitive damages to deter future misconduct;

7.   Unified have and recover of the Defendant post-judgment interest at the 8.00% per annum legal rate from the date of judgment;

8.   Plaintiff have and recover of the Defendant reasonable attorney fees to the extent permitted by statute;

9.   The costs of this action be taxed against the Defendant; and,

10. The Court grant any such additional and further relief as this Court deems proper and just.

*** SIGNATURES ON THE FOLLOWING PAGE ***

Respectfully submitted this the 25th day of February, 2022.

KAMERMAN, UNCYK, SONIKER & KLEIN, PC


/s/ Akiva M. Cohen
Akiva M. Cohen
New York Bar No. 4328969
*Pro Hac Vice*

ATTORNEYS FOR PLAINTIFF
1700 Broadway  16th Floor
New York, NY  10019-5977
Phone: (212) 400-4930
Email: acohen@kusklaw.com


THE LAW OFFICES OF T. GREG DOUCETTE PLLC


/s/ T. Greg Doucette
T. Greg Doucette
North Carolina Bar No. 44351
*Local Counsel*

311 E. Main Street
Durham, North Carolina  27701-3717
Phone: (919) 998-6993
Email: greg@tgdlaw.com

## <u>VERIFICATION OF DEIRDRE LEANE</u>

The undersigned Deirdre Leane, being first duly sworn, deposes and says that she is the Plaintiff in the foregoing matter, that she has read the foregoing Amended Verified Complaint, and that the facts alleged therein are true of her own knowledge, except as to the matters stated upon information and belief, and as to those matters she believes them to be true.

In addition, she further deposes and says that she has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this derivative action except (i) such fees, costs, or other payments as the Court expressly approves to be paid to or on behalf of the corporation, and (ii) reimbursement of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of the action.

Pursuant to N.C. Gen. Stat. § 7A-98(b), I declare under penalty of perjury under the laws of North Carolina that the foregoing is true and correct.

This the ___25___ day of _____February_____, 2022.


_____
Deirdre Leane

## <u>CERTIFICATE OF SERVICE</u>

The undersigned has this date served the foregoing **AMENDED VERIFIED COMPLAINT** upon the Defendant as follows:

**To:**          Ben E. Klein, Esq.
              Grant Sigmon, Esq.
              SIGMON KLEIN, PLLC
              114 N. Elm Street,  Suite 210
              Greensboro, NC  27401
              *Attorneys for Defendant*

**Service By:**

( )      Hand delivery

(X)      Electronic delivery via fax and/or Electronic Court Filing

( )      Overnight delivery via FedEx

( )      Depositing a copy with the applicable Sheriff's Office for service

( )      Depositing a copy of the same in the United States Mail, enclosed in a postage paid, properly addressed wrapper in an official depository under the exclusive care and custody of the United States Postal Service, Certified Mail, Return Receipt Requested

( )      Depositing a copy of the same in the United States Mail, postage paid, in the manner and form as prescribed by the North Carolina Rules of Civil Procedure

This the ___25th___ day of _____February_____, 2022.

THE LAW OFFICES OF T. GREG DOUCETTE PLLC


/s/ T. Greg Doucette
T. Greg Doucette
State Bar No. 44351

LOCAL COUNSEL FOR PLAINTIFF
311 E. Main Street
Durham, North Carolina  27701-3717
Phone: (919) 998-6993
Email: greg@tgdlaw.com


PLAINTIFF'S
EXHIBIT
4

### Agreement - ChanBond

This Agreement (this "**Agreement**"), is made as of October 27, 2015 (the "**Effective Date**"), by and among **Deirdre Leane**, an individual with an address of 2525 Carlisle St., Suite 439, Dallas, Texas 75201 ("**Seller**"), **ChanBond, LLC,** a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 ("**ChanBond**") and **UnifiedOnline, Inc.,** a Delaware corporation, of 4126 Leonard Drive, Fairfax, Virginia 22030 ("**Purchaser**"). The parties to this Agreement shall be referred to collectively herein as the "Parties" and separately as a "Party".

W i t n e s s e t h:

WHEREAS, Seller owns 100% of the limited liability company membership interests (the "**Interests**") of **ChanBond**;

WHEREAS, Purchaser wishes to acquire Seller's entire interest in ChanBond, following which Purchaser will become the sole interest holder of ChanBond, all according to the provisions set forth herein below;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the Parties hereto hereby agree as follows:

1.   **Definitions**

1.1    "**Affiliate**" means, with respect to a Party, any Person in any country that directly or indirectly Controls, is Controlled by or is under common Control with such Party. For the purposes of this Agreement, the term "Control" of a Person means ownership, of record or beneficially, directly or through other Persons, of fifty percent (50%) or more of the voting equity of such Person or, in the case of a non-corporate Person, equivalent interests.

1.2    "**Collateral Agreements**" means all such concurrent or subsequent agreements, documents and instruments, as amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof, including without limitation, the License Agreement, the Pay Proceeds Agreement, the Common Interest Agreement and the Promissory Note.

1.3    "**Contract Rights and Obligations**" means the rights and obligation assigned to ChanBond under the contracts ("**Contracts**") listed on **Schedule 1.3.**

1.4    "**Entity**" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Body (as defined below) or any other legal entity.

1.5    "**Governmental Body**" means any (i) U.S. federal, state, county, municipal, city, town village, district, or other jurisdiction or government of any nature; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or other entity and any court or other tribunal); or (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

1.6 **"Intellectual Property"** means all domestic or foreign rights in, to and concerning ChanBond's: (i) patents, patent applications, trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, trade dress, logos, symbols, trade names, assumed names, fictitious names, corporate names and other indications or indicia of origin, including translations, adaptations, derivations, modifications, combinations and renewals thereof; (ii) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of data or information), copyrights therein and thereto, moral rights, and rights equivalent thereto, including but not limited to, the rights of attribution, assignation and integrity; (iii) trade secrets, confidential and/or proprietary information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, schematics, designs, discoveries, drawings, prototypes, specifications, hardware configurations, customer and supplier lists, financial information, pricing and cost information, financial projections, and business and marketing methods plans and proposals), collectively **"Trade Secrets"**; (iv) computer software, including programs, applications, source and object code, data bases, data, models, algorithms, flowcharts, tables and documentation related to the foregoing; (v) other similar tangible or intangible intellectual property or proprietary rights, information and technology and copies and tangible embodiments thereof (in whatever form or medium); (vi) all applications to register, registrations, restorations, reversions and renewals or extensions of the foregoing; (vii) internet domain names; and (viii) all the goodwill associated with each of the foregoing and symbolized thereby; and (ix) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including rights to recover for past, present and future violations thereof.

1.7 **"Lien"** means any mortgage, pledge, security interest, encumbrance, lien, charge or debt of any kind, any trust, any filing or agreement to grant, deposit or file a pledge or financing statement as debtor under applicable law, any subordination arrangement in favor of any Person, or any other Third Party right.

1.8 **"Person"** means any individual or Entity.

1.9 **"Proceeding"** means any claim, suit, litigation, arbitration, mediation, hearing, audit, charge, inquiry, investigation, governmental investigation, regulatory proceeding or other proceeding or action of any nature (whether civil, criminal, legislative, administrative, regulatory, prosecutorial, investigative, or informal) commenced, brought, conducted, or known to be threatened, or heard by or before, or otherwise involving, any Governmental Body, arbitrator or mediator or similar person or body.

1.10 **"Third Party"** means any Person other than a Party or its Affiliates.

2. **Sale and Purchase of Interests**

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser ChanBond and Purchaser shall purchase and accept the assignment, transfer conveyance and delivery of ChanBond from the Seller.

Closing of Sale and Purchase of Interests; Covenants of Purchaser

2

2.1     Closing.  The sale, assignment, transfer and delivery of ChanBond by the Seller and the purchase thereof by the Purchaser, shall take place at a closing, to be held remotely via the exchange of documents and signatures within one business day following the execution of this Agreement (the "**Closing**" and the "**Closing Date**," respectively).

2.2     Transactions at Closing.  At the Closing, the following transactions shall occur, which transactions shall be deemed to take place simultaneously and no transaction shall be deemed to have been completed or any document delivered until all such transactions have been completed and all required documents delivered:

2.2.1   The Seller shall duly execute an interest assignment deed in the form attached hereto as **Schedule 2.2.1** (the "**Transfer Deed**") and shall deliver their respective Transfer Deed to Purchaser;

2.2.2   At Closing, ChanBond shall appoint William R. Carter, Jr. as sole manager ("**Manager**") and thereafter Manager shall have sole and exclusive authority over the business of ChanBond.

2.2.3   Purchaser shall deliver to the Seller copies of resolutions of its Board of Directors in the form attached hereto as **Schedule 2.2.3**, approving, *inter alia*, the transactions contemplated hereunder and the issuance of the Shares (as defined below) by Purchaser to Seller.

2.2.4   The Collateral Agreements shall have been executed and delivered by the respective parties thereto.

2.2.5   Purchaser shall deliver to the Seller a validly executed share certificate for the Shares (as defined below) issuable in the name of the Seller in such amounts as shall be directed by Seller not less than 72 hours after the Closing.

2.2.6   Purchaser shall deliver to Seller evidence that each Required Approval (as defined below) has been obtained.

2.2.7   Seller, ChanBond and Purchaser shall have entered into the Common Interest Agreement, in the form attached hereto as **Schedule 2.2.7**.

2.2.8   Purchaser shall deliver to Seller the Promissory Note (as defined below), in the form attached hereto as **Schedule 2.2.8**.

2.3     Conditions to Closing.  The obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions, any of which may be waived in writing by the Party entitled to the benefit thereof, in whole or in part, to the extent permitted by the applicable law:

2.3.1   No temporary restraining order, preliminary or permanent injunction or other order (whether temporary, preliminary or permanent) issued by any court of competent jurisdiction, or other legal restraint or prohibition shall be in effect which prevents the consummation of the transactions contemplated herein, nor shall any proceeding brought by any Governmental Body seeking any of the foregoing be pending, and there shall not be any action

3

taken, or any law, regulation or order enacted, entered, enforced or deemed applicable to the transactions contemplated herein illegal.

2.3.2    The representations and warranties of the Seller and Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those (i) representations and warranties that are qualified by materiality, which representations and warranties shall be true and correct in all respects and (ii) representations and warranties which address matters only as of a particular date, which representations and warranties shall be true and correct on and as of such particular date.

2.3.3    Each Party shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the Collateral Agreements ancillary hereto (collectively, the **"Transaction Documents"**) to be performed or complied with by it on or prior to the Closing Date.

2.3.4    Each Party shall have received evidence, in form and substance reasonably satisfactory to it, that any and all approvals of Governmental Bodies and other Third Parties required to have been obtained by a Party to consummate the transactions under the Transaction Documents, if any, have been obtained (each a **"Required Approval"**).

2.4    <u>Covenant of Purchaser</u>.  Promptly following the Closing, Purchaser shall (a) reimburse Seller for all of their costs and expenses (including reasonable attorneys' fees) incurred by Seller in connection with the consummation of the transactions contemplated by this Agreement and (b) file with the relevant Governmental Bodies all legally required reports in respect of the transactions contemplated under the Transaction Documents, including, but not limited to, the SEC Form 8-K and any Forms 3, Forms 4 or Schedule 13D's.

3.    <u>**Consideration**</u>

In consideration for the sale, assignment, transfer and delivery of ChanBond, Purchaser shall pay to the Seller (as directed by Seller) the consideration, as follows:

3.1    <u>Cash Payment</u>.  Five million U.S. Dollars ($5,000,000) payable on or before October 27, 2020 (the **"Cash Payment"**). The obligation to make the Cash Payment shall be evidenced by Purchaser's promissory note (the **"Promissory Note"**) in the form of Schedule 2.2.8 attached hereto; and

3.2    <u>Shares Payment</u>.  Forty-four million, seven hundred thousand (44,700,000) shares of Purchaser's Common Stock (the **"Shares"**) par value of $0.001 each.

