UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CBV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:21-cv-01456-MN |
| | ) | |
| CHANBOND, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF OF MOVANTS GREGORY COLLINS AND KAMAL
MIAN IN  SUPPORT OF THEIR MOTION TO INTERVENE AND
UNSEAL DOCUMENTS**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th floor
Wilmington, DE  19801-1186
(302) 573-2525
dfinger@delawgroup.com
Attorney for Movants Gregory
Collins and Kamal Mian

Dated:  May 19, 2022

# **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    MOVANTS, AS MEMBERS OF THE PUBLIC, SHOULD BE PERMITTED LIMITED INTERVENTION TO CHALLENGE SEALING . . . . . . . . . . . 6

II.   THE DOCUMENTS SHOULD BE UNSEALED. . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## Cases

*Bank of America Nat. Trust and Sav. Ass'n v. Rittenhouse Hotel Associates*, 800 F.2d 339 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*BASF Corporation v. SNF Holding Company*, 2019 WL 2881594 (S.D. Ga. July 3, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Avandia Marketing, Sales Practices and Products Liability Litigation*, 924 F.3d 662 (3d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Cendant Corp.*, 260 F.3d 183 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Continental Airlines*, 150 B.R. 334 (D. Del. 1993). . . . . . . . . . . . . . . . . . . . 8

*In re Grand Jury Proceedings*, 806 F.Supp. 1173 (D. Del. 1992) . . . . . . . . . . . . 7

*In re Storag Etzel GmbH*, 2020 WL 2949742 (D. Del. Mar. 25, 2020) . . . . . . . . 9

*Intellectual Ventures I LLC v. AT&T Mobility LLC*, 2014 WL 4445953 (D. Del. Sept. 8, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kamakana v. City and County of Honolulu,* 447 F.3d 1172 (9th Cir. 2006) . . . . 18

*LEAP Systems, Inc. v. MoneyTrax, Inc.*, 638 F.3d 216 (3d Cir. 2011) . . . . . . . . . 8

*Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Littlejohn v. BIC Corp.*, 851 F.2d 673 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 18

*Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424 (4th Cir. 2005) . . . . . 13

*Miller v. Indiana Hospital*, 16 F.3d 549 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . 10

*Orabi v. Attorney General of the U.S.*, 738 F.3d 535 (3d Cir. 2014) . . . . . . . . . . . 5

*Pa. Nat'l Mut. Cas. Ins. Grp. v. New Eng. Reinsurance Corp.,* 840 Fed. Appx. 688 (3d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

*Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994). . . . . . . . . . . . . . . 7

*Price v. Dunn*, 139 S.Ct. 2764 (2019) (Mem.). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984) . . . . . . . . . . . 8

*Republic of Philippines v. Westinghouse Elec. Corp*., 949 F.2d 653 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Samsung Elecs. Co. v. Imperium IP Holdings (Cayman), Ltd.*, 2017 WL 1157369 (D. Del. Aug. 28, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Takeda Pharm. U.S.A., Inc. v. Mylan Pharm., Inc*., 2019 WL 6910264 (D. Del. Dec. 19, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Thompson v. Warden, USP Allenwood,* 2014 WL 4437556 (M.D. Pa. Sept. 9, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*U.S. v. Amodeo*, 44 F.3d 141 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. v. Antar*, 38 F.3d 1348 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*U.S. v. Smith*, 123 F.3d 140 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Wilmington Savings Fund Society, FSB v. Houston Casualty Company*, 2018 WL 3768531 (D. Del. Aug. 8, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Other authorities

6 *Moore's Federal Practice* - Civil § 26 App.102 (2022) . . . . . . . . . . . . . . . . . . . 13

Federal Rule of Civil Procedure 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## INTRODUCTION

Gregory Collins and Kamal Mian ("Movants") move to intervene in this action for the limited purpose of obtaining an Order unsealing court records in this action.

Movants are shareholders of UnifiedOnline, Inc., a Delaware corporation ("UOI"). They have also moved, derivatively on behalf of UOI, to intervene as a party defendant in this action. D.I. 34. That motion has been fully briefed and is awaiting the Court's consideration of their request for oral argument. D.I. 34, 73, 76, 87 and 88. In preparation of their motion to intervene, and replying to the oppositions thereto, Movants found that they were unduly hampered in their efforts by the many heavily redacted and sealed pleadings, motion papers and exhibits filed by the parties to this action. Therefore, regardless of the outcome on the pending motion to intervene, Movants request the Court's leave to intervene for the limited purpose of presenting this motion to unseal those documents which have been improperly filed under seal in this case, specifically:

1. [SEALED] COMPLAINT filed against ChanBond, LLC filed by CBV, Inc. (Entered: 10/15/2021) (D.I. 2), followed by REDACTED VERSION of 2 Complaint by CBV, Inc. (Entered: 10/22/2021) (D.I. 5);

2. [SEALED] First AMENDED COMPLAINT against ChanBond, LLC filed by CBV, Inc. (Entered: 12/06/2021) (D.I. 6), followed by REDACTED

VERSION of 6 Amended Complaint filed by CBV, Inc. (Entered:12/13/2021) (D.I. 8);

3.  [SEALED] ANSWER to Amended Complaint, re: 6 Amended Complaint, filed by ChanBond, LLC. (Entered: 01/27/2022) (D.I. 11), followed by REDACTED VERSION of 11 Answer to Amended Complaint filed by ChanBond, LLC. (Entered: 02/03/2022) (D.I. 16);

4.  [SEALED] MOTION for Temporary Restraining Order, Preliminary Injunction, and for Expedited Delivery filed by CBV, Inc. (Entered: 03/15/2022) (D.I. 18), followed by REDACTED VERSION of 18 MOTION for Temporary Restraining Order, Preliminary Injunction, and for Expedited Delivery filed by CBV, Inc. (Entered: 03/25/2022) (D.I. 43);

5.  [SEALED] OPENING BRIEF in Support re 18 MOTION for Temporary Restraining Order, Preliminary Injunction, and for Expedited Delivery filed by CBV, Inc. (Entered: 03/15/2022) (D.I. 19), followed by REDACTED VERSION of 19 Opening Brief in Support filed by CBV, Inc. (Entered: 03/25/2022) (D.I. 44) ;

6.  [SEALED] ANSWER to 2 Complaint, CROSSCLAIM against ChanBond, LLC, COUNTERCLAIM against CBV, Inc. filed by Deirdre Leane and IPNAV, LLC. (Entered: 03/23/2022) (D.I. 41), followed by REDACTED VERSION

2

of 41 Answer to Complaint, Crossclaim, Counterclaim filed by Deirdre Leane and IPNAV, LLC. (Entered: 03/30/2022) (D.I. 47);

7.     [SEALED] ANSWERING BRIEF in Opposition re 18 MOTION for Preliminary Injunction filed by IPNAV, LLC and Deirdre Leane (Entered: 03/31/2022) (D.I. 48), followed by REDACTED VERSION of 48 Answering Brief in Opposition filed by IPNAV, LLC and Deirdre Leane (Entered: 04/08/2022) (D.I. 67);

8.     [SEALED] DECLARATION of Akiva M. Cohen re 48 Answering Brief in Opposition filed by IPNAV, LLC and Deirdre Leane (Entered: 03/31/2022) (D.I. 49), followed by REDACTED VERSION of 49 Declaration filed by IPNAV, LLC and Deirdre Leane (Entered: 04/08/2022) (D.I. 68);

9.     [SEALED] DECLARATION of Deirdre Leane re 48 Answering Brief in Opposition filed by IPNAV, LLC and Deirdre Leane (Entered: 03/31/2022) (D.I. 51), followed by REDACTED VERSION of 51 Declaration by IPNAV, LLC and Deirdre Leane (Entered:04/08/2022) (D.I. 69);

10.     [SEALED] ANSWERING BRIEF in Opposition re 18 MOTION for Temporary Restraining Order, Preliminary Injunction, and for Expedited Delivery filed by ChanBond, LLC. (Entered: 03/31/2022) (D.I. 54), followed by REDACTED

VERSION of 54 Answering Brief in Opposition filed by ChanBond, LLC. (Entered: 04/07/2022) (D.I. 66);

11.    [SEALED] REPLY BRIEF re 18 MOTION for Temporary Restraining Order, Preliminary Injunction, and for Expedited Delivery filed by CBV, Inc. (Entered: 04/07/2022) (D.I. 65), followed by REDACTED VERSION of 65 Reply Brief filed by CBV, Inc. (Entered: 04/14/2022) (D.I. 81);

12.    [SEALED] MOTION for Leave to File Sur-Reply in Further Opposition filed by IPNAV, LLC and Deirdre Leane (Entered: 04/08/2022) (D.I. 71), followed by MOTION for Leave to File A Sur-Reply In Further Opposition filed by IPNAV, LLC and Deirdre Leane (Entered: 04/21/2022) (D.I. 85); and

13.    [SEALED] ANSWER to 41 Answer to Complaint, Crossclaim, Counterclaim filed by CBV, Inc. (Entered: 04/13/2022) (D.I. 79), followed by REDACTED VERSION of 79 Answer to Counterclaim filed by CBV, Inc. (Entered: 04/21/2022) (D.I. 86).

## **BACKGROUND**

When this action was filed on October 15, 2022, plaintiff CBV, INC. ("CBV") moved the District Court for permission to file its complaint under seal, ostensibly because the Patent Purchase Agreement ("PPA") upon which the complaint was based included a confidentiality clause.  There has been no showing that any party to the

PPA would not have entered the agreement but for the confidentiality clause, and confidentiality was not court-ordered.  It appears CBV was unaware Defendant ChanBond, LLC ("ChanBond") had already publicly disclosed the PPA by filing it in litigation before the United States District Court for the Northern District of Texas. (Ex. D hereto). While not mentioned in its motion to file under seal, CBV also redacted allegations related to the Advisory Services Agreement ("ASA") and the Interest Sale Agreement ("ISA"), and the exhibits attaching these agreements remained sealed in the subsequent public filing.  The ASA (Ex. C hereto) and the ISA (Ex. B hereto) were also publicly filed in the Northern District of Texas litigation.[1]

When CBV filed its First Amended Complaint ("FAC") under seal on December 6, 2021, it was done so without the Court ordering the record sealed. ChanBond, nonetheless, rode on CBV's coattails, so to speak, filing a motion to seal its answer to the FAC, without disclosing to the District Court that it had already publicly disclosed the PPA in the Northern District of Texas.  Similarly, other agreements upon which, evidently, the parties premised their broad claims of "confidentiality" have all been publicly disclosed elsewhere. No counsel for any party

---

[1]

This Court may take judicial notice of the contents of the docket of a sister court. *Orabi v. Attorney General of the U.S.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014), as well as the docket sheet (Ex. A) itself. *E.g.*, *Thompson v. Warden, USP Allenwood*, 2014 WL 4437556 at *1 (M.D. Pa. Sept. 9, 2014).

to this action saw fit to so inform the District Court of this circumstance in any of their cryptic "unopposed" and overbroad motions to file documents under seal.

Most recently, ChanBond proclaimed the right to file under seal, as an exhibit to an opposition brief, an entire arbitration award against UOI.  Although ChanBond has not been required to offer any reason at all why this document should be filed under seal it has become obvious that the sole reason for filing the entire document under seal was that ChanBond does not want UOI's shareholders to know the amount of the Settlement Fund obtained in the patent litigation.  There has been no showing that  (I) the assumed Settlement Agreement, pursuant to which ChanBond obtained the funds, even contained a confidentiality clause, let alone what the clause might say, (ii)  the parties would not have entered the agreement but for confidentiality, or (iii) such confidentiality was court-promised or court-ordered.

## ARGUMENT

## I.   MOVANTS, AS MEMBERS OF THE PUBLIC, SHOULD BE PERMITTED LIMITED INTERVENTION TO CHALLENGE SEALING.

It is common practice in federal courts, including courts in the Third Circuit, to permit parties to intervene for the purpose of challenging the sealing of judicial records. *E.g., Price v. Dunn*, 139 S.Ct. 2764 (2019) (Mem.) (Order allowing intervention to challenge sealing of documents); *U.S. v. Smith*, 123 F.3d 140, 145 (3d

6

Cir. 1997); *U.S. v. Antar*, 38 F.3d 1348, 1353 (3d Cir. 1994); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777-79 (3d Cir. 1994); *In re Grand Jury Proceedings*, 806 F.Supp. 1173 (D. Del. 1992).

Normally, parties seeking permissive intervention pursuant to Federal Rule of Civil Procedure 24(b) must show: (1) an independent ground for jurisdiction, (2) timeliness of the motion, and (3) that the applicant's claim or defense and the main action have a question of law or fact in common. *Intellectual Ventures I LLC v. AT&T Mobility LLC*, 2014 WL 4445953 at *3 (D. Del. Sept. 8, 2014).

Where a party is seeking to intervene in a case for the limited purpose of unsealing judicial records, this meets the requirement of a common issue of fact or law. *Pansey*, 23 F.3d at 778 ("By virtue of the fact that the Newspapers challenge the validity of the Order of Confidentiality entered in the main action, they meet the requirement of Fed. R. Civ. P. 24(b)(2) that their claim must have 'a question of law or fact in common' with the main action"). Furthermore, when a party is seeking to intervene to unseal documents, an independent basis for jurisdiction is not required. *Id*. at 778 n.3. Finally, there is no issue of timeliness. *Id*. at 778-79 (courts have allowed parties to intervene for the limited purpose of unsealing a judicial record, even "long after a case has been terminated").

As such, Movants have satisfied the requirements for intervention.

7

## II.   **THE DOCUMENTS SHOULD BE UNSEALED.**

Movants, as members of the public, have the right to inspect records filed with the District Court. "The existence of a common law right of access to judicial proceedings and to inspect judicial records is beyond dispute." *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1066 (3d Cir. 1984). In addition, the right of the public to inspect judicial records is protected by the First Amendment to the Constitution of the United States. *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 659 (3d Cir. 1991). Consequently, there is a "strong presumption" of public access to judicial records. *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, 924 F.3d 662, 677 (3d Cir. 2019) ("*Avandia*"); *LEAP Systems, Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 220 (3d Cir. 2011); *In re Continental Airlines*, 150 B.R. 334, 341 (D. Del. 1993).

Given the strong presumption created by the common law and First Amendment rights of access, there is no legitimate reason for any of the judicial records in this case to be sealed or redacted. Although the dramatic response by some when confronted with this reality may be anomalous, the "litigate in secret" inclination and practice is not. As Judge Andrews wrote in 2019:

> In my experience, corporate parties in complex litigation generally prefer to litigate in secret. To that end, discovery is over-designated as being confidential, pleadings and briefs are filed under seal, redacted

8

versions of sealed documents are over-redacted, requests are made to
seal portions of transcripts of judicial proceedings, and parties want to
close the courtroom during testimony. I have tried over the years to
reign these tendencies in, but it is difficult because there is usually no
one opposing whatever requests are made, and I do not have time to be
independently monitoring any of these tendencies unless they are
directly requested of me (i.e., requests to close the courtroom and to seal
judicial transcripts).

*Takeda Pharm. U.S.A., Inc. v. Mylan Pharm., Inc.*, 2019 WL 6910264 at *1 (D. Del.
Dec. 19, 2019). Similarly, Judge Connolly wrote in 2020:

Unopposed motions to seal are filed regularly with this Court…I
similarly [referencing Judge Andrews' comments in *Takeda*] find that
parties in my civil cases routinely ask to seal pleadings that cannot
reasonably be characterized as disclosing confidential or proprietary
information. And in my (albeit short) tenure on the bench, I cannot recall
a party in a civil case opposing a request to seal or objecting to the scope
of redactions in the public version of a pleading that was filed pursuant
to an order that granted a motion to seal.

*In re Storag Etzel GmbH*, 2020 WL 2949742 at *4 (D. Del. Mar. 25, 2020) (Smolla,
R., Special Master, quoting Memorandum Order appointing a Special Master).

However, "[t]he District Court is not a star chamber. [It is] a public institution
in a democratic republic and the public has a right of access to our filings." *Id.*

The substantive and procedural standards that must be met to overcome the
presumption of access are onerous by definition and design. The party seeking to seal
judicial records must satisfy "a heavy burden." *Miller v. Indiana Hospital*, 16 F.3d
549, 551 (3d Cir. 1994). The party (or parties) seeking to overcome the presumption

9

of access bears the burden of showing that: (1) the material is the kind of information that courts will protect, (2) disclosure will work a clearly defined and serious injury to the party seeking closure, and (3) the interest in secrecy outweighs the presumption. *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001). "In delineating the injury to be prevented, specificity is essential." *Id*.

To ensure that proper weight is given to "the public's strong interest in the openness of judicial records," a District Court must engage in "a document-by-document review." *Avandia*, 924 F.3d at 673, 677. Casual, superficial review does not suffice. "Again, the strong presumption of openness inherent in the common law right of access 'disallows the routine and perfunctory closing of judicial records.'" *Id*. (Citation omitted).

In granting a sealing order, a District Court should articulate the compelling, countervailing interests to be protected, make specific findings on the record concerning the effects of disclosure, and provide an opportunity for interested third parties to be heard" *Id.* at 672-73. "In delineating the injury to be prevented, specificity is essential." *Id*. at 673 (quoting *In re Cendant Corp.*, 260 F.3d at 194). Generalized incantations that secrecy is required to prevent competitive or commercial harm are not enough to carry the movant's burden. Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient. *Id*. at 673.

10

The factfinding required by District Courts must be careful and meticulous in order to vindicate the rights of the public and the integrity of the judicial process itself, notwithstanding the private interests or preferences of the litigants, even when they are in agreement. "[C]areful factfinding and balancing of competing interests is required before the strong presumption of openness can be overcome by the secrecy interests of private litigants." *Leucadia, Inc. v. Applied Extrusion Technologies*, *Inc.*, 998 F.2d 157, 158 (3d Cir. 1993).

