# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CBV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 1:21-cv-01456-MN |
| | ) | |
| CHANBOND, LLC, DEIRDRE LEANE, | ) | ██████████████████ |
| and IPNAV, LLC, | ) | |
| | ) | **PUBLIC VERSION FILED** |
| Defendants. | ) | **June 1, 2022** |

## DEIRDRE LEANE AND IPNAV, LLC'S OPENING BRIEF IN SUPPORT
## OF MOTION FOR JUDGMENT ON THE PLEADINGS

OF COUNSEL:

Akiva M. Cohen
Dylan M. Schmeyer
KAMERMAN, UNCYK,
    SONIKER & KLEIN P.C,
1700 Broadway, 16th Floor
New York, NY 10019
212.400.4930
*acohen@kusklaw.com*
*dschmeyer@kusklaw.com*

Dated:  May 24, 2022

James H. S. Levine (Del. Bar. No. 5355)
TROUTMAN PEPPER
    HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
302.777.6500
*james.levine@troutman.com*

*Attorneys for IPNAV, LLC and Deirdre Leane*

## <u>TABLE OF CONTENTS</u>

**Page**

I.  NATURE AND STAGE OF PROCEEDINGS .................................................................. 2

II. SUMMARY OF ARGUMENT ...................................................................................... 2

III. STATEMENT OF FACTS ............................................................................................ 3

    A.  The Relevant 2015 Conduct.................................................................................. 3

    B.  The Terms of the Relevant Agreements ................................................................ 5

        a.  The PPA, Common Interest Agreement, and Mutual NDA ...................... 5

    C.  This Action............................................................................................................. 7

    D.  Earl Hennenhoefer's Deposition Testimony........................................................ 8

IV. ARGUMENT ................................................................................................................ 9

    A.  Standard on a Motion for Judgment on the Pleadings ........................................... 9

    B.  CBV'S Breach of Contract Claims Are Time-Barred ........................................... 9

    C.  There Was No Breach of Section 2.8.................................................................. 12

        a.  Section 2.8 Unambiguously Provides Only a Definition of "Net Recoveries," Not a Limitation on ChanBond's Ability to Contract........ 12

        b.  Even if Section 2.8 Were Ambiguous, There Would be No Material Issue of Fact Warranting Trial on Its Meaning or Whether Execution of the ASA Was a Breach ................................................................................. 15

    D.  Because IPNAV Is Not a ChanBond Affiliate, ChanBond Can Deduct the IPNAV Fee in Calculating Net Recoveries Even if CBV Did Not Approve that Payment 17

V.  CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AgroFresh Inc. v. MirTech, Inc.*,
  257 F. Supp. 3d 643 (D. Del. 2017) .......................................................................................14

*Almirall, LLC v. Torrent Pharms., Ltd.*,
  548 F. Supp. 3d 443 (D. Del. 2021) .........................................................................................9

*Altice USA, Inc. v. New Jersey Bd. of Pub. Utilities*,
  26 F.4th 571 (3d Cir. 2022) .....................................................................................................9

*In re Am. LaFrance, LLC*,
  461 B.R. 267 (Bankr. D. Del. 2011) ......................................................................................14

*Aronow Roofing Co. v. Gilbane Bldg. Co.*,
  902 F.2d 1127 (3d Cir. 1990) ...................................................................................................9

*Baxter Pharm. Prod., Inc. v. ESI Lederle Inc.*,
  1999 WL 160148 (Del. Ch. Mar. 11, 1999) ...........................................................................20

*E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*,
  693 A.2d 1059 (Del. 1997) .....................................................................................................12

*Engelhard Corp. v. N.L.R.B.*,
  437 F.3d 374 (3d Cir. 2006) ...................................................................................................13

*Institut Pasteur v. Cambridge Biotech Corp.*,
  104 F.3d 489 (1st Cir. 1997), *abrogated on other grounds as recognized by*
  *Hardemon v. City of Bos.*, No. 97-2010, 1998 WL 148382 (1st Cir. Apr. 6,
  1998) .......................................................................................................................................20

*Loc. 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc.*,
  458 F.3d 305 (3d Cir. 2006) ...................................................................................................19

*Lundbeck v. Apotex Inc.*,
  No. CV 18-88-LPS, 2020 WL 3507795 (D. Del. June 26, 2020) .............................................9

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018) .............................................................................................................14

*NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*,
  997 F.3d 1159 (Fed. Cir. 2021) ..............................................................................................14

*O'Brien v. Progressive N. Ins. Co.*,
  785 A.2d 281 (Del. 2001) .......................................................................................................13

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
38 F.3d 1380 (3d Cir. 1994), *overruled in irrelevant part by Rotkiske v.
Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) (en banc); .............................................9

*Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Zonko Builders, Inc.*,
No. CV 21-437-MAK, 2021 WL 4061564 (D. Del. Sept. 7, 2021) ........................................4

*Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*,
616 A.2d 1192 (Del. 1992) ...........................................................................................13

*Seidel v. Lee*,
954 F. Supp. 810 (D. Del. 1996)....................................................................................11

*In re Tyson Foods, Inc.*,
919 A.2d 563 (Del. Ch. 2007)........................................................................................9

*USA Cable v. World Wrestling Fed'n Ent., Inc.*,
2000 WL 875682 (Del. Ch. June 27, 2000), *aff'd*, 766 A.2d 462 (Del. 2000) ......................13

*W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*,
2007 Del. Ch. LEXIS 154 (Del. Ch. Nov. 2, 2007)...............................................................13

*Walker v. W. Michigan Nat. Bank & Tr.*,
324 F. Supp. 2d 529 (D. Del. 2004), *aff'd* 145 F. App'x 718 (3d Cir. 2005) ........................11

*Westfield Ins. Grp. v. J.P.'s Wharf, Ltd.*,
859 A.2d 74 (Del. 2004) ...............................................................................................12

*Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*,
No. CV 18-819-LPS, 2021 WL 1170374 (D. Del. Mar. 29, 2021), *amended on
reconsideration in part*, No. CV 18-819-LPS, 2021 WL 4319224 (D. Del.
Sept. 23, 2021) ...........................................................................................................17

**Statutes**

10 Del. C. § 8106 ........................................................................................................9

**Other Authorities**

Scalia, A. & Garner, B., *Reading Law: The Interpretation of Legal Texts* (2012)........................14

Defendants Deirdre Leane ("Leane") and IPNAV, LLC ("IPNAV," and collectively "Leane Defendants") respectfully move for a judgment on the pleadings dismissing Plaintiff CBV, Inc. ("CBV")'s breach of contract claims, because CBV's own pleadings conclusively establish that those claims are both time-barred and meritless. Leane Defendants are similarly entitled to a declaratory judgment that ChanBond, LLC ("ChanBond") may deduct the payment it owes IPNAV in calculating the share of revenues to which CBV is entitled.

