# EXHIBIT 1

```
 1   ---------------------------

 2   DEIRDRE LEANE and        : AMERICAN ARBITRATION
     IPNAV, LLC,              : ASSOCIATION
 3           Plaintiff        :
             v.               : CASE NO. 01-20-0015-0793
 4   UNIFIEDONLINE, INC. and  :
     CHANBOND, LLC,           :
 5           Defendants       :
     ---------------------------

 6

 7

 8

 9           VIDEOTAPE DEPOSITION OF EARL

10   HENNENHOEFER taken via Zoom Conference on Monday,

11   September 20, 2021, commencing at 9:57 a.m. before

12   Coleen Trifun, RPR and Notary Public.

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1     A P P E A R A N C E S :

 2             KAMERMAN UNCYK SONIKER & KLEIN, P.C.
               BY:  AKIVA COHEN, ESQUIRE
 3             123 South Broad Street
               Suite 2250
 4             Philadelphia, Pennsylvania 19109
               acohen@kusklaw.com
 5             Counsel for the Plaintiff

 6

 7             CARTER ARNETT
               BY:  NATHAN COX, ESQUIRE
 8             8150 N. Central Expressway
               Suite 500
 9             Dallas, Texas 75206
               ncox@carterarnett. com
10             Counsel for Unifiedonline and ChanBond

11

12             MCNEES WALLACE & NURICK
               BY:  JAMES P. DEANGELO, ESQUIRE
13             100 Pine Street
               Harrisburg, Pennsylvania 17101
14             jdeangelo@mcneeslaw.com
               Counsel for Earl Hennenhoefer
15

16

17             ALSO PRESENT:
               KEN AMRHEIN, VIDEOGRAPHER
18

19

20

21

22

23

24
```

```
 1                           -  -  -

 2                         INDEX

 3                           -  -  -

 4    WITNESS              INTERROGATION BY     PAGE

 5    EARL HENNENHOEFER

 6                       By Mr. Cox            7, 196

 7                       By Mr. Cohen        69, 215

 8                           -  -  -

 9                         EXHIBITS

                             -  -  -

11    EXHIBIT NUMBER       DESCRIPTION          PAGE

12    Exhibit-1            Tab 1                25

13    Exhibit-2            Tab 5                29

14    Exhibit-3            Tab 3                32

15    Exhibit-4            Tab 4                40

16    Exhibit-5            Objections & responses  50

17    Exhibit-6            Tab 9                58

18    Exhibit-7            E-mail               79

19    Exhibit-8            E-mail               82

20    Exhibit-9            E-mail               86

21    Exhibit-10           Spreadsheet          87

22    Exhibit-11           Bates 003496         95

23    Exhibit-12           E-mail               96

24    Exhibit-13           E-mail               98
```

```
 1   (Exhibits cont'd)

 2   Exhibit-14            CB004799              102

 3   Exhibit-15          CB004820              109

 4   Exhibit-16          Purchase agreement    114

 5   Exhibit-17          E-mail                120

 6   Exhibit-18          IPN0019376            122

 7   Exhibit-19          E-mail                125

 8   Exhibit-20          E-mail                131

 9   Exhibit-21          Purchase agreement    135

10   Exhibit-22          CB005793              138

11   Exhibit-23          CB005799              139

12   Exhibit-24          CB005804              141

13   Exhibit-25          IPN0055256            154

14   Exhibit-26          IPN0050874            157

15   Exhibit-27          IPN0032941            158

16   Exhibit-28          IPN0066639            163

17   Exhibit-29          IPN0041625            171

18   Exhibit-30          IPN0049400            188

19   Exhibit-31          E-mail                191

20

21

22

23

24
```

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

```
 1              DIRECTION TO WITNESS NOT TO ANSWER

 2    PAGE   LINE          PAGE   LINE          PAGE   LINE

 3                          (None)

 4

 5

 6

 7

 8

 9

10           REQUEST FOR PRODUCTION OF DOCUMENTS

11    PAGE   LINE          PAGE   LINE          PAGE   LINE

12                          (None)

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 6

1 THE COURT REPORTER: Will you need
2 a copy of the transcript?
3 MR. COHEN: Yes.
4 MR. DEANGELO: Yes.
5 - - -
6 VIDEOGRAPHER: We are now on the
7 record. Today's date is September 20, 2021. The
8 time is 9:57 a.m. Eastern. This is the recorded
9 video deposition of Earl Hennenhoefer in the
10 matter of Deirdre Leane and IPNav, LLC versus
11 UnifedOnline, Inc. and ChanBond, LLC, before the
12 American Arbitration Association, Case No.
13 01-20-0015-0793.
14 My name is Ken Amrhein from Everest
15 Court Reporting. I'm the video specialist. The
16 court reporter today is Coleen Trifun, also from
17 Everest Court Reporting.
18 All counsel appearing today will be
19 noted on the stenographic record.
20 Will the court reporter please
21 swear in the witness.
22 Do you swear or affirm that the
23 evidence you're about to give will be the truth,
24 the whole truth, and nothing but the truth so help

Page 7

1 you God?
2 THE WITNESS: I do.
3 - - -
4 EARL HENNENHOEFER, having been first
5 duly sworn, was examined and testified as follows:
6 - - -
7 Examination
8 - - -
9 BY MR. COX:
10 Q. Good morning. Could you please state --
11 A. Good morning.
12 Q. Could you please state your full name
13 for the record?
14 A. Yeah. My name is Earl Hennenhoefer.
15 Q. Have you given a deposition before?
16 A. Yes.
17 Q. Okay.
18 So just a few quick ground rules. If
19 you have any trouble understanding my question,
20 can you please just agree to ask me to either
21 rephrase it or clarify?
22 A. Yes. I'll ask you that.
23 Q. And another part that's important for
24 our court reporter is that you have to give a

Page 8

1 verbal answer. So it can't be a nodding of the
2 head or shaking of the head or a uh-huh or an
3 uh-uh. Does that make sense?
4 A. Yes, it does.
5 Q. All right.
6 I want to start off with just a brief
7 background on your education and work experience.
8 Do you have any college degrees?
9 A. Yes. After my tour in the navy, I went
10 to Weston University in St. Louis, got an
11 engineering degree, electrical engineering degree
12 and a master's in business administration.
13 Graduated in 1969.
14 Q. Any other form of -- of higher education
15 or certifications?
16 A. No. Went to a lot of different courses,
17 but nothing really that was any significant
18 certifications.
19 Q. And are you currently retired?
20 A. Yes.
21 Q. Prior to retirement, what was your
22 profession or career?
23 A. I was CEO and president of a company
24 called Z-band, Incorporated and CBV, Incorporated.

Page 9

1 Q. And what did you do as CEO of those two
2 companies?
3 A. CV -- I mean Z-Band was an operating
4 company. We sold product and my responsibility
5 was a leadership of the company, plus I had --
6 because it was a small company, I did things like
7 production control, assisted with the technical
8 side of the house, and actually did sales calls.
9 As CEO of CBV, that was a patent-holding
10 company, but not really an operation company. And
11 so my main purpose there was trying to modernize
12 the patents that we had in the -- in the holding
13 company.
14 Q. When was Z-Band created?
15 A. Z-Band was formed in October of 1999.
16 Q. And what about CBV?
17 A. I am not actually sure about that. It
18 was formed around -- I think around 2008. We took
19 the patents -- the patents were written in Z-Band
20 in 2000. We applied for a patent in
21 December 2000. And then we decided to move
22 outside of the operating company in to just a
23 patent-holding company. The reason for that is we
24 were trying to sell Z-Band and most the people

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 10

1  that are buying the company or thinking about
2  buying Z-Band, had no interest in patents that
3  would deal with the cable industry, so we
4  separated the two.
5  Q.      Did you have prior experience in the
6  cable industry before forming Z-Band?
7  A.      I worked for a company -- I worked GE
8  Star and eventually ended up in a company called
9  Amp, Incorporated, in 1973 as an engineer.
10 Advanced up in the company and became the division
11 manager/director of worldwide procurement.  And
12 then finally a vice president and general manager
13 and group director of numerous product lines.
14      And then I went to a French company and
15 had responsibility for all the United States and
16 part of the far east.  And the French company was
17 an Internet connection company also.
18 Q.      What was the name of that French
19 company?
20 A.      It was named Framatome.  We called it
21 FCI, Framatome Connectors Interconnects.
22      But Framatome was the provider of
23 nuclear power equipment for all of France, most of
24 Europe.  And they decided to diversify and get

Page 11

1  into something else, so they bought a U.S.
2  connector company and they needed somebody to turn
3  it around and I applied and got the job.
4  Q.      What -- what year did you retire?
5  A.      We sold the company, Z-Band in 2018, but
6  then we stayed active in the patent situation
7  until that was finally settled this year.
8  Q.      So then did you retire this year?
9  A.      Well, I -- my wife and I considered
10 retiring it in 2018 because we didn't get paid for
11 anything after that.
12 Q.      Fair enough.
13      You mentioned that you applied for the
14 patents, we'll call them the -- the ChanBond
15 patents, if that's all right, in 2000; is that
16 right?
17 A.      Yeah.  We applied -- actually the
18 application went in to -- for approval in December
19 of 2000.
20 Q.      Is that the -- strike that.
21      Are -- as I understand it, you're one of
22 named inventors on those patents; is that correct?
23 A.      That's correct.  There was three of us.
24 Q.      Could you name the other two?

Page 12

1  A.      Yes.  Robert Stine, which was our chief
2  engineer and did most of the work.  Stine is
3  S-T-I-N-E.  And the other one is Robert Snider,
4  call him Dick Snider, Richard Snider.
5  Q.      So his name is Richard Snider?
6  A.      Yeah.  Richard Snider.  Everybody calls
7  him Dick.
8  Q.      Are the ChanBond patents the only
9  patents that you're a named inventor on?
10 A.      I don't understand that question.
11 Sorry.
12 Q.      Are the ChanBond patents -- are you a
13 named inventor on any other patents?
14 A.      I'm on one other patent.  It has nothing
15 to do with ChanBond.  I was named the patent
16 holder --
17 Q.      So I take it you did not attempt to
18 monetize that patent; is that correct?
19 A.      Are you talking about the one on AMP?
20 Q.      Correct.
21 A.      AMP owned all the patents, so they also
22 had -- they put all the patents in a company
23 called Whittaker and that's who actually owned the
24 patents.  So if you were named on the patent, you

Page 13

1  didn't own the patent, it was just a --
2  Q.      I want to get into the background of --
3  of how CBV connected with -- with Billy Carter and
4  IP Navigation Group.
5      MR. DEANGELO:  Objection to form.
6      THE WITNESS:  We were talking to
7  our patent attorneys, we have two of them, trying
8  to find a way to monetize the patents.  Bob Stine,
9  who was our engineer, was doing all the traveling.
10      One of his trips, I handed him --
11 looked through a magazine in the back of the seat
12 of the airplane and there was advertising for --
13 what's it called?  IPNav, which turns out to be IP
14 Navigation.  And they claim that they could
15 monetize a patent for small companies that were
16 trying to claim patents against larger companies.
17      So we thought -- thought that it
18 sounded like a good idea and I contacted IP
19 Navigation, in particular I contacted Deirdre
20 Leane and she set up a meeting down in Dallas,
21 Texas, a dinner meeting.  And so we flew down to
22 Dallas and that's where I met Erich Spangenberg,
23 Deirdre, and Billy Carter.

Page 14

BY MR. COX:

Q.      And I want to for -- for clarification,
there's two different entities that I want to make
sure are clear.  One is IP Navigation Group, LLC,
and the other is IPNav, LLC.  Are you aware of
difference between the two?

A.      At the time, IPNav -- IP Navigation was
called IPNav for short.  It took us a while to
realize it's IP Navigation that we were dealing
with.  And then later when Deirdre contacted us
on -- for her to own the patents, yeah, she called
her company IPNav and it was our attorney that
pointed out they were two separate companies.

Q.      Okay.

        So you're aware that there is a
distinction between IP Navigation Group, LLC and
IPNav, LLC?

A.      Yes, I am.

Q.      And do you know -- and let's go at
the -- at the time you -- you found IP Navigation
Group, do you know who owned or managed IP
Navigation Group?

        MR. COHEN:  Objection to form.

        THE WITNESS:  Can I answer that?

Page 15

        MR. DEANGELO:  Yes.

        THE WITNESS:  Okay.  We were told
that Erich Spangenberg owned IP Navigation.  At
the dinner there was three of us, there was Erich,
myself, and Bob Stine.  Only the three of us.  He
also told us that he owned IP Navigation.

BY MR. COX:

Q.      And do you know --

A.      Owns it.

Q.      Sorry.

        And do know who owns IPNav, LLC?

A.      Yes.  We found out that supposedly
Deirdre owns IPNav.

Q.      When did you start negotiations for the
sale of CBV?

        MR. COHEN:  Objection to form.

        And, Mr. Hennenhoefer, I'm
objecting for issues of the record.  You can go
ahead and answer the questions even after I
object, unless your attorney directs you not to.
Okay?

        THE WITNESS:  Okay.

        We had a dinner meeting and the
three of us, three being Harry, Bob Stine, myself,

Page 16

The concept that Erich put forward was that we
would bring the patents to the deal.  He would
bring the money.  We would split the cost of all
the legal stuff and he went through ad-nausea what
that's about.  And then we divided the money
that's left over.  If we wanted, which we did,
some money up front that was not considered that
he was buying the patents, it was considered that
it was an advancement and we would have to pay
that back double what he puts up front.  So we
actually were giving the patents to the deal, not
selling them.

BY MR. COX:

Q.      Can you tell me what you were meaning by
you were giving the patents, not selling them?

A.      Yes.  The up-front money that they were
going to provide was an advancement on the
settlement that we were going to get.  So we
actually are putting the patents into the deal,
not -- not actually selling them.

        Now, what it said under the contract,
I'm not sure exact terminology, but it's more or
less we're not getting money for the patents, we
were getting an advancement against money that's

Page 17

going to get later on.  And this was different
than anyone else we talked about, which caused us
a real hiccup.  All the other people we kept
ownership of the patents and did not give up
ownership, which we had to do in order to get
Erich to sign, that was his condition.

        His condition was that since you have
three partners and since I am going to be talking
to the cable industry, which our guys don't
negotiate with, I can't have one of the partners
decide whatever I negotiate is not good enough.
We need to have a unified front.  The only way we
can have a unified front was for me to -- me,
being Erich, go in the patents.  So it was a take
it or leave it deal.

Q.      When was that dinner meeting?

A.      My recollection was in December of 2013.

Q.      And who was supposed to take over
ownership of the patents in the original deal that
was drafted?

        MR. COHEN:  Objection to form.

        MR. DEANGELO:  Could you rephrase
that question?  Because I think that's -- I have
a -- I have a form issue with that.  I don't know

Page 18

1 that there was -- I don't think there was an

2 init -- an initial deal signed up.

3        MR. COX:  Sure.  You mean -- are

4 you referring to the business meeting or the

5 dinner meeting?

6        MR. DEANGELO:  Yes.

7        MR. COX:  Yeah.  Sorry.  I'll

8 clarify it.

9 BY MR. COX:

10 Q.      Once -- once a deal eventually was

11 struck and contracts were signed, who was supposed

12 to be the original owner of the patents?

13 A.      Well, what we did, Erich explained that

14 he would form a holding company and the patents

15 would go into that and then IP Navigation would

16 own -- own the holding company -- company.  So when

17 we left the meeting, a month after or so forth,

18 Billy Carter contacted us and said that he was

19 interested in us going out to Kansas City, meeting

20 his company, and he had an opportunity that he

21 thought would be great for Z-Band Incorporated.

22        So we went out there and his deal was he

23 wanted to buy Z-Band and the CBV patents at one

24 time And he was working on a patent deal that was

Page 19

1 in court, pertaining to IP clouding and he thought

2 he was going to get a lot of money from that.  So

3 the deal was he was going to offer some up-front

4 money and some stock and you, know, IP and he

5 would put this in a company called VDV.  That was

6 a phrase that we developed, actually, Bob, I mean

7 Dick Snider did, that stood for Video, Data, and

8 Voice -- Voice, Data, and Video.  And that was the

9 company that he was going to put the patents into.

10        That deal never came about because the

11 patent lawsuit he had with IP clouding fell apart.

12 Q.      Okay.  Couple quick follow-up questions.

13        Do you recall when that -- that meeting

14 at Kansas City was?

15 A.      No, I don't.

16 Q.      Do you have a -- an approximate year?

17 Was it -- was it still in 2013 or was it --

18 A.      No.  It was -- it was in the early part

19 of 2014.  It was decedent enough whether that we

20 flew out there, we wore our sport coats, and it

21 was comfortable.

22 Q.      And you mentioned that the -- the deal

23 fell through at some point.  Do you recall when

24 that was?

Page 20

1 A.      It was shortly after a trip out there to

2 Kansas City.  The judge decided he -- his case did

3 not have standing, so he didn't get any money from

4 the case.  He thought he was going to get quite a

5 bit of money, so that fell apart.  But Billy

6 followed up with another phone call and he was

7 going to offer money, not very much, and the rest

8 of the money would be paid out of Z-Band as -- as

9 time goes on.  And what I did is invite him to

10 come to Z-Band and talk to all the partners.  So

11 he flew out, flew into Harrisburg, which is not an

12 easy place to get to and spent the whole day

13 talking about that.

14        And what we decided was, let's walk

15 before we run and let's do the PPA, the patent

16 purchase agreement first, and then we'll decide

17 whether or not we're going to sell the Z-band as

18 part to UIP.  Everybody kind of agreed to that and

19 we had our first patent purchase agreement signed

20 in May of 2014.

21 Q.      You mentioned first patent purchase

22 agreement.  How many total were there?

23        MR. COHEN:  Objection to form.

24        THE WITNESS:  Ended up being three.

Page 21

1 BY MR. COX:

2 Q.      And am I correct in -- in stating that

3 the final version of the PPA, that -- that

4 definitively sold the patents to ChanBond was in

5 April of 2015; is that correct?

6        MR. COHEN:  Objection form.

7        THE WITNESS:  Yes, that's correct.

8 BY MR. COX:

9 Q.      Do you recall when the second PPA was?

10        MR. COHEN:  Objection to form.

11        THE WITNESS:  I believe that was in

12 August of 2015 -- 2014.

13 BY MR. COX:

14 Q.      Can you tell me more about the -- the

15 second PPA from August 2014?  For instance, who is

16 to take ownership of the patents under that PPA?

17 A.      Yeah.  The first PPA we would get one

18 point $1.5 million up front as an advancement.

19 And then during that period of time, shortly after

20 that, congress -- it's 1.5 million -- congress

21 passed what is called the American Invention Act

22 or the ANA Troll Bill, which adversely affect the

23 value of patents for small companies.

24        So when Erich came back and said it

Page 22

doesn't make sense to advance you 1.5 million, I'm
going to cut it in half and that's 75,000. We
weren't too happy about that, but we went along
with it and said okay.

Then shortly after that, Erich came back
and said, well, at dinnertime, I mentioned I was
going to enjoy some of the money I made and I'm
going to retire and I decided to do that now
because of the American Invention Act. And so I'm
going to retire and don't take anything wrong
about Billy Carter, he's been my friend. He's
always been my friend, but Deirdre is the
president of my company and I'm going to turn the
opportunities over to Deirdre. And this is one of
them that she's going to follow up on. However,
there's not going to be any money up front because
I'm taking all the money out of the company and
just turning the opportunities over to Deirdre.

But the contract was basically saying,
but the one you just signed -- the one she signed
with Billy, but she's going to have her own shell
company. He didn't tell me what the name was.
And Deirdre will be contacting you directly on
that matter. So he just kind of bailed out at

Page 23

that point.
Q.     So once Erich left, that's when the new
owner of the patents would be through an entity
owned by Deirdre, rather than Billy?
A.     Well, I guess legally, I guess, from my
point of view, we still owned the patents because
although we signed a deal, neither deal was ever
consummated because Billy never came up with any
money. So when Deirdre contacted me for her to
come up with a contract, I told her I was not
interested because, as I put it around, this
thing's been taking nine months and we haven't
gotten anywhere.

In all fairness for the record, I was
talking to another party through Barnes and
Thompson Burke and they were interested in working
up some kind of deal. So I moved down to Philly
and talked to them, it was an ex-partner from
Kirkland and Ellis. And I told them that, you
know, we had this thing going with IP Navigation,
IPNav, and I gave them a definitive timeline to
come back with a proposal.

So when I got back to work, I took a
couple days off because I was trying to build a

Page 24

house and build with speks, but when I came back
to work, Deirdre had called my partners and
convinced them thoroughly that she was the team
that could do -- make this happen. She knew all
about this thing because of Billy. She claimed
she could have the patents filed between six and
eight weeks and she was the best team to do that.

I was not as positive as my partners
were, but they put a pretty good pitch on it and
we ended up signing Deirdre in Ap -- April of
2015. For the record, there was no consulting
agreement with Deirdre. There was no consulting
agreement with Billy's PPAs, and there was no
consulting agreement with the contract that we're
trying to work out with Kirkland Ellis,
ex-partner. So this was a carbon copy with a few
changes, the contract that we signed with Billy
Carter a couple times.
Q.     When you mentioned there was no
consulting agreement, the -- I think you're
referring to a part that is usually referred to as
an advisory services agreement; is that what you
are referring to?
A.     Yes.

Page 25

Q.     Do you recall when the switch was made
to -- to go with Deirdre as the new either owner
or manager of -- of the patents?
A.     Well, the contract was actually signed
in April of 2015. Is that what you're asking?
Q.     Yes. And when was the decision made to
switch from Billy to Deirdre?
A.     That was in the fall of 2014. It was
after August when we agreed to the PPA with Billy,
but then there was a -- she contacted us in the
fall. Nothing was done because I basically was
not too happy with the situation. So we went back
and renegotiated, thought to renegotiate it in
early 2015 with Deirdre.
          MR. COX: Let's pull up the PPA.
          Ken, can you bring up Tab 1,
please.
               - - -
          (Tab 1 marked as Exhibit-1 for
identification.)
               - - -
BY MR. COX:
Q.     Mr. -- am I saying it right, is it Mr.
Hennenhoefer?

Deposition of Earl Hennenhoefer    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 26

1    Let's turn to Page 2.
2    MR. COX:  Actually, ken, can you
3  just give me control?  It might be a little bit
4  easier.  Thank you.
5  BY MR. COX:
6  Q.    I'm going to read Section 2.8 here
7  called Net Recoveries.  Before I read that, are
8  you familiar with the net recoveries provision in
9  the PPA?
10 A.    Yeah.  Yes, I'm very familiar with that.
11 That was a provision that we negotiated, we being
12 my attorney from McNees and myself and Erich
13 Spangenberg, we negotiated this thing back and
14 forth a number of times.
15 Q.    So let me read just this -- this first
16 part here.  So Net Recoveries shall mean the total
17 aggregate gross recoveries less the total
18 aggregate amount of costs and expenses incurred by
19 or on behalf of purchaser in connection with
20 monetization, enforcement, and/or sale of the
21 assigned patent rights.  And then it lists a
22 number of -- allowable expenses there.  Is that
23 your understanding?
24 A.    Basically, yes.  Condition to the

Page 27

1  reasonable fees and expenses of all legal costs,
2  yeah.
3  Q.    And then this last sentence here, let me
4  see if I can highlight it.  The last sentence
5  states:  Notwithstanding the above, any cost or
6  expense which is paid to an affiliate of purchaser
7  or to a stakeholder of purchaser shall require the
8  prior approval of seller.  Such approval cannot be
9  unreasonably withheld.
10      Did I read that correctly?
11 A.    Yes, you did.
12      My concern was we have a contract which
13 depends on what the profit is after all expenses.
14 And I didn't want any additional expenses
15 including.  And Erich agreed, he said, you know,
16 we define the expenses and they can't have
17 anything of this size, so this all came out with
18 no other expenses added on.  He wanted to add
19 another patent to this thing and -- and combine
20 our patents with some other patent and -- which is
21 part of the reason this came up.
