# **<u>EXHIBIT 4</u>**

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

**In the Matter of Arbitration Between:**

Re:     01-20-0015-0793
        Deirdre Leane and IPNav, LLC
        -VS-
        Unified Online, Inc. and ChanBond, LLC

        -   Dallas, Texas

### FINAL AWARD OF ARBITRATION PANEL

WE, THE UNDERSIGNED ARBITRATORS, having been designated by and in accordance with the arbitration agreement entered into by the above-named parties and dated October 27, 2015 and having been duly sworn, and having heard the proofs and allegations of the parties, and having issued an Interim Award dated March 7, 2022, do hereby issue this FINAL AWARD, and find as follows:

1.      This dispute between the parties is governed by an arbitration agreement that has led to the instant arbitration, administered under the American Arbitration Association's Commercial Arbitration Rules and Mediation Procedures. The above-referenced matter came before this arbitration panel, consisting of Mr. John Shipp, the Honorable Carlos Lopez, and Chaired by the Honorable Joe Cox (the "Panel"), for a final hearing held on October 18-21, 2021. All parties were represented by counsel who zealously advocated for their clients while remaining courteous towards one another and the Panel. All parties were given ample time to open and close, put on evidence, call witnesses, cross-examine witnesses, make arguments, and engage in discussions with the Panel. At no point did any party request more time to put on their case or request a continuance.

2.      Over the course of four days, the parties called numerous witnesses in person, via Zoom and by deposition. In all, eight witnesses testified: Ms. Leane, Mr. Carter, Mr. Whitman, Mr. Raskin, Mr. Spangenberg, Ms. Woung, Mr. Cooper, and Mr. Hennenhoefer. Claimant, in her case-in-chief, called Ms. Leane, Ms. Woung and Mr. Cooper and then rested. Respondents, in their case-in-chief, called Mr. Hennenhoefer, Mr. Spangenberg, Mr. Whitman, Mr. Carter and Mr. Raskin and then rested. At the close of Respondents' case-in-chief, closing arguments were made by all parties and a post-hearing briefing schedule was ordered.

3.      Since the final hearing, the parties took the opportunity to provide post-hearing briefing and submitted their closing briefs, including the evidence each party considers relevant to the claims made in this matter. Further, the parties were allowed to respond to the opposing party's closing briefs and such responses have been filed.

4.      The Panel has reviewed and discussed the closing briefs and responses, as well as reviewed the transcript and the evidence cited by the parties in the closing briefing and responses. Further, the Panel requested clarification from the parties regarding what each party is seeking and the pleadings that support such request for relief. The Panel bases its decision in this matter upon the evidence presented at the final hearing, the briefs, and the clarifications, as well as applying the law to the evidence that has been presented.

## BACKGROUND FACTS

5.      Deirdre Leane and IPNav, LLC ("IPNAV") (collectively referred to as "Claimant") brought this arbitration action against Unified Online, Inc. and ChanBond, LLC (collectively referred to herein as "Respondent"). This dispute primarily centers around a Common Interest Agreement that Claimant signed on April 9, 2015, an Advisory Services Agreement ("ASA") that Claimant signed on July 28, 2015, and the Inter-Sale Agreement ("ISA") signed on October 27,

2015, between Claimant and Respondent. These agreements relate to a set of patents that CBV owned at one time and the litigation that ensued to enforce the patents. During the course of this Arbitration, and after the time for the parties to amend their pleadings, the underlying patent case settled for $125,000,000.00. The parties dispute how the proceeds of the settlement should be apportioned between the parties.

6.     The first witness Claimant called was Lillian Woung. Ms. Woung currently is the managing partner of a patent monetization company. She worked at IP Navigation Group ("IPNG") (Erich Spangenberg's company) from 2011 to 2013. She met Claimant at IPNG and collaborated on a number of projects for patent monetization work with Claimant. Ms. Woung thought Claimant was one of the best with respect to her knowledge of patents and how to monetize them. She also testified that the typical range of fees for the type of services rendered by IPNG was 20% to 25% of gross recovery. Ms. Woung had no personal knowledge of the facts relating to this Arbitration.

7.     Claimant called herself to the stand as the second witness. Claimant testified that CBV sold the patents at issue to ChanBond (See Ex. 2 Patent Purchase Agreement), an entity Claimant controlled. Exhibit B to the Patent Purchase Agreement is an NDA and Exhibit C to the Patent Purchase Agreement is the Common Interest Agreement. The ASA determines how Claimant would get paid upon settlement of any patent cases filed. Claimant acknowledged that the ASA was backdated to April 9, 2015, as she actually signed the ASA on July 28, 2015.

