# Exhibit A

Case 1:21-cv-01456-GBW   Document 247-1   Filed 02/19/24   Page 2 of 10 PageID #: 8043

Deirdre Leane, Individually and as Corp. Rep. of IPNAV, LLC        Pages 237

1  them permission to hand over the document.  So I was
2  barred from having that discussion with Bentham.  So,
3  sadly, I didn't get to ask them.  But I would like to
4  ask them, but I didn't get the opportunity.
5      Q.   So, in short, you were not part of any
6  discussion.  You did not hear any discussion between
7  Bentham and ChanBond about what the money was going to
8  be used for related to that third amendment to the
9  funding agreement, correct?
10     A.   Correct, because I would have blocked it had I
11 been.
12     Q.   And what evidence do you have that money given
13 to ChanBond, pursuant to the third amendment to the
14 funding agreement, was used for Mr. Carter's personal
15 expenses?
16     A.   Because, if I remember, the third amendment was
17 for working capital, if I recall correctly.
18     Q.   Uh-huh.
19     A.   And ChanBond doesn't have any business.
20 There's no business.  Everything else was paid for
21 through the previous amendments.  Everyone else was on
22 contingency.  There's no reason for ChanBond to be
23 drawing down any additional money for working capital.
24 It had no business.  The only business it has was -- had
25 and has is monetizing the patents through the ChanBond



```
 1  litigation, which had already been accounted for in the
 2  one -- in the original and second amendment of the LFA.
 3       Q.   So -- so your understanding is that ChanBond
 4  had no operating expenses?
 5       A.   That were not already accounted for.
 6       Q.   Do you have any other evidence that money for
 7  operating expenses at ChanBond was actually used for
 8  Billy Carter's personal expenses?
 9       A.   He stopped asking me for money, so I assumed he
10  found money elsewhere for his day-to-day living.  So I
11  guess I drew that assumption.
12       Q.   Any other evidence?
13       A.   He paid me back some money, so I had assumed he
14  took it from there.
15       Q.   How much did he pay you back?
16       A.   5,200 U.S. dollars.
17       Q.   Any other evidence?
18       A.   No, but there's something in that third
19  amendment that might rack my memory.
20       Q.   You've been paid the principal under the note
21  that's in the -- referenced in the ISA, correct?
22       A.   Yes.
23       Q.   You've been paid the full amount of the
24  principal pursuant to that note, correct?
25       A.   Do you mean the 5 million?
```



Case 1:21-cv-01456-GBW   Document 247-1   Filed 02/19/24   Page 4 of 10 PageID #: 8045

Deirdre Leane, Individually and as Corp. Rep. of IPNAV, LLC                Pages 250

```
 1      Q.    Under your interpretation of Section 8.3, you
 2 could have vetoed a $200 million settlement, correct?
 3      A.    I could have.
 4      Q.    You wouldn't have, right?
 5      A.    Unlikely.
 6      Q.    So under your interpretation of Section 8.3,
 7 your right -- really, you believe it was unlimited in
 8 how broad that right was to object to any settlement or
 9 license of the ChanBond patents?
10            MR. COHEN:  And I will object to the
11 extent it calls for a legal conclusion.
12            But you can answer as to your
13 understanding.
14      A.    My understanding is there's no limit as long as
15 it -- the scope is within handing out a percentage in
16 the patents.  That's the limitation.  It's all centered
17 around the patents.
18      Q.    (BY MR. BREEDLOVE)  If it has to do with
19 transferring any interest in the ChanBond patents, then
20 you would have full right to object and veto settlement
21 or license, correct?
22      A.    I think it refers to material assets and when
23 the patents are -- it's only material assets.  When I
24 say "patents," I'm actually talking about material
25 assets.  So I use that interchangeably, so sorry if I'm
```

Case 1:21-cv-01456-GBW   Document 247-1   Filed 02/19/24   Page 5 of 10 PageID #: 8046

Deirdre Leane, Individually and as Corp. Rep. of IPNAV, LLC                Pages 251

1  confusing you.

2     Q.   No, that's not confusing at all.

3     A.   Okay.

4     Q.   And so my question is simply -- I think I
5  understand your position, and I just wanted to make sure
6  I did.

7     A.   Uh-huh.

8     Q.   Your interpretation of 8.3, that if there is a
9  settlement or a license that involves transferring any
10 interest in the ChanBond patents, even a nonexclusive
11 license, that you have unlimited ability to veto that,
12 correct?  You had or have?

13    A.   Have.  And, yes, it's a sale, transfer --

14    Q.   No.  I just want your -- you don't have to read
15 it to me.  I just want to know if I've got that right
16 about what your interpretation is.

17    A.   If it involves sale, transfer, or spinoff, yes.

18    Q.   Okay.  Is it -- is it true that you didn't
19 trust Mr. Carter's judgment when it came to running
20 ChanBond and being in charge of settling or licensing
21 the ChanBond patents?

22    A.   I would say that's a fair statement, which is
23 why the IPNav advisory services agreement went with the
24 sale.

25    Q.   Are you talking about "went with the ISA"?



# Exhibit B

```
 1   route, has she gotten payment as a result of the
 2   monetization of these patents?
 3        A.  As I promised she'd get paid, and she
 4   did.
 5        Q.  And she will also receive payment
 6   when there's a dividend paid to UnifiedOnline on
 7   her shares; right?
 8        A.  Correct.
 9        Q.  I want to talk to you a little bit
10   about ChanBond's business.
11            So does ChanBond do anything other
12   than monetize these patents?
13        A.  No.
14        Q.  And so its only asset is the patents;
15   right?
16        A.  Correct.
17        Q.  And what is the mechanism by which
18   you obtain value from those patents?
19        A.  The license and the selling them or
20   going to trial and winning a verdict.
21        Q.  And the settlement in this case is
22   essentially a license; right?
23        A.  Yes.
24        Q.  And we've heard testimony, do you
25   agree, that the lawsuits really covered the
```

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CBV, INC., <br><br>       *Plaintiff* <br><br> v. <br><br> CHANBOND, LLC, DEIRDRE LEANE, and IPNAV, LLC, <br><br>       *Defendants.* | C.A. No. 1:21-cv-01456-MN |

### DECLARATION OF EARL HENNENHOEFER

COMMONWEALTH OF PENNSYLVANIA    )
                                          ) ss:
COUNTY OF CUMBERLAND              )

    1.    I, Earl Hennenhoefer, am a principal of CBV, Inc. ("CBV"), the named plaintiff in the captioned lawsuit. I submit this declaration in support of Plaintiff's Reply Brief in Support of its Motion for Summary Judgment. I have personal knowledge of the facts submitted herein, and will testify competently to them if called to do so.

    2.    CBV first learned of the payment made by ChanBond, LLC to Leane Defendants in connection with this action on or about November 30, 2022. This was after the time at which this payment was made.

    3.    CBV was never asked to approve the payment made by ChanBond, LLC to Leane Defendants in connection with this action.

    4.    CBV never approved the payment made by ChanBond, LLC to Leane Defendants in connection with this action.

    5.    I state under penalty of perjury pursuant to the laws of the United States of America and the state of Delaware that the foregoing statements are true and correct.

Dated: February 19, 2024

_____
Earl Hennenhoefer