3.3    <u>Release</u>.    Purchaser for itself, its respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the **"Releasing Parties"**) knowingly, voluntarily, and irrevocably releases, forever discharges and covenants not to sue the Seller, and their respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the **"Released Parties"**) from and against any and all rights, claims, losses, lawsuits or causes of action (at law or in equity), liabilities, duties, actions, demands, expenses, breaches of duty, damages,

4

obligations, proceedings, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, agreements, promises, judgments, and executions of whatever nature, type, kind, description or character (each a **"Claim"**), whether known or unknown, suspected or unsuspected, vested or contingent, past or present, that a Releasing Party ever had, now has or hereafter can, shall or may have against or with respect to the Released Parties or any of them for, upon or by reason of any matter, cause or thing related to or arising from any agreement to which ChanBond is a party or by which it is bound prior to the Closing Date, which are listed on **Schedule 3.3** (the **"Company Agreements"**), except in the case that such Claim arises out of an act of fraud, intentional misconduct or gross negligence on the part of one or more of the Released Parties, as finally determined by a court of competent jurisdiction.  For the avoidance of doubt, the Company shall continue to be bound by the Company Agreements and neither the Seller nor any of the Released Parties has or shall have any further obligation or liability under the Company Agreement (other than confidentiality, common interest and other similar provisions).  The Releasing Parties hereby waive the benefits of any provisions of the law of any state or territory of the United States, or principle of common law, which provides that a general release does not extend to claims which the Releasing Parties do not know or suspect to exist in its favor at the time of executing the release, which if known to it, may have materially affected the release.  It is the intention, understanding and agreement of the Releasing Parties to forever discharge and release all known and unknown, present and future claims within the scope of the releases set forth in this Agreement, provided, however, this Release shall not affect or limit any Claims arising under this Agreement, for enforcement, gross negligence or willful misconduct, fraud, misrepresentation, or similar matters.

## 4.     Representations and Warranties of the Seller

The Seller hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

4.1     The Seller is the sole lawful owners, beneficially and of record, of ChanBond and ChanBond constitute all of the membership interests in ChanBond, and upon the consummation of the transactions at the Closing, Purchaser will acquire from the Seller, good and marketable title to ChanBond sold by it.  There are no preemptive, anti-dilution or other participatory rights of any other parties with respect to the transactions contemplated hereunder.

4.2     The Seller has full and unrestricted legal right, power and authority to enter into and perform their obligations under the Transaction Documents and to sell and transfer ChanBond to Purchaser as provided herein.  The Transaction Documents, when executed and delivered by the Seller, shall constitute the valid and legally binding obligation of the Seller, legally enforceable against the Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.3     The Seller is acquiring the Shares for investment purposes only, for their own account, and not for the benefit of others, nor with any view to, or in connection with any distribution or public offering thereof within the meaning of the U.S. Securities Act of 1933 (the **"Securities Act"**).

4.4     The Seller understands that the Shares have been registered under the Securities Act. The Seller also acknowledges that the Shares will be restricted for sale for six (6) months after the issuance. The Seller acknowledges that any certificates evidencing the Shares will contain a legend to the foregoing effect.

4.5     Seller has sufficient knowledge and expertise in business and financial matters so as to enable it to analyze and evaluate the merits and risks of acquiring the Shares pursuant to the terms of this Agreement and is able to bear the economic risk of such acquisition, including a complete loss of its investment in the Shares.

4.6     Seller acknowledges that it has made detailed inquiries concerning Purchaser and its business, and that the officers of Purchaser have made available to the Seller any and all written information which it has requested and have answered to the Seller's satisfaction all inquiries made by the Seller.

4.7     The transactions provided for in this Agreement with respect to the Shares are not part of any pre-existing plan or arrangement for, and there is no agreement or other understanding with respect to, the distribution by the Seller of any of the Shares.

5.     **Representations and Warranties of ChanBond**

5.1     ChanBond hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

(a)     ChanBond is duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.

(b)     As of the Closing Date, ChanBond is a party to the pending litigation identified in **Schedule 5.1(b)**.

(c)     As of the Closing Date the Contracts are in full force and effect and none of the respective parties to the Contracts are in breach of any material obligation under the Contracts.

(d)     To ChanBond's knowledge, ChanBond is not a party nor bound by any contracts, agreements, promises or commitments except the assignments related to the Contracts.

(e)     Other than the assignments related to the Contracts, ChanBond has no material assets. None of ChanBond's employees will continue with ChanBond after the Closing. ChanBond's bank accounts and the contents thereof will be transferred to Purchaser. Any amounts paid or payable to ChanBond (or any of its Affiliates) under licenses or other agreements or judgments entered into by or awarded to any Affiliates of ChanBond prior to the Closing Date, shall be retained as the exclusive property of such

6

Affiliates and after the Closing Date, ChanBond or any of its Affiliates will disclaim any interest therein.

## 6.     Representations and Warranties of Purchaser

Purchaser, represents and warrants to the Seller and acknowledges that the Seller are entering into this Agreement in reliance thereon as follows:

6.1     Purchaser is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.  The corporate governance documents of Purchaser (including but not limited to its Certificate of Incorporation, Bylaws and any Voting Rights Agreements, Stockholders' Agreements, Investors' Rights Agreements and the like) as in effect on the date hereof have been provided or made available to the Seller (the "**Purchaser Governance Documents**").

6.2     The Transaction Documents, when executed and delivered by Purchaser, shall constitute the valid and legally binding obligation of Purchaser, respectively, legally enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.3     The authorized capital stock of Purchaser consists of 6,000,000,000 shares of Common Stock and 10,000,000 shares of Convertible Preferred Stock, each having a par value of USD \$0.001, of which 912,897,537 shares are issued and outstanding (exclusive of shares issued hereunder).  Purchaser's fully-diluted capital structure before and after Closing is set forth in the capitalization table attached hereto as **Schedule 6.3**.  All capital stock, preemptive rights, rights of first refusal, rights of co-sale, convertible, exercisable or exchangeable securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Purchaser or any of its subsidiaries or Affiliates any capital stock of the Purchaser and/or any of its subsidiaries are set forth in detail on **Schedule 6.3**.  Except for the transactions contemplated by this Agreement and the current Purchaser Governance Documents, there are no Liens, options to purchase, proxies, preemptive rights, convertible, exercisable or exchangeable securities, outstanding warrants, options, voting trust and other voting agreements, calls, promises or commitments of any kind and, Purchaser has no knowledge that any of the said stockholders owns any other stock, options or any other rights to subscribe for, purchase or acquire any capital stock of Purchaser from Purchaser or from each other.

6.4     All issued and outstanding capital stock of Purchaser has been duly authorized, and is validly issued and outstanding and fully-paid and non-assessable.  The Shares, when issued and allotted in accordance with this Agreement:  (a) will be duly authorized, validly issued, fully paid, non-assessable, and free of any preemptive rights, (b) will have the rights, preferences, privileges, and restrictions set forth in Purchaser's Certificate of Incorporation, Certificate of Designation and By-laws, and (c) will be issued free and clear of any Liens of any kind.

7

6.5     Purchaser is currently in material compliance with all applicable laws, including securities laws. Purchaser has timely filed all forms and reports required to be filed with the Securities Exchange Commission (the "**SEC**") including, without limitation, all exhibits required to be filed therewith, and has made available to the Seller true, complete and correct copies of all of the same so filed (including any forms, reports and documents incorporated by reference therein or filed after the date hereof, the "**Purchaser SEC Reports**").  For purposes hereof, such Purchaser SEC Reports shall be deemed delivered to Seller via the SEC's EDGAR database. The Purchaser SEC Reports: (i) at the time filed complied (or will comply when filed, as the case may be) in all material respects with the applicable requirements of the Securities Act and/or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and the rules and regulations promulgated thereunder, and with the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder, in each case applicable to such Purchaser SEC Reports at the time they were filed; and (ii) did not at the time they were filed (or, if later filed, amended or superseded, then on the date of such later filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

6.6     Purchaser has timely filed (or has been deemed to have timely filed pursuant to Rule 12b-25 under the Exchange Act) and made publicly available on the SEC's EDGAR system, and the Seller may rely upon, all certifications and statements required by (i) Rule 13a-14 or Rule 15d-14 under the Exchange Act and (ii) Section 906 of the Sarbanes Oxley Act of 2002 with respect to any documents filed with the SEC. Since the most recent filing of such certifications and statements, there have been no significant changes in Purchaser's internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act), or in other factors that could significantly affect its disclosure controls and procedures.

6.7     The financial statements (including footnotes thereto) included in or incorporated by reference into the Purchaser SEC Reports (the "**Purchaser Financial Statements**") were complete and correct in all material respects as of their respective filing dates, complied as to form in all material respects with the Exchange Act and the applicable accounting requirements, rules and regulations of the SEC promulgated thereunder as of their respective dates and have been prepared in accordance with United States generally accepted accounting principles ("**GAAP**") applied on a consistent basis during the periods involved (except as otherwise noted therein).  The Purchaser Financial Statements fairly present the financial condition of Purchaser as of the dates thereof and results of operations, cash flows and stockholders' equity for the periods referred to therein (subject, in the case of unaudited Purchaser Financial Statements, to normal recurring year-end adjustments which were not and will not be material in amount). Without limiting the generality of the foregoing, (i) no independent public accountant of Purchaser has resigned or been dismissed as independent public accountant of Purchaser as a result of or in connection with any disagreement with Purchaser on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, (ii) no executive officer of Purchaser has failed in any respect to make, without qualification, the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act with respect to any form, report or schedule filed by Purchaser with the SEC since the enactment of the Sarbanes-Oxley Act and (iii) no enforcement action has been initiated or, to the knowledge of Purchaser, threatened against Purchaser by the SEC relating to disclosures contained in any

Purchaser SEC Report.  There has been no change in Purchaser's accounting policies except as described in the notes to the Purchaser Financial Statements.

6.8     Purchaser is not in default and neither the execution and delivery of the Transaction Documents nor compliance by Purchaser with the terms and provisions hereof and thereof, will conflict with, or result in a breach or violation of, any of the terms, conditions and provisions of:  (i) the Purchaser Corporate Governance Documents, or (ii) any note, indenture, mortgage, lease, agreement, contract, purchase order or other instrument, document or agreement to which Purchaser is a party or by which it or any of its property is bound, or (iii) any law, statute, ordinance, regulation, order, writ, injunction, decree, or judgment of any court or any governmental department, commission, board, bureau, agency or instrumentality in any country in which Purchaser conducts business, with the exception of those judgments listed **Schedule 6.8**. Such execution, delivery and compliance with the Transaction Documents will not (a) give to others any rights, including rights of termination, cancellation or acceleration, in or with respect to any agreement, contract or commitment referred to in this paragraph, or to any of the properties of Purchaser, or (b) except for compliance with any applicable requirements under the Securities Act, the Exchange Act and any requirements of the Over-the-Counter Bulletin Board (**"OTCBB"**), no consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Body or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of the Transaction Documents or the consummation of the transactions contemplated hereby and thereby, which consent or approval has not heretofore been obtained or will be obtained by Closing.  To the knowledge of Purchaser, no third party is in default under any agreement, contract or other instrument or document to which Purchaser is a party.  To the knowledge of Purchaser, Purchaser is not a party to or bound by any order, judgment, decree or award of any Governmental Body.

6.9     No action, proceeding or governmental inquiry or investigation is pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its officers, directors or employees (in their capacity as such or as shareholders, if applicable), or against any of Purchaser's properties, including, without limitation, assets, licenses and rights transferred to Purchaser under any written agreement or other binding undertaking, or with regard to Purchaser's business, before any court, arbitration board or tribunal or administrative or other governmental agency, nor does Purchaser believe that there is any basis for the foregoing.

## 7.     Survival; Indemnification; Limitation of Liability; No Consequential Damages

7.1     The representations and warranties of each Party hereunder shall survive the Closing and remain in effect for a period of one (1) year thereafter.

7.2     Indemnification.  The Seller, on the one side, and Purchaser on the other side (as applicable, the **"Indemnifying Party"**) agree to indemnify and hold harmless the Parties of the other side and their respective Affiliates (as applicable, the **"Indemnified Parties"**), against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon (a) any breach of any of such Party's representations or warranties herein, misrepresentation or warranty or breach or failure by the Indemnifying Party to comply with any covenants or

agreement made by it herein, in the other Transaction Documents or in any other document furnished by it to any of the foregoing in connection with this transaction and (b) any action for securities law violations instituted by an Indemnifying Party which is finally resolved by judgment against such Indemnifying Party.