In *Leucadia*, the Third Circuit vacated the District Court's order denying a shareholder's motion to intervene to gain access to material sealed pursuant to a protective order, and remanded the matter for the District Court to review the documents under seal to determine whether any document or portion thereof required protection from disclosure. The Third Circuit held that "there is a presumptive right to public access to all material filed in connection with nondiscovery pretrial motions, whether these motions are case dispositive or not." *Id*. at 164.

Here, the parties have not articulated any specific harm which would result from disclosure of any of the pleadings and motion related documents that they have filed under seal, often without even seeking the Court's prior approval. The parties have not, and cannot, overcome the strong presumption of public access to the pleadings and motion-related documents they have filed under seal in this case. The

11

parties cannot just agree amongst themselves to waive the public's right to access the records of the District Court. *See Samsung Elecs. Co. v. Imperium IP Holdings (Cayman), Ltd.*, 2017 WL 1157369 at *3 (D. Del. Aug. 28, 2017) (the parties' "private agreement does not govern our obligation to ensure public access"). The agreements between the parties herein, which they seek to have the Court interpret or enforce, are not protected from public disclosure. *Id*. The Settlement Agreement in the patent litigation is not protected from public disclosure unless the confidentiality was court-ordered or court-promised. *Id.* The arbitration award lost whatever confidentiality attached to it when ChanBond filed it with the District Court. *See, e.g., Pa. Nat'l Mut. Cas. Ins. Grp. v. New Eng. Reinsurance Corp.,* 840 Fed. Appx. 688, 689 (3d Cir. 2020) (where the plaintiff filed an arbitration award under seal, the defendant was entitled to an order unsealing that award because the award constituted a judicial record to which the common-law right of access applied, and the plaintiff did not articulate a clear and serious injury that would result from the unsealing of the award).

Absent an applicable statute, rule or Court Order, a party may not file judicial records under seal. The parties in this case have, to date, made 13 filings under seal. However, eight of these records were filed under seal without the prerequisite Court Order. D.I. 6, D.I. 18, D.I. 19, D.I. 48. D.I. 49, D.I. 51, D.I. 65, D.I. 79.   All

documents comprising the foregoing judicial records should be immediately unsealed and fully published without redaction.

It is unclear how the sealing happened, given the District of Delaware's stated procedures regarding the filing of sealed documents, which provide that "[t]he authority for filing a document under seal must be provided by a protective order or other order of the Court."[2]

As explained in 6 *Moore's Federal Practice* - Civil § 26 App.102 (2022), "[c]lerks' offices should not agree to seal a record unless directed to by a statute, rule, or court order." *See also U.S. v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995) (reviewing sealed reports by a special master, the Court observed, "While we think that it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document, we consider it improper for the district court to delegate its authority to do so"); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 429 (4th Cir. 2005) ("The decision to seal documents must be made after independent review by a judicial officer, and supported by findings and conclusions specific enough for appellate review," quotation marks omitted).  Further, sealing requires more than an agreement

---

[2] https://www.ded.uscourts.gov/faq/how-do-i-present-documents-filing-under-seal.

among the parties. *Bank of America Nat. Trust and Sav. Ass'n v. Hotel Rittenhouse Associates*, 800 F.2d 339, 345 (3d Cir. 1986) (settlement agreement filed with court under seal subject to disclosure because parties' private confidentiality agreement could not bar access to what had become a judicial record); *Wilmington Savings Fund Society, FSB v. Houston Casualty Company*, 2018 WL 3768531 at *3 (D. Del. Aug. 8, 2018) ("Parties cannot seal public records by agreement. The parties present no particularized good cause for sealing the identified redacted information other than claiming confidentiality simply because of a private agreement. Their agreement does not govern our obligation to ensure public access").

The five filings for which the Court issued an order sealing the record have a corresponding unopposed motion to file under seal providing the stated basis for denying public access. The initial motion for leave to file under seal ("MFUS") was made by CBV prior to filing its initial complaint on October 15, 2021. D.I. 1. The need for secrecy expressed in the MFUS was premised on the Patent Purchase Agreement ("PPA") between CBV and Chanbond, stating: "[t]he Complaint sets forth confidential information concerning the parties' relationship and obligations regarding the exchange and treatment of each party's confidential information." It appears that when filed, CBV was unaware that Chanbond had previously made the PPA public through a filing in the Northern District of Texas.  Even without

14

Chanbond's public disclosure, it is unlikely that anything in the PPA could be considered commercially sensitive given that both CBV and Chanbond were formed solely in connection with the monetization of patents, which were fully monetized in the underlying patent litigation. In other words, these are not ongoing businesses for which "trade secrets" or other currently protectible interests exist. Whether it was learning that Chanbond had publicly filed the PPA or realizing the "confidential information" was completely stale, CBV did not seek a MFUS for its FAC or any of its subsequent briefs.

The next MFUS was filed by Chanbond on January 27, 2022 in connection with its answer to CBV's FAC. D.I. 10. Chanbond's MFUS was made with full knowledge that the "confidential information" CBV sought to protect had already been publicly disclosed, by them and the Leane Defendants, in filings made in the Northern District of Texas. Nevertheless, Chanbond claimed "The [FAC] sets forth information regarding the ChanBond's confidential business information. Likewise, ChanBond's Answer to the [FAC] contains the same." *Id*. Whether they were unconcerned with a second dissemination of this "confidential information" or believed that the MFUS would be automatically approvedby the Court, Chanbond filed its [Sealed] Answer immediately after the MFUS and four days before the Court's ruling on January 31, 2022.

15

On March 22, 2022, the Leane Defendants, despite being the plaintiffs in the Northern District of Texas case, and having publicly filing the ASA and the ISA, sought to seal their Answer to CBV's FAC.  With the success of Chanbond's previous MFUS, the Leane Defendants, presumably, saw the wisdom in sticking with the script and copied, virtually verbatim, the language used by Chanbond.  This time, however, the Court granted the MFUS before the [Sealed] Answer could be filed.

While there are two additional MFUS, both in response to CBV's Motion for Preliminary Injunction, one by Chanbond and the other by Leane Defendants (D.I. 53 and D.I. 70), the rationale in both is identical to those previously described (their filing had confidential stuff and so does ours, and so on).  The issue at hand, for all five of the Court sealed filings, is the same (at least, initially): have the parties met their burden in rebutting the public's presumptive common law and First Amendment right of access to judicial records?  The answer is "no."

While Chanbond has passionately argued against any distinction between documents produced in discovery and those filed with the Court, there is a significant amount of authority contradicting this position. For example, the Court in *Avandia*, with no protective order at issue, saw fit to distinguish the handling of documents produced in discovery and those filed with the Court, stating: "[a]nalytically distinct from the District Court's ability to protect discovery materials under Rule 26(c) [or

Local Rule 26.2], the common law presumes that the public has a right of access to judicial materials. In both criminal and civil cases, a common law right of access attaches to judicial proceedings and records." 924 F.3d at 672. The *Avandia* Court further explained:

> The right of access includes the right to attend court proceedings and to "inspect and copy public records and documents, including judicial records and documents." Whether the common law right of access applies to a particular document or record "turns on whether that item is considered to be a 'judicial record.' A "judicial record" is a document that "has been filed with the court...or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." Once a document becomes a judicial record, a presumption of access attaches.

*Id*. (internal citations omitted, italics added.)

With that in mind, however, the *Avandia* Court acknowledged that "the common law right of access is not absolute. The presumption of access is just that, and thus may be rebutted." *Id*. (citations and internal quotations omitted). The party seeking to have the material sealed "bears the burden of showing that the interest in secrecy outweighs the presumption." *Id*. Further, the "movant must show that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id*. None of the five MFUS at issue were accompanied by a declaration and evidence but, rather, the sealing party in each case provided only conclusory statements about

17

"confidential business information." What does this mean?  Why, how, or when was it "confidential business information?" These are basic questions that have no answer in the Court record.

Further, even if the why and/or the how could have justified the sealing of judicial records at some point in time, the rationale would not exist in perpetuity. Regardless, we are not discussing protection of confidential information in discovery, but preventing public access to judicial records filed with the Court. The protections afforded to the former rarely apply to the latter.  The most notable exception being current, commercially sensitive, trade secrets. Trade secrets are not synonymous with the "confidential business information" phrase utilized in all five of the MFUS filed with the Court. As explained by the Third Circuit "non-trade secret but confidential business information is not entitled to the same level of protection from disclosure as trade secret information." *Littlejohn v. BIC Corp.*, 851 F.2d 673, 685 (3d Cir. 1988).

The conclusory incantation of "confidential business information" without supporting evidence is inadequate to rebut the strong presumption of public access to judicial records. *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1182 (9th Cir. 2006); *BASF Corporation v. SNF Holding Company*, 2019 WL 2881594 at *12 (S.D. Ga. July 3, 2019).

18

This is especially true considering that the original justification for sealing was premised on the PPA, ASA, and ISA, all of which were publicly filed by either Chanbond or the Leane defendants in the Northern District of Texas.

More recently, Chanbond filed an interim arbitration award as an exhibit to its preliminary injunction opposition and then asked the District Court to exert its full power to punish the non-party recipients of the emailed documents. Given the supposedly super-secret and sensitive nature of the interim award, you would think Chanbond's MFUS would make clear the reasons it should remain hidden from public access. They didn't though. Instead, the basis for filing under seal was explained as follows: "CBV filed its Opening Brief in Support of the Motion on March 15, 2022 (D.I. 19) under seal. The Opening Brief in Support of the Motion sets forth information regarding ChanBond's confidential business information. ChanBond's Answering Brief in Opposition to the Motion contains the same." D.I. 53. Once the interim arbitration award was filed with the Court, "the award became a judicial record subject to the common-law right of access." *Pa. Nat'l Mut. Cas. Ins. Gp.*, 840 F. Appx. at 689.

As to the expectations of the District Court when denying public access to judicial records, the *Avandia* Court explained:

To overcome that strong presumption, the District Court must articulate the compelling, countervailing interests to be protected, make specific findings on the record concerning the effects of disclosure, and provide an opportunity for interested third parties to be heard. In delineating the injury to be prevented, specificity is essential. Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient. Careful factfinding and balancing of competing interests is required before the strong presumption of openness can be overcome by the secrecy interests of private litigants. To that end, the District Court must conduct a document-by-document review of the contents of the challenged documents.

*Avandia*, 924 F.3d at 672-673 (citations and internal quotations omitted).

## CONCLUSION

WHEREFORE, for the foregoing reasons, Movants respectfully request that this Court grant their motion to unseal all records filed in this case.

Respectfully submitted,

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th floor
Wilmington, DE 19801-1186
(302) 573-2525
dfinger@delawgroup.com
Attorney for Movants Gregory
Collins and Kamal Mian

Dated: May 19, 2022

20

# EXHIBIT A

CLOSED,EXH-ADM

# U.S. District Court
# Northern District of Texas (Dallas)
# CIVIL DOCKET FOR CASE #: 3:20-cv-03097-B

Leane et al v. ChanBond LLC et al
Assigned to: Judge Jane J Boyle
Case in other court:  298th Judicial District Court, Dallas County,
        TX, DC-20-14152
Cause: 28:1332 Diversity-Other Contract

Date Filed: 10/09/2020
Date Terminated: 11/16/2020
Jury Demand: None
Nature of Suit: 190 Contract: Other Contract
Jurisdiction: Diversity

## Plaintiff

**Deirdre Leane**

represented by **J Sean Lemoine**
Wick Phillips LLP
3131 McKinney Ave.
Suite 100
Dallas, TX 75204
214-692-6200
Fax: 214-692-6255
Email: sean.lemoine@wickphillips.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Akiva Meir Cohen**
Kamerman Uncyk Soniker & Klein PC
1700 Broadway
New York, NY 10019
212-400-4930
Fax: 866-221-6122
Email: acohen@kusklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

## Plaintiff

**IPNav LLC**

represented by **J Sean Lemoine**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Akiva Meir Cohen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Defendant**

**ChanBond LLC**                                   represented by **Linda R Stahl**
                                                                  Carter Arnett PLLC
                                                                  8150 N. Central Expressway
                                                                  Suite 500
                                                                  Dallas, TX 75206
                                                                  214-550-8188
                                                                  Fax: 214-550-8185
                                                                  Email: lstahl@carterarnett.com
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

                                                                  **Courtney Barksdale Perez**
                                                                  Carter Arnett PLLC
                                                                  8150 N. Central Expressway
                                                                  Suite 500
                                                                  Dallas, TX 75206
                                                                  214-550-5052
                                                                  Fax: 214-550-8185
                                                                  Email: cperez@carterarnett.com
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

                                                                  **E Leon Carter**
                                                                  Carter Arnett PLLC
                                                                  8150 N. Central Expressway
                                                                  Suite 500
                                                                  Dallas, TX 75206
                                                                  214-550-8188
                                                                  Fax: 214-550-8185
                                                                  Email: lcarter@carterarnett.com
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

                                                                  **Nathan Isaiah Charles Cox**
                                                                  Carter Arnett PLLC
                                                                  8150 N Central Expressway
                                                                  Suite 500
                                                                  Dallas, TX 75206
                                                                  214-550-8177
                                                                  Fax: 214-550-8185
                                                                  Email: ncox@carterarnett.com
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

                                                                  **Scott W Breedlove**
                                                                  Carter Arnett PLLC
                                                                  8150 N Central Expressway, Suite 500
                                                                  Dallas, TX 75206
                                                                  214-550-8172
                                                                  Fax: 214-550-8185
                                                                  Email: sbreedlove@carterarnett.com

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**UnifiedOnline Inc**                                          represented by   **Linda R Stahl**
                                                                                (See above for address)
                                                                                *LEAD ATTORNEY*
                                                                                *ATTORNEY TO BE NOTICED*
                                                                                *Bar Status: Admitted/In Good Standing*

                                                                                **Courtney Barksdale Perez**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*
                                                                                *Bar Status: Admitted/In Good Standing*

                                                                                **E Leon Carter**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*
                                                                                *Bar Status: Admitted/In Good Standing*

                                                                                **Nathan Isaiah Charles Cox**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*
                                                                                *Bar Status: Admitted/In Good Standing*

                                                                                **Scott W Breedlove**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*
                                                                                *Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/14/2020 | 53 | ELECTRONIC ORDER denying 50 Motion to Amend/Correct. The Court declines to alter or vacate its holdings in this case regarding the likelihood of success on the merits, a necessary element to consider Plaintiffs' request for injunctive relief. (Ordered by Judge Jane J. Boyle on 12/14/2020) (chmb) (Entered: 12/14/2020) |
| 12/11/2020 | 52 | RESPONSE filed by ChanBond LLC re: 50 MOTION to Amend/Correct. (Cox, Nathan) (Entered: 12/11/2020) |
| 11/23/2020 | 51 | Brief/Memorandum in Support filed by IPNav LLC, Deirdre Leane re 50 Motion to Amend (Attachments: # 1 Appendix in Support of Reply Brief, # 2 Proposed Order) (Lemoine, J) Modified text on 11/24/2020 (hml). (Entered: 11/23/2020) |
| 11/23/2020 | 50 | MOTION TO AMEND by IPNav LLC, Deirdre Leane re: 47 Memorandum Opinion and Order. (Lemoine, J) Modified event type and text on 11/24/2020 (hml). (Entered: 11/23/2020) |
| 11/18/2020 | 49 | (Document Restricted) Notice of Filing of SEALED Electronic Transcript of SEALED TRO Proceedings held on 11-04-2020 before Judge Jane J. Boyle. Court Reporter/Transcriber Shawnie Archuleta, Telephone number shawnie505@aol.com. (82 pages) (spa) (Entered: 11/18/2020) |
| 11/16/2020 | | Civil Case Terminated per 48 Electronic Order. Pursuant to LR 79.2 and LCrR 55.2, exhibits may be claimed during the 60-day period following final disposition (to do so, |