CBV alleges that: (1) the Patent Purchase Agreement it signed with ChanBond in April 2015 (the "PPA") barred ChanBond from hiring a ChanBond affiliate as an advisor without CBV's approval; and therefore (2) ChanBond breached the PPA when it retained IPNAV as its advisor in 2015, allegedly without CBV's approval. But CBV's pleadings *also* concede that: (1) CBV knew in 2015 that ChanBond and IPNAV were affiliates; (2) CBV knew and affirmatively expected in 2015 that ChanBond would be hiring IPNAV as its patent monetization advisor and paying IPNAV for those services; and (3) CBV received confirmation in 2015 that ChanBond had in fact retained IPNAV as its advisor. CBV's pleadings thus confirm that, on CBV's interpretation of the PPA, it was aware ***in 2015*** of every fact it needed to bring a breach of contract claim. Instead, CBV waited until 2021 to sue, and those claims must be dismissed.

Even were the claims not time barred, Leane Defendants would be entitled to judgment on the pleadings dismissing the breach of contract claims. Section 2.8 of the PPA, on which CBV relies, does not limit ChanBond's right to retain affiliated entities; it merely provides a rule of allocation that defines "Net Recoveries" by determining what payments by ChanBond can be deducted from "Gross Recoveries" when calculating such Net Recoveries. Not only is the plain language of Section 2.8 clear as a bell, but as CBV admitted in its Answer to the Counterclaims, CBV's President and CEO, Earl Hennenhoefer – who signed the PPA on CBV's behalf –

1

repeatedly agreed on the meaning when asked in deposition. As such, ChanBond's execution of IPNAV's Advisory Services Agreement (the "ASA") could not have breached the PPA.

Finally, Leane Defendants are also entitled to a judgment on the pleadings declaring that ChanBond can deduct payments to IPNAV – which is *not* a ChanBond affiliate – when calculating the Net Recoveries. Section 2.8 provides ChanBond may deduct payments to advisors or agents such as IPNAV in calculating Net Recoveries, except that amounts "paid to an Affiliate of [ChanBond]" may be deducted only if approved in advance by CBV. But IPNAV has not been an Affiliate of ChanBond since October 2015, when UnifiedOnline, Inc. ("Unified") purchased ChanBond from Ms. Leane, and therefore no amounts paid to IPNAV would be "paid to an Affiliate of [ChanBond]". As such, Section 2.8 is clear that ChanBond may deduct such payments in calculating the amounts due to CBV, and Leane Defendants are entitled to a judgment as a matter of law declaring as much. The motion should be granted.

## I.     NATURE AND STAGE OF PROCEEDINGS

Plaintiff CBV filed its amended complaint on December 6, 2021. (D.I. 6.) Leane Defendants filed their answer, counterclaims, and cross-claim on March 23, 2022. (D.I. 41.) CBV moved for a preliminary injunction on March 15, 2022. (D.I. 18.) Briefing on that motion is complete (D.I. 18-19, 48, 54, 65, 71.) Leane Defendants have moved contemporaneously for judgment on the pleadings. This is Leane Defendants' Opening Brief in support of their motion.

## II.     SUMMARY OF ARGUMENT

1.     CBV's breach of contract claims accrued (if at all) in 2015, and the claims are therefore time-barred.

2.     Even if the claims were not time barred, executing the ASA did not breach the PPA, because Section 2.8 merely defined "Net Recoveries" and did not limit ChanBond's ability

to contract with IPNAV *ab initio*.

3.    Leane Defendants are entitled to a declaratory judgment that amounts ChanBond pays to IPNAV are deductible in calculating Net Recoveries under Section 2.8 regardless of whether CBV approved such payments, because IPNAV and ChanBond are not Affiliates as defined in the PPA.

## III.    STATEMENT OF FACTS

### A.    The Relevant 2015 Conduct

In April 2015, CBV executed the PPA by which it sold its patents and associated intellectual property to ChanBond. (D.I. 6 ¶¶ 2, 36; D.I. 49-1 at 11.)[1] The parties to that agreement were ChanBond and CBV. (D.I. 49-1 at 1.) CBV also executed other agreements the same day, including a "Common Interest Agreement" ("CIA") and a "Mutual Non-Disclosure Agreement" ("Mutual NDA") among CBV, ChanBond, and IPNAV. (D.I. 41 ¶ 193; D.I. 48 at 3-4; D.I. 79 ¶ 8; D.I. 49-1 at 13, 15 and 16, 19.) The CIA and Mutual NDA were each referenced in, and appended as Exhibits to, the PPA. (D.I. 49-1, § 3.1 and pp 13-19.) Hennenhoefer signed the PPA, Mutual NDA, and CIA on behalf of CBV. (D.I. 41[2] ¶ 8; D.I. 79 ¶ 8, D.I. 49-1 at 11, 15, 19.) Ms. Leane, the sole member of both ChanBond and IPNAV, signed the PPA on behalf of ChanBond, (D.I. 41 ¶ 9, D.I. 79 at 9 and D.I. 49-1 at 11), and the CIA and Mutual NDA on behalf of ChanBond and IPNAV. (D.I. 41 ¶ 8; D.I. 79 ¶ 8; D.I. 49-1 at 15, 19.)