22      And he owned the other patent and I
23 didn't want to get involved in anything else.
24 It's kind of like going back to the Billy, let's

Page 28

1  walk before we run.  Let's get this thing
2  resolved.  So we didn't really want any more
3  expenses than what is defined in 2.8.  And let's
4  get this thing started.  It was taking too long to
5  get it going.
6  Q.    So is this a significant issue in the
7  years of negotiation leading up to the execution
8  of the PPA?
9    MR. COHEN:  Objection to form.
10   MR. COX:  I will just start over
11 from the beginning.
12 BY MR. COX:
13 Q.    Was this a significant issue in the
14 years of negotiations leading up to the execution
15 of the PPA?
16   MR. COHEN:  Objection to form.
17   THE WITNESS:  Yes, it was.  It was
18 a matter that my attorney, Michael Hund and I was
19 involved with.  Mike actually got into discussions
20 with Erich Spangleberg on this issue, so it was
21 significant, yes.
22   MR. COX:  Ken, can you please pull
23 up Tab 5.
24    - - -

Page 29

1    (Tab 5 marked as Exhibit-2 for
2  identification.)
3    - - -
4    MR. COX:  And we're going to start
5  at the bottom here.  And for the record, this is
6  Bates stamped CB003358 through -- the last page is
7  CB003361.
8  BY MR. COX:
9  Q.    All right.
10      If you look here at the bottom of that
11 first page it appears to be an e-mail from Michael
12 Hund to a number of parties, including Erich
13 Spangenberg and some of the IP navigation
14 attorneys.  Do you see that?
15 A.    Is there any way we can make that
16 bigger?
17   MR. COHEN:  Objection to form.
18   THE WITNESS:  I am trying to, you
19 know, look across the room.  Yeah.  Okay.
20 BY MR. COX:
21 Q.    We'll go through the e-mail.  But did
22 you want me to repeat my question?
23 A.    Yeah.  That's from Michael Hund, that's
24 the -- that was our attorney.

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 30

1  Q.      And could you read the date for me,
2  please?
3  A.      That was from February of 2014.
4  Q.      We're going to scroll down.
5  A.      I want to point out that you can see
6  where the confusion came.  Erich and some of the
7  other people, their e-mail address is IPNav, so
8  that's where the confusion comes as IPNav and IP
9  Navigation.
10 Q.      I'm with you there.
11         Let's -- let's go to this last paragraph
12 here from that February e-mail.  It states:
13 Finally as compared to the old agreement where the
14 seller had a significant role in selecting and
15 approving the expenditures that go into costs that
16 end up driving the, quote, net recoveries, end
17 quote, this agreement seeks to exclude the seller
18 from that process all together.  Frankly, I'm not
19 sure how this should best be resolved, but I would
20 suspect we would need to have a much clearer
21 understanding of what does and what does not
22 qualify as a deductible expense.
23         Did I read that correctly?
24 A.      Yes.

Page 31

1  Q.      Could you tell me what -- what this last
2  paragraph here is -- is talking about?
3  A.      Well, I think what the big issue was, we
4  didn't want anything coming into the expenses that
5  we didn't think should be in there.  So we wanted
6  the best definition we could find and we finally
7  ended up agreeing to that 2.8, which wasn't
8  totally satisfactory to us, but it was a
9  reasonable compromise.  Probably as definitive as
10 you can get about net recoveries.
11 Q.      And in that first sentence it mentions
12 that the seller originally had a -- a significant
13 role in selecting and approving expenditures
14 within the agreement that the parties are
15 currently talking about, that was removed; is that
16 correct?
17         MR. COHEN:  Objection to form.
18         THE WITNESS:  Yeah.  We went
19 through a number of agreements and I could not
20 exactly tell you what was in the old agreement.
21 But obviously Mr. Hund pointed out there was a big
22 change --
23 Q.      What --
24 A.      -- called some concern.

Page 32

1  BY MR. COX:
2  Q.      Was approval of expenses that would --
3  would impact net recoveries a critical factor
4  in -- in whether or not you would agree to sell or
5  give away these patents?
6         MR. COHEN:  Objection, form.
7  ███████████████████████████████████
8  ████████████████████████████████████████████
9  ██████████████████████████████████.
10        MR. COX:  Ken, if you could please
11 pull up Tab 3.
12                    - - -
13        (Tab 3 marked as Exhibit-3 for
14 identification.)
15                    - - -
16        VIDEOGRAPHER:  You have control.
17        MR. COX:  To make it bigger.
18 BY MR. COX:
19 Q.      Okay.  So let's see here.  If we go to
20 the bottom of --
21        MR. COX:  And this is Exhibit-3,
22 right?
23        VIDEOGRAPHER:  Correct.
24

Page 33

1         MR. COX:  All right.  For the
2  record, this is Bates stamped -- this document is
3  Bates stamped IPN0044240 through IPN0044245.
4  BY MR. COX:
5  Q.      If we go to the bottom of this first
6  page here, do you see an e-mail from Margo Alpert?
7         Did you hear my question, Mr.
8  Hennenhoefer?
9  A.      Yeah.  I see it, yeah.
10 Q.      All right.
11         And what is the date of that e-mail?
12 A.      That's all the way back to August 2014.
13 Q.      Just a little bit smaller.  Can you
14 still read that?
15        MR. COHEN:  Hold on.  Nathan, we
16 may have an issue here.  And these are documents
17 that are internal e-mails between IP Navigation
18 Group and their counsel.  I -- I certainly don't
19 have standing to raise any privilege objection on
20 the basis of it, but do you have permission from
21 IP Navigation Group to show priveledged e-mails to
22 Mr. Hennenhoefer?
23        MR. COX:  You mean these e-mails
24 that you produced to us?

Page 34

1    MR. COHEN:  Yeah.
2        MR. COX:  And we're not logged on
3  any privilege log?
4        MR. COHEN:  Yeah.  Again, you know,
5  Billy Carter was internal to IP Navigation.
6        MR. COX:  And the e-mails include
7  Billy Carter you produced them to us.
8        MR. COHEN:  That's -- that's fine.
9  As long as -- if that's the position you're
10  taking, that's fine.  I just would have some
11  concern showing them externally.  But that's okay.
12        MR. COX:  All right.
13  BY MR. COX:
14  Q.    So if we will go to this bottom part of
15  Page 1 and we'll just kind of start from the top.
16  So I think you -- you recognize this is an e-mail
17  from Margo Alpert on August 2014, right?
18        Did you hear my question?
19  A.    Yeah.
20  Q.    Sorry.
21  A.    It finally came -- came across.  It
22  takes a while to print all this.
23        Yes.  I -- I agree to this from Margo in
24  2014, August 2014.

Page 35

1  Q.    All right.
2        And let me -- so right here, it's -- do
3  you know who Margo Alpert is?
4  A.    If I have met her, I did not know who
5  she is.  I can make some assumptions, but I don't
6  know.
7  Q.    Okay.
8        So I can just represent to you she was
9  the attorney negotiating with your attorney,
10  Michael Hund.
11        In this e-mail, it's from Margo to
12  Lilian, Erich Spangenberg, and Deirdre Leane.  And
13  at the top it says, Hi, Erich and Deirdre.  And
14  then if you skip down two lines, that third line
15  says:  Given the court's general misunderstanding
16  of several of these provisions in clouding, I
17  consider changing the PPA as follows.
18  A.    Yes, I see that.
19  Q.    All right.
20        So that first bullet point says -- has a
21  recommendation to, quote, delete the last two
22  sentences in this definition of, quote, net
23  recoveries, end quote, in Section 2.8.  And then
24  in brackets states, removing any consent

Page 36

1  requirements on part of seller.
2        Do you see that?
3  A.    Yes, I see that.
4  Q.    And then it has the net recoveries
5  provision from the PPA, but the last sentence is
6  crossed out; is that right?
7        MR. COHEN:  Objection, form.
8        THE WITNESS:  I see it crossed out.
9  BY MR. COX:
10  Q.    Now, if we go up to the next e-mail from
11  the same day as an e-mail from Erich Spangenberg;
12  di you see that?
13  A.    Yeah.
14  Q.    And in it it states Bullet point 1,
15  spoke to Earl.  Bullet point 2, please revise per
16  below.  And the first sub-bullet states, quote,
17  end of sentence should -- should go.  I am okay
18  leaving in the affiliate sentence, end quote.
19        Do you see that?
20  A.    Okay.  What is he referring to?
21  Q.    I'll highlight it for you.
22  A.    Yeah.  Okay.  I understand.
23  Q.    Do you recall having a conversation with
24  Erich, appears to be August 4, 2014, about the net

Page 37

1  recoveries provision?
2  A.    I remember a conversation with Erich
3  about Deirdre taking over or replacing Billy.  I
4  don't really actually recall seeing this.  I guess
5  I'm not copied on it, so -- but I had other
6  conversations in August.
7  Q.    And so then I take it you -- do you not
8  recall a -- a conversation in August about the net
9  recoveries provision?
10  A.    Not -- I recall the number going from
11  1.5 to 750,000.  I recall Erich telling me that
12  Deirdre will be substituted for Billy Carter.  And
13  the contract would remain basically the same.
14  That's what I recall.  That's my takeaway.  I'm
15  sure it's more things that were discussed in that
16  phone call, but those were the three things I
17  recall.
18  Q.    Do you ever recall a conversation with
19  Erich where he -- he wanted to remove the consent
20  requirement in net recoveries?
21  A.    I don't recall anything about consent
22  requiring the consent requirement for net
23  recoveries.  That would be a major problem because
24  I know there was a concern about IP Nav -- I mean

Page 38

1 IP clouding and whether or not the previous owner
2 of the patents would have any right on any of the
3 contract, but we were very concerned on how the
4 money was going to be split up and we didn't want
5 to have somebody else getting part of the money
6 that was not legitimately part of the contract.
7 Q.      And -- and to be clear, as I understand
8 it, you're not saying that this conversation did
9 not occur based on -- on Eric's e-mail, you just
10 don't recall it; is that correct?
11 A.      That's the best -- that's a good
12 explanation, yes.
13 Q.      And in the context of the prior e-mail
14 from Margo where they wanted to delete the consent
15 requirement and then this follow e-mail with Erich
16 where he said he spoke with you and there, quote,
17 I'm okay leaving in the affiliate sentence.  In
18 the context, what does that mean to you as far as
19 the agreement regarding the consent requirement?
20          MR. COHEN:  Objection, form.
21          THE WITNESS:  Yeah.  As far as I
22 was concerned, we still had -- had to approve
23 anybody who was affiliated or stakeholder, being a
24 consultant, or any -- any involvement or cost to

Page 39

1 us.
2          You know, pretty close to Day 1,
3 Erich sent me a letter defining that I would not
4 be responsible for all of the costs that the
5 affiliate had, like overhead, travel, and so
6 forth.  So, you know, it was important that we
7 defined that there wasn't going to be additional
8 costs coming into this contract, that we didn't
9 have control over.  It was supposed to be the
10 legal costs, which covered a bunch of stuff.
11 Nothing else was going to be added.
12 BY MR. COX:
13 Q.      Would you have ever agreed to sell or
14 give the patents without this consent requirement?
15          MR. COHEN:  Objection, form.
16          THE WITNESS:  I had -- Day 1 after
17 we talked to Erich at the dinner party where he
18 basically said he would own the patents.  We went
19 back to the hotel.  Bob was pretty upset.  He just
20 wanted to go back and not even have the meeting
21 the next day because he was concerned that, you
22 know, once you give up the patents, you give up
23 control of everything and they got -- you know,
24 additional costs.  So we were concerned from the

Page 40

1 very beginning that giving up the patent control
2 would lead to costs that we didn't have control
3 over.
4          So I talked to Michael Hund a
5 number of times about that.  That sentence or part
6 of the sentence at the very end and he assured me
7 that, you know, I had the right to not add any
8 additional costs and if they were associated with
9 the affiliate.
10 BY MR. COX:
11 Q.      At the top of this Exhibit-3, you see
12 it's from Margo Alpert sent on August 5, 2014.
13          Do you see that?
14 A.      Yes.
15 Q.      In it says, Hi, Erich and Deirdre.
16 Attached is the revised PPA.
17          Do you see that?
18 A.      Yup.
19          MR. COX:  Ken, if you can please
20 pull up Tab 4, please.
21          - - -
22          (Tab 4 marked as Exhibit-4 for
23 identification.)
24          - - -

Page 41

1 BY MR. COX:
2 Q.      This is the attachment to that e-mail.
3 And for the record, that is Bates stamped
4 IPN0044246 through IPN0044294.
5          And if you go with me to, I believe it's
6 Page 2, you'll see that in this provision, the
7 last?
8 A.      That --
9 Q.      -- with the consent requirement is no
10 longer -- it has a strike through and it is still
11 included in that version of the PPA; is that
12 correct?
13          MR. COHEN:  Objection, form.
14          THE WITNESS:  That's correct.
15          MR. COX:  Let's go back to
16 Exhibit-3.  Pulling that back up again.
17 BY MR. COX:
18 Q.      On Page 4 of this document -- so on Page
19 4 there's an e-mail from your attorney dated
20 May 6th.  Let me scroll down a little bit.
21          Do you see that?
22 A.      Okay.  That's me.
23 Q.      And in it, the -- let's see, we'll start
24 with the second bullet point.  Do you see that

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 42

1 second bullet point, it says:  Did you intend to
2 include IP Navigation Group, LLC, and then in
3 parenthesis, quote, IPNav, quote?
4 A.      Yes.
5 Q.      In this transaction?
6 A.      Yes.
7 Q.      And then we'll keep going.  Bullet point
8 3 is IPVE and affiliate IPNav, end question mark,
9 who owns VDV, question mark.
10      Do you see that?
11 A.      Okay.
12 Q.      And then if you go down to the bottom of
13 the e-mail it says, what assurance/protection does
14 the seller have that the purchaser will not assign
15 right or licenses regarding the patents to another
16 affiliate under terms that result in a failure to
17 maximize the recoveries payment that might be --
18 might have been forthcoming in an arm's length
19 transfer of rights or that might result in the
20 transfer of rights in exchange for something that
21 cannot be converted into cash, such as agreements
22 for future business services, et cetera, end
23 question mark.
24 A.      Yes, I see that.

Page 43

1 Q.      So at the -- time of this August 5th
2 e-mail, the -- it appears to be that the -- the
3 signatory was IP Navigation Group; is that
4 correct, in addition to IPVDV?
5      MR. COHEN:  Objection, form.
6      THE WITNESS:  This is -- this is
7 dated May 2000 --
8 BY MR. COX:
9 Q.      I'm sorry.  May 2014.
10 A.      Yeah.
11 Q.      So -- so at the time, do you understand
12 that there were -- there were multiple signatories
13 to any PPA?
14      MR. COHEN:  Objection, form.
15      THE WITNESS:  Yes.
16 BY MR. COX:
17 Q.      And was your -- from your reading of
18 this, was your attorney concerned about affiliates
19 and who owns the different entities that are
20 signing this PPA?
21      MR. COHEN:  Objection, form.
22      THE WITNESS:  Actually I was
23 confused.  There was a lot of different signatures
24 here, so I talked to Mike about it and he seemed

Page 44

1 to be -- after discussions with whoever he talked
2 to, seemed to be all right with that.  Basically
3 the -- the way he explained it, there was a
4 signature for the company, which in this case
5 would be VDV and there was a signature of the
6 company that owned VDV, which is -- in the early
7 part of the days, it would have been IP Navigation
8 Group, which we understood was IPNav at that time.
9 BY MR. COX:
10 Q.      And -- and when you say IPNav at that
11 time, you mean --
12 A.      Well, again, you can see that
13 parenthesis, we all called it IPNav.  You know,
14 Eric's e-mail address was IPNav.  So, yeah,
15 legally it was IP Navigation, but everybody just
16 referred to it as IPNav.
17 Q.      And so at this time, had you heard of
18 IPNav, LLC?
19 A.      You talking about another company,
20 different IP Navigation.  At that particular time,
21 no, I did not know about IPNav as opposed to being
22 IP Navigation.
23 Q.      Right.
24      And -- and for the purposes of the

Page 45

1 deposition to try and keep it clear, if -- I will
2 only say IP Navigation Group or IP Navigation
3 Group, LLC to refer to, you know, the entity that
4 was originally owned by Erich Spangenberg.  Does
5 that make sense?
6      MR. COHEN:  Objection to form.
7      THE WITNESS:  Yeah, that makes
8 sense.
9 BY MR. COX:
10 Q.      And then if I just say IPNav or IPNav,
11 LLC, that's referring to Deirdre's entity.  Does
12 that make sense?
13 A.      Yes, that does make sense.
14 Q.      So just to -- just to be clear, so at
15 the time of May 6th or in these other e-mails in
16 referring to a conversation in August 2014, had
17 you heard of IPNav, LLC?
18      MR. COHEN:  Objection to form.
19      THE WITNESS:  At that time I did
20 not know that there was another company called
21 IPNav, LLC.
22 BY MR. COX:
23 Q.      When was the first time you heard of
24 IPNav, LLC?

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 46

1  A.      You know, I'm not really sure.  I think
2  the first time is when we saw the contract in
3  April and I noticed there was a different name
4  there and it was brought up to Mike and Mike
5  basically said that, you know, Deirdre had a
6  different company.
7  Q.      So what year was that?
8  A.      Well, that was -- it had to go back to
9  2015, when that last PPA was signed.
10  Q.      Did Deirdre or Erich ever explain why
11  IPNav, LLC appeared in that agreement?
12  A.      Not that I recall.
13  Q.      Let's go to this next e-mail from
14  Exhibit-3.  This is Margo Alpert's response to --
15  Margo Alpert's response on May 7th to Michael
16  Hund's e-mail on May 6th.
17         Are you with me?
18  A.      Okay.
19  Q.      And if you look at bullet point 2, it
20  says IPNav is not a party to the PPA.  IPNav is a
21  service -- is a service provider that has been
22  helping to negotiate the purchase of these patents
23  and will continue advising IPVDV with its
24  monetization campaign.  IPVDV is owned by Billy

Page 47

1  Carter.  I believe that he has been in touch with
2  Earl directly.  It might be beneficial for Earl,
3  Billy, and Erich to speak in more detail about
4  IPNav's role going forward.
5         Are you with me?
6  A.      Yeah, I am with you so far.
7  Q.      And that is in response to bullet point
8  2 from your attorney, which is asking, did you
9  intend to include IP Navigation, Group, LLC in
10  this transaction.
11         And then bullet point 3 asking if -- if
12  it's an affiliate of IPNav.
13         Are you still with me?
14  A.      Yes.
15         MR. COHEN:  Objection as to form.
16         Nathan, I -- I know you're quoting
17  text, but I think you just used IPNav in a way
18  that you said you weren't going to, so you might
19  want to clarify for the record.
20         MR. COX:  That is a good point.
21  Thank you.
22  BY MR. COX:
23  Q.      At that point when I mentioned IPNav, it
24  was a direct quote from bullet point 3 of Michael

Page 48

1  Hund's e-mail on May 6th; is that correct?
2  A.      Okay.
3  Q.      Are you with me there?
4  A.      Yeah, I'm with you.
5  Q.      All right.
6         And then let's go back up to Margo's
7  e-mail from May 7th.  So it explains under bullet
8  point 3, the reason that IPNav is a party to the
9  nondisclosure agreement and the common interest
10  agreement is to preserve privileged/work product.
11  From what I can see, IPNav is listed in the
12  opening paragraph of the common interest
13  agreement.
14  A.      Okay.
15  Q.      So at -- at this time, it's -- it's
16  referring only to IP Navigation Group, LLC; is
17  that correct?
18         MR. COHEN:  Objection to form.
19         THE WITNESS:  I'm not sure I
20  understand that particular question.
21  BY MR. COX:
22  Q.      Just clarifying that this is only
23  referring to IP Navigation Group, LLC, correct?
24         MR. COHEN:  Same Objection.

Page 49

1         THE WITNESS:  Yeah, that's correct.
2  BY MR. COX:
3  Q.      And just so the record is clear, this is
4  still part of that same e-mail chain or if we go
5  back up to Page 1, Erich mentions this e-mail with
6  you or this conversation with you in August 2014,
7  about the affiliate sentence in the net recoveries
8  provision; is that correct?
9  A.      Yeah, that's correct.  That's a
10  continuous e-mail chain, yeah.
11         MR. COX:  All right.  Ken, can you
12  please pull up Tab 2, please.
13         MR. COHEN:  And I'm just going to
14  note, we've been going for a little more than an
15  hour.  I am perfectly okay continuing on, I
16  just -- if the witness wants a break.  I know you
17  didn't mention it at the outset, but if the
18  witness ever wants a break, he can ask for one, so
19  I thought we would check.
20         MR. DEANGELO:  I was thinking --
21  this is Jimmy DeAngelo.  I was thinking the same
22  thing, that now might be a good time for us to
23  take a quick break if this is a good stopping
24  point.

Page 50

MR. COX:  Yeah.  And I -- I just have one quick line of questioning to finish before I was going to offer a break, if that's all right.  Of course that's fine, but I just wanted to finish -- wrap this one point up.

Is that all right with you, Earl?

THE WITNESS:  Yes, that's all right.

MR. COX:  All right.  Let's -- so this is Exhibit-5?

VIDEOGRAPHER:  Correct.

- - -

(Objections and responses marked as Exhibit-5 for identification.)

- - -

BY MR. COX:

Q.    All right.

Is it all right if I call you Earl so I don't mess up your last name again?

A.    Yes.  That's much better than trying to say Hennenhoefer.

Q.    Yeah.  I can try and say it, but I know I will mess it up again.  So if it's all right with you, I will stick with Earl.

Page 51

MR. COHEN:  And for the record, I am going to take on that permission myself for the rest of this time, so thank you, sir.

BY MR. COX:

Q.    All right.

So this document, I'll read the title for you, this is called claimant's objections and responses to respondent's first set of discovery requests.  Do you see that?

A.    Yes, I do.

Q.    And if we go down to Page 12.  Having a little delay here.

MR. COX:  Ken, could you go to Page 11 for me.

BY MR. COX:

Q.    All right.  So Interrogatory No. 1 to the claimants in this case, which would be Deirdre and IPNav, LLC, states:  Describe all communications between you and CBV related to CBV's consent or agreement that claimants would provide patent monetization services as referenced in Paragraphs 8 and 10 of claimants amended arbitration demand.

Do you see that?

Page 52

A.    That is extremely difficult to read from there.  Yeah.  I see that.  That's a lot, lot better.

Q.    Do you want me to read that again or can you read that?

A.    Yeah.  I can read that and that's good.

Q.    All right.

And then after that it asks for specific dates and -- and who was communicated with under those Sub Points A, B, C.

Do you see that?

A.    Yes, I see that.

MR. COX:  All right.  Ken, can you go to Page 12, please.  And scroll down to the bottom.

BY MR. COX:

Q.    All right.

Do you see that paragraph that starts with respect to oral communications?

A.    Yeah.

Q.    All right.

So this is the communication that Deirdre or that the claimants identified as a response to communications per CBV's consent.  And

Page 53

they state, quote, with respect to oral communications, Erich Spangenberg had a call with Earl Hennenhoefer on August 4, 2014, and then informed Miss Leane that Mr. Hennenhoefer had agreed that IPNav would be paid 22 percent for its work running the monetization campaign.

Did I read that correctly?

A.    You read that correctly, but that never happened.

Q.    So --

A.    There was no discussion between Erich and I about 22 percent for a monetization campaign.  That would have been a killer.

Q.    And -- and specifically it states August 4th, which if we could just very quickly go back to -- to Exhibit-3.

This would coincide with that e-mail that Erich sent to some of the members at IPNav, including Deirdre Leane, correct?

A.    That does.

Q.    And in that e-mail, does it -- does it indicate that CBV's consent was still required?

MR. COHEN:  Objection to form.

THE WITNESS:  That -- that's

Page 54

1 correct.
2 BY MR. COX:
3 Q.     So when you mentioned that the
4 22 percent would have been a killer, what did you
5 mean by that?
6 A.     Well, they're -- you know, they're
7 already getting 50 percent of the net recoveries
8 and then to put a 22 percent for gross recoveries
9 on top of that, that would not make any sense to
10 anybody.  So that's -- that would have been a deal
11 killer and I could not ever sell that to my
12 partners, let alone to myself, but, you know, my
13 partners wouldn't have agreed to it either.