8.     Claimant and Billy Carter, Respondent's representative, dated from 2013 to Spring 2016. Both are friends with Eric Spangenberg, the original founder of IPNG. IPNG focused on patent monetization for non-practicing entities (NPE's as they are known). Spangenberg originally

offered the CBV deal to Mr. Carter but Mr. Carter could not come up with the money to do the deal.

9.      At some point, Claimant had discussions with Respondent Carter that she would take a job at Technicolor because they needed money. Further, with ChanBond moving into the "Attorneys' Eyes Only" stage of the case, Claimant's monetization work would decrease as she is not an attorney, until the case reached the settlement and negotiating stage, at which point Claimant would become more involved again. When Claimant began the Technicolor job, she believed there was no question that her fee under the ASA would still be paid if the litigation was successful. Claimant testified that she agreed to sell ChanBond to Unified Online because (a) she started thinking about working in a products company and (b) Billy Carter begged her to sell ChanBond to him.

10.     The parties entered into the ISA and Claimant sold ChanBond to Unified Online. The ASA is an attachment to the ISA. After the ISA was signed, Mr. Carter repeatedly continued to show Claimant's position in the "proceeds distribution waterfall" ("Waterfall"). Further, on September 13, 2017 Mr. Carter sent an email to Claimant and the patent lawyers (then at Mishcon de Reya) acknowledging and confirming that the only ASA in place was between ChanBond, LLC and IPNAV, LLC, which he referred to as "Deirdre's agreement." Claimant testified that she told the lawyers representing ChanBond in the patent litigation of her 22% contingency fee interest in the patent litigation.

11.     At some point in the underlying patent litigation, Claimant was deposed. The parties and counsel in the underlying matter vehemently disagree as to what exactly transpired during this deposition, culminating in Claimant signing an agreement purportedly terminating the ASA. Claimant testified that it was the lawyers for ChanBond (Mishcon) who presented Claimant

with the idea of having her terminate the ASA because the ASA had not been disclosed and/or produced in the patent litigation. Based upon this discussion and because the ASA had not been disclosed or produced, Claimant agreed to terminate the ASA, but only after an assurance from Mr. Carter that she still would get paid her 22% fee. After the deposition, Claimant followed up with a text message to Mr. Carter, seeking confirmation that she still would get paid, to which Mr. Carter replied, "Of course you do." Furthermore, Mr. Carter continued to send Claimant emails showing a Waterfall that included Claimant's percentage of recovery if the patent case settled.

12.     Respondents have a different view of this deposition and what occurred. According to Respondents, Claimant needed to have the ASA terminated in order to avoid a conflict with her job at Technicolor. Mr. Whitman testified that it was not a big deal that the ASA had not been produced and that it was Claimant's decision to voluntarily terminate the ASA.

13.     Claimant disputes Mr. Whitman's testimony. Claimant stated that Mr. Whitman told her that she would still get paid even if she canceled the ASA and that she was being a "team player." Claimant denies there was any conflict between her interest in the ASA and her job at Technicolor and she denies ever saying so to Mr. Whitman. Claimant further testified that she had a conversation with Erich Spangenberg and that Mr. Spangenberg told her that CBV had approved the 22% fee to Claimant. Mr. Spangenberg and Earl Hennenhoefer (the representative of CBV) deny any such conversation took place.

14.     Mr. Hennenhoefer testified that he and two others came up with the patents (the parties referred to these three inventors as the "Bears"). They formed CBV to sell the patents to Claimant. At the time that Claimant sold the patents to Respondent, Mr. Hennenhoefer testified that he knew that IPNAV was different from Mr. Spangenberg's company (IPNG) and he knew this as early as April 2015. Mr. Hennenhoefer even stated that he discussed with his own lawyer

(a) IPNAV's involvement and (b) how IPNAV was Claimant's company. Mr. Hennenhoefer also stated that his own lawyer said that the difference between IPNAV and IPNG was not a big deal. Mr. Hennenhoefer knew IPNAV would be the enforcer of the patents, knew that ChanBond hired IPNAV, and knew that Claimant did not control ChanBond. Finally, Bob Whitman and Mark Raskin both told Mr. Hennenhoefer that Claimant's 22% fee would come out of Respondent's portion and not CBV's portion.