7.3    <u>Mechanics of Indemnification</u>.  Whenever any claim arises for indemnification under this Agreement or an event which may result in a claim for such indemnification has occurred, the Indemnified Party(ies) will promptly notify the Indemnifying Party of the claim and, when known, the facts constituting the basis for such claim.  The Indemnifying Party shall have the obligation to dispute and defend all such Third Party claims and thereafter so defend and pay any adverse final judgment or award or settlement amount in regard thereto.  Such defense shall be controlled by the Indemnifying Party, and the cost of such defense shall be borne by the Indemnifying Party, provided that the Indemnified Parties shall have the right to participate in such defense at their own expense, unless the Indemnified Parties require their own attorney due to a conflict of interest, in which case, the expense of a single law firm acceptable to such Indemnified Party will be borne by the Indemnifying Party.  The Indemnified Parties shall cooperate in all reasonable respects in the investigation, trial and defense of any such claim at the cost of the Indemnifying Party. If the Indemnifying Party fails to take action within thirty (30) days of notice, then the Indemnified Parties shall have the right to pay, compromise or defend any third party claim, such costs to be borne by the Indemnifying Party. The Indemnified Parties shall also have the right and upon delivery of ten (10) days advance written notice to such effect to the Indemnifying Party, exercisable in good faith, to take such action as may be reasonably necessary to avoid a default prior to the assumption of the defense of the Third Party claim by the Indemnifying Party, and any reasonable expenses incurred by the Indemnified Parties so acting shall be paid by the Indemnifying Party.  The Indemnifying Party will not settle or compromise any Third Party claim without the prior written consent of the Indemnified Parties, not to be unreasonably withheld.

7.4    <u>Purchaser Indemnification</u>.  Purchaser and ChanBond shall indemnify and hold the Seller harmless with respect to any loss, expense, cost, damage and settlement (collectively, **"Indemnified Expenses"**) caused to Seller as a result of Purchaser's or ChanBond's or its Affiliates' actions or omissions with respect to the Patents following the Closing Date, provided Seller is not determined to responsible for such actions as a result of their fraud or intentional misconduct.  In particular, in the event that the enforcement or other activities with the Patents results in litigation or other dispute resolution processes with one or more Third Parties, with Seller being required to be involved or liable for the expenses arising through actions of ChanBond (*e.g.*, being added as a party to the process, even if such joinder is improper, or being subject to Third Party discovery requests or otherwise having any exposure for any claims arising through activities of ChanBond), Purchaser and ChanBond shall, at Seller's request, indemnify Seller all of Seller's Indemnified Expenses arising from that involvement.

7.5    <u>Limitation of Liability</u>.    SELLER'S TOTAL LIABILITY UNDER THE TRANSACTION DOCUMENTS WILL NOT EXCEED THE CASH CLOSING CONSIDERATION ACTUALLY RECEIVED BY SELLER HEREUNDER. THE PARTIES ACKNOWLEDGE THAT THIS LIMITATION ON POTENTIAL LIABILITIES WAS AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THE TRANSACTION DOCUMENTS.

7.6     Limitation on Consequential Damages.  NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS EMPLOYEES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**8.    Miscellaneous**

8.1     Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of the Transaction Documents and the intentions of the Parties as reflected thereby.

8.2     Governing Law; Arbitration; Prevailing Party.  This Agreement and all claims or causes of action that may be based upon, arise out of or relate to this Agreement or the Collateral Agreements will be construed in accordance with and governed by the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State without regard to conflicts of laws principles thereof.  Any dispute arising under or in connection with any matter of any nature (whether sounding in contract or tort) relating to or arising out of this Agreement, shall be resolved exclusively by arbitration.  The arbitration shall be in conformity with and subject to the applicable rules and procedures of the American Arbitration Association. The arbitration shall be conducted before a panel of three (3) arbitrators, with one arbitrator to be selected by each of Seller and Buyer and the third arbitrator to be selected by the arbitrators selected by the Parties.  The Parties agree to be (a) subject to the exclusive jurisdiction and venue of the arbitration in the Eastern District of Texas (b) bound by the decision of the arbitrator as the final decision with respect to the dispute, and (c) subject to the jurisdiction of both of the federal courts of the United States of America or the courts sitting in the Eastern District in the State of Texas for the purpose of confirmation and enforcement of any award.  The prevailing party in any arbitration shall be entitled to recover its costs and expenses (including attorney's fees and expenses) from the non-prevailing party.

8.3     Limitations on Assignment.  Except as expressly permitted in this Section, none of Purchaser or ChanBond may grant or assign any rights or delegate any duties under this Agreement to any Third Party (including by way of a "change in control") or may sell, transfer, or spin-off any of the interests in ChanBond or any of its material assets without the prior written consent of Seller.  Notwithstanding the foregoing, Purchaser shall be permitted to transfer or assign) its rights, interests and obligations under this Agreement, as applicable, without Seller's prior written consent as part of a sale of all or substantially all of its business, equity to, or a change in control transaction with a Third Party acquirer (an "**M&A Transaction**", and an "**Acquirer**," respectively); provided that (a) such transfer or assignment is subject to all of the terms and conditions of this Agreement; and (ii) such Acquirer executes a written undertaking towards Seller agreeing to be bound by all of the terms and conditions of this Agreement with respect to the rights being transferred or assigned.  Except as otherwise expressly limited herein,

11

the provisions hereof shall inure to the benefit of, and be binding upon, the successors, permitted assigns, heirs, executors, and administrators of the Parties hereto.

8.4   This Agreement and the Schedules hereto constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.  Any term of this Agreement may be amended only with the written consent of all Parties thereto.  The observance of any term hereof may be waived (either prospectively or retroactively and either generally or in a particular instance) only with the written consent of the party against which such waiver is sought.

8.5   All notices and other communications required or permitted hereunder to be given to a Party to this Agreement shall be in writing and shall be faxed, emailed or mailed by registered or certified mail, postage prepaid, or prepaid air courier, or otherwise delivered by hand or by messenger, addressed to such Party's address as set forth above; or at such other address as the Party shall have furnished to each other Party in writing in accordance with this provision.  Any notice sent in accordance with this Section shall be effective (i) if mailed, seven (7) business days after mailing, (ii) if by air courier two (2) business days after delivery to the courier service, (iii) if sent by messenger, upon delivery, and (iv) if sent via facsimile or email, upon transmission and electronic confirmation of receipt or (if transmitted and received on a non-business day) on the first business day following transmission and electronic confirmation of receipt (provided, however, that any notice of change of address shall only be valid upon receipt).

8.6   No delay or omission to exercise any right, power, or remedy accruing to any Party upon any breach or default under this Agreement, shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any of the Parties, shall be cumulative and not alternative.

*[Signature Page Follows]*

12

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                                    **DEIRDRE LEANE**

                                           By: _Deirdre Leane_
                                           Name: _DEIRDRE   LEANE_
                                           Date: _29 October 2015_


PURCHASER:                                 **UNIFIEDONLINE, INC.**

                                           By: _____
                                           Name: _Rob Howe_
                                           Title: _CEO_
                                           Date: _29 October, 2015_


CHANBOND:                                  **CHANBOND, LLC**

                                           By: _Deirdre Leane_
                                           Name: _DEIRDRE  LEANE_
                                           Title: _MANAGER_
                                           Date: _29 October 2015_

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                              **DEIRDRE LEANE**

By: _Deirdre Leane_
Name: _DEIRDRE LEANE_
Date: _22 October 2015_


PURCHASER:                           **UNIFIEDONLINE, INC.**

By: _____
Name: _Rob Howe_
Title: _CEO_
Date: _29 October, 2015_


CHANBOND:                            **CHANBOND, LLC**

By: _Deirdre Leane_
Name: _DEIRDRE LEANE_
Title: _MANAGER_
Date: _22 October 2015_

13

## SCHEDULE 1.3

### Contracts

1. ChanBond, LLC – CBV, Inc. Patent Purchase Agreement dated April 9, 2015
2. ChanBond, LLC – Bentham IMF Litigation Funding Agreement dated September 9, 2015
3. ChanBond, LLC - IPNAV, LLC Advisory Services Agreement dated April 9, 2015
4. ChanBond, LLC - Mishcon de Reya Retention Agreement dated April 20, 2015
5. ChanBond, LLC - Bayard Law Engagement Agreement dated June 8, 2015
6. ChanBond, LLC - Ascenda Law Group Engagement Agreement dated July 14, 2015

## SCHEDULE 2.2.1

### Interest Transfer Deed

**FOR VALUE RECEIVED**, the undersigned, Deirdre Leane ("**Transferor**") hereby assigns, transfers and conveys all of its membership interests in ChanBond, LLC, a Delaware limited liability company (the "**Interests**") to UnifiedOnline, Inc., a Delaware corporation ("**Transferee**") and Transferee hereby accepts the above mentioned Interests.

In witness whereof, we affix our signatures hereto this 27th day of October, 2015.

Transferor:

**Deirdre Leane**

27. October 2015
Date

Transferee:

**UnifiedOnline, Inc.**

10-27-2015
Date

Witness:

Name: Joseph Ghally

10/27/2015
Date

Witness:

Name: B.J. Rodriguez

10-27-2015
Date

**SCHEDULE 2.2.3**

**UnifiedOnline, Inc.'s Board of Directors Resolutions**

STATEMENT OF UNANIMOUS
CONSENT TO ACTION TAKEN IN
LIEU OF A
SPECIAL MEETING OF THE BOARD OF
DIRECTORS OF
UNIFIEDONLINE, INC.

In lieu of a special meeting of the board of directors (the "Board") of UnifiedOnline, Inc., a Delaware corporation (the "Corporation"), and in accordance with the Bylaws of the Corporation and §141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the members of the Board, do hereby consent to the adoption of, and do hereby adopt, the following resolutions and declare them to be in full force and effect as if they had been duly adopted at a meeting of the Board, duly called, noticed and held:

**WHEREAS**, the Board deems it to be in the best interests of the Corporation to enter into a Purchase Agreement dated October 26, 2015 (the "Agreement"), in connection with the acquisition of ChanBond, LLC ("ChanBond"), a Delaware limited liability company, the owner of that certain portfolio of Intellectual Property, known as the "ChanBond" patent portfolio, more particularly described as follows:

> The Corporation and CHANBOND agree to an acquisition by the Corporation of 100% of the membership interests of CHANBOND for consideration generally defined as: 44,700,000 shares of the common stock of the Corporation , plus a $5MM 5-Year No-Interest Promissory Note, with a Maturity Date of October 27, 2020..

**NOW, THEREFORE BE IT RESOLVED,** that the Corporation is hereby authorized to enter into the Agreement and the Note.

**FURTHER RESOLVED,** that any executive officer of the Corporation be, and hereby is authorized, empowered and directed, from time to time, to take such additional action and to execute, certify and deliver to the transfer agent of the Corporation, as any appropriate or proper to implement the provisions of the foregoing resolutions; and be it

**FURTHER RESOLVED,** that this Consent may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument, and that counterpart signature pages transmitted by facsimile transmission, by electronic mail   in portable document format (.pdf) or by any other electronic means intended to preserve the original   graphic and pictorial appearance of a document, shall have the same effect as physical delivery of the   paper document bearing an original signature.

**IN WITNESS WHEREOF,** the undersigned members of the Board have executed this Consent as of October 26, 2015.

_____
Robert M. Howe, III

## SCHEDULE 2.2.7

### Common Interest Agreement

THIS COMMON INTEREST AGREEMENT ("**Agreement**") is entered into as of April 9, 2015, by and among **ChanBond, LLC** (the "**Company**") having its principal offices at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204; **UnifiedOnline, Inc.** ("**UnifiedOnline**"), having its principal offices at 4126 Leonard Drive, Fairfax, Virginia 22030; and **Deirdre Leane ("Leane")**, located at 2525 Carlisle Street, Suite 439, Dallas, Texas 75201.

1. Background.

1.1. Company, Unified and Leane are sometimes referred to herein as a "**party**" or the "**parties**" and are presently negotiating the closing of an agreement under which UnifiedOnline will purchase Company from Leane and continue to enforce and license patents and related rights owned by the Company "**IP Rights**" and the "**Patent Matters**" respectively).

1.2. The parties have a common legal interest in upholding the validity and enforceability of the IP Rights, for purposes of enforcement. The parties anticipate they will enforce inherent rights of the IP Rights against third parties through litigation. The parties have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest doctrine. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of privileged information and attorney work product developed by the parties and their respective counsel.