| | | |
|---|---|---|
| | | follow the procedures found at Exhibit Guide). The clerk will discard exhibits that remain unclaimed after the 60-day period without additional notice. (Clerk to notice any party not electronically noticed.) (axm) (Entered: 11/16/2020) |
| 11/16/2020 | 48 | ELECTRONIC ORDER: In light of 47 Memorandum Opinion and Order, it appears that no issues remain for resolution by this Court. Therefore, the parties shall submit a joint stipulation of dismissal or agreed final judgment on or before December 16, 2020. The Clerk of Court is directed to administratively close this case. (Ordered by Judge Jane J. Boyle on 11/16/2020) (chmb) (Entered: 11/16/2020) |
| 11/12/2020 | 47 | MEMORANDUM OPINION AND ORDER: The Court DENIES Leane and IPNav's motion for a TRO and preliminary injunction (Doc. 3 ). (Ordered by Judge Jane J. Boyle on 11/12/2020) (ctf) (Entered: 11/12/2020) |
| 11/04/2020 | 46 | ELECTRONIC Minute Entry for proceedings held before Judge Jane J. Boyle: Motion Hearing held on 11/4/2020 3 Emergency MOTION for Temporary Restraining Order . TRO denied. Order to follow. Attorney Appearances: Plaintiff - J Sean Lemoine; Akiva Meir Cohen; and Alexander Morovitz; Defense - Linda R Stahl; Courtney Barksdale Perez; Nathan Isaiah Charles Cox; Scott W Breedlove. (Court Reporter: Shawnie Archuleta) (Exhibits admitted - all exhibits, except Pl's 7 and 8) Time in Court - 1:22. (chmb) Modified on 11/6/2020 to correct filed date (chmb). (Entered: 11/06/2020) |
| 11/04/2020 | 44 | (Document Restricted) Unopposed Motion to Seal Courtroom (Sealed pursuant to motion to seal) filed by ChanBond LLC, UnifiedOnline Inc (Cox, Nathan) (Entered: 11/04/2020) |
| 11/03/2020 | 43 | (Document Restricted) Defendant's Exhibits filed by ChanBond LLC, UnifiedOnline Inc. (Attachments: # 1 Additional Page(s)) (ndt) (Entered: 11/04/2020) |
| 11/03/2020 | 42 | (Document Restricted) Joint Exhibits filed by IPNav LLC, Deirdre Leane. (ndt) (Entered: 11/04/2020) |
| 11/03/2020 | 41 | STATUS REPORT ORDER: Status Report due by 11/24/2020. (Ordered by Judge Jane J. Boyle on 11/3/2020) (svc) (Entered: 11/04/2020) |
| 11/03/2020 | 38 | NOTICE OF SUBPOENA DUCES TECUM served on Linda Stahl, Esq. on behalf of Unifiedonline Inc. on 10/30/20. (Lemoine, J) Modified text on 11/4/2020 (ykp). (Entered: 11/03/2020) |
| 11/03/2020 | 37 | AFFIDAVIT of Service for Subpoena served on Linda Stahl, Esq. on behalf of ChanBond on 10/30/20. (Lemoine, J) (Entered: 11/03/2020) |
| 11/02/2020 | 36 | (Document Restricted) Sealed Motion for Leave to File Defendants' Exhibits (Sealed pursuant to motion to seal) filed by ChanBond LLC, UnifiedOnline Inc. (Attachments: # 1 Exhibit(s) Defendants' Exhibit 1, # 2 Exhibit(s) Defendants' Exhibit 3, # 3 Exhibit(s) Defendants' Exhibit 8, # 4 Exhibit(s) Defendants' Exhibit 9, # 5 Exhibit(s) Defendants' Exhibit 10) (Cox, Nathan) (Entered: 11/02/2020) |
| 11/02/2020 | 35 | Exhibit List *Defendants' Exhibit List* by ChanBond LLC, UnifiedOnline Inc. (Attachments: # 1 Exhibit(s) Defendants' Unsealed Exhibits, # 2 Exhibit(s) Defendants' Demonstrative Exhibits) (Cox, Nathan) (Entered: 11/02/2020) |
| 11/02/2020 | 34 | Witness List by IPNav LLC, Deirdre Leane. (Lemoine, J) (Entered: 11/02/2020) |
| 11/02/2020 | 33 | Witness List by ChanBond LLC, UnifiedOnline Inc. (Cox, Nathan) (Entered: 11/02/2020) |
| 11/02/2020 | 32 | Proposed Order Granting 31 Plaintiffs Unopposed Motion for Leave to File Under Seal the Parties Joint Exhibit List Filed Under Seal by IPNav LLC, Deirdre Leane. (Lemoine, J) Modified event/text on 11/3/2020 (mjr). (Entered: 11/02/2020) |
| 11/02/2020 | 31 | (Document Restricted) Plaintiffs' Unopposed Motion for Leave to File Under Seal The |

| | | Parties' Joint Exhibits Filed Under Seal (Sealed pursuant to motion to seal) filed by IPNav LLC, Deirdre Leane (Attachments: # [1](#) Exhibit(s) Joint Ex. 1, # [2](#) Exhibit(s) Joint Ex. 2, # [3](#) Exhibit(s) Joint Ex 3, # [4](#) Exhibit(s) Joint Ex. 4) (Lemoine, J) (Entered: 11/02/2020) |
|---|---|---|
| 11/02/2020 | [30](#) | Exhibit List *the Parties Joint Exhibit List and Plaintiffs' Exhibit List* by IPNav LLC, Deirdre Leane. (Attachments: # [1](#) Exhibit(s) Joint Exhibit 1, # [2](#) Exhibit(s) Joint Exhibit 2, # [3](#) Exhibit(s) Joint Exhibit 3, # [4](#) Exhibit(s) Joint Exhibit 4, # [5](#) Exhibit(s) Joint Exhibit 5, # [6](#) Exhibit(s) Joint Exhibit 6, # [7](#) Exhibit(s) Joint Exhibit 7, # [8](#) Exhibit(s) Joint Exhibit 8, # [9](#) Exhibit(s) Joint Exhibit 9, # [10](#) Exhibit(s) Plaintiffs' Exhibit 1, # [11](#) Exhibit(s) Plaintiffs' Exhibit 2, # [12](#) Exhibit(s) Plaintiffs' Exhibit 3, # [13](#) Exhibit(s) Plaintiffs' Exhibit 4, # [14](#) Exhibit(s) Plaintiffs' Exhibit 5, # [15](#) Exhibit(s) Plaintiffs' Exhibit 6, # [16](#) Exhibit(s) Plaintiffs' Exhibit 7, # [17](#) Exhibit(s) Plaintiffs' Exhibit 8, # [18](#) Exhibit(s) Plaintiffs' Exhibit 9, # [19](#) Exhibit(s) Plaintiffs' Exhibit 10) (Lemoine, J) (Entered: 11/02/2020) |
| 11/02/2020 | [29](#) | ANSWER to Complaint filed by ChanBond LLC, UnifiedOnline Inc. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: [Attorney Information - Bar Membership](#). If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Stahl, Linda) (Entered: 11/02/2020) |
| 10/29/2020 | [28](#) | RESPONSE AND OBJECTION filed by IPNav LLC, Deirdre Leane re: [21](#) Response/Objection. (Attachments: # [1](#) Appendix) (Lemoine, J) (Entered: 10/29/2020) |
| 10/29/2020 | [27](#) | ORDER: The TRO and preliminary injunction hearing is set for 11/4/2020 01:00 PM in US Courthouse, Courtroom 1516, 1100 Commerce St., Dallas, TX 75242-1310 before Judge Jane J. Boyle. (Ordered by Judge Jane J. Boyle on 10/29/2020) (svc) (Entered: 10/29/2020) |
| 10/27/2020 | [26](#) | Brief in Support filed by UnifiedOnline Inc re [25](#) Sur-reply. (oyh) (Entered: 10/27/2020) |
| 10/27/2020 | [25](#) | Sur-reply In Opposition filed by UnifiedOnline Inc re: [3](#) Emergency MOTION for Temporary Restraining Order . (oyh) (Entered: 10/27/2020) |
| 10/27/2020 | 24 | ELECTRONIC ORDER denying [22](#) Motion for Leave to File. The hearing will be held in person on 11/4/2020, at 1:00 PM before Judge Jane J. Boyle. (Ordered by Judge Jane J. Boyle on 10/27/2020) (chmb) (Entered: 10/27/2020) |
| 10/27/2020 | 23 | ELECTRONIC ORDER granting [20](#) Motion for Leave to File. (Unless the document has already been filed, clerk to enter the document as of the date of this order.) (Ordered by Judge Jane J. Boyle on 10/27/2020) (chmb) (Entered: 10/27/2020) |
| 10/27/2020 | [22](#) | Unopposed MOTION for Leave to Conduct the November 4, 2020 Hearing Virtually filed by IPNav LLC, Deirdre Leane (Attachments: # [1](#) Declaration(s), # [2](#) Proposed Order) (Lemoine, J) Modified docket text on 10/28/2020 (oyh). (Entered: 10/27/2020) |
| 10/26/2020 | [21](#) | OBJECTION filed by ChanBond LLC, UnifiedOnline Inc re: [18](#) Sealed and/or Ex Parte Reply/Sur-reply. (Cox, Nathan) (Entered: 10/26/2020) |
| 10/26/2020 | [20](#) | MOTION for Leave to File Defendants' Sur-Reply in Opposition to Plaintiffs' Emergency Motion to Extend TRO filed by ChanBond LLC, UnifiedOnline Inc (Attachments: # [1](#) Additional Page(s) Defendants' Sur-Reply in Opposition to Plaintiffs' Emergency Motion to Extend TRO, # [2](#) Additional Page(s) Defendants' Appendix in Support of Sur-Reply)Attorney Nathan Isaiah Charles Cox added to party ChanBond LLC(pty:dft), Attorney Nathan Isaiah Charles Cox added to party UnifiedOnline Inc(pty:dft) (Cox, Nathan) (Entered: 10/26/2020) |
| 10/23/2020 | | Hearing/Deadline Modification: Motion Hearing set for 11/4/2020 01:00 PM before Judge Jane J. Boyle. (mjr) (Entered: 10/26/2020) |

| 10/23/2020 | 19 | ELECTRONIC ORDER: A hearing on Plaintiff's motion (Doc. 3 ) is hereby set for Wednesday, November 4, 2020, at 1:00 PM before Judge Jane J. Boyle. (Ordered by Judge Jane J. Boyle on 10/23/2020) (chmb) (Entered: 10/23/2020) |
|---|---|---|
| 10/21/2020 | 18 | (Document Restricted) Sealed Reply Brief in Support of 3 Emergency MOTION to Extend Temporary Restraining Order filed by Deirdre Leane (svc) (Entered: 10/21/2020) |
| 10/21/2020 | 17 | ORDER GRANTING PLAINTIFFS UNOPPOSED MOTION FOR LEAVE TO FILE UNDER SEAL REPLY BRIEF AND APPENDIX (Ordered by Judge Jane J. Boyle on 10/21/2020) (svc) (Entered: 10/21/2020) |
| 10/21/2020 | 16 | (Document Restricted) Plaintiffs' Unopposed Motion for Leave to File Under Seal Reply Brief and Appendix (Sealed pursuant to SO 19-1, statute, or rule) filed by IPNav LLC, Deirdre Leane (Attachments: # 1 Exhibit(s) Plaintiffs' Reply Brief in Support of Emergency Motion to Extend Temporary Restraining Order, # 2 Exhibit(s) Appendix in Support of Reply Brief, # 3 Proposed Order Proposed Order Granting Plaintiffs' Unopposed Motion for Leave to File Under Seal Reply Brief and Appendix) (Lemoine, J) (Entered: 10/21/2020) |
| 10/20/2020 | 15 | ELECTRONIC ORDER granting 14 Motion for Leave to File Plaintiffs' Unopposed Motion to Exceed Page Limits For Reply Brief In Support of Emergency Motion to Extend Temporary Restraining Order. (Ordered by Judge Jane J. Boyle on 10/20/2020) (chmb) (Entered: 10/20/2020) |
| 10/19/2020 | 14 | MOTION for Leave to File Plaintiffs' Unopposed Motion to Exceed Page Limits For Reply Brief In Support of Emergency Motion to Extend Temporary Restraining Order filed by IPNav LLC, Deirdre Leane (Attachments: # 1 Proposed Order) (Lemoine, J) (Entered: 10/19/2020) |
| 10/16/2020 | 13 | ELECTRONIC ORDER: Plaintiffs are hereby ORDERED to file any reply brief in support of their Emergency Motion for Temporary Restraining Order [Doc. 3] by 10/21/2020 at 12:00 p.m. CDT. (Ordered by Judge Jane J. Boyle on 10/16/2020) (chmb) (Entered: 10/16/2020) |
| 10/16/2020 | 12 | Appendix in Support of 11 Response filed by ChanBond LLC, UnifiedOnline Inc re 3 Emergency MOTION to Extend Temporary Restraining Order (Attachments: # 1 Cover Sheet) (Stahl, Linda) Modified text and linkage on 10/19/2020 (jmg). (Entered: 10/16/2020) |
| 10/16/2020 | 11 | RESPONSE filed by ChanBond LLC, UnifiedOnline Inc re: 3 Emergency MOTION for Temporary Restraining Order (Stahl, Linda) (Entered: 10/16/2020) |
| 10/13/2020 | 10 | ORDER: The Court enters this order to extend the state courts temporary restraining order and set an expedited briefing schedule for 3 Plaintiffs Emergency Motion to Extend Temporary Restraining Order. Responses due by 10/16/2020 re: 3 Emergency MOTION for Temporary Restraining Order. (Ordered by Judge Jane J. Boyle on 10/13/2020) (svc) (Entered: 10/14/2020) |
| 10/13/2020 | 9 | ELECTRONIC ORDER granting 8 Application for Admission Pro Hac Vice of Akiva M. Cohen. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Jane J. Boyle on 10/13/2020) (chmb) (Entered: 10/13/2020) |
| 10/13/2020 | 8 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number 0539-11258244) filed by IPNav LLC, Deirdre Leane (Attachments: # 1 Exhibit(s) Certificate of Good Standing)Attorney Akiva Meir Cohen added to party |

| | | |
|---|---|---|
| | | IPNav LLC(pty:pla), Attorney Akiva Meir Cohen added to party Deirdre Leane(pty:pla) (Cohen, Akiva) (Entered: 10/13/2020) |
| 10/13/2020 | 7 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by IPNav LLC, Deirdre Leane. (Lemoine, J) (Entered: 10/13/2020) |
| 10/12/2020 | 5 | Appendix in Support filed by IPNav, LLC re 3 Emergency MOTION for Temporary Restraining Order (Lemoine, J) (Entered: 10/12/2020) |
| 10/12/2020 | 4 | Brief/Memorandum in Support filed by IPNav, LLC re 3 Emergency MOTION for Temporary Restraining Order (Attachments: # 1 Proposed Order) (Lemoine, J) (Entered: 10/12/2020) |
| 10/12/2020 | 3 | Emergency MOTION to Extend Temporary Restraining Order filed by IPNav, LLC (Lemoine, J) Modified text on 10/19/2020 (jmg). (Entered: 10/12/2020) |
| 10/09/2020 | 6 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Ramirez). Clerk to provide copy to plaintiff if not received electronically. (oyh) (Entered: 10/13/2020) |
| 10/09/2020 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by ChanBond, LLC, Unified Online, LLC. (Stahl, Linda) (Entered: 10/09/2020) |
| 10/09/2020 | 1 | NOTICE OF REMOVAL filed by Unified Online, LLC, ChanBond, LLC. (Filing fee $400; receipt number 0539-11254218) In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Stahl, Linda) (Entered: 10/09/2020) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 03/23/2022 12:24:58 | | |
| PACER Login: | jasondilday:3431601:0 | Client Code: | Collins |
| Description: | Docket Report | Search Criteria: | 3:20-cv-03097-B |
| Billable Pages: | 6 | Cost: | 0.60 |

# EXHIBIT B

## Agreement - ChanBond

This Agreement (this "**Agreement**"), is made as of October 27, 2015 (the "**Effective Date**"), by and among **Deirdre Leane**, an individual with an address of 2525 Carlisle St., Suite 439, Dallas, Texas 75201 ("**Seller**"), **ChanBond, LLC,** a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 ("**ChanBond**") and **UnifiedOnline, Inc.,** a Delaware corporation, of 4126 Leonard Drive, Fairfax, Virginia 22030 ("**Purchaser**"). The parties to this Agreement shall be referred to collectively herein as the "Parties" and separately as a "Party".

W i t n e s s e t h :

WHEREAS, Seller owns 100% of the limited liability company membership interests (the "**Interests**") of **ChanBond**;

WHEREAS, Purchaser wishes to acquire Seller's entire interest in ChanBond, following which Purchaser will become the sole interest holder of ChanBond, all according to the provisions set forth herein below;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the Parties hereto hereby agree as follows:

## 1.    Definitions

1.1    "**Affiliate**" means, with respect to a Party, any Person in any country that directly or indirectly Controls, is Controlled by or is under common Control with such Party.  For the purposes of this Agreement, the term "Control" of a Person means ownership, of record or beneficially, directly or through other Persons, of fifty percent (50%) or more of the voting equity of such Person or, in the case of a non-corporate Person, equivalent interests.

1.2    "**Collateral Agreements**" means all such concurrent or subsequent agreements, documents and instruments, as amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof, including without limitation, the License Agreement, the Pay Proceeds Agreement, the Common Interest Agreement and the Promissory Note.

1.3    "**Contract Rights and Obligations**" means the rights and obligation assigned to ChanBond under the contracts ("**Contracts**") listed on **Schedule 1.3.**

1.4    "**Entity**" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Body (as defined below) or any other legal entity.

1.5    "**Governmental Body**" means any (i) U.S. federal, state, county, municipal, city, town village, district, or other jurisdiction or government of any nature; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or other entity and any court or other tribunal); or (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

## EXHIBIT 1 ("ISA")

1.6    "**Intellectual Property**" means all domestic or foreign rights in, to and concerning ChanBond's: (i) patents, patent applications, trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, trade dress, logos, symbols, trade names, assumed names, fictitious names, corporate names and other indications or indicia of origin, including translations, adaptations, derivations, modifications, combinations and renewals thereof; (ii) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of data or information), copyrights therein and thereto, moral rights, and rights equivalent thereto, including but not limited to, the rights of attribution, assignation and integrity; (iii) trade secrets, confidential and/or proprietary information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, schematics, designs, discoveries, drawings, prototypes, specifications, hardware configurations, customer and supplier lists, financial information, pricing and cost information, financial projections, and business and marketing methods plans and proposals), collectively "**Trade Secrets**"; (iv) computer software, including programs, applications, source and object code, data bases, data, models, algorithms, flowcharts, tables and documentation related to the foregoing; (v) other similar tangible or intangible intellectual property or proprietary rights, information and technology and copies and tangible embodiments thereof (in whatever form or medium); (vi) all applications to register, registrations, restorations, reversions and renewals or extensions of the foregoing; (vii) internet domain names; and (viii) all the goodwill associated with each of the foregoing and symbolized thereby; and (ix) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including rights to recover for past, present and future violations thereof.

1.7    "**Lien**" means any mortgage, pledge, security interest, encumbrance, lien, charge or debt of any kind, any trust, any filing or agreement to grant, deposit or file a pledge or financing statement as debtor under applicable law, any subordination arrangement in favor of any Person, or any other Third Party right.

1.8    "**Person**" means any individual or Entity.

1.9    "**Proceeding**" means any claim, suit, litigation, arbitration, mediation, hearing, audit, charge, inquiry, investigation, governmental investigation, regulatory proceeding or other proceeding or action of any nature (whether civil, criminal, legislative, administrative, regulatory, prosecutorial, investigative, or informal) commenced, brought, conducted, or known to be threatened, or heard by or before, or otherwise involving, any Governmental Body, arbitrator or mediator or similar person or body.