When it signed the PPA, CBV was specifically aware that Ms. Leane owned both IPNAV and ChanBond (D.I. 41 ¶ 5, D.I. 79 ¶ 5; Declaration of Akiva M. Cohen Ex. 1 ("Hen. Tr.") at

---

[1]D.I. 49-1 is a true and correct copy of the PPA, including each of the exhibits thereto.
[2]D.I. 41 contains Leane Defendants' Answer and Counterclaims, each of which are numbered in paragraphs beginning with "1". A citation to "D.I. 41, ¶ X" is a citation to the referenced paragraph in the Counterclaims. A citation to "D.I. 41, Answer, ¶ X" is a citation to the referenced paragraph in the Answer.

14:2-18),[3] and expected ChanBond to retain IPNAV as its patent monetization advisor and to pay IPNAV for such services. (D.I. 41 ¶ 4-5, D.I. 79 ¶¶ 4-5.) Indeed, the Common Interest Agreement specifically recited that ChanBond and IPNAV had an agreement by which IPNAV would "act as the worldwide intellectual property enforcement and licensing agent" for ChanBond and would "provide services related to the existing and future enforcement and monetization opportunities of the patents and related rights" owned by ChanBond. (D.I. 49-1 at 16, § 1.1.) And the Mutual NDA recited that CBV, IPNAV, and ChanBond were "engaged in a business relationship with each other." (*Id.* at 13.)

In June 2015, Ms. Leane twice reiterated to CBV that ChanBond had retained IPNAV and that she therefore "s[a]t on both sides of the fence" as both ChanBond and IPNAV. (D.I. 41 ¶¶ 11-12, D.I. 79 ¶¶11-12, D.I. 41-1, 41-2.) The agreement between ChanBond and IPNAV was documented in the ASA signed in July 2015 and dated as of April 9, 2015. (D.I. 6, ¶ 47, D.I. 41, Answer, ¶ 47.)

In October 2015, Ms. Leane sold her membership interest in ChanBond to Unified via an "Interest Sale Agreement" (the "ISA"). (D.I. 6, ¶ 10, D.I. 41, Answer, ¶ 10.) The ISA listed the "ChanBond, LLC – IPNAV, LLC Advisory Services Agreement dated April 9, 2015" as an existing contract of ChanBond's (D.I. 42-1 at 14) and contained a representation and warranty that the ASA was in full force and effect and had not been breached. (*Id.*, §§ 5.1(c) (representation and warranty) and 1.3 (defining "Contracts").) As a (then) public company, Unified disclosed its purchase of ChanBond in an SEC filing (D.I. 41 ¶ 17, D.I. 79 ¶ 17) and

---

[3]By referring to the entire transcript for its contents in responding to Leane Defendants' allegations, CBV incorporated that transcript by reference into the pleadings and the Court may therefore consider it on this motion. *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Zonko Builders*, *Inc.*, No. CV 21-437-MAK, 2021 WL 4061564, at *3 (D. Del. Sept. 7, 2021).

attached a copy of the ISA to its SEC filing. (D.I. 41 ¶ 18, D.I. 79 ¶ 28, D.I. 42-1.) Mr.

Hennenhoefer, who is (and in 2015 was) a shareholder in Unified, was aware of the purchase and

SEC filing. (D.I. 41 ¶ 19, D.I. 79 ¶ 19.)

> **B.      The Terms of the Relevant Agreements**
>
> **a.      The PPA, Common Interest Agreement, and Mutual NDA**

The PPA was the contract by which CBV sold its patents to ChanBond. Section 1 of the

PPA provides background relating to that sale – that CBV was the owner of the patents and

associated rights (D.I 49- 1, § 1.1) and wished to sell them to ChanBond (*id.*, § 1.2), that

ChanBond wished to purchase those rights (*id.*, § 1.3), and that the PPA superseded prior

agreements relating to the sale of the patents. (*Id.*, § 1.4.) Section 2 of the PPA defined the terms

used throughout the agreement: Affiliate, Assigned Patent Rights, Cash, Cash Equivalents,

Entity, Executed Assignment, Gross Recoveries, Net Recoveries, Patents, and Person. (*Id.*, §§

2.1-2.10.) "Net Recoveries" meant Gross Recoveries less "costs and expenses incurred on behalf

of [ChanBond] in connection with the monetization, enforcement and/or sale" of the intellectual

property, which were limited to the reasonable fees and expenses of: (a) litigation, licensing, and

patent counsel; (b) expert fees, court costs, deposition costs, and other costs and expenses

relating to the monetization campaign; and (5) other advisors or agents – except that,

notwithstanding that general list, "any cost or expense which is paid to an Affiliate of

[ChanBond] or to a stakeholder of [ChanBond] shall require the prior approval of [CBV]," which

approval was not to be unreasonably withheld. (*Id.*, § 2.8.)

Section 3 of the PPA provided, variously: (1) that the parties had executed the CIA and

Mutual NDA and CBV had delivered certain documents relating to the patents to ChanBond (*id.*,

§ 3.1 & pp 28-31); (2) the payment terms upon successful monetization of the patents, pursuant

to which CBV was to receive its share of Net Recoveries (*id.*, § 3.3); (3) the method of payment

and requirement for reports (*id.*, § 3.4 & 3.5); and (4) provisions relating to milestone payments and true up amounts, which were the subject of a later amendment. (*Id.*, §§ 3.6-38; D.I. 6 ¶ 38, D.I. 41, Answer, ¶ 38.)

Section 4 of the PPA addressed the transfer of the patents and a license back to CBV (D.I. 49-1 at 4-5), Section 5 addressed the closing and the parties' other obligations (*id.* at 5-6), Section 6 provided CBV's representations and warranties (*id.* at 6-8), and Section 7 provided ChanBond's representations and warranties. (*Id.* at 8, §§ 7.1-7.3.) Section 8, titled "Miscellaneous," included, *inter alia*, an anti-assignment provision barring CBV (but not ChanBond) from assigning its rights and obligations under the PPA without consent, including via a change of control (*id.*, § 8.3), a Delaware choice of law and forum (*id.*, § 8.5), and a "Miscellaneous" section that included an integration clause, a clause that disclaimed any obligations, understandings, definitions, or representations not expressly contained in the PPA and provided that no party would be bound by anything not expressly in the agreement, and a provision incorporating by reference the exhibits to the PPA (including the Mutual NDA and CIA). (D.I. 49-1, § 8.10.)