14 Q.     If we -- hopefully the final question,
15 if we go to Tab 4 real quick or Exhibit-4.
16     MR. COX:  Ken, can you go to Page
17 14, please.
18 BY MR. COX:
19 Q.     And this is the mutual nondisclosure
20 agreement that's attached to the proposed PPA; is
21 that correct?
22 A.     Yes.
23 Q.     And could you read -- we see IPNav -- or
24 IPVDV, LLC, and then could you read that -- that

Page 55

1 other name in bold right underneath it?
2 A.     Yes.
3 Q.     What does that say?
4     MR. DEANGELO:  You want him to tell
5 you who the parties are to this?
6     MR. COX:  Yeah.  The proposed
7 parties are in bold right underneath IPNav or
8 IPVDV.
9     MR. DEANGELO:  He just wants you
10 tell him who would have been parties to the
11 agreement.
12     THE WITNESS:  What do you mean?
13     MR. DEANGELO:  He wants to -- he
14 wants to know who were -- who were going to be
15 parties to that agreement.  So it's the three
16 parties that are in bold that are up there.
17     THE WITNESS:  You mean the numbers
18 commitment?
19     MR. DEANGELO:  Yeah.
20     THE WITNESS:  Well, it was always
21 attached, yeah.
22 BY MR. COX:
23 Q.     On that, could you just read that third
24 line, the -- the party from that third line?

Page 56

1 A.     In the -- starting with Greensboro?
2 Q.     Correct.
3 A.     Yeah.  Greensboro, North Carolina,
4 27403, IP Navigation Group, LLC, with offices in
5 Chateau Plaza, 2515 McKenzie Avenue.
6 Q.     So I --
7 A.     And it shows CBV.
8 Q.     Right.
9     So what -- what were the three parties
10 at the time?
11 A.     Well, the three parties would be IPVDV,
12 which would be Eric's company.  IP Navigation
13 Group, which is what we were dealing with at the
14 very beginning.  And then, of course, our company
15 CBV, Inc., so three parties, Billy, Erich, and us
16 partners.
17 Q.     And, again, this was from August 2014;
18 is that correct?
19 A.     Yes, that's correct.
20 Q.     Could you have given your consent for
21 IPNav, LLC to get 22 percent, when at the time it
22 was still IP Navigation Group, as a party to the
23 transaction?
24     MR. COHEN:  Objection to form.

Page 57

1     THE WITNESS:  Well, there was no
2 discussion about 22 percent and certainly no
3 discussion about another party getting 22 percent.
4     MR. COX:  All right.  I think now
5 is a good stopping point for a break.
6     VIDEOGRAPHER:  Okay.  Going off the
7 record.  The time is 11:19 a.m.
8                    - - -
9     (Whereupon, brief recess was held off
10 the record.)
11                    - - -
12     VIDEOGRAPHER:  Going back on the
13 record.  The time is 11:31 a.m.
14 BY MR. COX:
15 Q.     All right.
16     Earl, we just had a brief break.  Is
17 there anything from your prior testimony that you
18 feel like you need to go back and revise or add
19 to?
20 A.     No, there is not.
21 Q.     All righty.
22     MR. COX:  Ken, if you can please
23 pull up Tab 9, please.
24                    - - -

Page 58

1    (Tab 9 marked as Exhibit-6 for
2 identification.)
3                - - -
4       VIDEOGRAPHER:  This will be
5 Exhibit-6.
6    MR. COX:  Thank you.
7 BY MR. COX:
8 Q.    All right.
9       Earl, so this is the advisory service
10 agreement that is entered between ChanBond, LLC
11 and IPNav, LLC, dated April 9, 2015.
12    Do you see that?
13 A.    Yes, I do.
14 Q.    So at the top it says, dear, Deirdre,
15 and then it -- it mentions the -- the parties.
16    MR. COX:  And if we scroll down to
17 Page 5, please, Ken.
18 BY MR. COX
19 Q.    You'll see that --
20 A.    Yes, I do.
21 Q.    That it is signed by Deirdre for both
22 parties; is that correct?
23 A.    That is correct.
24    MR. COX:  And, Ken, if you can go

Page 59

1 back up to Page 2, please.  Can you scroll down
2 just a little bit to Bullet Point 5.
3 BY MR. COX:
4 Q.    All right.
5       And I'm going to read bullet point --
6 the first part of Bullet Point 5.  It says IPNav
7 fee.  As consideration for IPNav to enter into
8 this agreement and to provide the services, the
9 company shall pay IPNav 22 percent of the gross
10 consideration with respect to any monetization
11 fee.  And then in brackets, the, quote, IPNav fee,
12 end quote, end brackets.
13    Do you see that?
14 A.    Yes, I do.
15    MR. COHEN:  Just for the record,
16 that was any monetization event, not any
17 monetization fee.
18    MR. COX:  Sorry about that.  Thank
19 you.
20 BY MR. COX:
21 Q.    Would this fee, IPNav fee as it's
22 called, required, CBV's consent under the PPA?
23    MR. COHEN:  Objection, form.
24

Page 60

1 BY MR. COX:
2 Q.    Earl, would this quote, unquote, IPNav
3 fee under Subsection 5, require CBV's consent
4 under the PPA?
5    MR. COHEN:  Objection, form.
6    THE WITNESS:  Yes.  That would
7 require our approval according to the original PPA
8 that Deirdre signed.
9 BY MR. COX:
10 Q.    Did Deirdre ever get your consent to
11 enter into an agreement to pay 22 percent of the
12 gross proceeds?
13    MR. COHEN:  Objection.
14    THE WITNESS:  No.  No we never gave
15 any nor we were ever informed about the ASA.  I
16 didn't know anything about that.
17 BY MR. COX:
18 Q.    Sorry.  Say that again.  You cut out for
19 a second.
20 A.    I am saying I did not consent to any 22
21 percent of the gross proceedings, nor did I even
22 know about this ASA until, I think, 2020.
23 Q.    And to be clear, I'm just talking about
24 whether or not Deirdre ever asked for your

Page 61

1 consent.  So she never asked you personally for
2 consent to enter into a 22 percent -- to an
3 agreement that would pay an entity 22 percent of
4 the gross proceeds; is that correct?
5    MR. COHEN:  Objection, form.
6    THE WITNESS:  Yes, that is correct.
7 BY MR. COX:
8 Q.    And by any entity, I mean that to
9 include paying herself 22 percent or ChanBond 22
10 percent or IPNav, LLC, or IP Navigation Group; is
11 that correct?
12    MR. COHEN:  Objection, form.
13    THE WITNESS:  Yeah.  There's no --
14 there's no agreement to pay anybody 22 percent.
15 BY MR. COX:
16 Q.    To your knowledge, did she ever ask
17 anyone else at CBV for their consent?
18 A.    I asked both my partners that question
19 and they emphatically said that they had no
20 conversation pertaining to this subject with
21 Deirdre.
22 Q.    Similar line of questions, but for
23 Erich --
24 A.    They had no --

Page 62

1  Q.      Sorry.
2              MR. COHEN:  And just note my
3  objection for the record.
4              THE WITNESS:  They had no
5  conversation.
6              MR. COHEN:  I apologize.
7              MR. COX:  That's all right.  I
8  didn't realize you were still talking.  Can you
9  please --
10             MR. COHEN:  Hold on.  Just note my
11 objection to the form of the question.  Sorry, the
12 mute was -- was still on by the time you started
13 talking.
14 BY MR. COX:
15 Q.      Just to clean it up, Earl, I'll just
16 re-ask the question.  We'll give Mr. Cohen a
17 chance to object and then you can -- if you can
18 please restate your answer.
19      So I asked, to your knowledge did
20 Deirdre ever ask anyone else at CBV for their
21 consent?
22             MR. COHEN:  Objection, form.
23             THE WITNESS:  I asked both my
24 partners and they emphatically stated they had no

Page 63

1  conversation on this subject with Deirdre, nor did
2  they give permission on 22 percent.
3  BY MR. COX:
4  Q.      All right.
5      And now a similar line of questions, but
6  for Erich Spangenberg.  Did Erich ever have a
7  conversation with you about entering into a
8  agreement to pay 22 percent of the gross proceeds
9  to any entity?
10             MR. COHEN:  Objection, form.
11             THE WITNESS:  Erich and I never
12 discussed on any of the PPAs, a 22 percent fee for
13 anything.
14 BY MR. COX:
15 Q.      And then again for any of your -- your
16 fellow members of CBV, to your knowledge did
17 anyone -- did Erich ever speak with anyone at CBV
18 about getting their consent?
19             MR. COHEN:  Objection, form.
20             THE WITNESS:  Not to my knowledge,
21 given I would speak to my partners about that
22 subject.
23 BY MR. COX:
24 Q.      Did you have a -- a number in mind of --

Page 64

1  of what you expected the total value of any
2  settlement or judgment or -- or licenses for the
3  ChanBond patents?
4  A.      We had, well, a number of dollar values
5  in mind.  I believe the lawyers had a much smaller
6  number than we had and it wasn't until Dr. Tish
7  came up with a number that we came up with
8  something that's pretty close to what came up
9  with.



Page 65

21 Q.      And do you know what the -- the final
22 settlement number was?
23 A.      Yeah, I do.
24 Q.      And -- okay.

Deposition of Earl Hennenhoefer

Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 66

Is it -- is it a number that you're
happy with?

A.      Well, you know, you never want to go
around second-guessing people.  Obviously we
thought the number should have been higher.  But I
was not in court while things were going on, so I
don't think I'm in the position to second guess.
But all three partners felt disappointed with the
number.

Q.      I want to talk about the -- the work
that -- that Billy and Deirdre did on this -- this
monetization campaign.  Can you first talk about
what work Billy did to help monetize the patents?

A.      I really don't know what work Billy or
Deirdre did to monetize the patent.  Our
conversations were -- I want to say 90 percent of
our conversations were with Mishcon and KWM.  We
were told that Billy was reviewing all the costs
and sending those things to Betham, but I don't
know what Billy did.

I kind of -- I asked Billy out to lunch
when I was down in North Carolina visiting my son
a couple years ago.  I brought my wife along and
so forth.  And I -- I kind of asked, you know,

Page 67

what he was doing.  And he said, well, I'm
managing a -- your expectations and trying to make
sure they're not too high.  But that was really
the extent to what he said he was doing.

Q.      Are you aware of any actions that
Deirdre Leane or her attorneys may have taken
that -- that obstructed the Delaware litigation?

MR. COHEN:  Objection; form.

THE WITNESS:  No.  I'm -- I'm not
really -- all that would be hearsay.  I really
don't know what they were doing.

BY MR. COX:

Q.      And I understand you might think it's
hearsay.  And I'm just trying to understand if --
if you're aware of any actions that Deirdre or her
attorneys may have taken that -- that affected the
settlement?

MR. COHEN:  Objection to form.

THE WITNESS:  We talked about
Whitman and they were very unhappy with the fact
that they filed -- they being Deirdre and her
attorneys, filed something in the State of
Delaware trying to blow off the case.  The way
they stated it was that Deirdre was -- was of the

Page 68

opinion that if she didn't get her share, nobody
is going to get anything.  But that was really a
statement that -- that KWM made.  We didn't know
anything really about that.

BY MR. COX:

Q.      Are you aware of -- of how that effected
the settlement in the case?

MR. COHEN:  Objection, form.

THE WITNESS:  I don't think I'm
qualified to answer that.

BY MR. COX:

Q.      In your personal knowledge, would that
have helped or hurt settlement leverage?

MR. COHEN:  Objection, form.

THE WITNESS:  Well, it definitely
would not have helped the settlement leverage and
I think it did -- it did hurt it.  From my point
of view, that changed the thought process of KWM
to a much lower number than I thought they should
have had.  That's a personal opinion.

BY MR. COX:

Q.      If anyone did come to you, asking for
your consent to enter agreement giving 22 percent
of the gross proceeds, what would your response

Page 69

have been?

MR. COHEN:  Objection, form.

THE WITNESS:  I would not have
given anybody permission for 22 percent, nor would
I even agree to compromise anything even less than
22 percent.  I think the whole thing was
fabricated.

MR. COX:  Thank you.  I'll pass the
witness.

MR. COHEN:  Terrific.  Thank you,
Nathan.

- - -

Examination

- - -

BY MR. COHEN:

Q.      Earl, and as I said, I will take your
permission to call you that.

Earl, do you need a break before we keep
rolling?

A.      Yes.  You can call me Earl.

Q.      Thank you.

A.      It's much easier.

Q.      All right.

So, again, if you need a break at any

Page 70

1  time, please just let me know and we'll take a
2  break.
3        MR. COHEN:  Now that I am not on
4  mute like 90 percent of the time, I'll just
5  silence my cell phone so it doesn't interrupt
6  anybody.
7  BY MR. COHEN:
8  Q.     Okay.
9        Earl, just to get a couple preliminaries
10 out of the way.  Is there any reason you can think
11 of why your memory might be compromised today
12 versus normal?
13 A.     I think my memory is fine.
14 Q.     Good.
15       And any particular reason that you can
16 think of why you wouldn't be able to testify
17 truthfully and accurately today?
18 A.     No, there's no reason why I shouldn't be
19 able to be truthful and accurate.
20 Q.     I appreciate that.  And just to be
21 clear, those are questions we ask of every witness
22 just to make sure because every so often you get a
23 witness who says, oh, my God, I was -- I was on
24 medication that day and I didn't realize it was

Page 71

1  going to impact me, et cetera.  And so we just
2  sort of clear that out up at the top, it's not
3  anything to do with you.
4        I also -- I heard you say you served in
5  the navy.  Thank you for your service before I get
6  to anything else.
7        You testified quite a bit, Earl, about
8  the net recoveries provision of the patent
9  purchase agreement.  Do you recall that?
10 A.     Yes, I do recall that.
11 Q.     Okay.
12       Is it a fair summary to say that the
13 point of the net recoveries provision and
14 everything included in that was to define what
15 deductions could be taken before CBV's share of
16 revenue was calculated?
17       MR. COX:  Objection to form.
18       THE WITNESS:  I think that's a fair
19 statement.
20 BY MR. COHEN:
21 Q.     Okay.
22       And so just to be clear, does CBV have
23 any concern at all about what ChanBond does with
24 its share of the revenue?

Page 72

1  A.     Well, it depends what you mean by
2  ChanBond's share.  You mean after we get our
3  money, do we care what ChanBond does with their
4  money?  Is that what the question --
5  Q.     That's the exact question, sir.
6  A.     Okay.
7        As CBV, we would not care.  As some of
8  us are shareholders, we might have some concern
9  about that.
10 Q.     Shareholders in what?
11 A.     UOIP.
12 Q.     Who is a shareholder in UOIP?
13       Earl, who is a shareholder in UOIP?
14 A.     Well, I'm -- you know, only thing I know
15 is what some of the partners said.  I know I'm a
16 shareholder.
17 Q.     Okay.
18       When did you become a shareholder in
19 UOIP?
20 A.     When we went out to talk to Kansas City
21 and the offer was made and we came back to
22 Harrisburg and then a counteroffer was made and
23 basically we decided to just do the PPA and not
24 include UOIP.

Page 73

1        The natural tendency is, you know, well,
2  what if we did, you know, sign up to get some of
3  the UOIP shares stock.  So we watched the stock
4  very closely and also watched the message board
5  that people comment about the stock.  And I bought
6  some of the stock because it was very low priced
7  and figured, you know, you never know, might be a
8  good investment.  That's while the stock was still
9  listed.
10 Q.     Okay.
11       But CBV, Inc., the company, doesn't have
12 any concern one way or the other what -- what
13 ChanBond does with its money, right?
14 A.     CBV has no concern about what ChanBond
15 does with its money after we get our -- our cut.
16 Q.     Okay.
17 A.     That's their business.
18 Q.     ███████████████████████████████████
19 ████████████████████████████████████████
20 ████████████████████████████████████
21 ██████████████████████████████████████████
22       MR. COX:  Objection to form.
23       THE WITNESS:  We were not -- not
24 informed of that and we would have a problem with

Page 74

1 that.
2 BY MR. COHEN:
3 Q.     All right.
4        That would be an expense that you would
5 have a -- right to approve or disapprove before
6 it impacted your share of the funding, right?
7            MR. COX:  Objection to form.
8            THE WITNESS:  I would have a
9 problem with -- we should approve that expense,
10 basically a shareholder.
11 BY MR. COHEN:
12 Q.     Okay.
13        Have you had any communications with
14 Billy or his counsel or Unified or ChanBond or its
15 counsel about this arbitration, other than in
16 terms of scheduling your deposition?
17        So let me reask that, Earl.
18        Other than in terms of making the
19 arrangements for you to appear for deposition,
20 have you had communications with Billy or Unified
21 or their attorneys about this arbitration between
22 Deirdre and IPNav and Unified and ChanBond?
23 A.     Number one, my partners, because I was
24 hard of hearing, and they would call Billy and

Page 75

1 talk to him.  I did not attend that call because
2 my hearing problem.  That's when they found out
3 about this lawsuit pending.  Billy was very upset
4 about it and actually told my partners that I had
5 personally signed the advisory service agreement.
6        And then we had a meeting down in
7 Delaware to practice all the trial.  And Billy was
8 attending and -- and while we're going through the
9 practice of getting ready for the trial, and I
10 asked Billy, well, how the arbitration was going
11 between himself and Deirdre and he really pushed
12 back hard on that saying that this was not his
13 problem, it was our problem, and that caused a lot
14 of riff between the two of us at that time.
15 Q.     Did he explain why he thought it was
16 your problem?
17 A.     Yes.  He asked Dick Snider and Bob Stine
18 to sign an affidavit saying that we never
19 discussed an advisory service agreement with
20 Deirdre.  And it was kind of written not very
21 professionally and we referred it to our attorney.
22 He advised us not to sign anything and if we were
23 going to sign something, have it sent to us by his
24 attorney.

Page 76

1        Well -- and he did a meeting in
2 Delaware.  He was upset that we didn't sign
3 anything, which I have a problem with because I
4 did sign something with the Texas attorney saying
5 that I never had a discussion pertaining to the
6 ASA of 22 percent.  So I never did understand what
7 Billy got upset about.
8 Q.     Okay.
9        And generally speaking, do you
10 understand what the total amount of money that
11 will be going to CBV as its net recovery or its
12 share of the net recovery would be, assuming
13 nothing goes to Deirdre?
14 A.     Yes.  I understand the general money.
15 Not the detail, but still seems to be some
16 question outstanding, but generally I understand
17 what the percentage would be.
18 Q.     Okay.
19        Do you have -- do you have any idea what
20 the specific dollar amount would be or -- or
21 general understanding of where -- what that would
22 be in the area of?
23 A.     Yeah.  I have a general understanding
24 what that dollar amount would be, yes.

Page 77

1 Q.     Okay.
2        What is -- what is that understanding?
3 A.     ████████████████████████████████████████
4 ██████████████████████████████████████
5 ████████
6 Q.     Okay.
7        And you're aware that if the panel
8 awards Deirdre money, that then gets treated as a
9 deduction against net revenue, there's a
10 possibility that you would end up with
11 significantly less money, correct?
12 A.     Yes.  According to my -- Mark Raskin
13 reading of that PPA, our attorneys advised us in
14 the beginning and so did Mark and so did Bob
15 Whitman, was that this arbitration would not
16 affect our share of money.  After the settlement,
17 their -- their tune changed considerably.  But
18 without a settlement, this arbitration would have
19 no impact on us, that we were assured by them that
20 this was Billy's and Deirdre's argument, not ours.
21 Q.     Okay.
22        Meaning that if Deirdre was going to be
23 awarded money would it just come out of Billy's
24 share not impact you is that how you understood

Page 78

1 that?
2         MR. COX:  Objection to form.
3         THE WITNESS:  That's how we
4 understood it from Mark Raskin and Bob Whitman.
5 BY MR. COHEN:
6 Q.     Okay.
7         Now, can I ask you:  Did you have an
8 understanding at any time that IP Navigation
9 Group, and we'll just call it for now, both IPNav
10 and IP Navigation Group, that that business, the
11 way they got paid was by taking a percentage of
12 gross recoveries for providing monetization
13 services?
14 A.     That was not part of the agreement.
15 Never came up.  They were going to get part of the
16 net recoveries and that was it.
17 Q.     And just to be clear, if you ever had
18 thought that they were going to get -- let me
19 strike that.  I'm phrasing that really badly.  I
20 apologize.
21         Just to be clear, at no point did you
22 ever think there was going to be a structure where
23 IP Navigation Group or IPNav would be -- being
24 paid a percentage of the gross recoveries;

Page 79

1 that's -- that's as you recall it, correct?
2 A.     Yes.  We -- I understand the question
3 and, no, my under -- in no way did we believe that
4 IP Navigation Group or even IPNav would get a
5 percentage of gross recoveries.
6 Q.     Okay.
7         And that's whether it was 1 percent or
8 5 percent or 20 percent or 85 percent, right,
9 nothing?
10 A.     That was -- that was zero, as far as we
11 knew.
12 Q.     Okay.
13 A.     Period.
14         MR. COHEN:  So are we going to
15 continue the exhibit numbering, Nathan, or should
16 we mark this as -- as a letter?
17         MR. COX:  Whatever you want.
18         MR. COHEN:  You know, let's just
19 continue the numbering.  I think that's probably
20 going to be the easiest.  So your last one was
21 Exhibit-5 or Exhibit-6, so let's mark this one as
22 Exhibit-7 and I'm just going to share my screen.
23         - - -
24         (E-mail marked as Exhibit-7 for

Page 80

1 identification.)
2         - - -
3 BY MR. COHEN:
4 Q.     And so what you should see now is an
5 e-mail that is Bates numbered IPN0028763.  And
6 this is an e-mail chain between you and Deirdre
7 Leane with a CC to Bob Stine and then later on,
8 somebody named Umesh Jani, U-M-E-S-H, space,
9 J-A-N-I, gets added on to the e-mail chain.
10         Do you see that, Earl?
11 A.     Yeah.  I see it, yeah.
12 Q.     Okay.
13         I'm just going to scroll down to your
14 initial e-mail here.  And you see you ask the
15 question:  What is your firm compensation
16 schedule.  I know it depends on the strategy that
17 CBV and IPNav pursues.  Do you see that?
18 A.     Yes.
19 Q.     Okay.
20         And this, by the way, is November 11,
21 2013.  So this is before that very first in-person
22 meeting, correct?
23 A.     That was one of the first contact, yes.
24 Q.     Right.

Page 81

1         And Deirdre responded:  Our fee
2 structure is really dependent on the portfolio,
3 but we take a percentage of the gross proceeds
4 from the campaign.  Do you see that?
5 A.     Yes.
6 Q.     I'm going to pull that down now because
7 that's really all I wanted out of that one.
8         You reached out based on that airline
9 magazine article, correct?
10 A.     Yes.
11 Q.     And you reached out to Deirdre, not to
12 Billy Carter, correct?
13 A.     Yes.  That was first contact.
14 Q.     And -- and you chose to reach out to
15 Deirdre because she was the one with the patent
16 monetization experience and the technical
17 expertise based on the article, right?
18         MR. COX:  Objection to form.
19 Objection, leading.
20 BY MR. COHEN
21 Q.     And the reason you chose to reach out to
22 Deirdre was because -- and not to Billy was
23 because, based on the article, Deirdre was the
24 person who did the patent monetization work and

Page 82

1  had technical expertise, correct?
2        MR. COX:  Objection to form.
3        THE WITNESS:  Not actually.  I
4  reached out to Deirdre because she was the
5  president and I thought -- reached out to Deirdre
6  might be easier than trying to get ahold of Erich.
7  BY MR. COHEN:
8  Q.      Okay.
9        Now, you had mentioned that you recalled
10  your initial meeting being in December of 2013; is
11  that correct?
12  A.      I believe it was 2000, December.  I'm
13  not sure about that.
14  Q.      Okay.  Yeah.
15  A.      Certainly after the memo that we got
16  back from...
17  Q.      Sure.
18        And I'm just going to show you an
19  e-mail.
20        MR. COHEN:  We'll mark it as
21  Exhibit-8.
22              - - -
23        (E-mail marked as Exhibit-8 for
24  identification.)

Page 83

1              - - -
2  BY MR. COHEN:
3  Q.      And this really just so that we can sort
4  of start to set the timeline in place.