15.     Mr. Spangenberg testified via Zoom. He emphatically stated that he never told Claimant that Mr. Hennenhoefer had approved a 22% fee for Claimant out of gross proceeds. Mr. Spangenberg further testified that when he looked at this deal he did not see sufficient financial room in the deal to allow for a payout of 22% of gross to any entity like his. He initially tried to offer the CBV deal to Mr. Carter but Mr. Carter could not come up with the money. Ultimately, Mr. Spangenberg offered the CBV deal to Claimant and Claimant closed the deal with CBV. Mr. Spangenberg also testified that he did not tell Claimant that Mr. Hennenhoefer had agreed to her 22% fee; Mr. Spangenberg specifically stated it was not discussed because there was no room in the deal for it.

16.     Mr. Whitman testified that the settlement of the patent case for $125,000,000 was rare. In the beginning of the patent case, he was hoping for a quick settlement and eager to get the case settled prior to trial. Mr. Whitman testified that the patents had a thin description and the IPR challenges were many. Further, he stated that (a) the inventors were challenging and had a hard time articulating their inventions, (b) the damages expert was not as strong as he could have been, and (c) the infringement expert had his own issues. Mr. Whitman stated that it was Claimant's idea to terminate the ASA and that he did not promise Claimant her 22% of gross revenue would still be paid to her or that he ever talked to Mr. Carter about this. Mr. Whitman tried to help with the

dispute between the Bears and Claimant but was unsuccessful. The parties in the underlying patent case signed a settlement agreement on May 25, 2021, and such settlement agreement had to address the potential scenario of Claimant suing all the settling parties. Mr. Whitman did not offer any evidence of any damage that Claimant did to the settlement of the patent case.

17.     Mr. Carter was the second to last witness called to testify. After briefly going through his background, Mr., Carter testified that once Claimant terminated the ASA he was relieved as it would be more money for him. He stated that his text on April 30, 2018 – "of course you still get paid" meant that Claimant would still receive her $5,000,000.00 from a promissory note issued by Respondent and her shares of stock in Unified Online (Mr. Carter claims that it is not plausible to read this text any other way). Mr. Carter admitted that he continued to send Claimant text messages and emails which still showed Claimant's 22% position in the Waterfall of settlement proceeds but claims that he only did this to accurately reflect that Leane maintained an ongoing claim to the 22% fee (even though he didn't think her claim was valid). Further, Mr. Carter stated that he never talked to Claimant about reinstating the ASA other than the text messages but says the plan all along was to split what they made.

18.     At some point, Mr. Carter had Unified Online and ChanBond execute an ASA for the patents at issue but he did not tell the Bears about it. As for the settlement of $125,000,000.00 (the "Settlement"), CBV has received $10,000,000.00 and ChanBond has received $9,000,000.00 Another $33,000,000.00 went to the underlying lawyers, $31,000,000.00 went to the funder (Omni), and $2,000,000.00 remains in escrow. At this time, approximately $38,000,000.00 remains in the qualified settlement fund. Mr. Carter concluded his testimony on the alleged damage that Respondent suffered in the underlying patent litigation because of Claimant's actions, but Mr. Carter did not provide any credible evidence of any damages.

19.     Despite many factual discrepancies and disagreements between the parties presented in this matter, resolution of this case comes down to the credibility of the witnesses and the facts presented. Respondents' version of what transpired, relating to the circumstances surrounding the termination (and restoration) of the ASA does not comport with the contents of the documents (including emails and text messages) in this matter. Mr. Carter purchased ChanBond knowing of the ASA and knowing that the ASA called for IPNAV's 22% fee in the ASA to be calculated on a gross revenue basis.

## THE CLAIMS PLED

20.     Claimant seeks rescission of Claimant's agreement to terminate the ASA ("Termination Agreement") based on no meetings of the minds, a failure of consideration, and fraud (in misrepresenting that Claimant would "still get paid" even if she executed the Termination Agreement), resulting in enforcement of the ASA in the form of the 22% fee ($27,500,000.00), or alternatively an award of damages for Respondents' breach of contract and fraud for Claimant's loss of the 22% fee ($27,500,000.00) in procuring the Termination Agreement. Under either alternative, Claimant seeks an award of $27,500,000.00 from Respondents in this matter.

21.     Respondents ask the Panel to find that Respondents ChanBond and Unified are the prevailing parties with respect to the following claims that Claimants abandoned: (a) breach of contract claim based upon the ISA [Claimants' Count 1], (b) the request for declaratory relief that consideration for the ISA has failed [Claimants' Count 2], (c) Claimants' request for specific performance and injunctive relief [Count 5], and (d) the foreclosure claim [Count 6]. Further, Respondents request that the Panel hold that the Termination Agreement is not rescinded for lack of consideration, and that Respondents are thus prevailing parties to Claimants' Count 2 as it relates to the Termination Agreement. Respondents also seek an award of money damages on their

counterclaims for tortious interference. Furthermore, should this Panel determine that the ASA was "reinstated," Respondents also seek an award of money damages on their breach of contract claim relating to the ASA. Finally, Respondents request that the Panel award nothing to Claimants on all of their claims.