2. Common Interest.

2.1. The parties have a common, joint and mutual legal interest in the monetization of valid and enforceable patents. In furtherance of that common interest, the parties will cooperate with each other, to the extent permitted by law, to share information protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or immunity with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of this Agreement.

2.2. In order to further their common interest, the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, evidence of use materials, claims charts, prosecution history files and other information (hereinafter "**Common Interest Materials**"). The sole purpose of the exchange of the Common Interest Materials is to support the parties' common interest with respect to the enforcement for the Patent Matters. Any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection. Nothing in this Agreement requires a party to share information with the other party.

3. Nondisclosure.

3.1. The parties and their counsel shall use the Common Interest Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Common Interest Material. No party nor

their respective counsel shall produce privileged documents or information unless or until directed to do so by a final order of a court of competent jurisdiction, or upon the prior written consent of the other party. No privilege or objection shall be waived by a party hereunder without the prior written consent of the other party.

3.2. Except as herein provided, in the event that either party or its counsel is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar process) to disclose any Common Interest Materials, the party or its counsel shall assert all applicable privileges, including, without limitation, the common interest doctrine, and shall immediately inform the other party and the other party's counsel of the request or requirement to disclose.

4. Relationship; Additions; Termination.

4.1. This Agreement does not create any agency or similar relationship among the parties. Through the term of the agreement between the parties, or any other agreement requiring confidentiality, (whichever term is longer), no party nor their respective counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2. Nothing in this Agreement affects the separate and independent representation of each party by its respective counsel or creates an attorney-client relationship between the counsel for a party and the other party to this Agreement.

4.3. This Agreement shall continue until terminated upon the written request of either party. Upon termination, each party and their respective counsel shall return any Common Interest Material furnished by the other party. Notwithstanding termination, this Agreement shall continue to protect all Common Interest Materials disclosed prior to termination. Sections 3 and 5 shall survive termination of this Agreement.

5. General Terms.

5.1. This Agreement is governed by the laws of the State of Delaware, without regard to its choice of law principles to the contrary. In the event any provision of the Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect. Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2. The parties agree that a breach of this Agreement would result in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party shall be entitled to equitable relief, including injunctive relief, as a non-exclusive remedy for any

such breach.

5.3.  Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service as set forth below, and shall be deemed to have been given on the day received:

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, TX 75204

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

Deirdre Leane
2525 Carlisle Street
Suite 439
Dallas, TX 75201

5.4.  This Agreement is effective and binding upon each party as of the date it is signed by or on behalf of a party and may be amended only by a writing signed by or on behalf of each party. This Agreement may be executed in counterparts. Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

***The remainder of this page has been intentionally left blank.**

IN WITNESS WHEREOF, CHANBOND, LLC, UNIFIEDONLINE, INC. and DEIRDRE LEANE have executed this Common Interest Agreement by their duly authorized representatives.

CHANBOND, LLC

By: _____
        (Signature)

Name: DEIRDRE LEANE

Title: MANAGER

UNIFIEDONLINE, INC.

By: _____
        (Signature)

Name: Rob Howe

Title: CEO

DEIRDRE LEANE

By: _____
        (Signature)

Name: DEIRDRE LEANE

Title: DR.

## SCHEDULE 2.2.8

### Promissory Note

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.

## UNIFIEDONLINE, INC.

## PROMISSORY NOTE

Principal Amount: $5,000,000                    Original Issuance Date: October 27, 2015

FOR VALUE RECEIVED UnifiedOnline, Inc., a Delaware corporation (the "Company"), promises to pay to Deirdre Leane, an individual, of 2525 Carlisle St., Suite 439, Dallas, TX 75201 (the "Holder") an aggregate principal amount of Five Million Dollars ($5,000,000.00) (representing the Cash Payment as provided for and defined in the Interest Sale Agreement dated as of the date hereof (the "Interest Sale Agreement"), to which the Company and the Holder are parties) payable on or prior to October 27, 2020 (the "Maturity Date"), provided, however, that if this Note is not paid in full by the Maturity Date, the aggregate principal amount of this Note shall be increased by Twenty Five Thousand Dollars ($25,000.00) for each month such payment is delayed (or *pro rata* portion thereof) until paid in full (the "New Principal Balance").

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    Event of Default.

(a)    For purposes of this Note, an "Event of Default" means:

(i)    the Company shall default in the payment of principal on this Note on or prior to the applicable Maturity Date; or

(ii)    the Company shall be in breach of any obligation, covenant or representation made in this Note or the Interest Sale Agreement; or

(iii)    the Company shall (a) become insolvent; (b) dissolve or terminate its existence; (c) admit in writing its inability to pay its debts generally as they mature; (d) make an assignment for the benefit of creditors or commence proceedings for its

dissolution; or (e) apply for or consent to the appointment of a trustee, liquidator, receiver or similar official for it or for a substantial part of its property or business; or

(iv) a trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within thirty (30) days after such appointment; or

(v) any governmental agency or any court of competent jurisdiction at the insistence of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company and shall not be dismissed within thirty (30) days thereafter; or

(vi) bankruptcy, reorganization, insolvency or liquidation proceedings or other proceedings, or relief under any bankruptcy law or any law for the relief of debt shall be instituted by or against the Company and, if instituted against the Company shall not be dismissed within thirty (30) days after such institution, or the Company shall by any action or answer approve of, consent to, or acquiesce in any such proceedings or admit to any material allegations of, or default in answering a petition filed in any such proceeding.

Upon the occurrence of an Event of Default, the entire unpaid and outstanding indebtedness due under this Note shall be immediately due and payable without notice and Holder shall be entitled to such additional rights and remedies as are provided by law.

Until the Note is paid in full, the Company shall be obligated to make payments on this Note to the Holder from 100% of any Net Revenues (as defined below) within thirty (30) calendar days after each calendar month commencing with the calendar month ending October 31, 2015.

"*Net Revenues*" shall mean the total aggregate Gross Recoveries less the total aggregate amount of costs and expenses - incurred by or on behalf of the Company in connection with the monetization, enforcement and/or sale of the Assigned Patent Rights of the ChanBond, LLC patent portfolio (described in Exhibit A) - which are exclusively limited to: (a) the reasonable fees and expenses of litigation counsel; (b) the reasonable fees and expenses of licensing counsel (c) the reasonable  fees and expenses of any re-examination or other patent prosecution counsel; (d) reasonable expert fees, court costs, deposition costs and other reasonable costs and expenses related to the maintenance, prosecution, enforcement, and licensing of the Patents; and (e) the reasonable fees and expenses of any other advisors or agents which the Parties mutually agree are required and the repayment of litigation financing.

Notwithstanding anything to the contrary contained in this Note, in no event shall the total of all charges payable under this Note, which are or could be held to be in the nature of interest exceed the maximum rate permitted to be charged under applicable law.  Should the Holder receive any payment which is or would be in excess of that permitted to be charged under any such applicable law, such payment shall have been, and shall be deemed to have been, made in error and shall automatically be applied to reduce the principal balance outstanding on this Note.

(b)     As soon as possible and in any event within two days after the Company becomes aware that an Event of Default has occurred, the Company shall notify the Holder in writing of the nature, extent and time of and the facts surrounding such Event of Default, and the action, if any, that the Company proposes to take with respect to such Event of Default.

2.     Prepayment. The Company may prepay this Note at any time, in whole or in part, without penalty or premium.

3.     Miscellaneous.

(a)     Loss, Theft, Destruction or Mutilation of Note.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company and, in the case of mutilation, on surrender and cancellation of this Note (or what remains thereof), the Company shall execute and deliver, in lieu of this Note, a new note executed in the same manner as this Note, in the same principal amount as the unpaid principal amount of this Note and dated the date of this Note.

(b)     Payment.  All payments under this Note shall be made in lawful tender of the United States no later than 5:30 pm, Eastern Standard Time, on the date on which such payment is due, by wire transfer of immediately available funds to the account identified by the Holder. Time is of the essence as to all dates set forth herein, provided, however, that whenever any payment to be made under this Note shall be stated to be due on a Saturday, Sunday or a public holiday, or the equivalent for banks generally under the laws of the State of New York (any other day being a "Business Day"), such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest.

(c)     Waivers.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

(d)     Waiver and Amendment.  Any provision of this Note may be amended, waived or modified only by an instrument in writing signed by the party against which enforcement of the same is sought.

(e)     Notices.  Any notice or other communication required or permitted to be given hereunder shall be in writing sent by mail, facsimile with printed confirmation, nationally recognized overnight carrier or personal delivery and shall be effective upon actual receipt of such notice, to the following addresses until notice is received that any such address or contact information has been changed:

To the Company:

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

3

To the Holder:

Deirdre Leane
2525 Carlisle St.
Suite# 439
Dallas, TX 75201

      (f)    Expenses; Attorneys' Fees. If action is instituted to enforce or collect this Note, the Company promises to pay or reimburse all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by the Holder in connection with such action.

      (g)    Successors and Assigns. This Note may not be assigned or transferred by the Company without the express written consent of the Holder. This Note may only be assigned or transferred by Holder subject to applicable securities laws. Subject to the preceding sentence, the rights and obligations of the Company and the Holder of this Note shall be binding upon and benefit the successors, permitted assigns, heirs, administrators and permitted transferees of the parties.

      (h)    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising on the part of the Holder, any right, option, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, option, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, option, remedy, power or privilege. The rights, options, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, options, remedies, powers and privileges provided by law.

      (i)    Governing Law; Jurisdiction. THE PARTIES HEREBY AGREE THAT THIS NOTE IS MADE AND ENTERED INTO IN THE STATE OF DELAWARE AND FURTHER AGREE THAT ALL ACTS REQUIRED BY THIS NOTE AND ALL PERFORMANCE HEREUNDER ARE INTENDED TO OCCUR IN THE STATE OF DELAAWARE.  THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAWS.  EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION OF THE STATE OR FEDERAL COURTS OF THE STATE OF DELAWARE OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.  EACH PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, (A) ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT; AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  FINAL JUDGMENT IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON EACH PARTY DULY SERVED WITH PROCESS THEREIN AND MAY BE ENFORCED IN THE COURTS OF THE JURISDICTION OF WHICH EITHER PARTY OR ANY OF THEIR PROPERTY IS

4

SUBJECT, BY A SUIT UPON SUCH JUDGMENT.  THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY.

IN WITNESS WHEREOF, the Company has caused this Note to be executed as of the date first above written by its duly authorized officer.

**UNIFIEDONLINE, INC.**

By: _____
Name: Robert M. Howe III
Title: CEO

5

**EXHIBIT A**

| | |
|---|---|
| US Patent No. 7346918 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 7941822 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8341679 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8984565 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 9015774 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 13/799,749 October 10, 2013* | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 14/167,289 Filed January 29, 2014 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application - 10/346,571 (Abandoned – CIP of 09/824,531) | |
| US Application - 09/824,531 (Abandoned – CIP of 7346918) | |
| PCT/US2001/049629 (Expired – no national phase) | |
| PCT/US2002/009863 (Expired – no national phase) | |

*Publication Date

6

## SCHEDULE 3.3

## Company Agreements

## SCHEDULE 5.1(b)

### Pending Litigation

1. ChanBond, LLC v. WaveDivision Holdings, LLC, Civil Case No. 1:15-cv-00853
2. ChanBond, LLC v. Comcast Corporation et al, Civil Case No. 1:15-cv-00848
3. ChanBond, LLC v. Charter Communications, Inc., Civil Case No. 1:15-cv-00847
4. ChanBond, LLC v. WideOpen West Finance, LLC, Civil Case No. 1:15-cv-00854
5. ChanBond, LLC v. Cequel Communications, LLC, Civil Case No. 1:15-cv-00846
6. ChanBond v. RCN Telecom Services, LLC, Civil Case No. 1:15-cv-00851
7. ChanBond v. Cox Communications, Inc. et al, Civil Case No. 1:15-cv-00849
8. ChanBond v. Time Warner Cable Inc. et al, Civil Case No. 1:15-cv-00852
9. ChanBond v. Mediacom Communications Corporation, Civil Case No. 1:15-cv-00850
10. ChanBond v. Bright House Networks, LLC, Civil Case No. 1:15-cv-00843
11. ChanBond v. Cablevision Systems Corporation et al, Civil Case No. 1:15-cv-00845
12. ChanBond v. Cable One, Inc., Civil Case No. 1:15-cv-00844
13. ChanBond v. Atlantic Broadband Group, LLC, Civil Case No. 1:15-cv-00842