1.10    "**Third Party**" means any Person other than a Party or its Affiliates.

2.    <u>**Sale and Purchase of Interests**</u>

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser ChanBond and Purchaser shall purchase and accept the assignment, transfer conveyance and delivery of ChanBond from the Seller.

Closing of Sale and Purchase of Interests; Covenants of Purchaser

**EXHIBIT 1 ("ISA")**

2.1   <u>Closing</u>.  The sale, assignment, transfer and delivery of ChanBond by the Seller and the purchase thereof by the Purchaser, shall take place at a closing, to be held remotely via the exchange of documents and signatures within one business day following the execution of this Agreement (the "**Closing**" and the "**Closing Date**," respectively).

2.2   <u>Transactions at Closing</u>.  At the Closing, the following transactions shall occur, which transactions shall be deemed to take place simultaneously and no transaction shall be deemed to have been completed or any document delivered until all such transactions have been completed and all required documents delivered:

2.2.1   The Seller shall duly execute an interest assignment deed in the form attached hereto as **Schedule 2.2.1** (the "**Transfer Deed**") and shall deliver their respective Transfer Deed to Purchaser;

2.2.2   At Closing, ChanBond shall appoint William R. Carter, Jr. as sole manager ("**Manager**") and thereafter Manager shall have sole and exclusive authority over the business of ChanBond.

2.2.3   Purchaser shall deliver to the Seller copies of resolutions of its Board of Directors in the form attached hereto as **Schedule 2.2.3**, approving, *inter alia*, the transactions contemplated hereunder and the issuance of the Shares (as defined below) by Purchaser to Seller.

2.2.4   The Collateral Agreements shall have been executed and delivered by the respective parties thereto.

2.2.5   Purchaser shall deliver to the Seller a validly executed share certificate for the Shares (as defined below) issuable in the name of the Seller in such amounts as shall be directed by Seller not less than 72 hours after the Closing.

2.2.6   Purchaser shall deliver to Seller evidence that each Required Approval (as defined below) has been obtained.

2.2.7   Seller, ChanBond and Purchaser shall have entered into the Common Interest Agreement, in the form attached hereto as **Schedule 2.2.7**.

2.2.8   Purchaser shall deliver to Seller the Promissory Note (as defined below), in the form attached hereto as **Schedule 2.2.8**.

2.3   <u>Conditions to Closing</u>.  The obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions, any of which may be waived in writing by the Party entitled to the benefit thereof, in whole or in part, to the extent permitted by the applicable law:

2.3.1   No temporary restraining order, preliminary or permanent injunction or other order (whether temporary, preliminary or permanent) issued by any court of competent jurisdiction, or other legal restraint or prohibition shall be in effect which prevents the consummation of the transactions contemplated herein, nor shall any proceeding brought by any Governmental Body seeking any of the foregoing be pending, and there shall not be any action

**EXHIBIT 1 ("ISA")**

taken, or any law, regulation or order enacted, entered, enforced or deemed applicable to the transactions contemplated herein illegal.

2.3.2   The representations and warranties of the Seller and Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date, except for those (i) representations and warranties that are qualified by materiality, which representations and warranties shall be true and correct in all respects and (ii) representations and warranties which address matters only as of a particular date, which representations and warranties shall be true and correct on and as of such particular date.

2.3.3   Each Party shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the Collateral Agreements ancillary hereto (collectively, the "**Transaction Documents**") to be performed or complied with by it on or prior to the Closing Date.

2.3.4   Each Party shall have received evidence, in form and substance reasonably satisfactory to it, that any and all approvals of Governmental Bodies and other Third Parties required to have been obtained by a Party to consummate the transactions under the Transaction Documents, if any, have been obtained (each a "**Required Approval**").

2.4   <u>Covenant of Purchaser</u>.  Promptly following the Closing, Purchaser shall (a) reimburse Seller for all of their costs and expenses (including reasonable attorneys' fees) incurred by Seller in connection with the consummation of the transactions contemplated by this Agreement and (b) file with the relevant Governmental Bodies all legally required reports in respect of the transactions contemplated under the Transaction Documents, including, but not limited to, the SEC Form 8-K and any Forms 3, Forms 4 or Schedule 13D's.

**3.**   **<u>Consideration</u>**

In consideration for the sale, assignment, transfer and delivery of ChanBond, Purchaser shall pay to the Seller (as directed by Seller) the consideration, as follows:

3.1   <u>Cash Payment</u>. Five million U.S. Dollars ($5,000,000) payable on or before October 27, 2020 (the "**Cash Payment**"). The obligation to make the Cash Payment shall be evidenced by Purchaser's promissory note (the "**Promissory Note**") in the form of Schedule 2.2.8 attached hereto; and

3.2   <u>Shares Payment</u>. Forty-four million, seven hundred thousand (44,700,000) shares of Purchaser's Common Stock (the "**Shares**") par value of $0.001 each.

3.3   <u>Release</u>.   Purchaser for itself, its respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the "**Releasing Parties**") knowingly, voluntarily, and irrevocably releases, forever discharges and covenants not to sue the Seller, and their respective Affiliates, employees, officers, directors, representatives, predecessors in interest, successors and assigns (collectively, the "**Released Parties**") from and against any and all rights, claims, losses, lawsuits or causes of action (at law or in equity), liabilities, duties, actions, demands, expenses, breaches of duty, damages,

**EXHIBIT 1 ("ISA")**

obligations, proceedings, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, agreements, promises, judgments, and executions of whatever nature, type, kind, description or character (each a "**Claim**"), whether known or unknown, suspected or unsuspected, vested or contingent, past or present, that a Releasing Party ever had, now has or hereafter can, shall or may have against or with respect to the Released Parties or any of them for, upon or by reason of any matter, cause or thing related to or arising from any agreement to which ChanBond is a party or by which it is bound prior to the Closing Date, which are listed on **Schedule 3.3** (the "**Company Agreements**"), except in the case that such Claim arises out of an act of fraud, intentional misconduct or gross negligence on the part of one or more of the Released Parties, as finally determined by a court of competent jurisdiction.  For the avoidance of doubt, the Company shall continue to be bound by the Company Agreements and neither the Seller nor any of the Released Parties has or shall have any further obligation or liability under the Company Agreement (other than confidentiality, common interest and other similar provisions).  The Releasing Parties hereby waive the benefits of any provisions of the law of any state or territory of the United States, or principle of common law, which provides that a general release does not extend to claims which the Releasing Parties do not know or suspect to exist in its favor at the time of executing the release, which if known to it, may have materially affected the release.  It is the intention, understanding and agreement of the Releasing Parties to forever discharge and release all known and unknown, present and future claims within the scope of the releases set forth in this Agreement, provided, however, this Release shall not affect or limit any Claims arising under this Agreement, for enforcement, gross negligence or willful misconduct, fraud, misrepresentation, or similar matters.

4.      **Representations and Warranties of the Seller**

The Seller hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

4.1     The Seller is the sole lawful owners, beneficially and of record, of ChanBond and ChanBond constitute all of the membership interests in ChanBond, and upon the consummation of the transactions at the Closing, Purchaser will acquire from the Seller, good and marketable title to ChanBond sold by it.  There are no preemptive, anti-dilution or other participatory rights of any other parties with respect to the transactions contemplated hereunder.

4.2     The Seller has full and unrestricted legal right, power and authority to enter into and perform their obligations under the Transaction Documents and to sell and transfer ChanBond to Purchaser as provided herein.  The Transaction Documents, when executed and delivered by the Seller, shall constitute the valid and legally binding obligation of the Seller, legally enforceable against the Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.3     The Seller is acquiring the Shares for investment purposes only, for their own account, and not for the benefit of others, nor with any view to, or in connection with any distribution or public offering thereof within the meaning of the U.S. Securities Act of 1933 (the "**Securities Act**").

**EXHIBIT 1 ("ISA")**

4.4     The Seller understands that the Shares have been registered under the Securities Act.  The Seller also acknowledges that the Shares will be restricted for sale for six (6) months after the issuance.  The Seller acknowledges that any certificates evidencing the Shares will contain a legend to the foregoing effect.

4.5     Seller has sufficient knowledge and expertise in business and financial matters so as to enable it to analyze and evaluate the merits and risks of acquiring the Shares pursuant to the terms of this Agreement and is able to bear the economic risk of such acquisition, including a complete loss of its investment in the Shares.

4.6     Seller acknowledges that it has made detailed inquiries concerning Purchaser and its business, and that the officers of Purchaser have made available to the Seller any and all written information which it has requested and have answered to the Seller's satisfaction all inquiries made by the Seller.

4.7     The transactions provided for in this Agreement with respect to the Shares are not part of any pre-existing plan or arrangement for, and there is no agreement or other understanding with respect to, the distribution by the Seller of any of the Shares.

## 5.     **Representations and Warranties of ChanBond**

5.1     ChanBond hereby represents and warrants to Purchaser, and acknowledges that Purchaser is entering into this Agreement in reliance thereon, as follows:

(a)     ChanBond is duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.

(b)     As of the Closing Date, ChanBond is a party to the pending litigation identified in **Schedule 5.1(b)**.

(c)     As of the Closing Date the Contracts are in full force and effect and none of the respective parties to the Contracts are in breach of any material obligation under the Contracts.

(d)     To ChanBond's knowledge, ChanBond is not a party nor bound by any contracts, agreements, promises or commitments except the assignments related to the Contracts.

(e)     Other than the assignments related to the Contracts, ChanBond has no material assets.  None of ChanBond's employees will continue with ChanBond after the Closing.   ChanBond's bank accounts and the contents thereof will be transferred to Purchaser. Any amounts paid or payable to ChanBond (or any of its Affiliates) under licenses or other agreements or judgments entered into by or awarded to any Affiliates of ChanBond prior to the Closing Date, shall be retained as the exclusive property of such

**EXHIBIT 1 ("ISA")**

Affiliates and after the Closing Date, ChanBond or any of its Affiliates will disclaim any interest therein.

## 6.     Representations and Warranties of Purchaser

Purchaser, represents and warrants to the Seller and acknowledges that the Seller are entering into this Agreement in reliance thereon as follows:

6.1     Purchaser is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted and as currently proposed to be conducted.  The corporate governance documents of Purchaser (including but not limited to its Certificate of Incorporation, Bylaws and any Voting Rights Agreements, Stockholders' Agreements, Investors' Rights Agreements and the like) as in effect on the date hereof have been provided or made available to the Seller (the "**Purchaser Governance Documents**").

6.2     The Transaction Documents, when executed and delivered by Purchaser, shall constitute the valid and legally binding obligation of Purchaser, respectively, legally enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.3     The authorized capital stock of Purchaser consists of 6,000,000,000 shares of Common Stock and 10,000,000 shares of Convertible Preferred Stock, each having a par value of USD $0.001, of which 912,897,537 shares are issued and outstanding (exclusive of shares issued hereunder).  Purchaser's fully-diluted capital structure before and after Closing is set forth in the capitalization table attached hereto as **Schedule 6.3**.  All capital stock, preemptive rights, rights of first refusal, rights of co-sale, convertible, exercisable or exchangeable securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Purchaser or any of its subsidiaries or Affiliates any capital stock of the Purchaser and/or any of its subsidiaries are set forth in detail on **Schedule 6.3**.  Except for the transactions contemplated by this Agreement and the current Purchaser Governance Documents, there are no Liens, options to purchase, proxies, preemptive rights, convertible, exercisable or exchangeable securities, outstanding warrants, options, voting trust and other voting agreements, calls, promises or commitments of any kind and, Purchaser has no knowledge that any of the said stockholders owns any other stock, options or any other rights to subscribe for, purchase or acquire any capital stock of Purchaser from Purchaser or from each other.

6.4     All issued and outstanding capital stock of Purchaser has been duly authorized, and is validly issued and outstanding and fully-paid and non-assessable.  The Shares, when issued and allotted in accordance with this Agreement:  (a) will be duly authorized, validly issued, fully paid, non-assessable, and free of any preemptive rights, (b) will have the rights, preferences, privileges, and restrictions set forth in Purchaser's Certificate of Incorporation, Certificate of Designation and By-laws, and (c) will be issued free and clear of any Liens of any kind.

# EXHIBIT 1 ("ISA")

6.5     Purchaser is currently in material compliance with all applicable laws, including securities laws. Purchaser has timely filed all forms and reports required to be filed with the Securities Exchange Commission (the "**SEC**") including, without limitation, all exhibits required to be filed therewith, and has made available to the Seller true, complete and correct copies of all of the same so filed (including any forms, reports and documents incorporated by reference therein or filed after the date hereof, the "**Purchaser SEC Reports**").  For purposes hereof, such Purchaser SEC Reports shall be deemed delivered to Seller via the SEC's EDGAR database. The Purchaser SEC Reports: (i) at the time filed complied (or will comply when filed, as the case may be) in all material respects with the applicable requirements of the Securities Act and/or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and the rules and regulations promulgated thereunder, and with the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder, in each case applicable to such Purchaser SEC Reports at the time they were filed; and (ii) did not at the time they were filed (or, if later filed, amended or superseded, then on the date of such later filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

6.6     Purchaser has timely filed (or has been deemed to have timely filed pursuant to Rule 12b-25 under the Exchange Act) and made publicly available on the SEC's EDGAR system, and the Seller may rely upon, all certifications and statements required by (i) Rule 13a-14 or Rule 15d-14 under the Exchange Act and (ii) Section 906 of the Sarbanes Oxley Act of 2002 with respect to any documents filed with the SEC. Since the most recent filing of such certifications and statements, there have been no significant changes in Purchaser's internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act), or in other factors that could significantly affect its disclosure controls and procedures.

6.7     The financial statements (including footnotes thereto) included in or incorporated by reference into the Purchaser SEC Reports (the "**Purchaser Financial Statements**") were complete and correct in all material respects as of their respective filing dates, complied as to form in all material respects with the Exchange Act and the applicable accounting requirements, rules and regulations of the SEC promulgated thereunder as of their respective dates and have been prepared in accordance with United States generally accepted accounting principles ("**GAAP**") applied on a consistent basis during the periods involved (except as otherwise noted therein).  The Purchaser Financial Statements fairly present the financial condition of Purchaser as of the dates thereof and results of operations, cash flows and stockholders' equity for the periods referred to therein (subject, in the case of unaudited Purchaser Financial Statements, to normal recurring year-end adjustments which were not and will not be material in amount). Without limiting the generality of the foregoing, (i) no independent public accountant of Purchaser has resigned or been dismissed as independent public accountant of Purchaser as a result of or in connection with any disagreement with Purchaser on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, (ii) no executive officer of Purchaser has failed in any respect to make, without qualification, the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act with respect to any form, report or schedule filed by Purchaser with the SEC since the enactment of the Sarbanes-Oxley Act and (iii) no enforcement action has been initiated or, to the knowledge of Purchaser, threatened against Purchaser by the SEC relating to disclosures contained in any

**EXHIBIT 1 ("ISA")**

Purchaser SEC Report. There has been no change in Purchaser's accounting policies except as described in the notes to the Purchaser Financial Statements.

6.8    Purchaser is not in default and neither the execution and delivery of the Transaction Documents nor compliance by Purchaser with the terms and provisions hereof and thereof, will conflict with, or result in a breach or violation of, any of the terms, conditions and provisions of:  (i) the Purchaser Corporate Governance Documents, or (ii) any note, indenture, mortgage, lease, agreement, contract, purchase order or other instrument, document or agreement to which Purchaser is a party or by which it or any of its property is bound, or (iii) any law, statute, ordinance, regulation, order, writ, injunction, decree, or judgment of any court or any governmental department, commission, board, bureau, agency or instrumentality in any country in which Purchaser conducts business, with the exception of those judgments listed **Schedule 6.8**. Such execution, delivery and compliance with the Transaction Documents will not (a) give to others any rights, including rights of termination, cancellation or acceleration, in or with respect to any agreement, contract or commitment referred to in this paragraph, or to any of the properties of Purchaser, or (b) except for compliance with any applicable requirements under the Securities Act, the Exchange Act and any requirements of the Over-the-Counter Bulletin Board ("**OTCBB**"), no consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Body or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of the Transaction Documents or the consummation of the transactions contemplated hereby and thereby, which consent or approval has not heretofore been obtained or will be obtained by Closing.  To the knowledge of Purchaser, no third party is in default under any agreement, contract or other instrument or document to which Purchaser is a party.  To the knowledge of Purchaser, Purchaser is not a party to or bound by any order, judgment, decree or award of any Governmental Body.

6.9    No action, proceeding or governmental inquiry or investigation is pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its officers, directors or employees (in their capacity as such or as shareholders, if applicable), or against any of Purchaser's properties, including, without limitation, assets, licenses and rights transferred to Purchaser under any written agreement or other binding undertaking, or with regard to Purchaser's business, before any court, arbitration board or tribunal or administrative or other governmental agency, nor does Purchaser believe that there is any basis for the foregoing.

**7.    Survival; Indemnification; Limitation of Liability; No Consequential Damages**

7.1    The representations and warranties of each Party hereunder shall survive the Closing and remain in effect for a period of one (1) year thereafter.

7.2    Indemnification.  The Seller, on the one side, and Purchaser on the other side (as applicable, the "**Indemnifying Party**") agree to indemnify and hold harmless the Parties of the other side and their respective Affiliates (as applicable, the "**Indemnified Parties**"), against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon (a) any breach of any of such Party's representations or warranties herein, misrepresentation or warranty or breach or failure by the Indemnifying Party to comply with any covenants or

**EXHIBIT 1 ("ISA")**

agreement made by it herein, in the other Transaction Documents or in any other document furnished by it to any of the foregoing in connection with this transaction and (b) any action for securities law violations instituted by an Indemnifying Party which is finally resolved by judgment against such Indemnifying Party.