The Mutual NDA defined "Confidential Information" and provided the terms by which a receiving party could use or disclose it. (D.I. 49-1 at 13-15.) Its opening recital stated that ChanBond, IPNAV, and CBV were "engaged in a business relationship with each other." (*Id.* at 13.) The CIA declared that the parties – including IPNAV – had a "common, joint, and mutual legal interest in the monetization" of the patents and would cooperate with each other and share information within the attorney-client privilege in furtherance of that common interest. *Id.* at 16, § 2.1. The CIA detailed the nature of that interest: that ChanBond and IPNAV had agreed that IPNAV would be ChanBond's patent monetization agent. (*Id.*, § 1.1.)

The parties also entered into a license agreement between ChanBond and Z-Band, Inc. ("Z-Band") (*id.* at 33-37), which was the operating company run by the owners of CBV. (Hen. Tr. 9:3-13.) Like the PPA, the Z-Band license contained an anti-assignment clause that included a change of control provision, barring Z-Band from assigning or transferring the license agreement or its rights thereunder, "including by a change of control," without ChanBond's written consent. (D.I. 49-1 at 35, § 5.1.)

### C. This Action

CBV commenced this action on October 15, 2021, D.I. 1, and filed its amended complaint on December 6, 2021. (D.I. 6). CBV's amended complaint alleges that the 2015 execution of the ASA breached Section 2.8 because ChanBond and IPNAV were affiliates when the ASA was signed and that CBV did not approve its execution. (D.I. 6, ¶¶ 47, 140-144.) CBV also alleges that the 2015 execution of the ISA breached Section 2.8 of the PPA because the ISA "identified and adopted" the ASA. (D.I. 6, ¶¶ 117, 120-124). CBV seeks damages and a declaratory judgment in connection with the alleged breaches. (D.I. 6, ¶¶ 125, 135, 155, 175).

Leane Defendants filed their answer and counterclaims (the "Counterclaim") on March 23, 2022 and alleged that CBV had been repeatedly and expressly informed in 2015 that ChanBond had retained IPNAV as its patent monetization agent. (D.I. 41, ¶ 4). In response, CBV admitted that the CIA "indicate[d] that ChanBond had retained IPNAV as a patent monetization agent." (D.I. 79, ¶ 4). Leane Defendants alleged that CBV was aware when it executed the PPA that both IPNAV and ChanBond were owned and controlled by Ms. Leane (D.I. 41, ¶ 5); CBV admitted it, and pled that it also "understood that IPNAV would be compensated from ChanBond's [50%] share of Net Recoveries under the PPA." (D.I. 79, ¶ 5). In its answer to the Counterclaim, CBV acknowledged receipt of Ms. Leane's June 2015 emails (D.I. 79 ¶¶ 10-12 (referring to the emails as documents which "speak for themselves")), acknowledged Earl

Hennenhoefer and Richard Snyder are shareholders in Unified (*id.* ¶ 13), and admitted that Hennenhoefer received or reviewed a copy of Unified's November 2015 SEC filings (which included the ISA). (D.I. 41, ¶ 19 and Ex. 3; D.I. 79, ¶ 19). Leane Defendants alleged (and CBV admitted) that in the very first communication from Ms. Leane to Mr. Hennenhoefer, Ms. Leane informed him that patent monetization services would be provided for a percentage of the gross proceeds of the monetization. (D.I. 41, ¶ 21; D.I. 79, ¶ 21).

### D.      Earl Hennenhoefer's Deposition Testimony

On September 20, 2021, Mr. Hennenhoefer was deposed as a third-party witness in the arbitration between Leane Defendants and ChanBond, and testified about his (and therefore CBV's) understanding of the PPA and its terms when he executed it. Mr. Hennenhoefer agreed it was "fair" to say that the entirety of Section 2.8 was directed at defining "Net Recoveries":

> Q. … Is it a fair summary to say that the point of the net recoveries provision and everything included in that was to define what deductions could be taken before CBV's share of revenue was calculated?

> [Objection omitted] THE WITNESS: I think that's a fair statement.

(Hen. Tr. at 71:12-19.) He testified repeatedly that CBV had no concern for what ChanBond did with ChanBond's share of the revenue and that ChanBond was free to contract with and pay affiliates as long as it did not impact CBV's share of the revenue. (*Id.* at 71:22-72:7, 93:9-95:1, 118:13-23, 119:3-4, 167:14-168:5, 168:20-22, 175:13-14, 217:3-12.) And Hennenhoefer repeatedly confirmed that, to the extent that the payment to IPNAV called for by the ASA was governed by Section 2.8 at all, it would be unreasonable for CBV to continue to "withhold approval" for ChanBond to pay IPNAV once CBV received its share of the revenue. (*Id.* at 71:22-72:7, 73:11-17, 119:3-4, 184:19-185:13, 186:4-24.)

## IV.    ARGUMENT

### A.    Standard on a Motion for Judgment on the Pleadings

A motion for judgment on the pleadings may be granted where there are no genuinely disputed issues of material fact requiring discovery and the movant is therefore entitled to judgment as a matter of law. *Altice USA, Inc. v. New Jersey Bd. of Pub. Utilities*, 26 F.4th 571, 575 n. 1 (3d Cir. 2022). The Court may consider the competing pleadings, documents incorporated by reference or integral thereto, other concededly authentic documents already in the record, and facts of which it may take judicial notice. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994), *overruled in irrelevant part* by *Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) (en banc); *Almirall, LLC v. Torrent Pharms., Ltd.*, 548 F. Supp. 3d 443, 447 (D. Del. 2021); *Lundbeck v. Apotex Inc.*, No. CV 18-88-LPS, 2020 WL 3507795, at *3 (D. Del. June 26, 2020). Where the undisputed facts in the record establish that one party or another is entitled to a judgment as a matter of law, the motion must be granted.