5        So this is an e-mail that is -- starts
6  with Bates No. CB003263.  And I'm -- there's a
7  couple pages, but I'm just going to focus on the
8  e-mail at the bottom of that first page, which is
9  from Deirdre to you to Bob Stine and then to a
10  bunch of folks at IPNav.com e-mail addresses and
11  Billy Carter at ITCMadvisors.com.  Do you see
12  that?
13  A.      Yes, I see that.
14  Q.      Okay.
15        And -- and the e-mail says, Hi, Earl and
16  Bob.  Thank you for making the trip to Dallas.  It
17  was a pleasure to meet you both in person.  Do you
18  see that?
19  A.      Yes, I do.
20  Q.      Okay.
21        And do you recall on that first meeting
22  with Deirdre and her team, that it was just you
23  and -- and Bob Stine, Dick Snider didn't come,
24  correct?

Page 84

1        MR. COX:  Objection, leading.
2        THE WITNESS:  Yeah.  Just Bob and
3  I, yes.
4  BY MR. COHEN:
5  Q.      Okay.
6        And -- and so does the date here,
7  Monday, January 27, 2014, does that then refresh
8  your recollection that that first -- that first
9  in-person meeting was in late January 2014?
10  A.      Yeah.  That would make sense.
11  Q.      Okay.
12  A.      I don't recall the exact dates.
13  Q.      Terrific.
14        So let me just -- I apologize.
15        Now, I'm going to go back to an e-mail
16  that you saw earlier, I believe this was
17  Exhibit-2, the e-mail from Erich on the 28th of
18  January.  Do you see that?
19  A.      No, I don't.  It's not up there yet.
20  Q.      My apologies.  That's -- that's my
21  fault.  I didn't hit the screen share button.
22  A.      Okay.
23  Q.      Well, somebody has pulled it up for me
24  and I appreciate that.

Page 85

1        So do you see right here we have an
2  e-mail from Erich on January 28th; do you see
3  that?
4  A.      What's it referring to?
5  Q.      Exhibit -- Exhibit-2, that's --
6  A.      January 28th -- February 28th, yes.
7  Q.      January 28th, right?
8        So that's the day after that initial --
9  that initial meeting, correct?
10        MR. COX:  No, it's a month later.
11        THE WITNESS:  This says February,
12  right?
13  BY MR. COHEN:
14  Q.      Oh, sorry.  Then I'm looking at the
15  wrong e-mail.  It was not the same -- it was not
16  the same e-mail in the first place.
17        MR. COHEN:  Ken, can you take that
18  down and I will just -- I'll handle the screen
19  sharing on my end.  Aside from the -- the hiccup
20  of not actually pressing the button this time, I'm
21  generally all right with it, so I appreciate it.
22        So let me share this e-mail then, which
23  will be Exhibit-9.
24              - - -

Page 86

1    (E-mail marked as Exhibit-9 for
2  identification.)
3            - - -
4  BY MR. COHEN:
5  Q.    Now, do you see this e-mail here that's
6  Exhibit-9, is an e-mail Bates numbered CB003260;
7  do you see that?
8  A.    Yes, I do.
9  Q.    Okay.
10       And do you see it's an e-mail from Erich
11 to you and Bob Stine dated January 28, 2014,
12 right?
13 A.    Yes.
14 Q.    Okay.
15       And you see he says, Jonathan, and there
16 he's referring to Jonathan Skeels, who is somebody
17 at IP Navigation Group, pulled together an
18 analysis on three options.
19       And option one is you hold onto CBV.
20 And then there was option two and option three
21 where you sell CBV and the assets.  Do you see it?
22 A.    Yes.
23 Q.    So does that refresh your recollection
24 that actually in the initial discussion, there was

Page 87

1  an option where you wouldn't sell the patents at
2  all, you would hold onto them?
3  A.    Well, I don't recall -- recall that, but
4  if there was an option, I'm sure my partners would
5  have grabbed hold of that.
6  Q.    Okay.
7        MR. COHEN:  And I'm going to just
8  open another document which we'll mark as
9  Exhibit-10, which is the attachment.
10       And you guys are seeing this --
11 this spreadsheet, correct?
12            - - -
13       (Spreadsheet marked as Exhibit-10 for
14 identification.)
15            - - -
16       THE WITNESS:  I don't see any
17 spreadsheet yet.
18       MR. COHEN:  All right.  Hold on.
19 So...
20 BY MR. COHEN:
21 Q.    See it now?
22 A.    Okay.  Yeah.  It could be bigger, but...
23 Q.    Yeah.
24       And if you take a look, option one here,

Page 88

1  I'll just make that bigger.  You see option one
2  says CBV retains title?
3  A.    Yes.
4  Q.    Do you see that?
5  A.    Yes.
6  Q.    And then talks about -- runs through
7  various scenarios where there's various gross
8  recoveries and total cash and then after-tax
9  recoveries.  Do you see that?
10 A.    Yeah, I see that.
11 Q.    Okay.
12       And then --
13 A.    I don't understand all the numbers right
14 now, but I see all the numbers, yeah.
15 Q.    That's fine.
16       And -- and option two was CBV sells to a
17 new -- newly-formed LLC, correct?
18 A.    Right.
19 Q.    And otherwise, if you look at this, all
20 of the numbers end up being the same except this
21 last line after tax and gross recoveries.  So just
22 taking a look at -- so just looking at Column B
23 here, you see for option one it gives you total
24 gross recoveries of 5 million and that's right

Page 89

1  here on Line 24?
2  A.    Yup.
3  Q.    And then on Line 36, same thing, total
4  gross recoveries of 5 million?
5  A.    Yes.
6  Q.    And in both option one and option two
7  there's a cash advance of $500,000, yes?
8  A.    Yup.
9  Q.    Okay.
10       And then there's an estimate of advanced
11 costs, which in both of these -- in column one is
12 $5 million?
13 A.    Yeah.  Seems to be consistent, yes.
14 Q.    Right.
15       And then there's scenarios running
16 through, Column C is a scenario where the gross
17 recovery is 10 million and the cash advance is
18 6 million.  Column D is a 20 million gross
19 recovery and an 80 million cash advance.  But that
20 number -- that structure carries through.  Do you
21 see that?
22 A.    I see it, yeah.
23 Q.    Okay.
24       And then it runs through that the -- it

Page 90

1  tells you what your advanced costs would be in
2  these scenarios as a percentage of gross
3  recoveries and that's the same again for both
4  options --
5  A.      -- I see it.
6  Q.      -- one and option two, right?
7  A.      Yeah.
8  Q.      And then you have the total cash and
9  recoveries to CBV, and if you look across B, C, D,
10 E, F, and G in both Line 29 for option one and
11 then Line 41 for option two, those numbers are the
12 same; do you see that?
13 A.      That's right.
14 Q.      And then the difference becomes after
15 tax cash and gross recoveries to CBV, option two
16 the total recovery is significantly higher in
17 every circumstance than option one with CBV
18 retaining title.
19         Do you see that?
20 A.      Yes.  That's what they put down, yes.
21 Q.      Right.
22         And I believe that was because if CBV
23 retained title, then any income from the
24 recoveries would just be ordinary income and taxed

Page 91

1  at the ordinary rate, correct?
2  A.      That's what that thing showed.
3  According to our tax accountant, that's not true.
4  Q.      Okay.
5         But their pitch -- their pitch to you --
6  A.      That was his argument.
7  Q.      That was his argument, correct?
8  A.      Right.
9         MR. COHEN:  So I'm just going to
10 stop sharing this.
11 BY MR. COHEN:
12 Q.      But so at least initially, they were
13 pitching that there was a possibility that you
14 would retain that, correct?
15 A.      It was pretty emphatic at dinner.  And
16 later on, I pushed back a number of times about
17 that because the partners and I didn't want to
18 give up ownership.  So I'm sure that's what this
19 thing is lined up about.  But finally, you know,
20 it just came across, you know, I don't want you
21 guys making the decision because you don't make it
22 fast enough.
23 Q.      Okay.
24         MR. COHEN:  And now I'm just going

Page 92

1  to take a look -- let's go to -- my apologies.
2  I'm just going to pull up Exhibit-4.
3  BY MR. COHEN
4  Q.      Which is that red line of the PPA that
5  you saw earlier.  So hold on.
6  A.      It's not up yet.
7  Q.      Yep.  Here it comes.  All right.
8  A.      Okay.
9  Q.      So you see here that what came out in
10 Exhibit-4 in Section 2.8 was the language, which
11 the parties mutually agree are required.  Do you
12 see that?
13 A.      Could you make that bigger because, no,
14 I can't see it.
15 Q.      I apologize.  Let me -- let me --
16 A.      Okay.
17 Q.      Better?
18 A.      That's a lot better.
19 Q.      Okay.
20         So you see what came out was the
21 language:  Which the parties mutually agree are
22 required, correct?
23 A.      Yes.
24 Q.      Okay.

Page 93

1         And just looking at this net recoveries
2  position, right, that -- that language was part of
3  Exhibit -- was part of Sub Point E of net
4  recoveries, right, before it was deleted?
5  A.      Yeah.
6  Q.      Okay.
7         And prior to -- prior to the deletion,
8  what that provision said was that -- that the
9  reasonable fees and expenses of any other advisors
10 or agents which the parties mutually agree are
11 required, would be deducted in calculating net
12 recoveries, correct?
13 A.      Yes.
14 Q.      Okay.
15         And then when this got deducted, this
16 language which the parties mutually agreed are
17 required, what that meant was that the reasonable
18 fees and expenses of any other advisors or agents
19 would be deductions from net recoveries, even if
20 you hadn't specifically said I agree that those
21 agents are required, so it would be the purchasing
22 entities, total discretion what -- of who to
23 retain, correct?
24         MR. COX:  Objection to form.

Page 94

THE WITNESS:  It's the purchasing
entity's discretion of who they bring, as long as
they're not an affiliate with the purchaser or a
stakeholder.
BY MR. COHEN:
Q.     Well -- and that's that next sentence
there says, notwithstanding the above, any costs
or expense which is paid to an affiliate of
purchaser or to a stakeholder of purchaser shall
require the prior approval of seller, right?
A.     Right.
Q.     Meaning, they could retain whoever they
wanted, but if money is going out the door to an
affiliate or a stakeholder, that payment isn't
going to be a deduction against net revenues
unless you specifically approve it, right?
       MR. COX:  Objection, leading.
       THE WITNESS:  Let me rephrase that.
I think what you're saying, what I think I
understand is that they could have an agreement
with a third party, but it's not our expense.
BY MR. COHEN:
Q.     Right.
A.     Yeah.  That -- that would be my opinion

Page 95

valid.
Q.     Okay.  Thank you.
       MR. COHEN:  Now I'm just going to
stop sharing this one and I'm going to pull up
another document.  Hold on.  And this will become
Exhibit-10.
       VIDEOGRAPHER:  This should actually
be 11.  The Excel sheet was 10.
       - - -
       (Bates CB003496 marked as Exhibit-11 for
identification.)
       - - -
       MR. COHEN:  Oh, that's right.  The
Excel sheet was 10.  Thank you.
BY MR. COHEN:
Q.     So this is Exhibit-11.  And it is a
document Bates numbered CB003496.  And I see Mike
Hund sic block at McNees.  So I'm glad to see you
have a long relationship with attorneys, that
speaks well for them.  And it rolls all the way
through to 3506.  And it's not up.  I apologize.
A.     The document is not up there yet.
Q.     Yep.  Here it is.
       And so here we have -- here we have the

Page 96

e-mail dated Thursday, April 3rd, from Deirdre
internally at IP Navigation, saying parties are
very close on getting to a PPA.  Do you see that?
A.     Yes, I see that.
Q.     Okay.
       And you guys did, in fact, get to a
patent purchase agreement with IPVDV to buy the
patents from CBV in the spring of 2014, correct?
A.     That is correct.  They actually signed
everything.
Q.     Right.
       And then there was a -- a diligence
period, correct, where they would decide whether
or not they would -- whether or not they would
close on the deal, correct?
A.     I guess that could be.  My point of
view, we were waiting to get the money from --
from -- from Billy.  We had to send a lot of
documents to IP Navigation.
Q.     And you have anticipated my very next
question, sir, so I appreciate that.
       - - -
       (E-mail marked as Exhibit-12 for
identification.)

Page 97

       - - -
BY MR. COHEN:
Q.     I'm going to show you an e-mail dated
April 16th of 2014.  And do you recall that there
was an issue with one of CBV's current IP law
firms getting documents to IP Navigation?
A.     Okay.  I don't recall the letter, but...
Q.     Okay.
       And do you recall that IP Navigation and
the purchasing entity said they're not closing
until they have a chance to review the documents
that they would need to get from you guys, right?
A.     I see the memo, yeah.
Q.     Okay.
       And I believe you talked -- you
testified earlier that Billy had wanted to -- to
buy Z-Band from you as well, correct?  And -- and
you all had decided to pass on selling Z-band to
Billy because the money was too low to start,
correct?
A.     That is correct.
Q.     Okay.
       Now I'm going to show you another
document, it's dated May 1, so hold on a second.

Page 98

1  This was from when Billy was trying to talk to you
2  about buying both Z-Band and the patents.
3        MR. COHEN:  And we'll mark this one
4  as Exhibit-13.
5              - - -
6        (E-mail marked as Exhibit-13 for
7  identification.)
8              - - -
9  BY MR. COHEN:
10 Q.     Do you recall getting this e-mail from
11 Billy in May of 2014?
12 A.     No, I don't off the top of my head.
13 But, you know, I got a lot of memos -- a lot of
14 e-mails I don't --
15 Q.     Yeah.  No, that's -- that's perfectly
16 okay.
17        So just to -- to remind you, so in late
18 April 2019, and this is at CB004321, you -- you
19 passed along that you all decided to pass on
20 selling Z-Band to them, correct?
21 A.     Yes.
22 Q.     And you explained that was because his
23 offer just didn't give enough short-term success.
24 Do you see that?

Page 99

1  A.     Yes.  Well, I don't see the very bottom.
2  You know, okay.  Thank you for your offer.
3  Q.     Do you see that?  Okay.
4  A.     Yes.
5  Q.     And then there were some continued
6  discussions, Billy basically said why don't you
7  counter, right?
8        MR. COX:  Objection, leading.
9  BY MR. COHEN:
10 Q.     Do you see Billy wrote, why don't you
11 counter?
12 A.     Yeah.  I see that, yeah.
13 Q.     Okay.
14        And then you responded --
15 A.     I was waiting for nobody.
16 Q.     Yeah.
17        And -- and -- and then you responded
18 with some questions about Ice Webb, which was the
19 company that is currently know as UOIP, right,
20 Unified, right?
21 A.     Yeah.  I am sure we had some questions,
22 yeah.
23 Q.     Okay.
24        You know, what are the plans to get the

Page 100

1  top line significantly improved, what role do we
2  play, et cetera, et cetera.  Do you see that?
3  A.     Yeah.  Yeah.
4  Q.     And then Billy responds with some
5  answers.  Do you see that?
6  A.     Yes, I do.
7  Q.     Okay.
8        And he says, the approach is, No. 1,
9  to -- to get the top line better, they want to
10 negotiate some service contracts based on
11 clouding.  Do you see that?
12 A.     Yes.
13 Q.     And then he says they want to identify
14 and acquire additional IP assets that IPNav would
15 monetize on their behalf.  Do you see that?
16 A.     Yes, I see that.
17 Q.     Okay.
18        So as of May 1, 2014, you understood
19 that Billy was proposing that, and we'll just call
20 it Unified because that's how we all know it now,
21 that Unified would be retaining IPNav to monetize
22 patents for it, right?
23        MR. COX:  Objection; leading.  And
24 objection, form.

Page 101

1        THE WITNESS:  Well, he's talking
2  about IPNav, I am assuming -- you know, we would
3  assume that IP Navigation.
4  BY MR. COHEN:
5  Q.     At this time, May -- in May of 2014,
6  right?
7        But you understood that he was talking
8  about retaining IP Navigation Group to handle the
9  pat -- patent monetization work, right?
10 A.     IP Nav -- Navigation are -- Erich had
11 several IP assets that he wanted to include into
12 this deal, which would have been a lot more
13 complicated, in my opinion.
14 Q.     Okay.
15        And you understood that Billy was
16 thinking that IPVDV would retain IP Navigation
17 Group and pay IP Navigation Group a percentage of
18 the gross proceeds of the monetization, right?
19        MR. COX:  Objection; leading.
20        THE WITNESS:  That thought never
21 crossed us.  I don't think we understood that at
22 all.
23 BY MR. COHEN:
24 Q.     Okay.

Deposition of Earl Hennenhoefer                     Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 102

1  I'm just going to show you this next
2  document.
3        MS. STAHL:  Which is CB004799 and
4  this will be Exhibit-14.
5              - - -
6        (CB004799 marked as Exhibit-14 for
7  identification.)
8              - - -
9  BY MR. COHEN:
10 Q.     Okay.
11       So do you see here you sent an e-mail to
12 Billy and Erich on Wednesday May 7, 2014, at
13 10:28 a.m.?
14 A.     Okay.  I see that.
15 Q.     Okay.
16       And then you said before you get back to
17 him on Z-band, you have questions on the
18 relationships between companies.
19       Do you see that?
20 A.     Yeah.
21 Q.     Okay.
22       And then you describe your understanding
23 and asked whether it was correct.  So you said,
24 No. 1, the owner of IPVDV is 100 percent Billy

Page 103

1  Carter, correct, that was your -- that was your
2  question, right?
3  A.     Right.
4  Q.     So you understood at that point in time
5  that IP Navigation Group, LLC was not going to be
6  the owner of IPVDV, right?
7  A.     I'm not sure I understand that.
8  Q.     Well, go ahead.
9  A.     My understanding is that Billy owned
10 VDV, but IPNav owned -- that was a sub --
11 subsidiary of IPNav.  You're saying that IPVDV is
12 going to be a totally separate company and
13 separate from IPNav, we didn't understand it that
14 way.
15 Q.     So you thought IP Navigation Group owned
16 Billy Carter?
17       MR. DEANGELO:  Objection.
18       MR. COX:  Objection; leading.
19 Objection; form.
20       MR. DEANGELO:  I don't think you
21 meant -- Mr. Cohen, I think you misstated that.
22       MR. COHEN:  No.  No, I meant Billy
23 Carter.
24 BY MR. COHEN:

Page 104

1  Q.     Earl, you wrote here that your
2  understanding was that IPVDV was a hundred percent
3  owned by Billy Carter, who is an individual human
4  being, correct?
5  A.     That's a question, yes.
6  Q.     Okay.
7        And you understand, don't you, Earl,
8  that Billy Carter can't be a subsidiary of IP
9  Navigation Group, right?
10       MR. COX:  Objection, form.
11       THE WITNESS:  That's my -- that was
12 our understanding that IP -- VDV was a subsidiary
13 of IP Navigation.
14 BY MR. COHEN:
15 Q.     Okay.
16       And is that consistent, do you think --
17 and I understand that's your recollection --
18 A.     We're trying to get -- we're trying to
19 solve the dead bodies here.  You know, we didn't
20 understand how this thing all goes.  You got
21 IPNav, you got ICWebb.  You got IPclouding.
22 Q.     Earl --
23 A.     And trying to figure out what's going
24 on.

Page 105

1  Q.     I understand.
2        But, look, here's what I'm saying to
3  you, Earl, whatever your recollection is today,
4  and -- and I hundred percent believe you're being
5  totally and completely honest and straight
6  forward.  I don't want you to -- to mistake this
7  as me casting a spur on your integrity or your --
8  your -- your -- your honesty in any way.  I'm not.
9        It just -- it seems to me looking at
10 this e-mail where you said that you understood or
11 at least you asked whether your understanding was
12 correct, that VDV was going to be hundred percent
13 owned by Billy Carter.  That whether you remember
14 it today or not, in May of 2014, you knew that the
15 owner of VDV was not going to be IP Navigation
16 Group, because IP Navigation Group -- if VDV is
17 owned a hundred percent by Billy Carter, then it
18 cannot, literally cannot be a subsidiary of IP
19 Navigation, right?
20       MR. COX:  Objection to form and
21 leading.
22       MR. DEANGELO:  Is there -- is there
23 a question?
24 BY MR. COHEN:

Deposition of Earl Hennenhoefer                     Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 106

1  Q.     Well, let's -- let's just go with this
2  question and forget about everything else:  You
3  agree with me, Earl, that if VDV is 100 percent
4  owned by an individual person, then it cannot
5  legally be a subsidiary of another corporate
6  entity, right?
7           MR. COX:  Objection, form.
8           THE WITNESS:  Okay.  Forgetting
9  everything else, your question is if Billy Carter
10 owned VDV, it would not be a subsidiary of
11 anything else.  If that's the -- yeah, you're
12 right.
13 BY MR. COHEN:
14 Q.     Okay.  Thank you.
15 A.     In this letter here, we're fishing
16 what's -- who owns what.
17 Q.     No, I -- I understand.  And, honestly,
18 like, this is an area -- this is an area that I
19 am -- I am pleased that I don't have to play in on
20 the -- on the transaction structuring side, it's
21 why I'm a litigator, not a -- a contract attorney.
22 I don't have to deal with --
23 A.     Yes.
24 Q.     -- things on the front end.

Page 107

1           And then you say VDV contracts with
2  IPNav, and there you mean IP Navigation Group, to
3  license CBV patent, correct?  And I'm just leaving
4  out the parenthetical there.  So you're
5  understanding, at least as of this May 7, 2014,
6  e-mail, was that VDV would be contracting with
7  IPNav to do the licensing and monetization work,
8  right?  That's what you say here?
9  A.     We're asking questions and trying to
10 figure it out, what's -- what's going on.
11 Q.     Right.
12           And -- and --
13 A.     Where things are at.
14 Q.     Yep.
15           And you state here that your
16 understanding -- if they're going to be
17 contracting out, your understanding is that they
18 would be doing it for a percentage of revenue and
19 costs.  Do you see that?
20 A.     We're asking questions.  We didn't know
21 what was going on.
22 Q.     Okay.
23           But at least the concept that there
24 would be a contract with IP Navigation Group to

Page 108

1  monetize for a percentage of revenue and cost was
2  one that you were familiar with at the time,
3  right?
4           MR. COX:  Objection to form and
5  leading.
6           THE WITNESS:  I don't think I was
7  familiar with that at that time.
8  BY MR. COHEN:
9  Q.     So how did that language end up in your
10 e-mail if you have never heard of that as a
11 concept before?
12 A.     Now I can't remember all the facts going
13 into that e-mail.  I thought there was a lot of
14 things they were trying to fish out.  I'm trying
15 to answer the questions that Bob and Bill would --
16 not Bob, Bob and Dick would have.
17 Q.     That's fine.
18           And now I'm going to show you another
19 e-mail, which is Billy Carter's response to your
20 e-mail.
21           MR. COHEN:  And it's Bates numbered
22 CB004820.  So hold on one second while I pull that
23 up.
24           - - -

Page 109

1           (CB004820 marked as Exhibit-15 for
2  identification.)
3           - - -
4  BY MR. COHEN:
5  Q.     And you see Billy says that his comments
6  on your e-mail are highlighted in green below.  Do
7  you see that?
8  A.     I see that, yes.
9  Q.     Okay.
10           So let's just go to his responses.  No.
11 1, you asked whether it was correct that Billy
12 Carter individually was the 100 percent owner of
13 VDV, right?  What was his answer to that question?
14 A.     Yeah, he said that's correct.
15 Q.     Okay.
16           And based on what you just told me when
17 I asked you just generally speaking, if Billy
18 Carter as a human being was the 100 percent owner
19 of VDV, then it could not be an IP Navigation
20 Group subsidiary.  Then as soon as he said correct
21 to that, you knew or at least you were told,
22 whether or not you processed it, that the
23 purchasing entity would not be an IP Navigation
24 Group subsidiary, correct?

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 110

1      MR. COX:  Objection to form.
2      THE WITNESS:  Yeah.  That's --
3  that's what we have to assume, all that, yes.
4  BY MR. COHEN:
5  Q.     Okay.
6      And then you asked whether it was going
7  to be correct that VDV would be contracting with
8  IP Navigation Group for a percentage of revenue
9  and costs, right?
10  A.     Yeah, I see the answer.
11  Q.     And the answer was correct, that's what
12  they were going to be doing.  The purchasing
13  entity would be contracting with IP Navigation
14  Group for a percentage of revenue and costs,
15  right?