22.      The Respondents argue in part that this Panel should hold that the ASA is not enforceable because the principals of CBV ("the Bears") would never agree to a 22% fee calculated out of gross proceeds of any patent monetization, and that without CBV's consent, Section 2.8 of the Patent Purchase Agreement operates to preclude Claimant's recovery. However, Section 8.5 of the Patent Purchase Agreement stipulates that it shall be governed by Delaware law and that the courts in Wilmington, Delaware shall have sole and exclusive jurisdiction in any dispute or controversy arising out of or relating to the Patent Purchase Agreement. This issue is currently being litigated in Delaware. Therefore, interpretation of the terms of the Patent Purchase Agreement is outside the jurisdiction of this arbitration matter. This Panel's determination is strictly limited to the enforceability of the ASA as between the parties to this arbitration only.

23.      As stated earlier, Mr. Carter purchased ChanBond knowing of the ASA and with knowledge of the 22% fee in the ASA to be calculated on a gross revenue basis. Further, because Claimant and Respondents all sought attorneys' fees, pursuant to Rule 47 of the AAA Commercial Arbitration Rules such fees shall be awarded to Claimant, as well as Claimant's costs and expenses.

### FINAL AWARD

24.      Despite many factual discrepancies and disagreements between the parties presented in this matter, this case hinges on one key issue: the enforceability of the ASA after consideration of the effect of any purported termination or restoration of the ASA.

25.     The gravamen of this matter is whether the termination of the ASA was effective to foreclose Claimant's claim to the 22% fee.

26.     Based on the evidence presented, the Panel finds that the ASA was in force and effect as of April 30, 2018. For the reasons stated previously, the Panel finds that the termination of the ASA was not effective, and Claimant is entitled to enforcement of the provisions of the ASA as regards her claim to the 22% fee from Respondents.

27.     This Panel reaches this conclusion on alternative grounds. Claimant testified that she only executed the termination agreement upon assurances from Mr. Carter that she would still "get paid." It is undisputed that Claimant informed Mr. Carter that she would sign a termination agreement, as long as she would still be paid, and that Mr. Carter confirmed to her that she would still get paid. However, Mr. Carter claims that he understood Claimant to be asking if she would still be paid on the $5,000,000.00 note, plus any dividends from the shares in Unified Online. Based on the testimony of the parties, and the text messages containing the conversation above, this Panel finds there was no meeting of the minds as to the terms, basis, and consideration for the termination. Because there was no meeting of the minds, the termination is void and has no force and effect.

28.     The Panel also finds the evidence supports that Mr. Carter confirmed that Claimant would still get paid pursuant to the original terms of the ASA, and that he indicated that he would work on a draft to reinstate the ASA. Mr. Carter ultimately failed and refused to make the payment referenced in the ASA.

29.     IT IS ORDERED THAT Claimant is entitled to damages in the amount of $27,500,000.00 from Respondents constituting the 22% fee due and owing from the Settlement called for by the ASA between these parties.

30.     IT IS FURTHER ORDERED THAT pursuant to Rule 47 of the AAA and for the reasons set forth in Claimant's application for attorneys' fees, Claimant shall recover from Respondents her attorneys' fees in the amount of $1,642,383.25, costs and expenses in the amount of $118,638.65.

31.     IT IS FURTHER ORDERED THAT Claimant shall recover pre-judgment interest at 5% simple interest from June 24, 2021 to May 18, 2022 and post-judgment interest at 5% simple interest from May 19, 2022 until the judgment is paid in full.

32.     IT IS FURTHER ORDERED THAT Respondents' counterclaims and application for attorneys' fees should be and hereby are DENIED in all respects.

33.     The administrative fees and expenses of the AAA totaling $34,750.00 and the compensation and expenses of the Arbitrators totaling $181,183.69 shall be borne by Respondents. Therefore, upon demonstration by Claimant that such incurred fees and expenses have been paid, Respondent shall reimburse Claimant the additional sum of $117,091.85 representing that portion of said fees and expenses in excess of the apportioned cost previously incurred by Claimant.

34.     This is the Final Award. All claims and counterclaims not specifically awarded are hereby denied.

IT IS SO ORDERED.

5-18-2022
_____
Date

_____
Hon. Joseph M. Cox, Chair of the Panel

5-18-2022
_____
Date

_____
John Shipp

05-18-2022
_____
Date

_____
Hon. Carlos Lopez