**<u>SCHEDULE 6.3</u>**

**<u>Capitalization Table</u>**

Exhibit A

## UnifiedOnline, Inc. - 6,000,000,000 authorized shares
## Cap Table (10.26.15)

| Common Stock | Current | Own % | | Series | $0.00750 | $ 12,000 | $ 60,000 | Total | Expiration Date |
|---|---|---|---|---|---|---|---|---|---|
| Restricted | 904,088,389 | 99.0% | Series | N | 205,805,872 | | | 205,805,872 | 09/30/16 |
| Float | 8,809,148 | 1.0% | | O | | 68,452 | | 68,452 | 11/23/16 |
| | Common shares O/S | 912,897,537 | | Q | | 7,770 | | 7,770 | 02/08/17 |
| | | | | R | | | 37,004 | 37,004 | 06/30/17 |
| | | | | Total | 205,805,872 | 76,222 | 37,004 | 205,919,098 | |

| $ value if converted | Warrants Exercise Price | Shares |
|---|---|---|
| $ 1,543,544 | $0.00750 | 205,805,872 |
| $ 914,664 | $12,000 | 76,222 |
| $ 2,220,240 | $60,000 | 37,004 |
| **$ 4,678,448** | **Total Warrants** | **205,919,098** |

| Vested | Stock Options O/S | |
|---|---|---|
| 0 | Total O/S Options | 7,232 |
| | 7,232 | |

Vested 7,232

Preferred Stock - Series B

Preferred Stock - Series AA (0 shares)   1,567

**Fully Diluted Shares before convertible debt**   1,118,825,434

| Convertible debt | At prevailing share price | Conversion Price |
|---|---|---|
| Tangiers | 68,750 | 13,750,000 | 22,916,667 |
| JMJ | 30,500 | 6,100,000 | 10,166,667 |
| KBM | 53,232 | 10,646,394 | 18,234,290 |
| Vis Vires | 34,100 | 6,820,000 | 11,680,749 |
| $ 186,582 | 37,316,394 | 62,998,372 |

**Fully Diluted Shares after convertible debt**   1,181,823,806

## SCHEDULE 6.8

### Judgments

1. Two judgments held by FedEx being pursued in the General District Court of Fairfax County, Virginia; and the Circuit Court of Fairfax County, Virginia, respectively:

   *FedEx Customer Information Services, Inc. vs. Iceweb Storage Corporation fka Inline Corporation,* In the Circuit Court of Fairfax County, Virginia, Case No. CL2010-7512 – Judgment awarded $16,321.66 plus interest and costs.

   *FedEx Customer Information Services, Inc. vs. Iceweb, Inc.,* In the General District Court of Fairfax County, Virginia, Case No. GV10-023543-00 – Judgment awarded $12,900.95 plus $58 in costs.

2. Judgment held by i-Cubed:

   *i-Cubed information, integration and imagins, LLC aka i-Cubed, information, integration and imagins, LLC vs. Iceweb Storage Corporation,* in the General District Court of Fairfax County, Case No. GV12-019582-00 – Judgment awarded of $12,920.60, plus interest and costs.

3. Judgment held by Pellegrino and Associates:

   *Pellegrino and Associates vs. Iceweb, Inc.,* in the Marion County Superior Court No. 12, Marion County, Indiana, Case No. 49D12-1408-CC-2714 – Judgment awarded of $20,158.73 plus interest and costs.

**PLAINTIFF'S EXHIBIT 2**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
ELLEN SONDEE  (816) 979-1892

**B. E-MAIL CONTACT AT FILER (optional)**
ESONDEE@ICEWEB.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

UNIFIEDONLINE, INC.
324 E 11TH ST., 24TH FLOOR
24TH FLOOR
KANSAS CITY, MO 64106
US

Delaware Department of State
U.C.C. Filing Section
Filed: 04:29 PM 11/10/2015
U.C.C. Initial Filing No: 2015 5274179

Service Request No:  20150864084

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| **1a. ORGANIZATION'S NAME**  UNIFIEDONLINE, INC. | | | |
| **1b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |
| **1c. MAILING ADDRESS**  324 E 11TH ST., 24TH FLOOR | **CITY**  KANSAS CITY | **STATE** MO **POSTAL CODE** 64106 | **COUNTRY** US |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | |
| **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** **POSTAL CODE** | **COUNTRY** |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| **3a. ORGANIZATION'S NAME** | | | |
| **3b. INDIVIDUAL'S SURNAME**  LEANE | **FIRST PERSONAL NAME**  DEIRDRE | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |
| **3c. MAILING ADDRESS**  2633 MCKINNEY AVENUE SUITE 130-501 | **CITY**  DALLAS | **STATE** TX **POSTAL CODE** 75204 | **COUNTRY** US |

**4. COLLATERAL:** This financing statement covers the following collateral:
US PATENT NO. 7346918  US PATENT NO. 7941822  US PATENT NO. 8341679  US PATENT NO.
8984565  US PATENT NO. 9015774  US APPLICATION NO. 13/799,749  US APPLICATION NO.
14/167,289  US APPLICATION - 10/346,571    US APPLICATION - 09/824,531
PCT/US2001/049629    PCT/US2002/009863

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☑ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# EXHIBIT D

| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|
| GUILFORD COUNTY | SUPERIOR COURT DIVISION |
| | 21 CVS 5405 |

DR. DEIRDRE LEANE, derivatively on
behalf of UNIFIED ONLINE, INC.,

             Plaintiffs,

    v.

WILLIAM RALPH CARTER, JR.,

             Defendant.

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS**

       **NOW COMES** Defendant William Ralph Carter, Jr. (hereinafter referred to as "Carter" or "Defendant"), by and through his undersigned counsel, and respectfully submits the following Brief in support of his Motion to Dismiss.

I.     **FACTS**

       UnifiedOnline Inc. ("Unified") is a foreign corporation, incorporated in the state of Delaware. (Compl. ¶ 1).  Plaintiff, Dr. Deirdre Leane, (hereinafter referred to as "Leane" or "Plaintiff"), was a previous owner of ChanBond, LLC, (hereinafter "ChanBond") a Delaware limited liability company, which owned a patent portfolio related to "channel bonding" technology, a method of increasing the throughput of internet-connected devices, which is widely used by U.S. cable companies.  (Compl. ¶¶15, 16, 17).   On 21 September 2015, ChanBond filed 13 patent infringement lawsuits against various cable companies and related entities in the United States District Court for the District of Delaware (hereinafter "the Delaware litigation")[1].  (Compl. ¶18). On or about 27 October 2015, just over a month after the Delaware litigation was commenced, Plaintiff sold her entire interest in ChanBond to Unified pursuant to an Interest Sales Agreement ("ISA") whereby Unified acquired all of Plaintiff's interest in ChanBond in exchange for providing

---

[1] The Delaware litigation was settled during trial pursuant to confidential terms in May 2021.

Plaintiff a $5,000,000 promissory note and a minority ownership interest in Unified.  (Compl ¶20; Plaintiff's Exhibit 1 Sections 2, 3.1, 3.2, 3.3).  Pursuant to the ISA, ChanBond became a wholly owned subsidiary of Unified and Carter was appointed as ChanBond's sole manager with exclusive authority over the business of ChanBond.  (Compl. ¶32).

Plaintiff alleges that Carter is currently the controlling shareholder of Unified, owning roughly 90% of Unified's issued and outstanding shares of stock, and that Carter has purported to act as Unified's CEO following the death of former CEO Rob Howe on 24 May, 2018. (Compl. ¶¶ 26, 29).  As a result of the ISA transaction, Plaintiff became a minority shareholder of Unified and maintained her shareholder status through the institution of this action. (Compl. ¶¶ 9, 22).  Plaintiff claims that Carter has exploited his purported role as CEO of Unified to systematically pillage ChanBond, Unified's sole asset, and to squander Unified's interest in the ChanBond Patents. (Compl. ¶¶ 34, 41). Plaintiff also alleges that Carter has used patent litigation financing disbursements to finance his own personal expenses and other non-Unified business activities. (Compl. ¶ 44).

Importantly, Plaintiff references in her Complaint that she has filed a separate lawsuit against Unified and ChanBond (styled "Deirdre Leane and IPNav, LLC[2] v. UnifiedOnline, Inc. and ChanBond, LLC;" Case No. 01-20-0015-0793) pending before the American Arbitration Association in Texas (hereinafter "the Texas Arbitration"). (Compl. ¶ 13).  Notwithstanding that Plaintiff is squarely adverse to Unified and Chanbond in the Texas Arbitration[3], Plaintiff somehow claims to fairly and adequately represent the interests of Unified in enforcing its alleged rights through this action. (Compl. ¶ 9).

---

[2] IPNav, LLC is a patent-monetization firm of which Ms. Leane was the sole member.  (Exhibit A, Arbitration Demand ¶22).
[3] The Texas Arbitration proceeding remains pending at the time this Brief is submitted.

In connection with the Texas Arbitration, Plaintiff filed a Petition in the District Court of Dallas County, Texas, against Unified and ChanBond (the "Texas Petition"), which was verified under oath and signed by Ms. Leane, seeking an application for Temporary Restraining Order and Temporary Injunctive Relief in Aid of Arbitration, Petit. Sect. IV, a copy of which is attached hereto as Exhibit A and incorporated herein by reference.  In her Petition, Plaintiff also seeks to recover monetary relief from Unified and ChanBond in excess of $1,000,000.00 including damages, penalties, costs, expenses, pre-judgment interest, and attorneys' fees, and requests that the Court enter an ex-parte temporary restraining order, and injunctive relief, and then abate the lawsuit pending the outcome of Arbitration. (Petit. Sect. IV, ¶ 2 and Sect. X).

In Plaintiff's Arbitration Demand (the "Arbitration Demand"), which is attached as an Exhibit to the Texas Petition and referenced in paragraph 13 of her Complaint in this action, Plaintiff claims that "Unified and ChanBond have egregiously breached the anti-assignment provision of the contract, accelerating the payment date on the Note, rendering Unified's ability to pay the Note questionable at best, and utterly denuding Ms. Leane's interest in Unified of any value." (Exhibit A, Section IV-C, ¶ 26).  In the Arbitration Demand, Plaintiff, acting in her individual capacity, asserted five causes of action against Unified and ChanBond.  (Exhibit A, Section V). The first claim is for breach of contract based on a theory that Unified and ChanBond have breached the ISA, due to their actions with regard to Section 8.3 and their failure to pay the Note.  (Exhibit A, Section V, ¶ 90).  Plaintiff's second cause of action claims that Unified and ChanBond have breach the ISA and a separate Advisory Services Agreement, and requests a Declaratory Judgment to determine the rights and obligations of the parties.  (Exhibit A, Section V, ¶ 97).  The third cause of action against Unified and Chanbond is for fraud, alleging that Unified and Chanbond "made material representations concerning the Termination Agreement and their intent to enter into a new

agreement with IPNav for consulting services pursuant to the Advisory Services Agreement." (Exhibit A, Section V, ¶ 100). Plaintiff's fourth cause of action in the Arbitration Demand alleges that ChanBond has neglected and refused to perform its obligations under the Restoration Agreement by refusing to execute a new agreement granting Plaintiff and IPNav a 22% interest in the gross settlement proceeds from the Delaware Litigation, and requests the Court grant relief to Plaintiff in the form of specific performance. (Exhibit A, Section V, ¶ 108). The fifth and final cause of action seeks specific performance and injunctive relief against ChanBond and Unified, claiming that Unified and ChanBond have repeatedly breached the anti-assignment provision, and have threatened, through counsel, to further breach the anti-assignment provision by settling the ChanBond litigations without first obtaining Plaintiff's consent to the terms of such settlement. (Exhibit A, Section V, ¶¶ 111, 112). In addition to the above causes of action, Plaintiff requested relief in the form of rescission of the ISA and Termination Agreement, an award of attorneys' fees and litigation costs to be taxed to Unified and ChanBond, pre-and post-judgment interest, and monetary damages, as well as actual, consequential, and nominal damages. (Exhibit A, Section VI, ¶¶ 1, 4, 5).