7.3    Mechanics of Indemnification.    Whenever any claim arises for indemnification under this Agreement or an event which may result in a claim for such indemnification has occurred, the Indemnified Party(ies) will promptly notify the Indemnifying Party of the claim and, when known, the facts constituting the basis for such claim.  The Indemnifying Party shall have the obligation to dispute and defend all such Third Party claims and thereafter so defend and pay any adverse final judgment or award or settlement amount in regard thereto.  Such defense shall be controlled by the Indemnifying Party, and the cost of such defense shall be borne by the Indemnifying Party, provided that the Indemnified Parties shall have the right to participate in such defense at their own expense, unless the Indemnified Parties require their own attorney due to a conflict of interest, in which case, the expense of a single law firm acceptable to such Indemnified Party will be borne by the Indemnifying Party.  The Indemnified Parties shall cooperate in all reasonable respects in the investigation, trial and defense of any such claim at the cost of the Indemnifying Party. If the Indemnifying Party fails to take action within thirty (30) days of notice, then the Indemnified Parties shall have the right to pay, compromise or defend any third party claim, such costs to be borne by the Indemnifying Party.  The Indemnified Parties shall also have the right and upon delivery of ten (10) days advance written notice to such effect to the Indemnifying Party, exercisable in good faith, to take such action as may be reasonably necessary to avoid a default prior to the assumption of the defense of the Third Party claim by the Indemnifying Party, and any reasonable expenses incurred by the Indemnified Parties so acting shall be paid by the Indemnifying Party.  The Indemnifying Party will not settle or compromise any Third Party claim without the prior written consent of the Indemnified Parties, not to be unreasonably withheld.

7.4    Purchaser Indemnification.    Purchaser and ChanBond shall indemnify and hold the Seller harmless with respect to any loss, expense, cost, damage and settlement (collectively, "**Indemnified Expenses**") caused to Seller as a result of Purchaser's or ChanBond's or its Affiliates' actions or omissions with respect to the Patents following the Closing Date, provided Seller is not determined to responsible for such actions as a result of their fraud or intentional misconduct.  In particular, in the event that the enforcement or other activities with the Patents results in litigation or other dispute resolution processes with one or more Third Parties, with Seller being required to be involved or liable for the expenses arising through actions of ChanBond (*e.g.*, being added as a party to the process, even if such joinder is improper, or being subject to Third Party discovery requests or otherwise having any exposure for any claims arising through activities of ChanBond), Purchaser and ChanBond shall, at Seller's request, indemnify Seller all of Seller's Indemnified Expenses arising from that involvement.

7.5    Limitation of Liability.    SELLER'S TOTAL LIABILITY UNDER THE TRANSACTION DOCUMENTS WILL NOT EXCEED THE CASH CLOSING CONSIDERATION ACTUALLY RECEIVED BY SELLER HEREUNDER. THE PARTIES ACKNOWLEDGE THAT THIS LIMITATION ON POTENTIAL LIABILITIES WAS AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THE TRANSACTION DOCUMENTS.

# EXHIBIT 1 ("ISA")

7.6     Limitation on Consequential Damages.  NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS EMPLOYEES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 8.     Miscellaneous

8.1     Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of the Transaction Documents and the intentions of the Parties as reflected thereby.

8.2     Governing Law; Arbitration; Prevailing Party.  This Agreement and all claims or causes of action that may be based upon, arise out of or relate to this Agreement or the Collateral Agreements will be construed in accordance with and governed by the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State without regard to conflicts of laws principles thereof.  Any dispute arising under or in connection with any matter of any nature (whether sounding in contract or tort) relating to or arising out of this Agreement, shall be resolved exclusively by arbitration.  The arbitration shall be in conformity with and subject to the applicable rules and procedures of the American Arbitration Association. The arbitration shall be conducted before a panel of three (3) arbitrators, with one arbitrator to be selected by each of Seller and Buyer and the third arbitrator to be selected by the arbitrators selected by the Parties.  The Parties agree to be (a) subject to the exclusive jurisdiction and venue of the arbitration in the Eastern District of Texas (b) bound by the decision of the arbitrator as the final decision with respect to the dispute, and (c) subject to the jurisdiction of both of the federal courts of the United States of America or the courts sitting in the Eastern District in the State of Texas for the purpose of confirmation and enforcement of any award.  The prevailing party in any arbitration shall be entitled to recover its costs and expenses (including attorney's fees and expenses) from the non-prevailing party.

8.3     Limitations on Assignment.  Except as expressly permitted in this Section, none of Purchaser or ChanBond may grant or assign any rights or delegate any duties under this Agreement to any Third Party (including by way of a "change in control") or may sell, transfer, or spin-off any of the interests in ChanBond or any of its material assets without the prior written consent of Seller.  Notwithstanding the foregoing, Purchaser shall be permitted to transfer or assign) its rights, interests and obligations under this Agreement, as applicable, without Seller's prior written consent as part of a sale of all or substantially all of its business, equity to, or a change in control transaction with a Third Party acquirer (an "**M&A Transaction**", and an "**Acquirer**," respectively); provided that (a) such transfer or assignment is subject to all of the terms and conditions of this Agreement; and (ii) such Acquirer executes a written undertaking towards Seller agreeing to be bound by all of the terms and conditions of this Agreement with respect to the rights being transferred or assigned.  Except as otherwise expressly limited herein,

EXHIBIT 1 ("ISA")

the provisions hereof shall inure to the benefit of, and be binding upon, the successors, permitted assigns, heirs, executors, and administrators of the Parties hereto.

8.4     This Agreement and the Schedules hereto constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.  Any term of this Agreement may be amended only with the written consent of all Parties thereto.  The observance of any term hereof may be waived (either prospectively or retroactively and either generally or in a particular instance) only with the written consent of the party against which such waiver is sought.

8.5     All notices and other communications required or permitted hereunder to be given to a Party to this Agreement shall be in writing and shall be faxed, emailed or mailed by registered or certified mail, postage prepaid, or prepaid air courier, or otherwise delivered by hand or by messenger, addressed to such Party's address as set forth above; or at such other address as the Party shall have furnished to each other Party in writing in accordance with this provision.  Any notice sent in accordance with this Section shall be effective (i) if mailed, seven (7) business days after mailing, (ii) if by air courier two (2) business days after delivery to the courier service, (iii) if sent by messenger, upon delivery, and (iv) if sent via facsimile or email, upon transmission and electronic confirmation of receipt or (if transmitted and received on a non-business day) on the first business day following transmission and electronic confirmation of receipt (provided, however, that any notice of change of address shall only be valid upon receipt).

8.6     No delay or omission to exercise any right, power, or remedy accruing to any Party upon any breach or default under this Agreement, shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.   All remedies, either under this Agreement or by law or otherwise afforded to any of the Parties, shall be cumulative and not alternative.

*[Signature Page Follows]*

# EXHIBIT 1 ("ISA")

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                              **DEIRDRE LEANE**

By: _Deirdre Leane_
Name: _DEIRDRE LEANE_
Date: _27 October 2015_

PURCHASER:                           **UNIFIEDONLINE, INC.**

By: _____
Name: _Rob Howe_
Title: _CEO_
Date: _27 October, 2015_

CHANBOND:                            **CHANBOND, LLC**

By: _Deirdre Leane_
Name: _DEIRDRE LEANE_
Title: _MANAGER_
Date: _27 October 2015_

13

**EXHIBIT 1 ("ISA")**

IN WITNESS WHEREOF the Parties have signed this Agreement as of the date first hereinabove set forth.

SELLER:                                    **DEIRDRE LEANE**

By: _Deirdre Leane_
Name: DEIRDRE LEANE
Date: 27 October 2015


PURCHASER:                                 **UNIFIEDONLINE, INC.**

By: _[signature]_
Name: Bob Howe
Title: CEO
Date: 27 October, 2015


CHANBOND:                                  **CHANBOND, LLC**

By: _Deirdre Leane_
Name: DEIRDRE LEANE
Title: MANAGER
Date: 27 October 2015

13

**EXHIBIT 1 ("ISA")**

## SCHEDULE 1.3

### Contracts

1. ChanBond, LLC – CBV, Inc. Patent Purchase Agreement dated April 9, 2015
2. ChanBond, LLC – Bentham IMF Litigation Funding Agreement dated September 9, 2015
3. ChanBond, LLC - IPNAV, LLC Advisory Services Agreement dated April 9, 2015
4. ChanBond, LLC - Mishcon de Reya Retention Agreement dated April 20, 2015
5. ChanBond, LLC - Bayard Law Engagement Agreement dated June 8, 2015
6. ChanBond, LLC - Ascenda Law Group Engagement Agreement dated July 14, 2015

# EXHIBIT 1 ("ISA")

## SCHEDULE 2.2.1

### Interest Transfer Deed

**FOR VALUE RECEIVED**, the undersigned, Deirdre Leane ("**Transferor**") hereby assigns, transfers and conveys all of its membership interests in ChanBond, LLC, a Delaware limited liability company (the "**Interests**") to UnifiedOnline, Inc., a Delaware corporation ("**Transferee**") and Transferee hereby accepts the above mentioned Interests.

In witness whereof, we affix our signatures hereto this 27th day of October, 2015.

Transferor:

**Deirdre Leane**

27. October 2015
Date

Transferee:

**UnifiedOnline, Inc.**

10-27-2015
Date

Witness:

Name: Joseph Ghally

10/27/2015
Date

Witness:

Name: B. Rodriguez

10-27-2015
Date

# EXHIBIT 1 ("ISA")

**SCHEDULE 2.2.3**

**UnifiedOnline, Inc.'s Board of Directors Resolutions**

**EXHIBIT 1 ("ISA")**

STATEMENT OF UNANIMOUS
CONSENT TO ACTION TAKEN IN
LIEU OF A
SPECIAL MEETING OF THE BOARD OF
DIRECTORS OF
UNIFIEDONLINE, INC.

In lieu of a special meeting of the board of directors (the "Board") of UnifiedOnline, Inc., a Delaware corporation (the "Corporation"), and in accordance with the Bylaws of the Corporation and §141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the members of the Board, do hereby consent to the adoption of, and do hereby adopt, the following resolutions and declare them to be in full force and effect as if they had been duly adopted at a meeting of the Board, duly called, noticed and held:

**WHEREAS**, the Board deems it to be in the best interests of the Corporation to enter into a Purchase Agreement dated October 26, 2015 (the "Agreement"), in connection with the acquisition of ChanBond, LLC ("ChanBond"), a Delaware limited liability company, the owner of that certain portfolio of Intellectual Property, known as the "ChanBond" patent portfolio, more particularly described as follows:

  The Corporation and CHANBOND agree to an acquisition by the Corporation of 100% of the membership interests of CHANBOND for consideration generally defined as: 44,700,000 shares of the common stock of the Corporation , plus a $5MM 5-Year No-Interest Promissory Note, with a Maturity Date of October 27, 2020..

**NOW, THEREFORE BE IT RESOLVED,** that the Corporation is hereby authorized to enter into the Agreement and the Note.

**FURTHER RESOLVED**, that any executive officer of the Corporation be, and hereby is authorized, empowered and directed, from time to time, to take such additional action and to execute, certify and deliver to the transfer agent of the Corporation, as any appropriate or proper to implement the provisions of the foregoing resolutions; and be it

**FURTHER RESOLVED**, that this Consent may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument, and that counterpart signature pages transmitted by facsimile transmission, by electronic mail in portable document format (.pdf) or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, shall have the same effect as physical delivery of the paper document bearing an original signature.

**IN WITNESS WHEREOF**, the undersigned members of the Board have executed this Consent as of October 26, 2015.

_____

Robert M. Howe, III

**EXHIBIT 1 ("ISA")**

### SCHEDULE 2.2.7

### Common Interest Agreement

THIS COMMON INTEREST AGREEMENT ("**Agreement**") is entered into as of April 9, 2015, by and among **ChanBond, LLC** (the "**Company**") having its principal offices at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204; **UnifiedOnline, Inc.** ("**UnifiedOnline**"), having its principal offices at 4126 Leonard Drive, Fairfax, Virginia 22030; and **Deirdre Leane ("Leane")**, located at 2525 Carlisle Street, Suite 439, Dallas, Texas 75201.

# EXHIBIT 1 ("ISA")

1.      Background.

1.1.    Company, Unified and Leane are sometimes referred to herein as a "**party**" or the "**parties**" and are presently negotiating the closing of an agreement under which UnifiedOnline will purchase Company from Leane and continue to enforce and license patents and related rights owned by the Company "**IP Rights**" and the "**Patent Matters**" respectively).

1.2.    The parties have a common legal interest in upholding the validity and enforceability of the IP Rights, for purposes of enforcement. The parties anticipate they will enforce inherent rights of the IP Rights against third parties through litigation. The parties have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest doctrine. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of privileged information and attorney work product developed by the parties and their respective counsel.

2.      Common Interest.

2.1.    The parties have a common, joint and mutual legal interest in the monetization of valid and enforceable patents. In furtherance of that common interest, the parties will cooperate with each other, to the extent permitted by law, to share information protected by the

attorney-client privilege, the work product doctrine, or other applicable privilege or immunity with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of this Agreement.

2.2.    In order to further their common interest, the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, evidence of use materials, claims charts, prosecution history files and other information (hereinafter "**Common Interest Materials**"). The sole purpose of the exchange of the Common Interest Materials is to support the parties' common interest with respect to the enforcement for the Patent Matters. Any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection. Nothing in this Agreement requires a party to share information with the other party.

3.      Nondisclosure.

3.1.    The parties and their counsel shall use the Common Interest Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Common Interest Material. No party nor

**EXHIBIT 1 ("ISA")**

their respective counsel shall produce privileged documents or information unless or until directed to do so by a final order of a court of competent jurisdiction, or upon the prior written consent of the other party. No privilege or objection shall be waived by a party hereunder without the prior written consent of the other party.

3.2.    Except as herein provided, in the event that either party or its counsel is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar process) to disclose any Common Interest Materials, the party or its counsel shall assert all applicable privileges, including, without limitation, the common interest doctrine, and shall immediately inform the other party and the other party's counsel of the request or requirement to disclose.

4.    Relationship; Additions; Termination.

4.1.    This Agreement does not create any agency or similar relationship among the parties. Through the term of the agreement between the parties, or any other agreement requiring confidentiality, (whichever term is longer), no party nor their respective counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2.    Nothing in this Agreement affects the separate and independent representation of each party by its respective counsel or creates an attorney-client relationship between the counsel for a party and the other party to this Agreement.

4.3.    This Agreement shall continue until terminated upon the written request of either party. Upon termination, each party and their respective counsel shall return any Common Interest Material furnished by the other party. Notwithstanding termination, this Agreement shall continue to protect all Common Interest Materials disclosed prior to termination. Sections 3 and 5 shall survive termination of this Agreement.

5.    General Terms.

5.1.    This Agreement is governed by the laws of the State of Delaware, without regard to its choice of law principles to the contrary. In the event any provision of the Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect. Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2.    The parties agree that a breach of this Agreement would result in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party shall be entitled to equitable relief, including injunctive relief, as a non-exclusive remedy for any

**EXHIBIT 1 ("ISA")**

such breach.

5.3.    Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service as set forth below, and shall be deemed to have been given on the day received:

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, TX 75204

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

Deirdre Leane
2525 Carlisle Street
Suite 439
Dallas, TX 75201

5.4.    This Agreement is effective and binding upon each party as of the date it is signed by or on behalf of a party and may be amended only by a writing signed by or on behalf of each party.   This Agreement may be executed in counterparts.   Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

***The remainder of this page has been intentionally left blank.**

**EXHIBIT 1 ("ISA")**

IN WITNESS WHEREOF, CHANBOND, LLC, UNIFIEDONLINE, INC. and DEIRDRE
LEANE have executed this Common Interest Agreement by their duly authorized
representatives.

CHANBOND, LLC

By: _____
      (Signature)

Name: DEIRDRE LEANE

Title: MANAGER

UNIFIEDONLINE, INC.

By: _____
      (Signature)

Name: Rob Howe

Title: CEO

DEIRDRE LEANE

By: _____
      (Signature)

Name: DEIRDRE LEANE

Title: DR.

**EXHIBIT 1 ("ISA")**

**<u>SCHEDULE 2.2.8</u>**

**<u>Promissory Note</u>**

**EXHIBIT 1 ("ISA")**

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

## UNIFIEDONLINE, INC.

### PROMISSORY NOTE

Principal Amount: $5,000,000                    Original Issuance Date: October 27, 2015

FOR VALUE RECEIVED UnifiedOnline, Inc., a Delaware corporation (the "Company"), promises to pay to Deirdre Leane, an individual, of 2525 Carlisle St., Suite 439, Dallas, TX 75201 (the "Holder") an aggregate principal amount of Five Million Dollars ($5,000,000.00) (representing the Cash Payment as provided for and defined in the Interest Sale Agreement dated as of the date hereof (the "Interest Sale Agreement"), to which the Company and the Holder are parties) payable on or prior to October 27, 2020 (the "Maturity Date"), provided, however, that if this Note is not paid in full by the Maturity Date, the aggregate principal amount of this Note shall be increased by Twenty Five Thousand Dollars ($25,000.00) for each month such payment is delayed (or *pro rata* portion thereof) until paid in full (the "New Principal Balance").

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.  Event of Default.

    (a)    For purposes of this Note, an "Event of Default" means:

        (i)    the Company shall default in the payment of principal on this Note on or prior to the applicable Maturity Date; or

        (ii)   the Company shall be in breach of any obligation, covenant or representation made in this Note or the Interest Sale Agreement; or

        (iii)  the Company shall (a) become insolvent; (b) dissolve or terminate its existence; (c) admit in writing its inability to pay its debts generally as they mature; (d) make an assignment for the benefit of creditors or commence proceedings for its

**EXHIBIT 1 ("ISA")**

dissolution; or (e) apply for or consent to the appointment of a trustee, liquidator, receiver or similar official for it or for a substantial part of its property or business; or

(iv)     a trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within thirty (30) days after such appointment; or

(v)     any governmental agency or any court of competent jurisdiction at the insistence of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company and shall not be dismissed within thirty (30) days thereafter; or

(vi)     bankruptcy, reorganization, insolvency or liquidation proceedings or other proceedings, or relief under any bankruptcy law or any law for the relief of debt shall be instituted by or against the Company and, if instituted against the Company shall not be dismissed within thirty (30) days after such institution, or the Company shall by any action or answer approve of, consent to, or acquiesce in any such proceedings or admit to any material allegations of, or default in answering a petition filed in any such proceeding.