### B.    CBV'S Breach of Contract Claims Are Time-Barred

Based on the pleadings, there is no genuine issue of material fact precluding a judgment that CBV's breach of contract claims are time barred. CBV's claim that the 2015 execution of the ASA breached Section 2.8[4] is governed by Delaware's 3-year statute of limitations. (D.I. 49-1, §8.5; 10 Del. C. § 8106.) Yet CBV only filed those claims in 2021, roughly 6 years later. (D.I. 1). The claims are thus time barred unless the statute of limitations was somehow tolled. It was not.

The statute of limitations for Delaware breach of contract claims begins to run as of the

---

[4]As discussed, CBV's theory of breach is wrong; there was never any breach. But the Court need not reach that issue, because if CBV's theory were correct, the breach would have occurred upon execution of the ASA in 2015 and its claim would thus be time barred.

date of the breach, not the date of discovery. *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir. 1990); *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007) (statute runs from time of breach, whether or not plaintiff is aware of harm). CBV has previously argued that the statute of limitations should be deemed tolled until 2020, when it first learned that the specific fee in the ASA was 22% of the gross proceeds of the monetization campaign. (D.I. 81 at 4-5 (arguing that CBV did not learn of the "material terms" of the ASA until 2020); D.I. 81-5 ¶ 2 (affirming that 2020 was the first he heard of the "content and terms" of the ASA); D.I. 81-6 ¶ 2 (same); D.I. 81-7 ¶ 2 (same)) But the specific fee called for by the ASA is not an element of CBV's purported breach of contract claim, and the pleadings irrevocably establish that CBV was specifically aware (or should have been aware) of every element of its breach of contract claims.

CBV alleges that Section 2.8 barred ChanBond from entering into any contract with a ChanBond "Affiliate" to provide ChanBond with advisory services for a fee, unless CBV first approved it. (D.I. 6, ¶¶ 54, 76-78, 133.) Thus, on CBV's interpretation of Section 2.8, the elements of a breach of that section would be:

1.     ChanBond's execution of a contract with a ChanBond Affiliate;

2.     For the Affiliate to provide advisory services;

3.     For a fee;

4.     And which CBV did not pre-approve.

The pleadings establish that CBV knew (or should have known) of each element in 2015.

**<u>First</u>**, the pleadings confirm CBV actually knew or should have known in 2015 that ChanBond and IPNAV were "Affiliates." (*See* D.I. 79, ¶ 5; D.I. 49-1, § 2..)

**<u>Second</u>**, the pleadings establish CBV knew or should have known the ASA existed. As alleged in the Counterclaim, the CIA informed CBV that ChanBond and IPNAV were parties to

an agreement by which IPNAV would be ChanBond's "worldwide intellectual property enforcement and licensing agent" and would provide ChanBond with patent monetization services. (D.I. 41, ¶ 6 (reciting the relevant language); D.I. 79, ¶ 5 (referring to the document for its terms); D.I. 49-1 at 16, § 1.1.) In addition, Ms. Leane specifically confirmed to both CBV's counsel and CBV's principals that ChanBond had hired IPNAV. (D.I. 41, ¶¶ 10-12; D.I. 41-1 and 41-2; D.I. 79, ¶¶ 10-12.) Further, in November 2015, after purchasing ChanBond, Unified publicly filed ISA with the SEC – and that agreement disclosed the existence of the ASA. (D.I. 41, ¶¶ 17-18; D.I. 41-3 at Schedule 1.3; D.I. 79, ¶¶ 17-18.) CBV actually saw a copy of the ISA. (D.I. 41, ¶ 19 (alleging that Hennenhoefer received and reviewed the SEC filings); D.I. 79, ¶ 19 (admitting as much).) Moreover, CBV pled in its Answer to Leane Defendants' Counterclaims that at the time it entered the PPA, it expected ChanBond to retain IPNAV. (D.I. 79, ¶ 5.)

**Third**, CBV admits that it expected ChanBond to pay IPNAV. (D.I. 79, ¶ 5.)

And **fourth**, CBV's affirmatively alleges that it did not approve the ASA. (D.I. 6, ¶ 143.)

Thus, the pleadings foreclose any claim that the statute of limitations should be tolled. CBV unambiguously knew or should have known in 2015 the facts needed to allege its breach of contract claims. Even were the above insufficient to show actual or constructive knowledge, CBV was at least on inquiry notice by November 2015, when it knew or should have known that ChanBond had a contract with IPNAV and that IPNAV and ChanBond were no longer affiliates given the public disclosure of the ISA (D.I. 42-1) and its explicit reference to the ASA. *Seidel v. Lee*, 954 F. Supp. 810, 817 (D. Del. 1996) (SEC filings sufficient to place Plaintiff on notice), *Walker v. W. Michigan Nat. Bank & Tr.*, 324 F. Supp. 2d 529, 535 (D. Del. 2004), *aff'd* 145 F. App'x 718 (3d Cir. 2005) (failure to read relevant documents does not justify plaintiff's ignorance). On this record, no genuinely disputed *material* fact remains to be determined by

discovery or trial, and CBV's breach of contract claims must be dismissed as time barred.