16  A.     Yeah.  So he's not consulting, yeah.
17  Q.     So -- so the concept that a purchasing
18  entity would be retaining IP Navigation Group as a
19  consultant for a percentage of revenue and costs
20  was in play and specifically told to you that that
21  was how it was going to go way back in May of
22  2014, right?
23  A.     I read that differently.  I said 20 days
24  from Erich and don't make business decisions

Page 111

1  without consulting him, that's all.
2  Q.     Okay.
3      So when Billy told --
4  A.     I didn't say I would pay him.  I didn't
5  sit there -- you know, he's my partner.  It's like
6  saying I talked to Dick Snider, he's 20 feet from
7  me, I don't pay him for being a consultant.
8  Q.     So you asked him whether it was correct
9  that VDV would contract with IPNav and pay it a
10  percentage of revenue and cost to do the
11  monetization work, right?
12  A.     That's my question.
13  Q.     And his answer was correct.  Do you see
14  that?  He says yes, that's correct, right?
15  A.     That's what he says, yes.
16  Q.     So is it correct -- is it correct that
17  VDV will retain IPNav for a percentage of revenue
18  and costs and he said yes, that's correct.  And
19  you didn't understand that as meaning that VDV
20  would hire IPNav for a percentage of revenue and
21  costs?
22      MR. COX:  Objection; form and
23  leading.
24      THE WITNESS:  Well, I don't -- to

Page 112

1  tell you the truth, I don't remember the memo,
2  but, you know, you can take that any way you want
3  to, yeah.
4  BY MR. COHEN:
5  Q.     Okay.
6      And, again, we just -- you just told me
7  that you would have understood that IPNav -- or
8  excuse me -- that VDV was not a subsidiary of
9  IPNav.  So if IPNav wasn't getting paid a
10  percentage of revenue and costs and it wasn't the
11  owner, why would IPNav be doing anything at all?
12      MR. COX:  Objection, form.
13      THE WITNESS:  Well, when we signed
14  the contract, the contract was that this is
15  between IP Navigation and -- and VDV and CBV, so
16  that's what we signed for this stuff.
17  BY MR. COHEN:
18  Q.     That was -- that was the -- the
19  nondisclosure agreement was between those
20  entities, right?  And the common interest
21  agreement was between those entities.  But the
22  patent purchase agreement that you signed, sir,
23  was only with IPVDV.  The only entity purchasing
24  the patents was IPVDV; do you recall that?

Page 113

1  A.     Well, I don't recall the agreements.
2  There were so many of them.  But I would have to
3  look at them.  What you're saying, VDV and CBV are
4  the sole signers of the purchase agreement, is
5  that what you're saying?
6  Q.     Yes.
7  A.     I don't know.
8  Q.     Okay.
9      Now, when you were asking about whether
10  it was for a percentage of the revenue and costs,
11  did you have any sense of what the range of -- of
12  percentage of revenues and costs that IP
13  Navigation generally charged was?
14      MR. COX:  Objection, form.
15      THE WITNESS:  You know what?
16  You're asking a bunch of questions when we were
17  talking about several different deals at the same
18  time here.  At this time we were still talking
19  about, you know, Billy buying both companies.  So
20  I'm not sure we're trying -- what we're doing
21  here.  You got IP clouding included in there.
22  IPNav included in here.  So, you know, I'm not
23  sure what kind of deal finally come out of it.
24  But finally with the purchase agreement -- the

Page 114

1 purchase agreement that were not signing on
2 anybody to do consulting work for the purchase
3 agreement. These were negotiated about buying --
4 you know, combining everything, which, you know,
5 you can see, it turned out very, very complicated.
6 BY MR. COHEN:
7 Q.     Well, let's take a look at the actual
8 purchase agreement that you signed with IPVDV.
9 Okay.
10        MR. COHEN:  And this will be --
11        THE WITNESS:  Okay.
12        MR. COHEN:  This will be
13 Exhibit-16.
14               - - -
15      (Purchase agreement marked as Exhibit-16
16 for identification.)
17               - - -
18        THE WITNESS:  Okay.
19        MR. COX:  We're coming up on an
20 hour and, I think, 15 or 20 minutes.  I don't
21 personally need to eat lunch or anything, I am an
22 hour before you guys, but just wanted to put it
23 out there if you guys need a break.
24        MR. DEANGELO:  Actually, I was

Page 115

1 going to ask, Mr. Cohen, if you're in a -- when
2 you're at a break point here, we do -- we have
3 lunch here, so we won't need a long break, but we
4 would like a break and have lunch.
5        MR. COHEN:  All right.  Excellent.
6 Let me ask a couple questions about -- about this
7 executed patent purchase agreement and we'll --
8 we'll take a lunch break.
9 BY MR. COHEN:
10 Q.     So now, Earl, this is a document Bates
11 numbered CB005031, and it rolls pretty far along.
12 And so I'm just going to take you right now to the
13 signature page on this.  And do you see that's
14 your signature there on the signature page, which
15 is Page 12, right?
16 A.     Right.
17 Q.     And so now looking up at the top, can
18 you tell me, who are the parties to this patent
19 purchase agreement?
20 A.     We've got CV and we've got BDV -- you
21 know, BDV.
22 Q.     Right.
23        Just -- just those two entities, right?
24 A.     Yup.

Page 116

1 Q.     Okay.
2        And, again, you have been told by now
3 that VDV is 100 percent owned by Billy Carter and
4 not a subsidiary of IP Navigation Group, right?
5 A.     Well, the confusion is why he put down
6 himself as manager versus CEO or president.
7 Q.     And if we see here under net recoveries,
8 this is -- this has that language of which the
9 parties mutually agree are required, right?  Same
10 time as the -- in net recoveries.  Do you see
11 that?
12 A.     Yeah.  Yeah, I see that.
13 Q.     And then if we scroll down just a bit
14 further, we see that there was mutual NDA and this
15 is that mutual NDA between IPVDV, IP Navigation
16 Group, LLC, and CBV, Inc. that you were shown in
17 sort of draft form in an earlier exhibit.
18        Do you see that?
19 A.     Yes.
20 Q.     Okay.
21        And that's because IP Navigation Group
22 was going to need to get information, right, for
23 purposes of its patent monetization work that it
24 needed to make sure it was privileged, correct?

Page 117

1 A.     Yeah.  There was something to do with --
2 right for everybody to be able to see the
3 information.
4 Q.     Right.
5        And then Exhibit C is a common interest
6 agreement that's also, again, between VDV, CBV,
7 and IP Navigation Group.  Do you see that?
8 A.     Yeah.
9 Q.     And it says here, do you see in Section
10 1.1, that IP Navigation Group is going to be
11 acting as the worldwide intellectual and property
12 enforcement and licensing agent of the purchaser
13 and will be providing services for the
14 monetization.  Do you see that?
15 A.     Yes.
16 Q.     So putting that all together, you were
17 told by Billy Carter's e-mail that IPVDV was not a
18 subsidiary of IP Navigation Group.  You were told
19 that it was correct -- so putting together all of
20 what we -- what we just went through and then we
21 can take a lunch break, you were told by Billy
22 Carter's e-mail that IPVDV was a hundred percent
23 owned by Bill -- by Billy Carter and therefore not
24 a subsidiary of IP Navigation Group.  You were

Page 118

1  told by Billy Carter's e-mail that it was correct
2  that IPVDV would be retaining IP Navigation Group
3  to do the patent monetization work for a
4  percentage of the revenues and costs.  And you
5  were told in this common interest agreement that
6  that was, in fact, going to happen, IP Navigation
7  Group would, in fact, act as the worldwide
8  intellectual property enforcement and licensing
9  agent of the purchaser, which was IPVDV and will
10  be providing services relating to the patent
11  monetization, correct?
12        MR. COX:  Objection to form.
13        THE WITNESS:  Well, how you are
14  going to get the job done, that's really up to
15  Billy Carter because he's VDV.  The contract
16  basically says that I have to give permission for
17  him to spend money on that.  He can get anybody he
18  wants to and do whatever kind of deal he wants,
19  but, well, now he charges me.  No, we did not give
20  any verbal or signed agreement that we would pay a
21  certain percentage to anybody else.  And that was
22  written into the PPA early on to make sure that
23  that didn't happen.
24

Page 119

1  BY MR. COHEN:
2  Q.      Okay.
3  A.      If Billy wants to pay somebody in IP
4  Navigation out of his pocket, so be it.
5        MR. COHEN:  Okay.  I've got --
6  well, I was going to say nothing further, but
7  that's the wrong thing for a break.  Let's take a
8  break here and we can come back.  How long do you
9  guys need for lunch?
10        THE WITNESS:  Okay.
11        MR. DEANGELO:  Half an hour would
12  be great.
13        MR. COHEN:  Okay.  So let's be back
14  at 1:25.  Hold on.  Coleen, Ken, does that work
15  for both of you?  Because really, Coleen, you're
16  the most important person here, so...
17        MR. COX:  Can you add your exhibits
18  to -- either send it to Coleen or add it to the
19  exhibit link so that we can access them?
20        MR. COHEN:  I think Ken's been
21  doing that.
22        VIDEOGRAPHER:  Off the record,
23  12:53 p.m.
24        - - -

Page 120

1        (Whereupon, luncheon recess was held off
2  the record.)
3              - - -
4        VIDEOGRAPHER:  Welcome back,
5  everyone.  Looks like everyone is back from lunch.
6        MR. COHEN:  Yes, sir.
7        VIDEOGRAPHER:  We're going back on
8  the record.  Time is 1:26 p.m.
9  BY MR. COHEN:
10  Q.      Earl, thank you for coming back.  I'm
11  sure there was a temptation to just leave and be
12  done with this, I know I have that temptation
13  every so often, so I appreciate it.
14        I'm going to show you a document that
15  we're going to mark as Exhibit-17.
16              - - -
17        (E-mail marked as Exhibit-17 for
18  identification.)
19              - - -
20  BY MR. COHEN:
21  Q.      Which is an e-mail that begins with
22  Bates No. CB005414.
23        Do you see this?
24  A.      Yes.

Page 121

1  Q.      Okay.
2        And do you see that on July 3, 2014, you
3  were reaching out and asking if Billy had a
4  projected closing date for the PPA that you had
5  entered with him, right?
6  A.      Yes.
7  Q.      Okay.
8  A.      This is all spelled the same.
9  Q.      Yes, you did.
10        Well, you went with -- you went with a
11  weird spelling with a K when he's got the weird
12  spelling with the C-H.  I understand where that
13  miss came from.
14        And if you look at .4 in Billy's
15  response, he says they'll have completed their due
16  diligence by the end of the week.  Do you see
17  that?
18  A.      Okay.  I see that, yes.
19  Q.      And then I will show you a document,
20  another document.  Hold on.  And this is a
21  document, and I know it hasn't popped up yet, but
22  it's a document that's Bates numbered IPN0019376.
23        MR. COHEN:  And that's going to be
24  Exhibit-18.

Page 122

1            - - -
2        (Bates IPN0019376 marked as Exhibit-18
3  for identification.)
4            - - -
5  BY MR. COHEN:
6  Q.      And that document, you see is an e-mail
7  from you to Erich and Deirdre and Billy on
8  July 28, 2014.  Do you see that?
9  A.      Yes.
10 Q.      And you should be proud, you got Erich's
11 name spell correctly on this one, so well done.
12        And you see he says -- you say there
13 that you were disappointed to hear from Umesh on
14 Friday that there wasn't any interest in pursuing
15 the CBV patents.  Do you see that?
16 A.      I see that.
17 Q.      And do you recall that at some point in
18 July or towards the end of July, you were told
19 that IPVDV would not be closing on the purchase of
20 the CBV patents?
21 A.      We were told just -- which we did two
22 things.  One, we had Pat King talk to Umesh and we
23 called Erich, we being Bob and myself.
24 Q.      And then we talked a bit -- earlier in

Page 123

1  your deposition you testified about a phone call
2  that happened on August 4th of 2014, so just about
3  a week later, correct?
4  A.      Are you talking about the memo where
5  Erich's introducing Deirdre to take over?
6  Q.      Yeah.  You said you had a call where
7  Erich said Deirdre would be taking over?
8  A.      Yeah.
9  Q.      And you understood that -- what that
10 meant was Deirdre would be filling Billy's role in
11 the transaction, right?
12 A.      I guess you could say filling Billy's
13 role.  She would take over and Billy was no longer
14 in the mix.
15 Q.      Right.
16        So instead of an entity to be a hundred
17 percent owned by Billy, it would be an entity
18 hundred percent owned by Deirdre, right, doing the
19 buy?
20 A.      Well, that's not really what happened,
21 but that's what was said, yes.
22 Q.      Okay.
23 A.      Billy and Deirdre were still trying to
24 make a deal with RPX up to January of 2015.

Page 124

1  Q.      Okay.
2        And you don't recall having any
3  discussions with Erich about IP Navigation's fee;
4  is that correct?
5  A.      Yeah.  We had no discussion about IP
6  Navigation having a fee.  Surprising that
7  discussion would not have come up over the year.
8  Q.      Well, I mean, we did see your e-mail
9  earlier where you did discuss IPNav having a fee,
10 right?
11        MR. COX:  Objection, form.
12        THE WITNESS:  That was -- you know,
13 that was way early.
14 BY MR. COHEN:
15 Q.      When you say way early --
16 A.      I think that -- I think that memo that
17 you had was in 2013, wasn't it?
18 Q.      No.  Let's -- let's go back to that one.
19 Hold on.  So this is -- well, you're right there
20 was an initial e-mail from Deirdre, who had told
21 you that IP Navigation's structure was it got a
22 fee on the gross proceeds, right, that was at the
23 very start of the relationship, right?
24 A.      Yeah.  I understand that, yes.

Page 125

1  Q.      Okay.
2        And then on May 7, 2014, Billy confirmed
3  again that it was correct that the plan was for
4  VDV to contract with IPNav for a percentage of
5  revenue and costs, right?
6  A.      You can read into that, but at that time
7  the questions were what's all included in this
8  deal.
9  Q.      Okay.
10 A.      The NDA and so forth of the contract,
11 which was after all our discussions about having
12 IceWebb and IP clouding and all that deal put
13 together.
14 Q.      Okay.
15        MR. COHEN:  And then I'm just going
16 to mark this as Exhibit-19 because let's just have
17 it for -- so that we're -- we're aware of the
18 timeline.
19        - - -
20        (E-mail marked as Exhibit-19 for
21 identification.)
22        - - -
23 BY MR. COHEN:
24 Q.      That -- that e-mail that we talked about

Page 126

1 where Billy said correct, IPVDV will be obtaining
2 IPNav for a percentage of the gross proceeds was
3 May 7th.  You can see this is Exhibit-19.  It's an
4 e-mail from Mike Hund to Margo Alpert and Lilian
5 Shaked and you're CC'd on it, provided the version
6 of the agreement executed by CBV.  Do you see
7 that?
8 A.      Okay.  I see that, yeah, from Mike Hund.
9 Q.      So you signed -- when we're talking
10 about, you know, how long it was between when you
11 were told, yeah, the deal structure is IPVDV will
12 be retaining IP Navigation for a percentage of the
13 gross proceeds and when you signed it, that e-mail
14 was on May 7th, and you signed it or at least it
15 was sent over, on May 20th.  So something less
16 than two weeks went by between those two events,
17 right?
18 A.      Well, difference between May 7th and
19 20th.  May 20th is the -- the final agreement of
20 sale of the patents or whatever you call it, the
21 execution of the PPA.  The May 7th, we were still
22 negotiating and talking about some fancy deal
23 which included IP -- IPWebb and IPclouding and all
24 that stuff.  So that -- that's still kind of up in

Page 127

1 the air.
2 Q.      Did anybody --
3 A.      You can't -- you can't draw a direct
4 line from Point A to Point B, not in my opinion.
5 Q.      Okay.
6         Did anybody say to you at any point
7 between May 7th and May 20th, hey, listen, Earl,
8 actually IP Navigation is going to work for free?
9         MR. COX:  Objection to form.
10         THE WITNESS:  Nobody said IP --
11 anybody is going to work for free, yeah.
12 BY MR. COHEN:
13 Q.      Okay.
14         Did anybody say to you, the deal
15 structure is no longer that IPVDV will be
16 retaining IPNav for a percentage of the gross
17 proceeds?
18         MR. COX:  Objection to form.
19 BY MR. COHEN:
20 Q.      And costs?
21         MR. COX:  Objection to form.
22         THE WITNESS:  Well, what happened
23 then was the whole deal about combining things
24 together just went away because we agree we'd just

Page 128

1 do the PPA.  So now we're back to just the PPA.
2 BY MR. COHEN:
3 Q.      Okay.
4         Did anybody talk to -- did anybody tell
5 you that the deal for just for PPA would have a
6 different structure of a relationship between
7 IPVDV and IP Navigation Group?
8         MR. COX:  Objection to form.
9         THE WITNESS:  I don't think anybody
10 mentioned that.
11 BY MR. COHEN:
12 Q.      That was you don't think anybody
13 mentioned that, right?
14 A.      The PPA was different than all the other
15 discussions where they handled a bunch of other
16 companies.
17 Q.      I'm asking a different question.
18 A.      Okay.
19 Q.      Did anybody tell you that when you were
20 doing the PPA, that the relationship between IPVDV
21 and IP Navigation was going to be different from
22 what had been previously discussed with you in
23 that e-mail on May 7th?
24         MR. COX:  Objection to form.

Page 129

1         THE WITNESS:  The -- the PPA that
2 we discussed did not outline or talk about what
3 role IP Navigation would play, period.
4 BY MR. COHEN:
5 Q.      Well, the common interest agreement
6 attached as an exhibit to the PPA, in which you
7 signed on that same day, specifically said that IP
8 Navigation was going to be the patent monetization
9 agent IPVDV, did it not?
10 A.      That's what the common agreement said.
11 You asked me -- one question was -- was anybody
12 discussed that, that's different than what the
13 common interest agreement said, yes.
14 Q.      And what I'm asking you now is:  Given
15 that you knew at the time you executed that PPA on
16 May 20th of 2014, that IP Navigation Group would
17 be the patent monetization agent for IPVDV as it
18 purchased those patents, had anybody told you that
19 it would be doing it under any structure, other
20 than getting paid a percentage of the gross
21 revenues?
22         MR. COX:  Objection, form.
23         THE WITNESS:  Nobody mentioned
24 anything about gross revenues.

Deposition of Earl Hennenhoefer                     Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 130

BY MR. COHEN

Q.      Okay.

A.      It was a done deal between VDV and Erich, what they're doing, but nobody mentioned that it's going to be a fee based on gross revenues in any of the discussions.

Q.      Well, Billy mentioned that to you in that e-mail we looked at, he said, correct, it will be that fee.

Now, I know that you're saying, well, that was for the -- for the more complex deal. And I don't whether I agree with that recollection looking at the documents, but it doesn't matter. I'm asking you a different question.

Did anybody tell you that it was going to be different?  I'm not asking whether anybody told you it was going to be the same.  I know you said a couple of times, nobody told you anything. I'm asking, did anybody specifically tell you, well, now that this is just for the patents, it's different?

MR. COX:  Objection to form, leading.

THE WITNESS:  The way you phrased

Page 131

it, no, I don't think anybody discussed that.

BY MR. COHEN:

Q.      Okay.  I appreciate that.

Okay.

Let's take a look at a document that's Bates numbered IPN42965.  So hold on one second.

- - -

(E-mail marked as Exhibit-20 for identification.)

- - -

BY MR. COHEN:

Q.      And do you see this starts with an e-mail from you to Erich on August 5th?

A.      Yes.

Q.      Okay.

And you're talking about the revised deal.  Do you see that?

A.      Where are you pointing to now?

Q.      You're talking about what the changes were?

A.      Yeah.

Q.      Right.

And here's that change from 7 -- from 1.5 million to 750 that you guys were talking

Page 132

about before, right?

A.      Right.

Q.      And then when you start getting your -- your fee changes because they get -- they get basically two X of that back, correct?

A.      I understand that, yeah.

Q.      Okay.

And then the purchaser is going to be a different entity, not VDV, correct?

A.      Yes.

Q.      Okay.

And then Erich says, we're going to send it back to you and the entity name might change and also there might be some changes thanks to the clouding issue, right?

A.      Yeah.

Q.      Okay.

And then later on that day, you say, look, you got a -- you got a modified agreement and it still shows VDV in there.  And Erich says, we are just getting the name right, right?  On -- on their end, either Deirdre was going to buy VDV from Billy or she was going to basically set up a new entity and it would be a different entity,

Page 133

right?

A.      Yeah.  I understand that, yes.

Q.      Okay.

And was there anything in these communication that is suggested to you that IP Navigation Group, LLC or IPNav, LLC would have any ownership interest in whether it was IPVDV or ChanBond at all?

A.      Can we scroll up?

Q.      Up?  This is as high as it goes.

A.      No.  I mean just scroll down.  I'm sorry.  Down.  Yeah.  Okay.

Q.      Just tell me when to stop.

A.      In the discussions I had with Erich, you know, going back and forth, my understanding was that the deals would be turned over to Deirdre. Billy would be out.  It would be a different name other than VDV.  It was not clear at that time that there was an IPNav or IP Navigation, that was not made clear until later.  So --

Q.      Can I ask you -- sorry.  Can I ask you: Did it matter to you whether it was IP Navigation or IPNav, LLC that was going to be the advising agent?

Page 134

1  A.      Well, whether it's IPNav or IP
2  Navigation, I talked to Mike about that and the
3  feeling was there should be a difference between
4  what it is.
5  Q.      Either way, you were getting -- you were
6  getting services from Deirdre and you were happy
7  enough with that, right?
8  A.      I was getting services from somebody,
9  yeah.
10  Q.      Okay.
11  A.      That's what they're getting paid for.
12  They're getting 50 percent of the net, so they
13  should do something.
14  Q.      And, in fact, you were eventually told
15  very specifically that it was going to be IPNav,
16  LLC, and not IP Navigation Group, LLC, correct?
17  A.      I might have been told very
18  specifically.  I did not understand that until we
19  saw the last PPA and in which I asked Mike what
20  was going on.  He said, hey, she formed her own
21  company.
22  Q.      Okay.
23          So I'm going to show you a document that
24  is -- yeah.  So a document that is Bates numbered

Page 135

1  IPN0047479.  And this is a red line -- and I'm
2  sharing it now.  This is a red line of the draft
3  patent purchase agreement that was shared with
4  your -- your folks and it's dated October 19,
5  2014.
6                  - - -
7          (Patent purchase agreement marked as
8  Exhibit-21 for identification.)
9                  - - -
10  BY MR. COHEN:
11  Q.      Do you see it?
12  A.      Yeah.  I see it, yeah.
13  Q.      Okay.
14          And now if we scroll down to the
15  nondisclosure agreement, you can see that there's
16  a red line that changes IP Navigation Group, LLC
17  to IPNav, LLC.  Do you see that?
18  A.      Yes.
19  Q.      Okay.
20          And then if you scroll down a little
21  further and look at the common interest agreement,
22  you can see that that same change is made to the
23  common interest agreement.  So IPNav, as used in
24  the common interest agreement, they're telling you

Page 136

1  is now going to be IPNav, LLC, not IP Navigation
2  Group, LLC, right?
3  A.      Yup.
4  Q.      And, again, it says -- it says that
5  IPNav, meaning IPNav, LLC now will act as the
6  worldwide intellectual property enforcement and
7  licensing agent for the purchaser, which here is
8  now ChanBond instead of IPVDV, right?
9  A.      I see that's what it says, yeah.
10  Q.      Yeah.
11          So basically by mid October, Deirdre had
12  settled on the structures of the entities that
13  would be doing this purchase and then the
14  advising, right?  So ChanBond was going to be
15  doing the purchase and IPNav, LLC was going to be
16  the entity doing the advising, right?
17              MR. COX:  Objection to form.
18              THE WITNESS:  That's what it says,
19  yeah.
20  BY MR. COHEN:
21  Q.      And just to be clear, it doesn't just
22  say that in -- you know, they passed along a
23  contract that suddenly changed the entity names,
24  they gave you a red line that specifically called

Page 137

1  out that it wasn't going to be IP Navigation
2  Group, LLC, it was going to be IPNav, LLC, right?
3  A.      Yeah.  That was the proposed --
4  Q.      And -- and that's then how it stayed
5  from October of 2014, until April --
6  A.      That was not an agreement.  At that time
7  I passed on the whole thing, so...
8  Q.      Right.
9          But that's -- but that's -- yeah.
10          But that language stayed in from
11  October 2014, until April of 2015, when you signed
12  the ultimate patent purchase agreement with
13  ChanBond, right?
14  A.      I believe so, yeah.
15  Q.      And then do you recall that through sort
16  of November and December and January, Deirdre was
17  basically looking for funding to enable her to --
18  to complete this purchase?