Plaintiff initially obtained an *ex parte* Temporary Restraining Order against Unified and ChanBond in the District Court of Dallas County, Texas. Shortly thereafter, Unified and ChanBond removed the case to the United States District Court for the North District of Texas (the "Texas Court"). After briefing and a hearing on Plaintiff's request for a Temporary Restraining Order and Injunctive Relief on the Texas Petition, the Texas Court denied Plaintiff's motion. In its Memorandum Opinion and Order, the Texas Court determined that Plaintiffs failed to demonstrate a substantial likelihood of success on the merits of their claims. The Texas Court opined that the intent of the ISA favored a narrower interpretation regarding Unified's ability to

transfer any interest in ChanBond, that Plaintiff's alleged veto power would "undercut" Unified's ownership of ChanBond, that the Court's narrower interpretation of the anti-assignment provision actually helps ensure payment on the note held by Plaintiff, and thus Unified and ChanBond have not breached the ISA. (Exhibit B Sect. 3, sub-sect. A, ¶6, 7, 8, 11). The Court also determined that Plaintiffs failed to demonstrate a substantial threat of irreparable harm, in light of the monetary damages being easily calculable and due to the speculative nature of Plaintiff's threatened harm. (Exhibit B Sect. 3, sub-sect. B, ¶¶ 3, 6).

Finally, Plaintiff concedes she made no demand upon Unified's board of directors prior to the filing of this action as required by Delaware law, nor did she wait the required 90 days from the date of demand before initiating this proceeding. (Compl. ¶¶11, 14). Plaintiff contends that demand upon Unified's board of directors would be "futile" under Delaware law, yet she fails to state with specificity the basis for that claim. (Compl. ¶ 12).

## II.   ARGUMENT

### A.  <u>Delaware Law Controls Plaintiff's Claims</u>.

Plaintiff's Complaint concerns the duties that directors and officers of a Delaware corporation owe to the corporation and its stockholders.  Under the internal affairs doctrine, the law of the state of incorporation – Delaware – controls such claims. *Bluebird Corp. v. Aubin*, 657 S.E.2d 55, 63 (N.C. Ct. App. 2008).  Furthermore, because this is a corporate derivative action, the North Carolina Business Corporations Act expressly provides that Delaware law governs the case.  N.C. Gen. Stat. Ann. § 55-7-47 (2009); *Egelhof v. Szulik*, 2006 NCBC 4 ¶ 41 (N.C. Super. Ct. Mar. 13, 2006) ("Because Red Hat is a Delaware corporation, this Court applies Delaware law in determining whether Plaintiff's failure to make demand should be excused.") (citations omitted); *In re Pozen S'holders Litig.*, 2005 NCBC 7 ¶ 82 (N.C. Super. Ct. Nov. 10, 2005)

(granting motion to dismiss for failure to make demand under Delaware law where company was incorporated in Delaware).

    **B.** <u>**Leane Cannot Assert Derivative Claims Because She Is Not An Adequate Representative Plaintiff**</u>**.**

  In order to assert derivative claims, a plaintiff must fairly and adequately represent the interests of those who might benefit from the suit. *Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983). Put simply, if a derivative plaintiff has conflicting interests which encumbers its ability to act in the interests of the other beneficiaries of the suit, the plaintiff will not be permitted to prosecute the suit. *Scopas Tech. Co. v. Lord*, 1984 WL 8266, at *2 (Del. Ch. 1984).

    Plaintiff has a conflicting interest which precludes her from serving as derivative plaintiff. Plaintiff is directly adverse to Unified and ChanBond in the Texas Arbitration, where she seeks to recover 22% of the gross settlement proceeds from the Delaware Litigation. If successful, such a recovery by Plaintiff in the Texas Arbitration would deprive Unified of millions of dollars it would have otherwise been lawfully entitled to receive. Indeed, Plaintiff's position in the Texas Arbitration makes her the antithesis of a derivative plaintiff acting in the interests of the other Unified shareholders in this case.

    In determining whether a derivative plaintiff is an adequate corporate representative, Courts consider several factors:

> Among the elements which the courts have evaluated in considering whether the derivative plaintiff meets Rule 23.1's representation requirements are: economic antagonisms between representative and class; the remedy sought by the plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness towards the defendants and,

> finally, the degree of support plaintiff was receiving from the
> shareholders he purported to represent.

*Youngman v. Tahmoush,* 457 A.2d 376, 379-80 (Del. Ch. 1983).  Fundamentally, a court should

not find a plaintiff adequate to assert a derivative claim if there is "a substantial likelihood that the

derivative action is not being used as a device for the benefit of all the stockholders." *Youngman*,

457 A.2d at 381.  Although a court will consider all of these factors, and may consider others, a

particularly strong showing under any single category may warrant disqualification. *Id.* at 380;

*Emerald Partners*, 564 A.2d at 673-74.

Here, at least two of the *Youngman* factors weigh heavily in favor of disqualifying plaintiff

as a corporate representative of Unified in this case: (1) "other litigation pending between the

plaintiff and defendants," and (2) "the relative magnitude of plaintiff's personal interests as

compared to his interests in the derivative action itself". *Youngman*, 457 A.2d at 379-80.

Plaintiff's inability to serve as derivative plaintiff is highlighted by the positions she takes

in the Texas Arbitration.  In *Scopas*, where a director's derivative counterclaim was dismissed in

part due to the possibility that said counterclaim was instituted only as "leverage" to further

individual claims in another action, Vice Chancellor Walsh noted that "[o]rdinarily, other

litigation, in and of itself, may warrant disqualification of a plaintiff from bringing a derivative

suit where it appears that the derivative plaintiff instituted the derivative suit only as 'leverage' to

further his individual claims." 1984 WL 8266 at *2.  The Texas Arbitration generally arises out of

(1) Plaintiff's sale of ChanBond and its patents to Unified pursuant to the ISA, (2) an Advisory

Services Agreement (hereinafter "ASA") between IPNav and ChanBond  under which Plaintiff

contends she is entitled to 22% of the gross settlement proceeds from the Delaware Litigation, (3)

a subsequent Termination Agreement entered by IPNav and ChanBond whereby the ASA was

terminated, and (4) an alleged agreement between Carter, Leane, and others, to reinstate the prior

ASA (Exhibit A, Arbitration Demand ¶¶ 22, 52, 53, 54, 55, 69, 71, 72). The Texas Arbitration involves direct claims by Plaintiff that Unified and Chanbond breached the ISA by assigning certain interests in the Delaware Litigation without plaintiff's consent. Plaintiff seeks to rescind the ISA with Unified Online, Inc. and ChanBond and restore Plaintiff's right to receive 22% of the gross proceeds of the Delaware Litigation. Simply put, the Texas Arbitration seeks to improve Plaintiff's financial interest in any settlement proceeds obtained through the Delaware Litigation to the detriment of the Unified shareholders. Indeed, Plaintiff stands to gain millions of dollars in her direct claims brought in the Texas Arbitration, yet she stands to gain very little in this derivative action as Plaintiff received only a small ownership interest in Unified through the ISA. *See Scopas*, 1984 WL 8266, at *3 (the fact that the value of plaintiff's individual claims substantially outweigh its derivative claims "creates a strong potential for the derivative suit to be used merely as leverage, and not pursued with the same vigor as [the plaintiff's] direct claims"); *Youngman*, 457 A.2d at 379-80 (magnitude of personal interest compared to interest in derivative action is a factor to consider when determining whether plaintiff is an adequate representative).

To confirm the magnitude of what is at stake in the Texas Arbitration, the Court can compare Plaintiff's Arbitration Demand and her allegations in this action. In the Arbitration Demand, Plaintiff alleges that there are only three (3) parties entitled to recover a portion of the *gross* proceeds from the Delaware Litigation: ChanBond's attorneys who had the case on a contingency fee, Bentham Capital LLC, the litigation funding group which provided financing for the Delaware litigation, and IPNav, LLC, Plaintiff's single-member patent-monetization advising company. (Compl. ¶¶36, 37, 38). Thereafter, the first $1,000,000.00 of "net" proceeds remaining would be paid to CBV (the Inventors of the technology behind the ChanBond patents) with the balance of any "net" proceeds remaining to be equally divided between CBV and Unified on a 50-

50 basis.  (Compl. ¶38).  Under Plaintiff's interpretation of these agreements, nothing would flow to Unified and its stockholders.  Even if funds would flow to Unified, Plaintiffs' relatively minor stake in Unified makes her an inadequate representative to bring derivative claims in this action.[4] The hypothetical "waterfalls" showing potential distributions of settlement proceeds from the Delaware Litigation, which Plaintiff has included in both her North Carolina and Texas pleadings, confirm that Plaintiff cannot serve as an adequate representative because she has simultaneously asserted direct personal claims that dwarf her economic stake in Unified and that are directly contrary to the best interests of  Unified and its stockholders.  (Compl. ¶¶ 49, 50, 51; *see also* Arbitration Demand ¶24, 29, 31).  In other words, if Leane is successful in the Texas Arbitration by enforcing her purported rights to recover 22% of the gross settlement proceeds, then the Unified shareholders will recover nothing.  It is impossible for Plaintiff to properly pursue the other Unified shareholders' rights while simultaneously attempting to dig into Unified's pocket via the Texas Arbitration – this conflict is precisely what the *Youngman* factors referenced above seek to prevent.

Plaintiff's conflicting interests in the Texas Arbitration and in this proceeding are akin to the old adage "the fox wants to guard the hen house."  Plaintiff cannot and does not fairly or adequately represent Unified's interests.  As such, Plaintiff's claims must be dismissed with prejudice.

## C.  Plaintiff's Failure to Make Demand On The Board Cannot Be Excused.

---

[4] Pursuant to the ISA, Plaintiff owns 44,700,000 shares in Unified, representing a roughly 4.5% minority interest in Unified (Exhibit A, Arbitration Demand ¶15). Therefore, range of what Plaintiff could conceivably recover as a shareholder under any of the waterfalls referenced in her pleadings would be 4.5% of $0 to 4.5% of 24% of the settlement proceeds from the Delaware Litigation (Compl. ¶¶ 49, 50, 51; *see also* Arbitration Demand ¶24, 29, 31).

In the alternative, Plaintiff's Complaint should be dismissed under Court of Chancery Rule 23.1 for failure to make a demand on the Board. Rule 23.1(a) requires, *inter alia*, that "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." (Del. R. Ch. Ct. 23.1)

A stockholder plaintiff can pursue claims belonging to the corporation if (1) the corporation's directors wrongfully refused a demand to authorize the corporation to bring the suit or (2) a demand would have been futile because the directors were incapable of impartially considering the demand. *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017); *United Food & Commercial Workers Union & Participating Food Ind. Emp'rs Tri-State Pension Fund v. Zuckerberg*, No. 404, 2020, A.3d, 2021 WL 4344361 (Del. Sept. 23, 2021) (*Zuckerberg*). Here, Plaintiff concedes she failed to make a pre-suit demand and contends that making a pre-suit demand would be futile. (Compl. ¶¶11 – 12). When evaluating allegations of demand futility, the Court should consider the following "test" on a claim-by-claim basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Rales* 634 A.2d at 932-935; *United Food & Commercial Workers Union*

*& Participating Food Ind. Emp'rs Tri-State Pension Fund v. Zuckerberg*, No. 404, 2020, A.3d, 2021 WL 4344361 (Del. Sept. 23, 2021) (*Zuckerberg*).

Rule 23.1 is not satisfied by conclusory statements or mere notice pleading; rather, the pleader must set forth are particularized factual statements that are essential to the claim. *Brehm*, 746 A.2d at 254; *Seminaris v. Landa*, 662 A.2d 1350, 1351 (Del. Ch. 1995). Indeed, "only well-pleaded allegations of fact must be accepted as true; conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true. A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) (footnote omitted). Where plaintiff fails to plead the necessary allegations with particularity, dismissal of the derivative suit is required. *Levine v. Smith*, 591 A.2d 194, 210 (Del. 1991).