Upon the occurrence of an Event of Default, the entire unpaid and outstanding indebtedness due under this Note shall be immediately due and payable without notice and Holder shall be entitled to such additional rights and remedies as are provided by law.

Until the Note is paid in full, the Company shall be obligated to make payments on this Note to the Holder from 100% of any Net Revenues (as defined below) within thirty (30) calendar days after each calendar month commencing with the calendar month ending October 31, 2015.

"*Net Revenues*" shall mean the total aggregate Gross Recoveries less the total aggregate amount of costs and expenses - incurred by or on behalf of the Company in connection with the monetization, enforcement and/or sale of the Assigned Patent Rights of the ChanBond, LLC patent portfolio (described in Exhibit A) - which are exclusively limited to: (a) the reasonable fees and expenses of litigation counsel; (b) the reasonable fees and expenses of licensing counsel (c) the reasonable  fees and expenses of any re-examination or other patent prosecution counsel; (d) reasonable expert fees, court costs, deposition costs and other reasonable costs and expenses related to the maintenance, prosecution, enforcement, and licensing of the Patents; and (e) the reasonable fees and expenses of any other advisors or agents which the Parties mutually agree are required and the repayment of litigation financing.

Notwithstanding anything to the contrary contained in this Note, in no event shall the total of all charges payable under this Note, which are or could be held to be in the nature of interest exceed the maximum rate permitted to be charged under applicable law.  Should the Holder receive any payment which is or would be in excess of that permitted to be charged under any such applicable law, such payment shall have been, and shall be deemed to have been, made in error and shall automatically be applied to reduce the principal balance outstanding on this Note.

# EXHIBIT 1 ("ISA")

(b)     As soon as possible and in any event within two days after the Company becomes aware that an Event of Default has occurred, the Company shall notify the Holder in writing of the nature, extent and time of and the facts surrounding such Event of Default, and the action, if any, that the Company proposes to take with respect to such Event of Default.

2.     <u>Prepayment</u>. The Company may prepay this Note at any time, in whole or in part, without penalty or premium.

3.     <u>Miscellaneous</u>.

(a)     <u>Loss, Theft, Destruction or Mutilation of Note</u>.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company and, in the case of mutilation, on surrender and cancellation of this Note (or what remains thereof), the Company shall execute and deliver, in lieu of this Note, a new note executed in the same manner as this Note, in the same principal amount as the unpaid principal amount of this Note and dated the date of this Note.

(b)     <u>Payment</u>.  All payments under this Note shall be made in lawful tender of the United States no later than 5:30 pm, Eastern Standard Time, on the date on which such payment is due, by wire transfer of immediately available funds to the account identified by the Holder. Time is of the essence as to all dates set forth herein, provided, however, that whenever any payment to be made under this Note shall be stated to be due on a Saturday, Sunday or a public holiday, or the equivalent for banks generally under the laws of the State of New York (any other day being a "Business Day"), such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest.

(c)     <u>Waivers</u>.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

(d)     <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified only by an instrument in writing signed by the party against which enforcement of the same is sought.

(e)     <u>Notices</u>.  Any notice or other communication required or permitted to be given hereunder shall be in writing sent by mail, facsimile with printed confirmation, nationally recognized overnight carrier or personal delivery and shall be effective upon actual receipt of such notice, to the following addresses until notice is received that any such address or contact information has been changed:

To the Company:

UnifiedOnline, Inc.
4126 Leonard Drive
Fairfax, VA 22030

**EXHIBIT 1 ("ISA")**

To the Holder:

Deirdre Leane
2525 Carlisle St.
Suite# 439
Dallas, TX 75201


(f)     Expenses; Attorneys' Fees.  If action is instituted to enforce or collect this Note, the Company promises to pay or reimburse all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by the Holder in connection with such action.

(g)     Successors and Assigns.  This Note may not be assigned or transferred by the Company without the express written consent of the Holder.  This Note may only be assigned or transferred by Holder subject to applicable securities laws.  Subject to the preceding sentence, the rights and obligations of the Company and the Holder of this Note shall be binding upon and benefit the successors, permitted assigns, heirs, administrators and permitted transferees of the parties.

(h)     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising on the part of the Holder, any right, option, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, option, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, option, remedy, power or privilege.  The rights, options, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, options, remedies, powers and privileges provided by law.

(i)     Governing Law; Jurisdiction.  THE PARTIES HEREBY AGREE THAT THIS NOTE IS MADE AND ENTERED INTO IN THE STATE OF DELAWARE AND FURTHER AGREE THAT ALL ACTS REQUIRED BY THIS NOTE AND ALL PERFORMANCE HEREUNDER ARE INTENDED TO OCCUR IN THE STATE OF DELAAWARE.   THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAWS.  EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION OF THE STATE OR FEDERAL COURTS OF THE STATE OF DELAWARE OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.  EACH PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, (A) ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT; AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  FINAL JUDGMENT IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON EACH PARTY DULY SERVED WITH PROCESS THEREIN AND MAY BE ENFORCED IN THE COURTS OF THE JURISDICTION OF WHICH EITHER PARTY OR ANY OF THEIR PROPERTY IS

**EXHIBIT 1 ("ISA")**

SUBJECT, BY A SUIT UPON SUCH JUDGMENT.  THE PARTIES HEREBY WAIVE ANY
AND ALL RIGHTS TO TRIAL BY JURY.

IN WITNESS WHEREOF, the Company has caused this Note to be executed as of the date first
above written by its duly authorized officer.

**UNIFIEDONLINE, INC.**

By: _____

Name: Robert M. Howe III

Title: CEO

29087977v.2

**EXHIBIT 1 ("ISA")**

**EXHIBIT A**

| US Patent No. 7346918 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
|---|---|
| US Patent No. 7941822 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8341679 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8984565 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 9015774 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 13/799,749 October 10, 2013* | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 14/167,289 Filed January 29, 2014 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application - 10/346,571 (Abandoned – CIP of 09/824,531) | |
| US Application - 09/824,531 (Abandoned – CIP of 7346918) | |
| PCT/US2001/049629 (Expired – no national phase) | |
| PCT/US2002/009863 (Expired – no national phase) | |

*Publication Date

**EXHIBIT 1 ("ISA")**

## **SCHEDULE 3.3**

## **Company Agreements**

**EXHIBIT 1 ("ISA")**

## **SCHEDULE 5.1(b)**

### **Pending Litigation**

1.  ChanBond, LLC v. WaveDivision Holdings, LLC, Civil Case No. 1:15-cv-00853
2.  ChanBond, LLC v. Comcast Corporation et al, Civil Case No. 1:15-cv-00848
3.  ChanBond, LLC v. Charter Communications, Inc., Civil Case No. 1:15-cv-00847
4.  ChanBond, LLC v. WideOpen West Finance, LLC, Civil Case No. 1:15-cv-00854
5.  ChanBond, LLC v. Cequel Communications, LLC, Civil Case No. 1:15-cv-00846
6.  ChanBond v. RCN Telecom Services, LLC, Civil Case No. 1:15-cv-00851
7.  ChanBond v. Cox Communications, Inc. et al, Civil Case No. 1:15-cv-00849
8.  ChanBond v. Time Warner Cable Inc. et al, Civil Case No. 1:15-cv-00852
9.  ChanBond v. Mediacom Communications Corporation, Civil Case No. 1:15-cv-00850
10. ChanBond v. Bright House Networks, LLC, Civil Case No. 1:15-cv-00843
11. ChanBond v. Cablevision Systems Corporation et al, Civil Case No. 1:15-cv-00845
12. ChanBond v. Cable One, Inc., Civil Case No. 1:15-cv-00844
13. ChanBond v. Atlantic Broadband Group, LLC, Civil Case No. 1:15-cv-00842

# EXHIBIT 1 ("ISA")

## SCHEDULE 6.3

## Capitalization Table

**EXHIBIT 1 ("ISA")**

**Exhibit A**

**EXHIBIT 1 ("ISA")**

## UnifiedOnline, Inc.  - 6,000,000,000 authorized shares
## Cap Table (10.26.15)

| Common Stock | | | Current | Own % | Series | $0.00750 $ | 12.000 $ | 60.000 | Total | Expiration Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Restricted | | | 904,088,389 | 99.0% | N | 205,805,872 | | | 205,805,872 | 09/30/16 |
| Float | | | 8,809,148 | 1.0% | O | | 68,452 | | 68,452 | 11/23/16 |
| | | | | | Q | | 7,770 | | 7,770 | 02/08/17 |
| | | | Common shares O/S | 912,897,537 | R | | | 37,004 | 37,004 | 06/30/17 |
| | | Warrants | | | Total | 205,805,872 | 76,222 | 37,004 | 205,919,098 | |

| $ value if converted | | Exercise Price | Shares | |
|---|---|---|---|---|
| $ | 1,543,544 | $0.00750 | 205,805,872 | |
| $ | 914,664 | $12.000 | 76,222 | |
| $ | 2,220,240 | $60.000 | 37,004 | |
| $ | 4,678,448 | | Total Warrants | 205,919,098 |

| Vested | | Stock Options | O/S | |
|---|---|---|---|---|
| | | | 7,232 | |
| | 0 | | Total O/S Options | 7,232 |

**Preferred Stock - Series B**     1,567
**Preferred Stock - Series AA (0 shares)**

**Fully Diluted Shares before convertible debt**     1,118,825,434

| Convertible debt | | | At prevailing share price | Conversion Price |
|---|---|---|---|---|
| Tangiers | $ | 68,750 | 13,750,000 | 22,916,667 |
| JMJ | $ | 30,500 | 6,100,000 | 10,166,667 |
| KBM | $ | 53,232 | 10,646,394 | 18,234,290 |
| Vis Vires | $ | 34,100 | 6,820,000 | 11,680,749 |
| | $ | 186,582 | 37,316,394 | 62,998,372 |

**Fully Diluted Shares after convertible debt**     1,181,823,806

**SCHEDULE 6.8**

**Judgments**

1.  Two judgments held by FedEx being pursued in the General District Court of Fairfax
    County, Virginia; and the Circuit Court of Fairfax County, Virginia, respectively:

    *FedEx Customer Information Services, Inc. vs. Iceweb Storage Corporation fka Inline
    Corporation,* In the Circuit Court of Fairfax County, Virginia, Case No. CL2010-7512 –
    Judgment awarded $16,321.66 plus interest and costs.

    *FedEx Customer Information Services, Inc. vs. Iceweb, Inc.,* In the General District Court of
    Fairfax County, Virginia, Case No. GV10-023543-00 – Judgment awarded $12,900.95 plus
    $58 in costs.

2.  Judgment held by i-Cubed:

    *i-Cubed information, integration and imagins, LLC aka i-Cubed, information, integration
    and imagins, LLC vs. Iceweb Storage Corporation*, in the General District Court of Fairfax
    County, Case No. GV12-019582-00 – Judgment awarded of $12,920.60, plus interest and
    costs.

3.  Judgment held by Pellegrino and Associates:

    *Pellegrino and Associates vs. Iceweb, Inc.,* in the Marion County Superior Court No. 12,
    Marion County, Indiana, Case No. 49D12-1408-CC-2714 – Judgment awarded of $20,158.73
    plus interest and costs.

**EXHIBIT 1 ("ISA")**

# EXHIBIT C

April 9, 2015

ChanBond, LLC
2633 McKinney Avenue
Suite 130-501
Dallas, Texas 75204

Re: Advisory Services

Dear Deirdre:

This letter agreement ("Agreement") confirms the agreement of ChanBond LLC, a limited liability corporation organized under the laws of Delaware, with a principal place of business at 2633 McKinney Avenue, Suite 130-501, Dallas, Texas 75204 (including any and all of its current and future affiliates, associates, subsidiaries, successors and assigns, or any combination of the foregoing, the "Company") to engage IPNAV, LLC, a limited liability company organized under the laws of Texas, of 2525 Carlisle Street, Suite 439, Dallas, TX 75201 ("IPNAV") to provide specified services to the Company on the following terms and conditions:

RESPONSIBILITIES

1.  IPNAV:
    a.  IPNAV has and will continue to act as the Company's worldwide intellectual property licensing agent, and will provide strategic advisory services relating to the acquisition: sale, licensing, commercialization, enforcement, prosecution, and settlement with respect to the intellectual property owned or controlled by the Company, including without limitation, the patents identified in Exhibit A, as the same may be amended from time to time upon mutual agreement of the parties hereto (the "Services" and the "IP Rights," respectively).
    b.  IPNAV will introduce the Company to individuals and entities that may, among other things, act as counsel, consultants, vendors and experts relating to the Services.
    c.  The Services will be provided' by IPNAV from such locations, and at such times, as IPNAV shall reasonably determine.   IPNAV agrees to provide the Services to the best of its reasonable abilities, but guarantees no particular outcome.
    d.  IPNAV will provide additional services as may be reasonably requested by the Company and approved by IPNAV.
    e.  IPNAV will act as an independent contractor, and is not a fiduciary for the Company.

2.  The Company:
    a.  IPNAV will advise and make recommendations within the framework of the Services, but decision-making rests solely with the Company.  The Company confirms that IPNAV is not affiliated with the Company and does not directly or indirectly control the Company.
    b.  IPNAV is not a law or accounting firm, or a tax advisor, and the Company will not rely on IPNAV to provide any such advice or services. The Company will seek separate legal, accounting, tax and other similar advice and services at its discretion.
    c.  The Company identifies Deirdre Leane (the "Company Designee") as the point of contact for IPNAV.  IPNAV will exclusively report to and coordinate with the Company Designee and may rely on him/her as the official spokesperson and authorized officer of the Company, with full authority to bind the Company.
    d.  The Company will cooperate with IPNAV so that the Services may be performed in an efficient and prompt manner.
    e.  The Company will promptly inform IPNAV of any materially relevant information relating to the IP Rights.
    f.  The Company will retain full, clear, and exclusive title to the IP Rights, free and clear of any liens, pledges, encumbrances or any other third party rights, except as set forth on Exhibit B and as discussed and recommended by IPNAV in writing in connection with the monetization activities conducted in connection with the Services.

1

APP. 75

g.  In the event of a transfer, sale, exchange, acquisition, or other event impacting title to the IP Rights (including a change of control or sale of the Company) (a "Transfer"), which Transfer was not recommended by IPNAV in writing, the Company will ensure that the obligations hereunder will be assumed (in a contract acceptable in form to IPNAV) by the third party involved in such Transfer (the "Transferee"), such that the compensation, payment, and other obligations of the Company hereunder after the Transfer shall be the same upon the Transferee. Prior to any such Transfer, the Company shall offer an entity designated by IPNAV an opportunity to complete the Transfer on substantially similar terms, and shall hold such offer open for a period of twenty (20) business days.

h.  The Company has secured (and will secure) the agreement of any holders of indebtedness of the Company that they will not foreclose or exercise rights that would adversely impact the Company, IPNAV or the IP Rights.

3.  Both IPNAV and the Company:
    a.  IPNAV and the Company will act in a reasonable manner so as to preserve the other's goodwill and reputation.
    b.  Neither IPNAV nor the Company will undertake actions intended to circumvent this Agreement.
    c.  Both IPNAV and the Company will take reasonable actions to preserve the confidential nature of any information exchanged during the course of this Agreement. To the extent the parties have not already done so, together with the execution of this Agreement, the parties shall execute a Mutual Nondisclosure Agreement in the form attached hereto as Exhibit C.
    d.  Both IPNAV and the Company will maintain records (including financial records) sufficient to determine their respective rights and obligations under this Agreement, and will make such records available promptly upon written request.

### COSTS AND EXPENSES

4.  IPNAV and the Company will each pay their own travel, lodging, copying, fax, telephone and other ordinary business expenses incurred by it in connection with this Agreement. The Company will be responsible for and will pay any costs and expenses payable to third parties in connection with this Agreement (e.g., all litigation, patent prosecution and any other third party costs).

### DISTRIBUTION OF CONSIDERATION FROM THE IP RIGHTS; THE IPNAV FEE

5.  IPNAV Fee: As consideration for IPNAV to enter into this Agreement and to provide the Services, the Company shall pay IPNAV twenty two percent (22%) of the Gross Consideration with respect to any Monetization Event (the "IPNAV Fee").

    For the purposes hereof:

    "Gross Consideration" means the gross amount (prior to any deductions or reductions) of any licensing fee, litigation settlement fee, payment of damages or other remedies, sale or transaction payment, and any other consideration, assets and/or proceeds collected by or made available to the Company in respect of the IP Rights.

    "Monetization Event" means any event in which Gross Consideration is realized, including without limitation, by way of a licensing, monetization, enforcement or settlement transaction; the acquisition or disposition of the IP Rights; or an equity sale or merger of the Company which is concluded pursuant to or in connection with the Services.

6.  Certain Actions: If the Company takes or fails to take any action the result of which could adversely impact IPNAV's current or future ability to collect payment that is due or may become due under the terms of this Agreement, the Company will enter into an amendment to the

Agreement with IPNAV (in a form reasonably acceptable to IPNAV) to eliminate the adverse impact of such action or failure to take action.