C.    **There Was No Breach of Section 2.8**

Even if CBV's claims were considered on their merits, Leane Defendants would be entitled to a judgment on the pleadings because Section 2.8 does not limit ChanBond's freedom to retain (and pay) whatever advisors ChanBond wanted to. Section 2.8 defines "Net Recoveries" by identifying categories of expenses that ChanBond could deduct from "Gross Recoveries" (cash consideration received by ChanBond in connection with licensing, enforcing, or selling the patents, (D.I. 49-1, § 2.7)), including the reasonable fees and expenses of lawyers, consultants, and patent monetization advisors ChanBond chose to retain. (*Id.*, § 2.8.) And Section 2.8 provided that, "[n]otwithstanding the above" – *i.e.*, regardless of whether a category of expenses was *generally* deductible – amounts paid to a ChanBond "Affiliate" would "require the prior approval of [CBV], such approval to not be unreasonably withheld." (*Id.*) That language is unambiguous and, even were there any ambiguity, the pleadings establish that it would need to be construed exactly as Leane Defendants have argued. Leane Defendants are thus entitled to a judgment on the pleadings that Section 2.8 did not bar ChanBond from contracting with IPNAV.

a.    **Section 2.8 Unambiguously Provides Only a Definition of "Net Recoveries," Not a Limitation on ChanBond's Ability to Contract**

The final sentence of Section 2.8 unambiguously requires CBV's approval before money "which is paid to an Affiliate" could be deducted in calculating "Net Recoveries," and does not limit ChanBond's ability to contract with such an Affiliate. Contractual language is ambiguous only if it is reasonably susceptible to multiple interpretations, *Westfield Ins. Grp. v. J.P.'s Wharf, Ltd.*, 859 A.2d 74, 76 (Del. 2004), and the fact that CBV puts forward a strained interpretation in its complaint has no impact on that analysis. *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997) (language "is not ambiguous simply because the parties

-12-

disagree on its meaning"). Rather, the Court must adhere "to the language of the document and [may] not to look to extrinsic evidence to find ambiguity." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001). Where the plain meaning is unambiguous, the Court must give that plain meaning effect regardless of the subjective intent of the parties. *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) (Delaware applies the "objective" theory of contracts). The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations. *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 Del. Ch. LEXIS 154, at *32 (Del. Ch. Nov. 2, 2007). For several reasons, there is no ambiguity here, and as such, the Court must afford the contract its plain meaning (payments to Affiliates could only be deducted in calculating Net Recoveries with CBV's approval) rather than the self-serving meaning CBV raises for the first time in litigation (that CBV's approval was required to contract with Affiliates at all).

**First**, the final sentence of Section 2.8 must be read in the context in which it appears. *Engelhard Corp. v. N.L.R.B.*, 437 F.3d 374, 381 (3d Cir. 2006) (construing sentence in light of context of the paragraph in which it appeared: "Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.") *quoting Restatement (Second) of Contracts: Rules In Aid of Interpretation* § 202 comment d; *USA Cable v. World Wrestling Fed'n Ent., Inc.*, 2000 WL 875682, at *8 (Del. Ch. June 27, 2000) (language cannot be read in a vacuum, but must be construed in context), *aff'd*, 766 A.2d 462 (Del. 2000). Section 2.8 is the eighth subsection of Section 2 of the PPA – "Definitions" – and defines what "Net Recoveries" "shall mean" as used in the contract. (D.I. 49-1 at 1, 2). Section 2.8 is thus entirely focused on defining "Net Recoveries," and its final

sentence must be so construed.

**Second**, the sentence begins "[n]otwithstanding the above" – an introductory phrase that reaffirms the connection between CBV's 'approval right' and the definition of "Net Recoveries" (*i.e.* that the 'approval right' relates to whether particular expenses will be deductible, not ChanBond's freedom of contract). *See* Scalia, A. & Garner, B., *Reading Law: The Interpretation of Legal Texts* at 111 (2012) ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces … derogates from the provision to which it refers") (emphasis in original). *See also Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (quoting *Reading Law* in interpreting statutory "notwithstanding" clause). *Cf. NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1166 (Fed. Cir. 2021) (interpreting contract and explaining that a 'notwithstanding clause' would have indicated that the parties were "making an exception to, operating in even partial derogation of, or narrowing the coverage expressly specified in the immediately preceding sentence"). Were the Court to read the last sentence of Section 2.8 the way CBV proposes – as a limitation on ChanBond's freedom to enter into agreements – the words "[n]otwithstanding the above" would be a nullity, because the approval right would not be a derogation from "the above" language defining which categories of expense were deductible, but a limit on what expenses ChanBond could incur *ab initio*. *AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 657 (D. Del. 2017) (court should give meaning to every word, not render language superfluous); *In re Am. LaFrance, LLC*, 461 B.R. 267, 274 (Bankr. D. Del. 2011) ("Well-established principles of interpretation prevent such casual disposal of words in a contract"). The last sentence of Section 2.8 thus unambiguously limits only deductions in calculating Net Recoveries, not ChanBond's ability to contract.

**Third**, even without that context or introductory signal, the language of the final sentence

of Section 2.8 does not govern ChanBond's *agreements* with Affiliates – only *payments*. (D.I. 49-1, § 2.8.) Indeed, the reference not to "approval" generally but to "*prior* approval" – that is, approval prior to the payment rather than after it – also indicates that this provision is relevant only to how Net Recoveries are calculated, not to which payments ChanBond can or cannot make in the first instance. (*Id.*) Whether viewed in context or out of context, the meaning of Section 2.8 is unambiguously clear: payments made to ChanBond Affiliates could only be deducted in calculating Net Recoveries if CBV had given prior approval to such payments. Either way, the mere execution of the ASA could not breach that provision.

> **b.    Even if Section 2.8 Were Ambiguous, There Would be No Material Issue of Fact Warranting Trial on Its Meaning or Whether Execution of the ASA Was a Breach**

Typically, the proper construction of ambiguous language would be an issue for discovery, because the Court's role is to give effect to the parties' intent, and the parties' intent is typically a disputed factual issue. But here, CBV's pleadings and the other documents of record independently confirm that there is no disputed issue of fact; CBV fully understood and intended at the time it executed the PPA that Section 2.8 was only a rule of allocation and not (as it now claims) a limitation on ChanBond's freedom to contract with Affiliates in the first instance.