19  A.      Yes, because I told her I was not
20  satisfied with the fact that we got drug on so,
21  she said she would get the funding.
22  Q.      And so now I am just going to take a
23  look at -- hold on.  I just have to find it in my
24  documents.  It's CB005793.

Page 138

1    MR. COHEN:  And we'll mark this one
2  as Exhibit-22.
3           - - -
4     (CB005793 marked as Exhibit-22 for
5  identification.)
6           - - -
7  BY MR. COHEN:
8  Q.     And do you see she says she got a -- a
9  voice mail from you and Bob Stine?
10  A.     Okay.
11  Q.     She says she apologized that it's been
12  dragging on longer than even she wanted it to.  Do
13  you see that?
14  A.     Yeah.
15  Q.     Does that refresh your recollection that
16  by November 20th of 2014, you guys were
17  effectively on board with, in some form or
18  another, a sale to Deirdre in ChanBond, right?
19  A.     I see it, yeah.  I remember that one.
20  Q.     Okay.
21        And she says she secured financing.
22  She's a term sheet and she's hoping that she
23  can close in early December, right?
24  A.     Right.

Page 139

1  Q.     And I apologize, but we're going to walk
2  through some of these communications just in terms
3  of how the timing of this worked it's way out.
4     MR. COHEN:  So 23 is going to be
5  documents Bates number CB005799.
6           - - -
7     (CB005799 marked as Exhibit-23 for
8  identification.)
9           - - -
10  BY MR. COHEN:
11  Q.     And do you see early December you asked
12  about a projected closing date?
13  A.     Yes.
14  Q.     And then she responded that is she
15  basically working with her investors and it's
16  going to be January before that -- before they can
17  actually close, right?  Do you recall that?
18  A.     Yeah.  I read that, yeah.
19  Q.     Okay.
20        And eventually, by the way, you ended up
21  having to do a deal with no up-front payment for
22  the -- for the patents, correct?
23  A.     Yes.
24  Q.     And then -- and then eventually after

Page 140

1  that there was an amendment where you guy got paid
2  $200,000 for giving up a reversionary right,
3  correct?
4  A.     Yeah.  That $200,000 for the amendment,
5  yes.
6  Q.     Okay.
7        And by the way, was that what you meant
8  when you said there were three patent purchase
9  agreements, there's the one with IPVDV and then
10  there's the one you ended up signing with ChanBond
11  and then there was the amendment to that
12  afterwards?
13  A.     Well, to me there was three, there was
14  two with Billy, which I mentioned in the third
15  PPA.  The third PPA we signed with Deirdre, said
16  the first two were null and voided.
17  Q.     Okay.
18  A.     That's one of those lines in there.
19  Q.     Yeah.
20        We can take a look at that in a little
21  bit.  My memory is that there was only one signed
22  with Billy and only one that was described as null
23  and void, but I don't think it makes much of a
24  difference one way or the other, so we'll get to

Page 141

1  that -- we'll get to that shortly.
2        So -- and then we're going to take a
3  look at an e-mail that is Bates numbered CB005804.
4           - - -
5     (CB005804 marked as Exhibit-24 for
6  identification.)
7           - - -
8  BY MR. COHEN:
9  Q.     Okay.
10        And you see it starts with an e-mail
11  dated December 10th.  Oh, no.  Wait.  This goes
12  back to -- sorry -- your e-mail, December 8th.  Do
13  you see that?
14  A.     Yup.
15  Q.     And you then say you're worrying about
16  the priorities of the project and the selection
17  of -- of IPNav.  Do you recall that?
18  A.     Yes.
19  Q.     And so December or so is where you start
20  thinking, well, maybe IPNav isn't the right --
21  isn't the right partner on this, right?
22  A.     That's correct.
23  Q.     Okay.
24        And then Deirdre responds and she says,

Deposition of Earl Hennenhoefer

Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 142

1  you know, she understands, she's pressing her
2  funders to try and get this done, right?
3  A.     Yeah.
4  Q.     And she explains to you that it's part
5  of a larger deal structure that she's working on
6  and CBV is only one part of it in terms of what
7  she is dealing with the funders for.  And so while
8  she is trying to get them to fund the CBV
9  acquisition on its own, they are not doing it,
10 right?
11 A.     Yeah.  I see it.
12 Q.     Okay.
13        And then she says that in terms of
14 IPNav's work, she is treating it as a closed deal
15 and is working up claim charts and mapping out
16 targets, et cetera, et cetera.
17        Do you see that?
18 A.     Yeah.
19 Q.     Okay.
20        And now, this again, is in
21 December 10th -- on December 10, 2014, so it's
22 after that October 19th e-mail -- after that
23 October 19th red line that we saw earlier, right?
24 A.     Yes.  She's still working on the deal.

Page 143

1  Q.     Right.
2         And so by that point, the patent
3  monetization advisor that she's referencing when
4  she says IPNav is working up claim charts and
5  mapping out targets and doing all sorts of
6  monetization work, is IPNav, LLC, not IP
7  Navigation Group, LLC, right?
8         MR. COX:  Objection to form.
9         THE WITNESS:  The claim charts were
10 provided to her.  We did that.
11 BY MR. COHEN:
12 Q.     Okay.
13        Well, she says here she's continuing to
14 work up claim charts, right?  Do you see that?
15 A.     Yeah.
16 Q.     And I know you didn't -- you said
17 earlier you weren't sure what Deirdre or Billy had
18 done.  Is it possible that she continued to work
19 up claim charts and get them into shape for things
20 like FRE408 settlement discussions with potential
21 targets that you just didn't have insight into?
22        MR. COX:  Objection to form.
23        THE WITNESS:  She can work on
24 whatever she wants to work on trying to get the

Page 144

1  deal done, I guess.  The claimant charts were done
2  by two patent firms, Camamasol and Barns &
3  Thornburg.  So she had claim charts on all the
4  patents.
5  BY MR. COHEN:
6  Q.     Yes.
7         And -- and your understanding is
8  whatever claim charts got used after that were the
9  same ones from Buchanan & Ingersoll?
10 A.     I don't know what claim chart she used.
11 Q.     Okay.
12        But either way, she's saying IPNav, and
13 by that point she had already red lined that to
14 IPNav, LLC, was continuing to work on this, even
15 though the deal hadn't closed yet, right?
16        MR. COX:  Form.
17        THE WITNESS:  I can understand
18 that, she's trying to get the deal closed, yes.
19 BY MR. COHEN:
20 Q.     A hundred percent.
21        Okay.
22        And then you respond that the CBV team
23 still believes IPNav is the best team to go
24 forward, so let's target early January.  Do you

Page 145

1  see that?
2  A.     Right.
3  Q.     Am I correct in understanding that your
4  locution of the CBV team means your partners were
5  more gung ho on IPNav than you were at that point?
6  A.     I think you're using terms I wouldn't
7  agree with.
8  Q.     How so?
9  A.     I agree at that time that IPNav was the
10 best team to go forward.  We didn't have a -- an
11 alternative.  We found one a little bit later, but
12 we didn't have an alternative at that time.
13 Q.     Okay.  All right.
14        And then let's take a look -- and -- and
15 just to be clear, you understood that even if
16 ChanBond, LLC or some other special purpose entity
17 was going to be doing -- was going to be buying
18 the patents, they would be retaining IPNav, right?
19        MR. COX:  Objection to form and
20 leading.
21        THE WITNESS:  What do you mean
22 retaining IPNav?  IPNav would do some work, yeah,
23 but they getting the money, so...
24 BY MR. COHEN:

Page 146

1  Q.      You said that a couple times, you said
2  IPNav is getting money.  You know what, let's --
3  let's take a look at the actual PPA, which I
4  believe was already marked as Exhibit-5, was it,
5  or was that Exhibit-1?
6          MR. COX:  I believe it's Exhibit-1.
7  BY MR. COHEN:
8  Q.      Okay.  So hold on.  Let me just pull up
9  the PPA.  All right.  So let's just take a look at
10 the PPA and I have pulled up a version of this
11 document that I have on my computer, rather than
12 the previously-used version, but we don't need to
13 mark it as a -- a separate exhibit.  Exhibit-1 can
14 be the -- the version of it.
15         So taking a look at this, right, this is
16 the patent purchase agreement you eventually
17 executed on April 9, 2015, right?
18 A.      Correct.
19 Q.      And that is between CBV, Inc., as the
20 seller and ChanBond, LLC, as the purchaser, right?
21 A.      Right.
22 Q.      Okay.
23 A.      There's the two patents.
24 Q.      Oh, yeah.  It does -- it does say two.

Page 147

1  I don't know that I have ever seen an October 26th
2  one that was signed, but it does say two.  You are
3  correct and my memory was wrong, so way to go.
4          And then if we come here, net
5  recoveries.  This is the section that
6  determines -- that defines what CBV gets paid on
7  net recoveries, right?
8  A.      That's correct.
9  Q.      Okay.
10         And then consideration, it says you get
11 a possible future cash payment, right?  Do you see
12 that?  And that is No. 1, you get a million
13 dollars as a hundred percent of the net
14 recoveries, right?
15 A.      Right.
16 Q.      And then you get 50 percent of any net
17 recoveries that ChanBond actually collects, right?
18 A.      Right.
19 Q.      And the other 50 percent of that,
20 ChanBond gets to keep, right?
21 A.      Right.
22 Q.      Okay.
23         And you just said ChanBond gets to keep
24 that other 50 percent and that's right, because

Page 148

1  ChanBond is -- is the purchaser.
2          Where in this patent purchase agreement
3  does it say anything about IPNav, LLC getting
4  50 percent?
5  A.      ChanBond is owned by Deirdre and IPNav
6  is owned by Deirdre, so one in the same.  One is
7  my right pocket, one is my left pocket.  So put
8  money in one is the same as putting money in the
9  other.
10 Q.      Okay.
11         So -- but you know that they're two
12 separate entities, right?  Yes?
13 A.      Two separate entities owned by the same
14 person, yes.
15 Q.      Correct.
16         And you knew that at the time, right?
17 A.      Yeah.  I knew there was two separate
18 entities and two -- the same person, yeah.
19 Q.      Okay.
20 A.      So --
21 Q.      And you knew -- and you knew that based
22 on the common interest agreement, that IPNav, LLC
23 was going to be ChanBond, LLC's IP enforcement and
24 licensing agent, right?

Page 149

1  A.      So are you say that Deirdre contacted
2  herself or another -- yeah, it's one in the same
3  person, so...
4  Q.      Okay.
5  A.      You're asking me that -- do I agree
6  that's one in the same person signed, no.  It says
7  that's not possible.
8  Q.      Well, right now -- right now I'm just
9  asking, you knew that IPNav was going to be the
10 enforcement and monetization agent for ChanBond,
11 right?
12 A.      Yes.  That's what it says.  That's
13 correct.
14 Q.      Okay.
15         I apologize, this is a very long
16 agreement and there is a provision here that I
17 wanted to get to, so hold on.
18         Now, Section 8.3 says that you have the
19 right to consent to a change of control of the
20 seller, right?
21 A.      Yes.
22 Q.      Okay.
23         And you understand that there came a
24 time when Deirdre --

Page 150

1  A.     Because also we'd get written -- written
2  notes from the seller.
3  Q.     You -- you understand that there came a
4  time when Deirdre Leane sold 100 percent of her
5  membership interest in ChanBond to UnifiedOnline,
6  Inc., right?
7  A.     Yes.
8  Q.     Sorry.  Go ahead.  I apologize.  You
9  were continuing your answer.  You said yes?
10 A.     Yes.  We had a deal with UIP for common
11 interest, so she was planning to sell it to UIP
12 from day one.
13 Q.     And CBV consented to that change of
14 control, right?
15 A.     No.
16 Q.     No?
17 A.     We didn't know about it and the only way
18 we found out about it was on the Internet under
19 the stockholders -- what do you call it?  Where
20 they comment back and forth.  We didn't know about
21 it.  The lawyers didn't tell me.  Billy didn't
22 tell us.  Deirdre didn't tell us.  We had to find
23 out from the massage board that it was sold to
24 UIP.

Page 151

1  Q.     Okay.
2  A.     That's pretty unprofessional,
3  personally.
4  Q.     Well, did CBV ever approve that
5  transaction?
6  A.     No.  We never even saw it.
7  Q.     Okay.
8         So as far as -- as far as --
9  A.     I never saw a copy, never got a copy.
10 Q.     Okay.
11        So as far as CBV is concerned, does it
12 object to Deirdre having sold the membership
13 interest to Unified?
14 A.     At that time we probably would not have
15 objected because we knew Billy.
16 Q.     Okay.
17        And eventually you came to understand
18 that it had been sold to Unified, correct?
19 A.     Yes.  Eventually we did.
20 Q.     Okay.
21        And at that point when you did come to
22 understand, did you object?
23 A.     We objected that we didn't get a copy of
24 it because we didn't know what else was in there.

Page 152

1  And, unfortunately, we were told by KWM that we
2  were -- we don't get a copy of the agreement.  So
3  I asked my lawyer to talk to KWM and -- and was
4  told the same thing, so we didn't get a copy of
5  it.
6         We finally got a copy of the agreement,
7  partial copy of the agreement, but none of the
8  attachments off the Internet.
9  Q.     And after you got that, did you notify
10 Unified or ChanBond that you objected to the
11 change of control?
12 A.     We called Billy and tried to get the
13 understanding of what was going on.  We did not
14 object to Billy because we didn't know everything
15 that was going on.  What we had didn't seem to be
16 anything detrimental to us, but we didn't see all
17 the attachments that came later.
18 Q.     Okay.
19        And you have seen all the attachments
20 now, right?
21 A.     No, we have not seen all the
22 attachments.  That was KWM and -- those
23 attachments we never saw.
24 Q.     Those weren't attachments to the

Page 153

1  interest settlement?
2  A.     Those were -- those are exhibits, right?
3  Q.     I think there was a list of -- of
4  ChanBond's agreement, but I don't know that those
5  were specifically attached.
6         So I guess let me ask you this:  After
7  all that, once you -- once you understood that
8  Unified had bought all of the interest from
9  Billy -- hand on -- excuse me.  Strike that.
10        Once you understood that Unified had
11 bought all of the interest in ChanBond from
12 Deirdre, did you agree that that was fine or did
13 you object?
14 A.     The question was did we agree that's
15 fine?  No.  Did we object?  No.
16 Q.     Okay.
17        Did you have any intention to object?
18 A.     To the sale?
19 Q.     To the sale.
20 A.     I would have to leave that up to my
21 attorney.
22 Q.     All right.
23        I'm going to show you another document.
24 Hold on one second.

Page 154

1  MR. COHEN: It's a document Bates
2  numbered IPN0055256.
3  - - -
4  (IPN0055256 marked as Exhibit-25 for
5  identification.)
6  - - -
7  BY MR. COHEN:
8  Q.  And you see this is an e-mail from you
9  in April, at least this e-mail at the bottom of
10  the first page of it is an e-mail from you on
11  April 2, 2015, saying you are going to have your
12  attorney provide you with final comments on the
13  draft PPA and that you still have some
14  reservations.
15  Do you see that?
16  A.  Yeah.
17  Q.  And you were talking about maybe the
18  portfolio value should be based on buyers
19  obtaining market share, rather than litigation
20  value, right?  See that?
21  A.  Yeah.  Okay.  I'm sorry.  The print is
22  kind of small, so I just --
23  Q.  Yeah.  No.  It's -- unfortunately, when
24  this was --

Page 155

1  A.  Yeah, I understand.
2  Q.  The PDF -- the PDF for production, it
3  degraded for some reason.  I don't know why.  It's
4  been an issue.
5  And if you take a look, Deirdre responds
6  and she says she added her thoughts and expertise,
7  in caps next to each section.  Do you see that?
8  A.  Yeah.  Have a good Easter break, yeah.
9  Q.  And -- and she talks about -- she then
10  goes through your point by point.  And then she
11  says, Earl, all of the above is correct and you
12  make valid points.  What one needs to keep in mind
13  is that ChanBond patents are only one of thousands
14  of applicable technology to the above industry and
15  represents a tiny fraction of thousands of
16  patents.  No one portfolio is going to have a huge
17  uplift on market share.  Do you see that?
18  A.  Yup.
19  Q.  And you see, and if they wanted an
20  uplift in market, they should acquire Z-Band with
21  the license back to operate in the space.
22  Acquisition and merger is the way forward.  Z-Band
23  will be well placed.
24  Do you see that?

Page 156

1  A.  Yup.
2  Q.  And then she says, patents are a
3  different beast and while they carry value on a
4  company's books -- well, actually she says whilst
5  cause she's Irish -- they carry value on a
6  company's books, they are not necessarily utilized
7  for increasing market share.  Do you see that?
8  A.  Yes.
9  Q.  And then, you know, she goes on to talk
10  about net recoveries.
11  And I guess the question that I have for
12  you, Earl, is in your dealings with Deirdre, did
13  you get the sense that Deirdre understood the
14  technology?
15  A.  I think she understands it pretty good.
16  I don't think she understood it in detail.  She
17  ended up being -- working for Technicolor.  So she
18  had a, I would say, reasonable understanding about
19  the technology.
20  Q.  Okay.
21  And she understood the patents and --
22  and the claims, right?
23  A.  Yeah.  I think she would have to.
24  Q.  Yeah.

Page 157

1  And then let's take a look at -- I have
2  just got a few more for you.  So let's take a look
3  at an e-mail that was dated May 20th, and Bates
4  number -- of 2015 -- and Bates numbered
5  IPN0050874.
6  - - -
7  (IPN0050874 marked as Exhibit-26 for
8  identification.)
9  - - -
10  BY MR. COHEN:
11  Q.  And this is an e-mail from Deirdre to
12  you, Bob, and Dick.  Do you see that?
13  A.  Yeah.
14  Q.  Okay.
15  And you see here she talks about both
16  ChanBond and IPNav having your support in getting
17  access to Patrick Kean's colleague Jonathan.  Do
18  you see that?
19  A.  Yeah.  We got follow up from Patrick and
20  John, yes.
21  Q.  Okay.
22  And do you see here Matt Kitcharoen,
23  K-I-T-C-H-A-R-O-E-N, was CC'd?
24  A.  Yeah.  Whoever he is.

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 158

Q.     And Matt Kitcharoen is somebody who
worked at IP Navigation Group and did some work on
this as well for IPNav.
A.     Okay.
Q.     So did you -- did you notice that there
was -- that -- that Matt Kitcharoen was CC'd on
these e-mails?
A.     We didn't pay any attention to that.  He
could have been the consultant that we met first
meeting.  I was -- not a consultant, but analyst.
Q.     Okay.
       And just to show you an e-mail from a
couple of days later, that's IPN0032941.
                - - -
       (IPN0032941 marked as Exhibit-27 for
identification.)
                - - -
       MR. COHEN:  So this will be
Exhibit-26(sic) if I have my count correct.
BY MR. COHEN:
Q.     And you see this is an e-mail from Matt
Kitcharoen to Deirdre and you Earl, and your
coinventors at CBV, yes?
A.     Yes.

Page 159

Q.     And you see IPNav legal was CC'd there,
right?
A.     Yes.
Q.     So -- and -- and you can see there's
some pretty -- there's a -- Matt's doing some
analysis and write up here, right?
A.     Right.
Q.     And he's talking about action items for
ChanBond and IPNav.  Do you see that?
A.     I see that, yes.
Q.     Okay.
       So aside from Deirdre, you knew in May
of 2015 that there were some other people at IPNav
doing work on this, right?
       MR. COX:  Objection to form.
Akiva, I got I -- I got to stop you on that one.
This is --
       MR. COHEN:  No speaking objections,
Nathan.  We can't -- I know what the objection is.
I'm standing by the question.
       MR. COX:  No.  Akiva, just like you
politely corrected me earlier and I appreciated,
it came -- this is a mix up of IPNav versus IP
Navigation.  His e-mail is from IPNav --

Page 160

       MR. COHEN:  Wait.  Hold on --
       MR. COX:  Make the record clear.
       MR. COHEN:  Nathan, at this point
I'm just going to note you're making a speaking
objection.  You're obviously trying to feed the
witness some information.  It's information I
don't believe is accurate and that's fine, we can
have that argument separately.
       You've got your objection to form.
I am standing by the question.  The witness can
answer it.
BY MR. COHEN
Q.     So as you are aware --
       MR. COX:  -- your e-mail, not
IPNav, which you corrected me earlier and I didn't
object to because it's keeping the record clear.
That's different than a speaking objection.  You
may -- with that in the record, you can ask your
question.
BY MR. COHEN:
Q.     So you were aware that by this point in
2015, there were people at IPNav who were doing
work on this, correct?
       MR. COX:  Objection to form.

Page 161

BY MR. COHEN:
Q.     You can answer.
       MR. DEANGELO:  Where did this
e-mail come from?  As witness counsel.
       MR. COHEN:  This e-mail was
produced by the claimants.
       MR. DEANGELO:  Who was Matt
Kitcharoen working for at the time?
       MR. COHEN:  Was doing work on
IPNav, LLC matters and IP Navigation Group, LLC
matters.  And frankly, this is way beyond the
scope of a deposition.  Nathan, you can have your
arguments about that in the arbitration.  That's
frankly --
       MR. COX:  -- that's your
obligation.  He's on IP Navigation's payroll at
the time of this e-mail.  So if you want to say
that to the panel, fine with me, I just want it on
the record.
       MR. COHEN:  That's fine.
BY MR. COHEN:
Q.     So, Earl, you were aware, were you not,
that other people than Deirdre were doing work for
IPNav, LLC on this matter, correct?

Page 162

1    MR. COX:  Objection to form.
2    THE WITNESS:  That's the long way
3  to get around to this thing.  Was I aware there's
4  other people at IPNav?  No.
5  BY MR. COHEN:
6  Q.    Okay.
7    So you saw -- you knew --
8  A.    I saw a letter.  I don't know who he
9  worked for.  I don't know what his deal was.
10  Q.    You had no idea, as far as you knew he
11  was dropping in from the sky?
12    MR. COX:  Objection to form.
13    THE WITNESS:  I don't know where he
14  came from, no.
15  BY MR. COHEN:
16  Q.    Okay.
17    And you didn't have any inkling that he
18  was doing work on this for Deirdre and IPNav, LLC?
19    MR. COX:  Objection to form.
20    THE WITNESS:  This -- this
21  information could have come from anywhere.  I
22  don't know where, who this gentleman was.  And
23  quite frankly, I didn't check up on it, so I
24  should have checked who that person was, but I

Page 163

1  didn't.
2    MR. COHEN:  Okay.
3    VIDEOGRAPHER:  Mr. Cohen, just real
4  fast, that was Exhibit-27, not 26.
5    MR. COHEN:  Oh, 27.  Okay.  Now I
6  am off by one somewhere and now that -- we'll have
7  to figure that out.
8  BY MR. COHEN:
9  Q.    So let's take a look at the next e-mail
10  here.  And -- and I just want to -- before I get
11  there, sir, I just want to be clear, did you ever
12  get a clear understanding that Matt Kitcharoen was
13  doing work on your matter at Deirdre's direction
14  or under her supervision?
15    MR. COX:  Objection to form.
16    THE WITNESS:  No.  There was no
17  discussion about Matt.
18  BY MR. COHEN:
19  Q.    Okay.
20    Let's take a look at this document.
21    MR. COHEN:  This is a document
22  Bates numbered IPN0066639.
23    - - -
24    (IPN0066639 marked as Exhibit-28 for

Page 164

1  identification.)
2    - - -
3  BY MR. COHEN:
4  Q.    And if you take a look here, this is,
5  again, from Deirdre to you and Bob and Dick.  Do
6  you see that?
7  A.    Yeah.
8  Q.    And you see CC'd on it -- CC'd on it are
9  Matt Kitcharoen, IPNav legal, and Jennifer
10  Watkins?
11  A.    Okay.
12  Q.    And do you see how Deirdre starts her
13  e-mail by saying, hi, guys.  Sorry for the delay
14  in getting back to you.  And then she says, Matt
15  spent most of today going through all the files
16  and the thumb drives and then goes on to talk
17  about all that.