Thus, to establish that a pre-suit demand would have been futile, plaintiff must plead particularized facts that are essential to each one of her claims. Directors of a Delaware corporation are presumed to be independent. *See Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984). "[M]ere directorial approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim … is insufficient to excuse demand. *Aronson*, 473 A.2d at 817. Nor is a mere threat of liability enough. *Id*. at 815. Rather, demand may be excused only in "rare cases" where the alleged conduct is "so egregious" that there is a "substantial likelihood of director liability." *Id.*

As to the first prong of the test, the burden is on Plaintiff to plead facts demonstrating that Carter received a personal benefit from the alleged misconduct complained in all four of Plaintiff's causes of action. Plaintiff alleges that Carter "exploited" his position in Unified to "pillage ChanBond and squander Unified's interest in ChanBond Patents." In support of this general,

conclusory allegation, Plaintiff references examples of corporate decision making *at Chanbond* that Carter would have every right to take in light of his role as manager of Chanbond and which are not alleged to conflict with his obligations as a director of Unified.  Plaintiff alleges that Carter renegotiated ChanBond's attorney fee agreement, that Carter renegotiated litigation funding arrangement with Bentham, that Carter manages ChanBond through a separate entity via an Advisory Management Agreement, and that Carter circulated a spreadsheet illustrating a distribution of proceeds upon a hypothetical settlement[5].  These allegations, even taken as true, fail to provide the necessary, particular facts to demonstrate that Carter derived some personal benefit from these corporate decisions to the detriment of Unified stockholders such that he could not properly consider a demand.  As a result, Plaintiff ought not be excused from making a lawful demand.

Plaintiff also falls short of satisfying the second prong of the futility test.  The foregoing are not claims with particularized facts specifically identifying "exploitation" and/or "pillaging".  These allegations do not create a substantial likelihood of director liability.  At best, these allegations simply evidence Carter's exercise of business judgment while serving as the manager of Chanbond.  None of these allegations reflect or challenge actions that Carter, as the single director of Unified took on behalf of Unified.  Nor do they allege any conflict between Chanbond and Unified or self-interest of Carter that would excuse the demand.  Even taken as true, Plaintiff's allegations fall well short of establishing a substantial likelihood of liability.

---

[5] Here, it seems Plaintiff is attempting to assert a double-derivative claim as the specific actions alleged were taken by Carter at the ChanBond level, not the Unified level.  As a result, to pursue a double-derivative claim, Plaintiff must have named Chanbond as a party and alleged that demand was futile or excused at both the Chanbond and Unified levels.  *Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1201 (Del. Ch. 2010); *Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010).  Here she did neither.

The third prong of the test is whether Carter lacks independence from someone who is subject to the first and/or second prong of the test.  Plaintiff alleges Carter is the sole director of Unified.  (Compl. ¶12).  Taking Plaintiff's allegations as true, Unified would have a Board consisting of only one (1) member.  As such, the analysis under the third prong of the test is essentially the same as the first two, and there are no allegations upon which the Court could conclude that Carter did not use his own independent, business judgment when taking the challenged actions on behalf of Chanbond that would excuse Plaintiff's demand obligation to Unified.

Accordingly, Plaintiff has failed to meet the demand requirements of Chancery Rule 23.1 as to all of her claims asserted.

### D.  Carter's Actions are Protected by the Business Judgment Rule.

#### i.  <u>Breach of Fiduciary Duty</u>

In the alternative, and to the extent it is determined that Carter acted on behalf of Unified, Plaintiff's allegations do not defeat the business judgment rule.  The business judgment rule effectively "permit[s] corporate directors to exercise their discretion in managing the corporation's business affairs in the manner they deem in the corporation's best interests in accordance with their power to govern the corporation pursuant to 8 Del. C. § 141(a)." *Maldonado v. Flynn*, 413 A.2d 1251, 1256 (Del. Ch. 1980). "If in the particular case there is nothing to show that the directors did not exercise their discretion for what they believed to be the best interest of the corporation, certainly an honest mistake of business judgment should not be reviewable by the court." *Id.* The business judgment rule "requires utmost loyalty to the corporation and its interests and does not protect fraudulent, illegal, or reckless decisions by the directors." *Id.*

13

In this case, Plaintiff contends that Carter breached his fiduciary duties by "pillaging Unified's sole asset for his own benefit, and on terms that cannot be justified by anyone exercising ordinary sound business judgment." (Compl. ¶ 58). In support of this general, conclusory allegation, Plaintiff references examples of decisions that Carter made in his capacity as the manager of *ChanBond*. Plaintiff references that Defendant renegotiated *ChanBond's* attorney-fee agreement, that Defendant renegotiated *ChanBond's* litigation funding arrangement with "Bentham," that Defendant manages ChanBond through a separate entity via an Advisory Management Agreement, and that Defendant circulated a spreadsheet illustrating a distribution upon a hypothetical settlement of the *ChanBond* settlement proceeds.[6] These allegations, even taken as true, do not represent that Defendant acted negligently as a Unified director in failing to inform himself of material information before making these business decisions or that he failed to act prudently in managing *ChanBond*. The allegations also do not state materials facts that could lead the Court to believe that Defendant failed to act with an undivided and unselfish loyalty to the corporation and failed to prove that a conflict between his duty and self-interest existed that harmed the corporation.

In *Maldonado*, the Court interprets 8 *Del. C.* § 141(a) to permit corporate directors to exercise their discretion in managing the corporation's business affairs in the manner they deem in the corporation's best interests in accordance with their power to govern the corporation. *Maldonado v. Flynn*, 413 A.2d 1251, 1256 (Del. Ch. 1980). Here, Plaintiff has failed to allege any material facts to demonstrate that the Carter did not exercise his discretion for what he believed to be the best interest of the corporation, or that the decisions made by Carter amount to "exploitation" and/or "pillaging" of Unified. At best, these allegations simply evidence

---

[6] *See* Footnote 5 above.

Defendant's valid exercise of business judgment as **ChanBond's** manager.  Defendant, as the sole director of Unified, also has the ultimate authority to transact business on behalf of Unified using his best judgment.  Even taken as true, these allegations fall well short of establishing a substantial likelihood of liability and so each of plaintiff's claims for breach of fiduciary duty should fail.

ii.   Corporate Waste

"To state a claim for waste, a stockholder must allege, with particularity, that the board authorized action that no reasonable person would consider fair . . . the Plaintiffs must shoulder the burden of proving that the exchange was so one sided that no business person of ordinary sound judgment would conclude that the corporation has received adequate consideration." *Freedman v. Adams*, 58 A.3d 414, 417 (Del. 2013). "This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose." *Id.*

Plaintiff alleges that Defendant systematically pillaged Chanbond and squander Unified's interest in the ChanBond Patents. (Compl. ¶ 41). Of the examples given by Plaintiff as to Defendant's pillaging and squandering of Unified's assets include unilaterally renegotiating Patent Counsel's attorney fee agreement, unilaterally renegotiating the litigation funding agreement, and that Defendant manages ChanBond through a separate entity via an Advisory Management Agreement.

As stated in *Freedman*, Plaintiff must allege with particularity actions taken by the **Unified** board of directors that no reasonable person would consider fair and would conclude that the consideration received by the corporation was adequate. *Freedman v. Adams*, 58 A.3d 414, 417 (Del. 2013). In making her claim for corporate waste, Plaintiff alleges only actions taken at the **Chanbond** level and fails to allege with particularity how fairly standard patent licensing behavior,

in which Plaintiff herself repeatedly engaged, constitutes corporate waste at the parent level. Plaintiff cannot state a claim for corporate waste as a matter of law and the complaint should be dismissed.

### iii.   Unjust enrichment

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). To established a claim for unjust enrichment a plaintiff must prove: "(1) an enrichment. (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.*  Here, Plaintiff fails to allege what enrichment Carter received at the expense of the Unified stockholders.  She simply states bare, conclusory allegations that rise to nothing more than corporate director decision making in furtherance of the ChanBond litigation.  Furthermore, as discussed above, Plaintiff's claims herein directly contradict the claims Plaintiff made in the Texas Arbitration.  The reality here is that Plaintiff is the party who stands to be enriched at the expense of her co-stockholders.  In the event Plaintiff is successful in the Texas Arbitration, she will stand to take 22% of the gross recovery in the ChanBond litigation, thereby leaving her co-stockholders with nothing.

## CONCLUSION

Plaintiff has failed to state a claim upon which relief may be granted and Defendant requests that Plaintiff's Complaint be dismissed with prejudice.

## RULE 7.8 CERTIFICATION

Counsel for Defendant hereby certifies that the foregoing Brief complies with the word limitations set forth in Rule 7.8 of the Rules of the North Carolina Business Court.

Respectfully submitted, this the 25th day of October, 2021.

**SIGMON KLEIN, PLLC**

By: /s/ Ben E. Klein
NC Bar No. 40993
Email: ben@sklawnc.com

By: /s/ Grant Sigmon
NC Bar No. 43205
Email: grant@sklawnc.com

114 N. Elm St., Suite 210
Greensboro, NC 27401
Telephone:  336-663-8773
Facsimile:  336-663-8777

**Bayard, P.A.**
**A Delaware Law Firm**

By:  /s/ Stephen B. Brauerman
Stephen B. Brauerman
Email:  sbrauerman@bayardlaw.com

600 N. King St., Suite 400
Wilmington, DE 19899
Telephone:  302-429-4232

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document has been served on all counsel of record in accordance with Rule 3.9 of the General Rules of Practice and Procedure for the North Carolina Business Court and Rule 5 of the North Carolina Rules of Civil Procedure, by electronic filing with the North Carolina Business Court, which will send notice to counsel of record as follows:

Akiva M. Cohen (email: acohen@kusklaw.com)
Kamerman, Uncyk, Soniker & Klein PC
1700 Broadway, 16th Floor
New York, NY 10019-5977

T. Greg Doucette (email: greg@tgdlaw.com)
The Law Offices of T. Greg Doucette, PLLC
311 E. Main St.
Durham, NC 27701-3717

This the 25th day of October, 2021.

**SIGMON KLEIN, PLLC**

By: <u>/s/ Grant Sigmon</u>
NC Bar No. 43205
Email: grant@sklawnc.com

# EXHIBIT E

## Steven Rader

| | |
|---|---|
| **From:** | Ronald Golden <rgolden@bayardlaw.com> |
| **Sent:** | Wednesday, April 6, 2022 3:43 AM |
| **To:** | Grivner, Geoffrey G.; Sparks, Kody L.; Levine, James H.S.; Akiva Cohen; Dylan Schmeyer; Steven Rader; Jason Dilday; brian@trustwilliams.com |
| **Cc:** | Steve Brauerman; Nicholas Talarowski |
| **Subject:** | FW: Activity in Case 1:21-cv-01456-MN CBV, Inc. v. ChanBond, LLC Letter |
| **Attachments:** | Chanbond - Opposition to PI (as-filed).pdf; ChanBond - Motion to File Under Seal Answering Brief in Opposition on PI (as-filed).pdf |

Attached please find a courtesy copy of the Letter to the Honorable Maryellen Noreika from Stephen B. Brauerman regarding Emergency Request to Protect Confidentiality of Chanbond, LLC's Under Seal Filing that we filed with the Court last night.  Thank you.

Ron

Ronald P. Golden III
Associate
BAYARD, P.A.
Cell: +1 609-972-3577
Office: +1 302-429-4238
rgolden@bayardlaw.com

**From:** ded_nefreply@ded.uscourts.gov <ded_nefreply@ded.uscourts.gov>
**Sent:** Tuesday, April 5, 2022 11:49 PM
**To:** ded_ecf@ded.uscourts.gov
**Subject:** Activity in Case 1:21-cv-01456-MN CBV, Inc. v. ChanBond, LLC Letter

CAUTION EXTERNAL

This is an automatic e-mail message generated by the CM/ECF system.
Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court
District of Delaware

Notice of Electronic Filing
The following transaction was entered by Brauerman, Stephen on 4/5/2022
11:48 PM EDT and filed on 4/5/2022

Case Name: CBV, Inc. v. ChanBond, LLC

Case Number: 1:21-cv-01456-MN https://ecf.ded.uscourts.gov/cgi-bin/DktRpt.pl?76834

# EXHIBIT F

REDACTED IN ITS ENTIRETY

# EXHIBIT G

Vmedex, Inc. v. TDS Operating, Inc.

## *Vmedex, Inc. v. TDS Operating, Inc.*

United States District Court for the District of Delaware

October 14, 2021, Decided; October 14, 2021, Filed

Civil Action No. 18-1662-MN

**Reporter**

2021 U.S. Dist. LEXIS 198043 *; 2021 WL 4806814

*VMEDEX*, INC., et al., Plaintiffs, v. TDS OPERATING, INC., et al., Defendants.