7.   Timing: The Company shall wire the IPNAV Fee within five (5) business days of the Gross Consideration being received by the Company. If the Company receives non-cash consideration (e.g., stock), the Company and IPNAV will cooperate to divide the non-cash consideration in a manner consistent with the terms of this Agreement.  Any amounts that are not paid in a timely manner will bear interest at the lower of (i) 22% per annum and (ii) the maximum rate permitted by law.  IPNAV's wire information is:

IPNAV, LLC

Bank: Wells Fargo Private Banking

Dallas, TX 75201

Routing No.: 111900659

Swift International: WFBIUS6S

Account Name: IPNAV, LLC

Account Number: 7921420746

## TERMINATION

8.   Generally: Survival: This Agreement will terminate one (1) year after the last-to-expire of the patents included within the definition of IP Rights unless earlier terminated by mutual written consent of the parties or as set forth in Sections 9 and 10.  Sections 9-13 and 15-16 of this Agreement shall survive any termination of this Agreement and survive until the expiration of the applicable statute of limitations.

9.   Termination by IPNAV:
    a.   IPNAV may terminate this Agreement in the event of a material breach by the Company that is not cured, if capable of being cured, within ten (10) days of notice to the Company of the breach.  In the event of such a termination the Company will remain responsible for and shall pay the IPNAV Fee under and in accordance with this Agreement.
    b.   IPNAV may terminate this Agreement at its discretion upon five (5) days written notice to the Company. In the event of such a termination, the Company will remain responsible for and shall pay the IPNAV Fee with respect to Gross Consideration received prior to termination, but the Company shall otherwise have no further payment obligation to IPNAV under this Agreement.

10.   Termination by the Company: The Company may terminate this Agreement in the event of a material breach by IPNAV that is not cured, if capable of being cured, within ten (10) days of notice to IPNAV of the breach. In the event of such a termination, the Company will remain responsible for and shall pay the IPNAV Fee with respect to Gross Consideration received prior to breach, but the Company shall otherwise have no further payment obligation to IPNAV under this Agreement.

## REPRESENTATIONS AND WARRANTIES

11.   By the Company: The Company represents and warrants that:
    a.   It exclusively owns and has full, clear and exclusive title to the IP Rights, free and clear of any liens, pledges, encumbrances or any other third party rights, except as otherwise set forth on Exhibit B.
    b.   All prior licenses, covenants, and other third party rights granted under the IP Rights

3

are set forth on Exhibit B.
c.  It has disclosed to IPNAV and listed on Exhibit B, all prior attempts to enforce or monetize the IP Rights, whether through correspondence, litigation or otherwise.
d.  The IP Rights have never been held invalid or unenforceable.
e.  It has disclosed to IPNAV all prior art it is aware of in connection with the IP Rights.
f.  Other than as provided on Exhibit D, there are no terminal disclaimers of any kind related to or arising from the IP Rights.  Exhibit D includes a list of all terminal disclaimers that exist with respect to the IP Rights and a detailed description of each such terminal disclaimer.  Further, other than as provided on Exhibit D, there are no US patent applications of any kind constituting an Assigned Patent Right.  Exhibit D includes a list of all pending US patent applications and the respective confirmation numbers issued by the USPTO therefor.

## MISCELLANEOUS

12. Common Interest: From time to time, the parties may share information with each other that is covered by the attorney-client privilege, work product immunity, or other privileges and immunities. This Agreement memorializes the parties' understanding that any such communications are covered by a community of interest that exists between them with respect to the Services.  The parties intend that all applicable privileges and immunities have been, are, and will be preserved. Simultaneous with the execution of this Agreement, the parties shall execute a Common Interest Agreement, in the form attached hereto as Exhibit E.

13. Conflicts of Interest: IPNAV is now, and may in the future be, engaged by other entities that may hold intellectual property in a field of technology similar to the IP Rights.  The Company has assessed the risks of any potential conflicts and has determined that the benefit of engaging an advisor with relevant experience outweighs the risks of any potential conflicts.  Notwithstanding the foregoing, pursuant to that certain Mutual Non-Disclosure Agreement by and between the parties, IPNAV shall protect the Confidential Information (as defined therein) of the Company and shall take those steps necessary to ensure that no Confidential Information shall be used by IPNAV in any manner or for any purpose other than in connection with the Services.

14. Choice of Law: This Agreement shall be governed by and construed under the laws of the State of Texas. Any disputes relating to or arising from this Agreement by or among the parties shall be resolved exclusively by arbitration to be conducted exclusively in Dallas, Texas, in accordance with the Commercial Rules of the American Arbitration Association. Any court of competent jurisdiction shall be authorized to enforce the provisions of the previous sentence and enforce the remedies imposed by such arbitration. The losing party in any action to adjudicate rights relating to this Agreement shall bear the costs of such action.

15. Indemnification: The Company shall indemnify, hold harmless and reimburse IPNAV, its affiliates, directors, officers, controlling persons, employees, attorneys and agents ("Indemnified Persons") to the fullest extent lawful against any and all claims, losses, damages, liabilities, expenses; costs, actions, joint or several, of any nature or type whatsoever ("Indemnified Expenses"), relating to or arising from this Agreement, the Services provided hereunder or any other matter whatsoever relating to or involving the IP Rights, except to the extent (and only to the extent) that a court of competent jurisdiction determines that such Indemnified Expenses arose exclusively from such Indemnified Person's reckless or willful misconduct.

16. Other:
a.  There are no third-party beneficiaries under this Agreement.
b.  This Agreement shall be binding on and inure to the benefit of the Company and IPNAV, and their respective successors, assigns, heirs and representatives.  This Agreement may only be modified or amended by a written agreement signed by both parties.
c.  This Agreement constitutes the entire agreement between the parties and supersedes any prior written or oral agreements or understandings between the parties hereto.  No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

4

    d.   In the event that a party executes this Agreement by an electronic or scanned signature, such electronic or scanned signature shall create a valid and binding obligation of the party executing the same with the same force and effect as if such electronic or scanned signature were an original signed signature.

******

If the foregoing correctly sets forth our understanding, please sign below and return an executed copy of this Agreement to IPNAV. We look forward to working with you.

Regards,
IPNAV, LLC

By: _____
    Duly Authorized


Accepted and Agreed to:

ChanBond, LLC

By: _____
    Duly Authorized


**APP. 79**

EXHIBIT A

IP Rights

| US Patent No. 7346918 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
|---|---|
| US Patent No. 7941822 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8341679 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 8984565 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Patent No. 9015774 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 13/799,749<br><br>October 10, 2013* | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application No. 14/167,289<br><br>Filed January 29, 2014 | Intelligent device system and method for distribution of digital signals on a wideband signal distribution system |
| US Application - 10/346,571<br>(Abandoned – CIP of 09/824,531) | |
| US Application - 09/824,531<br>(Abandoned – CIP of 7346918) | |
| PCT/US2001/049629 (Expired – no national phase) | |
| PCT/US2002/009863 (Expired – no national phase) | |

6

## EXHIBIT B

Prior Rights and Monetization Efforts

1.  Nonexclusive license from ChanBond, LLC to Z-Band, Inc. dated April 9, 2015

**APP. 81**

<u>EXHIBIT C</u>

Possible Vendor Arrangements

IPNAV has negotiated arrangements with various vendors at what are believed to be favorable rates. As vendors recommended by IPNav, their fees would be covered under Section 4b of the Agreement as Advanced Costs. Examples of such vendor arrangements are presented below.

A. Litigation counsel to handle all legal aspects of any litigation filed by the Company

B. Vendors to (i) collect, electronically format, review for privilege and produce responsive documents in the Company's control and to (i) analyze, review and compile documents received from third parties, including documents produced in the course of any litigation.

C. Counsel and vendors to (i) prepare Rule 11 analysis, (ii) prepare infringement contentions and (iii) review and analyze invalidity contentions.

D. Various technical, damages and patent experts required to support Licensing Transactions ("Consulting and Testifying Experts").

E. Graphics presentation experts and vendors to prepare (i) graphics for Markman, (ii) graphics for key motions and (iii) graphics for trial and appellate matters.

F. If requested by the Company to be coordinated by counsel that IPNav has preferred rate arrangements with, fees and expenses of prosecution counsel to handle regular portfolio services and possible reexamination counsel.

G. Foreign litigation counsel to handle all legal aspects of any litigation filed by the Company in any jurisdiction outside of the United States.

H. ITC counsel to handle all legal aspects of any action filed by the Company in the United States International Trade Commission.

I. Licensing counsel to handle licensing matters.

IPNAV has longstanding relationship with many of these counsel and vendors and regularly recommends new counsel and vendors.  IPNAV and its affiliates regularly refer business to these counsel or vendors. IPNAV or its affiliates may invest in or have other significant relationships with these counsel or vendors. IPNAV is not impartial in recommending counsel or vendors that IPNAV believes provide superior service. The Company, should it choose to work with such counsel and/or vendors, hereby waives, and agrees to sign any required waiver of, any conflicts of interest in connection with any services provided by any such counsel and/or vendors.

**APP. 82**

# EXHIBIT D

*Execution Version*

## PATENT PURCHASE AGREEMENT

This PATENT PURCHASE AGREEMENT (the *"Agreement"*) is entered into on April $\mathcal{1}$, 2015 (the *"Effective Date"*) by and between CBV, Inc., a Pennsylvania corporation, of 848B North Hanover Street, Carlisle, Pennsylvania 17013 (the *"Seller"*) and ChanBond, LLC, a Delaware limited liability company, of 2633 McKinney Ave., Suite 130-501, Dallas, Texas 75204 (the *"Purchaser"*) (each a *"Party"* and collectively the *"Parties"*). The Parties hereby agree as follows:

### 1.   BACKGROUND

1.1   Seller is the sole and exclusive owner of certain Patents (defined below).

1.2   Seller wishes to sell to Purchaser its right, title and interest in the Patents and any and its rights associated therewith, including, for the avoidance of doubt and without limitation (i) the right to practice the Patents, including without limitation, the right to make, use and sell products and services under the Patents; and (ii) exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current and future infringement of the Patents.

1.3   Purchaser wishes to purchase from Seller its right, title and interest in the Patents and any and its rights associated therewith, including, for the avoidance of doubt and without limitation (i) the right to practice the Patents, including without limitation, the right to make, use and sell products and services under the Patents; and (ii) exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current and future infringement of the Patents.

1.4   The Parties hereby agree and acknowledge that this Agreement supersedes that certain Patent Purchase Agreements by and between the Parties dated as of May 6, 2014 and October 26, 2014 (the *"Previous PPAs"*) which Previous PPAs are now terminated and of no force or effect.

### 2.   DEFINITIONS

2.1   *"Affiliate"* means, with respect to any Person, any Entity in any country that controls, is controlled by or is under common control with such Person. The term "control" means possession directly or indirectly of the power to direct or cause the direction of the management and policies of an Entity, whether through the ownership of voting securities, by trust, management agreement, contract or otherwise; provided, however, that beneficial ownership of more than fifty percent (50%) of the voting equity interests of an Entity shall be deemed to be control.

2.2   *"Assigned Patent Rights"* means its right, title and interest in the Patents and (a) all causes of action (whether currently pending, filed, or otherwise) and exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current and future infringement; (b) all rights to recover and collect settlement arrangements, license payments (including lump sum payments), royalties and other payments due now or hereafter due or payable with respect thereto, under or on account of any of the Patents or any of the foregoing; (c) the right to practice the Patents, including without limitation, the right to make, use and sell products and services under the Patents;  and (d) any and all privileges, including the benefit of all attorney-client privilege and attorney work product privilege, to the extent transferrable.

{A4164423 5}

2.3    "*Cash*" shall mean cash and Cash Equivalents.

2.4    "*Cash Equivalents*" shall mean debt and/or equity securities (including, but not limited to stocks, warrants, options or ADRs) and/or any real or personal property, received by Purchaser, that is reducible to cash (net of taxes required to be paid by Purchaser on Seller's portion in order to take possession of the same) but only at such time as such debt securities, equity securities, real or personal property have been converted to cash. Purchaser shall convert Cash Equivalents to cash as soon as commercially practical and legally permissible.

2.5    "*Entity*" means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, governmental entity (or any department, agency, or political subdivision thereof) or any other legal entity.

2.6    "*Executed Assignment*" means an executed original of the Patent Assignment Agreement in *Exhibit 2.6*.

2.7    "*Gross Recoveries*" shall mean the Cash compensation received by Purchaser solely from payments made by a third party in consideration for the licensing, enforcement and/or sale of the Patents.

2.8    "*Net Recoveries*" shall mean the total aggregate Gross Recoveries less the total aggregate amount of costs and expenses incurred by or on behalf of Purchaser in connection with the monetization, enforcement and/or sale of the Assigned Patent Rights which are exclusively limited to: (a) the reasonable fees and expenses of litigation counsel; (b) the reasonable fees and expenses of licensing counsel (c) the reasonable fees and expenses of any re-examination or other patent prosecution counsel; (d) reasonable expert fees, court costs, deposition costs and other reasonable costs and expenses related to the maintenance, prosecution, enforcement, and licensing of the Patents; and (e) the reasonable fees and expenses of any other advisors or agents Notwithstanding the above, any cost or expense which is paid to an Affiliate of Purchaser or to a stakeholder of Purchaser shall require the prior approval of Seller, such approval to not be unreasonably withheld.

2.9    "*Patents*" means each and all of the patents and patent applications listed on *Exhibit A* hereto, all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, provisionals and divisions of such patents, and any patents or patent applications which correspond to or claim priority to any of the foregoing, and all foreign counterparts of the foregoing, whether or not listed on *Exhibit A*.

2.10    "*Person*" means any individual or Entity.

## 3.    DOCUMENT DELIVERY; LICENSE-BACK; CONSIDERATION AND REPORTS

3.1    Document Delivery. As of the Effective Date, the Mutual Non Disclosure Agreement attached hereto as *Exhibit B* and the Common Interest Agreement attached hereto as *Exhibit C* have been executed by the parties and the parties have agreed that such agreements apply to the materials provided previously by Seller to Purchaser or Purchaser's affiliates, such materials consisting of the originals and/or certified copies of the patent prosecution files and all other documents, communications and files (electronic or otherwise) relating to the Assigned Patent Rights in possession or control of Seller and its agents, counsel and related parties that pertain to the ownership, prosecution, maintenance and enforcement of the Patents, including, but not limited to those documents listed on the Document Request Form attached hereto as *Exhibit 3.1*

(collectively, the *"Documents"*). The Seller has signed the declaration attached to the Document Request Form as *Attachment 1*.

3.2     [Intentionally omitted.]

3.3     Additional Consideration for the Patents. In consideration for the Patents, Seller shall be entitled, in addition to the other consideration to which Seller is entitled herein, to the following:

    3.3.1   Intentionally omitted.

    3.3.2   Possible Future Cash Payment. Following the Closing Date, Purchaser shall pay to Seller one hundred percent (100%) of the Net Recoveries received, up to a cumulative amount of One Million US Dollars ($1,000,000) (the *"Recoveries Threshold"* and the payments making up the Recoveries Threshold, the *"Threshold Payments"*). Thereafter, Purchaser will pay to Seller a portion (each a *"Recoveries Payment"* and together with the Threshold Payments, the *"Payments"*) of the Net Recoveries received by Purchaser in consideration for the licensing, enforcement and/or sale by Purchaser of the Patents, calculated as follows: fifty percent (50%) of all Net Recoveries actually received and collected by Purchaser. For the avoidance of doubt, it is hereby clarified that, if a licensee paid in a consideration in a form other than Cash, there would be no payment made under this Section 3.3.2 for the non-Cash portion at the time of the non-Cash payment. However, when such non-Cash payments are converted to Cash by way of licensing, enforcement and or sale, Purchaser will pay a Recoveries Payment (as defined above) to Seller in consideration for the licensing, enforcement and/or sale by Purchaser of the non-Cash portion. By way of example, if a licensee took a license to the Patents and no other patents or patent applications owned by Purchaser with payment being made in Cash, there would be a payment made under this Section 3.3.2 as follows:

        R x fifty percent (50%), where R = Net Recoveries

    Payments payable under this Section 3.3.2 shall be paid within thirty (30) calendar days after each applicable calendar quarter, commencing with the first calendar quarter following the Closing Date until the expiration of the Patent.

    Seller acknowledges that (i) the obligations of Purchaser under this Agreement are contractual only and do not create any fiduciary or other relationship between them; (ii) any Gross Recoveries may be subject to and may be dependent on the provision of licenses, releases and covenants not to sue with respect to the Patents, and enforcement action, all as solely determined by Purchaser; (iii) in the event of a sale of a Patent by Purchaser to a third party (a *"Sale Transaction"* and an *"Acquirer,"* respectively), no further Payments with respect to such Patent would be due or owing to Seller from either Purchaser or such Acquirer, provided that Seller receives the Payment to which it is entitled in connection with such Sale Transaction; and (iv) Purchaser has not represented that it will be successful in its efforts to monetize the Patents and, accordingly, makes no representation as to the value, if any, of the possible Gross Recoveries or Net Recoveries under this Section 3.3.2.

3.4     Payment Procedures. All payments made by Purchaser pursuant to this Agreement shall be made by wire transfer to an account specified by Seller at such times and in accordance with the provisions of Sections 3.4 (and until another account is designated in writing to Purchaser by Seller, to the account identified in *Exhibit 3.4*).

3.5     Reports. Simultaneous with any wire transfer pursuant to Section 3.4, Purchaser will include a report detailing the payment amount and will provide such supporting documentation as may reasonably be requested by Seller (subject to appropriate and customary confidentiality obligations as may be required in order to disclose such documentation to Seller).

3.6     Milestone Amounts; True Up Amount Payments. In the event the aggregate amount of all payments (including all Threshold Payments and all Recoveries Payments) paid to Seller from the Closing Date and until the fourth (4th) anniversary following the Closing Date (the "*Milestone Date*") does not equal five million USD ($5,000,000) (the "*Milestone Amount*"), Purchaser shall pay Seller an amount (the "*True Up Amount*") equal to the Milestone Amount less the aggregate amount of all payments (including the Threshold Payments and all Recoveries Payments) paid to Seller hereunder from the Closing Date and until the Milestone Date. The True Up Amount, if any, will be payable to Seller not later than thirty (30) days following the Milestone Date. It is hereby clarified and agreed that the True Up Amount paid to Seller shall be deemed an advance payment of Gross Recoveries for the purposes of calculating Gross Recoveries payable to Assignor pursuant to Section 3.3.2 above. In the event that one or more of the Patents becomes involved in an inter-partes review or other re-examination or similar action before the USPTO or any litigation relating to the Patents is stayed by a court (an "*IPR*") at any time prior to the Milestone Date, Milestone Date set forth in this Section 3.6 shall be tolled for the duration of the IPR and shall resume only upon the receipt of a final non-appealable judgment on the matter, in favor of the Purchaser, with Milestone Date and the Last Date (as defined below) extended accordingly.