Start with the PPA and CBV's understanding when it executed that agreement in April 2015. There is no dispute that Earl Hennenhoefer executed the PPA on CBV's behalf. (D.I. 49-1 at 11.) There is no dispute that Hennenhoefer testified to his understanding of the PPA during his deposition in the arbitration. (D.I. 79, ¶ 15.) And there can be no dispute that Hennenhoefer repudiated CBV's made-for-litigation claims about the meaning of Section 2.8. Hennenhoefer:

- Confirmed that the purpose of everything included in Section 2.8 was to define what deductions could be taken before CBV's share of revenue was calculated. (D.I. 41, ¶ 28; D.I. 79, ¶ 28; Hen. Tr. at 71:12-19);

- Confirmed that under Section 2.8, ChanBond could enter into agreements with third

parties, including Affiliates, without CBV's approval, so long as the agreement was not CBV's expense. (D.I. 41, ¶ 29; D.I. 79, ¶ 29; Hen. Tr. at 94:6-95:1);

- Confirmed that he understood similar language in a prior draft contract as allowing the purchaser to "get anyone he wants to and do whatever kind of deal he wants" as long as CBV would not be charged for it. (D.I. 41, ¶ 32; D.I. 79, ¶ 32; Hen. Tr. at 116:13-118:23);

- Confirmed that he understood that prior language as allowing the purchaser to "pay somebody in IP Navigation out of [its own] pocket." (D.I. 41, ¶ 34; D.I. 79, ¶ 34; Hen. Tr. at 119:3-4);

- Specifically and confirmed that CBV was not required to approve contracts between ChanBond and its affiliates, that if Ms. Leane wanted to have ChanBond "sign[] a deal outside of the PPA, yeah, she can sign *any* deal outside of the PPA" and that "[w]here the money comes out of" would then be "something for the lawyers to argue." (D.I. 41, ¶ 37-8; D.I. 79, ¶ 37-8; Hen. Tr. at 167:2-168:5) (emphasis added);

- Confirmed that money being paid to an "Affiliate" would require CBV approval only if it was "going out of the net recoveries." (D.I. 41, ¶ 40; D.I. 79, ¶ 40; Hen. Tr. at 168:17-22);

- Expressly confirmed that ChanBond could "do whatever it wants out of its share of the money" and the "only question" was whether the money would "come out of gross or net." (D.I. 41, ¶ 44-5; D.I. 79, ¶ 44-5; Hen. Tr. at 217:3-12); and

- Specifically testified that ChanBond could enter into agreements with "anybody else they want to" as long as the cost was not charged to CBV. (D.I. 41, ¶ 45; D.I. 79, ¶ 45; Hen. Tr. at 217:3-12).

Nor does Hennenhoefer's testimony stand alone as confirmation of Section 2.8's meaning. As Leane Defendants alleged and CBV has now admitted, the Nondisclosure Agreement and CIA placed CBV on specific notice that ChanBond was retaining IPNAV as its patent monetization advisor. (D.I. 79, ¶ 4). As CBV has now admitted, it was aware of that relationship and affirmatively expected ChanBond to retain *and pay* IPNAV for such work. (D.I. 41, ¶¶ 4-5; D.I. 79, ¶¶ 4-5.) And CBV acknowledges that it was repeatedly told that ChanBond had in fact contracted with IPNAV. (D.I. 41, ¶¶ 11-12; D.I. 79, ¶¶ 11-12; D.I. 41-1, 41-2.) Yet CBV never objected that doing so breached the PPA or claimed it had a right to pre-approve ChanBond's contract with IPNAV. That undisputed course of performance confirms the parties

-16-

never intended or expected the PPA to grant CBV any such right. *See Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*, No. CV 18-819-LPS, 2021 WL 1170374, at *8 (D. Del. Mar. 29, 2021) (considering course of performance evidence), *amended on reconsideration in part*, No. CV 18-819-LPS, 2021 WL 4319224 (D. Del. Sept. 23, 2021).

Considering CBV's admissions and the undisputed facts, Section 2.8 cannot support any interpretation that would render ChanBond's execution of the ASA a breach of Section 2.8. Indeed, CBV has not pled *any* facts supporting its proposed interpretation. Hennenhoefer's testimony makes crystal clear that ChanBond and CBV shared the same view of Section 2.8 at the time of execution: it did not limit ChanBond's freedom to contract – ChanBond could sign "any deal outside of the PPA" – but was intended only "to define what deductions could be taken before CBV's share of revenue was calculated." (Hen. Tr. at 71:12-19.) And nothing in the ASA requires that ChanBond's fee be deductible under the PPA. If the fee is deductible (which, as shown in Point IV below, it is), then the fee is paid before ChanBond's payment to CBV. If the fee is not deductible, then the fee must be paid from ChanBond's share of the recoveries after paying CBV. Either way, the execution of the ASA could not have breached Section 2.8, and CBV's breach of contract claims must be dismissed.

### D. Because IPNAV Is Not a ChanBond Affiliate, ChanBond Can Deduct the IPNAV Fee in Calculating Net Recoveries Even if CBV Did Not Approve that Payment[5]

Finally, IPNAV is entitled to a judgment on the pleadings declaring that ChanBond may deduct the fee it owes IPNAV when calculating the "Net Recoveries" in which CBV shares under the PPA. The language of Section 2.8 is straightforward: ChanBond may deduct fees paid

---

[5]As Leane Defendants alleged, CBV sufficiently approved ChanBond's retention of IPNAV, or at the very least should be estopped from challenging it now given its failure to inquire about the precise terms of the fee since 2015. Because those issues turn on fact questions that cannot be decided on a motion for judgment on the pleadings, Leane Defendants do not address them here.

to its "other advisors or agents" when calculating Net Recoveries, unless that fee is "paid to" a ChanBond "Affiliate" or stakeholder, in which case it can be deducted only if CBV pre-approves it. (D.I. 49-1, § 2.8.) An "Affiliate" of ChanBond is an entity that controls, is controlled by, or is under common control with ChanBond. (*Id.*, § 2.1.) Until Ms. Leane sold ChanBond to Unified in October 2015, both ChanBond and IPNAV were commonly controlled by Ms. Leane, and therefore were Affiliates as defined by the PPA. (D.I. 41, ¶ 5; D.I. 79, ¶ 5.) Since that sale, however, ChanBond and IPNAV have *not* been Affiliates, because IPNAV does not control ChanBond, is not controlled by ChanBond, and is not under common control with ChanBond. (D.I. 41, ¶ 50-2; D.I. 79, ¶ 50-2; Hen. Tr. at 178:4-181:24.) As such, no fee paid by ChanBond to IPNAV would be "paid to an Affiliate of [ChanBond]," and the final sentence of Section 2.8 has no impact on ChanBond's ability to deduct that expense when calculating Net Recoveries.