18    Do you see that?
19  A.    Yes.
20  Q.    Okay.
21    Does the fact that Deirdre is telling
22  you how Matt Kitcharoen spent his day doing work
23  on your files, give you any sort of indication
24  that Matt Kitcharoen was working for Deirdre?

Page 165

1    MR. COX:  Objection, form.
2    THE WITNESS:  Yeah.  He might work
3  for Deirdre.  I didn't give any thought about it.
4  There's going to be somebody doing something
5  behind the scene if you're going to file a
6  lawsuit.
7  BY MR. COHEN:
8  Q.    Yeah.  There were going to be -- there
9  were going to be --
10  A.    They were going to get paid for that, so
11  what the heck.
12  Q.    Yeah.  You knew IPNav, LLC was going to
13  be doing work and was going to be getting paid for
14  it, right?
15    MR. COX:  Objection to form.
16    THE WITNESS:  IPNav, LLC owns
17  ChanBond, so they were going to get the money from
18  ChanBond.
19  BY MR. COHEN:
20  Q.    You knew IPNav, LLC was going to be
21  getting paid for its work somehow, correct?
22    MR. COX:  Objection, form.
23    THE WITNESS:  Getting paid by
24  ChanBond.  Payment to be done.  One in the same,

Deposition of Earl Hennenhoefer      Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 166

1 she owns ChanBond. How she splits it up with her
2 company, I don't know.
3 BY MR. COHEN:
4 Q. Did you ever say to Deirdre, by the way,
5 we don't approve any payment to IPNav?
6      MR. COX: Objection to form.
7      THE WITNESS: No. We did not say
8 that because that doesn't make any sense.
9 BY MR. COHEN:
10 Q. Okay.
11      Did you ever say --
12 A. IPNav is going to have to do something.
13 Q. Okay.
14      Did you ever -- sorry. I keep taking
15 your pauses as you being finished and I apologize.
16      Did you ever say to Deirdre, look, I
17 know that ChanBond has hired IPNav, but we don't
18 approve them getting paid out of gross revenues?
19      MR. COX: Objection to form.
20      THE WITNESS: No, we did not say
21 that.
22 BY MR. COHEN:
23 Q. Okay.
24      Now, looking back at the PPA for a

Page 167

1 second. So looking at the PPA.
2      This says that not withstanding the
3 above, any costs or expense which is paid to an
4 affiliate of purchaser or to a stakeholder of
5 purchaser shall require the prior approval of
6 seller, such approval not to be unreasonably
7 withheld. Do you see that?
8 A. Yes, I do.
9 Q. And you would agree with me that what
10 that means is that if when a payment is being
11 made, it is being made to somebody who is an
12 affiliate or a purchaser of -- or sorry. Strike
13 that.
14      You would agree with me, wouldn't you,
15 that what that means is that if when a payment is
16 being made, it is being made to an affiliate of
17 the purchaser or to a stakeholder of the
18 purchaser, than CBV gets to approve it or if CBV
19 doesn't approve it, it can't come out of gross
20 recoveries in calculating your net recoveries,
21 right?
22      MR. COX: Objection to form.
23      THE WITNESS: Well, first of all, I
24 agree that it wouldn't require CBV's approval.

Page 168

1 Where the money comes out of, I guess that's
2 something for the lawyers to argue. I guess
3 you're saying that if she signed a deal outside of
4 the PPA, yeah, she can sign any deal outside of
5 the PPA.
6 BY MR. COHEN:
7 Q. And the time when it matters whether the
8 person is getting paid, is an affiliate of
9 purchaser or a stakeholder of purchaser, is at the
10 time of payment, correct? Any costs or expense
11 which is paid to an affiliate of purchaser or to a
12 stakeholder of purchaser?
13      MR. COX: Objection to form.
14 BY MR. COHEN:
15 Q. Yes, that was your understanding?
16      MR. COX: Objection to form.
17      THE WITNESS: I'm not sure where
18 you're getting that. Trying to say that Mark gets
19 paid directly from ChanBond or Mark is employed by
20 IPNav. All I know is that money going out of the
21 net recoveries to any affiliate, had to require
22 our acceptance, which we did not give.
23 BY MR. COHEN:
24 Q. Okay.

Page 169

1      And that's if that person is an
2 affiliate at the time of payment, right?
3      MR. COX: Objection to form.
4      THE WITNESS: I don't understand
5 the question.
6 BY MR. COHEN:
7 Q. Well, it says, any expense which is paid
8 to an affiliate of the purchaser, right? So you
9 asked at the time that the person is being paid,
10 are they an affiliate of the purchaser, right?
11      MR. COX: Objection, form.
12      THE WITNESS: I don't know -- I do
13 not know what Matt --
14 BY MR. COHEN:
15 Q. I'm not asking about Matt.
16 A. If you're talking about ChanBond versus
17 IPNav, IPNav is a affiliate.
18 Q. Today, right now IPNav is an affiliate
19 of ChanBond?
20      MR. COX: Objection to form.
21      THE WITNESS: Well, I would say it
22 the other way around, ChanBond is an affiliate of
23 IPNav, right.
24

Page 170

BY MR. COHEN
Q.     Let's -- let's assume with me for a
second that they're not affiliates at all today.
Would you have a right to approve that expense if
they're not affiliates today?
        MR. COX: Objection to form.
BY MR. COHEN:
Q.     As you understand the agreement?
        MR. COX: Objection to form.
        THE WITNESS: My understanding, it
has to be a reasonable legal expense? Was that a
legal expense?
BY MR. COHEN:
Q.     It would be the reasonable fee and
expense of any other advisory agent. So the
question is: Would it be a reasonable fee that
they were being paid, right, if they're not
affiliates today?
        MR. COX: Objection to form.
        THE WITNESS: I -- you know, I
guess you're arguing something that I am not in
position to agree with. But, yeah, if -- if
legally he had to go out and ask those guys
opinion and he's not an affiliate, you would pay

Page 171

him, but you just argued that he wasn't.
BY MR. COHEN:
Q.     Okay.
        Let's talk about -- so we're going to
take a look at -- okay. Yeah, here it is.
        So we're going to take a look at two
documents in succession. So let's take a look at
this first one, which is IPN0042107. Hold on one
second.
        Are these the right ones? Let me just
make sure.
        Nope. Sorry. Wrong one.
        All right. We are just going to go to
IPN0041625.
                - - -
        (IPN0041625 marked as Exhibit-29 for
identification.)
                - - -
BY MR. COHEN:
Q.     Okay.
        Let's just take a look. This is an
e-mail from Deirdre to you, among other people, on
June 18, 2015. Do you see that?
A.     Yeah.

Page 172

Q.     Okay.
        And in this e-mail, she is responding to
some notes from Mike Hund. Do you see that? I do
want to clarify below, some of Michael's notes.
Do you see that?
A.     Yeah.
Q.     And her first clarification is in this
first paragraph here. And she said, Mike Hund's
notes said that the purchaser at ChanBond is an
affiliate of IPNav. And she responds, the
purchaser is not an affiliate of IPNav, but a
standalone entity set up to monetize the assets.
Do you see that?
A.     I see that.
Q.     ChanBond could have been wrong at the
time. But did you ever reach out to her and say,
no, Deirdre, you are an affiliate of IPNav, which
means we have an approval right on any agreements
you have with IPNav?
A.     Did I respond to that, no?
Q.     The last part of that was any agreements
you have with IPNav.
        Okay.
        And, in fact, she had told you that

Page 173

ChanBond had hired IPNav, right?
A.     Where does it say that?
Q.     That would be right here, the language,
since ChanBond has hired IPNav; do you see that?
A.     That's on both sides of the fence.
Q.     Yup.
        So she very specifically told you that
ChanBond had hired IPNav, did she not?
A.     That's what that says, yes.
Q.     And we already know from our prior
discussions that you were aware that when somebody
hires IPNav, that means they're agreeing to pay
IPNav a percentage of the gross revenue, right?
        MR. COX: Objection to form.
BY MR. COHEN:
Q.     That's their -- that's -- that's what
you were told was the typical transaction
structure, right?
        MR. COX: Objection to form.
        THE WITNESS: That wasn't the
typical transaction thing explained to us early
on, nor was that explained to -- by any of the
other competitors, that there is a double dipping
going on. That's basically what you're saying.

Deposition of Earl Hennenhoefer      Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 174

1  Deirdre's on both sides of this.  She's selling
2  services to herself.  Now, that's questionable, to
3  say the least.
4  BY MR. COHEN:
5  Q.     And, in fact, she sold ChanBond to
6  Unified, correct?
7  A.     Sold ChanBond to what?
8  Q.     To Unified, correct?
9  A.     Yeah.  She sold ChanBond to UOIP, yeah.
10 Q.     Okay.  And if UOIP had entered into an
11 agreement the day after the purchase where it said
12 ChanBond is retaining IPNav for 22 percent of the
13 gross proceeds, you wouldn't have had any say in
14 that one way or another, would you?
15        MR. COX:  Objection to form.
16        THE WITNESS:  UIP did -- you're
17 saying if -- if UIP, ChanBond retained IPNav for
18 22 percent?
19 BY MR. COHEN:
20 Q.     Yeah.  You wouldn't have had any say in
21 that, right?
22 A.     To me that would be against the PPA.
23 That's my opinion.
24 Q.     UOIP -- UOIP and IPNav aren't

Page 175

1  affiliates, are they?
2  A.     UIP now owns the saying.  You can't --
3  you can't go back and change the contract, saying
4  I am going to give away money to somebody else and
5  charge them -- you know, heck, I mean, all my
6  mortgages would be in danger for that.  You know,
7  just turn around and sell the mortgage to somebody
8  else and now the interest rates double and triple.
9  You are changing the contract after the rules -- I
10 mean, rules after the contract is signed.
11 Q.     So as you understand it, UOIP couldn't
12 hire anybody?
13 A.     UOIP could hire anybody at their
14 expense, yes.
15 Q.     Okay.
16        And ChanBond could have hired -- isn't
17 it true that ChanBond could have hired -- and I'm
18 just going to stop sharing now.
19        Isn't it true, Mr. Hennenhoefer, that --
20 Mr. Hennenhoefer, that under your PPA, ChanBond
21 could have hired Dominion Harper Group for
22 22 percent of the gross proceeds and CBV wouldn't
23 have any say in that one way or the other?
24        MR. COX:  Objection to form.

Page 176

1        THE WITNESS:  You're saying --
2  yeah.  Under PPA ChanBond hired a non-related
3  person for 22 percent of the gross, I would have
4  trouble with that contract.  I am not sure what
5  the legal standing would be, but I couldn't do
6  that when I was director of purchasing, change the
7  contract and adversely affect persons that was
8  signed on the first contract.
9  BY MR. COHEN:
10 Q.     Well, that's not a -- that's not a
11 change of the contract.  There's nothing in the
12 PPA that says ChanBond is not going to retain a
13 monetization agent, is there?
14        MR. COX:  Objection to form.
15        THE WITNESS:  No.  I agree with
16 you.
17 BY MR. COHEN:
18 Q.     And, in fact, you specifically deleted
19 the requirement that any monetization agent they
20 hired, be one that you mutually agreed that they
21 could hire, correct?
22        MR. COX:  Objection to form.
23        THE WITNESS:  Yeah, because I had
24 concern about the IP clouding, yes.

Page 177

1  BY MR. COHEN:
2  Q.     Right.
3        And so if they had chosen to go out and
4  hire an unrelated entity as a monetization agent
5  for 22 percent of the gross proceeds, the only
6  question that you would have would be whether that
7  was a reasonable fee for a monetization agent,
8  right?
9  A.     But that's not what they did.
10 Q.     Well -- so now I'm asking a
11 different --
12 A.     See --
13 Q.     You can answer the question I'm asking
14 you.  I understand what you want to say.  I just
15 need you to answer the question that I'm asking.
16        Which is:  If they had hired somebody
17 unrelated for 22 percent of the gross proceeds,
18 your only issue would be whether was that
19 reasonable or not, right?
20 A.     Yeah, which -- which it obviously
21 wouldn't be, but...
22        MR. COHEN:  Okay.  Move to strike
23 on the end, but that's fine.
24

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 178

1  BY MR. COHEN:
2  Q.      And if Unified -- well, let's -- let's
3  go back to the PPA for a second.
4        So I would like to take a look at the
5  definition of affiliates in the PPA.  So affiliate
6  is any entity that controls, is controlled by, or
7  is under common control with such person.
8        Do you see that?
9  A.      Yes.
10 Q.      And you agree, don't you, that Deirdre
11 Leane does not control UnifiedOnline, right?
12 A.      Yeah, she does not control Unified.
13 Q.      And you agree that Deirdre Leane does
14 not control ChanBond, LLC after she sold it,
15 right?
16 A.      Well, her lawsuit said something
17 different, but I agree that she did not control
18 ChanBond after she sold it.
19 Q.      Okay.
20       And you agree that Deirdre Leane is not
21 controlled by either Unified or ChanBond, correct?
22 A.      At this time, no, she's not controlled
23 by Unified or ChanBond.
24 Q.      And you agree that at this time, she is

Page 179

1  not under common control with Unified or ChanBond,
2  is she?
3  A.      Is that a true statement?
4  Q.      Well, are you aware of whether whoever
5  owns -- well, let's look at the definition of the
6  term control here.
7        It means having the power to direct or
8  cause the direction of the management and policies
9  of an entity.
10       So do you agree that nobody who can
11 direct or cause the direction of management and
12 policies of Unified or ChanBond can currently
13 direct or cause the direction of the management or
14 policies of Deirdre Leane?
15 A.      Yes, I agree nobody can --
16 Q.      Okay.
17 A.      -- make changes that Deirdre -- yes.
18 Q.      Okay.
19       And since IPNav, LLC is 100 percent
20 owned and controlled by Deirdre, the same thing
21 applies to IPNav, LLC, right?
22 A.      That question does not make sense.
23 Q.      Well, Deirdre owns a hundred percent of
24 IPNav, LLC, right?

Page 180

1  A.      Yes.
2  Q.      So the only person who controls IPNav,
3  LLC, meaning has the ability to direct or cause
4  direction of IPNav, LLC's management and policies,
5  is Deirdre Leane, right?
6  A.      That is correct.
7  Q.      Right.
8        And since we already agreed that Deirdre
9  Leane is not -- doesn't control Unified or
10 ChanBond, that means IPNav, LLC also doesn't
11 control Unified or ChanBond, right?
12 A.      The -- does not control Unified or
13 ChanBond, that's right.
14 Q.      Okay.
15       And we agree that Deirdre Leane is not
16 controlled by Unified or ChanBond and that means
17 that IPNav, LLC is not controlled by Unified or
18 ChanBond, right?
19 A.      That's right.
20 Q.      And since we agree that Deirdre Leane is
21 not under common control with Unified or ChanBond,
22 that means IPNav, LLC is not under common control
23 of Unified or ChanBond, right?
24 A.      Is that a correct statement?  Yeah.

Page 181

1  Q.      Just talking about today.
2  A.      I'm trying -- I am not knowledgeable of
3  common -- common interest things.  Yes.
4  Q.      Okay.
5        So sitting here today as things exist
6  after Deirdre sold, and just to be clear, right,
7  like, when Deirdre was the sole owner of both
8  ChanBond, LLC and IPNav, LLC, they weren't
9  affiliates under this definition because IPNav,
10 LLC and ChanBond, LLC were under common control,
11 right, because Deirdre Leane controlled both
12 entities, right?
13       MR. COX:  Objection; form.
14       THE WITNESS:  That's my
15 understanding, yes.
16 BY MR. COHEN:
17 Q.      So at the time they were affiliates, but
18 now that she has sold it and the ChanBond, LLC is
19 controlled by Unified, LLC, there's no control,
20 there's no being controlled by, and there's no
21 under common control.  So ChanBond, LLC and IPNav,
22 LLC are no longer affiliates, right?
23       MR. COX:  Objection to form.
24       THE WITNESS:  That's correct.

Page 182

BY MR. COHEN:

Q.     Okay.

So now talking about after Unified bought ChanBond, LLC, if Unified had said or if ChanBond had said then, I'm going to retain IPNav, LLC to handle the ChanBond for 22 percent of the gross revenue or the gross proceeds, then that would have been no different than what we talked about earlier, retaining a monetization agent that is not an affiliate, right?

MR. COX:  Objection to form.

THE WITNESS:  Well, you would think the 22 percent gross revenue, to do that is under reasonable fees, I would object.

BY MR. COHEN:

Q.     Right.

So that -- but that would be where your objection would be, whether or not that's reasonable, right?

A.     Yeah.  Definitely not a reasonable fee, yes.

Q.     Okay.

And on that subject, Earl, how many patent monetization contracts have you signed?

Page 183

A.     How many patent monetization contracts have I signed?  Well, it looks like it was maybe three.  I definitely know I signed two, one with Billy and one Deirdre.

Q.     Okay.

So you're talking about the PPAs.

Other than that, do you have any experience with how much a patent monetization agent like IPNav, IP Navigation Group, Dominion Harbor Group, or anybody else in that space generally charges as its fee?

MR. COX:  Objection to form.

THE WITNESS:  The offers we had are the -- the discussions we had with other firms, that was included in the cost of doing business along with everything else.  So we got a gross fee of 30 percent or more.  So how much things are going to cost, I don't know.  Usually the lawyers will take care of that.

BY MR. COHEN:

Q.     Okay.

And so I guess what I'm asking is:  Do you think as a practical matter, there's any difference between Unified and ChanBond retaining

Page 184

IPNav the day after Unified bought ChanBond or Unified deciding after it bought ChanBond, that it was going to keep IPNav retained?

MR. COX:  Objection to form.

THE WITNESS:  Well, you're talking about what -- you know, what happened or what didn't happen.  The question is, do I think IPNav or Unified retained -- retaining IPNav to monetization, that would fall outside of reasonable fees.  But the real question is, why would they need to do that?  They already had KWM or Mishcon do -- do the monetization.  Seems to be redundant, irrespective of if they're going to do it for free or for money.

The patents are being monetized by Bob Whitman and crew.  Why would you need anybody else?

BY MR. COHEN:

Q.     So are you aware that Unified signed an advisory services agreement with Billy Carter, giving him 20 percent of Unified proceeds of the patent?

MR. COX:  Objection to form.

THE WITNESS:  According to this

Page 185

declaration, he signed an agreement with Unified, which came out of his money that he received not out of our money.

BY MR. COHEN:

Q.     And do you care about that at all?

A.     That was what I read in the complaint.

Q.     Okay.

Do you care about that at all?

A.     Do I care how much -- how much -- what Billy spent his money on or gave his money to?  That's not my business.  As -- as a CBV guy, I care as a shareholder, but not as representative of CBV.

Q.     And as a shareholder in Unified, do you have any concern about Billy carving off an extra 20 percent for himself?

MR. COX:  Objection to form.

THE WITNESS:  I'm sure the shareholder is going to complain about giving money to Billy Carter, which turns out to be a tax dodge, that's what it really turns out to be.

They stand to get a -- a dividend and if he gives away money, they're not going to give a dividend.

Page 186

BY MR. COHEN:
Q.    Are you aware --
A.    -- to Billy.
Q.    Are you aware that Billy Carter also
signed a deal with -- with Unified to pay himself
$5,000 a month in perpetuity for handling the
ChanBond patent monetization?
        MR. COX:  Objection to form.
        THE WITNESS:  Not -- not until you
mentioned it.
BY MR. COHEN:
Q.    Okay.  And I'll ask you two questions.
No. 1, as CBV, do you care one way or another?
        MR. DEANGELO:  About what?
BY MR. COHEN:
Q.    About that money coming out of Unified?
A.    Yeah.
Q.    As long as it doesn't touch --
A.    Money is coming out of Unified or is it
coming out of ChanBond.
Q.    As long as it's not coming out of your
share, you don't care, right, as CBV?
A.    As CBV, I don't care where the money
goes.

Page 187

Q.    Okay.
A.    As long as it doesn't affect CBV.
Q.    Right.
        And as a shareholder in Unified, do you
care?
A.    Yeah.
Q.    Do you think it's reasonable?  Do you
think --
A.    I think, you know, unfair deal there,
but that's -- that's not what I'm representing
here.
        MR. COHEN:  Okay.  So now I am just
going to mark another exhibit.
        MR. DEANGELO:  Is this a good time
for a break?
        MR. COX:  Yeah.  Let's -- let's
take, let's take a break here.  I probably have
about 15 more minutes.  So let's take a break here
and then I'll just get things lined up to wrap up.
Okay?
        VIDEOGRAPHER:  Off the record at
2:55 p.m.
        - - -
        (Whereupon, brief recess was held off

Page 188

the record.)
        - - -
        VIDEOGRAPHER:  Going back on the
record.  The time is 3:05 p.m.
BY MR. COHEN:
Q.    All right.
        So, Earl, I'm going to share with you
another document and this will end up being
Exhibit-30.
        MR. COHEN:  This will be
Exhibit-30.
        - - -
        (IPN0049400 marked as Exhibit-30 for
identification.)
        - - -
BY MR. COHEN:
Q.    And this is an e-mail Bates numbered
IPN0049400.  And the chain goes on for two pages.
It's an E-mail from Deirdre to you on December 10,
2015.  Do you see it?
A.    Yes.
Q.    Do you recall receiving this e-mail?
A.    I'm trying to read this thing, but I
don't -- I don't recall right now.

Page 189

Q.    Okay.
        And do you see she basically says, look,
guys, CBV sold the patents to ChanBond, so
ChanBond is the client, not you guys, right?
A.    Right.
Q.    And then she said, ChanBond has a
contract with IPNav, right?
A.    Okay.
Q.    And then ChanBond has attorney-client
privilege with its litigation counsel at Mishcon.
And she goes on to say, look, we don't want you
guys to be too informed on litigation strategy
because you can get deposed on that and we don't
want you to have anything to tell them, right?
A.    Yeah.  I see what it says, yes.  And
that's probably coming from us because we wanted
to know what was going on.
Q.    Yeah.  I saw a whole bunch of e-mails
from you guys and there were voice mails asking
what was going on.  I think she -- this was her
response of, I know -- I know why you're asking,
but we need you to not know, essentially.  Does
that make sense?
A.    Yeah.

Page 190

Q.     Were you aware by this time that she had
sold ChanBond to Unified?
A.     I don't know if we knew by then,
December 2015. I don't know when I actually found
out.
Q.     Okay.
       Do you remember finding out about it?
A.     We found out -- I think we found out by
the message board of -- pertaining to UOIP.
Q.     Okay.
A.     I'm not -- I'm really not positive how
we found out, but then we called Billy up to
confirm it.
Q.     Okay.
       And was there any discussion at that
time, other than, hey, this happened?
A.     No. It was just -- you know, we just
called Billy to confirm that he was now the owner
of it.
Q.     Okay.
A.     It was a friendly phone call.
Q.     Okay.
       And I'm just trying to see if I can
bookmark somehow in your mind around when that

Page 191

was.
       Do you recall whether that was before or
after you were deposed in the ChanBond
litigations?
A.     It was definitely before we found out.
Before we deposed -- we were deposed, I think, in
2018, right?
Q.     Yeah. So you -- you found out before
that, right?
A.     Oh, yeah. Most definitely.
Q.     Okay.
       And, again, once you found out, you
didn't say, hey, we never consented to this, we
are not okay with it, right?
A.     We did not say that. We just asked for
a copy and never got it.
Q.     I'm just going to take a look at one
more e-mail, so hold on one second.
       Okay.
                    - - -
       (E-mail marked as Exhibit-31 for
identification.)
                    - - -
BY MR. COHEN:

Page 192

Q.     And this is an e-mail from Dick to
Deirdre and CC'ing you and Bob in response to an
e-mail from Deirdre in January of 2016. Do you
see it?
A.     Yeah.
Q.     And do you see in mid January, Deirdre
reached out to you to ask about proposed
amendments to a patent application that was due on
January 17th; do you see it?
A.     Yeah.
Q.     And do you recall Deirdre reaching out
to you at various times on stuff that was relating
to the litigation or to the patents?
A.     I don't recall this memo. And, you
know, I don't recall having phone calls with her.
I might have. I was kind of surprised she would
get herself involved in this after she sold it.
Q.     Okay.
       Did you say you were at the time
surprised or you are now surprised? I just wasn't
clear on what you said.
A.     I don't -- quite frankly, I don't recall
the memo, so, yeah, I'm copied on it, but I don't
recall.