**Prior History:** *vMedex, Inc. v. TDS Operating, Inc., 2020 U.S. Dist. LEXIS 152059, 2020 WL 4925512 (D. Del., Aug. 21, 2020)*

**Counsel:** **[*1]** For *vMedex*, Inc., Neuron Dynamics, LLC, Brent Patton, Lorraine Grosso, Joseph Grosso, Robert Nixon, Eric Westbrook, Garth Schneider, Mark McCurry, Curt Van Calster, Jeffrey Wickman, Plaintiffs: Ann Marie Kashishian, LEAD ATTORNEY, Kashishian Law LLC, Wilmington, DE.

For TDS Operating, Inc., Transaction Data Systems, Inc., Rx30 Holdings, LLC, GTCR, LLC, Jude Dieterman, Steve Wubker, Defendants: Marc Stephen Casarino, LEAD ATTORNEY, White & Williams, Wilmington, DE; David M. Friebus, PRO HAC VICE.

**Judges:** John W. Shaw, Special Master.

**Opinion by:** John W. Shaw

## Opinion

**MEMORANDUM**

The Court has entered an Order assigning me to serve as a special master to hear and decide discovery and protective order disputes in this litigation. (D.I. 102). Before me is plaintiffs' (together, "***vMedex***") *October* 6, *2021*, letter arguing that no protective order is warranted because the existing contractual confidentiality agreements suffice to protect defendants' confidential information. Defendants (together, "TDS") opposed on *October* 13, *2021*, and included a proposed form of protective order with their submission. I have reviewed the parties' papers in detail and do not believe oral argument is needed to decide the issues presented. *VMedex* **[*2]** also has filed a motion to stay discovery pending resolution of the protective order dispute. D.I. 108. This memorandum sets forth the reasons for my decisions on these motions.

Is a protective order warranted?

In the absence of a protective order, Local Rule 26.2 applies by default to documents any party deems to be confidential. Local Rule 26.2 states:

> If any documents are deemed confidential by the producing party and the parties have not stipulated to a confidentiality agreement, until such an agreement is in effect, disclosure shall be limited to members and employees of the firm of trial counsel who have entered an appearance and, where appropriate, have been

Thomas Stephens

Vmedex, Inc. v. TDS Operating, Inc.

admitted *pro hac vice*. Such persons are under an obligation to keep such documents confidential and to use them only for purposes of litigating the case.

I understand that defendants deem at least part of their document production to be confidential and have, accordingly, made their production under this rule.

If no party applied for a protective order within the timeframes set by the Scheduling Order, ¶3, and the parties did not enter into a confidentiality stipulation as contemplated by Local Rule 26.2, Local Rule 26.2 applies until ordered otherwise. *vMedex* recognizes this, as it agreed **[*3]** that Local Rule 26.2 applies until this dispute is resolved. (*vMedex* Letter at *1* ("the entire defense production is thus considered 'attorneys' eyes only' until such time as this discovery dispute is resolved")).

*vMedex*'s letter nonetheless opposes entry of a formal protective order, while recognizing that some variation in Local Rule 26.2's procedures to protect confidential information is warranted. (*vMedex* Letter at 8 ("we believe that due to the excessive lateness of the request, no protective order is warranted, except the directive that the parties and their counsel continue to follow the contractual confidentiality agreements that have been honored for years").

But *vMedex*'s request to vary the Local Rule to allow client access to documents produced by defendants is itself an application for an "order specifying terms and conditions for the disclosure of confidential information"—the definition of a "protective order" in the Scheduling Order, ¶3. (*See also vMedex* Letter at 2 ("Despite the foregoing [timeliness] objection, Plaintiffs are pragmatic and acknowledge that reasonable and practical restrictions may be warranted in order to provide for the orderly prosecution of this case")). TDS also seeks entry of **[*4]** an order that changes the default Local Rule, and, by doing so, does not demand attorneys' eyes only treatment of defendants' entire documents production.

The special master referral order further authorized me to "manage discovery, including any current or future protective order and discovery disputes." (D.I. 102, ¶*1* (emphasis added)). The special master referral order thus appears to contemplate resolution of a dispute of the nature presented here. For all of these reasons, good cause exists for entry of a protective order.


What is the appropriate form of protective order?

*vMedex* promised to provide a draft protective order by close of business on *October* 7 "if the Special Master is inclined to Order a late protective order." (*vMedex* Letter at 8). During a hearing conducted without a court reporter on *October* 6, *2021*, pursuant to all parties' written agreement, the parties briefly discussed the protective order issues. After the hearing, I sent an email to the parties, summarizing the path forward from the hearing. That email stated in relevant part:

> Protective Order: The defense will make a submission of even length to the submission received from plaintiffs this morning. The submission **[*5]** should include a proposed form of protective order that, where there is a dispute, contains competing proposals from each side.

Defendants' submission included a proposed form of order modeled on a form of order previously shared between the parties. Defendants states that it did not receive counterproposals from *vMedex*. I did not receive a draft protective order or competing proposals from *vMedex*.

Defendants' submission states that there are two disputes between the parties—post-litigation document retention and client access to defendants' document production. The majority of plaintiffs' *October* 6 letter discusses the same subjects. The meet and confer correspondence in the record is consistent. I therefore find these are plaintiffs' only area of objections to defendants' proposed form of protective order.

On the post-litigation document retention issue, defendants propose to allow counsel of record to "retain one copy of Defendants' document production, including documents marked 'Confidential,' but not any document marked AEO." Plaintiffs' letter asserts that the New Jersey and New York rules of professional responsibility require counsel

Vmedex, Inc. v. TDS Operating, Inc.

to retain all litigation records for seven **[\*6]** years and indicates that at least one attorney of record for plaintiffs is subject to these rules. (***vMedex*** Letter at 7). TDS disputes this assertion. (TDS Letter at 4).

Resolution of this dispute is unnecessary. It is common in this district for protective orders to allow counsel of record to retain a full copy of the litigation record. There appears to be no harm from such a provision in this litigation, and defendants' letter identifies no risk of improper use or disclosure of even highly confidential documents by counsel of record during or after the litigation ends. To reinforce this, the draft proposed by defendants ensures that the archival copy maintained by counsel of record for the parties remains subject to the protective order. Further, the draft order requires the litigants to return or destroy any copies (whether paper or electronic) in the possession of anyone other than counsel of record, and, to ensure compliance, the draft requires counsel of record to certify completion of the return or destruction tasks. (TDS Letter, Exh. A ¶13).

I will enter a revised version of paragraph 13 of defendants' proposed protective order reflecting this ruling.

On client access, the parties' **[\*7]** letters are not completely clear as to what is in dispute. Defendants assert that only two documents in its document production require a Highly Confidential designation. Plaintiffs appear to argue that there should be no restrictions on who, for plaintiffs, sees defendants' documents and argues that the parties' contractual agreement is sufficient to protect the defendants' interests. Plaintiffs do not contest, however, that the documents at issue warrant some form of confidential protection. at 6

As a general matter, it is well-recognized in this district that litigants are entitled to know what is happening in litigation they are involved in. *Ineos Fluor Americas LLC v. Honeywell Int'l Inc.*, C.A. No. 06-189-SLR, Transcript at 6 (D. Del. Jan. 18, 2007) ("absent extraordinary circumstances, every client is entitled to have one representative who actually knows what is going on in the litigation and that they are not bound by simply listening to their lawyers give them their representations about what is going on with litigation.").

Defendants' proposed protective order recognizes this, and permits each party to the litigation to access any document marked Confidential. (TDS Letter, Exh. A ¶7.2(g)). Defendants do not argue that any particular party be denied such access. This proposal is reasonable **[\*8]** and gives each party the ability to know what is going on in the litigation.

Plaintiffs' letter argues that a broader group of witnesses should have access to all documents. (***vMedex*** Letter at 4). Plaintiffs' concern is that knowledge of various facts is distributed among different persons, and that plaintiffs need to consult with persons who have knowledge about the documents produced in the litigation. *Id*. The draft protective order permits "the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information" to access documents marked Confidential. (TDS Letter, Exh. A ¶7.2(f)). This provision appears to satisfy plaintiffs' concerns, while not allowing the distribution of a confidential document to persons who previously had never seen the document.

Defendants' letter states that only two documents need to be designated Highly Confidential — Attorneys' Eyes Only. I will hold them to this representation. Defendants state that the first document, labeled TDS_000896, pertains only to Messrs. Grosso and Nixon and agree that this document may be viewed by Messrs. Grosso and Nixon. Plaintiffs make no particularized **[\*9]** argument as to this document. I therefore agree that this restriction is appropriate.

The second document, labeled TDS_000897, is a document that from the submissions appears to pertain to the entity plaintiff. Defendants' propose that only one corporate representative have access to this document (to be selected by the entity plaintiff) and, further, that none of three specified individuals be given access. I agree that the first portion of the proposal is appropriate.

As to one of the three individuals, Mr. Cozzarelli, defendants state that "Mr. Cozzarelli would have no first-hand knowledge of the information in the document." (TDS Letter at 3). But first-hand knowledge of a particular document is not a normal pre-requisite for a corporate representative. A corporate representative is, instead, an employee, officer, or director of a litigating entity who needs to understand the full scope of the litigation in order to guide

Vmedex, Inc. v. TDS Operating, Inc.

business decisions about the litigation. I do not believe Mr. Cozzarelli should be excluded from this list on grounds he had no knowledge of a particular document.

As to the second individual, Mr. Wickman, defendants state that he is not affiliated with any plaintiff. **[*10]** As such, he is not an appropriate corporate representative. As to the third individual, Mr. Grosso, defendants state that they have concerns that Mr. Grosso has in the past breached a written confidentiality agreement. Defendants have not brought a claim in this litigation making this assertion.

I am not prepared, on the basis of the materials presented here, to agree or to disagree with these concerns. Further, defendants do not appear to contest Mr. Grosso's ability to view confidential information because he is a party to the litigation. While not entirely clear, proposed paragraph 7.*1*.3(b) also appears to recognize that each party (including Mr. Grosso) is entitled to access any documents produced as Highly Confidential. I therefore do not believe Mr. Grosso should be excluded from this list if he otherwise meets the criteria to serve as a corporate representative.

I have reviewed the balance of the order. Paragraph 12.4, concerning use of Protected Material in court filings, is inconsistent with the District of Delaware CM/ECF procedures for filing confidential information. I have modified this paragraph to permit the parties to file confidential information pursuant the District **[*11]** of Delaware's CM/ECF procedures for sealed filings. I have verified that the protective order provision required by Judge Noreika are included, and made one minor change to comply with the Court's required language.

I will enter the protective order submitted by defendants, with the changes discussed above.


Other matters.

Plaintiffs have filed a motion to stay discovery pending disposition of the protective order on **_October_** 12. (D.I. 108).

Plaintiffs assert prejudice due to delays in resolution of this dispute. My review of the record provided by the parties shows that the timing of the protective order decision and any resulting prejudice is not entirely driven by defendants. Plaintiffs agreed to a five business day response period to any motion submissions, as embodied in the procedures order, despite knowing this dispute was pending; defendants filed their response yesterday, on the fifth day. Plaintiffs volunteered to submit last week a competing protective order proposal, but did not. Defendants' protective order proposals, while not adopted entirely, were well within the mainstream. It appeared at the **_October_** 6 hearing that an amicable resolution to the protective order dispute was **[*12]** within reach if the parties continued to negotiate and, in particular, spoke live. The parties' correspondence expressly discussing the protective order provisions (as opposed to ancillary issues) nonetheless appears to have ended several days before plaintiffs filed this motion. Neither party appears to have initiated a verbal discussion.

Now that the protective order issues are resolved, I will deny this motion as moot. The parties should cooperate with all reasonable requests to ensure that all discovery is completed by the existing deadlines set by Judge Noreika.

An implementing order is attached.

Dated: **_October_** **_14_**, **_2021_**

/s/ John W. Shaw

Special Master

**ORDER**

In light of the resolution of the protective order issues, plaintiffs' motion to stay pending entry of a protective order (D.I. 108) is denied as moot.

Dated: **_October_** **_14_**, **_2021_**


Thomas Stephens

Vmedex, Inc. v. TDS Operating, Inc.

/s/ John W. Shaw

Special Master

---

**End of Document**

Thomas Stephens