3.7     Reversion Assignment Right. In the event that Purchaser fails to timely pay the True Up Amount and does not cure such failure within thirty (30) calendar days of receipt of notice from Seller with a request to cure (the "*Last Date*"), then, provided that Seller is not in material breach of this Agreement at such time, Seller shall have the right, exercisable by it by written notice to Purchaser within thirty (30) days of the Last Date, to re-acquire from Purchaser for no additional consideration all right, title and interest in and to the Assigned Patent Rights (the "*Reversion Assignment Right*"), subject to all then-in-effect licenses, encumbrances, covenants not to sue and other restrictions applicable thereto. If Seller exercises the Reversion Assignment Right within such thirty (30) calendar day period, Purchaser and Seller shall execute a patent assignment and any other required documents in order to transfer the Assigned Patent Rights back to Seller, who shall acquire the Assigned Patent Rights, subject to all then-in-effect licenses, encumbrances, covenants not to sue and other restrictions applicable thereto. Purchaser shall execute all documents reasonably required to transfer the Assigned Patent Rights back to Seller within five (5) business days of receipt of the same from Seller.

3.8     Seller's rights set forth in Sections 3.6 and 3.7 shall be the sole and exclusive right and remedy available to Seller in the event the True Up Amount is not paid and Seller shall have no other rights or remedies against such failure, monetary or otherwise with respect to the Assigned Patent Rights or otherwise against Purchaser, under or in connection with Sections 3.6 and 3.7.

4.      TRANSFER OF PATENTS AND ADDITIONAL RIGHTS

4.1     Assignment of Patents. At Closing, Seller shall sell, assign, transfer and convey to Purchaser its right, title and interest in and to the Assigned Patent Rights and at Closing will provide Purchaser with the Executed Assignment for the Assigned Patent Rights.

4.2     Additional Patents. Seller hereby represents and warrants to Purchaser that the only patents, reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, provisionals and divisions of the Patents and patents and patent applications that

{A4164423 5}                                     4                                     **APP 008**

claim priority to any of the foregoing are listed on *Exhibit A*, including any foreign counterparts thereof. In the event that Purchaser discovers, at any time, any patents, reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, provisionals and/or divisions of the Patents or patents and patent applications that claim priority or otherwise relate to any of the foregoing, or any foreign counterparts thereof that are owned by Seller (the *"Additional Patents"*), then the Additional Patents shall be sold, including by transferring, assigning and setting over, to Purchaser, its right, title and interest thereto, for no additional consideration, and the Additional Patents shall be deemed "Patents", as applicable, under this Agreement, for all intents and purposes. In such event, the Parties shall sign an amended *Exhibit A* to add the Additional Patents thereto and in the event that Purchaser's notification to Seller is subsequent to the Closing, then the Parties shall conduct a subsequent closing and the provisions of Section 5.1 shall apply to the sale, assignment transfer and setting over to Purchaser of the Additional Patents, *mutatis mutandis*.

4.3 Non-Assumption of Liabilities. It is expressly understood and agreed that Purchaser shall not be liable for and hereby disclaims any assumption of any of the obligations, claims or liabilities of Seller and/or its Affiliates and/or of any third party of any kind or nature whatsoever arising from or in connection with any circumstances, causes of action, breach, violation, default or failure to perform with respect to the Assigned Patent Rights prior to the assignment and sale thereof to Purchaser.

4.4 License to Seller. Subject to the Closing, Purchaser shall grant to Seller and its Affiliate, Z-Band, Inc., effective as of the Closing Date, a license-back to the Patents, pursuant to the terms of the License Agreement, in the form attached hereto as *Exhibit 4.4* (the *"License Agreement"*).

## 5. CLOSING AND ADDITIONAL OBLIGATIONS

5.1 The closing of the purchase and sale of the Assigned Patent Rights (the *"Closing"*) shall take place on the Effective Date. The conditions to Closing set forth in Section 5.1.2, 5.2 and 5.3 below have been previously met and/or simultaneously with the Closing will be met.

    5.1.1 At the Closing, Seller shall execute and deliver to Purchaser the Executed Assignment and a copy of any and all corporate approvals required by it in order to execute, deliver and perform this Agreement and the transactions contemplated hereunder.

    5.1.2 The parties acknowledge and agree that the following conditions have each been previously met and/or simultaneously with the Closing will be met:

        (a) Seller has performed all of its obligations hereunder required to be performed by it at or prior to the Closing;

        (b) the representations and warranties of Seller contained in this Agreement are true at and as of the Closing;

        (c) the Purchaser has completed all of its financial, commercial, intellectual property and legal due diligence examination of the Assigned Patent Rights; and

        (d) all corporate and other proceedings in connection with the transactions contemplated by this Agreement have been performed by Seller, all documents and instruments incident to such transactions and reasonably requested by Purchaser are reasonably satisfactory in substance and form to Purchaser and its counsel, have been executed and Purchaser and its counsel have received

> counterpart originals or certified or other copies of such documents and
> instruments as Purchaser or its counsel have reasonably requested.

5.2  Inventor Agreements. Seller has obtained and delivered to Purchaser the Inventor Consulting
Agreements, in the form attached hereto as *Exhibit 5.2*, signed by each of the inventors under the
Patents. For the avoidance of doubt, such inventors shall be reasonably compensated for their
assistance, in accordance with the terms of *Exhibit 5.2*.

5.3  Inventor Oath and Declaration. Seller shall obtain and deliver to Purchaser fully executed
declarations from each inventor under those of the Patents which are, as of the Effective Date,
pending before the United States Patent and Trademark Office (a "*Pending Patent*"), in the form
attached hereto as *Exhibit 5.3* or in another form compliant with 37 CFR 1.63 as in force on the
filing date of the Pending Patent and on the Effective Date, in connection with any Pending
Patent. The foregoing shall not apply to any Pending Patent(s) which are reissue applications.
All Pending Patents that are reissue applications will be particularly designated as such by the
Seller.

5.4  Further Cooperation. At the reasonable request of Purchaser, Seller will execute and deliver such
other instruments and do and perform such other acts and things as may be necessary or desirable
for effecting completely the consummation of the transactions contemplated hereby, including
execution, acknowledgment and recordation of other such papers for fully perfecting and
conveying unto Purchaser the benefit of the transactions contemplated hereby.

5.5  Payment of Fees. Purchaser shall have the sole responsibility to pay any maintenance fees,
annuities, and the like due or payable on the Patents for the period commencing on the Closing
Date.

## 6.  REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows that, as of the Effective Date:

6.1  Authority. Seller has the full power and authority, and has obtained all third party consents,
approvals or other authorizations required, to enter into this Agreement and to carry out its
obligations hereunder, including, without limitation, the assignment of the Assigned Patent Rights
to Purchaser. The execution and delivery of this Agreement and the related transaction documents
and the consummation of the transactions contemplated hereby and thereby have been duly
authorized by all necessary corporate actions on the part of Seller. This Agreement and the other
transaction documents have been duly executed and delivered by Seller, and constitute legal,
valid and binding obligations of Seller, enforceable in accordance with their terms.

6.2  Non-Contravention. To the best of Seller's knowledge, Seller's execution, delivery, and
performance of its obligations under this Agreement will not conflict with or violate the corporate
documents of Seller or any laws to which Seller is subject, or any agreement or other obligation
of Seller or binding upon Seller's assets or result in the creation or imposition of any mortgage,
lien, charge, pledge, security interest, other encumbrance or third party right upon any of the
Assigned Patent Rights.

6.3  Title and Contest. Seller owns the right, title, and interest to the Assigned Patent Rights,
including the right, title, and interest to sue for infringement of the Patents. To the best of Seller's
knowledge, the identity of all inventors of the inventions underlying the Patents has been fully
disclosed to the U.S. Patent Office as required by U.S. law. To the best of Seller's knowledge, the
Assigned Patent Rights are free and clear of all liens, claims, mortgages and security interests,

{A4164423 5}                                      6                                    **APP 010**

There are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the Assigned Patent Rights. Seller is not obligated or under any liability whatsoever to make any payments by way of royalties, fees or otherwise to any owner or licensee of, or other claimant with respect to the use of any of the Assigned Patent Rights or subject matter disclosed and claimed in the Patents or in connection with the licensing or sale of any of the Assigned Patent Rights to third parties.

6.4   No Joint Development Activity. No Patent (i) is the product or subject of any joint development activity or agreement with any third party; (ii) is the subject of any consortia agreement; or (iii) has been financed in whole or in part by any third party.

6.5   No Preexisting Licenses.   Except as otherwise listed on *Exhibit 6.5* (the "*Pre-Existing Licenses*"), no exclusive or non-exclusive licenses under the Patents or interest or rights in any of the Assigned Patent Rights have ever been granted.  For the avoidance of doubt, from and after the Closing Date, Seller shall not be entitled to any payment or other consideration with respect to any Pre-Existing Licenses.

6.6   Terminal Disclaimers. Except as otherwise listed on *Exhibit 6.6*, there are no terminal disclaimers of any kind related to or affecting any of the Assigned Patent Rights. *Exhibit 6.6* includes a list of all terminal disclaimers that exist with respect to or that affect the Assigned Patent Rights and provides a description of each such terminal disclaimer, including the subject earlier issued patent(s) and the respective expiration dates thereof.

6.7   Pending United States Applications.  Except as otherwise listed on *Exhibit 6.7*, there are no pending US patent applications of any kind constituting an Assigned Patent Right.  *Exhibit 6.7* includes a list of all pending US patent applications and the respective confirmation numbers issued by the USPTO therefor.

6.8   Enforcement. Seller has not put a third party on notice of actual or potential infringement of any of the Patents. Seller has not invited any third party to enter into a license under any of the Patents. Seller has not initiated any enforcement action with respect to any of the Patents.

6.9   Patent Office Proceedings.   To Seller's best knowledge, none of the Patents has been or is currently involved in any reexamination, reissue, interference proceeding, or any similar proceeding, or that any such proceedings are pending or threatened.

6.10   Prosecution Obligations; Fees.  No actions must be taken by Seller before any governmental entity (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) within ninety (90) days of the Closing Date with respect to any of the Assigned Patent Rights. All maintenance fees, annuities, and the like due or payable on the Patents until the lapse of ninety (90) days following the Closing Date have been timely paid. For the avoidance of doubt, such timely payment includes payment of registration, maintenance, and renewal fees for which the fee payment window has opened even if the surcharge date is in the future.

6.11   Validity and Enforceability.  To Seller's knowledge, the Patents have never been found invalid or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and there are no proceedings or actions before any governmental entity (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) in which claims are or were raised relating to the validity, enforceability, scope, ownership or infringement of any of the Patents. Seller does not know of and has not received any notice or information of any kind from any source suggesting that the Patents may be invalid or unenforceable.

6.12    Compliance with Applicable Law. To the best of Seller's knowledge, the Patents are currently in compliance with all legal requirements (including payment of filing, examination and maintenance fees and the filing of any necessary oaths, proofs of use or other documents) for maintaining, registering, filing, certifying or otherwise perfecting or recording such Patents.

## 7.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows that, as of the Effective Date:

7.1    Purchaser is a Delaware limited liability company.

7.2    Purchaser has the full power and authority, and has obtained all third party consents, approvals or other authorizations required, to enter into this Agreement and to carry out its obligations hereunder.

7.3    Purchaser's execution, delivery, and performance of its obligations under this Agreement will not conflict with or violate any laws to which Purchaser is subject, or any agreement or other obligation directly or indirectly applicable to Purchaser or binding upon Purchaser's assets.

## 8.    MISCELLANEOUS

8.1    Indemnification. Purchaser shall provide counsel to Seller to defend any Third Party Claim (as defined below) and shall indemnify and hold Seller, its Subsidiaries and each of their respective employees, agents, officers, directors and managers (collectively, the "**Seller Indemnified Parties**") harmless from and against all of its reasonable fees and expenses that are suffered or otherwise incurred by the Seller Indemnified Parties or to which the Seller Indemnified Parties may otherwise become subject and that arise from or directly relate to any Third Party claim relating to any Patent (including, without limitation, by way of counterclaim should a Seller Indemnified Party be included in a litigation as an indispensable or necessary plaintiff party) (a "**Third Party Claim**"), all except to the extent that the Seller Indemnified Parties' expenses or costs are due to acts or omissions of any of the Seller Indemnified Parties and/or obligations, claims or liabilities of any of the Seller Indemnified Parties of any kind or nature whatsoever arising from or in connection with any circumstances, causes of action, breach, violation, default or failure to perform with respect to the Patents prior to the assignment and sale thereof to Purchaser. The foregoing indemnification obligation shall not apply to the Seller Indemnified Parties' legal fees, unless and only to the extent that due to a conflict of interests, the Seller Indemnified Parties reasonably requires their own counsel.

8.2    Compliance With Laws. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties will be subject to all laws, present and future, of any government having jurisdiction over the Parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.3    Assignment. This Agreement may not be assigned by Seller without the prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder upon the provision of written notice to Seller. A "change of control" transaction of Seller shall be deemed an assignment and therefore subject to Purchaser's consent as aforesaid. Under no circumstances will any assignment be permitted to an entity acquiring Seller through insolvency, bankruptcy, assignment for the benefit of one or more creditors (through foreclosure or any other means) or any similar proceeding, any or all of which shall require the consent of Purchaser.

8.4 Confidentiality of Terms. The Parties hereto will keep the terms and existence of this Agreement and the identities of the Parties and their Affiliates confidential and will not now or hereafter divulge any of this information to any third party except as follows: (a) with the prior written consent of the other Party; (b) subject to obligations of confidentiality and/or privilege at least as stringent as those contained herein, to a Party's legal and financial counsel and other professional advisors, in their capacity of advising a Party in such matters; (c) subject to obligations of confidentiality and/or privilege at least as stringent as those contained herein, to a counterparty engaged in due diligence in connection with a proposed merger, acquisition, reorganization, or financing of all or substantially of a Party's assets or equity or in connection with a proposed sale or exclusive license of the Assigned Patent Rights, as applicable; (d) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignment in any governmental patent office); (e) to enforce Purchaser's right, title and interest in and to the Assigned Patent Rights; (f) to any governmental body having jurisdiction and specifically requiring such disclosure; or (g) as required during the course of litigation and subject to a protective order with a confidentiality designation of "Outside Attorneys' Eyes Only" or higher; provided that, in (f) and (g) above, (i) the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing Party will provide the other Party with at least ten (10) days' prior written notice of such disclosure.

8.5 Governing Law; Forum. This Agreement, its performance and interpretation shall be governed by the substantive law of the State of Delaware, USA, exclusive of its choice of law rules. The competent courts and tribunals situated in Wilmington, State of Delaware, USA shall have sole and exclusive jurisdiction in any dispute or controversy arising out of or relating to this Agreement.

8.6 Notices. All notices given hereunder will be given in writing, will refer to this Agreement and will be: (i) personally delivered, (ii) delivered prepaid by an internationally recognized express courier service, or (iii) sent postage prepaid registered or certified U.S. mail (return receipt requested) to the address set forth below:

| If to Seller | If to Purchaser |
|---|---|
| CBV, Inc. | ChanBond, LLC |
| Tel: 717-249-2606 | 2633 McKinney Avenue |
| Fax: 717-249-3253 | Suite 130-501 |
| Email: earlh@z-band.com | Dallas, TX 75204 |
| Attn: Mr. Earl Hennenhoefer, President | Tel: (214) 930-6408 |
| and CEO | Email: deirdre@ipnav.com |
| | Attn: Ms. Deirdre Leane, Manager |

Notices are deemed received on (a) the date of receipt if delivered personally or by express courier (or if delivery refused, the date of refusal), or (b) the fifth (5th) calendar day after the date of posting if sent by US mail. Notice given in any other manner will be deemed to have been received only if and when received at the address of the Person to be notified. Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Section.

8.7 Relationship of Parties. The Parties are independent contractors and not partners, joint venturers, or agents of the other. Neither Party assumes any liability of or has any authority to bind, or control the activities of, the other.

9

8.8     Severability. If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate its original objective.

8.9     Waiver. Failure by either Party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the Parties.

8.10    Miscellaneous. This Agreement, including its exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions including, for the avoidance of doubt, the Previous PPAs. Neither of the Parties will be bound by any conditions, definitions, warranties, obligations (including obligations to prosecute any of the Patents), understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No oral explanation or oral information by either Party hereto will alter the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in writing and signed by authorized representatives of both Parties. The Exhibits referenced herein and attached hereto are incorporated into this Agreement as though fully set forth herein.

8.11    Counterparts; Electronic Signature. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument. Each Party will execute and deliver to the other Party a copy of this Agreement bearing its original signature. Prior to such execution and delivery, in order to expedite the process of entering into this Agreement, the Parties acknowledge that Transmitted Copies of this Agreement will be deemed original documents. *"Transmitted Copies"* means copies that are reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission.

*\*\*\*The remainder of this page has been intentionally left blank. Signature page follows.\*\*\**

In witness whereof, the Parties have caused this Patent Purchase Agreement to be executed as of the Effective Date by their respective duly authorized representatives.

CBV, Inc.                                        ChanBond, LLC

By: _____                      By: _____

Name: Mr. Earl Hennenhoefer                       Name: Ms. Deirdre Leane

Title: President and CEO                           Title: Manager