CBV's Amended Complaint does not even allege that any fee paid to IPNAV would be "paid to an Affiliate of [ChanBond]" and therefore subject to CBV's "approval right" under Section 2.8 before it can be deducted. Rather, the Amended Complaint alleges only that IPNAV and ChanBond were "Affiliates" *in 2015, when the ASA was executed*, and therefore that the ASA is an "affiliate transaction." (D.I. 6, ¶¶ 76-78.) But the PPA does not purport to provide CBV with a right to approve "affiliate transactions" before payments made in connection with an "affiliate transaction" can be deducted in calculating Net Recoveries; indeed, the phrase "affiliate transactions" is not in the PPA. Only amounts actually "paid to an Affiliate" require such approval before they can be deducted. (D.I. 49-1, § 2.8.) Because nothing in the PPA purports to give CBV a right to pre-approve amounts "paid to entities which at one point were Affiliates of ChanBond, but no longer are," ChanBond unambiguously has the right to deduct IPNAV's fee when calculating Net Recoveries, whether CBV "approved" that payment or not.

And that makes sense. The "approval" provision in the PPA was designed to avoid allowing ChanBond (or its owners) to retain a greater share of the Gross Recoveries by effectively "paying itself" at CBV's expense. (D.I. 41, ¶ 58; D.I. 79, ¶ 58 (failing to deny that was CBV's intent).) But fees paid to a third party, rather than kept within the 'ChanBond family,' were to be a shared expense regardless of CBV's approval. (D.I 49-1, § 2.8.) And CBV was both aware that ChanBond would be retaining IPNAV ('within the family') (D.I. 79, ¶¶ 4-5), and that it had not negotiated any provision that prevented (or limited) a change of control in ChanBond (i.e. that nothing required ChanBond and IPNAV to *remain* 'family'). (Hen. Tr. at 217:21-218:17.) Upon Unified's purchase of ChanBond from Ms. Leane, ChanBond and IPNAV ceased being "Affiliates," and the fee due to IPNAV was no longer to be paid 'within the ChanBond family' – exactly as Mr. Hennenhoefer assumed would happen upon such a sale. At that point, ChanBond's obligation to IPNAV was to a non-Affiliate advisor, no different than had ChanBond retained any other patent monetization advisor it was not under common control with.

Because CBV did not negotiate any provision in the PPA preventing the sale of Chanbond, or requiring its' approval of "affiliate transactions," or an approval right for "former Affiliates," the PPA effectively allocated the risk that IPNAV and ChanBond would 'disaffiliate' to CBV: so long as a third-party purchaser was willing to purchase ChanBond with the IPNAV ASA in place, it could do so knowing that the PPA would allow ChanBond to treat the ASA fee as a shared expense, exactly as though it had retained IPNAV for the first time after that purchase, because no payment of the ASA fee would be "to an Affiliate." CBV now wishes it had negotiated a broader approval right, but the Court cannot graft onto the contract a broader agreement than the parties actually negotiated. *See Loc. 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc*., 458 F.3d 305, 311 n. 3 (3d Cir. 2006) (refusing to broaden

interpretation beyond what was expressly included in contract, because "[w]e are not inclined to impose on parties provisions that they themselves did not negotiate"); *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 494 (1st Cir. 1997) (refusing to treat stock sale as violation of anti-assignment provision, where patent owner could have negotiated a change-of-control provision but failed to do so), *abrogated on other grounds as recognized by Hardemon v. City of Bos.*, No. 97-2010, 1998 WL 148382 (1st Cir. Apr. 6, 1998) (court could not address merits before jurisdiction); *Baxter Pharm. Prod., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at *4 (Del. Ch. Mar. 11, 1999) (parties "could have explicitly prohibited stock acquisitions in their contract, but because they did not, BHC was free to acquire all of OPP's stock without violating the M & D Agreement's nonassignability clause").

Indeed, as in *Institut Pasteur* and *Baxter Pharmaceutical*, ChanBond and CBV knew how to draft a change of control provision: Section 8.3 of the PPA includes a requirement that *ChanBond* consent to any change of control at *CBV*, but not vice versa. (D.I. 49-1, § 8.3.) And the Z-Band license agreement similarly limits changes of control in Z-Band. (D.I. 49-1 at 35, § 5.1.) The parties opted not to include any similar provision addressing a change in control of ChanBond – despite CBV's knowledge that ChanBond would be retaining IPNAV. CBV is thus entitled to what it agreed to, no more and no less: the right to pre-approve any payment to an Affiliate before that payment can be deducted in calculating Net Recoveries. Because no payment to IPNAV would be a payment to an Affiliate and the pleadings establish that there is no disputed fact requiring trial on that issue, that provision has no application here, and Leane Defendants are entitled to judgment on the pleadings declaring as much.

## V.      CONCLUSION

For the reasons set forth above, the motion should be granted.

Respectfully submitted,

OF COUNSEL:

_/s/ James H. S. Levine_
James H. S. Levine (DE No. 5355)

Akiva M. Cohen                    TROUTMAN PEPPER
Dylan M. Schmeyer                        HAMILTON SANDERS LLP
KAMERMAN, UNCYK,                  Hercules Plaza, Suite 5100
        SONIKER & KLEIN P.C,      1313 N. Market Street
1700 Broadway, 16th Floor         P.O. Box 1709
New York, NY 10019                Wilmington, DE  19899-1709
212.400.4930                      302.777.6500
_acohen@kusklaw.com_              _james.levine@troutman.com_
_dschmeyer@kusklaw.com_

                                  _Attorneys for Deirdre Leane and IPNAV, LLC_
Dated:  May 24, 2022