Page 193

Q.     Okay.
       And you see Dick, one of things he says
is he thanks Deirdre for her continuing leadership
and support; do you see that?
A.     Yeah. That sounds like Dick, yes.
Q.     Yup.
       And did you agree with those sentiments
at the time?
A.     I wasn't content, a very good fan of
Deirdre. So Dick -- Dick had her more friendly
liked than I did.
Q.     Why is that?
A.     I think Dick thought more highly of
Deirdre than I did.
Q.     Okay.
       Any particular reason you didn't think
highly of her?
A.     Yes. I had one particular reason that
bothered me considerably.
Q.     What was that?
A.     Going back to July of 2015 or so, they
were pushing this still, you know, what's
happening, what's going on. She finally said,
hey, I'm lining this thing up with Bentham and

Page 194

1  you -- you guys have to go see Bentham, go up to
2  New York City.  And I didn't have any problem with
3  that, we were going to meet Bob and Mark in
4  Bentham.
5       So we went up there.  It was a very good
6  meeting and everything was honky-dory and so forth
7  like that.  And it was -- obviously Bentham had a
8  very positive attitude about the patents, more so
9  that I think even Deirdre thought.
10      So when we got back to Harrisburg a week
11 or so later, I don't know the timing she called
12 up -- Bentham called us and he had another Bentham
13 person on the line and Deirdre on the line with
14 us, and myself and Bob.  And they asked a lot of
15 questions.  Most of the questions we answered
16 before.  And they finally got to the punchline and
17 it's like, Earl, what do you think this thing is
18 worth?  Well, I told him -- ████████████
19 ████████████████████████████████
20 ███████████████████████████████████
21 ████████████
22      Well, Deirdre interrupted and said, hey,
23 guys, you just don't understand this stuff.  You
24 know, this is not the way it works. ████████████

Page 195

1  ████████████████████
2  ████ in which Bentham kind of replied, well,
3  we're Bentham and we support this, this is what we
4  do for business.  Well, that kind of ended it.
5       But shortly after that we got another
6  phone call from Bentham without Deirdre.  And we
7  were talking about this and, you know, the
8  question really came up, what -- you know, what's
9  going on and do you support this.  The answer was,
10 yeah, we're a hundred percent behind this thing,
11 but it's going to take a lot long for you guys to
12 get the money than you think, but we're going to
13 make you guys very rich men, so that ended it.
14      It wasn't days that went by and then we
15 got this amendment that was thrown at us, saying
16 that we got to change the PPA so we can't get it
17 back.  And the first called out was the IP
18 clouding thing, we were worried about standing and
19 we kind of shot that down.  So the next thing we
20 came back with me personally was, well, you got to
21 sign this amendment.  If you don't sign it,
22 Bentham is not going to give us the money.  Well,
23 we already had that phone call with Bentham and we
24 knew that Bentham was very positive.  So I said to

Page 196

1  her, I'm not going to sign it.  She said, well, if
2  you don't sign this thing, I'm going to take it to
3  Europe because I got a European job opportunity
4  there and you won't be receiving a dime.
5       So with that, my relationship with
6  Deirdre was not very good.
7  Q.      Okay.  I appreciate hearing that.
8            MR. COHEN:  And on that note, I
9  don't have anything further for you.
10           THE WITNESS:  Okay.
11           MR. COX:  Yeah.  I have some
12 follow-up questions here.
13                   - - -
14                Examination
15                   - - -
16 BY MR. COX:
17 Q.      So, Earl, Mr. Cohen took you through
18 some e-mails from, I think, mid 2014 and before
19 about some potential fees or payments that IP
20 Navigation Group or IPNav might get.  Do you
21 recall that?
22 A.      Yes.  I recall the -- the discussions,
23 yes.
24 Q.      And I believe, correct me if I'm wrong,

Page 197

1  you characterized those as just part of the
2  negotiations, right?
3            MR. COHEN:  Objection to form.
4            THE WITNESS:  That is correct.
5  BY MR. COX:
6  Q.      And -- and by that I took it as, there
7  was never an agreement that IPNav, LLC, or IP
8  Navigation, LLC would receive a fee coming from a
9  percentage of the gross proceeds; is that correct?
10           MR. COHEN:  Objection to form.
11 BY MR. COX:
12 Q.      Did I summarize your testimony
13 correctly?
14 A.      That is correct.
15 Q.      I'm going to read from the record and --
16 and take it with a grain of salt.  It's from the
17 realtime, so it's not our affirmed record yet, but
18 I'm going to read a quick portion for you real
19 quick.
20           MR. COHEN:  Nathan, where are you
21 headed to?
22           MR. COX:  We'll give that to you
23 one second.  All right.  So if you are reading
24 from -- it says, I believe it's Page 128/6, and

Page 198

1  I'm just going to quote from the realtime here.
2  BY MR. COX
3  Q.    Mr. Cohen asked you, quote, did you ever
4  say, oh, Deirdre, I know ChanBond hired IPNav,
5  but -- but we don't approve them getting paid out
6  of gross revenues.  And you responded, no, we did
7  not say that.
8       Do you recall that -- that testimony?
9  A.    Yes.  I -- I agree to that, we did not
10 grant of gross revenues at any -- any -- any point
11 of gross revenues.
12 Q.    And -- and he then asked you why you
13 would not have had told IP -- or told Deirdre that
14 you didn't approve of IPNav getting paid out of
15 the gross revenues.
16      So my question to you is -- is:  Why
17 not?
18 A.    Well, let's see.  I'm not sure I
19 understand the question.  The question is, we did
20 not approve her getting paid out of the gross
21 revenues, any percentage at any time.
22 Q.    So let -- let's do it this way.  So at
23 that time, had you been told by Deirdre or anyone
24 that IP Navigation Group or IPNav was to be paid a

Page 199

1  percentage of gross proceeds?
2  A.    The question hasn't come up.  Okay.
3       MR. COHEN:  Sorry.  And just for
4  the record, the question hasn't come up, was a
5  reference to the scroll, that wasn't part of his
6  answer.
7       THE WITNESS:  Yeah.  You're right.
8  She was trying to scroll this thing up for me.
9       So, yeah, we were not told by
10 Deirdre or IPNav that they're going to get a paid
11 a percentage of gross proceeds.
12 BY MR. COX:
13 Q.    So then going back to Mr. Akiva's
14 question from Page 128, Line 6, would it have made
15 sense for you to tell Deirdre you didn't consent
16 to payment of a percentage of the gross proceeds
17 that you didn't know about?
18      MR. COHEN:  Objection to form.
19      THE WITNESS:  We did not consent to
20 any payment of gross proceeds.  Did that answer
21 the question?
22 BY MR. COX:
23 Q.    Kind of.
24      So the -- the point is, if it wasn't

Page 200

1  brought up to you, according to your testimony,
2  would it have made sense to have, out of blue,
3  told Deirdre that you didn't consent to a payment
4  of gross proceeds?
5       MR. COHEN:  Objection to form.
6       THE WITNESS:  Yeah.  I agree that
7  was never brought up by anybody, whether it's
8  Deirdre, Erich, or Billy Carter, about paying us
9  any -- paying out anything in gross proceeds.  So
10 it doesn't make sense that we didn't -- you know,
11 that we would have consented a payment because it
12 never came up.
13      MR. COX:  Ken, can you bring up
14 Exhibit-15 for me, please.
15      And let's see if I can take control
16 here.
17 BY MR. COX:
18 Q.    All right.
19      So if you recall, this is an e-mail that
20 was reviewed earlier with Mr. Cohen where you had
21 some questions to Billy and then Billy in this
22 green highlighted text, inserted some of his
23 answers that -- that were questions between you
24 and -- and Bob and -- and Dick, I believe; is that

Page 201

1  correct?
2  A.    I don't recall the exact memo, but, you
3  know, understand there was one, you know.  And it
4  makes sense after rereading it, yeah.  I think
5  that was a follow-up to his visit to us because,
6  you know, got all the other stuff in that memo.
7  Q.    And the -- the second bullet point where
8  it states, quote, VDV contracts with IPNav and
9  then in brackets, for a percentage of revenue and
10 costs, end brackets.
11      Do you see that?
12 A.    Yeah.  I see that question, yes.
13 Q.    And --
14 A.    That's -- that's the one that says we
15 want to make sure we get Erich and my share?
16 Q.    Correct.
17      And that -- that doesn't say anywhere
18 that IPNav receives a percentage of the gross
19 proceeds, does it?
20 A.    No, it does not.
21      MR. COHEN:  Objection to form.
22 BY MR. COX:
23 Q.    Saying that someone receives a
24 percentage of the revenue and costs, would imply

Page 202

1  the net proceeds, correct?
2           MR. COHEN:  Objection to form.
3  BY MR. COX:
4  Q.      I'll ask it this way:  When you see that
5  someone is going to be paid based on a percentage
6  of the revenue and costs, would that mean a
7  percentage of the gross or the net, to you?
8           MR. COHEN:  Objection to form.
9           THE WITNESS:  Well, I would assume
10 to be part of the net proceeds because, you know,
11 Erich was going to get 50 percent of the net
12 proceeds, we were talking about how he got paid
13 originally.  So, you know, I was thinking that he
14 would get part of the net proceeds of, you know,
15 and one share.  You know, I'm just trying to
16 find -- figure this thing out for them.  It was --
17 it was confusing as heck at that time.
18 BY MR. COX:
19 Q.      And -- and I think on the point
20 you're -- you're referring to right now, I believe
21 you mentioned that there were a number of
22 negotiations going on at this time, including
23 other entities besides IPVDV and CVB.  Can you
24 explain what you meant by that?

Page 203

1  A.      Well, there was -- there was a question
2  about -- you know, pertaining to Billy and what
3  Billy was doing.  Billy was offering deals and we
4  were kind of changing, very fluent, trying to put
5  something together that included Billy and -- and
6  maybe his company and including us and management
7  and so forth.  Outside of that, we were also
8  talking to Pat Kane about them being a
9  modernization for patents.  So we had several
10 things going on and it kind of gave us a standard
11 of what we should be asking questions about
12 because I'm trying to get some answers to
13 questions to compare the two alternatives.
14          MR. COX:  Ken, can you please bring
15 up -- actually, no.  In just a little bit.
16 BY MR. COX:
17 Q.      So there was some discussion about
18 whether or not under the PPA, ChanBond and IPNav
19 would be affiliates at the time of payment.  Do
20 you recall that testimony?
21 A.      Okay.  I'm not sure -- are you talking
22 about the -- at this particular time, you talking
23 about VDV.  IPNav didn't exist at that time.
24 Q.      So sorry.  Not at the time of this

Page 204

1  e-mail, just in general in the PPA and --
2           MR. COX:  Ken, if you can bring up
3  Exhibit-1, it might be helpful to just look at the
4  agreement.
5  BY MR. COX:
6  Q.      And so during your discussions with --
7  with Mr. Cohen, he -- he pointed out that at the
8  time --
9  A.      Which -- which -- which agreement is
10 this?
11 Q.      The PPA.  Sorry.
12 A.      What date?
13 Q.      The final PPA from --
14 A.      Oh, okay.  '21.  Okay.
15 Q.      So Mr. Cohen pointed out that at the
16 time of entering the ASA between Deirdre, through
17 ChanBond and Deirdre through IPNav, they wouldn't
18 be affiliates under the PPA; is that correct?
19 A.      Yes, that is correct.
20 Q.      And then I believe you testified that
21 under your current understanding of how the
22 parties are situated today, ChanBond and IPNav,
23 LLC are no longer affiliates; is that correct?
24 A.      That's -- that's my understanding, yes,

Page 205

1  that's correct.
2  Q.      I'm going to take you through a quick
3  hypothetical.
4           So if the settlement was in this case,
5  on May 25, 2021, which I believe that's when it
6  actually was, so I am going to take you through
7  this hypothetical.
8           If Billy, through ChanBond, had executed
9  another ASA for 22 percent of the gross proceeds
10 to a company that he owned on May 23rd, and then
11 on May 24th, he sold ChanBond to his brother.
12          Are you with me?
13 A.      Okay.  I didn't know he had a brother,
14 but go on.
15 Q.      I actually don't know if he does, but
16 that will take over if he does.
17          So then by the time of the settlement in
18 the ChanBond litigation, technically under the
19 claimant's interpretation of net recoveries, they
20 wouldn't be affiliates, correct?
21          MR. COHEN:  Objection to form.
22          THE WITNESS:  So he's saying by
23 selling it to his brother, he's now an affiliate;
24 is that correct?

Deposition of Earl Hennenhoefer                    Deirdre Leane & IPNAV, LLC v. Unifiedonline, Inc. & ChanBond, LLC

Page 206

BY MR. COX:
Q.     Correct.
       So under that hypothetical, the -- after
the day before this settlement, his brother would
be the owner of ChanBond and Billy would have an
ASA for 22 percent.
       Are you with me under this hypothetical?
A.     Yeah.  I think what you're saying, he
sold it to a non-related party, other than being
in his family, before the settlement to get
22 percent.
Q.     And how would you feel about a
transaction like that to get around this consent
requirement of the net recoveries?
A.     Well, the problem I have --
       MR. COHEN:  Objection to form.
       THE WITNESS:  The problem I have,
and I go back to discussions we had with the --
the attorneys, both attorneys, because we asked
him pointblank, even with the ASA as written, does
any of this come out of our pocket and both of
them said, no, it doesn't, because -- now,
irrespective if it was backdated and all that
stuff, that is something between Billy and

Page 207

Deirdre.
       So we walked away thinking there
was -- there was nothing to this, but, you know,
now there seems to be the fact that everybody want
CBV to pay part of it, which I have a problem
with.
BY MR. COX:
Q.     So would it be fair to characterize that
hypothetical as a -- a disingenuous loophole to
what that parties had agreed to?
       MR. COHEN:  Objection to the form.
       THE WITNESS:  Yeah.  I would -- I
would characterize it as, you know, disingenuous
would probably be a polite word for it.
BY MR. COX:
Q.     And let's -- let's assume that the
transaction of Deirdre creating an ASA with
another entity that she owns, but then sold --
sold ChanBond, that they're -- they're no longer
affiliated at the time of the payment.  So let's
just assume -- assume this last provision isn't in
play for this next question.  Are you with me?
       So let's just assume that this -- this
last provision of consent requirement is not --

Page 208

not in play for this next line of questioning; are
you with me?
A.     Okay.
Q.     So is it your testimony that Deirdre was
the new owner through ChanBond sometime in the
fall of 2014; is that correct?
       MR. COHEN:  Objection to form.
       THE WITNESS:  As far as I'm
concerned, she did not own it in 2014.
BY MR. COX:
Q.     Correct.  And -- and sorry, it was my
fault on the question.  We negotiated a deal,
switched to being an entity that Deirdre owned
sometime in the fall of 2014?
       MR. COHEN:  Objection to form.
       THE WITNESS:  Deirdre was going to
take over the deal.  We never had a deal with
Deirdre though.
BY MR. COX:
Q.     Correct.
       And that was in -- in the fall of 2014?
A.     Yeah.
Q.     And the ISA where she sold the
membership interest in ChanBond to Unified was in

Page 209

October of 2015?
A.     Yeah.  That was in 2015, yes.
Q.     Would 22 percent --
A.     The -- the other question is 2014, yeah.
Q.     Yeah.
       So in that -- that year or so time
period that she was supposed to be negotiating for
and was the owner or manager of ChanBond, is
22 percent a reasonable fee for her work on that?
       MR. COHEN:  Objection to the form.
       THE WITNESS:  The reasonable fee is
the $5 million she got.  That's -- that's a pretty
good deal for just a couple months worth of
rearrange every -- all the contacts and turn it
over to Billy.  So that's pretty good money.  I'll
sign up for that.
BY MR. COX:
Q.     And -- and just so I'm very clear, so
then your testimony is that 22 percent of the
gross is not a reasonable fee?
A.     It is not a reasonable fee.
       MR. COHEN:  Objection to the form.
       THE WITNESS:  Reasonable fee,
period.

Page 210

1  MR. COX:  Ken, could you please
2 bring up Exhibit-25 for me, please.
3 BY MR. COX:
4 Q.     This is another e-mail that you went
5 over with Mr. Cohen.  And if we scroll down just a
6 little bit.
7     So as I understand it, these portions
8 that are in all caps is Deirdre's response to you;
9 is that correct?
10 A.    Yeah.  That's my understanding, yes.
11 Q.    And if you'll look at the bottom here,
12 there's a paragraph that starts on a different
13 subject, colon.
14 A.    Cost of capital, yeah.
15 Q.    Yeah.
16    And if you read this last sentence, she
17 states, quote, basically it means I, as in
18 Deirdre, will be trying my hardest to ensure we
19 max recoveries.  Are you with me?
20 A.    Okay.
21 Q.    And this paragraph, it's -- it's
22 responding to your question about determining,
23 quote, unquote, net revenue; is that correct?
24 A.    Yes.

Page 211

1 Q.     Would you characterize a 22 percent of
2 the gross agreement giving it to herself through a
3 different entity, count as ensuring max
4 recoveries?
5    MR. COHEN:  Objection to the form.
6    THE WITNESS:  I would think paying
7 herself 22 percent of the gross was definitely not
8 maximizing our recoveries.  And I don't think she
9 even asked me the question about the cost of
10 capital.
11    MR. COX:  Ken, can you please pull
12 up Exhibit-7, please.
13 BY MR. COX:
14 Q.     So this is an e-mail from Deirdre to you
15 in November 2013, answering some early questions
16 and negotiation between the parties; is that
17 correct?
18 A.    I think this is probably the first
19 response we got from IP Navigation.  She's trying
20 to explain how this works.
21 Q.     And under Sub-point 1, Deirdre writes,
22 quote, our fee structure is really dependent on
23 the portfolio, but we take a percent of the gross
24 proceeds from the campaign.

Page 212

1    Do you see that?
2 A.    Yes.
3 Q.     Is there any e-mail in this exhibit
4 where you respond saying, yes, IPNav, LLC can have
5 a percent of the gross proceeds?
6 A.    Well, that turns out to be the
7 alternative.  You know, we actually thought at
8 that time that we would keep the patents and there
9 would be some type of fee for doing this.  You
10 know, so we get like 30 percent net, 40 percent
11 net.  But then it turned out that they -- Erich
12 did not want us to not hold onto the patents.  He
13 wanted to keep the patents sold or get the patents
14 sold.  That fee structure went out the door.
15    The concept of turning over our patents
16 was a very hard sell to my partners.  They would
17 have rather had a percentage of the gross -- I'm
18 sorry -- a fee structure like what is referred to
19 by Deirdre for just doing the work and we hold
20 onto the patents.  That was what they would have
21 preferred.  It just turned out that that was not a
22 viable option for -- for Erich.
23    MR. COX:  Ken, can you bring back
24 up Exhibit-1.  Thank you.

Page 213

1 BY MR. COX:
2 Q.     So we're down here on Page 8 of the PPA.
3 You discussed with Mr. Cohen about this assignment
4 provision.  Do you recall that testimony?
5 A.    Yes.  Page 8.  Yes, I recall that.
6 Q.     And we're going to just briefly go
7 through -- through this.  So that first sentence
8 says:  This agreement may not be assigned by
9 seller, as in CBV, with the prior written concept
10 of purchaser, ChanBond; is that correct?
11 A.    Yes.
12 Q.     So that first sentence only applies to
13 if CBV is going to assign anything in this
14 agreement; is that right?
15 A.    Yes, that's right --
16 Q.     And --
17 A.    -- agreement.
18 Q.     And in the second sentence it says,
19 purchaser, as in ChanBond?
20 A.    Yes.
21 Q.     May assign its rights and obligations
22 here under, upon the provision of written notice
23 to seller, which would be CBV; is that right?
24 A.    That's correct.

Page 214

1 Q.      And I think we all understand that
2 ChanBond sold its membership interest to Unified;
3 is that correct?
4 A.      That's correct.
5 Q.      Have you seen anything, any
6 communication or -- or contract where ChanBond
7 assigned its rights or its obligations under the
8 PPA to a different entity?
9 A.      You mean CBV?
10 Q.      No.
11       So the second provision applies to
12 ChanBond.  It says ChanBond -- replacing
13 purchaser -- ChanBond may assign its rights and
14 obligations if it had written --
15 A.      No.  I have not seen -- I have not seen
16 anything in writing, no.
17 Q.      Right.
18       So the -- although the ownership has
19 changed, ChanBond is still the one that has the
20 rights and obligations under the PPA; is that
21 right?
22 A.      Yes, that's correct.  It's my
23 understanding.
24 Q.      So then -- thank you.

Page 215

1       MR. COX:  Let me just quickly my
2 notes.  That might be everything that I have.
3 Just give me one second.
4       All right.  I will pass the
5 witness.  Thank you.
6            - - -
7       Examination
8            - - -
9 BY MR. COHEN:
10 Q.      Earl, I apologize for keeping you
11 slightly longer.  I really only have, like I said,
12 two questions, but two topic areas for question.
13       So you mentioned both attorneys said
14 that whatever was happening on the ASA wasn't
15 going to come out of your pocket.
16       When you -- do you recall testifying to
17 that?
18 A.      I think you -- didn't come up this way,
19 but it says come out of our pocket.
20 Q.      It was not going to come out of your
21 pocket, correct?
22 A.      Right, it was not going to come out of
23 my packet.
24 Q.      Which attorneys were those, do you

Page 216

1 remember their names?
2 A.      Both Bob Whitman and Mark Raskin.  And
3 they did it more than once.
4 Q.      Okay.
5       And do you recall when they told you
6 that?
7 A.      The most adamant discussion was when we
8 were up -- not up, we went to Delaware to practice
9 for the trial.  We were there three days.  And
10 that question came up a couple times, but it come
11 up very emphatic after Billy Carter said this is
12 our problem, not -- not his problem with the
13 Deirdre thing.  And it was such a problem that we
14 threatened to walk out of the meeting and just
15 leave.
16 Q.      But anyway, Raskin and Whitman assured
17 you that if the ASA was valid and enforceable and
18 Deirdre was going to get paid, it would come out
19 of ChanBond's money, not yours, right?
20 A.      That is correct.
21 Q.      And did either of them ever tell you
22 that they thought that if you didn't approve it,
23 then it wasn't enforceable at all?
24 A.      I don't recall if Mark ever said that.

Page 217

1 Bob Whitman did.
2 Q.      Right.  Okay.
3       And, you know, based on what we have
4 talked about and looking at that PPA, that
5 that's -- that's not the fee agreement, right,
6 ChanBond can do whatever it wants out of its share
7 of the money.  The only question is:  Does it come
8 out of gross or net, right?
9 A.      Yeah.  I mean, ChanBond could write an
10 agreement fee note, them and anybody else they
11 want to, as long as it's not coming out of my
12 pocket.
13 Q.      Right.  Okay.
14       And then just looking back at the PPA
15 for a second.
16       MR. COHEN:  Let me just re-share
17 it.  And, Nathan, thank you for catching that.  I
18 misread that assignment provision, this is the
19 problem with doing this stuff on the fly.
20 BY MR. COHEN:
21 Q.      There was nothing in the assignment
22 provision that gave CBV any right to say anything
23 about a transfer from Deirdre to Unified, right?
24 A.      We had no rights to make a transfer, but

Page 218

1  they were supposed to be notified in writing, but
2  they didn't do that.
3  Q.     Okay.
4      And just to be clear, that meant you
5  didn't have a right under your PPA to insist that
6  IPNav and ChanBond stay affiliates for all time,
7  did you?
8      MR. COX:  Objection to form.
9      THE WITNESS:  I don't believe we
10 had that right under the PPA.
11 BY MR. COHEN:
12 Q.     You knew that at any point after you
13 signed the PPA, Deirdre could sell off her
14 interests in ChanBond and then ChanBond and IPNav,
15 LLC wouldn't be affiliates anymore, right?
16 A.     Yeah.  She sold off her interest, I
17 would assume she would not be an affiliate.
18     MR. COHEN:  Okay.  I got nothing
19 else.
20     MR. COX:  All right.  Thank you,
21 Earl.  I appreciate your time.
22     VIDEOGRAPHER:  This now concludes
23 the deposition of Earl Hennenhoefer.  Going off
24 the record, 3:50 p.m.

C E R T I F I C A T I O N

        I, COLEEN TRIFUN, RPR and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the stenographic notes taken by me in the aforementioned matter.

                        - - -

DATE:October 1, 2021          _Coleen Trifun_____

                              COLEEN TRIFUN, RPR